## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

———————————————————————
)
SECURITIES AND EXCHANGE COMMISSION, )
)
     Plaintiff,                )         Civil Action No.:  4:14-CV-2345
)
     v.                    )
)
ANDREW I. FARMER,          )         JURY TRIAL DEMANDED
CHARLES E. GROB, JR.,      )
CAROLYN AUSTIN,         )
BALDEMAR P. RIOS, and      )
CHIMERA ENERGY CORP.     )
)
     Respondents.         )
———————————————————————)

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "SEC") alleges:

## NATURE OF THE ACTION

1.     From approximately August 2011 through at least November 2012, Defendant Andrew I. Farmer orchestrated a fraudulent "pump-and-dump" scheme to profit from the sales of stock of Defendant Chimera Energy Corp. ("Chimera"), a shell company controlled by Farmer and created at his direction specifically for the purpose of implementing his scheme. The scheme involved sales of millions of shares of Chimera stock to the public at the same time the Defendants were inflating Chimera's stock price by aggressively touting its entirely fictitious business. Through this scheme, Farmer obtained illicit profits of more than $4.5 million.

2.     To implement his scheme, Farmer installed Defendant Charles E. Grob, Jr. as Chimera's putative Chief Executive Officer ("CEO"). Farmer then directed an initial public offering of Chimera stock (the "IPO") that resulted in Farmer obtaining control, at nominal cost,

of all five million shares of Chimera stock issued in the IPO.  Farmer's name and the nature of his control over Chimera was not disclosed in any of Chimera's filings with the SEC.

3.      After the IPO, Chimera initiated at Farmer's direction an aggressive promotional campaign during which it issued over thirty press releases in less than three months touting its licensing and commercial development of a "revolutionary" technology that supposedly enables production of shale oil and gas without the perceived environmental impact of hydraulic fracturing.  Each of these press releases was false and misleading because Chimera had not actually licensed and did not possess the technology it touted, and because Chimera had not achieved the claimed results in commercially developing this technology.  Contemporaneously with Chimera's press release barrage, Farmer funded an internet advertising campaign designed to increase investor awareness of Chimera.

4.      Grob and Defendant Baldemar P. Rios, who succeeded Grob as Chimera's CEO, helped implement Farmer's scheme by, among other things, participating in the drafting of Chimera's misleading press releases and a variety of false filings with the SEC, ostensibly approving and participating in the dissemination of such press releases and filings, and operating Chimera at the minimum level necessary to lend the company a veneer of legitimacy, all the while concealing Farmer's level of involvement in the company.

5.      As the price and trading volume of Chimera's stock was being artificially "pumped" by false press releases and the internet advertising campaign Farmer funded, entities and individuals controlled by Farmer sold at least 6.1 million shares of Chimera stock to the public in unregistered transactions, generating proceeds to Farmer of at least $4.58 million. Defendant Carolyn Austin helped Farmer reap these ill-gotten gains by selling Chimera stock to the public, also in unregistered transactions, for her and Farmer's benefit.

## DEFENDANTS

6.    **Andrew I. Farmer**, age 36, resides in Houston, Texas.  Farmer executed aspects of his fraudulent scheme through the following entities that he wholly owned and controlled at all relevant times:  Chartered Investments, Inc. ("Chartered"), an entity incorporated in Nevada with its principal place of business in Houston, Texas; Iridium Capital Ltd. ("Iridium"), an entity incorporated in Louisiana with its principal place of business in Houston, Texas; and Infinite Funding, Inc. ("Infinite"), an entity incorporated in Wyoming with its principal place of business in Houston, Texas.

7.    **Charles E. Grob, Jr.**, age 34, resides in Houston, Texas.  From approximately August 2011 to approximately October 9, 2012, Grob was Chimera's CEO, sole director, and majority shareholder.

8.    **Baldemar P. Rios**, age 53, resides in Mexico City, Mexico, and is a citizen of the United States.  Rios has been CEO of Chimera from approximately October 9, 2012 through the present.    From approximately August 2012 to approximately October 2012, Rios was a consultant to Chimera.

9.    **Carolyn Austin,**[1] age 59, resides in Houston, Texas and Lake Charles, Louisiana. Austin helped Farmer reap his ill-gotten gains by selling Chimera stock to the public for her and Farmer's benefit.    Austin engaged in these sales through TransAmerica Trading Inc. ("TransAmerica"), an entity incorporated in Nevada with its principal place of business in Houston, Texas.  At all relevant times, Austin owned and controlled TransAmerica.

---

[1] Defendants Farmer, Grob, and Austin asserted their Fifth Amendment privilege against self-incrimination in response to all substantive questions concerning their roles in connection with Chimera during the SEC's investigation giving rise to this enforcement action.  Farmer also asserted the Fifth Amendment act-of-production privilege in response to the SEC's subpoena to Farmer requesting documents relating to Chimera.

10.    **Chimera Energy Corp.** is incorporated in Nevada.   At all relevant times, Chimera's principal place of business was in Houston, Texas.   Chimera's stock (ticker symbol "CHMR") was quoted on the OTC Bulletin Board and on OTC Link (formerly, "Pink Sheets"), operated by OTC Markets Group, Inc.   From its inception to the present, Chimera has not had any significant operations or assets, and currently Chimera is not operating.   Chimera became subject to reporting requirements pursuant to Section 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act") when its registration statement on Form S-1 was declared effective on December 21, 2011.

## OTHER RELEVANT PERSONS

11.    At all relevant times, Individual A served as a public relations consultant to Farmer and to Chimera.   In this capacity, Individual A drafted certain of Chimera's press releases, and helped Chimera to disseminate them to the public.   In addition, Individual A coordinated Chimera's advertising campaign that Farmer funded.   Between August 2011 and October 2012, Individual A and entities controlled by him were paid by entities controlled by Farmer over $1.1 million in consulting fees, expense reimbursements, and other unspecified payments.   Individual A received no payments from Chimera.

12.    At all relevant times, Individual B acted as an intermediary between Grob and Rios on one hand, and Farmer and Individual A on the other.   In addition, Individual B assisted Chimera with its efforts to disguise itself as a legitimate business.   Between August 2011 and October 2012, entities controlled by Individual B were paid by entities controlled by Farmer over $230,000 in consulting fees, expense reimbursements, and other unspecified payments.[2]

---

[2] In the course of the investigation that gave rise to this enforcement action, Individual A indicated that if asked to testify concerning his involvement with Chimera, among other issues, he would assert his Fifth Amendment privilege against self-incrimination.  Individual A further asserted the Fifth Amendment privilege in response to the SEC's subpoena for documents served on him in the course of this investigation.  Individual B asserted his Fifth

## JURISDICTION AND VENUE

13.     The SEC brings this action pursuant to authority conferred upon it by Section 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78(u)(e)].

14.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

15.     Venue is proper in this District because at all relevant times, Chimera maintained an office in this District, all individual Defendants except Rios reside in this District, and the acts, transactions, and courses of business constituting violations of law alleged in this Complaint occurred within this District.

16.     In connection with the conduct described in this Complaint, Defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

## FACTUAL ALLEGATIONS

### I.     Farmer Directs Grob to Create Chimera

17.      On or about August 5, 2011, Grob, acting under Farmer's direction and control, incorporated Chimera.  Farmer paid the fees incurred in incorporating Chimera, and he also paid for Chimera's website registration.  Chimera did not reimburse Farmer for these expenses, and Farmer did not seek such reimbursement.

---

Amendment privilege against self-incrimination in response to all substantive questions concerning his involvement with Chimera and his dealings with Farmer put to him by the SEC.

18.     From at least August 2011 through March 2012, Farmer's company Iridium paid Grob a monthly salary.  The monthly payments from Iridium were Grob's sole source of income during this time period.  While serving as Chimera's CEO, Grob regarded Farmer as his boss.

19.     Grob became Chimera's CEO when the company was incorporated.  At that time, Grob had no prior experience in the oil and gas industry or in executive management of public or private companies.

20.     As part of his scheme, Farmer introduced Grob to an auditor and a securities attorney, each of whom Chimera retained to perform auditing and legal services as directed by Farmer.  Although Grob (and later Rios) were nominally Chimera's sole officer and employee, and Chimera never openly retained Farmer's services, throughout Chimera's existence, Farmer communicated with Chimera's securities counsel concerning matters related to Chimera.

21.     On or about August 21, 2011, Chimera obtained a capital infusion of $100,000 from Kylemore Corp. ("Kylemore"), an entity incorporated in the Republic of the Marshall Islands.  This transfer was falsely cloaked as a loan by a promissory note that was purportedly payable in its entirety on August 21, 2013, with interest accrued at annual rate of 15 percent.  The so-called loan was secured by all of Chimera's assets, which, as of August 21, 2011, were minimal.  Chimera never repaid this loan, and Kylemore neither took action to collect the amount due on the loan nor exercised its purported rights to the collateral.

22.     Farmer had a significant relationship with Kylemore.  During 2011 and 2012, more than $4 million was transferred between Kylemore's bank account in Switzerland and the U.S. bank accounts of entities controlled by Farmer.  At all relevant times, Farmer's wife used an email address ending in @kylemorecorp.com.  Moreover, as described further below, in May 2012 Farmer purchased on behalf of Kylemore 700,000 shares of Chimera stock.  At the time of

this purchase, Farmer described Kylemore as a "client" of Iridium.  In fact, however, Kylemore was simply another entity closely affiliated with Farmer that was used as part of his scheme. Farmer's significant financial and business relationship with Kylemore was not disclosed to the public, Chimera's auditor, or other gatekeepers.  Instead, Grob helped to conceal this relationship by misrepresenting to Chimera's auditor that Kylemore was not a related party of Chimera.

## II.    Chimera Registers and Executes a Sham Initial Public Offering

23.    On or about October 19, 2011, Chimera filed a registration statement on Form S-1 (the "Registration Statement") in which Chimera disclosed that it intended to offer for sale five million shares on a self-underwritten basis at the price of $0.015 per share.  No public trading market for Chimera stock existed at the time of the filing of the Registration Statement.  Grob signed and approved the Registration Statement, but Farmer directed its preparation, or helped prepare or review it.  The Registration Statement became effective on December 21, 2011.

### A.    At the Time of the IPO, Chimera's Business Operations Were Nominal

24.    In the Registration Statement, Chimera described its business as supplying equipment and components used in the exploration and production of oil and gas.  As of the filing of the Registration Statement, the only products Chimera had supplied were polycrystalline diamond compact ("PDC") cutters, which are components of drill bits used for exploration and production of oil and gas.  Chimera stated that it would use the proceeds from the IPO to provide working capital for its PDC business, and that it had no plans to change its business activities.

25.    According to the Registration Statement, Chimera intended to develop product lines in addition to PDC cutters to become a "diversified equipment company."  Chimera never developed any additional product lines, and Chimera's PDC business operations were minimal, selling a total of $25,000 in cutters to four customers for a profit of just over $4,000 and leaving

nearly $16,000 in unsold PDC inventory.  Chimera abandoned any pretense of PDC business by July 2012.

26.     In its Form 10-Q filed on January 13, 2012 for the quarter ended November 30, 2011, Chimera reported that from its inception through November 30, 2011 (shortly before the Registration Statement became effective), it had generated $18,200 in revenues resulting in a net loss of $20,085.  Chimera also reported total assets of $96,521 – the majority of which was cash provided by Kylemore – and liabilities of $106,606.  In its Form 10-Q/A filed on March 28, 2012 for the period ended November 31, 2011, Chimera acknowledged that it was "shell company" as that term is defined in Rule 12b-2 of the Exchange Act.  Rule 12b-2 defines "shell company" as a company with "[n]o or nominal operations" and either "[n]o or nominal assets; [a]ssets consisting solely of cash and cash equivalents; or [a]ssets consisting of any amount of cash and cash equivalents and nominal other assets."  Throughout its existence, Chimera had no employees other than Grob, and later, Rios.

27.     As alleged in further detail below, Farmer and Grob used Chimera's nominal PDC business operations to make Chimera appear as a legitimate company in the eyes of certain gatekeepers and the Financial Industry Regulatory Authority ("FINRA"), thus enabling Chimera to obtain regulatory clearance for its stock to be quoted on a public market.

**B.     Farmer Rigs Chimera's IPO Stock Sales To
       Take Control of all Shares Issued in the IPO**

28.     Chimera represented in the Registration Statement that the offering would be conducted on a self-underwritten basis, meaning that Grob, "will use his best efforts to sell the common stock and there is no commitment by any person to purchase any shares."  According to the Registration Statement, the IPO shares would be offered "directly through Charles Grob," Chimera would not offer "its shares for sale through underwriters, dealers, [or] agents," and

Chimera's "control persons and affiliates do not intend to purchase any shares in this offering." As detailed below, all of these statements were false and misleading because the offering that actually occurred was drastically different from the one described in the Registration Statement.

29.     The Registration Statement was declared effective on December 21, 2011.  At that time, Farmer, with the aid of Grob and others, orchestrated Chimera's IPO stock sales in a manner that enabled him to assume control of millions of shares of purportedly unrestricted Chimera stock while creating the appearance that bona fide investors – and not Farmer – purchased shares in the IPO.  This scheme consisted of soliciting individuals (all of whom became Farmer's nominees) to make straw purchases of Chimera stock in the IPO with the understanding that they would remit the stock to Farmer at a later time as directed by Farmer.  In all, 29 individuals bought all five million shares issued in the IPO.  Each individual signed a subscription agreement and paid by check or money order, ostensibly evidencing a bona fide purchase, but these transactions were not legitimate.

30.     In addition to disguising Farmer's ultimate ownership of the stock issued in the IPO, the sales to Farmer's nominees also had the effect of misleading gatekeepers into believing that there was sufficient investor interest in Chimera's business to clear its stock for quotation on the over-the-counter ("OTC") market.

31.     Farmer used various means to rig the IPO.  First, he recruited friends and relatives to act as straw purchasers in the IPO.  Farmer's parents, wife,[3] tax accountant, and other associates all were IPO "investors."  Second, acting through Chartered and Iridium, Farmer provided funds to at least ten others for purchasing stock in the IPO.  Third, Farmer acted as Chimera's agent in soliciting IPO "investments" from several other persons.  In this regard,

---

[3] In the course of the investigation that gave rise to this enforcement action, Farmer's wife invoked her Fifth Amendment privilege against self-incrimination.

COMPLAINT

Farmer provided Chimera's offering documents and subscription agreements to Defendant Austin's husband, and authorized him to make changes to Chimera's form subscription agreement.  When the Austin's' daughter, two sons, and daughter-in-law each invested in Chimera's IPO, Farmer accepted delivery of the signed subscription agreements from these purchasers.  Finally, as discussed further below, a few months after the IPO transactions, Farmer directed the timing and manner in which all IPO "investors" (except Farmer's wife, whose Chimera stock Farmer otherwise controlled) remitted their stock to entities controlled by Farmer.

32.    At Farmer's direction, Grob used similar means as Farmer to find straw purchasers of Chimera stock.  Grob's wife (then fiancée) and at least seven of his friends invested in the IPO.  Again, however, these transactions merely had the appearance of being investments.  Grob provided funds, either directly or through sham loan arrangements, to at least five individuals for purchasing stock in the IPO.  Certain of the individuals whom Grob solicited did not even take possession of the stock certificates of the stock they ostensibly owned.  Instead, Grob retained control of the stock certificates putatively issued to these persons.

33.    Because Farmer and Grob made it appear that Chimera's stock had been issued in a bona fide initial public offering, and because Farmer concealed his role in the IPO from Chimera's transfer agent,[4] the transfer agent concluded that the stock was not subject to any trading restrictions.  Accordingly, the transfer agent issued stock certificates to IPO investors that bore no restrictive legend, thereby enabling Farmer to sell the stock to the public on the market (after Farmer collected the stock from the IPO investors) while avoiding applicable registration requirements and trading restrictions.

---

[4] Transfer agents record changes of stock ownership, maintain the issuer's security holder records, cancel and issue stock certificates, and distribute dividends.

34.     The part of the scheme detailed above subverted the SEC registration process because the transactions that were registered by the Registration Statement – sales of stock to bona fide and unaffiliated purchasers on a self-underwritten basis – were not the transactions that actually occurred.  The transactions that did occur were sales of stock to Farmer through his nominees, whereby the sole purpose of the sales to the nominees was to disguise the distribution of stock to Farmer.  As such, the Registration Statement did not register the transactions that actually occurred.  No other registration statement was in effect for these transactions.

## III.    Chimera's Stock Is Cleared for Quotation on a Public Market

35.     By sustaining a nominal level of operations, filing audited financial statements and periodic reports, and demonstrating a purported interest in Chimera by finding 29 individuals to participate in the IPO, Farmer, with Grob's assistance, erected a facade that lent to Chimera the appearance of a legitimate startup company.  The next step in Farmer's scheme involved obtaining regulatory clearance to have Chimera's stock quoted on the OTC, which would make its stock available to the public.

36.     To have its stock quoted on an OTC quotation medium, an issuer must find a market-maker to "sponsor" an application with FINRA to quote the issuer's stock.  If FINRA determines that applicable requirements have been met, it clears the market-maker to quote the stock on the OTC.  The market-maker submits such an application to FINRA on a Form 211, which calls for disclosure of certain detailed information about the issuer whose securities the market-maker is seeking to quote.  A market-maker relies on information provided and representations made by the issuer in preparing and submitting the Form 211.  FINRA's clearance does not imply that FINRA has passed on the accuracy or adequacy of the documents

contained in the Form 211 submission, or that FINRA considered any regulatory requirements other than those pertaining specifically to quotations on the OTC.

37.     On or about December 22, 2011 – the day after Chimera's Registration Statement became effective – Farmer solicited a registered representative ("Broker A") at a broker-dealer firm ("B-D Firm A") to sponsor Chimera's Form 211 application.  Although Farmer exerted substantial control over Chimera, he falsely represented to Broker A that neither he nor Austin were "involved" with Chimera "in any way."  Following this assurance, B-D Firm A agreed to sponsor Chimera's FINRA application.

38.     After Farmer successfully induced B-D Firm A to sponsor Chimera's application, he injected himself into the application process at every turn.  Farmer was B-D Firm A's primary point of contact on issues that arose in connection with the application.  Farmer fielded requests from B-D Firm A for various documents necessary to file the application, provided to B-D Firm A the requested documents, coordinated with Grob in responding to certain other requests for information, and addressed questions raised by B-D Firm A's compliance department and by FINRA.

39.     On or about April 10, 2012, FINRA cleared B-D Firm A's application, thus enabling Chimera's stock to be quoted on the OTC.

**IV.     Farmer Consolidates His Control over Millions of Shares of Chimera Stock**

40.     Following FINRA's clearance of Chimera's stock for quotation, Farmer effectuated a series of transactions through which he consolidated his ownership of all five million shares of Chimera stock issued in the IPO.  Farmer structured these consolidating transactions by having each IPO "investor" (except Farmer's wife) sell their shares in private transactions to one of seven entities that Farmer controlled.  All IPO "investors" (with two

exceptions) sold their shares to entities controlled by Farmer in the span of just three days in May 2012, and Farmer paid each IPO investor the same price of $0.0225 per share.

41.     Of the seven entities that participated in these consolidating transactions, three were domestic companies and four were incorporated offshore.  Chartered, TransAmerica, and Oak Resources, Inc. ("Oak Resources"), an entity incorporated in Wyoming with its principal place of business in Houston, Texas, were the domestic entities that purchased Chimera stock from IPO investors.  At all relevant times, Farmer owned and controlled Chartered, and Austin owned and controlled TransAmerica.  Oak Resources was nominally owned by Individual C, Farmer's associate, who was an investor in the IPO.  Farmer and Individual C controlled Oak Resources.

42.     At Farmer's direction, in May 2012 these three entities acquired a combined two million shares of Chimera stock from twelve IPO investors, with Chartered acquiring 600,000 shares and TransAmerica and Oak Resources each acquiring 700,000 shares.  Farmer provided funds to Oak Resources and to TransAmerica for these entities' acquisitions of Chimera stock from IPO investors.[5]

43.     Clarent Services Corp., Hillsmere S.A., Levantera S.A., and Kylemore (Chimera's purported lender), all of which are registered in the Republic of the Marshall Islands (collectively, the "Marshall Islands Entities"), acquired in May 2012 a combined 2.8 million shares of Chimera stock (700,000 shares each) from sixteen IPO investors.  Farmer, through Chartered, purchased all 2.8 million shares on behalf of the Marshall Islands Entities.  By representing to Chimera's transfer agent that the Marshall Island Entities were "clients" of

---

[5] Individual C asserted her Fifth Amendment privilege against self-incrimination in response to all substantive questions concerning her transactions in Chimera stock and her dealings with Farmer that were put to her by the SEC staff during the SEC's investigation giving rise to this enforcement action.

Iridium, Farmer convinced the transfer agent to issue, and provide to Farmer, stock certificates in the name of each Marshall Island Entity.

44.     Chimera did not disclose at any time that its purported lender Kylemore had acquired 700,000 shares of its stock, or that Kylemore was a client of Chimera's control person (Farmer).

45.     To maximize Farmer's profit potential from the sale of Chimera stock to the public, on or about July 6, 2012, Chimera effected a 4:1 forward stock split.  The stock split, which had no legitimate business purpose, gave Farmer control of 20 million shares of Chimera stock – a 15 million increase from the number of shares Farmer had controlled before the stock split – at no additional cost.  After the stock split, orchestrated by Farmer to his own benefit, Farmer's cost to acquire 20 million shares was less than a penny ($0.005625) per share.

**V.      Chimera Initiates an Aggressive Promotional Campaign, Fueled by False Public Statements and by Farmer's Internet Advertising**

46.     By July 2012, Farmer had:  (i) orchestrated a sham IPO; (ii) used the sham IPO and the veneer of Chimera's nominal but seemingly legitimate business operations to obtain regulatory clearance for Chimera's stock to be quoted on the OTC; and (iii) consolidated his control over 20 million shares of Chimera stock.  These actions positioned Farmer to implement the next step in his fraudulent scheme – to "pump" the price and trading volume of Chimera stock using false press releases and online advertising, so that he could "dump" his Chimera stock on unsuspecting investors.

**A.      In Preparation for the "Pump," Chimera Claims to Abruptly Morph from Struggling PDC Cutter Supplier to Developer of "Revolutionary" Shale Fracturing Technology**

47.     Since its formation, Chimera ostensibly had been pursuing the business plan it disclosed in the Registration Statement to supply PDC cutters to oil and gas drillers.  As of July

2012, this business showed no signs of profitability or growth.  From its inception through May 31, 2012 (the last month for which Chimera reported its financial condition, which was reported on Form 10-Q filed on July 16, 2012), Chimera had total revenues of $25,000.  Approximately 68 percent of these revenues were generated and recognized in August 2011, however, and Chimera's revenues for the quarterly period ended May 31, 2012 were $2,880.  In the same quarterly period, Chimera reported a net loss of $67,333.

48.     After filing a Form 10-Q on July 16, 2012, Chimera made no other periodic filings with the Commission, even though Chimera was required to file a Form 10-K for its fiscal year ended August 31, 2012.  Since the filing of the July 16 Form 10-Q, Chimera's auditor did not review or audit the company's financial statements.

49.     After filing its last periodic report in July 2012 – a mere ten days after Farmer took control of 20 million shares of Chimera stock – Chimera announced a dramatic change in its business plan.  On July 27, 2012 Chimera filed with the SEC a Form 8-K in which it touted that it had entered into a "License Agreement" with China Inland Oil Exploration Company of Chencunzhen, China ("China Inland").  Chimera attached a copy of the purported License Agreement as an exhibit to the July 27 Form 8-K.  In the attached License Agreement, Chimera claimed that China Inland had granted Chimera an "exclusive license to develop and commercialize [China Inland's] cutting edge technologies related to Non-Hydraulic Extraction" for a monthly fee of $5,000 and a royalty payment of 20% of the net proceeds generated from the "Non-Hydraulic Extraction" technologies.  Grob signed and approved the filing of the Form 8-K.

50.     The License Agreement describes the Non-Hydraulic Extraction ("NHE") technology that China Inland purportedly licensed to Chimera as an "environmentally friendly oil & gas extraction procedure for shale to replace hydraulic fracturing."  Other than this cursory

description, the License Agreement provides no details about the technology that China Inland purportedly licensed.

51.     As Farmer and Grob then knew, Chimera's purported acquisition of a license to develop NHE technology, and the License Agreement itself, are entirely fictitious as demonstrated by the following:

a.     On information and belief, no legitimate entity known as China Inland exists.  In the course of the SEC's investigation giving rise to this enforcement action, neither Chimera nor any other Defendant (or any nonparty) produced any documents or communications that evidenced the existence of China Inland or any negotiations relating to the License Agreement.  The SEC staff issued subpoenas to all Defendants and several nonparties demanding production of such documents.

b.     The License Agreement, which is just five pages long (including both English and Chinese text for each clause), contains no description of the licensed NHE technology other than the conclusory statement that it is an "environmentally friendly oil & gas extraction procedure for shale to replace hydraulic fracturing."  The License Agreement does not include any drawings, reference any patents, or contain any other information demonstrating the conveyance of any intellectual property, product, or technology.

c.     In the course of the SEC's investigation giving rise to this enforcement action, neither Chimera nor any other Defendant (or any other nonparty) produced any drawings, models, or other technical documents demonstrating Chimera's possession of NHE technology other than marketing materials describing the

technology solely in conclusory fashion.  The SEC staff issued subpoenas to all Defendants and several nonparties demanding production of such documents.

d.      Chimera took no action to protect or establish commercial exclusivity over the supposedly "breakthrough" NHE technology, such as by filing an application for a patent or other intellectual property protection, despite retaining a law firm specializing in intellectual property law for this purpose and publicizing the retention of the law firm in a press release.

e.      In the course of the SEC's investigation giving rise to this enforcement action, neither Chimera nor any other Defendant (or nonparty) provided any documents evidencing that Chimera tested or deployed the NHE technology, or otherwise commercially exploited it in any respect.  The SEC staff issued subpoenas to all Defendants and several nonparties demanding production of such documents.

f.      As alleged below, certain nonparties refused to deal with Chimera in its attempts to market and commercially develop NHE because they did not believe that the technology as described was feasible or because they believed Chimera's statements about the technology and its business prospects were misleading.

52.   The July 27, 2012 Form 8-K was false and misleading because Chimera had not licensed and did not have possession of the NHE technology as it was described in the Form 8-K. Reasonable investors would have considered this fact important to the evaluation of an investment in Chimera.

### B.   Chimera Issues a Barrage of Misleading Public Statements Promoting its Licensing of NHE Technology and Other Purportedly Positive Information

53.    Prior to announcing its licensing of the NHE technology, Chimera had not issued a single press release and filed only one Form 8-K  (the July 27 Form 8-K discussed above). Between July 30, 2012 and October 11, 2012 (a period comprising 53 trading days),  however, Chimera made approximately 37 written public statements, including approximately 33 press releases and three Form 8-K filings.  All of these public statements touted some aspect of Chimera's business, and all of them were materially false and misleading.

54.    Nearly all of Chimera's press releases were drafted by and disseminated through Individual A, a public relations consultant and associate of Farmer who was on Farmer's payroll at all relevant times.  While he was CEO, Grob authorized Individual A to disseminate all or most of Chimera's press releases.  Individual A was the contact person for the service providers engaged by Chimera to distribute their press releases.  In addition, and as discussed in further detail below, Individual A executed the advertising campaign orchestrated and funded by Farmer that was designed to increase investor awareness of Chimera.  Individual A's name or role with Chimera was never disclosed in any of Chimera's SEC filings.

55.    On July 30, 2012, Chimera issued a press release sensationally titled "CHMR Unveils Breakthrough Shale Oil Extraction Method to Safely and Effectively Replace Hydraulic Fracturing," in which it provided further information about its acquisition of a license relating to NHE.  In the July 30 press release, which Chimera disseminated via the public news outlet called *Business Wire*, Chimera stated that NHE is

> a shale oil extraction technology that is designed to safely replace
> hydraulic fracturing (AKA fracking and fracing) without negative
> environmental impacts.  Originally developed for shale oil in
> geographic areas that were far too cold to use water due to
> freezing, [NHE] has recently emerged to be asserted as a cheaper

and more effective extraction method that does not affect groundwater at all.

Chimera Energy Corp has put in place their procedure for engineering this new method for mass production, patenting, licensing and sales.

56.     As CEO of Chimera, Grob authorized the issuance of the July 30 press release. Grob's name is listed as the media contact at the bottom of the July 30 press release.  The July 30 press release was false and misleading because Chimera had not licensed and did not have possession of NHE technology, and had taken no steps to put in place a "procedure for engineering" the NHE technology.

57.     On July 31, 2012, the day after Chimera issued the July 30 press release, Chimera's stock price soared to an intraday high of $1.41 per share and closed at $1.26 per share (up from a closing price of $1.05 the prior day) on trading volume of 464,213 shares (up from 57,100 shares the prior day, and 3,500 shares the day before that).

58.     On August 1, 2012 Chimera issued a press release titled "Drought May Enable CHMR's Proprietary [NHE] to Quickly Replace Hydraulic Fracturing."   The August 1 press release, which was disseminated via *Business Wire*, was issued for the purpose of attracting attention to Chimera, as it did not announce any new developments with regard to Chimera's business.  Rather, the August 1 press release referenced an article on the *CNNMoney* website reporting on drought causing water shortages for hydraulic fracturing operators in the Midwest. The press release stated that NHE "uses zero water, which means the drought would have no impact on their new process."   The press release also repeated claims about NHE made in Chimera's July 30 press release.

59.     As CEO of Chimera, Grob authorized the issuance of the August 1 press release, and Grob's name is listed as the media contact at the bottom of the August 1 press release.  The

August 1 press release was false and misleading because Chimera had not licensed and did not have possession of NHE technology, and had no basis to claim that the NHE technology used zero water and would not be impacted by the drought.

60.     On August 2, 2012 Chimera issued a press release titled "CHMR Patenting [NHE] System That is Designed to Safely Replace Hydraulic Fracturing."   In the August 2 press release, which was disseminated via *Business Wire*, Chimera disclosed that it had retained an intellectual property law firm to "protect the Company's breakthrough Non-Hydraulic Shale Oil Extraction process and its economic benefits from any potential copycats."   The press release also repeated claims about NHE made in Chimera's prior press releases.

61.     As CEO of Chimera, Grob authorized the issuance of the August 2 press release, and Grob's name is listed as the media contact at the bottom of the August 2 press release. While Chimera did retain the services of a law firm specializing in intellectual property, the August 2 press release nevertheless was false and misleading because Chimera had not licensed and did not have possession of NHE technology, and these facts were omitted from the press release.

62.     On August 6, 2012 Chimera issued a press release titled "CHMR Discloses First Purchase Order on New [NHE] System Designed to Safely Replace Hydraulic Fracturing."   In the August 6 press release, disseminated via *Business Wire*, Chimera disclosed that it had "executed a purchase order" with a third party ("Drilling Supplier A") "regarding an integral component necessary for Non-Hydraulic Extraction known as a 'casing perforator.'"   A casing perforator is a component used in the production of oil and gas.  The press release also repeated claims about NHE made in Chimera's prior press releases, including describing this technology as "revolutionary."

63.     While Chimera did purchase a component from Drilling Supplier A, paying Drilling Supplier A $7,101.95 for the component, this purchase had no legitimate business purpose.  Individual B, an associate of Farmer who acted as an intermediary between Grob and Farmer, directed Grob to purchase the casing perforator from Drilling Supplier A, and requested that Grob provide Individual B a copy of the purchase order.  The purpose of Chimera's transaction with Drilling Supplier A was to contrive a basis for Chimera to issue a positive press release, and to do so in a manner that gave Chimera the ability to support the accuracy of the press release, if it were questioned, by providing a copy of the purchase order.

64.     As CEO of Chimera, Grob authorized the issuance of the August 6 press release, and Grob's name is listed as the media contact at the bottom of the August 6 press release.  The August 6 press release was false and misleading because Chimera had not licensed and did not have possession of NHE technology.  By omitting these facts, the August 6 press release misled investors into believing that Chimera acquired a component to further its development of NHE.

65.     On August 8, 2012 Chimera issued a press release titled "CHMR to Present New System Designed to Safely Replace Hydraulic Fracturing at NAPE Expo 2013."   In the August 8 press release, which was disseminated via *Business Wire*, Chimera disclosed that it would be an exhibitor at the North American Prospect Expo, an exhibit scheduled to occur six months from the date of the press release, where Chimera would "be presenting their new Non-Hydraulic Shale Oil Extraction system."   The press release also repeated claims about NHE made in Chimera's prior press releases.

66.     As CEO of Chimera, Grob authorized the issuance of the August 8 press release, and Grob's name is listed as the media contact at the bottom of the August 8 press release. While Chimera paid a small fee to obtain exhibit space at the North American Prospect Expo, the

August 8 press release nevertheless was false and misleading because Chimera had not licensed and did not have possession of NHE technology, and these facts were omitted from the press release.  Chimera never exhibited the NHE technology or otherwise participated in the North American Prospect Expo.

67.    On August 9, 2012 Chimera began a new phase of its "pump" campaign by claiming that it has entered into a business relationship with a large foreign oil and gas exploration and production company ("E&P Company A") through which E&P Company A would utilize NHE to produce oil from E&P Company A's wells.  In a press release issued on August 9, 2012 titled "[E&P Company A] Signs Deal with CHMR for New [NHE] System Designed to Safely Replace Hydraulic Fracturing" and disseminated via *Business Wire*, Chimera claimed that it had "executed a Memorandum of Understanding" with E&P Company A "regarding utilization of CHMR's revolutionary exothermic [NHE] method throughout Latin America."  Chimera stated that the Memorandum of Understanding "precedes a supplemental encompassing agreement."  The press release also repeated claims made in Chimera's prior press releases about NHE.

68.    As CEO of Chimera, Grob authorized the issuance of the August 9 press release, and Grob's name is listed as the media contact at the bottom of the August 9 press release.  The August 9 press release was false and misleading because at all relevant times, Chimera had no business relationship with E&P Company A whatsoever.  Chimera did not enter into a memorandum of understanding or any other agreement with E&P Company A that concerned utilization of NHE on E&P Company A's wells.   Additionally, the August 9 press release was false and misleading because Chimera had not licensed and did not have possession of NHE technology, and these facts were omitted from the press release.

69.     The day that Chimera issued the August 9 press release, Chimera's stock price soared to an intraday high of $2.00 per share (Chimera's all time high) and closed at $1.81 per share (up from a closing price of $1.47 the prior day) on trading volume of 1,416,216 shares (up from 275,522 shares the prior day).

70.     On August 10, 2012, Chimera filed a Form 8-K with the SEC in which it disclosed the same information as it disclosed in the August 9 press release, which it attached as an exhibit to the Form 8-K.  Grob signed and approved the filing of the Form 8-K.  The Form 8-K was false and misleading for the same reasons as the August 9 press release.

71.     On August 10, 2012 Chimera issued a press release titled "[E&P Company A] and CHMR Collaboration on New [NHE] System Begins Monday in Mexico City."  In the August 10 press release, disseminated via *Business Wire*, Chimera disclosed that its "management has been scheduled to meet with [E&P Company A] associates . . . regarding a collaboration for utilizing CHMR's revolutionary exothermic [NHE] method throughout Latin America."  The press release also repeated claims made in Chimera's prior press releases about NHE and the relationship with E&P Company A.

72.     As CEO of Chimera, Grob authorized the issuance of the August 10 press release, and Grob's name is listed as the media contact at the bottom of the August 10 press release.  The August 10 press release was false and misleading because Chimera had no business relationship with E&P Company A, and Chimera was not scheduled to, and did not meet with, E&P Company A at the time specified in the press release.  E&P Company A had no contact with any Chimera representative until late September 2012, and the only meeting between Chimera and E&P Company A occurred on October 1, 2012.  Additionally, the August 10 press release was

false and misleading because Chimera had not licensed and did not have possession of NHE technology, and these facts were omitted from the press release.

73.     On August 13, 2012 Chimera issued a press release titled "New Deal Would Utilize CHMR's [NHE] System at [E&P Company A] Location."  In the August 13 press release, disseminated via *Business Wire*, Chimera disclosed that its "management arrives in Mexico City this morning for their direct meetings with [E&P Company A] to collaborate on utilizing CHMR's revolutionary exothermic [NHE] system throughout Latin America."  The press release also repeated claims made in Chimera's prior press releases about NHE and the relationship with E&P Company A.

74.     As CEO of Chimera, Grob authorized the issuance of the August 13 press release, and Grob's name is listed as the media contact at the bottom of the August 13 press release.  The August 13 press release was false and misleading because Chimera had no business relationship with E&P Company A and Chimera was not scheduled to, and did not meet with, E&P Company A at the time specified in the press release.  Additionally, the August 13 press release was false and misleading because Chimera had not licensed and did not have possession of NHE technology, and these facts were omitted from the press release.

75.     On August 14, 2012 Chimera issued a press release titled "Weis S.A. Steps Onboard to Integrate CHMR's [NHE] System."  In the August 14 press release, disseminated via *Business Wire*, Chimera disclosed that "Oil and Gas stalwart Weis S.A. has come aboard to oversee the integration of CHMR's new [NHE] system with [E&P Company A] and other potential customers."  The press release identified Defendant "Valdamar" [*sic*] Rios as "director" of Weis S.A.  The press release also repeated claims made in Chimera's prior press releases about NHE and the relationship with E&P Company A.

76.     As CEO of Chimera, Grob authorized the issuance of the August 14 press release, and Grob's name is listed as the media contact at the bottom of the August 14 press release.  The August 14 press release was false and misleading because Chimera had no business relationship with E&P Company A.  Additionally, the August 14 press release was false and misleading because Chimera had not licensed and did not have possession of NHE technology, and these facts were omitted from the press release.

77.     On August 15, 2012 Chimera issued a press release titled "[E&P Company A] Green Lights CHMR's New [NHE] System on Chicontepec[6] Formation Wells."  In the August 15 press release, disseminated via *Business Wire*, Chimera disclosed that "meetings with [E&P Company A] in Mexico City are progressing exceedingly well, with an early development being that [E&P Company A] has already identified three Chicontepec Formation wells for use of Chimera's new [NHE] system."  The press release also repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

78.     As CEO of Chimera, Grob authorized the issuance of the August 15 press release, and Grob's name is listed as the media contact at the bottom of the August 15 press release.  The August 15 press release was false and misleading because Chimera had no business relationship with E&P Company A, there were no meetings between Chimera and E&P Company A representatives at the time specified in the press release, and at no time did E&P Company A identify any wells that would be produced using NHE.  Additionally, the August 15 press release was false and misleading because Chimera had not licensed and did not have possession of NHE technology, and these facts were omitted from the press release.

---

[6] In its press releases and marketing materials, Chimera consistently used the incorrect spelling *Chicontepic* to refer to the Chicontepec Formation, a petroleum system in Mexico, northwest of Mexico City.  This Complaint reproduces Chimera's spelling as used without *sic* notation.

79.     Also on August 15, 2012 Chimera issued a second press release titled "CHMR: Government Commissioner Advocates New [NHE] System Designed to Safely Replace Hydraulic Fracturing."  In this press release, disseminated via *Business Wire*, Chimera claimed that a Commissioner of the National Commission of Hydrocarbons of Mexico "has voiced his support of CHMR's revolutionary new [NHE] system."  The press release also repeated claims made in prior press releases about NHE and the relationship with E&P Company A, including statements concerning purported meetings with E&P Company A in Mexico City and E&P Company A's purported identification of wells for use of NHE.

80.     As CEO of Chimera, Grob authorized the issuance of this press release described in paragraph above, and Grob's name is listed as the media contact at the bottom of this press release.  This press release was false and misleading because Chimera had no business relationship with E&P Company A, there were no meetings between Chimera and E&P Company A representatives at the time specified in the press release, and at no time did E&P Company A identify any wells that would be produced using NHE.  Additionally, this press release was false and misleading because Chimera had not licensed and did not have possession of NHE technology, and these facts were omitted from the press release.

81.     On August 20, 2012 Chimera issued a press release titled "Chimera Energy Corp President Comments on Recent Developments."  In the August 20 press release, disseminated via *Business Wire*, Chimera disputed "[r]ecent comments" made by "anonymous bloggers and admitted shorters" that have "apparently contributed to a decline in [Chimera's] stock price over the last few trading sessions."  The August 20 press release quoted Grob stating that "Chimera and I are committed to implementing our business model as outlined and described in our filings,

on our website and in our press releases."  The press release also repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

82.     As CEO of Chimera, Grob authorized the issuance of the August 20 press release, and Grob's name is listed as the media contact at the bottom of the August 20 press release.  The August 20 press release was false and misleading because, contrary to Grob's quoted statement, the "business model" that he and Chimera were committed to implementing was a fabrication. In reality, Chimera had no business relationship with E&P Company A, Chimera had not licensed and did not have possession of NHE technology, and these facts were omitted from the press release.

83.     On August 22, 2012 Chimera issued a press release titled "Chemical Engineer Announces Details of Chimera Energy Corp's Revolutionary [NHE]."  In this press release, disseminated via *Business Wire*, Chimera sought to "dispel[] incorrect rumors regarding CHMR's [NHE] process" by quoting Defendant Rios's explanation of the "scientific portions of the new process that differentiate it from any prior technology."  The press release quoted Rios stating that Chimera's NHE

> process does not use steam, LPG gel, natural gas or the pumping of anything hot into the well being used.  The central operation in the process uses only inert elements.  These elements are non-toxic or caustic in any way . . . .  Helium, beginning in its liquid state, is used to create the pressures needed to open up existing fractures and form new ones. . . .  Helium is the 2nd most abundant element in the Universe and it is less water soluble than any other gas known.

> Chimera Energy Corp is in the process of reengineering this new method of Shale Oil [*sic*] extraction for mass production, relicensing and sales.  Due to the recent positive developments in Mexico, the Company now expects to complete much of this work in Mexico with some opportunities with [E&P Company A].

84.     As CEO of Chimera, Grob authorized the issuance of the August 22 press release, and Grob's name is listed as the media contact at the bottom of this press release.  The August 22 press release was false and misleading because Chimera had not licensed and did not have possession of NHE technology, and these facts were omitted from the press release.  The August 22 press release was further false and misleading because Chimera had no business relationship with E&P Company A.

85.     On August 24, 2012 Chimera issued a press release titled "[E&P Company A] Executes Go Ahead for Three Wells to use CHMR System Designed to Safely Replace Hydraulic Fracturing."  In the August 24 press release, disseminated via *Business Wire*, Chimera disclosed that it received "the official signed document from [E&P Company A] to utilize the Company's new [NHE] system on Central Tajin Area wells number 4, 5 and 6 in the Chicontepic Basin of Mexico."  The press release quoted Grob stating that he was "elated to have this signed official document physically in my hands from the largest company in all of Latin America.  I cannot overstate the significance of this achievement for Chimera Energy Corp.  A lot of science, planning and hard work got us to this point."  The press release also repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

86.     As CEO of Chimera, Grob authorized the issuance of the August 24 press release, and Grob's name is listed as the media contact at the bottom of the August 24 press release.  The August 24 press release was false and misleading because Chimera had no business relationship with E&P Company A, E&P Company A never permitted Chimera to use NHE on E&P Company A's wells, E&P Company A did not provide to Chimera any "official signed document" to that effect, and Chimera had not licensed and did not have possession of NHE technology.  All of these facts were misrepresented and omitted from the press release.

87.     On August 27, 2012 Chimera issued a press release titled "Chimera Energy Corp Begins Shipping Equipment to Mexico for [NHE] on [E&P Company A's] Wells."   In the August 27 press release, disseminated via *Business Wire*, Chimera disclosed that it had "begun shipping equipment to Mexico to utilize the Company's new [NHE] system on [E&P Company A's] wells number 4, 5 and 6 in the Chicontepic Basin of Mexico."   The press release also repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

88.     As CEO of Chimera, Grob had ultimate authority over the August 27 press release.  Grob authorized the issuance of the August 27 press release, and Grob's name is listed as the contact at the bottom of the August 27 press release.   The August 27 press release was false and misleading because Chimera had no business relationship with E&P Company A, E&P Company A never permitted Chimera to use its technology on E&P Company A's wells, and Chimera had not licensed and did not have possession of NHE technology.   All of these facts were misrepresented and omitted from the press release.

89.     On August 28, 2012 Chimera filed with the SEC a Form 8-K to which it attached a letter from Grob to Chimera shareholders.  The Form 8-K disclosed that this letter was posted to Chimera's website.  In the letter, Grob repeated Chimera's prior claims about NHE and about Chimera's relationship with E&P Company A, including that Chimera met with E&P Company A, that E&P Company A had selected wells for production using NHE, that Chimera and E&P Company A had signed a Memorandum of Understanding, and that Chimera and E&P Company A would execute a "Master Service Agreement" that would specify "all of the operational and financial details of the services" Chimera was to provide to E&P Company A.

90.     Grob signed and approved the filing of the August 28 Form 8-K and he signed the shareholder letter attached as an exhibit thereto.  The August 28 Form 8-K and the shareholder letter were false and misleading because Chimera had no business relationship with E&P Company A, Chimera had not licensed and did not have possession of NHE technology, and these facts were misrepresented and omitted from the press release.

91.     On or about August 27, 2012, *Business Wire*, which had provided press release distribution services for Chimera, became aware of blog posts on financial news and investment websites that called into question the accuracy of Chimera's public statements.  Individual A was aware of the questions raised by *Business Wire* regarding the accuracy of Chimera's public statements.  After Chimera and Individual A were unable to assure *Business Wire* of the accuracy of Chimera's press releases, *Business Wire* stopped providing distribution services to Chimera. Undeterred, Individual A hired another service provider ("PR Distributor A") to distribute Chimera's press releases via the *MarketWire* public news outlet and distribution channel. Farmer paid all fees for services rendered by PR Distributor A to Chimera, which totaled nearly $20,000.

92.     On August 30, 2012 Chimera issued a press release titled "Press Reports Mexico Friendly to [NHE] While U.S. Hydrocarbon Industry Ties to Research is [*sic*] Questioned."  In the August 30 press release, which was disseminated via *MarketWire*, Chimera referenced an article published by United Press International ("UPI") that repeated Chimera's claims about NHE and the relationship with E&P Company A.  The press release also repeated these same claims.

93.     As CEO of Chimera, Grob authorized the issuance of the August 30 press release, and Grob's name is listed as the media contact at the bottom of the August 30 press release.  The

August 30 press release was false and misleading because Chimera had no business relationship with E&P Company A, Chimera had not licensed and did not have possession of NHE technology, and these facts were misrepresented and omitted from the press release.

94.     On August 31, 2012 Chimera issued a press release titled "New Influential Anti-Hydraulic Fracking Movement Could Be Big Boost for CHMR's New [NHE]."  In the August 31 press release, disseminated via *MarketWire*, Chimera referenced efforts by an advocacy group called "Artists Against Fracking" to oppose hydraulic fracturing in New York state due, in part, to the perceived negative environmental consequences of leakage of wells that are produced using hydraulic fracturing.  The press release stated that Chimera "feels that they have a viable solution to this problem that uses zero water.  It is a system called [NHE] . . . ."  The press release also repeated claims made in prior press releases about NHE.

95.     As CEO of Chimera, Grob authorized the issuance of the August 31 press release, and Grob's name is listed as the media contact at the bottom of the August 31 press release.  The August 31 press release was false and misleading because Chimera had not licensed and did not have possession of NHE technology, and these facts were misrepresented and omitted from the press release.

96.     On September 5, 2012 Chimera issued a press release titled "Chimera Energy Corp to Request Consideration for [NHE] to Be Excluded From France's Shale Ban."  In the September 5 press release, disseminated via *MarketWire*, Chimera disclosed that Grob would be traveling to France in October 2012 "in an effort to request consideration of the Company's [NHE] system for exception under the country's current shale ban."  The September 5 press release also repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

97.     As CEO of Chimera, Grob authorized the issuance of the September 5 press release, and Grob's name is listed as the media contact at the bottom of the September 5 press release.   The September 5 press release was false and misleading because Chimera had no business relationship with E&P Company A, Chimera had not licensed and did not have possession of NHE technology, and these facts were misrepresented and omitted from the press release.

98.     On September 6, 2012 Chimera issued a press release titled "Hydraulic Fracking Continues to Face Controversy as CHMR Proceeds With System Designed as Safer Alternative." In the September 6 press release, disseminated via *MarketWire*, Chimera referenced the public debate about hydraulic fracturing and its perceived effects in New York State.   The press release stated that Chimera's NHE system is "designed to safely and economically replace hydraulic fracking," and repeated other claims made in prior press releases about NHE and the relationship with E&P Company A.

99.     As CEO of Chimera, Grob authorized the issuance of the September 6 press release, and Grob's name is listed as the media contact at the bottom of the September 6 press release.   The September 6 press release was false and misleading because Chimera had no business relationship with E&P Company A, Chimera had not licensed and did not have possession of NHE technology, and these facts were misrepresented and omitted from the press release.

100.    On September 10, 2012 Chimera issued a press release titled "[E&P Company A's] Officials Deliver Logging Reports on Target Wells to Chimera Energy Corp. for Use of [NHE]."   In the September 10 press release, disseminated via *MarketWire*, Chimera claimed that E&P Company A delivered to Chimera "well data and logging reports" for Chimera's use "in

dialing in specifications for the use of" NHE.  The September 10 press release also repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

101.    As CEO of Chimera, Grob authorized the issuance of the September 10 press release, and Grob's name is listed as the media contact at the bottom of the September 10 press release.  The September 10 press release was false and misleading because Chimera had no business relationship with E&P Company A, E&P Company A did not provide logging reports to Chimera or permit Chimera to use NHE to develop its wells, and Chimera had not licensed and did not have possession of NHE technology.  All of these facts were misrepresented and omitted from the press release.

102.    On September 11, 2012 Chimera issued a press release titled "Chimera Energy Corp Sets 90-Day Schedule for [NHE] Deployment in Chicontepic Basin."  In the September 11 press release, disseminated via *MarketWire*, Chimera disclosed that it formulated a "90-day schedule for the first deployment of [NHE] in the Chicontepic Basin of Mexico."  The September 11 press release also repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

103.    As CEO of Chimera, Grob authorized the issuance of the September 11 press release, and Grob's name is listed as the media contact at the bottom of the September 11 press release.  The September 11 press release was false and misleading because Chimera had no business relationship with E&P Company A, Chimera had not licensed and did not have possession of NHE technology, Chimera had not formulated a schedule for "deployment" of NHE, and these facts were misrepresented and omitted from the press release.

104.    On September 13, 2012 Chimera issued a press release titled "Chimera Energy Corp Sets Up [NHE] System Assembly in Poza Rica at Chicontepic Basin."  In the September 11

press release, disseminated via *MarketWire*, Chimera disclosed that its consultant Weis S.A. engaged an entity in Poza Rica, Mexico for "final fabrications and assembly of the main equipment to be used for [NHE] at the Chicontepic Basin in Mexico." The September 13 press release also repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

105.   As CEO of Chimera, Grob authorized the issuance of the September 13 press release, and Grob's name is listed as the media contact at the bottom of the September 13 press release. The September 13 press release was false and misleading because Chimera had no business relationship with E&P Company A, Chimera had not licensed and did not have possession of NHE technology, and these facts were misrepresented and omitted from the press release.

106.   On September 17, 2012 Chimera issued a press release titled "Hydraulic Fracking Faces New Political Opposition in the US As Mexico Embraces CHMR's Waterless Alternative." The September 17 press release, disseminated via *MarketWire*, was issued for the purpose of attracting attention to Chimera, as it did not disclose any new developments with regard to Chimera's business. In the press release, Chimera repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

107.   As CEO of Chimera, Grob authorized the issuance of the September 17 press release, and Grob's name is listed as the media contact at the bottom of the September 17 press release. The September 17 press release was false and misleading because Chimera had no business relationship with E&P Company A, Chimera had not licensed and did not have possession of NHE technology, and these facts were misrepresented and omitted from the press release.

108.    On September 19, 2012 Chimera issued a press release titled "CHMR's [NHE] Does Not Utilize Radioactive Equipment Like Halliburton Recently Lost."  The September 19 press release, disseminated via *MarketWire*, referenced an article published by a public news outlet reporting on a loss of a radioactive cylinder in the course of Halliburton's hydraulic fracturing operations.  The press release repeated claims made in prior press releases about NHE and the relationship with E&P Company A.  Chimera issued the September 19 press release for the purpose of attracting attention to Chimera, as the press release did not disclose any new developments within Chimera's business.

109.    As CEO of Chimera, Grob authorized the issuance of the September 19 press release, and Grob's name is listed as the media contact at the bottom of the September 19 press release.  The September 19 press release was false and misleading because Chimera had no business relationship with E&P Company A, Chimera had not licensed and did not have possession of NHE technology, and these facts were misrepresented and omitted from the press release.

110.    On September 20, 2012 Chimera issued a press release titled "[E&P Company A] Schedules Chimera Energy Corp Onsite Verification of Chicontepec Wells for End of Month." In the September 20 press release, disseminated via *MarketWire*, Chimera disclosed that E&P Company A requested that Chimera's personnel "be onsite with [E&P Company A's] representatives at the Central Tajin Area to verify the first wells for intended use of [NHE].  The request states the last week of this month for the onsite activity in Chicontepec Tajin, Veracruz." Chimera also repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

111.    As CEO of Chimera, Grob authorized the issuance of the September 20 press release, and Grob's name is listed as the media contact at the bottom of the September 20 press release.  The September 20 press release was false and misleading because Chimera had no business relationship with E&P Company A, Chimera did not receive any requests from E&P Company A to "verify" wells, and Chimera had not licensed and did not have possession of NHE technology.  All of these facts were misrepresented and omitted from the press release.

112.    On September 21, 2012 Chimera issued a press release titled "Chimera Energy Corp Selects Air Liquide as Supplier for Upcoming [NHE] Project."  In the September 21 press release, disseminated via *MarketWire*, Chimera disclosed that it had "selected Air Liquide as its supplier of helium for use in [NHE] on [E&P Company A's] wells in the Chicotepic Basin of Mexico.  Articles have circulated recently that report a temporary tightening in the worldwide helium supply.  As such, Chimera Energy Corp management acted quickly to identify the supplier for the project in order to eliminate any potential impact."  Chimera also repeated claims made in prior press releases about NHE.

113.    Air Liquide is a multinational corporation specializing in gases for industry, health, and the environment, and is headquartered in France with offices in Houston, Texas. Upon learning of the September 21 release, Air Liquide demanded that Chimera retract it. Individual A was aware of Air Liquide's demand for a retraction.  When Chimera failed to issue a retraction, Air Liquide filed a lawsuit against Chimera and Grob in Harris County District Court in which it sought to permanently enjoin Chimera and Grob from asserting the existence of any relationship with Air Liquide without Air Liquide's permission.  Chimera and Grob settled the lawsuit be agreeing to entry of such injunction.  On September 25, 2012, Air Liquide issued a press release disavowing any relationship with Chimera.

114. As CEO of Chimera, Grob authorized the issuance of the September 21 press release, and Grob's name is listed as the media contact at the bottom of the September 21 press release. The September 21 press release was false and misleading because Chimera had no business relationship with Air Liquide whatsoever, Air Liquide had not agreed to supply any helium to Chimera, and Chimera had not licensed and did not have possession of NHE technology. All of these facts were misrepresented and omitted from the press release.

115. On September 24, 2012 Chimera issued three press releases (disseminated via *MarketWire*), all of which were false and misleading. As CEO of Chimera, Grob authorized the issuance of these press releases, and Grob's name is listed as the media contact at the bottom of each of the September 24 press releases.

116. In the first press release, titled "Chimera Energy Corp Secures $2.5 Million Line of Credit to Implement New [NHE] Projects," Chimera disclosed that it had "secured a $2.5 million (U.S.) line of credit to be used in implementing [NHE] on projects in conjunction with [E&P Company A] on wells in the Chicontepic Basin of Mexico and future locations, as needed." Chimera also repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

117. The press release did not identify the source of the purported financing. Even though obtaining a $2.5 million credit line would have constituted entry into a material definitive agreement, thus triggering Chimera's reporting requirement with the SEC, Chimera did not file a Form 8-K disclosing this event and attaching the applicable agreement. And, Chimera did not otherwise make the agreement documenting the purported financing available to the public. This press release was false and misleading because Chimera had not secured a $2.5 million line of credit, had no business relationship with E&P Company A, had not licensed and did not have

possession of NHE technology, and these facts were misrepresented and omitted from the press release.

118.    In its second press release issued on September 24, 2012, titled "Chimera Energy Corp Distributes [E&P Company A] Onsite Schedule Regarding [NHE]," Chimera announced the "distribution of the signed [E&P Company A] onsite schedule letter dated September 14, 2012 regarding CHMR's [NHE]."   The press release included an image of the September 14 letter from E&P Company A described in the press release.  Chimera also repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

119.    This press release was false and misleading because the attached image of the September 14 letter was not a genuine copy of any letter from E&P Company A, but instead was a forgery.  E&P Company A never sent to Chimera the September 14 letter.  This press release was false and misleading for the additional reasons that Chimera had no business relationship with E&P Company A, Chimera had not licensed and did not have possession of NHE technology, and these facts were misrepresented and omitted from the press release.

120.    In its third press release issued on September 24, 2012, titled "Chimera Energy Corp Distributes [E&P Company A] Well Identification Letter for [NHE]," Chimera announced the "distribution of the signed [E&P Company A] well identification letter dated August 6, 2012 regarding CHMR's [NHE]."   The press release included an image of the August 6 letter from E&P Company A described in the press release.  Chimera also repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

121.    This press release was false and misleading because the attached image of the August 6 letter was not a genuine copy of any letter from E&P Company A, but instead was a forgery.  E&P Company A never sent to Chimera the August 6 letter.  This press release was

false and misleading for the additional reasons that Chimera had no business relationship with E&P Company A, Chimera had not licensed and did not have possession of NHE technology, and these facts were misrepresented and omitted from the press release.

122.   On September 25, 2012 Chimera issued a press release titled "Chimera Energy Corp Representatives Traveling to Chicontepic Basin for [E&P Company A] Onsite Well Verification."   In the September 25 press release, disseminated via *MarketWire*, Chimera disclosed that its representatives "are travelling to the Chicontepic Tajin, Veracruz Mexico to meet with [E&P Company A] and verify the first wells for intend use of [NHE].  This onsite work is pursuant to a written [E&P Company A] request dated September 14, 2012."  Chimera also repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

123.   As CEO of Chimera, Grob authorized the issuance of the September 25 press release, and Grob's name is listed as the media contact at the bottom of the September 25 press release.  The September 25 press release was false and misleading because Chimera had no business relationship with E&P Company A, Chimera did not receive any requests from E&P Company A, there is no legitimate written request from E&P Company A dated September 14, 2012, and Chimera had not licensed and did not have possession of NHE technology.  All of these facts were misrepresented and omitted from the press release.

124.   On September 26, 2012 Chimera issued a press release titled "Coordination Technology Management Initials Formal Request Regarding CHMR's [NHE]."   In the September 26 press release, disseminated via *MarketWire*, Chimera disclosed that it had received "a new formal request letter" from a representative of E&P Company A for the purpose of conducting a "scientific level presentation review.  [Chimera] management expressed their

elation at learning of the letter as [Chimera] believes it signals that [E&P Company A] has escalated the level of immediate opportunity for the [Chimera's] new technology."  Chimera also repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

125.    In reality, E&P Company A never requested any meetings with Chimera.  Instead, on or around September 21, 2012, Rios, acting on behalf of Chimera, contacted a representative of E&P Company A in an attempt to set up a meeting for Chimera to pitch NHE technology to E&P Company A.  This was the first actual contact between Chimera and E&P Company A.  On or about September 25, 2012, Grob followed Rios's contact with an email to a different representative of at E&P Company A, in which Grob again requested a meeting with E&P Company A at which Chimera would pitch NHE technology.  On or about September 26, 2012, a representative of E&P Company A agreed to Chimera's request and scheduled a meeting for October 1, 2012 at E&P Company A's office in Mexico.  All of these facts were misrepresented and omitted from the September 26 press release.

126.    As CEO of Chimera, Grob authorized the issuance of the September 26 press release, and Grob's name is listed as the media contact at the bottom of the September 26 press release.  The September 26 press release was false and misleading because it misrepresented the nature of the communications and of the scheduled meeting between Chimera and E&P Company A as described above, and because Chimera had not licensed and did not have possession of NHE technology, which facts were misrepresented and omitted from the press release.

### *Chimera Meets with E&P Company A*

127.     On or about October 1, 2012, Chimera met with E&P Company A in Mexico. Chimera was represented at the meeting by Grob, Rios, and Individual B.  During the meeting, a representative of E&P Company A requested Chimera's explanation of an article published in the Journal of Petroleum Technology claiming that Chimera's NHE technology would be deployed at E&P Company A's wells in Chicontepec.  The representative of E&P Company A raised this issue because he did not believe this article, and similar reports that he had seen before the meeting, to be accurate.  The Chimera representatives responded that the referenced articles arose out of a miscommunication and apologized.

128.     During the meeting, Chimera's representatives described NHE and requested E&P Company A's permission to deploy NHE at its wells.  Representatives of E&P Company A responded that use of NHE on its wells would not be possible because NHE was a theoretical concept that had never been tested and represented too high a risk for E&P Company A to undertake.  In addition, the division of E&P Company A that met with Chimera could not allow such high-risk testing on E&P Company A's wells, which are considered to be public property of Mexico.  At the conclusion of the meeting, E&P Company A representatives made clear that they had no interest in NHE and told Chimera that it could contact the Directorate General of E&P Company A, which would be able to identify the appropriate channels to approve NHE testing if it were determined to be in the best interest of E&P Company A.  The outcome of the October 1 meeting was that E&P Company A did not approve NHE for use on E&P Company A's wells.  After the October 1 meeting, E&P Company A had no further contact with Chimera. Despite this development, none of the Defendants took any steps to correct the various

statements available to the public about Chimera's use of NHE and its dealings with E&P Company A.  Rather, they continued to lie about Chimera's relationship with E&P Company A.

*Farmer Approves Rios's Replacement of Grob as CEO of Chimera*

129.    In or about early October 2012, Farmer authorized Grob to resign as Chimera's CEO, and authorized Rios to replace Grob.  Rios became CEO effective on or about October 9, 2012.  Farmer was personally involved in the logistics of the change in Chimera's leadership.

130.    On or about October 8, 2012, Farmer drafted a press release on Chimera's behalf announcing the appointment of Rios as CEO.  The draft press release contained the following statement, which was attributed to Rios:  "I am very confident that our work with [E&P Company A] will allow us the opportunity to prove that our exclusive technology is the game-changer that we believe it to be."  On October 9, 2012 Chimera issued a press release titled "Chimera Energy Corp. Appoints New CEO," disseminated via *MarketWire*.  The October 9 press release was substantially similar to Farmer's draft press release of October 8, and it included the exact same statement attributed to Rios.  The press release also repeated claims made in prior press releases about NHE.

131.    As CEO of Chimera, Rios authorized the issuance of the October 9 press release, and Rios's name is listed as the media contact at the bottom of the October 9 press release.  The October 9 press release was false and misleading because the outcome of the October 1 meeting with E&P Company A provided no basis for the statement attributed to Rios in the press release (as Rios knew, being present at the meeting), and because Chimera had not licensed and did not have possession of NHE technology, which facts were misrepresented and omitted from the press release.

132.    On or about October 9, 2012, Farmer drafted a Form 8-K on Chimera's behalf announcing Rios's appointment as CEO, and an exhibit to Form 8-K in the form of a letter from Rios to Chimera's shareholders.  Farmer directed the Form 8-K (together with the shareholder letter) to be filed with the SEC upon Rios's approval the following day.

133.    On October 10, 2012 Chimera filed with the SEC a Form 8-K attaching the shareholder letter from Rios as an exhibit.  Both documents were in substantially the same form as the documents drafted by Farmer on October 9, 2012.  The shareholder letter repeated claims made in prior press releases about NHE and the relationship with E&P Company A.  In addition, the shareholder letter complained of an "unabashed short campaign being carried out against [Chimera's] stock," which it characterized as "manipulative and generally illegal."

134.    Rios approved the filing of the Form 8-K and he signed the Form 8-K and the attached shareholder letter.   The October 10 Form 8-K and letter were false and misleading because Chimera had no business relationship with E&P Company A, Chimera had not licensed and did not have possession of NHE technology, and these facts were misrepresented and omitted from the Form 8-K and shareholder letter, all of which Rios knew.

135.    On October 10, 2012 Chimera issued a press release titled "Chimera Energy Corp and [E&P Company A] Complete First Collaboration at Chicontepic Basin."  In the October 10 press release, disseminated via *MarketWire*, Chimera disclosed that "the first activities in Poza Rica, Mexico between the two companies have been completed with very good results. . . .  The efforts were initiated by earlier invitation by [E&P Company A] that Chimera Energy Corp personnel meet with [E&P Company A] representatives . . . to verify the first wells for intended use of [NHE]."  Chimera also repeated claims made in prior press releases about NHE and the relationship with E&P Company A.

136.    As CEO of Chimera, Rios authorized the issuance of the October 10 press release, and Rios's name is listed as the media contact at the bottom of the October 10 press release.  The October 10 press release was false and misleading because there was no collaboration between Chimera and E&P Company A that achieved "very good results," and because no "efforts" were initiated by "invitation" of E&P Company A.  The October 10 press release was false and misleading for the additional reason that Chimera had not licensed and did not have possession of NHE technology, which facts were misrepresented and omitted from the press release.

137.    On October 10, 2012, Farmer drafted or directed Chimera's outside securities counsel to draft a written consent of the board of directors of Chimera authorizing Rios's appointment as CEO.  Farmer instructed Individual B to obtain Rios's signature on the document.

138.    Also on October 10, 2012, Farmer drafted a press release on Chimera's behalf.  On October 11, 2012 Chimera issued a press release titled "Chimera Energy Corp. Announces Aggressive Action Targeted at Naked Short Sellers," disseminated via *MarketWire*.  The October 11 press release was in substantially the same form as Farmer's draft press release of October 10.  In the press release, Chimera alleged that its stock was being shorted in violation of SEC regulations, and characterized this activity to be the "most serious challenge facing our Company."  The press release also disclosed Chimera's intent to change its CUSIP number to combat the purported shorting activity.  Finally, the press release referenced the shareholder letter included in Chimera's October 10 Form 8-K, which, according to the press release, "lay[s] out the current status of the Company's efforts to commercialize its technology."

139.    As CEO of Chimera, Rios authorized the issuance of the October 11 press release, and Rios's name is listed as the media contact at the bottom of the October 11 press release.  The

October 11 press release was false and misleading because it referenced the "current status of the Company's efforts to commercialize" NHE described in Rios's shareholder letter attached to Chimera's October 10 Form 8-K, while failing to disclose the facts that Chimera had not licensed and did not have possession of NHE technology and that Chimera had no business relationship with E&P Company A.

### C.   Concurrent with Chimera's Press Release Barrage, Farmer Funds an Online Advertising Campaign

140.    To maximize the impact of Chimera's false and misleading press releases and SEC filings identified above, between July and October 2012 Farmer spent over $300,000 on online advertising designed to raise investor awareness of Chimera.

141.    Individual A carried out this advertising campaign at Farmer's direction. Individual A placed Chimera advertisements with online publishers of mostly business and financial content. The advertisements appeared in popular mainstream publications such as *The Wall Street Journal* and *MarketWatch*.

142.    In August 2012, one online content publisher stopped displaying Chimera advertisements on its websites because of the publisher's doubts about the accuracy of Chimera's public statements. Individual A was aware of the publisher's doubts about the accuracy of Chimera's public statements. Chimera's advertisements continued to appear on the websites of other content providers.

## VI.   Farmer Profits from Sales of Millions of Shares of Chimera Stock to the Public

143.    Chimera's false press release barrage and the advertising campaign that drew attention to it produced Farmer's desired effect – to raise the price and trading volume of Chimera stock. Before the Chimera's false press releases and misleading marketing, the average daily trading volume of Chimera stock was approximately 15,577 shares. From July 30, 2012

(when the promotional and advertising campaign began) through October 11, 2012 (the day Chimera issued its last press release), the average daily trading volume of Chimera stock was approximately 948,066 shares, with the volume exceeding one million shares per day on at least 24 trading days, and exceeding two million shares per day on at least five trading days.

144.    Farmer took advantage of the fraudulently inflated market that he created for Chimera stock by "dumping" the shares he controlled on investors he and other Defendants deceived.  As detailed below, entities controlled by Farmer sold at least 6,148,468 shares of Chimera stock to the public on the OTC market (and possibly more), at prices ranging from a few cents to nearly $2.00 per share.  Even for the stock that Farmer sold at its lowest price of just a few pennies per share, his sales generated extraordinary profits because Farmer effectively paid only $0.005625 per share to acquire the stock.  These profits were even larger for the more than two million shares that Farmer sold at prices exceeding $1.00 per share.

145.    Through a brokerage account at B-D Firm B in the name of Chartered, Farmer sold approximately 1,148,322 shares of Chimera stock for proceeds of approximately $692,554.51 ($661,793.91 with commissions paid to B-D Firm B netted out).  All of these sales took place between June 29, 2012 and September 27, 2012.  No registration statement was filed and in effect for these sales and these sales were not otherwise exempt from registration.

146.    Through a brokerage account at B-D Firm B in the name of TransAmerica, Carolyn Austin sold approximately 2.8 million shares of Chimera stock for proceeds of approximately $3,224,630.87 ($3,079,522.48 with commissions paid to B-D Firm B netted out).  All of these sales took place between July 30, 2012 and August 23, 2012.  Carolyn Austin transferred the vast majority of TransAmerica's proceeds from these sales to Chartered's bank

account.  No registration statement was filed and in effect for these sales and these sales were not otherwise exempt from registration.

147.    Through brokerage accounts at B-D Firm A and B-D Firm C, Oak Resources sold approximately 2,200,146 shares of Chimera stock for proceeds of approximately $667,709.69 (or $638,338.75 with commissions paid to B-D Firm A and B-D Firm C netted out).  All of these sales took place between June 20, 2012 and November 15, 2012.  Farmer controlled Oak Resources for purposes of its transactions in Chimera securities because his associate, Individual C, authorized Farmer to trade in Oak Resources' brokerage accounts, Farmer directed sales of Chimera securities in Oak Resources' brokerage accounts, and proceeds from these transactions were used for Farmer's benefit.  No registration statement was filed and in effect for these sales, and these sales were not otherwise exempt from registration.

148.    In addition to Farmer's stock proceeds specifically described above, entities controlled by or associated with Farmer additionally sold at least 4.6 million shares of Chimera stock approximately between July 31, 2012 and October 24, 2012, for illicit proceeds of at least $2.6 million, as part of the "dump" portion of the scheme.  These shares were sold to the public through omnibus accounts located overseas.

## VII.    Farmer Participates in Chimera's Deception of FINRA in an Effort To Cover Up His Scheme

149.    On October 2, 2012 FINRA's Office of Fraud Detection and Market Intelligence issued to Chimera a request for information in connection with FINRA's ongoing review of trading in Chimera securities.  In response, Grob and Rios each emailed FINRA the same letter, which was dated October 15, 2012 and signed by Rios on behalf of Chimera.  The October 15 letter contained several misrepresentations made in Chimera's prior press releases relating to NHE and the relationship with E&P Company A, including the assertion that Chimera continues

to work "diligently with [representative of E&P Company A] and his engineering team towards the common goal of an onsite demonstration program at one of the well locations identified by [E&P Company A]."  In addition, the October 15 letter made misleading statements concerning Grob's relationship with Farmer.  In this regard, the October 15 letter stated that

> [d]uring the formation of the Company, Mr. Grob sought advice from Mr. Farmer regarding the process of filing the Company's Registration Statement with the SEC.  At no time was Mr. Farmer an officer, director or affiliate of the Company.  Mr. Farmer was never compensated for his advice.  The Company does not have now, nor has it ever had, a business relationship with Mr. Farmer. While Mr. Farmer and Mr. Grob are friends, they have never had a business relationship.

These statements were false and misleading because Farmer controlled Chimera and Grob (and as such was at a minimum an "affiliate" of Chimera), and Farmer paid Grob's salary for several months.  Moreover, as described below, Infinite (owned and controlled by Farmer) was a lender to Chimera, thus creating a business relationship between Farmer and Chimera.

150.    Farmer drafted, directed the preparation of, or helped prepare or review the October 15 letter before it was transmitted to FINRA, and Farmer received a copy of the transmission of the October 15 letter to FINRA.  Accordingly, Farmer was aware before and after the October 15 letter was sent that Chimera would be making, and did make, a misstatement of material fact to FINRA about Farmer's role vis-à-vis Chimera and Grob.

**VIII.  Additional False and Misleading Statements and Omissions Made by Chimera**

151.    In addition to the allegations above, Chimera made numerous other false and misleading statements or omissions as alleged below.

152.    Chimera's Registration Statement was false and misleading because it failed to disclose that Farmer was a control person of Chimera and that Farmer would be the ultimate

buyer of the shares offered in the IPO.  In addition, the following statements in the Registration Statement were false and misleading:

> a.      "We are offering the shares on a 'self-underwritten' basis directly through Charles Grob, our sole officer and director, named herein."  This statement was false and misleading because it did not disclose Farmer's participation in the offering as the ultimate buyer of the offered shares and as a person who arranged for his nominees to buy the shares in straw transactions.
>
> b.      "Our officer, director, control persons and affiliates do not intend to purchase any shares in this offering."  This statement was false and misleading because at the time it was made, Farmer was Chimera's control person and affiliate and it was his intent to purchase shares in the offering, through his nominees.
>
> c.      "All decisions regarding the management of our affairs will be made exclusively by [Grob] along with the outcome of all corporate transactions and other matters . . . and he will also have the power to prevent or cause a change in control."  This statement was false misleading because Grob did not have exclusive control of Chimera's affairs.  Farmer had significant control over Chimera's affairs, and Grob's control was in fact nominal.

153.    Each of the false and misleading statements and omissions identified in the paragraph above also were made in amended Registration Statements filed on November 22, 2011 and December 5, 2011, and in a Prospectus filed on December 21, 2011.  Grob signed and approved the Registration Statement, all amendments thereto, and the Prospectus.  Farmer

directed the preparation of, or helped prepare or review the Registration Statement, all amendments thereto, and the Prospectus.

154.    Chimera's Form 10-Q filed on January 13, 2012 (for the quarter ended November 30, 2011), Form 10-Q/A filed March 13, 2012 (for the quarter ended November 30, 2011), Form 10-Q/A filed March 28, 2012 (for the quarter ended November 30, 2011), Form 10-Q filed on April 13, 2012 (for the quarter ended February 29, 2012), and Form 10-Q filed on July 16, 2012 (for the quarter ended May 31, 2012) each were false and misleading because they failed to disclose that Farmer was a control person of Chimera.  Grob signed and approved each of the forms identified in this paragraph.

155.    The April 13, 2012 Form 10-Q was false and misleading for the additional reason that it inaccurately disclosed Grob's true compensation as Chimera CEO.  The Form 10-Q disclosed that Chimera would pay Grob a salary of $2,500 per month beginning on March 1, 2012.  According to this disclosure, at the time of his resignation as CEO in October 2012, Grob should have been paid $20,000 since March 2012.  Over this time period, however, Chimera actually paid Grob approximately $67,499.99, which more than tripled Grob's disclosed compensation from Chimera.  During the period that Grob was CEO (or thereafter), Chimera made no additional disclosures about Grob's compensation to correct its April 13, 2012 statement, which already was untrue when made.  Farmer directed the preparation of, or helped prepare or review the April 13 Form 10-Q.

156.    On August 15, 2012, Chimera entered into a credit agreement with Infinite (which was owned and controlled by Farmer at all relevant times), pursuant to which Infinite agreed to extend to Chimera a borrowing facility for an amount not to exceed $500,000 (the "Master Credit Agreement").  Farmer signed the Master Credit Agreement on behalf of Infinite, and Grob

signed on behalf of Chimera.  The Master Credit Agreement was material to Chimera and was a related party transaction, because Infinite was controlled by Farmer, who also controlled Chimera.  Chimera failed to disclose its entry into the Master Credit Agreement in any SEC filing or other public statement.

157.    Each of the false and misleading statements and omissions alleged in this Complaint concern:  (i) controlling persons of Chimera and their relationship with Chimera; (ii) the nature of the IPO; (iii) Grob's compensation; (iv) sources of Chimera's funding; (v) Chimera's relationship with E&P Company A and Air Liquide; or (vi) Chimera's NHE technology.  Each false and misleading statement and omission alleged in this Complaint is material because a reasonable investor would have wanted to know the truth behind Chimera's misstatements and omissions.  Of particular interest to Chimera investors would have been the facts that its core technology did not actually exist, that someone other than Chimera's CEO exerted control over the company, and that the nominal CEO had received a substantial increase in compensation at a time when the company had less than $120,000 in assets and was generating losses and minimal revenues.

### FIRST CLAIM FOR RELIEF
**Fraud in the Offer or Sale of Securities in
Violation of Section 17(a) of the Securities Act
(Against Farmer, Grob, and Chimera)**

158.    The SEC incorporates the allegations in paragraphs 1-157 as if fully set forth herein.

159.    Farmer, Grob, and Chimera, in the offer or sale of securities, employed devices, schemes, or artifices to defraud, obtained money or property by means of untrue statements or omissions, and engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit, in violation of Section 17(a) of the Securities Act.

160.     Farmer, Grob, and Chimera violated, and unless restrained and enjoined, they will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Fraud in Connection with the Purchase or Sale of Securities
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
### (Against Farmer, Grob, Rios, and Chimera)

161.     The SEC incorporates the allegations in paragraphs 1-157 as if fully set forth herein.

162.     Farmer, Grob, Rios, and Chimera employed a device, scheme, or artifice to defraud, made untrue statements or omissions of material facts, and engaged in an act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

163.     Farmer, Grob, Rios, and Chimera violated, and unless restrained and enjoined, they will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Offers and Sales of Unregistered Securities
### Violation of Section 5(a) and (c) of the Securities Act
### (Against Farmer and Austin)

164.     The SEC incorporates the allegations in paragraphs 1-157 as if fully set forth herein.

165.     Farmer and Austin, directly or indirectly, sold securities when no registration statement was in effect with the SEC as to such securities, and offered to sell securities when no registration statement had been filed with the SEC as to such securities.   There were no

applicable exemptions from registration with regard to Farmer's and Austin's sales and offers to sell securities.

166.    Farmer and Austin have violated, and unless restrained and enjoined, they will continue to violate Section 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

**FOURTH CLAIM FOR RELIEF**
**False Reports and Failure to File Reports with the SEC**
**Violation of Section 15(d) of the Exchange Act and**
**Rules 12b-20, 15d-1, 15d-11, and 15d-13 thereunder**
**<u>(Against Chimera)</u>**

167.    The SEC incorporates the allegations in paragraphs 1-157 as if fully set forth herein.

168.    Chimera filed with the SEC inaccurate registration statements, and current and quarterly reports, and failed to file with the SEC an annual report for Chimera's reporting period ended August 31, 2012, in violation of Section 15(d) of the Exchange Act and Rules 12b-20, 15d-1, 15d-11, and 15d-13 thereunder.

169.    Chimera violated, and unless restrained and enjoined, it will continue to violate Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rules 12b-20, 15d-1, 15d-11, and 15d-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.15d-1, 240.15d-11, 240.15d-1].

**FIFTH CLAIM FOR RELIEF**
**Aiding and Abetting Filing of False Reports and Failure to File Reports with the SEC**
**Violation of Section 15(d) of the Exchange Act and**
**Rules 12b-20, 15d-1, 15d-11, and 15d-13 thereunder**
**<u>(Against Grob and Rios)</u>**

170.    The SEC incorporates the allegations in paragraphs 1-157 as if fully set forth herein.

171.    Chimera filed with the SEC inaccurate registration statements and current and quarterly reports, in violation of Section 15(d) of the Exchange Act and Rules 12b-20, 15d-11, and 15d-13 thereunder.

172.    Grob aided and abetted Chimera's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rules 12b-20, 15d-11, and 15d-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.15d-11, 240.15d-13], and unless he is restrained and enjoined, he will continue to aid and abet violations of these provisions.

173.    Rios aided and abetted Chimera's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rules 12b-20 and 15d-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.15d-11], and unless he is restrained and enjoined, he will continue to aid and abet violations of these provisions.

## **RELIEF REQUESTED**

WHEREFORE, the SEC respectfully requests that this Court enter a judgment:

### I.

Finding that each of the Defendants committed the violations alleged in this Complaint;

### II.

Permanently enjoining pursuant to Rule 65(d) of the Federal Rules of Civil Procedure the following Defendants, their agents, servants, employees, attorneys, and all persons in active concern or participation with them, from directly or indirectly violating the following laws:

A.    Farmer from further violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)];

B.     Grob from further violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and from aiding and abetting further violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rules 12b-20, 15d-11, and 15d-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.15d-11, 240.15d-13];

C.     Rios from further violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and from aiding and abetting further violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rules 12b-20 and 15d-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.15d-11]; and

D.     Chimera from further violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rules 12b-20, 15d-1, 15d-11, and 15d-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.15d-1, 240.15d-11, 240.15d-1].

III.

Permanently enjoining Austin, her agents, servants, employees, attorneys, and all persons in active concert or participation with her, from directly or indirectly, participating in the offer, issuance, purchase, or sale of any penny stock;

IV.

Ordering Farmer, Grob, Austin, and Chimera to disgorge any ill-gotten gains or unjust enrichment realized by each of them resulting from the conduct alleged in this Complaint, plus prejudgment interest thereon;

V.

Ordering each of the Defendants to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

VI.

Permanently barring Farmer, Grob, and Rios from serving as an officer or director of any issuer required to file reports with the SEC under Section 12(b), 12(g), or 15(d) of the Exchange Act [15 U.S.C. §§ 78*l*(b), 78*l*(g), and 78o(d)] pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

VII.

Permanently barring Farmer, Grob, and Rios from participating in any offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, and finding that all equity stocks are penny stocks unless exempted per Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)(A)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1];

VIII.

Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

IX.

Granting such other and further relief as this Court deems just and appropriate.

Dated:  August 14, 2014

Respectfully submitted,

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

*s/Matthew J. Gulde*_____
Matthew J. Gulde
Illinois Bar No. 6272325
S.D. Texas Bar No. 1821299
United States Securities and
Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
Telephone:  (817) 978-1410
Facsimile:  (817) 978-4927
guldem@sec.gov

Of Counsel:

NIKOLAY VYDASHENKO
New York Registration No.:  4628566
United States Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102

*Attorney for Plaintiff United States*
*Securities and Exchange Commission*