**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No.:  4:14-CV-02345** |
| | § | |
| **ANDREW I. FARMER,** | § | |
| **CHARLES E. GROB, JR.,** | § | |
| **CAROLYN AUSTIN,** | § | |
| **BALDEMAR P. RIOS, and** | § | |
| **CHIMERA ENERGY CORP.** | § | |
| | § | |
| **Defendants.** | § | |
| _____ | § | |

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Dated:  August 14, 2015

Respectfully submitted,

Matthew J. Gulde
Attorney-in-Charge
Illinois Bar No. 6272325
S.D. Texas Bar No. 1821299
Nikolay Vydashenko
New York Bar No. 4628566
United States Securities and
Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
Telephone:  (817) 978-1410 (mg)
Facsimile:  (817) 978-4927
guldem@sec.gov

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF CONTENTS .........................................................................................ii-iii

TABLE OF AUTHORITIES ..................................................................................iii-vi

INTRODUCTION....................................................................................................1

FACTUAL BACKGROUND ...................................................................................2

    I.    Farmer's Involvement in Chimera's Formation and IPO .........................2

    II.    Farmer's Role in the Form 211 Application Process...............................4

    III.    Consolidation of Chimera Shares and Stock Split..................................6

    IV.    Farmer Funds a False Promotional Campaign........................................7

    V.    Farmer's Continued Involvement in Chimera's
    Business and Regulatory Affairs ...........................................................8

    VI.    Sales of Chimera's Stock to the Public for Farmer's Benefit.................9

SUMMARY JUDGMENT STANDARD ..................................................................12

ARGUMENT AND AUTHORITIES......................................................................13

    I.    The Court Should Grant Summary Judgment On the Commission's
    Third Claim Because Farmer Offered and Sold Unregistered Securities.............13

        A.    Farmer, directly and indirectly, offered and sold securities......................14

        B.    No registration was in effect for Farmer's many
        transactions in Chimera stock ..................................................15

        C.    Chimera's stock was offered and sold through interstate commerce ........16

        D.    Defendants Cannot Prove That An Exemption From
        Registration Applies Here.........................................................17

    II.    The Court Should Grant Summary Judgment on the SEC's
    First and Second Claims for Relief Because Farmer Defrauded Investors ...........17

        A.    Elements of Securities Fraud ....................................................18

        B.    Farmer Made Material Misrepresentations and Misleading Omissions ....19

        C.    Farmer Substantially Participated in a Fraudulent Scheme ......................22

        D.    Farmer Conducted His Fraudulent Activities in Connection

With the Purchase, Offer, and Sale of Securities ......................................23

E.      Farmer Acted with *Scienter* ......................................................................23

F.      Farmer and Chimera Violated Sections 17(a)(2)
        and 17(a)(3) of the Securities Act ..............................................................24

III.    The Court Should Enter Final Judgment Against Chimera ...................................25

**CONCLUSION**……… .............................................................................................................25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Aaron v. SEC*,
      446 U.S. 680 (1980) .............................................................................................18, 24

*Anderson v. Libby Lobby, Inc.*,
      477 U.S. 242 (1986) ....................................................................................................12

*Basic v. Levinson,*
      485 U.S. 224 (1988) ....................................................................................................19

*Broad v. Rockwell International Corp.*,
      642 F.2d 929 (5th Cir.) *en banc, cert. denied* 454 U.S. 965 (1981) ...........................23

*Celotex Corp. v. Catrett*,
      477 U.S. 317 (1986) ....................................................................................................12

*In Re Cowin*,
      492 B.R. 858 (Bankr. S.D. Tex. 2013) .........................................................................4

*Ernst & Ernst v. Hochfelder*,
      425 U.S. 185 (1976) ....................................................................................................23

*FDIC v. Fidelity & Deposit Co. of Maryland,*
      45 F3d 969 (5th Cir. 1995) .........................................................................................4

*Forsyth v. Barr*,
      19 F.3d 1527 (5th Cir. 1994) ......................................................................................12

*In re Global Crossing, Ltd. Sec. Litigation*,
      322 F. Supp. 2d 319 (S.D.N.Y. 2004) .........................................................................19

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ...................................................................19

*Hassinger v. JP Morgan Chase & Co.*,
  394 Fed Appx. 63 (5th Cir. La. 2010).........................................................12

*SEC v. Cavanagh*,
  1 F. Supp. 2d 337 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2nd Cir. 1998) .............14, 16

*SEC v. Continental Tobacco Co. of S.C.*,
  463 F.2d 137 (5th Cir. 1972) ...........................................................13, 16, 17

*SEC v. Fehn*,
  97 F.3d 1276 (9th Cir. 1996) ...................................................................18

*SEC v. Friendly Power Co LLC*,
  49 F. Supp. 2d 1363 (S.D. Fla. 1999) ..........................................................14

*SEC v. Gann*,
  565 F.3d 932 (5th Cir.2009) ...............................................................18, 19

*SEC v. Holschuh*,
  694 F. 2d 130 (9th Cir. 1982) ..................................................................13

*SEC v. Hopper*,
  2006 WL 778640 (S.D. Tex. Mar. 24 2006)..............................................18, 24

*SEC v. Lee*,
  720 F. Supp. 2d 305 (S.D.N.Y. 2010)...........................................................19

*SEC v. Murphy*,
  626 F.2d 633 (9th Cir. Cal. 1980)..............................................................17

*SEC v. Platforms Wireless International Corp.*,
  617 F.3d 1072 (9th Cir. 2010) ..................................................................17

*SEC v. Provident Royalties, LLC*,
  2013 WL 5314354 (N.D. Tex. Sept. 23, 2013).................................................19

*SEC v. Ralston Purina Co.*,
  346 U.S. 119 (1953)............................................................................17

*SEC v. Seghers*,
  298 Fed. Appx. 319 (5th Cir. Tex. 2008).......................................................19

*Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*,

    395 F.3d 533 (5th Cir. 2004) ...................................................................12

*Simpson v. AOL Time Warner, Inc.*,
    452 F.3d 1040 (9th Cir. 2006), *vacated on other grounds by Simpson v.*
    *Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008) ..................................19

*State Farm Mut. Auto. Ins. Co. v. Abrams*,
    2000 WL 574466 (N.D. Ill. May 11, 2000) ...................................................4

*Swenson v. Engle*,
    626 F.2d 421 (5th Cir. 1980) ...................................................................13

*Tidewater Inc. v. U.S.*,
    565 F.3d 299 (5th Cir. 2009) ...................................................................12

*U.S. v. Dist. Council of N.Y City & Vicinity of the United Bhd of Carpenters and*
    *Joinder of Am*,
    832 F. Supp 644 (S.D.N.Y 1993) ................................................................4

*U.S. v. Naftalin*,
    441 U.S. 768 (1979)...............................................................................19

*U.S. v. Tager*,
    788 F.2d 349 (6th Cir. 1986) ...................................................................19

## FEDERAL STATUTES

Section 5(a) of the Securities Act,
    15 U.S.C. §§ 77e(a)..........................................................................13, 17

Section 5(c) of the Securities Act,
    15 U.S.C. § 77e(c)...........................................................................13, 17

Section 17(a) of the Securities Act of 1933,
    15 U.S.C. § 77q(a) .........................................................18, 19, 20, 24, 25

Section 10(b) of the Securities Exchange Act of 1934,
    15 U.S.C. § 78j(b).........................................................................18, 19, 25

Rule 10b-5 of the Securities Exchange Act of 1934,
    17 C.F.R. § 240.10b-5...................................................................18, 19, 25

Section 15(d) of the Securities Exchange Act of 1934,
    15 U.S.C. § 78o(d) ..................................................................................25

Rule 12b-20 of the Securities Exchange Act of 1934,

17 C.F.R. § 240.12b-20.................................................................................................25

Rule 15d-1 of the Securities Exchange Act of 1934
17 C.F.R. § 240.15d-1..............................................................................................25

Rule 15d-11 of the Securities Exchange Act of 1934
17 C.F.R. § 240.15d-11............................................................................................25

Rule 15d-13 of the Securities Exchange Act of 1934
17 C.F.R. § 240.15d-13............................................................................................25

## MISCELLANEOUS

Rogers, Jr. & Weeden, *Resales of Securities Under the Securities Act*,
1012 PLI/Corp. 285 (Sept. 1997)................................................................................16

Pursuant to Fed. R. Civ. P. 56, Plaintiff Securities and Exchange Commission ("Plaintiff" or "Commission") moves for Summary Judgment against Defendant Andrew I. Farmer on all claims against him and submits the following Brief in Support.[1]  Plaintiff also moves for entry of Final Judgment against defaulting Defendant Chimera Energy Corp. ("Chimera"), or in the alternative, for summary judgment against Chimera.

## <u>INTRODUCTION</u>

Andrew Farmer orchestrated an elaborate scheme through which he gained control, at nominal cost, of millions of shares of Chimera stock.  Chimera and Farmer then embarked on a public relations barrage designed to pump the company's stock price, despite the fact that Chimera had only nominal assets and illusory business dealings.  Personally selling at inflated prices and receiving proceeds of others' inflated sales, Farmer made millions of dollars at the expense of the uninformed market.

While the Commission plans to prove Farmer's entire scheme at trial, there are currently sufficient undisputed facts for the Court to conclude that Farmer violated the antifraud provisions of the securities laws as well as laws prohibiting the unregistered sales of securities.  As will be seen at trial, Farmer's scheme involved a relatively complex web of deceit and misdirection with many different people playing various roles.  For the purposes of this Motion, Plaintiff will show that the facts demonstrating Farmer's own lies and misleading omissions to gatekeepers and market participants are not subject to any genuine dispute.  Similarly, there is no doubt that Farmer personally sold unregistered securities in violation of the federal securities laws.  As set forth below, the Commission requests the Court to enter an Order of Summary Judgment against Andrew Farmer on the three claims alleged against him.

---

[1]   All evidentiary citations are to Plaintiff's Statement of Undisputed Facts ("SOF") filed concurrently with this Motion, and fully incorporated herein.

As to Defendant Chimera, which has neither answered the Complaint nor otherwise participated in this litigation, the Clerk of this Court filed an Entry of Default on March 3, 2015. On March 26, Plaintiff moved for entry of Final Judgment. Plaintiff respectfully requests the Court to enter Final Judgment against Chimera and order the requested injunctive relief. In the alternative, Plaintiff moves for summary judgment on all counts alleged against Chimera.

## FACTUAL BACKGROUND

Throughout Chimera's brief and eventful corporate existence, Andrew Farmer actively participated in every facet and stage of the company's lifespan. From the formation of the company by an inexperienced sole officer and director, Charles Grob, Farmer guided the company through interactions with regulators and personally orchestrated sham sales of stock as part of Chimera's initial public offering ("IPO"). Farmer also personally financed efforts to publicize Chimera's fictional waterless fracking technology and reaped millions of dollars once the company's shares were sold to an unsuspecting public. Directly and indirectly, Farmer repeatedly misled gatekeepers, market participants, and regulators about his role in the company.

## I.    Farmer's Involvement in Chimera's Formation and IPO

Grob incorporated Chimera in August 2011, about two months after meeting Farmer for the first time. (SOF 6). Chimera's initial source of funding came within a month of its formation in the form of a $100,000 loan from Kylemore Corp. ("Kylemore"), putatively owned by a friend of Farmer's wife. (SOF 10). At the time of the loan, Farmer was Kylemore's "de facto agent in the United States." (SOF 11). Farmer introduced Chimera to its securities counsel and auditor and served as the counsel's primary contact at Chimera. (SOF 9).

Coinciding with Chimera's formation, in August 2011 Farmer began paying Charles Grob $2,500 per month. (SOF 13). These payments continued until March 2012, when Chimera

began paying Grob the same amount pursuant to his March 1, 2012 employment agreement with Chimera.  (*Id*.).

Farmer continued to play a central role during Chimera's IPO.  He helped prepare, reviewed, revised, and assisted in filing with the Commission Chimera's Registration Statement and Prospectus, which described the Company and the IPO.  (SOF 16).  Farmer also coordinated Chimera's response to the Commission staff's questions regarding the Registration Statement. (SOF 21-22).  Although Chimera represented in the Registration Statement and Prospectus that the IPO shares would be sold by Grob, Farmer actively peddled shares among his family, friends, and associates.  (SOF 26, 28, 30-35).  For example, Farmer sold shares to his own parents without any involvement from Grob.  (SOF 28).

Further, Farmer provided at least seven IPO investors with money for the explicit purpose of their investing in Chimera's IPO.  (SOF 28).  With money provided by Farmer, his friends and family purchased two million of the total five million shares offered in the IPO.  (*Id*.).   In addition to the investors whom Farmer admits soliciting and financing, Farmer's wife and his accountant also purchased Chimera shares in the IPO.  (SOF 32-33).  While brokering the IPO investments of Eddie Austin's and Defendant Carolyn Austin's children and their spouses, Farmer authorized Eddie Austin to revise Chimera's subscription agreement.  (SOF 34).  When members of the Austins' family invested, Farmer took delivery of their signed subscription agreements.  (*Id*.).  Despite his central role in preparing the Registration Statement, brokering multiple IPO transactions, and funding the IPO investments of several investors, neither Farmer nor Chimera ever disclosed his payments to investors, his role in soliciting them, or the fact that he had been paying Grob's salary.  (SOF 6, 13, 26, 29).  This silence created the false impression that Grob was directing the company and that the company's investors were unrelated parties.

During the IPO, Grob set up a straw purchaser for 100,000 shares of Chimera stock. Asking his friend Daniel SoRelle for a personal favor, Grob provided SoRelle with cash to purchase Chimera stock while SoRelle posed as the purchaser.  (SOF 37-38).  When asked if Farmer had provided him the cash for such transactions, Grob asserted his rights under the Fifth Amendment and refused to answer.[2] (SOF 38).

## II.   Farmer's Role in the Form 211 Application Process

After the IPO, Farmer continued to be at the front and center of Chimera's dealings with third parties.  Farmer located a broker-dealer to act as a market maker who would publish trading quotations for Chimera's stock, a crucial ingredient in creating liquidity in the market for Chimera stock and the illusion of legitimacy of the company.  (SOF 39-41, 43-44).  To initiate quotations in a microcap stock such as Chimera, a market maker must comply with Rule 15c2-11 under the Exchange Act, and also submit a Form 211 to FINRA's OTC Compliance Unit to demonstrate compliance with that rule.  (SOF 41).  One purpose of this application process is to discern situations in which there is a concentration of freely tradeable stock in the hands of one person or a group of people – a pump-and-dump red flag.  (SOF 40, 42).

Farmer engaged Mark Dillon of Pennaluna & Co. ("Pennaluna") to submit a Form 211 application and act as Chimera's market maker.  (SOF 43-44).  Farmer and Grob took steps to conceal from Pennaluna (and therefore FINRA) the true nature of Farmer's relationship with

---

[2] During his deposition, Grob invoked his Fifth Amendment privilege against self-incrimination as to every question and category of question posed.  The Fifth Circuit permits an adverse inference to be drawn against a party due to a non-party witness's assertion of the Fifth Amendment privilege against self-incrimination. *In re Cowin*, 492 B.R. 858, 885 (Bankr. S.D. Tex. 2013); *Fed. Deposit Ins. Corp. v. Fidelity & Deposit Co. of Maryland,* 45 F.3d 969, 977 (5th Cir.1995). This is particularly appropriate where, as here, Grob and Farmer are co-conspirators.  *See State Farm Mut. Auto. Ins. Co. v. Abrams,* No. 96–C–6365, 2000 WL 574466, at *7 (N.D.Ill. May 11, 2000) (allowing an adverse inference to be drawn against a party from an alleged co-conspirator's invocation of the Fifth Amendment); *United States v. Dist. Council of N.Y. City & Vicinity of the United Bhd. Of Carpenters & Joiners of Am.,* 832 F.Supp. 644, 652 (S.D.N.Y.1993) ("the refusal to testify by a proven co-conspirator may justify an adverse inference against the other co-conspirators").

Chimera and Grob.  On December 22, 2011, when describing Chimera to Dillon, Farmer represented that "neither Carolyn [Austin] or (sic) myself are involved in the deal in any way." (SOF 43).  Farmer again concealed his role when responding to Pennaluna's diligence inquiry, which sought from Chimera information about the IPO shareholders, including "who made introductions" to shareholders, "who solicited them," how the shareholders were known to the person introducing or soliciting them, and interrelationships among shareholders.  (SOF 48). Farmer responded by sending a letter from Grob stating that "each of the individuals who subscribed to the offering was either personally known to our CEO, Charles Grob, or introduced to our CEO by another shareholder.  Mr. Grob was the sole individual authorized by the company to solicit investments from individuals who indicated interest in the offering."  (SOF 50).  Farmer's response also attached a chart describing shareholder relationships that omitted any mention of Farmer himself.  (SOF 50-56).  Similarly, when asked directly about Farmer's relationship with Chimera, Grob told Pennaluna that Farmer was not an "officer, director, consultant, affiliate, or shareholder of the issuer." (SOF 59).

Thus, despite extensive personal interactions, Farmer never disclosed to Dillon or anyone at Pennaluna (i) that he had provided the money for the purchase of two million of the five million total IPO shares; (ii) that his wife, parents, former assistant, and accountant were shareholders; (iii) that a significant number of Carolyn Austin's family were IPO shareholders; or (iv) that he had been paying Charles Grob's salary for as long as Chimera had existed.  (SOF 43-64).  Had Dillon known these facts, he would have investigated further, because the relationships and transactions would have been potentially indicative of an attempt to concentrate ownership of shares in the hands of one person or a group of people.  (SOF 45).

### III.   Consolidation of Chimera Shares and Stock Split

In May and June 2012, about six months after the IPO, every shareholder except for Farmer's wife sold his or her shares to one of seven entities.  (SOF 65).  None of these sales was registered with the Commission.  (SOF 20).

Each of the following entities acquired 700,000 shares at $.0225 per share:  Oak Resources, Inc. ("Oak Resources") (owned by Farmer's associate and former assistant, Lydia Cotton); TransAmerica Trading, Inc. ("TransAmerica") (owned by Carolyn Austin, wife of Eddie Austin and mother of several IPO investors); Kylemore (putatively owned by a friend of Farmer's wife's); Hillsmere SA (putatively owned by Farmer's sister-in-law); Clarent Services Corp.; and Levantera SA.  (SOF 66-70).  Additionally, Farmer personally acquired 600,000 shares from IPO investors, also at $.0225 per share, through his company Chartered Investments, Inc. ("Chartered").  (SOF 67).  Kylemore, Hillsmere SA, Clarent Services Corp., and Levantera SA are incorporated in the Republic of the Marshall Islands (collectively, the "Marshall Islands Entities").  (SOF 66).

For all 2.8 million shares acquired by the Marshall Islands Entities, Andrew Farmer paid the purchase price to each of the IPO investors, and referred to the acquiring entity as his "client" in correspondence with Chimera's transfer agent.  (SOF 66).  While Oak Resources and TransAmerica wrote their own checks to IPO investors when acquiring their stock, Farmer reimbursed each entity for the cost of acquiring Chimera shares.[3]  (SOF 69-70).

One of the IPO investors who sold directly to Farmer was Daniel SoRelle, who was provided cash by Grob to make the investment as described above.  (SOF 68).  SoRelle sold his shares to Andrew Farmer at the direction of Charles Grob.  (*Id.*).  Without negotiation, Grob

---

[3]  Both Cotton and Austin asserted their rights under the Fifth Amendment during the investigation.

provided the sales documents, gave SoRelle a check for $2,250, and instructed SoRelle to cash

the check and return the cash to Grob.  (*Id.*).  As promised by Grob, SoRelle did not make or lose

any money in his Chimera "investment."[4] (*Id.*).

On July 6, 2012, Chimera effected a 4:1 forward stock split, thus quadrupling the number

of shares in possession of all shareholders.  (SOF 72).  After the split, Oak Resources,

TransAmerica, and each of the Marshall Islands entities held 2.8 million shares of Chimera

stock, while Farmer owned 2.4 million shares through Chartered.  (*Id.*).

## IV.    Farmer Funds a False Promotional Campaign

Less than a month after the stock split, on July 27, 2012, Chimera announced that it had

licensed technology related to waterless fracking from a Chinese company.  (SOF 74).  When the

staff of the Commission asked if the technology or the Chinese company actually existed,

Charles Grob asserted his Fifth Amendment privilege against self-incrimination.  (SOF 75).  In

the next two and a half months, Chimera issued 33 press releases and four 8-K filings touting its

waterless fracking technology and business relationships, including the oft-repeated – but false –

claim that it had executed agreements with Petroleos Mexicanos ("Pemex"), the state-owned

petroleum company of Mexico.  (SOF 80).  Representatives of Pemex testified that Chimera had

neither a business relationship nor any agreements with Pemex.  (SOF 77).  Grob asserted his

privilege against self-incrimination when asked about the truth of Chimera's public claims

between July and October 2012.  (SOF 81).

As Chimera was beginning its barrage of press releases, Andrew Farmer placed images

advertising Chimera on websites of online publishers of finance and business content.  (SOF 82-

83).  Farmer paid at least $80,000 to Crisp Media, an ad placement firm, for online

---

[4]  When asked about this transaction, Grob asserted his rights under the Fifth Amendment.

advertisements touting Chimera's "NEW SAFE FRACKING!" that "USES ZERO WATER!",

and urging viewers to "INVEST TODAY."  (SOF 83).  Farmer paid Marchex, another placement

firm, approximately $104,000 for text advertisements of Chimera published through the Google

mobile advertising network.  (*Id.*)  The Marchex advertisements also hailed Chimera's "New

Safe Fracking" and "newly licensed method" that "uses zero water and is environmentally

neutral."  (*Id.*)  Additionally, Farmer paid Dow Jones & Company $162,615 for image

advertisements on its websites (including the Wall Street Journal) touting Chimera's "NEW

SAFE FRACKING" method and urging viewers to "INVEST TODAY."  (*Id.*)  In addition to

paying  $346,615 to these three entities, Farmer also paid his associate John Brotherton, who

placed these advertisements for him, more than a million dollars between August 2011 and

October 2012.  (SOF 84).  Farmer characterized a portion of his payments to Brotherton as the

cost of "creat[ing] an aware market for Chimera," and recognized such amounts as an "indirect

expense" related to his Chimera stock transactions.  (SOF 84-85).[5]

**V.      Farmer's Continued Involvement in
         Chimera's Business and Regulatory Affairs**

As Farmer funded Chimera's advertising campaign, he continued to stay active in the

company's affairs, notably preparing the company's Form 8-K announcing its license of the

fracking technology.  (SOF 106).  The metadata of the file containing the license agreement,

which Farmer provided to an employee of Chimera's law firm for filing, reflect that the license

agreement was last modified by Farmer.  (*Id.*)  Farmer also forwarded to the law firm for filing

the Form 8-K announcing Chimera's non-existent deal with Pemex.  (*Id.*)

---

[5]  Brotherton stated that he would assert the Fifth Amendment privilege against self-incrimination if compelled to testify about Chimera and any dealings with Farmer and Chartered.

On August 15, 2012, Farmer caused his company, Infinite Funding Inc. ("Infinite") to enter into a Master Credit Agreement with Chimera whereby Infinite loaned Chimera $25,000 and extended Chimera a line of credit up to $500,000.  (SOF 112).

In October 2012, FINRA's Fraud Detection and Market Intelligence Unit began investigating Chimera.  FINRA asked Chimera to describe how Grob knew Farmer and "any business [Chimera] or the executive officer has done" with Farmer.  (SOF 124-125).  On October 11, 2012, Chimera emailed a draft response to Chimera's securities counsel.  (SOF 125).  Metadata on that letter indicates that Farmer created the response and last edited it on the day Chimera sent it.  (*Id.*).  The draft response stated that "Mr. Farmer is a long-term friend of our former CEO Charles Grob.  The Company does not have now, nor has it ever had, a business relationship with Mr. Farmer.  While Mr. Grob and Mr. Farmer are friends, they have never had a business relationship."  (*Id.*).

After comment and revision, Chimera responded to FINRA's inquiry about Grob and Farmer, stating:

> Mr. Farmer is a long-term friend of our former CEO, Charles Grob.  During the formation of the Company, Mr. Grob sought advice from Mr. Farmer regarding the process of filing the Company's Registration Statement with the SEC.  At no time was Mr. Farmer an officer, director or affiliate of the Company.  Mr. Farmer was never compensated for his advice.  The Company does not have now, nor has it ever had, a business relationship with Mr. Farmer.  While Mr. Grob and Mr. Farmer are friends, they have never had a business relationship.

Metadata attached to the final form of this response again indicates that Farmer created and last modified the letter sent to FINRA.  (SOF 126).

## VI.  Sales of Chimera's Stock to the Public for Farmer's Benefit

While Chimera was publishing its misleading press releases, and while Farmer was conducting his own "market awareness" campaign, the seven entities holding nearly 20 million

shares of Chimera stock began to sell the stock to the public.  (SOF 87-103).  More than $4.1 million of the proceeds of these sales would ended up in Farmer's pockets.  (SOF 89, 93, 95).

Between June 29 and September 27, 2012, Farmer sold to the public more than 1.1 million shares of Chartered's Chimera stock for proceeds of approximately $692,554. (SOF 95).

Between July 30 and August 23, 2012, TransAmerica sold to the public all of the 2.8 million shares of Chimera stock that it owned for total proceeds of approximately $3,224,630. (SOF 88).  TransAmerica sold at prices as high as $1.84 per share.  (*Id.*).  During August 2012, TransAmerica transferred $3,050,000 to Farmer.  (SOF 89).

Between June 20 and November 15, 2012, Oak Resources sold to the public more than 2.2 million of its shares for proceeds of approximately $667,557.  (SOF 91).  While Oak Resources was selling its Chimera stock from its Pennaluna brokerage account, it became clear to Mark Dillon that Andrew Farmer – not Lydia Cotton, the ostensible owner of Oak Resources – was directing Oak Resources' trades.  (SOF 92).  Dillon asked Cotton to provide written authorization for Farmer to direct trading.  (*Id.*).  In connection with this process, Farmer told Dillon that Cotton was his girlfriend.  (*Id.*). Concurrent with and shortly after its sales of Chimera stock, Oak Resources transferred approximately $425,000 to Farmer's accounts.  (SOF 93).

Two of the Marshall Islands entities with extensive ties to Farmer also sold significant amounts of Chimera stock to the public.  (SOF 96-106).  In August and September 2012, Kylemore made $790,876 on sales of approximately 740,000 shares of Chimera stock.  (SOF 96).  Similarly, between July 31 and October 24, 2012, Hillsmere SA sold about 2,946,500 shares for proceeds of about $1.419 million.  (SOF 97).

Kylemore is putatively owned by Alina Yurovskaya, a Russian citizen who is a friend of Farmer's wife.  (SOF 99-100).  Farmer was Kylemore's "de facto agent in the United States," his wife used the email account anna@kylemorecorp.com, he registered Kylemore's internet domain name, and at least $4.36 million moved between Kylemore's and Chartered's bank accounts between October 2011 and October 2012.  (SOF 10-11).  Farmer introduced Yurovskaya to David Craven, who is affiliated with EuroHelvetia TrustCo S.A. ("EuroHelvetia"), a private wealth management firm based in Geneva, Switzerland.  (SOF 99). Craven was the trustee of Kylemore.  (*Id.*).  Farmer is listed as the "Settlor" of the Kylemore Trust, which controls Kylemore, in documents establishing Kylemore's bank account at the Geneva bank Compagnie Bancaire Helvetique ("CBH").  (SOF 99-100).

Similarly, Hillsmere SA is putatively owned by Olga Tikhonova, Farmer's sister-in-law. (SOF 101).  EuroHelvetia's documents establishing Hillsmere SA's account also list Farmer as "Settlor" of the Hillsmere Trust (which controls Hillsmere SA), and state that the source of Hillsmere SA's funds at CBH was "[f]unds coming from A. Farmer to start in the form of a loan."  (*Id.*).  Olga Tikhonova and Alina Yurovskaya opened their accounts at EuroHelvetia in Geneva on the same day: April 8, 2011.  (SOF 100-101).  On April 1, 2011, Farmer bought airline tickets for the two women to travel from their home in Yekaterinburg, Russia to Geneva, Switzerland.  (SOF 103).

## SUMMARY JUDGMENT STANDARD

Summary judgment, "upon all or any part of [a] claim," is appropriate where there is no genuine dispute as to any material fact regarding that portion of the claim.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The Commission, as the movant, bears the initial burden of identifying the evidence that demonstrates the absence of any material fact.  *See Celotex*, 477 U.S. at 323.  Once that burden is met, the defendants cannot rest on mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative to defeat the motion.  *See Celotex Corp.,* 477 U.S. at 324*; Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) ("Needless to say, unsubstantiated assertions are not competent summary judgment evidence.").  Instead, they must submit significant probative *evidence* to show that material, triable issues of fact remain.  *See Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).   "The mere scintilla of evidence in support of the [nonmoving party's] position will be insufficient."  *Liberty Lobby*, 477 U.S. at 252.

"On cross motions for summary judgment, the court reviews each motion independently, viewing the evidence and inferences in the light most favorable to the non-moving party." *Hassinger v. JP Morgan Chase & Co*., 394 Fed. Appx. 63, 65 (5th Cir. 2010); *see also Tidewater Inc. v. United States*, 565 F.3d 299, 302 (5th Cir. 2009).  "If there is no genuine issue and one of the parties is entitled to prevail as a matter of law, [this] court may render summary judgment." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc*., 395 F.3d 533, 539 (5th Cir. 2004).

In short, the Court must enter summary judgment if, under the governing law, there is only one reasonable conclusion.  *See Anderson,* 477 U.S. at 250.

## ARGUMENT AND AUTHORITIES

**I.**  **The Court Should Grant Summary Judgment On the Commission's Third Claim Because Farmer Offered and Sold Unregistered Securities[6]**

Farmer violated Sections 5(a) and 5(c) of the Securities Act because he participated in hundreds of transactions in Chimera securities without registering those transactions with the SEC. *See* 15 U.S.C. §§ 77e(a) & 77e(c). Both of these statutory provisions prohibit the unregistered offer or sale of securities in interstate commerce unless an exemption from registration applies. *SEC v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137, 155 (5th Cir. 1972).

Section 5 operates as a strict liability statute; a defendant's intent is irrelevant. *Swenson v. Engle,* 626 F.2d 421, 424 (5th Cir. 1980). Therefore, the Commission does not need to prove that a defendant knowingly, recklessly, or even negligently committed the violation. *Id.*; *see SEC v. Holschuh*, 694 F.2d 130, 137 n.10 (9th Cir. 1982) ("good faith is not relevant to whether there has been a primary violation of the registration requirements"). In order to establish a *prima facie* case of a violation of Sections 5(a) and 5(c), the Commission need only prove that: (1) defendants, directly or indirectly, offered or sold securities; (2) no registration was in effect or filed with the Commission for the offer or sale of those securities; and (3) interstate transportation or communication, or the mails were used in connection with the offer and sale. *See* 15 U.S.C. §§ 77e(a) & 77e(c); *Cont'l Tobacco,* 463 F.2d at 155. Once a *prima facie* case is established, the ***burden shifts*** to defendants to prove that their acts fall within an exemption to Section 5. *Cont'l Tobacco,* 463 F.2d at 156.

---

[6] The Commission is not yet moving for summary judgment on its claims against Defendant Carolyn Austin under Section 5 of the Securities Act because Plaintiff's counsel and Defendant Austin have reached a tentative agreement in principle to resolve those claims. Defendant has made an offer to settle those claims, which Plaintiff's counsel is in the process of submitting for review by the Commission. Only the Commission, not Plaintiff's counsel, may approve or reject any settlement offer.

A defendant may be liable under Section 5 even in instances in which the defendant did not have direct contact with the purchasers of the securities, if the defendant employed or directed others to sell or offer the securities, or if the defendant planned the scheme by which the securities were offered or sold in an unregistered transaction.  *See SEC v. Friendly Power Co LLC*, 49 F. Supp. 2d 1363, 1371 (S.D. Fla. 1999).  Furthermore, Section 5 liability extends beyond those who sell stock in unregistered transactions to all necessary participants in the transactions.  *See SEC v. Cavanagh*, 1 F. Supp. 2d 337, 372 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2nd Cir. 1998).

### A.      Farmer, Directly and Indirectly, Offered and Sold Securities

It is undisputed that Farmer offered and sold Chimera's securities and was a necessary participant in multiple levels of transactions between Chimera's issuance of securities and their ultimate purchase by public market participants.

In the first level of transactions – the distribution of shares from Chimera to the 29 investors via the IPO – Farmer solicited the investment of, *and provided the investment funds to*, several IPO shareholders.

In the second level of transactions – the consolidation of shares distributed in the IPO in the hands of seven entities – Farmer again provided *all* of the investment funds used to fund the consolidating transactions.  He wrote every single check to each IPO shareholder from whom the Marshall Islands Entities acquired stock, and he called himself the agent of the Marshall Islands Entities.  Moreover, Farmer provided to Oak Resources and TransAmerica all of the funds that they then used to acquire Chimera stock from IPO shareholders.

In the third level of transactions – when Chimera's shares reached the uninformed public market – Farmer orchestrated the sale of Chimera stock from the accounts at Oak Resources and

sold Chimera stock for his own account through Chartered.  Kylemore and Hillsmere SA, two Marshall Islands entities with close associations with Farmer, also sold to the public at this stage. Farmer then received the proceeds not only from his own sales through Chartered, but also the proceeds of the sales of Chimera securities by Oak Resources and TransAmerica.  The proceeds to Farmer directly from the sales of these securities amounted to more than $4.1 million, and this amount expands to $6.3 million considering gains to his associates Alina Yaruvskaya and Olga Tikhonova.

There is no reasonable dispute that Farmer offered, sold, and was a necessary participant in the sales of millions of shares of Chimera stock for proceeds of millions of dollars at the IPO level, consolidating level, and public market level.  Having funded all the consolidating acquisitions from IPO shareholders, Farmer was a necessary participant in 28 separate unregistered transactions.  Later, when selling to the uninformed public for his account through Chartered and that of his close associates (through Kylemore and Hillsmere SA), and for Oak Resources, Farmer again was a participant in unregistered transactions.  And, in taking nearly all of the proceeds of TransAmerica's stock sales to the public, Farmer participated in its unregistered transactions as well.  Accordingly, this element of the Commission's Section 5 claim is not in question.

### B.    No Registration Was in Effect for Farmer's Many Transactions in Chimera Stock

Chimera's IPO was a sham in that sales were not *bona fide*, but were made to straw purchasers with no personal stake in the purported investment.  Chimera's Registration Statement on Form S-1, of course, does not describe such straw transactions.  Rather, the Registration Statement discloses a securities offering in which Chimera would "offer shares on a self-underwritten basis directly through Charles Grob," relying on the safe-harbor provisions of

Exchange Act Rule 3a4-1 applying to Mr. Grob alone.  Grob and Farmer both set up straw

purchasers by providing their friends with money to "buy" Chimera stock.  Accordingly, each

such IPO transaction was unregistered and violated Section 5.

Importantly, the registration requirements did not end at Chimera's IPO.  "[O]nce a

security has been sold pursuant to a registration statement, subsequent sales are not themselves

sales for which a registration statement is in effect.  Each sale of a security, then, must either be

made pursuant to a registration statement or fall under a registrations exemption."  *SEC v.*

*Cavanagh*, 155 F.3d 129, 133 (2th Cir. 1998) (quoting Rogers, Jr. & Weeden, *Resales of*

*Securities Under the Securities Act*, 1012 PLI/Corp. 285, 287 (Sept. 1997)); *see also* Securities

Act, Rule 144 Preliminary Note 1 ("If any person sells a non-exempt security to another person,

the sale must be registered unless an exemption can be found for the transaction.").  Thus, even if

the initial IPO transactions were legitimate and effectively registered, which they were not, all

subsequent transactions, including the consolidating transactions and the sales to the public on

the market, violated Section 5 of the Securities Act unless they were registered or made pursuant

to an exemption.  Here, it is undisputed that all transactions in Chimera stock subsequent to the

IPO were unregistered, and, as discussed below, the burden now shifts to Farmer to prove that

the transactions subsequent to the IPO were exempt from registration.  *See Cont'l Tobacco,* 463

F.2d at 156.

### C.    Chimera's Stock Was Offered and Sold Through Interstate Commerce

Likewise, there is no dispute that Chimera's securities were offered and sold through

interstate commerce.  Farmer personally sold to investors in various jurisdictions and used the

mail, emails, and telephones to communicate with investors.  By his own admission, Farmer

engaged in a "market awareness" campaign that included financing advertisement in national publications like the Wall Street Journal.

### D.     Defendants Cannot Prove That an Exemption From Registration Applies Here

Having established a *prima facie* Section 5 violation, the burden of proof shifts to Farmer to show that an exemption from registration was available for his offers or sales of Chimera securities. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 124-26 (1953); *Murphy*, 626 F.2d at 641. Exemptions from registration are construed narrowly "in order to further the purpose of the [Securities] Act: To provide full and fair disclosure of the character of the securities, and to prevent frauds in the sale thereof." *Cont'l Tobacco,* 463 F.2d at 155 (exempted transactions must be "narrowly viewed" since the Securities Act "is remedial legislation entitled to a broad construction"); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1087 (9th Cir. 2010). While the Securities Act provides numerous exemptions from the registration requirements of Section 5, none apply to the case at bar.[7] Accordingly, the Court should grant the Commission's Motion for Summary Judgment as to Farmer's violations of Section 5 of the Securities Act.[8]

### II.     The Court Should Grant Summary Judgment on the SEC's First and Second Claims Because Farmer Defrauded Investors[9]

As alleged in the Complaint, Andrew Farmer's securities fraud scheme permeated every stage of the Chimera's life and every share of the company's stock. Because there is no genuine issue of material fact regarding many facets of Farmer's fraud, the Court should grant the SEC's

---

[7] Because they are facially inapplicable, the Commission will not address the exemptions here. If the Defendants attempt to demonstrate that an exemption applies, the Commission will address that argument in its reply to Farmer's opposition to this Motion.

[8] Because the SEC has demonstrated that Farmer violated Section 5 of the Securities Act through, this Court should order Farmer to disgorge his illicit gains from those violations. If the Court grants this Motion, the SEC will file a Motion for remedies addressing the relief sought against Farmer for his securities law violations.

[9] Plaintiff is not moving for summary judgment on these claims as to Grob and Rios because counsel for those defendants have represented intent to consent to the entry of Agreed Partial Judgments against them. Plaintiff's counsel will file such documents when received**.**

motion on its first and second claims for relief pursuant to Section 17(a) of the Securities Act and

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### A.      Elements of Securities Fraud

Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), prohibits fraud in the offer or sale

of securities, and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5

thereunder, 17 C.F.R. § 240.10b-5, prohibit fraud in connection with the purchase or sale of any

security.  To establish liability under Section 17(a) of the Securities Act and Section 10(b) of the

Exchange Act, and Rule 10b-5, the SEC must prove by a preponderance of the evidence: (i) a

material misrepresentation, omission of material fact, or other fraudulent device; (ii) in

connection with the purchase, offer, or sale of a security; (iii) with the requisite mental state.  *See*

*Aaron v. SEC,* 446 U.S. 680, 695 (1980); *SEC v. Gann, 565* F. 3d 932, 936 (5th Cir. 2009); *SEC*

*v. Seghers,* 298 F. App'x 319, 328 (5th Cir. 2008).  Violations of Section 17(a)(1), Section 10(b),

and Rule 10b-5 require a showing of scienter.  *See Aaron,* 446 U.S. at 697.  Violations of

Sections 17(a)(2) and (a)(3) require, at most, a showing of negligence.[10]  *See SEC v. Hopper,*

2006 WL 778640 at *9 (S.D. Tex. Mar. 24 2006).

Even without specific fraudulent statements, Sections 17(a)(1) and (3) of the Securities

Act, and Exchange Act Rules 10b-5(a) and (c) prohibit *schemes* to defraud.  These antifraud

provisions impose primary liability for a scheme to defraud on any person who "*substantially*

*participates* in a manipulative or deceptive scheme by directly or indirectly employing a

manipulative or deceptive device . . . intended to mislead investors, even if a material

misstatement by another person creates the nexus between the scheme and the securities market."

---

[10]   The Supreme Court has never addressed whether negligence is necessary to prove a violation of Sections
17(a)(2) and (a)(3).  In fact, the Court has suggested that, at least under Section 17(a)(3), the focus is only on the
"effect of particular conduct on members of the investing public, rather than upon the culpability of the person
responsible" for the conduct.  *Aaron,* 446 U.S. at 696-97.

*SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010) (emphasis in original); *see also Simpson v. AOL Time Warner*, Inc. 452 F.3d 1040, 1048 (9th Cir. 2006) ("the defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme"), *vacated on other grounds by Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335-36 (S.D.N.Y. 2004) ("a cause of action exists under [Rule 10b-5] subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant").

As demonstrated below, there is no genuine issue of material fact that Farmer violated Section 10(b), and Rule 10b-5 thereunder, and Section 17(a) by making material misstatements and omission, and also by engaging in a scheme to defraud.

### B.    Farmer's Made Material Misrepresentations and Misleading Omissions

"[T]he standard for misrepresentation is whether the information disclosed, understood as a whole, would mislead a reasonable potential investor. [And a] statement or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *SEC v. Provident Royalties, LLC*, 2013 WL 5314354, at *4 (N.D. Tex. Sept. 23, 2013) (quoting *SEC v. Seghers*, 298 F. App'x 319, 328 (5th Cir. 2008); see *S.E.C. v. Gann*, 565 F.3d 932, 937 n.17 (5th Cir.2009). Phrased another way, "[a]n omitted fact is material if disclosure of the omitted fact would have "significantly altered the total mix of information made available." *Basic v. Levinson*, 485 U.S. 224, 232 (1988).  As such, the antifraud provisions of the securities statutes and regulations impose a "'duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or

volunteered, not misleading.'" *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992)).

To the extent fraud is committed on an intermediary, such as a broker, materiality is evaluated from that person's perspective, and not from the perspective of a reasonable investor. *U.S. v. Tager*, 788 F.2d 349, 354-55 (6th Cir. 1986) (affirming convictions for securities, wire and mail fraud on the ground, in part, that misrepresentations to a broker about the defendant's financial situation designed to transfer risk were material); *see also U.S. v. Naftalin*, 441 U.S. 768 (1979) (Section 17(a) of the Securities Act held to cover fraud against brokers).

As the SOF and Factual Background above demonstrate, Andrew Farmer told lies and made misleading omissions that are undisputed.  The major goal of these lies and omissions was to conceal the nature and extent of Farmer's involvement with Chimera.  Farmer's actual relationship with Chimera and Grob was material because the persons relying on his statements – including brokers, regulators, and investors – considered such relationships important given the ease and frequency with which microcap companies like Chimera can and are manipulated by undisclosed control persons.

Yet, in the face of inquiries by market participants, gatekeepers, and regulators, Farmer repeatedly minimized his role.  Farmer told Mark Dillon, Chimera's market maker who Farmer knew would rely on his statements in applying for FINRA's clearance to quote Chimera stock, that neither Farmer nor Carolyn Austin were "involved in the deal in any way."  This was a knowing and intentional lie, as not only did it conceal Farmer's extensive involvement with every facet of Chimera's operational, financial, and regulatory affairs, but at the very same time Farmer made that statement, he was brokering IPO transactions between Chimera and multiple investors, going so far as to personally finance the purchases of two million of the five million

shares offered.  Farmer's financial involvement in the IPO was not otherwise disclosed to regulators, and his express lie to Dillon helped it remain so.  These facts are not in question and Farmer's lie was undoubtedly material to the process of bringing Chimera's stock to the public.

Farmer's active involvement in Chimera's IPO made many of the statements he made to Dillon and FINRA false and misleading.  On January 13, 2012, for example, in responding (ostensibly from Chimera) to Pennaluna's questions about how IPO investors came to invest, Farmer sent Pennaluna a response that misleadingly omitted his own involvement.  The response included the false claims that "each of the individuals who subscribed to the offering was either personally known to our CEO, Charles Grob, or introduced to our CEO by another shareholder.  Mr. Grob was the sole individual authorized by the company to solicit investments from individuals who indicated interest in the offering."  Farmer's response attached a chart that also misleadingly described investor interrelationships in a tortured way that omitted any mention of Farmer himself, even though he was the common denominator that linked many of the IPO investors to each other and to Grob.  None of these materials disclosed the fact that Farmer had personally paid for 2/5 of the IPO shares or that Farmer was currently paying Grob's salary and had been since Chimera's inception.  Again, these misstatements were undoubtedly material. Any broker in the role of a market maker would have wanted to know about an undisclosed control person who was positioning himself to secretly obtain control of vast amounts of the company's stock.

Farmer also lied to regulators during the critical period when he and his associates were dumping inflated stock on the public market.  In October 2012, when FINRA's Fraud Detection and Market Intelligence Unit began investigating Chimera, Farmer drafted a response to FINRA's inquiries on Chimera's behalf in which he claimed that he had never had a business

relationship with Grob or with Chimera. Both claims are indisputably false for many reasons, including that Farmer paid Grob's salary for the first six months of Chimera's existence and also had extended a $500,000 line of credit to Chimera only two months earlier. Rather than disclose these facts, Farmer and Chimera misleadingly described Farmer as Grob's "long-term friend." Even this statement, intended to explain why Farmer would be involved with Chimera at all, was false because Farmer had met Grob only a year earlier around the time the Chimera scheme began. There is no question that Farmer misled Pennaluna, FINRA, the Commission, and the market about his control of and interest in Chimera.

### C.  Farmer Substantially Participated in a Fraudulent Scheme

The fraudulent statements described above violated the antifraud provisions of the securities laws, but they also form part of Farmer's overarching scheme to defraud. Additional facets of this deceptive scheme, which enabled Farmer to make millions on worthless stock, include: (i) personally financing, in secret, purchases of IPO stock for at least two million of the total five million shares being offered; (ii) guiding Chimera and acting as the face of the company in interactions with securities counsel and market maker; (iii) personally spending hundreds of thousands of dollars to advertise Chimera's fictional "NEW SAFE FRACKING!" business; (iv) personally paying an undisclosed salary to Chimera's sole officer, director, and only employee for the first six months of Chimera's existence; (v) financing and orchestrating the purchase of nearly five million shares from IPO investors; and (vi) personally collecting proceeds of at least $4.1 million from sales to the public. In sum, Farmer was on both sides of every transaction in Chimera stock until the stock was sold to the unsuspecting public making Farmer millions. The undisputed facts in this case clearly show Farmer's substantial participation in the fraudulent scheme.

**D.**    **Farmer Conducted His Fraudulent Activities In Connection with the Purchase, Offer, and Sale of Securities**

The securities at issue in this case are the shares of Chimera.  Not only did Farmer's conduct have "some nexus with" Chimera stock, but all of Farmer's conduct in this case was focused on obtaining Chimera shares to sell to the uninformed public.  There is no question that the second element of securities fraud is satisfied in this case.

**E.**    **Farmer Acted with Scienter**

The element of scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  In the Fifth Circuit, scienter is established by a showing that the defendants acted intentionally or with severe recklessness.  *See Broad v. Rockwell Int'l Corp.*, 642 F. 2d 929 (5th Cir.) *en banc, cert. denied* 454 U.S. 965 (1981).

There is no share of Chimera stock that did not have Farmer's fingerprints on it at multiple levels of sales.  Farmers' role in orchestrating these sales was not accidental, but motivated by the intent to deceive, manipulate, and defraud.  The clearest evidence that Farmer conducted this scheme and told these lies intentionally is that, when the shares reached his victims in the public market, Farmer pocketed at least $4.1 million of the proceeds.  As discussed above, at exactly the same time he was "financing" the stock purchases of a significant number of the IPO investors, Farmer was telling Mark Dillon that he was not "involved in the deal in any way."  This undisputed statement was made with the intent to deceive and manipulate Dillon and allow Farmer's scheme to continue.

Farmer's interaction with Pennaluna and FINRA is sufficient to show that Farmer acted with scienter.  But it is only the tip of the iceberg of Farmer's fraudulent scheme.  Following the money trail, Farmer's scienter becomes even more clear considering that he received nearly all

proceeds from the fraudulent sales of shares owned by his former assistant Lydia Cotton's company, Oak Resources ($425,000); all proceeds from his associate Carolyn Austin's company, TransAmerica Trading, Inc. ($3,223,004); and all proceeds from his own sales through Chartered Investments, Inc. ($692,554). There is no stage of Chimera's life in which Farmer was not deeply involved, and there is no question that Farmer acted intentionally with a motive for illegal personal gain.

Farmer's deep personal and financial commitment invested in this scheme also bears on his scienter. Not only was he paying Grob's salary, but he paid hundreds of thousands of dollars to advertise Chimera's non-existent technology. When presented with the allegation that the company's technology and business relationships did not exist, he did not investigate, but rather continued his central role in Chimera's media barrage. Any review of the undisputed facts of this case shows that Farmer's conduct was measured and calculated far in excess of the minimum standard for scienter fraud.

### F.    Farmer and Chimera Violated Sections 17(a)(2) and 17(a)(3) of the Securities Act

The Complaint also alleges that Farmer violated Sections 17(a)(2) and (a)(3) of the Securities Act. These provisions require, at most, a showing of negligence. *See, e.g.*, *SEC v. Hopper,* 2006 WL 778640 at *9 (S.D. Tex. Mar. 24 2006). The Supreme Court, however, has suggested that, at least under Section 17(a)(3), the focus is only on the "*effect* of particular conduct on members of the investing public, rather than upon the culpability of the person responsible" for the conduct. *Aaron*, 446 U.S. at 696-97. While the SEC believes the evidence strongly supports that the Farmer acted with scienter, there is no doubt that they at least acted negligently. The effect of their conduct on members of the investing public justifies a finding that they violated, at a minimum, Sections 17(a)(2) and 17(a)(3) of the Securities Act.

After trading was suspended and the true value of Chimera stock became known, innocent shareholders were left holding worthless stock after Farmer had made more than $4.1 million on their backs.  The effect on members of the investing public is undisputed and enormous.

## III.    The Court Should Enter Final Judgment Against Chimera

The requirements of Rule 55 being satisfied, the Court should enter Final Judgment against Chimera and order appropriate injunctive relief, holding the question of disgorgement and penalties until such time as the Court is resolving similar matters in connection with other defendants.  In the alternative, because the undisputed facts presented in connection with this motion show that there is no issue of material fact as to any allegation against Chimera.  Making material misrepresentations and omissions to regulators and the public, and participating in a fraudulent scheme to sell worthless shares to the public, Chimera violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Filing a false and misleading Registration Statement and Forms 10-Q and 8-K, Chimera violated Section 15(d) of the Exchange Act and Rules 12b-20, 15d-1, 15d-11, and 15d-13 thereunder.  Accordingly, the Court should enter Summary Judgment against the company on all counts alleged against it.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the Commission's motion for summary judgment and grant Plaintiff such other relief as it may be entitled.  A proposed Order is attached to this motion.

Dated: August 14, 2015                          Respectfully submitted,

s/Matthew J. Gulde
Matthew J. Gulde
Illinois Bar No. 6272325
S.D. Texas Bar No. 1821299
Nikolay V. Vydashenko
New York Bar No. 4628566

United States Securities and
Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
Telephone:  (817) 978-1410 (MJG)
Facsimile:  (817) 978-4927
guldem@sec.gov

*Attorneys for Plaintiff Securities
and Exchange Commission*

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all counsel who have registered with the Court. Additionally, I have caused a true copy thereof to be delivered by the United States Postal Service, Certified Mail, Return Receipt Requested, addressed to:

Chimera Energy Corp.
c/o Nevada Secretary of State
Meyers Annex Office, Attn: Alfie Frieser
202 N. Carson Street
Carson City, Nevada 89701
Defendant

_s/Matthew J. Gulde_
Matthew J. Gulde