**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No.:  4:14-CV-02345** |
| | § | |
| **ANDREW I. FARMER,** | § | |
| **CHARLES E. GROB, JR.,** | § | |
| **CAROLYN AUSTIN,** | § | |
| **BALDEMAR P. RIOS, and** | § | |
| **CHIMERA ENERGY CORP.** | § | |
| | § | |
| **Defendants.** | § | |
| _____ | § | |

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF SECURITIES**
**AND EXCHANGE COMMISSION'S MOTION FOR SUMMARY JUDGMENT**

Dated: August 14, 2015          Respectfully submitted,

Matthew J. Gulde
Attorney-in-Charge
Illinois Bar No. 6272325
S.D. Texas Bar No. 1821299
Nikolay Vydashenko
New York Bar No. 4628566
United States Securities and
Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
Telephone:  (817) 978-1410 (mg)
Facsimile:  (817) 978-4927
guldem@sec.gov

*Attorneys for Plaintiff*

1

## I.      Farmer's Control of Relevant Entities, Bank Accounts, and Brokerage Accounts

1.      From at least August 1, 2011 through at least October 2012 (the "Relevant Time Period"), Defendant Andrew I. Farmer owned, controlled, and conducted business through Chartered Investments Inc. ("Chartered"), Infinite Funding, Inc. ("Infinite"), and Iridium Capital Ltd. ("Iridium").  (APP 000008 Farmer Dep. Tr. 61:19 – 62:17.)

2.      During the Relevant Time Period, Farmer controlled, and was the only person authorized to conduct transactions, in the bank accounts of Chartered, Infinite, and Iridium. (APP 000281-282 ¶ 5-7.)

3.      During the Relevant Time Period, Farmer controlled Chartered's brokerage account at Scottsdale Capital Advisors ("Scottsdale"), and authorized all transactions in this account.  (APP 000283 ¶ 19)

4.      During the Relevant Time Period, Farmer was authorized to conduct transactions in the bank account of Oak Resources Inc. ("Oak Resources").  (APP 000282 ¶ 11)  Lydia Cotton purports to be the President of Oak Resources.  (APP 000295; APP 000013 Farmer Dep. Tr. 87:12.)

5.      During the Relevant Time Period, Farmer was authorized to trade in the brokerage accounts of Oak Resources held at Pennaluna & Co. ("Pennaluna") and Merrimac Corporate Securities Inc. ("Merrimac").  (APP 000282 ¶ 12; APP 000297.)

## II.     Farmer's Role in Setting up and Funding Chimera Energy Corp.

6.      Chimera Energy Corp. ("Chimera") was incorporated by Defendant Charles Grob, who was Chimera's first CEO, in August 2011.  (APP 000299.)  Grob had no energy company experience when he founded Chimera.  (APP 000321.)  When asked during his deposition whether Farmer directed him to form Chimera, Grob asserted the Fifth Amendment privilege against self-incrimination.  (APP 000039 Grob Dep. Tr. 9:25 – 10:2.)

7.      Farmer first met Grob in approximately June or July of 2011.  (APP 00010 Farmer Dep. Tr. 70:22-25.)

8.      Farmer allowed an associate of his, Tyson Rohde, to use Farmer's credit card to pay Chimera's $950 incorporation service fee, and also to pay a $136.08 fee for setting up Chimera's website.  (APP 000023-24 Farmer Dep. Tr. 184:22 – 185:1.)  In the course of the Commission's investigation, Rohde submitted a sworn declaration in which he stated that if required to appear to testify, he would assert the Fifth Amendment privilege against self-incrimination in regard to all questions relating to, among other topics, "[a]ny and all conduct related to Chimera Energy Corp." and all "communications, understandings, or other dealings relating to Chimera with Charles Grob [and]  . . . Andrew Farmer."  (APP 000142-144.)

9.      Farmer introduced Grob to Carlos Lopez of LBB & Associates Ltd., LLP ("LBB"), which Chimera engaged as its auditor.  (APP 00010 Farmer Dep. Tr. 72:8-10.)  Farmer also introduced Grob to David Loev, whose law firm Chimera engaged as counsel in connection with its initial public offer filing, as well as for other matters.  (APP 000010 Farmer Dep. Tr. 72:8-14.)

10.     On or about August 22, 2011, Kylemore Corp. ("Kylemore") extended to Chimera a purported loan in the amount of $100,000.  (APP 000301-304.)  According to Farmer, he helped Chimera obtain the loan.  (APP 000011 Farmer Dep. Tr. 77:1-13.)  As of August 31, 2011, Chimera's only assets other than cash from the loan were accounts receivable valued at $17,000 and inventory valued at $15,000.  (APP 000357.)

11.     Farmer said that during the Relevant Time Period, he was Kylemore's "de facto agent in the United States."  (APP 000012 Farmer Dep. Tr. 82:19-25.)  On September 23, 2011 Farmer purchased a Kylemore domain name.  (APP 000011-12 Farmer Dep. Tr. 80:4-6; 81:23 –

82:1.)  From October 2011 through October 2012, at least $4.36 million moved between Chartered's and Kylemore's bank accounts.  (APP 000188, 000193, 000198-199, 000204, 000207-209, 000215, 000240-241, 000250.)  During the Relevant Time Period, Farmer's wife, Anna Tikhonova, used anna@kylemorecorp.com as an email account.  (APP 000016, 000024 Farmer Dep. Tr. 105:6 – 106:13; 186:6-21.)  In the course of the Commission's investigation, Tikhonova submitted a sworn declaration in which she stated that if required to appear to testify, she would assert the Fifth Amendment privilege against self-incrimination in regard to all questions relating to, among other topics, "[a]ny information concerning . . . Kylemore Corp." (APP 000146-149.)

12.    Grob asserted the Fifth Amendment privilege against self-incrimination when asked (i) if he had any contact with Kylemore regarding the loan; (ii) whether Farmer arranged the loan; and (iii) whether he believed that Chimera would be obligated to repay the loan.  (APP 000039 Grob Dep. Tr. 10:6-18.)

13.    Between August 2011 and February 2012, Iridium paid Grob a monthly salary of $2,500.  (APP 000274-279.)  Grob was not paid by Chimera during this time.  (APP 000345.)  In March 2012, Chimera began paying Grob a salary.  (APP 000378.)

## III.    Farmer's Role in Chimera's Initial Public Offering

### A.    Farmer's Participation in Drafting and Filing of the Registration Statement

14.    As discussed above, Chimera retained Loev to prepare and file its Registration Statement.

15.    Farmer was Loev's primary contact at Chimera, and Farmer was more active when it came to matters relating to Chimera.  (APP 000055 Loev Dep. Tr. 47:25 – 48:7.)  When issues arose relating to Loev's work on behalf of Chimera, he first contacted Farmer, not Grob.

4

(APP 000055 Loev Dep. Tr. 48:17-24.)  Loev believed that Farmer's and Rohde's roles with Chimera were more important than Grob's, particularly in dealing with government agencies to get approval for Chimera to become a public company.  (APP 000063 Loev Dep. Tr. 100:15-21.)

16.     On September 28, 2011, Farmer emailed Loev a draft of Chimera's Registration Statement on Form S-1, which was the first time a draft of Chimera's Registration Statement was transmitted to Loev.  (APP 000383-385.)  Grob was not included as a recipient of Farmer's email.  (*Id.*)  Loev found it strange and unusual that Grob was not copied on the email.  (APP 000054 Loev Dep. Tr. 38:7-22.)

17.     Metadata of the file containing the draft Registration Statement that Farmer emailed on September 28, 2011 reflects that the document was authored by Rohde and last modified by Farmer.  (*Id.*)  Farmer stated that Rohde created the first draft of the Registration Statement.  (APP 000016 Farmer Dep. Tr. 107:19-23.)

18.     On October 18, 2011, Farmer emailed Loev and Loev's associate, John Gilles, a "[f]inal clean version" of Chimera's Registration Statement, stating that "we're ready to edgarize."  (APP 000387-388.)  To EDGARize a document means to have the document converted into a format that is compatible for filing with the Commission using its EDGAR filing system.  (APP 000056 Loev Dep. Tr. at 55:1-14.)  Once a document is EDGARized, it is ready to be filed with the Commission.  (*Id.*)  Grob was not copied on the October 18 email, which Loev found unusual.  (APP 000056 Loev Dep. Tr. 56:7-17.)

19.     Chimera filed the Registration Statement on October 19, 2011.  (APP 000306-370.).  The Registration Statement sought the registration of an initial public offering ("IPO") of 5 million shares of Chimera stock.  (*Id.*)

20.     Other than the Registration Statement purporting to register an initial public offering of 5 million shares of Chimera stock, neither Chimera nor any other person or entity filed any registration statements attempting to register any other transactions in Chimera securities.  (APP 000002 Vydashenko Decl. ¶ 3.)

21.     On November 16, 2011, a member of the staff of the Commission's Division of Corporation Finance provided comments on Chimera's Registration Statement to Loev and Grob.  (APP 000390-392.)  The same day, Loev forwarded the comment letter to Farmer, copying Grob, and indicated that Loev would "coordinate with Charles [Grob] regarding who will be responding to which comments."  (*Id.*)  Loev explained that he intended to coordinate the division of labor between Chimera, his law firm, and LBB in preparing a response.  (APP 000057 Loev Dep. Tr. 62:1-20.)

22.     On November 17, 2011, Farmer responded to Loev, copying Gilles, stating that [w]e've gone ahead and drafted the response letter," and that Farmer is "working on making sure all the changes are made in the s-1."  (APP 000390-392.)  Grob was not copied on this email. (*Id.*)  Loev admitted that he never coordinated the response with Grob as he first intended (and as was typical practice), and when asked to comment on Grob's absence from Farmer's email, Loev stated that "[i]t looks like Andrew was kind of authorized to kind of orchestrate this process." (APP 000057 Loev Dep. Tr. 64:3-12.)

23.     On December 5, 2011, Loev emailed Grob and Farmer to inform them that he had filed with the Commission a response to comments from the staff of the Division of Corporation Finance.  (APP 000394.)  The same day, Farmer responded to Loev, instructing him to request that the Commission declare Chimera's Registration Statement effective on a particular date. (*Id.*)  Once the Commission declares a Registration Statement effective, the stock sale

transactions subject to the registration may then take place.  (APP 0000 Loev Dep. Tr. 73:6-10.)
Loev followed Farmer's instruction.  (APP 000058 Loev Dep. Tr. 72:3-17.)

24.    On December 12, 2011, Farmer emailed Loev, without copying Grob, and
directed Loev to follow up on Chimera's request for effectiveness.  (APP 000396.)  Farmer
stated that he "[w]ould like to get the capital raise completed before everyone disappears for the
holidays."  (*Id.*)

25.    On December 22, 2011, the day Chimera's Registration Statement was declared
effective, Rohde emailed Farmer, Loev, and Grob with comments to the form of a subscription
agreement that was to be used by Chimera's IPO investors.  (APP 000398.)  Rohde suggested
removing the reference in the subscription agreement to the year 2011, "so that we can sell into
2012 without further revision."  (*Id.*)

26.    The identity of the person actually raising capital for Chimera through its IPO was
important to Loev, because the Registration Statement disclosed and registered the sale of shares
specifically by Grob (and no other person).  (APP 000060 Loev Dep. Tr. 78:17 – 79:17.)  This
limitation was significant because it placed Grob's selling activity within a safe harbor that
exempted officers of companies participating in their companies' offerings from registration as
broker-dealers, despite engaging in activity that ordinarily would require such registration.  (*Id.*)

**B.     Farmer's Participation in the IPO Transactions**

**1.     Transfers of Money**

27.    Between approximately December 22, 2011 and January 12, 2012, Chimera
completed its IPO.  (APP 000400-498.)  The IPO resulted in the transfer of five million shares of
its stock to 29 persons at the price of $0.015 per share, raising a total of $75,000.  (*Id.*)

28.     Immediately prior to the acquisition of Chimera stock in the IPO by certain investors, Farmer transferred to these investors money in amounts that closely matched the purchase price that the investors then paid for Chimera shares, as follows:

- On December 23, 2011, Iridium transferred $6,000 to Linwood Farmer, who is Farmer's father.  (APP 000272.)  On December 22, 2011, Linwood Farmer and Patricia Farmer, who is Farmer's mother, each signed a subscription agreement subscribing to the purchase of 200,000 Chimera shares for $3,000, for a total purchase price of $6,000 for the two of them.  (APP 000432-437.)  On December 25, 2011, Linwood Farmer and Patricia Farmer each wrote checks for $3,000 to Chimera for the ostensible purchase of shares in the IPO.  (*Id.*)

- Also on December 23, 2011, Iridium transferred $6,300 to Jana Robinson Demandante.  (Iridium bank account statement (APP 000272.)  Jana Robinson Demandante is the wife of Archie Demandante.  (APP 000025 Farmer Dep. Tr. 189:20-25.)  On December 23, 2011, Jana and Archie each signed a subscription agreement subscribing to the purchase of 200,000 shares for $3,000, for a total purchase price of $6,000 for the two of them.  (APP 000476-478, 000426-428)  On December 28, 2011, Jana and Archie each made out cashier's checks to Chimera in the amounts of $3,000 to Chimera for the ostensible purchase of shares in the IPO.  (*Id.*)

- Also on December 23, 2011, Iridium transferred $6,300 to Brittany Garcia.  (APP 000272.)  Brittany Garcia is the wife of Alejandro Garcia Herrera.  (APP 000027 Farmer Dep. Tr. 199:5-17.)  On December 27, 2011, Brittany and Alejandro each signed a subscription agreement subscribing to the purchase of 200,000 shares for $3,000, for a total purchase price of $6,000 for the two of them.  (APP 000445-450.)  On December 28, 2011, Brittany and Alejandro each made out certified checks issued by People's Trust Bank to Chimera in the amounts of $3,000 to Chimera for the ostensible purchase of shares in the IPO.  (*Id.*)

- On January 6, 2012, Iridium transferred $3,050 to Brandi Leal.  (APP 000267.)  On January 9, 2012, Leal signed a subscription agreement subscribing to the

purchase of 200,000 shares for $3,000.  (APP 000455-457.)  On the same day, Leal made out a cashier's check to Chimera in the amount of $3,000 to Chimera for the ostensible purchase of shares in the IPO.  (*Id.*)

- Also on January 6, 2012, Farmer transferred from his personal bank account $3,000 to the bank account of Oak Resources.  (APP 000175, 000255, 000169.)  On the same day, Cotton signed a subscription agreement subscribing to the purchase of 200,000 shares for $3,000.  (APP 000417-419.)  And, on that same day, Cotton made out a cashier's check from the same bank account of Oak Resources to Chimera in the amount of $3,000 to Chimera for the ostensible purchase of shares in the IPO.  (*Id.*)

- On January 12, 2012, Iridium transferred $10,000 to Kellie Moss.  (APP 000267.)  Kellie Moss is Eddie Austin's daughter and Carolyn Austin's step-daughter (Eddie and Carolyn are married); Kellie is married to James Moss.  (APP 000029 Farmer Dep. Tr. 207:6-14.)  On January 11, 2012, Kellie and James each signed a subscription agreement subscribing to the purchase of 200,000 shares for $3,000, for a total purchase price of $6,000 for the two of them.  (APP 000467-472.)  On the same day, Kellie and James each made out checks from their joint account to Chimera in the amounts of $3,000 to Chimera for the ostensible purchase of shares in the IPO.

29.    Farmer now asserts that each of the payments described in paragraph 28 above, with the exception of the payments to Oak Resources and to Kellie Moss, constituted loans that were repaid.  (APP 000017, 000018, 000025-29 Farmer Dep. Tr. 112:20-22; 115:9-12; 190:10-191:9; 196:7-13; 198:12-20; 200:2-8; 204:23-205:6.)  According to Farmer, no documentation exists for the purported loans.  (APP 000018 Farmer Dep. Tr. 115:5-8; 198:17-20.)  Farmer does not recall the reason for his $10,000 transfer to Kellie Moss.  (APP 000029-30 Farmer Dep. Tr. 208:16 – 209:1.)  Farmer did not disclose these transactions to anyone.  (APP 000017-18 Farmer. Dep. Tr. 112:23 – 114:22.)

### 2.    Farmer's Solicitations of Investors

30.    Farmer contacted Jana Robinson Demandante and Archie Demandante to solicit them to invest in Chimera's IPO. (APP 000025 Farmer Dep. Tr.190:10 – 191:9.)  Farmer also solicited his parents' investment in the IPO.  (APP 000026, 000030 Farmer Dep. Tr. 196:7-13; 210:12-25.)  Charles Grob never spoke to Farmer's parents about their Chimera investment. (APP 000027 Farmer Dep. Tr. 198:21 – 199:4.)  Farmer solicited Brandi Leal's investment in the IPO.  (APP 000029 Farmer Dep. Tr. 206:2-9.)

31.    When Farmer contacted persons to solicit their investment in Chimera, he handed them a copy of Chimera's prospectus.  (APP 000028 Farmer Dep. Tr. 201:21-24.)

32.    David Parisi, one of Chimera's IPO investors, provided accounting services to Farmer during the Relevant Time Period.  (APP 000031 Farmer Dep. Tr. 222:13-15.)

33.    Farmer's wife, Anna Tikhonova, invested in Chimera's IPO.  (APP 000488-491.)

34.    On December 25, 2011, in an email discussing Chimera's IPO, Farmer authorized Eddie Austin to revise Chimera's subscription agreement in connection with potential IPO investments in Chimera by Eddie Austin's children and children-in-law.  (APP 000500, APP 000020 Farmer Dep. Tr. 121:23 – 122:9.)  When Austin's children and children-in-law subscribed to purchase shares in the IPO, Farmer took delivery of their signed subscription agreements.  (APP 000502-504, 000506-507, 000509.)

35.    At the time of Farmer's discussions with Eddie Austin regarding the IPO, Farmer told Austin that Farmer was "keep[ing] my options open" as to whether he would obtain for himself most of Chimera's shares, or if he would sell Chimera as a shell to a potential buyer. (APP 000020 Farmer Dep. Tr. 123:4 – 124:14; APP 000511.)

36.     In the course of the Commission's investigation, Eddie Austin and Carolyn Austin submitted sworn declarations in which they stated that if required to appear to testify, they would assert the Fifth Amendment privilege against self-incrimination in regard to all questions relating to, among other topics, "[a]ny and all conduct related to Chimera Energy Corp." and all "communications, understandings, or other dealings relating to Chimera with . . . Andrew Farmer." (APP 000150-153 ¶ 2; APP 000154-156 ¶ 2.)

### 3.     Other IPO Transactions

37.     Grob induced his long-time friend, Daniel SoRelle, to invest in the IPO. (APP 000157-158) Grob approached SoRelle in December 2011, telling him that he needed people to sign off on certain paperwork to help take Chimera public. (*Id.* at ¶ 4.) Grob further explained to SoRelle that to take Chimera public, he needed to find about ten investors who could pay about $1,500 to buy shares in the company, as this would demonstrate interest in Chimera's stock. (*Id.*)

38.     SoRelle, who was in college at the time and had no money to invest and no investment experience, initially refused to invest in Chimera's IPO. (*Id.* at ¶ 6.) Grob responded that he would give SoRelle cash for the investment, and all SoRelle needed only to make out a personal check to Chimera in the same amount. (*Id.*) In this way, according to Grob, SoRelle could "invest" without any risk or expense to him, and then later transfer the stock to another buyer that Grob would find. (*Id.*) As a favor to Grob, SoRelle agreed to invest, took $1,500 in cash from Grob, and then wrote a $1,500 check to Chimera on January 5, 2012. (*Id.* at ¶ 7.) When asked if Farmer was the source of cash that Grob provided to SoRelle, Grob asserted the Fifth Amendment privilege. (APP 000049 Grob Dep. Tr. 49:15-19.)

## IV.     Farmer's Role in the Form 211 Application Process

### A.      The Market in Microcap Stocks and its Regulation

39.      Microcap securities (like those of Chimera) generally are characterized by low share prices and no analyst coverage.  (APP 000516.)  The issuers of such securities typically are thinly capitalized, and the securities trade "over the counter," with price quotations posted on various quotation mediums, rather than on a national exchange such as the NYSE or the NASDAQ.  (*Id.*)  The Commission has described fraud and manipulation involving microcap securities as "a serious concern."  (*Id.*)  Because of the relative lack of information about microcap issuers, when a broker-dealer, acting as a market maker, publishes quotations for microcap securities traded over the counter, the market maker "raises the profile of the security" (*Id.*), which can give the market for such security "an aura of credibility" and increase its volume of trading.  (APP 000571.)  This enables those who orchestrate microcap fraud both to point to the quotation to "validate" the worth of a security, and to sell their shares to unsuspecting investors.  (*Id.*)

40.      Rule 15c2-11, promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), together with the Financial Industry Regulatory Authority ("FINRA")'s Form 211 application process, comprise an important part of the regulatory regime that governs the quotation by broker-dealers of prices of microcap securities that are traded over the counter.  The requirements of Rule 15c2-11 are "intended to deter broker-dealers" from initiating quotations for securities "that may facilitate a fraudulent or manipulative scheme."  (APP 000516.)  This rule deters broker-dealers by prohibiting them from initiating the publication of a quotation in a quotation medium (such as the OTC Bulletin Board, where Chimera's stock price was quoted) unless a broker-dealer has reviewed current information about the company whose stock it

proposes to quote, and has a reasonable basis for believing that such information is accurate and is from a reliable sources.  (Rule 15c2-11; APP 000516-517.)

41.     To quote a security traded over the counter, a broker-dealer is required to obtain FINRA's clearance (in addition to complying with Rule 15c2-11).  (APP 000605-606.)  To obtain clearance, a broker-dealer must submit to FINRA's OTC Compliance Unit an application on FINRA's Form 211.  (*Id.*; APP 000621-627.)  The intent of the application process is to require a broker-dealer to demonstrate compliance with Rule 15c2-11 before such broker-dealer is cleared to quote prices and make a market in a security.  (APP 000605-606.)

42.     FINRA's predecessor, the NASD, has issued several notices to its member broker-dealer firms that articulate the procedures and inquiries to be undertaken by broker-dealers to ensure that they are in compliance with Rule 15c2-11.  (*See* APP 000608-611; APP 000613-619.)  The Commission also has published a list of "red flags" that, if detected, a broker-dealer should "reasonably address" before it can publish quotations.  (APP 000552-557.)  One such red flag is the concentration of ownership of freely tradable stock (such as the stock Chimera issued in its IPO) in the hands of one person or a group of people, which the Commission identified as a "prominent feature of microcap fraud cases."  (*Id.* at p. 40.)

**B.     Farmer's Involvement in the Form 211 Process on Chimera's Behalf**

43.     On December 22, 2011, the day Chimera's Registration Statement was declared effective, Farmer emailed Mark Dillon, a registered representative at broker-dealer Pennaluna & Co. ("Pennaluna"), to solicit Dillon to sponsor a Form 211 application on Chimera's behalf.  (APP 000629.)  In introducing Chimera and Grob, Farmer represented to Dillon that "neither Carolyn [Austin] or (sic) myself are involved in the deal in any way."  (*Id.*)

44.     Dillon agreed to submit the application.  (APP 000159-161 ¶ 4.)  Pennaluna then commenced a diligence process to comply with Rule 15c2-11, and to ensure that Chimera would not be used as part of market manipulation or "pump-and-dump" scheme.  (*Id.* ¶¶ 5-6.)  Dillon understood the risk presented by a scenario where one person or a group of people owns nearly all of the freely tradable shares of a company like Chimera.  (*Id.* ¶ 6.)  Therefore, it was important to Pennaluna to determine the nature of the relationships between and among Chimera's shareholders and other persons associated with Chimera.  (*Id.*)

45.     Farmer did not tell Dillon that he transferred money to certain persons to enable them to purchase shares in Chimera's IPO, and that Farmer characterized these transfers as loans.  (*Id.* ¶ 7.)  Farmer also did not tell Dillon that Farmer's wife and parents were Chimera shareholders.  (*Id.*)  Had Dillon known these facts, he would have investigated further, because the relationships and transactions, even if characterized by Farmer as loans, were seen by Dillon as potentially indicative of an attempt to concentrate ownership of shares in the hands of one person or a group of people.  (*Id.* ¶ 8.)

46.     Having been provided this information, Dillon now believes that Farmer's statement that he was not "involved in the deal in any way" was false when Farmer made it.  (*Id.* ¶ 9.)

47.     Farmer's involvement in the Form 211 application process was so pervasive that Loev perceived him to be the person who, on Chimera's behalf, took the lead on the Form 211 application process.  (APP 000058, 000061 Loev Dep. Tr. 69:14-17; 85:1-8.)

48.     As part of its diligence and compliance process, Pennaluna required Chimera to provide certain information, including, as relevant here, a letter describing "who made introductions" to shareholders, "who solicited them," and how the shareholders were known to

14

the person introducing or soliciting them.  (APP 000631-633.)  Pennaluna's request for this information was directed by email to Farmer, copying Grob.  (*Id.*)

49.      In response to this inquiry, on January 13, 2012, Farmer emailed Pennaluna (without copying Grob) two documents: a letter on Chimera letterhead that contains Grob's signature block, but is unsigned, and a chart titled "Relationships Between Shareholders."  (APP 000631-637.)  Metadata for each of the files containing these documents, which were emailed in PDF format, reflects that they were created by Farmer on the evening of January 13 using the Microsoft Word application, and then converted by him into PDF format.  (*Id.*)

50.      The letter, which is dated January 13, 2012, states that each IPO subscriber "was either personally known to our CEO, Charles Grob, or introduced to our CEO by another shareholder.  Mr. Grob was the sole individual authorized by the company to solicit investments from individuals who indicated interest in the offering."  (APP 000634.)  The letter characterizes the chart as describing "inter-relationships between the investors as well as the individual who introduced them to our CEO."  (*Id.*)

51.      Farmer's name is not contained anywhere on the chart.  (APP 000636.)  The chart describes Anna Tikhonova, Farmer's wife, as a "longtime friend" of Grob.  The first time Grob met Anna Tikhonova was in July 2011; Farmer was present during this meeting.  (APP 000031 Farmer Dep. Tr. 223:12-20.)  The chart describes Linwood and Patricia Farmer as "father-in-law" and "mother-in-law" of Anna Tikhonova.  (APP 000636.)

52.      The chart describes Jana Robinson Demandante, who was a former co-worker of Farmer's (APP 000025 Farmer Dep. Tr. 189:24 – 190:3), as a "close friend of Anna Tikhonova." (APP 000636.)

53.     The chart describes Lydia Cotton as a "longtime friend" of Grob.  (*Id.*)  Cotton is Farmer's former receptionist; Farmer has helped her financially over the years by offering her employment opportunities and providing loans; in addition, Farmer helped Cotton pay her bills on time.  (APP 000013, 000034 Farmer Dep. Tr. 87:16 – 88:17; 245:16-20.)

54.     The chart describes Brittany Garcia as a "close friend" of Jana Robinson Demandante.  (APP 000636.)  Garcia is Farmer's and Rohde's former assistant.  (APP 000027 Farmer Dep. Tr. 199:5-8.)

55.     The chart describes Andrew Austin, Robbie Austin, Kellie Moss, and James Moss as "close friend[s]" of Brian Barrileaux, another IPO investor.  (APP 000636.)  Andrew and Robbie Austin are Carolyn and Eddie Austin's sons (APP 000636, 000638), and, as discussed above, Kellie Moss and James Moss are Carolyn Austin's husband's daughter and son-in-law.

56.     The chart describes David Parisi as a "business acquaintance" of Grob.  (APP 000636.)  Parisi has worked as Farmer's CPA, and during the Relevant Time Period, he worked on tax issues for Eddie Austin out of Farmer's office.  (APP 000031 Farmer Dep. Tr. 222:13-18.)

57.     On our about January 24, 2012, Pennaluna submitted the Form 211 application to FINRA's OTC Compliance Unit.  (APP 000639-646.)  On February 1, 2012, a FINRA compliance examiner sent Pennaluna a letter in which he explained that the application has been found "deficient," and requested additional information to cure the deficiencies.  (APP 000648-49.)  As relevant here, FINRA requested (i) a "detailed explanation of the relationship between Andrew Farmer and the Issuer," (ii) details "surrounding the Issuer's offering," including "who solicited investors" and "how the solicitor knew them," and (iii) a description of "**all** relationships and affiliations among and between the shareholders and the Issuer."  (Emphasis in original.) (*Id.*)

58.     In response to the deficiency letter, Chimera provided to Pennaluna certain information for purposes of transmitting it to FINRA, including the same letter and chart that Farmer had provided to Pennaluna on January 13, 2012.  (APP 000651-658.)  In addition, Chimera provided a letter, dated February 3, 2012 and signed by Grob, that responded to FINRA's inquiries, including those identified in paragraph 57 above.  (APP 000653-654.)

59.     Chimera's February 3 letter stated, in response to the inquiry about the relationship between Farmer and Chimera, that "Mr. Farmer is a long-term friend of the Issuer's CEO, Charles Grob.  Mr. Grob sought advice from Mr. Farmer on firms with which to discuss a Form 211 Application.  Among others, Mr. Farmer recommended Pennaluna & Company to the Issuer and made the initial introduction.  Mr. Farmer is not an officer, director, consultant, affiliate, or shareholder of the Issuer."  (APP 000653.)

60.     On February 6, 2012, Pennaluna submitted to FINRA the January 13 letter and chart, as well as the February 3 letter.  (APP 000660-666.)

61.     On March 12, 2012, a FINRA compliance examiner sent Pennaluna a letter in which he explained that the Form 211 application remains deficient because, among other reasons, it was the opinion of FINRA staff that Chimera was a "shell company" as defined by Rule 12b-2 of the Exchange Act.  (APP 000668-669.)  Pennaluna was given an opportunity to provide "documentation detailing why [Chimera] is not a shell."  (*Id.*)

62.     On March 13, 2012 at 11:45 p.m., Farmer emailed Loev a draft of an amendment to Chimera's Form 10-Q, directed Loev to review the language of an explanatory note contained in the draft Form 10-Q, and directed him to prepare the document for filing with the Commission.  (APP 000671-674.)  The explanatory note stated that Chimera was amending its prior Form 10-Q for the sole purpose of indicating that it was a "shell company."  (APP 000673.)

17

The metadata of the file containing the draft Form 10-Q indicated that the document was last modified by Farmer on March 13 at 11:10 p.m.  (*Id.*)

63.     On March 14, 2012, Chimera provided to Pennaluna a letter response to FINRA's March 12, 2012 letter.  (APP 000676-677.)  In its response, which Pennaluna then transmitted to FINRA, Chimera stated that it had amended its Form 10-Q to update its status as a shell company.  (*Id.*)

64.     On April 10, 2012, FINRA cleared Pennaluna's Form 211application to initiate quotations of Chimera securities.  (APP 000679.)

## V.     Consolidation of Chimera's Shares in the Hands of Farmer and his Associates

65.     In May and June 2012, seven entities acquired 4.6 million shares (out of the total 5 million shares sold in the offering) of Chimera stock from all IPO investors except Anna Tikhonova.[1]  (APP 000681-684, 000686, 000688, 000690.)  The acquiring entities were Chartered, Oak Resources, TransAmerica Trading Inc. ("TransAmerica"), and the Marshall Islands Entities (defined *infra*).  (*Id.*)  These entities all paid the IPO investors the same price for their stock – $0.0225 per share.  (*Id.*)

66.     On April 6, 2012, four entities incorporated in the Republic of Marshall Islands – Hillsmere SA, Kylemore, Clarent Services Corp., and Levantera SA (collectively, the "Marshall Islands Entities") – each acquired 700,000 shares of Chimera stock from a total of 16 IPO investors.  (APP 000681-684.)  Farmer arranged these transactions for each of the Marshall Islands Entities, representing to Chimera's transfer agent that the Marshall Island entities were clients of Iridium.  (*Id.*)  Chartered funded each of the transactions between the Marshall Islands Entities and the IPO investors by writing checks from Chartered's bank account to each IPO

---

[1] Prior to these consolidating transactions, on March 21, 2012, Oak Resources purchased from Lydia Cotton the 200,000 shares of Chimera stock that Cotton acquired in the IPO, at the price of $0.0225 per share.  (APP 000705-706.)

investor from whom the Marshall Island Entities acquired the stock.  (APP 000220-221, 000223, 000225-237)  In total, Chartered paid IPO investors $63,000 to acquire their shares on behalf of the Marshall Islands Entities.  (*Id.*)

67.     Also on April 6, 2012, Chartered acquired 600,000 shares of Chimera stock from four IPO investors.  (APP 000686, APP 000692-703.)

68.     SoRelle was one of the IPO investors from whom Chartered acquired Chimera stock.  (APP 000701-703.)  SoRelle disposed of his Chimera shares after Grob contacted him in the spring of 2012 and instructed him to transfer the stock in the manner dictated by Grob.  (APP 000157-158 ¶ 8.)  To effectuate the transaction between SoRelle and Chartered, Grob drove SoRelle to a bank branch in Houston, where a bank employee stamped documents required for the transaction.  (*Id.* ¶ 9.)  In connection with this transaction, Grob gave SoRelle a check for $2,250 – the ostensible purchase price for the 100,000 shares then held by SoRelle – and instructed SoRelle to cash the check and return the cash to Grob, which SoRelle did.  (*Id.* ¶ 10.)  As a result, SoRelle did not make or lose any money in connection with his transactions in Chimera stock.  (*Id.*)

69.     On May 1, 2012, Oak Resources acquired 500,000 shares of Chimera stock from three IPO investors.  (APP 000707-714.)  Including the 200,000 shares Oak Resources previously had acquired from Cotton in March 2012, Oak Resources held 700,000 Chimera shares as of May 1, 2012.  (*Id.*)  On May 5, 2012, Farmer wrote a check to Oak Resources from his Chartered account for $15,750 – which was Oak Resources' cost of acquiring all 700,000 shares of Chimera stock from IPO investors.  (APP 000222.)  On May 8, 2012, Oak Resources issued checks to the three IPO investors for the acquisition of their shares.  (APP 000179-181.)  In testimony given during the Commission's investigation, Cotton asserted the Fifth Amendment

privilege against self-incrimination as to all questions relating to Oak Resources, and as to questions relating to Oak Resources' acquisition of shares from IPO investors.  (APP 000717-718 Cotton Testimony Tr. 14:11-14; 17:11-20.)

70.     Also on May 1, 2012, TransAmerica acquired 700,000 shares of Chimera stock from four IPO investors.  (APP 000721-732.)  On May 5, 2012, Farmer wrote a check to TransAmerica from his Chartered account for $15,750 – which was TransAmerica's cost of acquiring 700,000 shares of Chimera stock from IPO investors.  (APP 000224.)  That same day, TransAmerica issued checks to the four IPO investors for the acquisition of their shares.  (APP 000723, 000726, 000729, 000732.)  In her declaration submitted in the course of the Commission's investigation, Austin stated that she would assert the Fifth Amendment privilege against self-incrimination if compelled to testify about TransAmerica's transactions in Chimera securities and any dealings with Farmer and Chartered.  (APP 000154-156 ¶ 2.)

71.     At the time of these consolidating transactions, there was no public liquid market for Chimera stock.  (*See* paragraph 65 *supra* and APP 000374-378.)

72.     On or about July 6, 2012, Chimera effected a 4:1 forward split of its stock, thus quadrupling the number of shares in possession of each of the entities discussed above at no cost to them.  (APP 000740-742.)  After the stock split, Oak Resources, TransAmerica, and the Marshall Islands Entities each held 2.8 million shares of Chimera stock, while Chartered held 2.4 million shares.  (*See* paragraphs 65-72 *supra*.)

## VI.     Farmer's Funding of a False Promotional Campaign

73.     In its Prospectus and each of its quarterly financial statements filed thereafter, Chimera described its business as supplying equipment and components that are used in the exploration and production of oil and gas.  (APP 000770, 001090, 001110, 000809.)  This

description appeared in the last financial statement that Chimera ever filed, dated as of July 16, 2012. (APP 000807, 000809.) Grob asserted the Fifth Amendment privilege against self-incrimination in response to all questions relating to the accuracy of statements made in Chimera's Prospectus and Forms 10-Q. (APP 000039; APP 000048 Grob Dep. Tr. 10:22 – 11:6; 12:5-8; 42:16 – 43:1; 43:22 – 44:18.)

74.     On July 27, 2012, Chimera filed with the Commission a Form 8-K in which it disclosed that it has purportedly entered into a "License Agreement" with China Inland Oil Exploration Company of Chencunzhen, China ("China Inland"). (APP 000814-821.) The License Agreement purports to grant Chimera an "exclusive license to develop and commercialize [China Inland's] cutting edge technologies relating to Non-Hydraulic Extraction." (APP 000816-821.)

75.     During his deposition, Grob asserted the Fifth Amendment privilege against self-incrimination in regard to questions relating to the negotiation of the License Agreement, the existence of communications related to such negotiations with China Inland, the existence of China Inland, the existence of NHE, the existence of any technical documents evidencing that NHE is a real technology, and the accuracy of the statements in Chimera's Form 8-K dated July 27, 2012 and exhibits thereto. (APP 000041-42 Grob Dep. Tr. 14:19 – 17:3.) No communications to or from China Inland and no technical documents evidencing that NHE was a real technology were produced by any party to this litigation or any person or entity that was subpoenaed during the Commission's investigation of this matter. (APP 000002-3 Vydashenko Decl. ¶ 4.)

76.     Rios, Chimera's former consultant and then CEO, and the only person affiliated with Chimera who had a technical professional and educational background (APP 000072-73

Rios Dep. Tr. 60:2 – 62:2), never received from anyone at Chimera any technical details relating to NHE technology, other than a marketing brochure, despite his repeated requests for such information.  (APP 000074 Rios Dep. Tr. 107:3-21.)

77.     On August 9, 2012, Chimera issued a press release in which it claimed that it signed a "Memorandum of Understanding" with Petróleos Mexicanos ("Pemex"), the Mexican state-owned petroleum company that is among the largest enterprises in Latin America.  (APP 000105.)  This press release was false; Chimera had never entered into a Memorandum of Understanding with Pemex, and it did not have then, and never had a business relationship with Pemex of any kind.  (APP 000080, 000084 Flores Avila Dep. Tr. 22:6 – 23:25; 97:19 – 98:23; APP 000093-94 Sanchez Dep. Tr. 93:20 – 95:3; 104:16-24.)

78.     Dr. Fernando Sebastian Flores Avila, a Pemex employee in charge of implementation of new drilling technology in Pemex's Northern Region (one of four regions into which Pemex is divided), had never seen NHE technology before and, when presented with the concept by Chimera, viewed it as science fiction.  (APP 000079, 000081, 000087 Flores Avila Dep. Tr. 17:5 – 18:3; 45:6-14; 164:11-18.)  Dr. Flores Avila has a Ph.D. in Petroleum Engineering from Louisiana State University, where he focused his studies on the drilling.  (APP 000078 Flores Avila Dep. Tr. 15:7-19.)  Dr. Flores Avila teaches engineering classes at the University of Veracruz, in Poza Rica, Mexico.  (APP 000086 Flores Avila Dep. Tr. 109:21 – 110:3.)  Dr. Flores Avila has approximately 30 years of experience in the field of petroleum engineering.  (APP 000086 Flores Avila Dep. Tr. 111:8-9.)

79.     During his deposition, Grob asserted the Fifth Amendment privilege against self-incrimination in regard to questions relating to dealings with Pemex, the purported Memorandum of Understanding, and the authenticity of three letters purportedly written by Pemex employees

that Chimera claimed were evidence of its dealings with Pemex.  (APP 000042 Grob Dep. Tr. 17:4 – 21:2.)

80.     Between July 27, 2012 and October 11, 2012, Chimera made approximately 38 written public statements in the form of approximately 33 press releases and approximately four filings on Form 8-K.  (APP 000100-140)  Each of these public statements was false because it referred to Chimera's purported licensing of NHE technology, which was fictitious for the reasons described in paragraphs 75-76 and 78  above, and/or because it referred to Chimera's purported business relationship with Pemex, which also was fictitious for the reasons described in paragraphs 75, 77, and 79 above.

81.     Grob asserted the Fifth Amendment privilege against self-incrimination in regard to questions relating to whether the statements in Chimera's 33 press releases and four Commission filings on Form 8-K were false.  (APP 000044-47 Grob Dep. Tr. 22:1 – 40:10.)

82.     During the time period that Chimera was publishing the false public statements described above, Farmer directed his associate, John Brotherton, to conduct a "market awareness" campaign.  (APP 000019 Farmer Dep. Tr. 118:12-18.)  The purpose of this campaign, according to Farmer, was to introduce Chimera to potential investors, with the goal of creating a liquid market for Chimera shares and increasing the price of Chimera stock.  (APP 000019 Farmer Dep. Tr. 118:12-24.)

83.     As part of this "market awareness" campaign, Brotherton took the following actions:

- On July 18, 2012, engaged Crisp Media, an advertising placement firm, to run a campaign beginning on July 30, 2012 that would display images advertising Chimera on websites of online publishers that focus on finance and business content.  (APP 000826.)  The images that were displayed on the websites as part

of the campaign touted Chimera's "NEW SAFE FRACKING!" that "USES ZERO WATER!" and urged viewers to "INVEST TODAY."  (APP 000827.) Farmer, through Chartered, paid at least $80,000 for services provided by Crisp Media relating to Chimera.  (APP 000823-826.)

- On July 26, 2012, engaged Marchex, another advertising placement firm, to run a campaign beginning on July 31, 2012 that would display text advertising Chimera through the Google mobile advertising network.  (APP 000829-831, 000833)  The text that was displayed as part of the campaign touted Chimera's "New Safe Fracking," and described the technology as a "[n]ewly licensed method" that "uses zero water and is environmentally neutral."  (APP 000829.)  Farmer, through Chartered and his personal credit card, paid approximately $104,000 for services provided by Marchex relating to Chimera.  (APP 000835; APP 000837; APP 000245.)

- On July 24, 2012, contracted with Dow Jones & Company, publisher of The Wall Street Journal, MarketWatch, SmartMoney, and Barrons, for these publications to display images advertising Chimera on their websites, starting on July 30, 2012. (APP 000839-841.)  The images that were displayed on the publications' websites as part of this campaign touted Chimera's "NEW SAFE FRACKING" method and urged viewers to "INVEST TODAY."  (APP 000843-847.)  Farmer, through Chartered, paid Dow Jones & Company $162,615 for Chimera advertisements that it ran through August 15, 2012.  (APP 000248.)

84.    In addition to paying $346,615 directly to advertisers as described above, Farmer also paid Brotherton for the services Brotherton provided in placing the advertisements. Between August 2011 and October 2012, Farmer transferred to Brotherton over $1 million. (APP 000019 Farmer Dep. Tr. 117:25 – 118:1; 118:25 – 119:5)  Farmer acknowledged that some of the money that he transferred to Brotherton constituted payment to Brotherton for "creat[ing] an aware market for Chimera."  (APP 000019 Farmer Dep. Tr. 118:12-16.)

85.     Farmer further acknowledged that to calculate the net proceeds to him of his subsequent sales of Chimera stock to the public, his payments to Brotherton would have to be deducted from his stock sales proceeds, as such payments were an "indirect expense" related to Farmer's transactions in Chimera stock.  (APP 000019 Farmer Dep. Tr. 118:2 -11.)

86.     In a sworn declaration submitted in the course of the Commission's investigation, Brotherton stated that he would assert the Fifth Amendment privilege against self-incrimination if compelled to testify about Chimera and any dealings with Farmer and Chartered.  (APP 000162-165 ¶ 2.)

## VII.   Sales of Chimera's Stock to the Public for Farmer's Benefit

87.     After the consolidating transactions described above concentrated ownership of most of the 20 million shares of Chimera stock issued in the IPO (after the 4:1 stock split in July 2012) in just seven entities, these entities sold millions of shares of stock to the public through over-the-counter quotation mediums, as described more fully below.  Farmer acknowledged that proceeds from the sale of stock by these entities ended up in his accounts.  (APP 000018-19 Farmer Dep. Tr. 116:23 – 117:13.)

### A.     TransAmerica's Transactions

88.     Between July 30, 2012 and August 23, 2012, TransAmerica, through a brokerage account at Scottsdale, sold all 2.8 million shares of Chimera stock it had acquired in the consolidating transactions for total proceeds of approximately $3,224,630.87.  (APP 000849-850.)  The highest price at which TransAmerica sold this stock was $1.84 per share.  (*Id.*)

89.     Between August 10, 2012 and August 30, 2012, TransAmerica transferred from its brokerage account at Scottsdale, to its bank account at Wells Fargo Bank, N.A., and then to Chartered's bank account at Chase Bank, N.A. $3,050,000, which represented the vast majority

of the proceeds that TransAmerica obtained from its sale of Chimera stock.  (APP 000852-855; APP 000257-264.)

90.     Farmer now claims that the transfer of money from TransAmerica to Chartered in August 2012 was for repayment of obligations that Austin owed Farmer.  (APP 000034 Farmer Dep. Tr. 246:10 – 247:14.)

**B.     Oak Resources' Transactions**

91.     Between June 20, 2012 and November 15, 2012, Oak Resources, through brokerage accounts at Pennaluna and Merrimac, sold 2,200,146 shares of Chimera stock it had acquired in the consolidating transactions for total proceeds of approximately $667,557.19. (APP 000857-858; APP 000860-866.)

92.     During the time that Oak Resources was selling Chimera stock from its Pennaluna brokerage account, it became apparent to Dillon, who was the registered representative servicing Oak Resources' account, that Cotton – the ostensible owner of Oak Resources – was not the person who was directing trading in Oak Resources' account.  (APP 000159-161 Dillon Decl. ¶ 10.)  Dillon concluded that Farmer was directing the trading in Chimera shares in Oak Resources' account.  (*Id.*)  As a result, Dillon requested that Cotton provide a written authorization for Farmer to direct trading, and in connection with this process, Farmer told Dillon that Cotton was Farmer's girlfriend.  (*Id.* ¶¶ 10-11.)

93.     Between August 9, 2012, and November 21, 2012, Oak Resources transferred approximately $525,000 from its brokerage accounts to its bank account at Chase Bank, N.A. (Oak Resources brokerage account transfer records [APP 000868-870.)  From August 10, 2012 to September 16, 2012, Oak Resources transferred from its bank account at Chase Bank, N.A.,

for which Farmer had signatory authority, to Chartered's bank account at Chase Bank, N.A., approximately $425,000. (APP 000182-185.)

94.     Farmer stated that proceeds from Oak Resources' sales of Chimera stock ended up in accounts controlled by him because Cotton was repaying obligations she owed to Farmer, which she would not have been able to repay but for the proceeds from selling Chimera stock. (APP 000033-34 Farmer Dep. Tr. 244:17 – 246:3.)

C.     **Chartered's Transactions**

95.     Between June 29, 2012 and September 27, 2012, Chartered, through its brokerage account at Scottsdale, sold 1,148,322 shares of Chimera stock it had acquired from Daniel SoRelle and three other IPO investors for total proceeds of approximately $692,554.51.  (APP 000849-850.)

D.     **Marshall Islands Entities' Transactions**

96.     Between August 10, 2012 and September 11, 2012, Kylemore, through its bank account at Compagnie Bancaire Helvetique ("CBH"), a bank based in Geneva, Switzerland, sold via United States quotation mediums approximately 740,000 shares of Chimera stock it had acquired in the consolidating transactions for total proceeds of approximately $790,876.00. (APP 000872.)

97.     Between July 31, 2012 and October 24, 2012, Hillsmere SA, through its bank account at CBH, sold via United States quotation mediums approximately 2,946,500 shares of Chimera stock for total proceeds of approximately $1,419,035.00.  (APP 000874.)  Of the total amount of shares it sold, Hillsmere SA had acquired 2.8 million shares in the consolidating transactions described in Section V *supra*, and had purchased the remaining 146,500 shares in market transactions via United States quotation mediums.  (*Id.*)

98.     Farmer has numerous and significant links to Kylemore.  As discussed in paragraphs 10-11 *supra*, he claimed to have been Kylemore's "de facto agent in the United States," his wife used the email account anna@kylemorecorp.com, he registered and paid for the registration of the domain name kylemorecorp.com, and between October 2011 and October 2012, at least $4.36 million moved between Chartered's and Kylemore's bank accounts.

99.     Farmer also has other connections to Kylemore.  The beneficial owner of Kylemore is Alina Yurovskaya, a Russian citizen who is a friend of Farmer's wife and Rohde's former girlfriend.  (APP 000015, APP 000021 Farmer Dep. Tr. 93:9-22; 138:15 – 139:8.) Farmer introduced Yurovskaya to David Craven, who during the Relevant Time Period was a trustee of Kylemore.  (APP 000014-15 Farmer Dep. Tr. 92:23 – 93:8.)  Craven is affiliated with EuroHelvetia TrustCo S.A. ("EuroHelvetia"), a private wealth management firm based in Geneva, Switzerland.  (*Id.,* APP 000015 Farmer Dep. Tr. 94:2-4.)

100.     Yurovskaya became a client of EuroHelvetia on April 8, 2011.  (APP 000876-880.)  On that date, she instructed EuroHelvetia to (i) register Kylemore as a corporation in the Marshall Islands, (ii) set up an entity called The Kylemore Trust in Bermuda, and (iii) open a bank account in the name of Kylemore at CBH.  (APP 000878.)  The Kylemore Trust was set up on May 12, 2011 (APP 000882-887.), at which time it took ownership of Kylemore by being settled with the only two issued and outstanding shares of Kylemore.  (*Id.*; APP 000889.)  On July 15, 2011, EuroHelvetia caused Kylemore to open an account at CBH.  (APP 000891-892.) CBH's account opening documents list Farmer as the "settlor" of The Kylemore Trust.  (*Id.*)

101.     The beneficial owner of Hillsmere SA is Olga Tikhonova, who is Farmer's sister-in-law.  (APP 000032 Farmer Dep. Tr. 230:16 – 231:10.)  Olga Tikhonova became a client of EuroHelvetia on April 8, 2011.  (APP 000894-897.)  On that date, she instructed EuroHelvetia to

(i) register Hillsmere SA as a corporation in the Marshall Islands, (ii) set up an entity called The

Hillsmere Trust in Bermuda, and (iii) open a bank account in the name of Hillsmere SA at CBH.

(APP 000895.)  The Hillsmere Trust was set up on May 12, 2011 (APP 000899-903), at which

time it took ownership of Hillsmere by being settled with the only two issued and outstanding

shares of Hillsmere SA.  (*Id.*; APP 000905-906.)  On July 15, 2011, EuroHelvetia caused

Hillsmere SA to open an account at CBH.  (APP 000908-909.)  CBH's account opening

documents list Farmer as the "settlor" of The Hillsmere Trust.  (*Id.*)  EuroHelvetia's due

diligence questionnaire completed in connection with the opening Olga Tikhonova's account

states that the "[s]ource of funds to be under administration" at EuroHelvetia is "[f]unds coming

from A. Farmer to start in the form of a loan."  (APP 000911.)

102.    At the time they opened their accounts at EuroHelvetia, Olga Tikhonova and

Yurovskaya both lived in Yekaterinburg, Russia.  (APP 000911; APP 000913.)

103.    On April 1, 2011, Farmer's American Express credit card was used to purchase

two tickets for Olga Tikhonova and Yurovskaya on an Aeroflot flight from Yekaterinburg to

Geneva.  (APP 000915.)  The American Express credit card statement indicates the flight

departure date as April 1, 2011.  (*Id.*)

## VIII.   Farmer's Continued Involvement in Chimera's Business and Regulatory Affairs

104.    After FINRA's OTC Compliance Unit cleared Pennaluna to quote Chimera's

stock, Farmer remained deeply involved with Chimera's business operations and regulatory

affairs, as described more fully in the examples below.

105.    On March 13, 2012, Farmer approved Loev's filing with the Commission of

Chimera's quarterly financial statements on Form 10-Q.  (APP 000917.)  Loev believed that

Farmer had sufficient authority to approve the filing of these quarterly financial statements on Chimera's behalf.  (APP 000062 Loev Dep. Tr. 90:15 – 92:7.)

106.    On July 27, 2012, Farmer emailed Loev and Alyssa Vasquez, an employee of Loev's law firm, a copy of Chimera's purported License Agreement with China Inland.  (APP 000919-925.)  Farmer directed Vasquez to "prep the attached agreement" for filing with the Commission, and stated that he was "finalizing the 8-k now."  (*Id.*)  Grob, who is a signatory to the License Agreement, was not included on Farmer's communications with Loev and Vasquez.  (*Id.*)  The metadata of the file containing the License Agreement reflects that it was last modified by Farmer. (*Id.*)  As discussed in paragraph 74 above, on July 27, 2012, Chimera filed with the Commission a Form 8-K announcing its License Agreement with China Inland, with the License Agreement attached as an exhibit to the Form 8-K.

107.    On July 30, 2012, Grob sought to engage Hulsey LP, a law firm concentrating in intellectual property law, to represent Chimera in an application for a patent of NHE technology.  Grob Hulsey LP's draft engagement letter to Thomas Massey, and informed Massey that the cost of the engagement would be around $4,000 - $5,000.   (APP 000927-929.)  Massey is an associate of Farmer with whom Farmer had a financial and business relationship.  (APP 000035 Farmer Dep. Tr.  263:8-17.)  On July 31, 2012, Massey forwarded Grob's email to Eddie Austin, who responded that Chimera should "move forward" with the engagement of Hulsey LP, and asked Massey if he had discussed this topic with "Andrew."  (APP 000927-929.)  Later on July 31, 2012, Eddie Austin emailed Massey to tell him that Eddie "just talked with Andrew.  All is good, and Charles has the money to pay the retainer.  The law firm needs to receive payment and signed retainer letter by tomorrow so press can go out Thursday [August 2, 2012] . . . ."  (*Id.*)

108.    On August 2, 2012, Chimera published a press release titled "CHMR Patenting Non-Hydraulic Shale Oil Extraction System . . .," in which Chimera claimed that it had engaged "the prominent intellectual Property (sic) legal firm of Hulsey LP . . . to protect the Company's breakthrough" NHE technology.  (APP 000102.)

109.    In sworn testimony provided during the Commission's investigation of this matter, Massey asserted the Fifth Amendment privilege against self-incrimination in regard to questions relating to Farmer, services Massey performed for Chimera, and Massey's compensation in connection with such services, among other topics.  (APP 000098 Massey Dep. Tr. 17:20 – 18:18.)

110.    On August 10, 2012, Farmer emailed Vasquez and Hannah Loev, wife of David Loev and owner of a business used by Chimera to format and file documents with the Commission, a Form 8-K electronically signed by Grob on Chimera's behalf.  (APP 000931-937.)  The Form 8-K disclosed that Chimera had entered into a Memorandum of Understanding with Pemex, and attached a press release announcing this news.  (*Id.*)  As discussed above, this Form 8-K and the attached press release were false, because, among other reasons, Pemex never entered into such a Memorandum of Understanding with Chimera.  (*See* paragraph 77 *supra*.) Farmer directed Vasquez and Hannah Loev to "file the attached 8-k ASAP."  (APP 000931.)

111.    On August 14, 2012, Loev emailed Farmer a link to a yet to be published article in which the author alleged that Chimera was being used in a pump-and-dump scheme.  (APP 000938A-939; 000940-953.)

112.    On August 15, 2012, Farmer caused Infinite to enter into a Master Credit Agreement with Chimera, whereby Infinite loaned Chimera $25,000 and agreed to extend Chimera a line of credit in an amount not to exceed $500,000.  (APP 000955-966.)

113.     On August 20, 2012, Rios emailed Massey a letter purporting to have been sent by Pemex to Chimera, inviting Chimera to carry out tests of its NHE technology on Pemex's oil wells.  (APP 000968-969.)  The same day, Massey forwarded Rios's email (together with the purported Pemex letter) to Farmer.  (*Id.*)  The letter is a forgery, as Pemex had never sent such a letter to Chimera.  (APP 000092 Sanchez Dep. Tr. 55:2-16.)

114.     On August 24, 2012, Loev emailed Farmer and Rohde (but not Grob) a link to a YouTube video that purported to be a recording of the head of Pemex's Investment Relations department confirming that there were no agreements between Chimera and Pemex.  (APP 000971-972.)  Loev agreed that he emailed the link to Farmer and Rohde only because he believed that they were in charge of Chimera.  (APP 000066-67 Loev Dep. Tr. 118:18 – 121:17.)

115.     Also On August 24, 2012, Grob forwarded to Farmer a copy of the purported Memorandum of Understanding between Chimera and Pemex.  (APP 000973A-975.)

116.     On August 28, 2012, Farmer emailed Loev and Vasquez a letter from Grob to Chimera's shareholders, which was to be included as an exhibit to Chimera's Form 8-K and filed with the Commission.  (APP 000977-981.)  Farmer drafted the letter.  (*Id.*)  The letter contained a number of false statements, including that Chimera had executed a Memorandum of Understanding with Pemex, and that Chimera was negotiating the terms of a Master Service Agreement with Pemex.  (*Id.*)  Later on August 28, 2012, Loev emailed Farmer (but not Grob) requesting his approval to file the Form 8-K and letter exhibit thereto.  (APP 000983-988.)  Loev believed that Farmer's approval was sufficient for Chimera to file a Form 8-K with the Commission.  (APP 000064 Loev Dep. Tr. 106:24 – 107:22.)

117.     Loev stated that Farmer had a "pretty significant role and potentially should have been disclosed as a control person" of Chimera.  (APP 000065 Loev Dep. Tr. 115:10-16.)  Loev

believed that Farmer was "taking on some roles that are typically suited for an officer or director of a company," including authorizing of filings with the Commission and dealing with various regulatory agencies.  (APP 000065 Loev Dep. Tr. 115:17 – 116:9.)  The general nature of Farmer's interactions with Loev as they related to Chimera also supported Loev's belief that Farmer' was taking on roles typically suited for officers or directors of a company.

118.    On September 17, 2012, Rios emailed Massey concerning Rios's attempts to contact Pemex on Chimera's behalf, and requested $5,000 to cover expenses associated with this effort.  (APP 000990-991.)  The same day, Massey forwarded Rios's email to Farmer, stating "[n]eed you to approve 5k for Baldamer (sic), for expenses and other things if we do not see anything positive news form this 5k I will address it a different way…."  (*Id.*)

119.    On September 26, 2012, Grob emailed Farmer an expense report detailing all of Chimera's expenses from the date of its inception.  (APP 000993-999.)  Grob stated that he "can and will provide receipts or bank statements for every line item" on the expense report.  (*Id.*)

120.    On October 2, 2012, Loev emailed Grob, copying Farmer and Rohde, proposed terms to settle a lawsuit brought against Chimera and Grob by Air Liquide USA LLC ("Air Liquide").  (APP 001001-1004.)  Air Liquide alleged in its petition that Chimera published a press release that falsely claimed that Air Liquide has been chosen to be Chimera's helium supplier for use in its NHE technology, and demanded that Chimera and Grob be enjoined from using Air Liquide's name without its permission.  (APP 001006-1021.)  Loev requested that Grob let him know whether the settlement terms proposed by Air Liquide were acceptable. (APP 001073-1076.)

121.    On October 3, 2012, Grob responded to Loev that the "terms look fine to me pending Andrew's approval."  (APP 001023-1025.)  Later that day, Farmer emailed Loev stating

that Farmer believed the proposed settlement to be "a reasonable arrangement."  (*Id.*)  Loev

understood that Farmer's approval was required to effectuate the settlement with Air Liquide.

(APP 000068 Loev Dep. Tr. 129:9 – 130:9.)  Loev further acknowledged that by this time,

Farmer's role was not limited to being a consultant to Chimera with regard to its filing of the

Registration Statement.  (APP 000068 Loev Dep. Tr. 131:13-17.)

122.    On October 9, 2012, Farmer emailed Brotherton and Massey a draft of a letter

from Rios to Chimera shareholders.  (APP 001027-1029.)  Farmer requested that Massey obtain

Rios's approval to publish the letter, as the "plan" was to "put this out was (sic) part of an 8-k

around 10am our time."  (*Id.*)

123.    On October 10, 2012, Chimera filed with the Commission a Form 8-K with

Rios's shareholder letter attached as an exhibit, in the same form as Farmer emailed it to Massey

on October 9.  (APP 001031-1038.)  The shareholder letter contained several false statements,

including claims that Chimera had executed a Memorandum of Understanding with Pemex, and

that Chimera had received a formal proposal request from Pemex relating to use of NHE

technology on Pemex wells.  (*Id.*; APP 000082-85 Avila Dep. Tr. 91:8 – 103:8.)

124.    On October 2, 2012, Melinda Park of FINRA's Fraud Detection and Market

Intelligence Unit sent Grob a letter requesting from Chimera certain documents and explanations

in connection with FINRA's inquiry into Chimera's activities and public statements.  (APP

001040-1041.)

125.    On October 11, 2012 at 11:20 p.m., after Grob resigned as CEO and Rios replaced

him, a person using Rios's Chimera email address emailed Loev a draft response to FINRA's

letter.  (APP 001043-1047.)  Metadata of the attached response letter file indicates that it was

created by Farmer on October 11, 2012 at 3:28 p.m. and last modified by Farmer the same day at

11:17 p.m.  (*Id.*)  In response to FINRA's request to describe how Grob knew Farmer, and "any business [Chimera] or the executive officer has done" with Farmer, "either for business or personal purposes," the draft response stated that "Mr. Farmer is a long-term friend of our former CEO, Charles Grob.  The Company does not have now, nor has it ever had, a business relationship with Mr. Farmer.  While Mr. Grob and Mr. Farmer are friends, they have never had a business relationship."  (*Id.*)

126.    Loev provided several comments on the draft response to FINRA, after which a person using Rios's Chimera email address sent Loev a revised letter on October 15, 2012 at 9:38 p.m.  (APP 001049-1062.)  The revised letter now contained the following response to the question about Grob's and Chimera's relationship with Farmer:

> Mr. Farmer is a long-term friend of our former CEO, Charles Grob.  During the formation of the Company, Mr. Grob sought advice from Mr. Farmer regarding the process of filing the Company's Registration Statement with the SEC.  At no time was Mr. Farmer an officer, director or affiliate of the Company.  Mr. Farmer was never compensated for his advice.  The Company does not have now, nor has it ever had, a business relationship with Mr. Farmer.  While Mr. Grob and Mr. Farmer are friends, they have never had a business relationship.

(*Id.*)  Metadata of this file indicates that it was created by Farmer on October 15 at 1:01 p.m. and last modified by him the same day at 1:04 p.m.  (APP 001060.)

127.    On October 15, 2012, Grob emailed Melinda Park of FINRA a response to her October 2, 2012 letter, which was identical to the revised letter discussed in the paragraph above.  (APP 001064-1072.)

128.    Farmer acknowledged that the statement in Chimera's response letter to FINRA that he and Grob "have never had a business relationship" is not accurate because Farmer paid Grob for services he claims were unrelated to Chimera.  (APP 000022 Farmer Dep. Tr. 175:18 - 176:4.)

35

Dated:  August 14, 2015                          Respectfully submitted,

                                                 s/Matthew J. Gulde
                                                 Matthew J. Gulde
                                                 Illinois Bar No. 6272325
                                                 S.D. Texas Bar No. 1821299
                                                 Nikolay V. Vydashenko
                                                 New York Bar No. 4628566
                                                 United States Securities and
                                                 Exchange Commission
                                                 Burnett Plaza, Suite 1900
                                                 801 Cherry Street, Unit 18
                                                 Fort Worth, TX  76102
                                                 Telephone:  (817) 978-1410 (MJG)
                                                 Facsimile:  (817) 978-4927
                                                 guldem@sec.gov

                                                 *Attorneys for Plaintiff Securities
                                                 and Exchange Commission*

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all counsel who have registered with the Court. Additionally, I have caused a true copy thereof to be delivered by the United States Postal Service, Certified Mail, Return Receipt Requested, addressed to:

Chimera Energy Corp.
c/o Nevada Secretary of State
Meyers Annex Office, Attn: Alfie Frieser
202 N. Carson Street
Carson City, Nevada 89701
Defendant

                                                 *s/Matthew J. Gulde*
                                                 Matthew J. Gulde