# Appendix

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No.: 4:14-CV-02345** |
| | § | |
| **ANDREW I. FARMER,** | § | |
| **CHARLES E. GROB, JR.,** | § | |
| **CAROLYN AUSTIN,** | § | |
| **BALDEMAR P. RIOS, and** | § | |
| **CHIMERA ENERGY CORP.** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**DECLARATION OF NIKOLAY VYDASHENKO IN**
**SUPPORT OF PLAINTIFF U.S. SECURITIES AND EXCHANGE**
**COMMISSION'S MOTION FOR SUMMARY JUDGMENT**

1.      I am an attorney in the Division of Enforcement of the United States Securities and Exchange Commission (the "Commission").

2.      I submit this declaration in support of the Commission's Motion for Summary Judgment. This declaration is based on my personal knowledge.

3.      I have made a diligent search of the Commission's EDGAR filing system. Other than the Registration Statement that the Commission declared effective on December 22, 2011, I did not find any filed registration statement that registered any other transactions in Chimera stock.

4.      During the Commission's investigation of this matter, to my knowledge, no person or entity produced to the Commission any communications to or from China Inland Oil Exploration Company of Chencunzhen, China ("China Inland"), or any technical documents

relating to the functioning of Chimera's purported non-hydraulic extraction technology.  To my

knowledge, no person or entity produced any such documents in the course of this litigation.

5.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 14th day of August, 2015.

Nikolay Vydashenko

# Appendix

# Exhibit B

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

**Page 1**

1        IN THE UNITED STATES DISTRICT COURT
2       FOR THE SOUTHERN DISTRICT OF TEXAS
3           HOUSTON DIVISION
4  - - - - - - - - - - - - - - - - - -
5  SECURITIES AND EXCHANGE COMMISSION,  )
6        Plaintiff,        ) CASE NO.
7  v.                    ) 4:14-CV-02345
8  ANDREW I. FARMER, CHARLES E.    )
9  GROB, JR., CAROLYN AUSTIN, BALDEMAR  )
10  P. RIOS, and CHIMERA ENERGY CORP.   )
11        Defendants.       )
12  - - - - - - - - - - - - - - - - - -
13
14
15        DEPOSITION OF ANDREW I. FARMER
16          FRIDAY, JULY 17, 2015
17          PAGES 1 - 291; VOLUME 1
18
19
20
21       BEHMKE REPORTING AND VIDEO SERVICES, INC.
22    BY:  LARISSA L. MCPHEARSON, TEXAS CSR NO. 8371
23            160 SPEAR STREET, SUITE 300
24         SAN FRANCISCO, CALIFORNIA  94105
25               (415) 597-5600

**Page 2**

1
2
3
4
5
6
7
8    Deposition of ANDREW I. FARMER, VOLUME 1, taken
9  on behalf of Plaintiff, at Securities and Exchange
10  Commission, 801 Cherry Street, Suite 1900, Fort Worth,
11  Texas 76102, commencing at 9:16 A.M., FRIDAY, JULY 17,
12  2015, before Larissa L. McPhearson, Certified Shorthand
13  Reporter No. 8371, pursuant to Notice of Videotaped
14  Deposition.
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1  APPEARANCES OF COUNSEL:
2  FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION:
3    UNITED STATES SECURITIES AND EXCHANGE COMMISSION
4    BY:  MATTHEW J. GULDE, ATTORNEY AT LAW
5        NIKOLAY VYDASHENKO, ATTORNEY AT LAW
6    801 Cherry Street, Suite 1900, Unit 18
7    Fort Worth, Texas 76102
8    Telephone:  (817) 978-1410
9    Email:  guldem@sec.gov
10         vydashenkon@sec.gov
11
12  FOR DEFENDANT ANDREW I. FARMER:
13    EDMUNDSON PLLC
14    BY:  J. KEVIN EDMUNDSON, ATTORNEY AT LAW
15    21209 Highway 71 West, Suite 3
16    Spicewood, Texas 78669
17    Telephone:  (512) 720-0782
18    Email:  kevin@edmundsonpllc.com
19
20
21
22
23
24
25

**Page 4**

1  APPEARANCES OF COUNSEL - (CONTINUED):
2  FOR DEFENDANT BALDEMAR P. RIOS - (TELEPHONICALLY):
3    RICHARD D. MORENO, LLC
4    BY:  RICHARD D. MORENO, ATTORNEY AT LAW
5    125 West School Street
6    Lake Charles, Louisiana  70602-0149
7    Telephone:  (337) 656-8654
8    Email: richard@rdmorenolaw.com
9
10  FOR DEFENDANT CAROLYN AUSTIN - (TELEPHONICALLY):
11    FELDMAN + TUCKER + LEIFER + FIDELL
12    BY:  DUHA EL-QUESNY, ATTORNEY AT LAW
13    1129 20th Street, NW, Suite 400
14    Washington, DC 20036
15    Telephone:  (202) 466-8960
16    Email:  delquesny@ftlf.com
17
18
19
20
21
22
23
24
25

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

---

Page 5

1                          INDEX

2   FRIDAY, JULY 17, 2015

3   ANDREW I. FARMER - VOLUME 1                          Page

4      Examination by MR. GULDE                            10

5   P.M. SESSION

6      Examination by MR. EDMUNDSON                       282

7      Further examination by MR. GULDE                   288

8

9

10

11                        -oOo-

12

13     QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

14                  PAGE     LINE

15                  None.

16

17

18

19

20

21

22

23

24

25

---

Page 6

1                       EXHIBITS

2              ANDREW I. FARMER - VOLUME 1

3   Number              Description                        Page

4   Exhibit 81A  Contact Info for Shopper ID 31388119;

5              Bates Nos. SEC-GoDaddy-E-0000001

6              through SEC-GoDaddy-E-0000003 - 3 pages     80

7   Exhibit 82A  EuroHelvetia TrustCo S.A. Compliance

8              Requirements; Bates Nos.

9              SEC-FINMA-P-0000592 through

10             SEC-FINMA-P-0000636 - 15 pages              95

11  Exhibit 83   Account Ending 3-3005; Bates Nos.

12             SEC-AMEX-P-0000119 - 1 page                 98

13  Exhibit 84   E-mails, subject:  Chimera S-1;

14             Bates Nos. SEC-LoevLaw-E-0001111

15             through SEC-LoevLaw-E-0001112

16             - 2 pages                                  106

17  Exhibit 85   E-mails, subject:  Chimera Subscription

18             Agreement; Bates Nos. EA0000220

19             through EA0000033 - 3 pages                121

20  Exhibit 86   E-mails, subject:  SEC Comment

21             Letter:  Chimera Energy Corp

22             2011-11-16 Letter - 10 pages               120

23  Exhibit 87   Seekingalpha.com article - 14 pages      156

24

25

---

Page 7

1                   EXHIBITS - (CONTINUED)

2              ANDREW I. FARMER - VOLUME 1

3   Number              Description                        Page

4   Exhibit 88   Checks to Charles Grob; Bates Nos.

5              SEC-WellsFargo-P-0000186 through

6              SEC-WellsFargo-P-0000198 - 5 pages          176

7   Exhibit 89   E-mail, subject:  Reimbursement;

8              Bates Nos. SEC-Grob-E-0000416 through

9              SEC-Grob-E-0000417 - 2 pages                183

10  Exhibit 90   E-mail, subject:  Wire Request;

11             Bates Nos. SEC-ACA-E-0000620 - 1 page       186

12  Exhibit 91   Subscription Agreement; Bates Nos.

13             AF-00528 through AF-00620 - 93 pages        189

14  Exhibit 92   Wells Fargo Combined Statement of

15             Accounts; Bates Nos.

16             SEC-WellsFargo-P-0000019 through

17             SEC-WellsFargo-P-0000027 - 9 pages          191

18  Exhibit 93   E-mail, subject:  Chimera Energy Corp;

19             Bates Nos. SEC-PC-E-0000441 - 1 page        214

20  Exhibit 94   E-mails, subject:  Pre-211 Paperwork

21             (1st e-mail); Bates Nos.

22             SEC-PC-E-0000723 through

23             SEC-PC-E-0000727 - 5 pages                  215

24

25

---

Page 8

1                   EXHIBITS - (CONTINUED)

2              ANDREW I. FARMER - VOLUME 1

3   Number              Description                        Page

4   Exhibit 95   E-mails, subject:  Chimera Deficiency;

5              Bates Nos. SEC-PC-E-0000224 through

6              SEC-PC-E-0000229 - 8 pages                  224

7   Exhibit 96   Switzerland documents; Bates Nos.

8              SEC-FINMA-P-0000970 through

9              SEC-FINMA-P-0001033 - 15 pages              231

10  Exhibit 97   Letter from Andrew Farmer to Island

11             Stock Transfer; Bates Nos.

12             ICL-0066 through ICL-0001 - 4 pages         237

13  Exhibit 98   Chimera bank statements; Bates Nos.

14             SEC-HANCOCK-P-0000086 through

15             SEC-HANCOCK-P-0000136 - 51 pages            252

16  Exhibit 99   E-mails, subject:  ChEC Follow Up

17             Negotiations with Pemex; Bates Nos.

18             TM000392 through TM000393 - 2 pages         254

19  Exhibit 100  Executive Employment Agreement;

20             Bates Nos. 00057 through 00061

21             - 5 pages                                   259

22  Exhibit 101  E-mails, subject:  Chimera Expenses;

23             Bates Nos. TM000541 through TM000547

24             - 7 pages                                   263

25

---

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

---

Page 9

1                PREVIOUSLY MARKED EXHIBITS

2              ANDREW I. FARMER - VOLUME 1

3   Number      Description                    Page

4   Exhibit 43  E-mails, subject:  Shareholder Letter;

5               Bates Nos. TM000617 through TM000619

6               - 3 pages                       267

7   Exhibit 48  E-mail, subject:  Chimera Energy Corp.;

8               Bates Nos. SEC-LoevLaw-E-0000340 through

9               SEC-LoevLaw-E-0000348 - 10 pages   170

10  Exhibit 52  Promissory Note; Bates Nos.

11              SEC-LoevLaw-E-0000770 through

12              SEC-LoevLaw-E-0000773 - 5 pages    75

13  Exhibit 58  Form S-1/A - 61 pages            108

14  Exhibit 64  E-mails, subject:  CHMR and NVMN

15              - 1 page                         153

16  Exhibit 69  E-mails, subject:  Recording of Head of

17              PEMEX IR Confirming No Contract Exists

18              with CHMR; Bates Nos. TM000289 through

19              TM000290 - 2 pages               147

20  Exhibit 70  E-mails, subject:  Air Liquide/Chimera

21              - 3 pages                        162

22  Exhibit 71  E-mails, subject:  Chimera - 2 pages  166

23  Exhibit 82  Master Credit Agreement; Bates Nos.

24              IF-000001 through IF-000012 - 12 pages  287

25

---

Page 10

1          FRIDAY, JULY 17, 2015; 9:16 A.M.

2

3          ANDREW I. FARMER,

4   having been first duly sworn, testified as follows:

5   THE WITNESS: I do.

6

7          EXAMINATION

8   BY MR. GULDE:

9       Q.  Mr. Farmer, my name is Matt Gulde.  I

10  introduced myself to you before.  It's nice to meet you.

11      A.  You as well.

12      Q.  I work for the SEC.  I'm joined by Nikolay

13  Vydashenko, who I believe you've met before.  We are

14  going to — I am going to be taking your deposition

15  today in the matter of the SEC's case against you,

16  Chimera, and other individuals.  Do you understand that?

17      A.  I do.

18      Q.  Have you ever been deposed before?

19      A.  I have.

20      Q.  When and where?

21      A.  About five years ago in Houston.

22      Q.  In what matter?

23      A.  It was a private legal matter.

24      Q.  Who were the parties?

25      A.  Beter, B-E-T-E-R, vs. Austin, I believe.

---

Page 11

1       Q.  What was the — and — and who is Austin in

2   that case?

3       A.  That was Eddie Austin.

4       Q.  Okay.  And who is Eddie Austin?

5       A.  He is or was an attorney in Lake Charles,

6   Louisiana.

7       Q.  Okay.  Is that Carolyn Austin's husband?

8       A.  Yes, it is.

9       Q.  Okay.  How did you — what did you testify

10  about in Beter V. Austin?

11      A.  It was a case over legal fees.  And I had

12  worked for Ms. Beter and she thought I had information

13  that might be helpful to her.

14      Q.  Was Ms. Beter a lawyer?

15      A.  No.

16      Q.  Who —

17      A.  It was a client of Mr. Austin's.

18      Q.  Okay.  Ms. Beter was suing Mr. Austin for what

19  as far as you know?

20      A.  I wouldn't be able to tell you.

21      Q.  Okay.  And she thought that you could help her.

22  And what was the subject of your testimony, if you can

23  recall?

24      A.  It was what did I know about Mr. Austin and his

25  business dealings.

---

Page 12

1       Q.  Okay.  What do you know about Mr. Austin's

2   business dealings?

3       A.  At the time, I knew very little.  I worked for

4   her, not for him.

5       Q.  What do you know now about Mr. Austin's

6   business dealings?

7       A.  Mr. Austin was an attorney, now lives in

8   Houston.  I — he's an investor, I guess.

9       Q.  Do you have any business dealings with

10  Mr. Austin?

11      A.  Mr. Austin and I share an office.

12      Q.  Okay.  Where is that office located?

13      A.  In Houston.

14      Q.  Address, please?

15      A.  10111 Richmond, Suite 300, 77042.

16      Q.  How long have you shared that office with

17  Mr. Austin?

18      A.  About nine months.

19      Q.  Does Carolyn Austin share that office as well?

20      A.  She does not.

21      Q.  Who else shares that office with you?

22      A.  Myself and Mr. Austin.

23      Q.  You guys have any employees?

24      A.  We do not.

25      Q.  Okay.  In addition to sharing an office with

---

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

---

Page 61

1  quit, you know.  I had a conversation with Ms. Delaney
2  that my time was coming to an end and I was going to go
3  find other things to do.
4      Q.  Okay.  When was this?
5      A.  Likely early 2011.  Late 2010, early 2011.
6      Q.  And do you personally believe the circumstances
7  of your quitting are covered by the attorney-client
8  privilege held by a client of KM Delaney?
9      A.  Yes.
10     Q.  Do —
11     MR. EDMUNDSON: Do you mind if I --
12     MR. GULDE: Go ahead.
13     MR. EDMUNDSON: Can we just go off the record real
14  quick?
15     MR. GULDE: Sure.
16     MR. EDMUNDSON: I just don't know anything about
17  this.
18     MR. GULDE: Take your time.
19         (Off the record from 10:27 to 10:30 a.m.)
20     Q.  All right.  Mr. Farmer, would you describe for
21  me in the level of detail that you're comfortable with,
22  given the privilege issues that may surround this issue,
23  the circumstances that led to you leaving the employment
24  of the KM Delaney Law Firm?
25     A.  Certainly.  In general, I became aware of

---

Page 62

1  clients of Ms. Delaney's utilizing 144 -- or the
2  auspices I should say of 144 to convert debt into
3  shares -- or into free trade and stock and then have
4  those shares sold into the market.  And it was my belief
5  that some of the opinions that may have been utilized
6  for that were insufficient.
7      MR. GULDE: Okay.  Can -- we had a little bit of
8  noise on the phone, so can I get the court reporter to
9  read that back to me, the answer.
10         (Requested portion was read.)
11     Q.  Okay.  Beyond that level of detail, you're
12  uncomfortable that it may reveal privileged information?
13     A.  Yes.
14     Q.  Okay.  So you left the employment of Delaney
15  Law Firm in 2011.  What did you do after you left?
16     A.  I went back into my relaxation mode.  A lot of
17  golf, a lot of -- I guess relaxation.  A lot of quiet
18  time while I was figuring out what I was going to do
19  next.
20     Q.  How long did you relaxation mode last?
21     A.  Overall, probably a year.
22     Q.  Were you in this relaxation mode when you met
23  Mr. Grob?
24     A.  Yes, I was.
25     Q.  When did the -- did you have any deals going

---

Page 63

1  whenever you met Mr. Grob?
2      A.  I had made an investment -- or I should say my
3  company had made an investment in a pubco called Onyx --
4  Onyx Service and Solutions.  And that didn't go so well.
5  And I don't remember exactly how the time frames matched
6  up to when Tyson introduced me to Grob.
7      Q.  Okay.  When you say your company made an
8  investment, what company are you talking about?
9      A.  I believe that was Chartered Investments.
10     Q.  Okay.  What other companies do you control?
11     A.  Well, now I only have one company, and that's
12  Teton Global.
13     Q.  T-E-T-O-N?
14     A.  G-L-O-B-A-L, LLC.
15     Q.  Okay.  Is it incorporated in Wyoming?
16     A.  It is an LLC, but, yes, it is a Wyoming LLC.
17     Q.  Okay.  Organized under the laws of Wyoming?
18     A.  Yes.
19     Q.  At the time you met Mr. Grob, what were — what
20  companies did you control?
21     A.  Chartered Investments, Inc., Wyoming, and
22  Infinite Funding, which I believe was also Wyoming.
23     Q.  Okay.  How about Iridium?
24     A.  Iridium was by that time basically defunct.
25     Q.  Okay.  What — can you give us a sketch of what

---

Page 64

1  these various companies did?
2      A.  Sure.  Chartered Investments, in general, made
3  equity investments in companies either directly with the
4  company or through a secondary transaction.  And
5  Infinite Funding was set up to provide loans and lines
6  of credit to pubcos.
7      Q.  And then you said Iridium was basically defunct
8  by that time; is that right?
9      A.  That's correct.
10     Q.  What did Iridium do before it was defunct?
11     A.  Iridium was set up as my personal holding
12  company.
13     Q.  And how does your personal holding company
14  operate?  What does that mean?
15     A.  If I was paying employees' consultants, you
16  know, office expenses, any of those things, that was an
17  Iridium expense, an Iridium line item.
18     Q.  And why did it become defunct?
19     A.  I decided it was time to move — to restructure
20  myself.  So I shut down Iridium.  I would say by the end
21  of 2011 it was completely shut down.
22     Q.  Okay.  Why did you decide that it was time to
23  restructure yourself?
24     A.  Well, frankly because Iridium had -- you know,
25  Iridium's name had been out there.  It was in the

---

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 65

1  message boards, you know, being tarnished I would say
2  unfairly. But it just wasn't worth the fight to keep
3  it.
4      Q.  Okay. So you stopped using Iridium in part
5  because of the negative public connotation surrounding
6  that company?
7      A.  Partly. Partly because it was formed by
8  Ms. Delaney and her office and I felt that wasn't a --
9  it wasn't a connection I wanted to maintain.
10     Q.  Okay. For the reasons we've already discussed?
11     A.  Not specifically for those -- the reasons we
12  sort of discussed. Just because I didn't want the name
13  connection out there. If something happened to
14  KM Delaney or -- I did not want some future deal I'm
15  doing for somebody to look up who was the incorporator,
16  see it was KM Delaney and then all of a sudden I'm part
17  of whatever their disaster was.
18     Q.  Okay. Who incorporated Chartered and Infinite
19  Funding or organized it?
20     A.  Wyoming Corporate Services.
21     Q.  Both of them?
22     A.  Yes.
23     Q.  Okay. Wyoming Corporate Services served the
24  same role in organizing Chartered and Infinite as the
25  Delaney firm did in organizing Iridium?

Page 66

1      A.  No. I would say that Wyoming Corporate
2  provided substantially more services than KM Delaney.
3      Q.  Okay. Can you give us a general idea of those
4  services?
5      A.  Sure. I bought both of those entities as aged
6  shelf companies which came set up with books, records,
7  from formation, you know, everything ready to go for me
8  to use and put my assets or business or whatever into.
9      Q.  Okay. So the Wyoming company had those
10  basically off the shelf for you to use?
11     A.  Yeah. Articles of incorporation, by laws, you
12  know, corporate books ready to go.
13     Q.  Okay.
14     A.  When Ms. Delaney formed Iridium for me, I got a
15  piece of handwritten paper with her signature on it.
16  Which I guess is sufficiently -- I don't know.
17     Q.  She had to build Iridium from the ground up?
18     A.  Yes.
19     Q.  Yeah. Okay. Can you put a -- well, let me ask
20  you -- I'm not sure if I asked this question. So -- oh,
21  what was the business of Onyx that you invested in?
22     A.  Onyx had a contract in Honduras -- I think it
23  was Honduras -- to install a large scale solar project
24  for an island there.
25     Q.  How were you introduced to Onyx?

Page 67

1      A.  You know, I don't remember. But I know the CEO
2  was a friend of Maurice Stone's. So it was likely an
3  introduction from Maurice.
4      Q.  Okay. What made it seem like a good idea to
5  invest in Onyx?
6      A.  Small public company with a, you know,
7  $84 million, you know, government contract seemed like
8  a reasonable risk.
9      Q.  Penny stock or no?
10     A.  Yes.
11     Q.  Yes, they were?
12     A.  Yes, they were.
13     Q.  Who ran Onyx?
14     A.  I knew you were going to ask me that question.
15  I had his name a few seconds ago. Burleson. I think
16  his last name -- Malcolm Burleson I think was the guy's
17  name.
18     Q.  Okay. Was Mr. Stone involved in Onyx, as far
19  as you know?
20     A.  I don't know, honestly.
21     Q.  Did you make any money off of Onyx?
22     A.  I believe I basically broke even on Onyx.
23     Q.  Okay.
24     A.  I didn't make -- I can't sit here and tell you
25  that I lost, you know, a large amount of money, but I

Page 68

1  certainly didn't make a large amount of money either.
2      Q.  Okay. What do you call a large amount of money
3  though anyway? What's your scale?
4      A.  I mean, a couple hundred thousand dollars would
5  be, you know, a large amount of money.
6      Q.  Could you have made a hundred thousand
7  dollars on Onyx?
8      A.  I don't believe I made a hundred thousand
9  dollars on Onyx.
10     Q.  Was trading suspended in Onyx, as far as you
11  know?
12     A.  To my belief, yes, it was.
13     Q.  Okay. When was that?
14     A.  I don't recall exactly.
15     Q.  Okay. Do you know why trading was suspended?
16     A.  I mean, I can tell you what the commission
17  order said.
18     Q.  Okay. To your knowledge, what did the
19  commission order say?
20     A.  There were questions about the accuracy or
21  adequacy, or it might have been the other way around, of
22  the company's public statements.
23     Q.  Okay. Do you know what public statements they
24  were talking about?
25     A.  I do not.

APP: 000009

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 69

1    Q. As an investor did you go make any
2    investigation into that?
3    A. I will tell you that I took a perfunctory look
4    at what the company had said about their solar project.
5    And, I mean, I saw a video of the company at the
6    government whatever it was, you know, signing the
7    project. I take that to be a relatively good indication
8    that the project was real. And, you know, my decisions
9    were based upon that. I didn't see where the company --
10   Q. On the front end?
11   A. Yeah.
12   Q. When you're deciding to invest?
13   A. When I decided, I did not see anything that
14   would indicate to me that the deal was not exactly what
15   it was being purported to be.
16   Q. Okay.
17   A. Nor did I see anything along the way that
18   indicated to me otherwise. And obviously I have no --
19   no idea what happened behind the scenes of the company
20   or in Roatan or what information the commission had when
21   they made that decision.
22   Q. Uh-huh.
23   A. To my knowledge, no formal investigation was
24   conducted.
25   Q. Now, you said Roatan. What's that?

Page 70

1    A. That's Roatan, Honduras. I think that was the
2    island that this project was supposed to be on.
3    Q. Okay.
4    A. But I'm sure Nikolay will find it shortly.
5    Q. Now, once the trading was suspended, were you
6    still investing -- were you left holding any shares?
7    A. Yeah, I -- I believe that I still have an
8    account that has those shares in them. Because they
9    were suspended there's no market for them and you just
10   can't get rid of them.
11   Q. Uh-huh. Do you have an idea of the rough
12   amount of shares you ever purchased at Onyx -- of Onyx?
13   A. I don't. I don't know the total number of
14   shares. I'd like to sit here and tell you I think I own
15   1.1 million shares still, but I -- that would be a
16   recollection of a number, not based upon, you know, a
17   fact that I can point to here.
18   Q. Okay. Do you have a rough idea of the
19   percentage of the shares that you ever owned you were
20   able to sell before trading was suspended?
21   A. I don't know, 10 percent, 15 percent.
22   Q. Okay. Okay. So back to Charles Grob and Tyson
23   Rohde. When did the introduction take place?
24   A. June, maybe, 2011. June, July, somewhere in
25   that area.

Page 71

1    Q. Okay. And as you heard the two ideas that --
2    did they both present those ideas to you at the same
3    time?
4    A. I wouldn't class it as a presentation. I would
5    class it as a discussion.
6    Q. Okay.
7    A. It's not like, you know, Shark Tank or
8    something where I was sitting on a -- you know, no.
9    They believed their ideas worked together, you know,
10   Charles having an idea for the business and Tyson having
11   an idea for how that business could acquire the capital
12   it needed.
13   Q. Okay. And did you view those ideas as
14   complementary?
15   A. I see the value of access to public capital, so
16   I -- yes, I did see those ideas as not opposed.
17   Q. Okay. What was the next step -- well, let
18   me -- let me ask you this just to close it out: other
19   than Onyx, were you involved in any other companies
20   either as an investor or otherwise at the time you met
21   Charles Grob?
22   A. I don't believe so.
23   Q. Okay. So what was the next step with Mr. Grob?
24   A. The next step was determining whether or not
25   his cutter business could be viable. And he

Page 72

1    demonstrated that viability by going out and selling his
2    first group of cutters.
3    Q. What was the next step after that?
4    A. Actually, let me back up. I guess step number
5    one was forming the corporation, which Mr. Rohde did I
6    believe shortly after our meeting.
7    Q. Okay.
8    A. Then Mr. Grob went and sold his first round of
9    cutters. And then I -- I believe Tyson introduced me to
10   Carlos Lopez and I introduced Charles to Carlos. And
11   they began doing an audit. And then Tyson introduced me
12   to David Loev. We met -- I believe the two of us met
13   with David Loev. And then I made an introduction to
14   Charles.
15   Q. At this point, was Mr. Rohde being compensated
16   for his involvement in any way?
17   A. Not to my knowledge.
18   Q. Do you know if there's any plan to compensate
19   Mr. Rohde with stock or in any other way?
20   A. I -- you'd have to ask Charles, but I don't
21   know of an agreement between the two of them.
22   Q. Okay. At this time, were you being compensated
23   for your time at all?
24   A. I was not.
25   Q. Was there ever any discussion to compensate you

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

APP: 000010

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 77

1    Q.  Okay.  Who connected Tyson and Charles with
2    Kylemore?
3    A.  I did.
4    Q.  Okay.  Who did you introduce them to to connect
5    them to Kylemore?
6    A.  David Craven.
7    Q.  Okay.  And what did you tell David Craven about
8    Chimera?
9    A.  I said that I had a company that approached me
10   that was looking to raise some C capital to go public.
11   And I thought they had a good, you know, business plan.
12   And he said that he would consider it.  And, you know,
13   Kylemore agreed to fund it.
14   Q.  Okay.  What due diligence did Mr. Craven do on
15   Chimera that you know of?
16   A.  You would have to ask him.  I don't know what
17   he did.
18   Q.  Okay.  But you told him it seemed like a good
19   company?
20   A.  I told him that it seemed like they had a good
21   business plan that would -- that had a reasonable chance
22   of success.
23   Q.  Okay.  Now, this loan is currently in default,
24   right?
25   A.  I would imagine so, yes.

Page 78

1    Q.  Okay.  Do you know what efforts Kylemore has
2    made to collect or seize the collateral that secured
3    this note?
4    A.  I wouldn't want to speak for Kylemore, but I
5    would imagine that they knew when the company was
6    suspended that is was unlikely that they were going to
7    receive payment.
8    Q.  Has Mr. Craven called you about that at all?
9    A.  Mr. Craven had -- you know, asked me at the
10   time whether the assets remained and could they be
11   collected.
12   Q.  At the time of the default or at the time of
13   suspension?
14   A.  Shortly after the suspension.
15   Q.  Okay.  And what did you tell him?
16   A.  I told him that I thought it was unlikely that
17   the company -- the company certainly wasn't sitting on
18   the money to pay.
19   Q.  Uh-huh.
20   A.  And I thought it was unlikely after the
21   suspension the company would be in a position to make
22   payment.
23   Q.  Okay.  All the company's assets were collateral
24   for this loan, right?
25   A.  That's what it says, yes.

Page 79

1    Q.  Okay.  And that would include a -- the
2    patent -- the license that -- from -- the license that
3    Chimera obtained from the Chinese company regarding
4    waterless fracking, right?
5    A.  It likely would, yes.
6    Q.  Okay.  So what basis did you have to tell
7    Mr. Craven that that asset was worthless?
8    A.  I didn't have a basis to tell him that.
9    Q.  Okay.
10   A.  I told him that I had not seen -- I had not
11   seen assets that were worth going after.  And there
12   would likely be a lot of competing claims including one
13   from the government and for him -- for Kylemore throwing
14   away a hundred thousand dollars was a lot less expensive
15   than it was going to be to go fight the legal process.
16   Q.  Right.  Did you consider the license that
17   Chimera held on the waterless fracking technology when
18   determining whether there were any assets worth going
19   after?
20   A.  I don't believe I specifically -- this was not,
21   hey, Mr. Farmer, go sit down and look at all of the
22   assets of the company.  This was an ad hoc conversation
23   where I said, look, man, you know, sorry I put you into
24   this, but this company just got suspended by the SEC.
25   What I'm reading out there, you know, is all this, you

Page 80

1    know, Pemex isn't real stuff.  Look, I don't know.  You
2    know.  And he said let's chalk it up to a bad
3    investment.  And that was the end of it.
4    Q.  Okay.  Did you obtain a domain name on behalf
5    of Kylemore?
6    A.  It's possible I did.
7    Q.  Did you maintain a domain or a website for
8    Kylemore?
9    A.  I don't believe Kylemore ever had a website.
10      MR. GULDE:  Okay.  Can I see tab 80, Nikolay?  Well,
11   this is not marked.
12   Q.  I'm going to hand you what's been marked as
13   Exhibit 81.
14      (Exhibit No. 81 marked.)
15   Q.  I've just handed you Exhibit 81.  And I'll
16   represent to you that it's something that GoDaddy gave
17   us.  Do you maintain an account with GoDaddy?
18   A.  I do.
19   Q.  Do you do that under the name Iridium Capital?
20   A.  I believe it's still listed under that name,
21   yes.
22   Q.  Okay.  So is it currently listed under Iridium
23   Capital?
24   A.  Probably so, yes.
25   Q.  Okay.  Does Iridium Capital pay the domain name

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 81

1  registration fees for this?
2  A. No. They're likely on my American Express
3  card.
4  Q. Okay. Have you -- so is it fair to say, as you
5  look through the list that follows on the following two
6  pages, that this is a listing of the domain names that
7  you maintain through GoDaddy?
8  A. It is a listing of domain names that I had set
9  up, yes, or was asked to set up by others.
10 Q. And certain of which you would continue to
11 maintain through the payment of domain name fees?
12 A. As you can see, there's quite a few of them
13 here that I have set up thinking I might use them in the
14 future. But the couple of bucks a year it costs to keep
15 them isn't really significant.
16 Q. Okay. But you're on the hook -- you pay these
17 to the extent anything's needed to keep them active?
18 A. Yes.
19 Q. Okay. And you'll see about -- it's two-thirds
20 of the way down on the first page. You see
21 kylemorecorp.com?
22 A. That's correct.
23 Q. Is that -- I think you said you may have
24 established a domain name for them. Does this clear
25 that up for you?

Page 82

1  A. Yeah, it appears that I did.
2  Q. Okay. And now that you see this, do you recall
3  setting up the domain name for Kylemore Corp.?
4  A. Obviously, there's a lot of them here. I mean,
5  there's no doubt it's on the list. I don't remember
6  specifically setting it up, but it's on the list, so I
7  imagine I did.
8  Q. Right. You see that it's -- it was established
9  or created September 23rd of 2011?
10 A. Yes, I do.
11 Q. Do you see that? And that's right around the
12 time of this loan from Kylemore to Chimera; is that
13 right?
14 A. Yes, I believe so.
15 Q. But you don't recall setting that up for
16 Kylemore?
17 A. I don't recall the instance that led it to be
18 set up.
19 Q. Okay. Why would you have registered this
20 domain for Kylemore?
21 A. Likely because at the time I was Kylemore's de
22 facto agent in the United States. And they were
23 probably trying to establish a presence here in their
24 business and asked me if I could set up a domain for
25 them.

Page 83

1  Q. Why do you say you were Kylemore's de facto
2  agent in the United States?
3  A. Well, you'll -- I'm sure you have the Iridium
4  Capital documents that show that I assisted with the
5  transfer of their securities. And that was, you know --
6  David asked me to do things because they didn't have a
7  U.S. office.
8  Q. Okay. So did David Craven ask you to set up
9  kylemorecorp.com?
10 A. I can't sit here and tell you that David Craven
11 asked me to set it up because I don't know the specifics
12 of why I set it up. But if I -- forcing me to -- you
13 know, to guess, I'd say it's likely because we had a
14 conversation about him wanting to expand Kylemore's
15 business in the United States. And I thought it would
16 be important to get a domain set up for them.
17 Q. Okay. I'm never forcing you to guess, by the
18 way.
19 A. I -- I just want to be clear that I'm --
20 Q. Let's run through some of these other names
21 here. TexasGO.com, what's that?
22 A. I believe -- I looked at a business plan once
23 on geothermic power that was being used in California
24 and Nevada. And I read it and I thought that Texas
25 could be an opportunity for that. So I formed a website

Page 84

1  thinking that some day I would, you know, try and put
2  together a deal on that.
3  Q. Was Texas GO or any of those following four
4  ever related in any way to a penny stock?
5  A. I don't know. I think -- Southern GO Power may
6  have been acquired, but Texas GO and Southern GO Power
7  are not connected, even though they were formed at the
8  same time.
9  Q. Okay. Was Texas GO related to a penny stock?
10 A. No.
11 Q. Okay. You're saying Southern GO Power might
12 have been acquired?
13 A. It --
14 Q. By whom?
15 A. Honestly, I couldn't -- I remember a
16 transaction by which -- Southern GO Power was not owned
17 by me. And I believe it was acquired by a public
18 company, but I don't know which one.
19 Q. Okay. Down a little further, Solar America --
20 A. Uh-huh.
21 Q. -- Corp., was that involved with a penny stock?
22 A. Solar America Corp. was a penny stock, yes.
23 Q. Okay.
24 A. Or -- yes, it was a penny stock company.
25 Q. How about Deep Blue Minerals?

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 85

1    A. Not to my knowledge.
2    Q. Devotion Minerals?
3    A. No.
4    Q. Black Water Mining?
5    A. No.
6    Q. What's TAtrading.com?
7    A. TA Trading was an account -- was a domain that
8  I formed for Ms. Austin.
9    Q. Okay. She asked you to do that?
10   A. She asked me to form it for her, yes.
11   Q. Okay. You continue to pay the registration fee
12  for her?
13   A. It was a one-time five-year fee, probably cost
14  me $30 in 2011.
15   Q. Okay.
16   A. And I never paid for it again.
17   Q. When it comes up, are you going to call her or
18  would you just go ahead and pay it?
19   A. I would imagine -- I mean, I -- before letting
20  it cancel, I would call her and ask her if she wanted to
21  keep it. But I'm not going to pay the fee on something
22  that hasn't been used in five years and likely isn't
23  going to be used.
24   Q. Okay. Even if it's just 30 bucks?
25   A. 30 bucks is still 30 bucks.

Page 86

1    Q. True. Nova Mining is a penny stock, right?
2    A. That was a public company, yes.
3    Q. Okay. But a penny stock?
4    A. Yes, I believe that was a penny stock.
5    Q. Okay. Solawerks? Solawerks?
6    A. Solawerks was a company that I worked with that
7  had an iPad -- solar iPad charger that when the iPad 2
8  came out, the solar pad was released and was a
9  relatively successful product.
10   Q. Were any of the people we've discussed today
11  involved in Solawerks?
12   A. Not to my knowledge, no.
13   Q. Okay. Who's in charge of Solawerks?
14   A. That's actually a good question. I don't
15  remember who was the CEO of Solawerks.
16   Q. Okay. You don't remember who asked you to
17  register --
18   A. It was Tom Ked who was the CEO of -- the name
19  of that company -- Solawerks was a subsidiary of a pubco
20  and its name was Domark. D-O-M-A-R-K.
21   MR. GULDE: And just to make sure we have the
22  spelling on Solawerks, it's S-O-L-A-W-E-R-K-S.
23   Q. How about Nova Mining Corporation, who was
24  involved in that?
25   A. A guy named Joseph Passalaqua out of New York.

Page 87

1    Q. How do you spell Passalaqua, if you know?
2    A. P-A-S-S-A-L-A-Q-U-A. Don't hold me to that.
3    Q. Are any of the other people that we've
4  discussed today involved in Nova Mining Corporation?
5    A. Not to my knowledge.
6    Q. Okay. Solar pad related to Solawerks?
7    A. Yes, sir.
8    Q. Okay. Oak Resources, that's Carol Austin,
9  right?
10   A. No, it is not.
11   Q. Oh. Who's --
12   A. Oak Resources is Lydia Cotton.
13   Q. Lydia Cotton. That's right.
14   A. C-O-T-T-O-N.
15   Q. Okay. And who's Lydia Cotton to you?
16   A. Lydia Cotton was my first receptionist when I
17  moved to Houston.
18   Q. Has she -- did you employ her when you moved to
19  Houston?
20   A. I did as a consultant.
21   Q. You employed your receptionist as a consultant?
22   A. Well, she didn't work -- receptionist may be a
23  misnomer.
24   Q. Okay.
25   A. She's kind of an assistant. She worked when I

Page 88

1  needed her to work.
2    Q. Okay. But she helps you with tasks?
3    A. Yes. I mean, she's a single mom struggling to
4  get by and I helped her out over the years.
5    Q. You're using the word "consultant" just to mean
6  that you weren't her employer, she did work for you on
7  kind of a 1099 basis?
8    A. I mean, since you're not the IRS, it was kind
9  of a cash basis.
10   Q. Okay. How much did -- would she make in an
11  average year?
12   A. I don't know.
13   Q. From you?
14   A. $15,000, maybe.
15   Q. Okay.
16   A. Maybe 20, you know, if there was a lot of stuff
17  that I needed done.
18   Q. Okay. Massive Dynamics, Inc., what's that?
19   A. Massive Dynamics was a public company that had
20  the next product on the list, Cocoa Blue. It was a -- I
21  guess it was a way to add two lines to your iPhone.
22   Q. Okay. How did that work out?
23   A. The product worked well. The reception in the
24  market wasn't very good.
25   Q. Was it a penny stock?

APP. 000013

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 89

1    A. It was.
2    Q. Did you personally make any money on it?
3    A. I did not. A guy named JJ Howard brought the
4    deal to me.
5    Q. Was anybody that we've discussed today involved
6    in Massive Dynamics?
7    A. I don't believe so.
8    Q. Okay. Print Forged with a — Print Forge —
9    I'm sorry, Print Forge 3D, what is that?
10   A. Print Forge I put together with the idea of
11   doing a deal in the 3D space or 3D printing space.
12   Q. Okay.
13   A. Never used the domain.
14   Q. Was anybody we've talk about involved in that?
15   A. It was never a deal.
16   Q. Okay.
17   A. It was just an idea like the mining ones that
18   eventually I might use that domain for something.
19   Q. Okay. You discuss specific technology with
20   anybody?
21   A. No. I had gone to a CES show in Vegas and seen
22   all the 3D printers that were coming out and I thought
23   some of them were interesting. And I thought, hey, I
24   might want to get involved in the 3D printing space.
25   Q. Did you pick the name Print Forge 3D just out

Page 90

1    of the air? Did you make it up yourself?
2    A. There was a company called Source Forge, I
3    think, and I liked the — I liked the combination. I
4    like the word "forge," and so I made up a name.
5    Q. Okay. But you had no — no interaction with
6    them?
7    A. No plans. With Source Forge?
8    Q. Yes.
9    A. No. I don't know anything about them.
10   Q. What is Euro Certs VCS?
11   A. It was a company that David Craven and I were
12   going to form to provide services to European stock
13   depositors that did not have U.S. representation to deal
14   with things like transfer agents.
15   Q. Okay. And how far did that deal get?
16   A. We found it very difficult to get the banks and
17   brokerages on board with utilizing the services.
18   Q. So how far did it get?
19   A. I mean, it handled a few transactions, but it
20   never turned into a business.
21   Q. Okay. Pro Force Investments?
22   A. Pro Force Investments was a gentleman that came
23   to me, his name was Chet Gutowsky, and he asked me to
24   set up Pro Force for him and, you know, help him out
25   and get his name out there as a guy who was ready to

Page 91

1    invest in deals.
2    Q. And has he done that, to your knowledge?
3    A. I -- he got very, very sick. I haven't spoken
4    to him in probably a year.
5    Q. Okay.
6    A. And I -- I mean, I hate to say it, but I'm not
7    sure if he's still alive.
8    Q. Horizon Energy USA?
9    A. Horizon Energy was the name of Solar America --
10   Solar America changed its name to Horizon Energy.
11   Q. Okay. And then Cannabis Biotech?
12   A. Cannabis Biotech was another one of those
13   companies I -- that I thought I would use later.
14   Q. Like Print Forge?
15   A. Yeah, like Print Forge.
16   Q. Okay. But there were no real world connections
17   in connection with Cannabis Biotech?
18   A. Well, they -- Cannabis Biotech went and
19   licensed a vapor technology, and then ultimately I think
20   that license was transferred to Massive Dynamics, I
21   believe.
22   Q. Okay. And we've discussed Massive Dynamics.
23   Did you put them together?
24   A. I made an introduction, yes.
25   Q. Okay. Is anybody we've discussed involved in

Page 92

1    Horizon or Massive?
2    A. No.
3    Q. Okay. And then Inhale?
4    A. Yes.
5    Q. Inhale, Inc., is that related to
6    Cannabis Biotech?
7    A. No.
8    Q. Okay. What's that all about?
9    A. Inhale is a company that was going to have a
10   greenhouse technology -- actually put together a
11   greenhouse and a container technology. I just found it
12   was too expensive to commercialize. It's a public
13   company. It still exists, it trades. The CEO is Lance
14   Williams.
15   Q. Anybody involved in Inhale that we've talked
16   about today?
17   A. Not to my knowledge. Well, let me back up.
18   Tyson Rohde formed the original corporation, which was
19   called Gankit.
20   Q. Okay.
21   A. And you'll see it in the Loev production.
22   Sorry, that's me. I'll turn it off.
23   Q. All right. Now, you've been talking about
24   Mr. Craven as somebody who works for EuraHelvetia; is
25   that right?

Page 93

1    A.  Let me be clear, I don't know exactly what the
2    relationship is between Mr. Craven and EuraHelvetia.
3    Q.  Okay.  But you understand him to be the trustee
4    of --
5    A.  I understand he --
6    Q.  -- of Kylemore?
7    A.  I understand that he was or is the trustee of
8    Kylemore.
9    Q.  What role did you have in the organization of
10   Kylemore?
11   A.  I introduced Ms. Yurovskaya, who's the
12   beneficial owner of Kylemore, to Mr. Craven.
13   Q.  Okay.  Who is Ms. Yurovskaya?
14      MR. GULDE: And let me give you the spelling.
15   Y-U-R-O-V-S-K-A-Y-A.
16   A.  Ms. Yurovskaya is a Russian national who lives
17   in Yekaterinburg, Russia and is a -- or was, I should
18   say, the personal assistant of the general director of
19   Uralmash, which is one the world's largest weapons
20   manufacturers.
21   Q.  And how is she known to you?
22   A.  That is a friend of my wife's.
23   Q.  Okay.  And who is your wife?
24   A.  Anna Tikhonova, T-I-K-H-O-N-O-V-A.
25   Q.  And Alina is A-L-I-N-A?

Page 94

1    A.  A-L-I-N-A.
2    Q.  Okay.  Can you tell me what EuraHelvetia is?
3    A.  I can tell you what I believe EuraHelvetia to
4    be, which is a private wealth management firm.
5    Q.  Does EuraHelvetia own Kylemore?
6    A.  I don't know the structure of that situation.
7    Q.  Okay.  What is Ms. Yurovskaya's relationship
8    with Kylemore?
9    A.  She is the beneficial owner of Kylemore, as I
10   understand it.
11   Q.  Okay.  In layman's terms, what does it mean to
12   be the beneficial owner, if you know?
13   A.  I --
14   Q.  What did you mean?
15   A.  Well, I mean the terminology as it's defined,
16   beneficial is that at the end of the day, it's her
17   money.
18   Q.  Okay.  The money in Kylemore, wherever it is,
19   belongs to Alina Yurovskaya?
20   A.  As I understand it, yes.
21   Q.  Okay.  Now, you helped Ms. Yurovskaya set up
22   Kylemore as it's organized with EuraHelvetia.  You
23   helped her do that, right?
24   A.  No.  I introduced her to EuraHelvetia.
25   Q.  Okay.  Did you pay for her to fly out there to

Page 95

1    fill out their due diligence questionnaire?
2    A.  No, I did not pay for her to fly out there.
3       MR. GULDE: Okay.  Would you pull out Exhibit 81.
4       MR. EDMUNDSON: Matt.
5       MR. GULDE: Yeah.
6       MR. EDMUNDSON: I think you marked that as 81.
7       MR. GULDE: Oh.  Tab 81, I'm sorry.
8       MR. EDMUNDSON: Sorry.
9       MR. GULDE: It's different.  I'm going to -- I'm
10   going to go ahead and just label this whole thing
11   Exhibit 82.  For people -- benefit of the people on the
12   phone, I'm labeling a package that bears the Bates --
13   the first page bears the Bates stamp SEC-FINMA-P, and a
14   bunch of 0s, 592.
15       (Exhibit No. 82 marked.)
16       MR. GULDE: I'm handing that across labeled Exhibit
17   82.
18       MS. EL-QUESNY: Thank you.
19       MR. GULDE: Do we have an extra, or is there --
20       MR. VYDASHENKO: Yeah.
21       MR. GULDE: Is there another in there?
22   Q.  Okay.  Now, turn to the second page there.  Do
23   you see that this purports to be a EuraHelvetia
24   compliance trust -- compliance requirement package for
25   the client Alina Yurovskaya?

Page 96

1    A.  I mean, that's what it says.
2    Q.  Okay.  And it appears to be dated April 8th,
3    2011?
4    A.  That's the date on it, yes.
5    Q.  Okay.  Did you have anything to do with
6    Ms. Yurovskaya completing this due diligence
7    questionnaire with EuraHelvetia?
8    A.  I'm just flipping through the whole thing
9    before I answer your question.  No, I had nothing to do
10   with her filling out this form.
11   Q.  Okay.  Now, on the third page where the due
12   diligence questionnaire starts, you see that?
13   A.  I do.
14   Q.  Ms. Yurovskaya has apparently listed her
15   profession as vice president of international sales.  Do
16   you see that?
17   A.  I do.
18   Q.  Do you believe that to be consistent with your
19   understanding of Ms. Yurovskaya's profession?
20   A.  I wouldn't know one way or the other.  I don't
21   know how she was classified at the company.
22   Q.  Okay.  Help me remember what you about what she
23   did before?
24   A.  As I understood it, she was the assistant to
25   the chairman of Uralmash.

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 105

1  through transactions that you helped them with, right?
2  A.  Yes.
3  Q.  Okay.  So that's consistent with your
4  experience of them?
5  A.  Yes.
6  Q.  Okay.  Did you know -- well, why did Anna
7  Tikhonova use a Kylemore e-mail address?
8  A.  I don't believe she ever did.  I believe one
9  was set up.  I don't know if any e-mail was ever sent --
10  Q.  Okay.
11  A.  -- by her.  But I will tell you that the
12  purpose of that, again, was David asking that Kylemore
13  be able to represent stuff in the states.  And perhaps
14  Anna was willing to do that and be the conduit of
15  information.
16  Q.  David requested that you establish a contact in
17  the United States for Kylemore?
18  A.  David requested that if Kylemore was going to
19  be making substantial investments that a contact was
20  established that was domestic so that stock certificates
21  and things of that nature would have a route that didn't
22  include them going international prior to being
23  processed.
24  Q.  And he made that request of you?
25  A.  He made that request of me.

Page 106

1  Q.  And you nominated or said that Anna Tikhonova,
2  your wife, would be a good person to hold that role?
3  A.  I suggested that she could facilitate that for
4  him, yes.
5  Q.  Okay.  And so you believed that a Kylemore
6  e-mail address was assigned to her, but you don't know
7  if she used it?
8  A.  I do not know if she used it.
9  Q.  Okay.  But you don't doubt that she had a
10  Kylemore address?
11  A.  I do not doubt that she had a Kylemore address,
12  but it was not her primary e-mail address.  And I
13  couldn't tell you if it was --
14  Q.  Okay.  What was her primary e-mail address, by
15  the way?
16  A.  Tikhonova -- or Tihomechka,
17  T-I-H-O-M-E-C-H-K-A, 666@yahoo.com.
18  Q.  All right.
19  A.  Correct me if I made a mistake in that.
20  Q.  Okay.  All right.  Would you pull tab 5.
21      (Exhibit No. 84 marked.)
22  Q.  I labeled this Exhibit 84.  You see this is an
23  e-mail from David Loev to Charles Grob, also to John
24  within his law firm and Carlos Lopez -- I'm sorry, I've
25  said this all wrong.  It's an e-mail from you, correct?

Page 107

1  A.  Yes.
2  Q.  To all those people?
3  A.  Yes, it appears to be.
4  Q.  Okay.  And this is from back in October
5  of 2011?
6  A.  That's correct.
7  Q.  Subject is Chimera's S1?
8  A.  That's correct.
9  Q.  Is this pretty standard for you to have
10  interaction with -- with all of these people in
11  connection with Chimera's filings with the SEC?
12  A.  Well, I believe I interacted with all of these
13  people, yes.  But in this specific instance, I was
14  replying all to an e-mail that I had been copied on.
15  Q.  In general, though, it's not uncommon for you
16  to be having discussions about the S1?
17  A.  Not uncommon for me to be reviewing and making
18  suggestions, that's correct.
19  Q.  Okay.  Did you -- did you take the first crack
20  at the S1 whenever Chimera was preparing it?
21  A.  I did not.
22  Q.  Who took the first crack at it?
23  A.  Tyson wrote it.
24  Q.  But you were involved in editing it and
25  offering revisions throughout the process?

Page 108

1  A.  I believe my suggestions were more towards the
2  end of the process.
3  Q.  Okay.  You're familiar with its contents?
4  A.  I'm familiar with the contents of the document,
5  yes.
6      MR. GULDE:  Okay.  This has already been labeled
7  Exhibit 58.  It's tab 3 in the SEC filing.
8  Q.  I've handed you what's previously been labeled
9  as Exhibit 58 in this matter.  Is this the S1 we've been
10  talking about?
11  A.  This is -- this appears to be amendment number
12  2 to Chimera's S1.
13  Q.  Were there any more amendments after this, to
14  your knowledge?
15  A.  I'm not sure.
16  Q.  Okay.  Were you involved in the process of
17  creating this amendment?
18  A.  I'm sure that I looked at it and I likely
19  commented on it.
20  Q.  Generally familiar with its contents?
21  A.  I am generally familiar with what it says, yes.
22  Q.  I'd like to look at page -- there's a couple of
23  paginations here.  And I always get messed up when I'm
24  referring to them.  Let's try to use the top one's page
25  23 of 61.  You see that?

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 109

1    A.  Okay.  Got you.
2    Q.  You see the part where it says plan of
3  distribution?
4    A.  Uh-huh.
5    Q.  Is this a section that you would have helped
6  prepare or at least reviewed?
7    MR. EDMUNDSON: Can you break that up just so we're
8  clear, review or prepare?
9    MR. GULDE:  Okay.
10   Q.  Is this a section -- well, you've already said
11  that Mr. Rohde took the first cut at this, right?
12   A.  Yes.
13   Q.  Would plan of distribution have been in his
14  first cut?
15   A.  Yes.
16   Q.  So you didn't write this section?
17   A.  No.
18   Q.  Did you review this section?
19   A.  I read the document, so I read this section.
20   Q.  Okay.
21   A.  Did I review this section with an eye to legal
22  completeness, no, I did not.
23   Q.  Now, you see where it says we're offering
24  shares on a self-underwritten basis to Charles Grob?
25   A.  Yes.

Page 110

1    Q.  What does self-underwritten mean to you?
2    A.  Well, there's no underwriter to this
3  registration, ergo the company is serving as its own
4  underwriter.  And I believe that's what
5  self-underwritten means.
6    Q.  Okay.  So physically, what steps would the
7  company have to go through to sell its shares?
8    A.  Well, I believe it's specified in the next
9  couple of sentences that Mr. Grob would have to directly
10  go to the investors to sell those shares without going
11  through a broker in that transaction.
12   Q.  Okay.  And it says that Mr. Grob will be doing
13  it.  And does it say that anybody else will be doing it?
14   A.  I would have to read it in detail, but I don't
15  see that it specifies other names that would be doing
16  it.
17   Q.  Okay.  Are you disclosed here?
18   A.  I am not.
19   Q.  Was Carolyn Austin disclosed here?
20   A.  She does not appear to be.
21   Q.  Is Eddie Austin disclosed here?
22   A.  He does not appear to be.
23   Q.  Did you have any discussion about disclosing
24  yourself or the Austins with Mr. Grob?
25   A.  It was never discussed.

Page 111

1    Q.  Okay.  On the reverse page of my copy,
2  probably -- do you have a double sided copy?
3    A.  Yeah.
4    Q.  Okay.
5    A.  I've got yours.
6    Q.  Page 24 of 61 about almost to the bottom, you
7  see where it says, our office director, control person
8  and affiliates do not intend to purchase any shares in
9  this offering?
10   A.  I see that.
11   Q.  Why is that in there?
12   A.  I'm sorry.  I'm not an attorney.  You should
13  probably ask Mr. Loev.
14   Q.  Is it always in S1s?
15   A.  I have found it generally to be consistent with
16  what's in an S1.
17   Q.  Okay.  Whenever you've helped somebody with an
18  S1, has there been a claim like this in the S1?
19   A.  I don't specifically remember every instance,
20  but I -- I would say I've likely seen it more than I
21  haven't seen it.
22   Q.  Okay.  And are you saying right now you don't
23  know why companies make this representation?
24   A.  From a legal basis, I have an idea of why the
25  representation is made, but I certainly don't have a

Page 112

1  definitive this is why the representation is there.
2    Q.  What's your understanding for why companies
3  have to make this representation or why companies make
4  this representation?
5    A.  Because it would do no good for an office
6  control person or affiliate to participate in the S1
7  offering because you would end up with shares that were
8  restricted at the end of the day anyway.
9    Q.  Okay.  And so if the purpose is to sell them to
10  the public --
11   A.  If the purpose is to acquire the shares as an
12  investment, then it wouldn't do much good to acquire
13  them if you couldn't sell them.
14   Q.  Okay.  You're aware that Charles Grob purchased
15  shares on behalf or for named investors in the IPO?
16   A.  I would be shocked if I found out that Charles
17  directly purchased shares in the IPO.
18   Q.  And you're aware that you provided money for
19  investors to buy shares in the IPO?
20   A.  I'm aware that I made loans to people to make
21  investments.  And I was repaid for every single one of
22  those loans.
23   Q.  Okay.  We'll talk about that.  Is that -- well,
24  we'll talk more in detail about these loans.  But are
25  those loans something that you disclosed to anyone other

APP: 000017

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

---

Page 113

1  than Mr. Grob or Mr. Rohde in this case?
2      A.  I --
3      MR. EDMUNDSON:  Objection to form.
4          But you can answer.
5      A.  I'm not sure who I would disclose that matter
6  to.
7      Q.  Did you ever tell the SEC that you had made
8  loans for the purpose of people buying shares of stock
9  in Chimera?
10     A.  I mean, not to be facetious but tell me how
11 that communication happens?  Do I just call you guys up
12 and say, I loaned somebody money?
13     Q.  Did you ever do that?
14     A.  No, but I mean, hey, if that's the idea here,
15 every transaction I ever do, I'll call the SEC first and
16 leave a recording of what I did.
17     Q.  Okay.
18     A.  Oh, great.
19     Q.  Your answer is you never disclosed to the SEC
20 that you made these loans for that purpose?
21     A.  Again, I asked the question.  And let me be
22 specific.  What is the forum for me making a disclosure
23 to the SEC?
24     Q.  In any of the disclosures --
25     A.  What is the forum for me to make a disclosure?

---

Page 114

1  I don't want to be argumentative here.  I really don't.
2  But this is not my document.  It doesn't have my name on
3  it, I didn't write it, I didn't draft it.  I can't go
4  file a form with Edgar, you know.  So I'm asking how I
5  made that disclosure -- how I'm supposed to make that
6  disclosure to the SEC.
7      Q.  Let me ask this question -- well, the answer is
8  no, you never disclosed it personally?
9      A.  Yes.
10     Q.  Okay.  Did Chimera ever disclose it?
11     A.  I have read Chimera's filings, as you have, and
12 I did not see a disclosure that I lent people money to
13 acquire a stock.
14     Q.  Did you ever recommend to Chimera that they
15 disclose it?
16     A.  I never had that conversation with anybody.
17     Q.  You never discussed the fact of the loans with
18 Charles Grob?
19     A.  No.
20     Q.  Did you ever discuss the fact of the loans with
21 Tyson Rohde?
22     A.  No.
23     Q.  Did they know about the loans?
24     A.  I don't know if they did or didn't.
25     Q.  Is there any --

---

Page 115

1      A.  I have no belief to -- I have no belief that
2  they knew that loans had been made.
3      Q.  Okay.  Did you tell David Loev about the loans?
4      A.  I did not.
5      Q.  Were these loans papered?
6      A.  No.
7      Q.  Handshake deals?
8      A.  Yes.
9      Q.  Okay.  And you're saying that each one of them
10 were paid back?
11     A.  Every loan that I -- to my knowledge, every
12 loan I made on this deal was paid back.
13     Q.  Okay.  We'll definitely come back to it.  But
14 with respect to this document here, which is Exhibit 58,
15 the S1, and page 24 of 61, do you believe this statement
16 that says, our officer, director, control persons and
17 affiliates do not intend to purchase any shares in this
18 offering?  Do you believe that to be true?
19     MR. EDMUNDSON:  What -- did -- I'm going to object
20 to the form.  I mean, it's a statement.  It says what it
21 says.  Do not intend to purchase any shares on this
22 offering.  Do you believe that to be true?
23     Q.  Do you have any way to say one way or the
24 other?
25     A.  I don't.  Again, I didn't write it.

---

Page 116

1      Q.  Okay.  Were you -- did you consider yourself an
2  affiliate of Chimera?
3      A.  No.
4      Q.  What -- will you tell me what an affiliate is
5  in your mind?
6      A.  I wish I remembered that sentence from
7  yesterday.  Somebody who is under common control or
8  controls -- it was actually convoluted.  It was from the
9  33 act -- or 34 act.  Excuse me.  Affiliate means
10 somebody who is under common control with the other
11 person or controls the other person or is controlled by
12 the other person.  And so -- now, I will expand upon
13 that.  That is my understanding, that somebody who owns
14 10 percent or more of the equity of the company is
15 considered to be an affiliate.
16     Q.  Uh-huh.
17     A.  So -- and under those circumstances -- those
18 are the circumstances under which I view affiliate, the
19 common control and percentage ownership.
20     Q.  And you don't -- you've never considered
21 yourself an affiliate of Chimera?
22     A.  Obviously not.
23     Q.  Okay.  When you gave loans to individuals for
24 the purchase of Chimera stock, did either the shares or
25 stock or the proceeds from eventual sale of that stock

---

Min-U-Script®

APP: 000018

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 117

1 end up in accounts that you own?
2 A. Yes. But none of those shares were sold -- or
3 the vast majority of those shares were not sold into the
4 market by the purchasers of those stocks. There was a
5 secondary transaction in there.
6 Q. Okay. And after that secondary transaction,
7 proceeds from sales of those stocks ended up in accounts
8 that you control?
9 A. Yes.
10 Q. Okay. And how much money?
11 A. I -- you guys have said 4-and-a-half to
12 6-and-a-half. And I haven't sat down with records to
13 figure it out.
14 Q. Do you have any reason to disagree with the
15 assertion that you personally obtained more than
16 $4 million from the proceeds of sales of Chimera stocks?
17 A. I would say it is highly unlikely that the net
18 proceeds to me were 4-and-a-half to 6-and-a-half million
19 dollars.
20 Q. And when you say net, what are you taking out?
21 A. Expenses relating to my business and what I did
22 and payments that I made along the way.
23 Q. Give me examples of those payments and those
24 expenses.
25 A. I mean, you guys have alleged that I paid

Page 118

1 John Brotherton $1.2 million for his services.
2 Q. Was that — that's an expense you — a payment
3 to John Brotherton, is that an expense related to your
4 shared transactions and Chimera stock?
5 A. It is not a direct expense, no.
6 Q. Do you consider it an indirect expense?
7 A. Yeah.
8 Q. And so when you're thinking about what your net
9 is, you've got to take out what you paid to John
10 Brotherton?
11 A. That's correct.
12 Q. Okay. The purchase — what was the purpose of
13 paying John Brotherton for you?
14 A. Mr. Brotherton specializes in market awareness.
15 Q. What was the purpose of paying him?
16 A. To create an aware market for Chimera.
17 Q. What does that mean?
18 A. Introduce chimera to potential investors.
19 Q. Okay. With the goal of increasing stock price?
20 A. With the goal of creating a liquid — an
21 organized liquid market for Chimera.
22 Q. Okay. Hopefully, one by product of that being
23 that the price per share goes up?
24 A. Clearly.
25 Q. Okay. All right. Back to John Brotherton,

Page 119

1 too. Do you have any reason to disagree with the
2 assertion that you paid John Brotherton $1.2 million?
3 A. I honestly -- I don't know the specifics of the
4 transactions that you reference, but it does not seem
5 outside the realm of possibility.
6 Q. Okay. And did you ever disclose to the public,
7 to the SEC, to FINRA, that you had made those payments
8 on behalf of the — at least the idea of Chimera? I'm
9 not really helping him. Did you make these payments on
10 behalf of Chimera?
11 A. No. Of course not.
12 Q. You made them on behalf of yourself?
13 A. Yes.
14 Q. Because you anticipated at the time that you
15 would personally benefit from holding Chimera stock if
16 the price went up?
17 A. Correct.
18 Q. So you paid John Brotherton to get the word
19 out?
20 A. Yes.
21 Q. Okay. Did you ever disclose that to Tyson
22 Rohde?
23 A. I -- I can't sit here and tell you a specific
24 instance that Mr. Rohde understood that, but Mr. Rohde
25 understood -- you know, clearly understood the

Page 120

1 transaction that was going on.
2 Q. Okay. Did you tell Charles Grob about that —
3 A. No.
4 Q. — relationship?
5 A. No.
6 Q. Why didn't you tell Charles Grob?
7 A. Charles Grob was the face of the public
8 company. He probably should not be participating or
9 knowledgeable in a market awareness campaign.
10 Q. Why not?
11 A. Well, my understanding is that that's not
12 kosher.
13 Q. Why is it not kosher?
14 A. Well, it's a public company. It can't market
15 itself. It can't advertise its stock.
16 Q. Okay. But you believe that you were far enough
17 removed that you could advertise in stock?
18 A. Yes, I did.
19 Q. Okay. I feel like we've seen this before, but
20 I am not sure what — which one it will be. I have a
21 lot so I'm going to go ahead and label it again.
22 You got 15 minutes in you?
23 A. Yeah. Yeah. 15 minutes is good, but if you
24 tell me it's another hour, then I've got to --
25 Q. Okay. All right. I'm going to hand you what

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 121

1   I've labeled Exhibit 85.
2       (Exhibit No. 85 marked.)
3   Q.  Do you see that this is an e-mail from -- at
4   least the top one is from Eddie Austin to
5   Curly Admonson, Grace, K Feldman.  Do you -- those
6   people are lawyers, right, or --
7   A.  I don't know who --
8   Q.  Do you know?
9   A.  -- who Grace Admonson is, but I know who Kerry
10  Feldman is.  Yes, he's an attorney.
11  Q.  Okay.  And Kerry Feldman is Carolyn Austin's
12  attorney?
13  A.  I believe so.  I mean, I couldn't speak to
14  that.
15  Q.  Okay.  The forwarded message here -- and this
16  is Bates labeled EA four 0s 220.  And then followed by
17  nonsequential EA a bunch of 0s 32.  Do you see the front
18  page?  The forwarded e-mail is from Eddie to you.  Do
19  you see that?
20  A.  Yeah.
21  Q.  On Christmas Day, 2011?
22  A.  It appears to be, yeah.
23  Q.  Why was Eddie involved in this?
24  A.  I believe Eddie was interested in going out and
25  getting some investors in the deal based upon probably

Page 122

1   his conversation with Mr. Grob.
2   Q.  Okay.  What do you know about Eddie's
3   conversation with Mr. Grob?
4   A.  I don't know anything about it.
5   Q.  You're guessing that he had a conversation with
6   Mr. Grob?
7   A.  I'm guessing that there must have been a reason
8   why Eddie was interested in, you know, potentially
9   getting some of his family members to invest.
10  Q.  Okay.  See where it says -- well, let's go
11  ahead and turn to the second page here.  The second page
12  of Exhibit 85 is a later -- it seems to be a related
13  chain.  Do you agree with that?
14  A.  It appears to be, yeah.
15  Q.  And there's another -- a Christmas e-mail from
16  you to Eddie in which you tell him to leave, quote, and
17  warrants.  I can't believe nobody else caught that,
18  yours truly included.  What does that refer to, if you
19  know?
20  A.  Well, I can -- if you reference back to page 1,
21  the message from Mr. Austin to myself, Hi, Andrew, two
22  questions.  It refers to warrants a well as stock but
23  warrants are not discussed.  And so obviously my
24  response to him was delete warrants because there were
25  no warrants being issued by Chimera.

Page 123

1   Q.  Okay.  And then it purports to attach a copy of
2   the final prospectus.  You see that?
3   A.  Uh-huh.
4   Q.  And then the third item here says the vehicle
5   will be substantially harder to sell if we can't deliver
6   99 percent plus to the buyer.  What does 99 percent plus
7   to the buyer mean?
8   A.  99 percent of the free trading stock.
9   Q.  What does vehicle mean?
10  A.  Vehicle is a generally accepted term in the
11  industry for a public company.
12  Q.  Okay.  So if we're talking about in this
13  context, vehicle is Chimera?
14  A.  I -- it could be, I believe so, yeah.
15  Q.  Okay.  Can you explain to me what it means to
16  say that the vehicle will be substantially harder to
17  sell if we can't deliver 99 percent plus to the buyer?
18  A.  In general, in the small cap business, if you
19  acquire a vehicle i.e. you buy a shell or a non-shell,
20  you want to get as much of the free trading stock as you
21  can so that you're not -- you know, there are not other
22  investors out there that are looking to dump their
23  shares at pennies when you're trying to move a stock
24  price up and build shareholder value.
25  Q.  So at this point, it seems like you were

Page 124

1   undecided as to whether you were going to try to obtain
2   a bunch of Chimera shares or you were going to sell it
3   as a vehicle with 99 percent of the shares available to
4   the eventual buyer; is that right?
5   A.  I like to keep my options open, so yeah.
6   Q.  Okay.  At least from reading this, you -- you
7   think that was an option you were keeping open in this
8   small --
9   A.  It's always an option to sell a vehicle.  If,
10  for example, the Chimera business did not take off and
11  Charles couldn't sell the cutters, the company would
12  have given it a run and tried its damndest, but at the
13  end of the day, there's still an asset that was probably
14  worth, you know, $300- $350,000 back then.
15  Q.  And the asset being the vehicle because all of
16  this work has been done.
17  A.  Yes.
18  Q.  To bring it public?
19  A.  Yes.
20  Q.  Okay.  And then it says, unless we are going to
21  be the buyer.  Do you see that?
22  A.  I do.
23  Q.  The shares turned over prior to the sale, what
24  does that all mean?
25  A.  Well, it's a poorly written sentence, for one.

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 137

1  disclosed promissory note, we have no arrangements or
2  agreements with Kylemore.  Do you see that?
3      A.  I do.
4      Q.  Did you ever tell Charles Grob that you acted
5  as settler in the establishment of Kylemore with
6  EuraHelvetia?
7      A.  No.
8      Q.  That's the truth, though, you're the settler?
9      A.  Let's be clear about what that word means --
10     Q.  Tell me.
11     A.  -- in the, you know, Swiss arena.  All that is
12  is an introducer.  It is not -- I had no fiduciary
13  responsibility and no value in that company.  I
14  introduced people.  That's what I did.  Nothing more,
15  nothing less.
16     Q.  So when the Swiss authorities have a blank on
17  their form that says settler, your position is they're
18  just asking who introduced --
19     A.  You will not find a form where I wrote -- and
20  I'm sorry.  Finish your question.
21     Q.  I'm trying to understand -- make sure I
22  understand your understanding of what the Swiss are
23  talking about when they say settler.  So who is being
24  introduced in the scenario you just said?
25     A.  I introduced the beneficial owners to the

Page 138

1  trustees.
2      Q.  Okay.  So in this case, it would be -- I'm
3  going to mess up the pronunciation of her name.
4      A.  Ms. Yurovskaya.
5      Q.  Ms. Yurovskaya.  You introduced Ms. Yurovskaya
6  with David Craven and his group?
7      A.  That's correct.
8      Q.  Okay.  And that's the extent -- to the extent
9  you are characterized as a settler, that's your
10  understanding of what it means?
11     A.  That's my understanding of what it means.
12     Q.  Okay.  You never disclosed your status as
13  settler to Charles Grob for Kylemore?
14     A.  No, I did not.
15     Q.  Okay.  You never told Tyson Rohde about that?
16     A.  I don't think it specifically came up.
17     Q.  Okay.
18     A.  Although he could ask his girlfriend about
19  that.
20     Q.  Who's Tyson's girlfriend?
21     A.  Alina.  You didn't know that?
22     Q.  I didn't know that.
23     A.  Oh.
24     Q.  Alina Yurovskaya is Tyson Rohde's girlfriend?
25     A.  Yeah.  Well, was.  I believe they broke up last

Page 139

1  year, but you guys knew about that.
2      Q.  Were they long distance?  I thought she lived
3  in Russia?
4      A.  She lived in Russia.  He went to Russia several
5  times.  They went to Ibiza together, Puerto Rico.  She
6  came here several times to visit him.
7      Q.  Did you introduce the two of them?
8      A.  Well, clearly, yeah.
9      Q.  Okay.  And throughout your process of
10  helping -- I mean, is it fair to characterize your role
11  with Chimera as in part helping them through the process
12  of dealing with regulatory agencies?
13     A.  I believe that's a fair characterization, yes.
14     Q.  Okay.  Throughout that process, did you ever
15  throw a flag up to Chimera and tell them about your
16  relationship with Kylemore?
17     A.  No, I didn't.
18     Q.  Okay.  So it's fair to say that's never been
19  disclosed to the public?
20     A.  It's fair to say that I never saw a conflict
21  which would lead me to throw up such a red flag.
22     Q.  So your relationship with Kylemore and -- your
23  relationship with Kylemore's never been shared with the
24  investing public as it relates to Chimera, right?
25     A.  That would be correct.

Page 140

1      Q.  Okay.  And your name has never been disclosed
2  as -- into the investing public as somebody's who's been
3  involved in Chimera at all?
4      A.  That is correct.
5      Q.  Okay.  And part of your role in this whole
6  thing was to give Chimera advice about what it was
7  required to disclose?
8      A.  No.  That would have been the lawyer's job.  My
9  job was to give them advice on how to say what it was
10  that they were trying to say.
11     Q.  Okay.  So whether or not to disclose certain
12  items, it's not your job?
13     A.  That's correct.
14     Q.  So you told -- you told David Loev about your
15  relationship with Kylemore to let him decide?
16     A.  No, of course not.
17     Q.  But it's his job.
18     A.  I wasn't -- okay.  I was not the client.  I was
19  not David Loev's client.
20     Q.  Okay.  So you told Charles Grob to tell David
21  Loev about your relationship with Kylemore?
22     A.  No, I did not.
23     Q.  Okay.
24     A.  Again, my viewpoint is that making an
25  introduction between two people does not rise to the

APP: 000021

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 173

1  response -- in connection with the response to this
2  letter with Mr. Grob whether you -- whether or not you
3  were an affiliate of the company?
4   A.  I did not.  I will point out that these are the
5  words of Mr. Rios, not the words of Mr. Grob.
6   Q.  Thank you.
7   A.  And I did not speak to Mr. Rios about his
8  response.
9   Q.  Okay.  But you said -- you've testified that
10  you reviewed this before it got sent to Ms. Park?
11   A.  No.  What I testified to is that I received it
12  I believe at the same time that it was sent to Ms. Park.
13   Q.  Okay.  Did you ever have any conversation with
14  Mr. Rios about whether or not you could be considered an
15  affiliate of the company?
16   A.  I have never had a conversation with Mr. Rios.
17   Q.  Period?
18   A.  Period.
19   Q.  Okay.  E-mail conversations?
20   A.  E-mail conversation, verbal, or otherwise.  I
21  will be very clear.  I met Mr. Rios one time long after
22  the Chimera matter in my office in Houston.  He was
23  there to see Mr. Massey.  I shook his hand, said nice to
24  meet you.  And that is the extent of my knowledge or
25  discussions with Mr. Rios.

Page 174

1   Q.  Okay.  If you were -- ever wanted to get ahold
2  of Mr. Rios during the life of Chimera, would you do
3  that through Mr. Massey?
4   A.  If I wanted to get ahold of him today, I would.
5   Q.  Okay.
6   A.  Mr. Massey would be the only outlet I believe
7  would know where he was.
8   Q.  Okay.  Now, this letter says -- okay.  So your
9  testimony is you received this letter at the same time
10  that it was sent out to Ms. Park?
11   A.  Yes.
12   Q.  Okay.  Did you read the letter?
13   A.  Yes.
14   Q.  Okay.  Did you ever follow up with anyone to
15  correct any problems with the letter?
16   A.  I did not.
17   Q.  Okay.  Now, it says that you were never
18  compensated for your advice.  It's your testimony that
19  that's true as well?
20   A.  That is true.
21   Q.  Okay.  The company does not have now, nor has
22  it ever had, a business relationship with Mr. Farmer; is
23  that true?
24   A.  I would consider that to be a true statement,
25  yes.

Page 175

1   Q.  Okay.  Notwithstanding any loans you made for
2  people to buy shares?
3   A.  Yeah.
4   Q.  I mean --
5   A.  I don't see that that's --
6   Q.  Okay.
7   A.  I take a business relationship to mean was
8  there a contract for services, was I being paid by the
9  company, was the company -- you know, was I receiving
10  compensation from the company to do something.  That's
11  what I term business relationship.  Not relationships
12  that had nothing to do with the company.
13   Q.  Okay.  Anything you were doing to promote
14  market awareness of Chimera's stock did not rise to the
15  level of business relationship with Chimera in your
16  mind?
17   A.  In my mind, that's correct.
18   Q.  Okay.  Now, this final sentence says, while
19  Mr. Grob, Mr. Farmer are friends, they have never had a
20  business relationship; is that true?
21   A.  I would not phrase our relationship in that
22  fashion.
23   Q.  How would you phrase it?
24   A.  I would phrase that at periods of time I have
25  paid Mr. Grob for his services unrelated to Chimera.

Page 176

1   Q.  Okay.  And those times were at least from
2  September of '11 through February of 2012, right?
3    (Mr. Vydashenko present.)
4   A.  That sounds like a reasonable time period, yes.
5   Q.  Okay.  Let me go ahead and hand you tab 21.
6  I'm going to mark this as Exhibit 88 and hand it to you.
7    (Exhibit No. 88 marked.)
8   Q.  Are -- these are -- this is a document with
9  printed copies of checks from Iridium Capital, Charles
10  Grob; is that right?
11   A.  Yes.  Appears to be.
12   Q.  Are these checks that you wrote to Charles
13  Grob?
14   A.  Yes.  These are checks that I wrote to Charles
15  Grob.
16   Q.  Is this what you were just talking about, the
17  relationship that would cause you to phrase that
18  sentence in Exhibit 48 differently?
19   A.  Yes.
20   Q.  Okay.  Tell me -- let's get the scope hear real
21  quick.  You paid Charles Grob $2,500 a month in
22  September, October, November, December, skipping
23  January, but paid in February of 2012.  So $2,500 per
24  month skipping one month from September to February '11
25  into '12; is that right?

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 181

1 conversation that the company had with -- somebody at
2 the company had with its counsel about that very
3 specific answer.
4   Q.   Okay.  Had you told -- and when you say at the
5 company, I mean, at this point, Mr. Grob is no longer
6 employed with the company?
7   A.   The -- my recollection of the timing was that
8 during the time period where this document is being
9 crafted and these responses are being crafted was the
10 time when Mr. Grob left the company.
11   Q.   Okay.
12   A.   So I imagine that's why we see that it was sent
13 by Baltimore to everybody and included Mr. Grob, you
14 know, on the list.
15   Q.   Uh-huh.
16   A.   So he would know what the ultimate -- what
17 ultimately had been said.
18   Q.   Okay.  At this point, to your knowledge, is
19 Mr. Rios the only employee of Chimera?
20   A.   Yes.
21   Q.   Okay.  And at this point meaning when this
22 letter was written?
23   A.   Yes.
24   Q.   Okay.  Now, Chartered Investments MB, we've
25 discussed this before.  I mean, you -- you paid what

Page 182

1 you've characterized as loans to people who ended up
2 buying IPO shares.  And you did that through Chartered,
3 right?
4   A.   I believe so.  I mean, I don't remember --
5   Q.   Okay.
6   A.   -- every check I've ever written, but that
7 would make sense to me.
8   Q.   Okay.  And you would not characterize that --
9 or would you characterize that as a business or personal
10 relationship with Chimera?
11   A.   Obviously, I wouldn't.
12   Q.   Why is that obvious?
13   A.   I'm not sure what me giving Nikolay $5,000 has
14 to do with -- you know, loaning him money has nothing to
15 do with the business of the company.  And the company
16 wouldn't have even known that.  And these aren't my
17 words.  So you keep trying to get in my head about why
18 these words are here.  Talk to the people who wrote the
19 words.
20   Q.   I'm just asking you your understanding.
21   A.   My understanding is the words that are on the
22 page, I didn't write them.  I don't believe that
23 Chartered had a business relationship with Chimera.
24   Q.   Okay.  That's what I wanted to hear.
25   Ms. Cotton is listed here as a social acquaintance of

Page 183

1 Mr. Grob.  How did Ms. Cotton meet Mr. Grob?
2   A.   I would imagine that I introduced them.
3   Q.   Okay.  Do you pay for Ms. Cotton's living
4 expenses?
5   A.   No, I do not.
6   Q.   Does she have access to Chartered accounts
7 to -- through which she pays for living expenses?
8   A.   No.
9   Q.   So this is Exhibit 89 I'm handing you.
10   (Exhibit No. 89 marked.)
11   Q.   It's an e-mail with an attachment sent from
12 Charles to his lawyer, but it's a forwarded message from
13 Charles to Tyson --
14   A.   Uh-huh.
15   Q.   -- dated August 15th.  And I know you're not
16 copied on this e-mail, but have you ever seen this
17 e-mail?
18   A.   No, I have not.
19   Q.   Okay.  Charles says, I forgot to attach the
20 spreadsheet of all expenses.  And that's what he ended
21 up attaching on this e-mail.  But he says, if I recall,
22 Andrew said it would be better if I was not paid
23 directly from the Chimera account.  So maybe it would a
24 good idea to reimburse me on my next paycheck.  Do you
25 see that?

Page 184

1   A.   I do.
2   Q.   Do you remember saying anything like that to
3 Charles Grob?
4   A.   No.
5   Q.   Did you ever discuss reimbursement with Charles
6 Grob generally?
7   A.   When the company was first formed and there was
8 a discussion of how to pay for items, what I told
9 Mr. Grob was that he would be best served by paying the
10 out of pocket expenses and then preparing an expense
11 reimbursement request and putting that to the company
12 instead of going out and using his company debit card to
13 buy all the stuff.  Because the accounting was much
14 messier that way.  And did he take that and spin it into
15 something else?
16   Q.   See, this looks to you like a misunderstanding
17 of something you actually did say to him?
18   A.   Yeah.  I mean, I would have no purpose in
19 saying, Charles, don't pay expenses out of the Chimera
20 account from the funds that are set aside to pay the
21 expenses.
22   Q.   Uh-huh.  So look at the expenses on the next
23 page.  Do you recall paying bids filings 950 bucks and
24 136 bucks to GoDaddy on behalf of Chimera?
25   A.   I remember allowing Mr. Rohde to use my credit

APP: 000023

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 185

1    card to make those charges.
2    Q.  Okay. And do you know if you were reimbursed
3    for those expenses?
4    A.  My recollection is that Mr. Rios -- or excuse
5    me, Mr. Grob put those expenses on his expense report
6    and then reimbursed me in cash for those expenses.
7    Q.  Okay. In your mind, is fronting business
8    expenses like company formation and domain registration,
9    is that a business relationship?
10   A.  I don't see how it would be.
11   Q.  Explain to me why not.
12   A.  It's a simple transaction to take -- you know,
13   I need to get this done, can I use your card to do it?
14   Sure. Just pay me back. It's no different than, you
15   know, going out to lunch with somebody. It's just a
16   line item. It doesn't mean I had ownership or control
17   or anything of the like.
18   Q.  I didn't ask you if it indicated an
19   ownership --
20   A.  Okay. Specific to a business relationship, no
21   I don't believe it establishes a business relationship.
22   Q.  What would be required for transactions to kind
23   of take on that mantle of a business relationship as
24   to -- as opposed to something lesser?
25   A.  If the company was paying me for services and I

Page 186

1    was delivering services to the company for compensation
2    or I was employed by the company or there was a
3    consulting agreement with the company that specified a,
4    you know, monthly retainer or something of that nature,
5    then that would probably rise to that level.
6    Q.  I want to go -- actually, let me just hand this
7    to you. I don't even know if we need to put it in.
8    This is an e-mail -- I think you testified earlier that
9    you weren't sure if -- if Anna Tikhonova ever used the
10   Kylemore e-mail address. Does that clear it up for you?
11   A.  I mean, it appears that she sent a -- why she
12   would request from her personal account using that
13   e-mail address, couldn't tell you.
14   Q.  And what does that mean, why she would request
15   it from her personal account?
16   A.  Well, I mean, I -- I assume -- well, by reading
17   this I assume she's asking for a -- she sent a wire
18   transfer request to Scottsdale Capital for her personal
19   account and she sent it from her Kylemore Corp. e-mail
20   address. Was she logging into the wrong account? It's
21   possible.
22   Q.  Let me go ahead and label it Exhibit 90.
23       (Exhibit No. 90 marked.)
24   A.  Do you have the attachment that goes along with
25   it.

Page 187

1    Q.  Not here. I'm not even sure if I've personally
2    seen it. But what did Anna have at Scottsdale Capital?
3    A.  I don't know. You would have to ask her about
4    that or review the records from Scottsdale.
5    Q.  Okay. You personally don't know? Have you
6    ever known?
7    A.  Do I have a general understanding, yes. But my
8    wife operates under a separate property agreement that
9    includes her making her own investment decisions. I
10   don't participate in that.
11   Q.  Generally, what does she have at Scottsdale
12   Capital.
13   A.  I wouldn't know what she had there at the time.
14   I don't believe she has anything there now.
15   Q.  Okay. What sorts of amounts or investments did
16   she have in Scottsdale Capital that you know -- that
17   you've known of?
18   A.  You know, to my knowledge, she made some blue
19   chip investments there. You know, it's probably less
20   than a hundred thousand dollars. I don't follow what
21   she does with her money.
22   Q.  Okay. But as far as her using this
23   KylemoreCorp.com e-mail, you can't think of another
24   example of her using it?
25   A.  I am surprised that you're giving me an example

Page 188

1    where it was used.
2    Q.  It sounded like you were suggesting she might
3    have logged into it by accident?
4    A.  I gave her the logins after my conversation
5    with David Craven that we might utilize it. And it's
6    entirely possible that she kept on checking it to see if
7    some e-mail was coming into it. And obviously she sent
8    an e-mail from it, but clearly it has nothing to do with
9    Kylemore's business.
10   Q.  What kind of e-mail program did Anna use at the
11   time?
12   A.  I have no idea. I think she uses some Russian
13   mail system and all her e-mail goes through one -- it's
14   mail.ru.
15   Q.  Something she could get to one interface?
16   A.  Something -- Yahoo goes in there, Gmail goes in
17   there. Everything goes to one place. So it wouldn't
18   surprise me if she was logged into that.
19   Q.  Okay. All right. Let's talk a little bit
20   about -- well, we started talking about it earlier. You
21   were giving people money to buy Chimera shares?
22   A.  I lent some people money to buy Chimera shares,
23   that's correct.
24       MR. GULDE: Okay. Let's go ahead and -- I think
25   I'll just hand over this whole thing. I'm labeling as

APP: 000024

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 189

1  Exhibit 91 a package of subscription agreements and
2  related documents.
3       (Exhibit No. 91 marked.)
4  Q.  Does this look familiar to you?
5  A.  It appears to be exactly what you say it is.
6  Q.  With the AF Bates numbers, I'll represent to
7  you that this is something that you produced to us.  How
8  was it that you had subscription agreements in your
9  possession?
10  A.  Because I was -- the subscription agreement --
11  these particular agreements were purchased by the
12  European investors, or these -- I should say these
13  shares purchased by the European investors.  And they
14  asked me to handle the transfer of securities into their
15  names.  And as part of that process, I would need to
16  provide these documents along with others to the
17  transfer agent.  So I'm quite certain that you'll find
18  that the transfer agent provided you a copy of these as
19  well along with the transfer documents.
20  Q.  Well, let's take a look at, for example, Archie
21  Demandante.  Who is Archie Demandante?
22  A.  Archie Demandante is the husband of a lady that
23  I know.
24  Q.  And is that Janna Robinson?
25  A.  It is.

Page 190

1  Q.  How do you know her?
2  A.  She had previously worked with me when I was
3  with the J.T. Cloud camp.
4  Q.  Where did she live?
5  A.  She lives in Katy, Texas, I believe.
6  Q.  Okay.  Does Charles Grob know her personally?
7  A.  Charles met her.
8  Q.  On what occasion did Charles meet her?
9  A.  I imagine prior to the investment.
10  Q.  Did you have anything to do with soliciting
11  Janna and Archie to invest in Chimera Energy Corp.?
12  A.  I told them that there was an investment
13  opportunity.  If they were interested in it, that they
14  should speak to Mr. Grob.
15  Q.  And you referred them to Mr. Grob.  Did you
16  have any further conversation with them?
17  A.  Not that I remember specifically.
18  Q.  Well, you would have had to have --
19       MR. GULDE: Are you asking for a Bates number,
20  Kevin?
21       MR. EDMUNDSON: Yeah, just in reference to these
22  investors that you're talking about.
23       MR. GULDE: The two I'm talking about right now are
24  AF 555 and 606.
25  Q.  You would have had to have further conversation

Page 191

1  with them about the loan that you've talked about,
2  right?
3  A.  Yeah.  I mean, obviously at some point
4  thereafter they said, yeah, we're interested in doing
5  that and, you know, likely called me and said, hey, can
6  we borrow some money to do this.  In fact, I'd go so far
7  as to say I probably told them when, you know, the
8  opportunity existed that, hey, if you need some help,
9  let me know.
10       MR. GULDE: 25 for me.
11  Q.  So when you first made contact with Archie and
12  Janna, do you recall saying that if you need help, I can
13  help you out?
14  A.  Specifically, no, I don't recall that.
15  Q.  Okay.  What's the basis for you saying you
16  probably did something like that?
17  A.  It would not surprise me that I made that
18  offer.  I'm a pretty generous guy.
19  Q.  Okay.
20       (Exhibit No. 92 marked.)
21  Q.  And would you have made that offer with others?
22  A.  Quite possibly so.
23  Q.  Okay.  You'll note the subscription agreement
24  was signed on page AF00 – 00556 by Archie on the 23rd
25  of December 2011 and by Janna – and this is Exhibit 91

Page 192

1  Bates 607 – signed by Janna on the same day, 23rd of
2  December.  And take a look at – take a look at what
3  I've just handed you labeled Exhibit 92.
4  A.  Okay.
5  Q.  Is that a statement of your accounts at
6  Iridium Capital held at Wells Fargo?
7  A.  It appears to be, yes.
8  Q.  Dated between January 1, 2012, and January
9  31st, 2012?
10  A.  It appears to be, yes.
11  Q.  Okay.  And if you turn a few pages into this to
12  the one Bates labeled ending in 26 – a bunch of 0s and
13  then 26.
14  A.  Okay.
15  Q.  Do you see about halfway down there, the third
16  entry of December 23rd?
17  A.  Uh-huh.
18  Q.  There is a payment going out to Janna Robinson
19  for $6,300.  Do you see that?
20  A.  I do.
21  Q.  Is that the loan you've been talking about?
22  A.  It would seem to be, yes.
23  Q.  Okay.  So your testimony is — well, do you
24  know when you would have contacted Janna and Archie
25  about this?

APP: 000025

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 193

1    A.  Specifically, no.
2    Q.  Okay.  But clearly you gave them the money,
3  $6,300, on the same day they entered the subscription
4  agreement with Chimera, correct?
5    A.  That appears to be the case, yes.
6    Q.  Now, I notice that the amount you've given them
7  is $6,300, but the cumulative amount of their investment
8  was only $6,000, two $3,000 investments.
9    A.  That appears to be, yes.
10   Q.  Can you explain to me why those two aren't the
11  same number?
12   A.  No, I can't.
13   Q.  Do you recall any conversations you had with
14  Janna or Archie about this money that they — about this
15  money, the use they were going to put it to?
16   A.  I mean, I understood that they were going to
17  use it to subscribe to the offering.
18   Q.  How did they make you understand that?
19   A.  Well, I think it was part and parcel of the
20  conversation when they said, hey, we'd love to do it,
21  but we're a little strapped right before the holidays.
22  You know, if you can loan it to us, then, you know,
23  we'll pay you back.
24   Q.  Okay.  And did they tell you when they would
25  pay that back?

Page 194

1    A.  They did not specifically, no.
2    Q.  Okay.  Did they tell you they would pay back
3  $6,300 or just $6,000?
4    A.  The loan was $6,300, so that was the amount
5  that they were to pay back.
6    Q.  How do you know the loan was just — was
7  $6,300?
8    A.  That's the amount I gave them.
9    Q.  Okay.  So the amount you gave them was the
10  total amount of the loan?
11   A.  Yes.
12   Q.  And you recall that?
13   A.  I recall -- I mean, I see the amount that I
14  gave them.  And since I was giving them a loan, ergo, it
15  must be the amount.  I wouldn't pay them an initiation
16  fee for a loan that they're taking from me.
17   Q.  Okay.  How about your parents?
18   A.  You'll find a series of payments to my parents.
19   Q.  Let's talk about the date of their
20  subscription, which is seen in Exhibit 91.
21   A.  Yeah.  You'll find on December 23rd a
22  payment --
23   Q.  And let me point --
24   A.  -- to my parents in the amount of $6,000.
25   Q.  Okay.  You're — you're talking about

Page 195

1  Exhibit 92, right?
2    A.  I'm talking about Exhibit 92.
3    Q.  Yeah.
4    A.  Bates stamp No. 26 just below the $6,300 to
5  Ms. Robinson.
6    Q.  Okay.  So that shows a $6,000 payment to
7  Lynnwood E. Farmer Jr.?
8    A.  That's correct.
9    Q.  And that's your father?
10   A.  It is.
11   Q.  Okay.  Now, looking at Exhibit 91 at page —
12  starting at page 0561, we find the subscription
13  agreement for Mr. Farmer, your father, and it looks
14  like -- looks to me like he signed it on the 22nd day of
15  December.  Do you disagree with that?
16   A.  I would say the document appears to be hard
17  dated on the 22nd.
18   Q.  What makes you say it was -- oh.  On the first
19  page it's hard dated?
20   A.  No.  I'm looking at just above the signature
21  line just above where he signed.  I see that it's not
22  written in the 22nd of December, it's actually printed
23  the 22nd of December.
24   Q.  Oh, I see it.
25   A.  So when it was actually signed, I couldn't tell

Page 196

1  you.
2    Q.  Okay.
3    A.  I would point out, however, looking at your own
4  documentation, that the check was written on 12/25.  So
5  it's unlikely that he executed the subscription
6  agreement three days prior to writing the check.
7    Q.  Well, do you recall the same conversation with
8  your father —
9    A.  I --
10   Q.  — that you had with Mr. Demandante?
11   A.  I remember telling him that I -- if he was
12  interested, I would happily loan him the money to make
13  the investment.
14   Q.  Did he tell you he needed the help?
15   A.  Not specifically, no.
16   Q.  Does your father need the help?
17   A.  He could have done it on his own, probably.
18   Q.  How are your dad's finances?
19   A.  Ask him.
20   Q.  As far as you know, how are your dad's
21  finances?
22   A.  Suitable.
23   Q.  Enough to have $6,000 laying around, he could
24  make this investment?
25   A.  I would presume, yes.

APP. 000026

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 197

1   Q.  Okay.  Where does your dad live?
2   A.  42735 Mountain Shadow Road, Murrieta,
3   California 92562.
4   Q.  Lives with your mom?
5   A.  Well, I hope so.
6   Q.  Okay.  You know so or you hope so?
7   A.  Well, if I don't know so then I have to have a
8   conversation with somebody.
9   Q.  Okay.  So you don't remember him saying he
10  needed the money from you to do it, but you remember
11  offering that you could help him out if he wanted?
12  A.  I believe that would probably be a correct
13  assertation.
14  Q.  Okay.  So if he made this investment on the
15  22nd, his financial situation was no obstacle and you
16  could well have paid him later on the 23rd, correct?
17  A.  Yes.
18  Q.  Okay.
19  A.  However, as I pointed out, it's obvious he
20  wrote the check on the 25th, not on the 22nd.
21  Q.  And the same issue, right?  He had the money to
22  make it happen either way, right?
23  A.  Yes.
24  Q.  Okay.  Did you ever ask any of these people to
25  put different dates other than what they were — other

Page 198

1   than the date they were signing their checks on these
2   checks?
3   A.  No.
4   Q.  Now, I noticed that the amount going to your
5   mom and dad is $6,000 even.  Do you recall why theirs
6   would just be $6,000 as opposed to $6,300?
7   A.  I would say that the outlier is the $6,300, not
8   the $6,000.  I don't — sitting here, I don't know why I
9   would have given Janna an extra 300 bucks.  It might
10  have been just before Christmas and she needed some
11  help.  I don't know.
12  Q.  Okay.  The idea that it was a loan with your
13  mom and dad, was that explicit they agreed to pay it
14  back?
15  A.  Yes.
16  Q.  Under what terms?
17  A.  I don't remember the specific terms.  It was a
18  loan — as in all of these loans, it wasn't paper.
19  Just, you know, that they'd pay it back when they paid
20  it back.
21  Q.  Did Mr. Grob ever talk with your father about
22  Chimera?
23  A.  I don't believe so, no.
24  Q.  Did Mr. Grob ever talk with your mother about
25  Chimera?

Page 199

1   A.  I don't believe so.
2   Q.  Were you the only person who ever spoke to your
3   parents about Chimera?
4   A.  Yes.
5   Q.  Take a look down at two lines down, Brittany
6   Joanne Garcia.  Who is that?
7   A.  Brittany was another assistant, if you will,
8   that worked for Mr. Rohde and I.
9   Q.  Was she known to Mr. Grob independently of you?
10  A.  It's entirely possible that when Mr. Grob
11  visited Mr. Rohde at the office that he met her.
12  Q.  Do you know if Mr. Grob ever spoke with
13  Brittany Garcia about Chimera?
14  A.  I do not.
15  Q.  Do you know — let's see.  Do you know
16  Alejandro Garcia Herrera?
17  A.  That is Ms. Garcia's husband.
18  Q.  Okay.  Now, you — again, we have a check going
19  from Ms. Garcia to Chimera dated — excuse me — 12/28.
20  And we have you paying her $6,300 on 12/27.  Do you
21  agree with that?
22  A.  I agree with that's what's in the bank
23  statement.
24  Q.  You agree that that's what happened?
25  A.  I lent her the money and she made the

Page 200

1   investment.
2   Q.  Did you have a specific conversation with
3   Brittany Joanne Garcia about this being a loan?
4   A.  I discussed it with Brittany after she had
5   talked to Janna.  And Janna said, hey, Andrew helped me
6   out with this.  And Brittany said I'd like to make that
7   investment, too, and make some money.  And she asked me
8   to help her out, and I did.
9   Q.  What kind of money did these people expect to
10  make?
11  A.  I don't know what their anticipated return was.
12  Q.  What did you tell them about what kind of money
13  they could expect to make?
14  A.  I wouldn't — I certainly would not make an
15  assertation to that effect.
16  Q.  Well, you just said that Alejandro thought it
17  was a good deal.  So what —
18  A.  No, I did not say that.  Brittany —
19  Q.  Tell me what Alejandro said.
20  A.  I never spoke to Alejandro.
21  Q.  Okay.  Did you ever say anything to Brittany
22  Garcia about potential performance of this investment?
23  A.  No, I did not.
24  Q.  Okay.  Did she tell you what she had told
25  Alejandro about performance of the investment?

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 201

1   A.  No, she did not.
2   Q.  When she related to you that Alejandro thought
3   it sounded like a good investment, did you inquire about
4   what she was talking about?
5   A.  Let me -- I believe there's a misinterpretation
6   of what I said.
7   Q.  Okay.
8   A.  At no point have I said that Mr. Alejandro made
9   any assertations as it related to the investment.  I
10  spoke to Ms. Garcia.  And Ms. Garcia said she spoke to
11  Ms. Robinson, Janna Robinson.  And Janna said or told
12  her that she was -- you know, she had made this
13  investment and Brittany may want to do the same.  And
14  Brittany asked me if I would help her make this
15  investment and I did so.  Never spoke to Mr. Alejandro.
16  Q.  Okay.  My mistake.  Did Brittany tell you what
17  aspects of it she thought sounded like a good deal?
18  A.  No.
19  Q.  Did you ever discuss why this seem -- why this
20  was a good deal for anybody involved?
21  A.  No.  I -- anybody that I introduced, I gave
22  them a copy of the filing, a copy of the prospectus, and
23  suggested if they had any questions they should call
24  Mr. Grob.
25  Q.  Okay.  You didn't personally extol the virtues

Page 202

1   of the company in any way?
2   A.  I did not.
3   Q.  Now, you paid Brittany Joanne $6,300 just like
4   you did with Ms. Robinson and Archie.  So same question,
5   you suggested that -- well, it's a different question.
6   You suggested that $6,000 was the outlier.  But at least
7   for these three -- or I'm sorry.  $6,300 was the
8   outlier.  At least for these three, it's the opposite.
9   So --
10  A.  Well, I mean, there's two loans for $6,300.
11  Q.  Uh-huh.
12  A.  Four investments.  So, yeah, I mean, I gave her
13  the exact same deal that I had given Janna.
14  Q.  My question is, why -- why would you loan
15  $6,300 for a $6,000 investment?
16  A.  It was right before Christmas.  Everybody could
17  use a little help before Christmas.
18  Q.  Okay.  Just a little bump?
19  A.  Well, let's not say a little bump.  It's not
20  like it was a payment for, you know, inducement.  It was
21  a loan to help them get through Christmas.  And since
22  I'd given Janna an extra $300 as a loan, I felt it only
23  right to give Brittany an extra $300 because Janna was
24  the one who talked to Brittany about maybe you should
25  make this investment, too.

Page 203

1   Q.  Do you know anything about their life
2   circumstances as to whether either Janna or Brittany or
3   their significant others needed a $300 loan around
4   Christmas time?
5   A.  I know that none of them are extremely well
6   off.
7   Q.  And how do you know that?
8   A.  Well, I know that both of them were making good
9   money when they were working with me.  I know that when
10  they were terminated, they were not able to get jobs
11  that paid anywhere near the amount of money they were
12  making from the Delaney Law Firm.
13  Q.  So both Brittany and Janna worked at Delaney?
14  A.  Yes.
15  Q.  Okay.  How about Brandi Leal, how did you know
16  Brandi?
17  A.  Brandi was introduced to me by -- actually I
18  have no idea who introduced me to Brandi.  She was a
19  party girl, I guess would be the description for her.
20  Q.  And are you saying you don't remember how you
21  met her?
22  A.  I likely met her at a party somewhere.
23  Q.  Okay.  Do you remember when that would have
24  been?
25  A.  I've known her -- you know, I knew her a couple

Page 204

1   of years before that.  So 2010, maybe.
2   Q.  Now, Brandi -- looking at 585 and Exhibit 91
3   and a couple of pages forward, she wrote her check on
4   January 9th for $3,000.  And these are all cashier's
5   checks by the way, or at least the majority of them are.
6   Is there a requirement that these be cashier's checks
7   for the process, or is this just personal checks?
8   A.  No.  It's just as I -- as I understand things,
9   the FINRA specifically prefers to see, you know,
10  official checks going to the company so that it's easier
11  for them to track back that the check was actually
12  deposited and actually cashed.
13  Q.  These kinds of things are important to FINRA?
14  A.  I would imagine so.
15  Q.  Okay.  And then your Exhibit 92, your Wells
16  Fargo account shows on page Bates ending 21 that you
17  paid Brandi Leal $3,050.  Do you see that on
18  January 9th?
19  A.  I do.
20  Q.  Okay.  And that's the same day as her check --
21  is that right?  Is that the same day as her check?
22  A.  It appears to be, yeah.
23  Q.  Why would it be that you paid Brandi Leal $50
24  on top of her $3,000 investment as opposed to the $150
25  that others got proportionately?

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 205

1   A.  Well, let's be clear.  The $150 had nothing to
2   do with, you know -- that was me as a measure of good
3   faith -- I mean, it's clear to me that I gave Brandi an
4   extra 50 bucks because she needed to be able to pay for
5   the cashiers check that she was getting in order to make
6   the investment.
7   Q.  Okay.  So is it fair to say that the $300 on
8   top for the Robinsons and Brittany Joanne and Alejandro,
9   would those extra amounts have been to cover, in part --
10  or in part to cover cashier checks that cost -- the
11  expense of getting a cashier's check?
12  A.  No.
13  Q.  No?  How do you know that it was that case for
14  Brandi and -- and not the others?
15  A.  Because as I remember, Brandi couldn't rub two
16  nickels together.
17  Q.  So I mean, it's still around the holidays.
18  Well, why didn't you make her a little bigger loan if
19  she was in such need?
20  A.  I didn't know her as well and I didn't care
21  about her welfare as much.
22  Q.  Did Charles Grob know Brandi?
23  A.  I have no idea.
24  Q.  Did Charles Grob discuss Chimera with Brandi
25  Leal?

Page 206

1   A.  I have no idea.
2   Q.  You discussed Chimera with Brandi Leal, though?
3   A.  I introduced her to the opportunity, yes.
4   Q.  Okay.  When you say you introduced her to the
5   opportunity, what do you mean?
6   A.  As I said before, I gave everybody a copy of
7   the prospectus, a copy of the S1, said that it could be
8   a good opportunity for them.  And if they had questions,
9   they should call Mr. Grob.
10  Q.  But you don't know if she called Mr. Grob?
11  A.  I do not.
12  Q.  Did she give this check to you?
13  A.  I don't remember getting this check, no.
14  Q.  Did Mr. Grob ever discuss Brandi Leal with you?
15  A.  No.
16  Q.  Okay.  I mean, simply the fact that we have
17  this, if Mr. Grob is who you pointed her to, does that
18  not tell you that Mr. Grob and Leal interacted here?
19  A.  What I told people to do is if they were
20  interested, fill out the form, sign the form.  If they
21  had questions, talk to Grob.  If not, send the form and
22  the check with a copy of their ID to the company's
23  office.
24  Q.  Okay.  So it's possible that she could have not
25  interacted with anybody, just written a check and sent

Page 207

1   it on?
2   A.  That's correct.
3   Q.  Okay.  And that's possible with any one of
4   these people?
5   A.  It is possible with any one of those people.
6   Q.  Okay.  Okay.  Who is James Moss?
7   A.  James Moss is Eddie Austin's son-in-law.
8   Q.  And Kelly Moss, is that Eddie's daughter?
9   A.  It is.
10  Q.  Okay.  And Carolyn's daughter and son-in-law as
11  well?
12  A.  No.
13  Q.  From a previous marriage?
14  A.  Yes.
15  Q.  Who contacted James and Kelly Moss about
16  investment with Chimera?
17  A.  I believe that would have been Mr. Austin.
18  Q.  Did Mr. Grob have any interaction with James
19  and Kelly moss about Chimera?
20  A.  I do not know the answer to that question.
21  Q.  But you had interaction with James and Kelly
22  Moss about Chimera; is that right?
23  A.  I did not speak to James and Kelly about their
24  investment in Chimera.
25  Q.  Okay.  Help me -- if you look at Exhibit 91,

Page 208

1   Bates 597, in the next few pages you see James Moss
2   wrote a check to Chimera in the amount of $3,000 on
3   January 11, 2012.
4   A.  I see that.
5   Q.  And you see that Kelly, a few pages later,
6   wrote her own $3,000 check on the same day,
7   January 11th, 2012?
8   A.  That's correct.
9   Q.  You wrote it out of the Jeff Davis Bank in
10  Lake Charles?
11  A.  That's correct.
12  Q.  And if you look at Exhibit 92, on the next day,
13  we have a payment from you to Kelly Moss to the Jeff
14  Davis Bank in the amount of $10,000.
15  A.  That's correct.
16  Q.  Explain to me what that $10,000 payment was
17  for.
18  A.  I'll be honest.  I'm not entirely sure.  I have
19  from time to time sent funds to Ms. Moss.  If I had
20  certain situations that needed to be dealt with in Lake
21  Charles where she's a resident, including, you know,
22  going over to the casino and paying off markers, things
23  of that nature, going to the jeweler, who's also in Lake
24  Charles to pick something up.  So sitting here looking
25  at that entry, I can't tell you why I sent Kelly Moss

APP: 000029

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 209

```
 1   $10,000.
 2      Q.  Would it be unusual for you to send her $4,000
 3   as payment for one of these tasks that you've just
 4   described?
 5      A.  Well, I wouldn't pay her $4,000 to go over
 6   there.  But, you know, if I had a $5,000 marker at the
 7   casino -- I don't pay Ms. Moss for her services.  I
 8   would send her money if I needed something done, not to
 9   pay for the service, but to go pay for whatever it was I
10   needed done.  For example, go to the casino and pay a
11   marker or go to Diamond Durrell's and pick up a set of
12   earrings for me and send them back.
13      Q.  You did not have a conversation with James and
14   Kelly about Chimera?
15      A.  I did not.
16      Q.  And do you characterize all of this $10,000 as
17   a loan?
18      A.  I don't characterize any of the $10,000 as a
19   loan.
20      Q.  Okay.  Why did you -- oh, do you believe that
21   this $10,000 is connected in any way to James and Kelly
22   Moss's dual investment in Chimera Energy Corporation for
23   $6,000 the day before?
24      A.  I do not.
25      Q.  Okay.  And what's the basis of that belief?
```

Page 210

```
 1      A.  I see no reason why I would have lent funds to
 2   Eddie's kids who are certainly more than capable of
 3   making the investments on their own.
 4      Q.  Okay.  Your parents are more than capable of
 5   making the investment on their own, right?
 6      A.  True.  That's a different situation.  They're
 7   my parents.
 8      Q.  Okay.  Familial relationship tenderness made
 9   you send them the money?
10      A.  You could phrase it that way, I guess.
11      Q.  Okay.  How would you phrase it?
12      A.  I offered them an opportunity to make an
13   investment and make money.  And in doing so, I didn't
14   want them to have to come out of pocket and take a risk.
15      Q.  What did you say to your dad?  Did you talk to
16   your mom about this?
17      A.  No.
18      Q.  What did you say to your dad about what he
19   stood to gain?
20      A.  I -- I told him this is an opportunity to get
21   in on the ground floor of a company that if they're --
22   you know, if they can make a hit in the market with
23   these cutters, this could be a very valuable operation.
24   And I think this is something that you may want to, you
25   know, buy in and hold.
```

Page 211

```
 1      Q.  Did you tell him that you were still undecided
 2   as to whether this would be a vehicle for the sale of a
 3   shell?
 4      A.  I didn't even enter into that conversation.
 5      Q.  You didn't tell him that?
 6      A.  I did not tell him that.
 7      Q.  Okay.
 8      A.  Nor do I agree with the assertation that I was
 9   making a decision on whether or not the company would be
10   sold as a shell.  I clearly was not the control person.
11   I did not have the majority to share control.  I did not
12   have any control and couldn't have made that decision if
13   I wanted to.
14      Q.  Okay.  We talked about -- earlier we talked
15   about you and Eddie discussing the possibility of it
16   being sold as a shell, correct?
17      A.  We discussed the parameters under which it
18   could be sold as a shell if Mr. Grob decided he did not
19   want to carry through with his business model and sell
20   it.
21      Q.  Okay.  And you didn't tell your dad that that
22   was a possibility?
23      A.  No.
24      Q.  Okay.  Did you say anything about what he might
25   hope to gain?
```

Page 212

```
 1      A.  No.
 2      Q.  Okay.  Now, you've had -- you've had some time
 3   here.  You -- you know -- you've known our allegations
 4   for quite a while.
 5      A.  I have.
 6      Q.  Have you gone to Kelly or James in the interim
 7   to say, what did I pay you that $10,000 for in January
 8   of 2012?
 9      A.  This is the first time that I've seen this bank
10   statement since I received it three-and-a-half years
11   ago.
12      Q.  Okay.  Not something you put any thought on?
13      MR. EDMUNDSON:  Can we take five?
14      MR. GULDE:  Yeah.
15         (Break taken from 3:14 p.m. to 3:21 p.m.)
16      Q.  Tell me who Pennaluna is.
17      A.  Pennaluna is a broker dealer in Coeur d'Alene,
18   Idaho.
19      Q.  How did you become aware of them?
20      A.  I was introduced to them by Mr. Joseph
21   Passalaqua.
22      Q.  Remind me what deal we talked about today?
23      A.  Nova Mining.
24      Q.  Global Mining?
25      A.  Nova Mining.
```

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 221

1   least a relationship that several of these people share
2   that is not disclosed is with you, correct?
3       A.  I would like to refer to the title of the page,
4   relationships between shareholders.  I was not a
5   shareholder, ergo, I had no relationship to disclose.
6   So if I had -- if my name was on this list as the
7   introducer of people, then it would not be relationships
8   between shareholders, which is what -- what was asked
9   for was relationships between shareholders.  And that's
10  what this document is.
11      Q.  Several of these shareholders had in common the
12  fact that they were lent money by you to buy these
13  shares, correct?
14      A.  That is correct.
15      Q.  And you wouldn't call that a relationship among
16  them?
17      A.  No.  I wouldn't consider that Archie and
18  somebody else have a relationship because I lent them
19  money.
20      Q.  It's just something they all have in common?
21      A.  Do you and I have a relationship because we
22  both bank and we both have credit cards from American
23  Express?
24      Q.  In a manner of speaking, yes.
25      A.  Wow.  I never knew I had a relationship with so

Page 222

1   many people.
2       Q.  Yeah.  Now, which of these -- which of the
3   people on this list did you introduce to the Chimera
4   opportunity?
5       A.  Well, I discussed the matter with Ms. Cotton,
6   with Mr. Demandante, with my parents, Garcias, and
7   Brandi Leal and Janna Robinson.
8       Q.  And then -- okay.  How about with David Parisi?
9       A.  I believe David spoke directly to Charles.
10      Q.  You never spoke with him about Chimera?
11      A.  I never discuss with David Parisi investing at
12  Chimera.
13      Q.  Okay.  Who is David Parisi to you?
14      A.  David Parisi has at times been a CPA that
15  helped me out.
16      Q.  Was he at the time doing any work for you?
17      A.  I believe at the time he was working out of our
18  office working on tax issues for Mr. Austin.
19      Q.  Did you discuss -- well, you never told Charles
20  Grob that you made any loans to the individuals you
21  talked about today, right?
22      A.  That's correct.
23      Q.  You never told anybody at Chimera that?
24      A.  That is correct.
25      Q.  Why not?

Page 223

1       A.  I didn't find it to be pertinent.
2       Q.  Do you think anyone at Pennaluna would have
3   liked to know that you had funded the IPO investments of
4   several investors?
5       MR. EDMUNDSON: Objection, form.
6       A.  I'm not sure.  I'm sure Mr. Dillan can answer
7   that question.
8       Q.  Did you consider disclosing to anybody at
9   Pennaluna the fact that you had financed the purchase of
10  shares for several IPO investors?
11      A.  I did not.
12      Q.  Has Charles ever met Anna Tikhonova?
13      A.  Of course he has.
14      Q.  When did he meet her?
15      A.  Probably not long after I met him.  I remember
16  having a 4th of July party at my house and he was there
17  with his girlfriend.
18      Q.  Okay.  So this would have been 4th of July
19  of 2011?
20      A.  Yes, it would.
21      Q.  Okay.  So the assertion that she's a long time
22  friend of CEO Charles Grob, you agree with that?
23      A.  I wouldn't want to characterize what long time
24  means.  But I assume, you know, of all of Charles' frat
25  brothers are long term friends, then she can be too.

Page 224

1       Q.  It's all relative, right?
2       A.  I would probably --
3       MR. EDMUNDSON: Objection to the form.
4       A.  Again, these are Mr. Grob's words and not mine.
5       Q.  Sure.  But to be clear, you sent them on to
6   Pennaluna for him, correct?
7       A.  I mean, that's what the e-mail says, is I
8   forwarded these things to Pennaluna at his request.
9       Q.  Okay.  And you read them?
10      A.  I did read them.
11      Q.  Okay.  If you had an issue with them, you could
12  have piped up?
13      A.  I don't believe that was my responsibility to
14  do so.
15      Q.  But you could have said something if you had an
16  issue with any of these?
17      A.  Yes, I could.
18      Q.  Okay.  Why didn't Charles send this himself?
19      A.  It -- I can't remember the specifics of what
20  happened, you know, four years ago.  But I would imagine
21  Charles was busy with the business of the company and
22  asked me to see if I could, you know, facilitate this.
23      MR. GULDE: 35.  Could you grab 35?
24      (Exhibit No. 95 marked.)
25      Q.  I'll hand you what I've marked as Exhibit 95.

APP: 000031

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer -  Vol. 1
July 17, 2015

Page 229

1    these loans?
2    A.  I mean, they're friends and acquaintances.  I'm
3    sure I would go talk to them at some point.
4    Q.  Demand them pay you back?
5    A.  Eventually.
6    Q.  What if they refused to pay you back?  Could —
7    A.  I — at that point then I would have looked at
8    what assets they may have to make payment on the loan.
9    Q.  What if they just said, take the shares back?
10   A.  I'm not sure what would have happened at that
11   point because it didn't happen.
12   Q.  Would you have taken a share back as — as
13   payment of the loan?
14   A.  Probably not.
15   Q.  Why not?
16   A.  I would likely have tried to find a way for
17   another shareholder to purchase their shares.
18   Q.  Why?
19   A.  Because I believe the last thing I would want
20   to do is do exactly the transaction that you've
21   described, and make it appear that it was just -- they
22   were just a straw man purchaser and who eventually just,
23   oh, we'll give you the shares back.  So, no, I would not
24   have accepted Chimera shares from somebody as payment on
25   the debt.

Page 230

1    Q.  Now, let's talk about sale of shares back.  How
2    was it that, for example, Andrew Austin decided to sell
3    his shares to Clarent Services, Corp.?
4    A.  There came a time when the company wasn't
5    progressing as fast as everybody kind of had hoped.  And
6    some of these shareholders were looking to, you know,
7    exit their positions.  And it was, you know, discussed
8    loosely, let's see if there's a way to facilitate that.
9    And once it got rolling, the Europeans said, hey, look,
10   you know, we'll take some shares.  And I clearly bought
11   some shares and Carolyn clearly bought some shares.
12   Q.  Who is Clarent Services?
13   A.  It's a European entity.
14   Q.  Who runs it, do you know?
15   A.  It's run by the same group as Kylemore.
16   Q.  Who's the beneficial owner?
17   A.  I do not know.
18   Q.  As to Kylemore, Ms. —
19   A.  Yurovskaya.
20   Q.  — Yurovskaya is the beneficial owner, right?
21   A.  I have every reason to believe that's
22   true.
23   Q.  Do you know who that person is with respect to
24   Clarent?
25   A.  I do not.

Page 231

1    Q.  Okay.  Do you know who that person is with
2    respect to Levantera?
3    A.  I do not.
4    Q.  Do you know who that person is with respect to
5    Hillsmere?
6    A.  I believe that that's Olga Tikhonova.
7    Q.  Olga Tikhonova?
8    A.  Yes.
9    Q.  Is that your sister-in-law?
10   A.  It is.
11   Q.  Okay.  And why are you — why do you say you
12   believe it is?  Are you not sure that's the case?
13   A.  I'm not sure what documentation was prepared in
14   Europe or what they have done.  Obviously I wasn't
15   involved in that.  So they may list other directors.  I
16   don't know what your records say.  So I'm telling you my
17   belief.
18   Q.  All right.  Take a look at tab 82.  I'll label
19   this Exhibit 96.
20       (Exhibit No. 96 marked.)
21   Q.  I've just handed you a document that we
22   received from Switzerland who produced to the parties.
23   The second page of which — this is Exhibit 96.  Second
24   page of which is a cover page that says EuraHelvetia
25   Trust account opening forms.  The listed client is Olga

Page 232

1    Tikhonova?
2    A.  It does.
3    Q.  Okay.  And the date is in the European style
4    April 8th, 2011.  You see that?
5    A.  I do.
6    Q.  Have you ever seen this document before?
7    A.  I have not.
8    Q.  Okay.  Now, on the next page, it appears to be
9    discussing a trust set up under the laws of Bermuda
10   named the Hillsmere trust.  You see that?
11   A.  I do.
12   Q.  Is that consistent with your understanding of
13   what the Hillsmere trust is?  Is it set up under the
14   laws of Bermuda?
15   A.  I have no idea to know one way or the other.
16   Q.  Okay.  Did you know that they were registered
17   in the Marshall Islands?
18   A.  I am aware that some of these entities in the
19   discussion were Marshall Islands companies.
20   Q.  Now, does this — this document appears to be
21   signed by Olga Tikhonova.  You see that?
22   A.  That appears to be her signature.
23   Q.  Are you familiar with her signature?
24   A.  I've seen it before, yeah.
25   Q.  And that looks like it?

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 241

1   shares to Levantera?
2       A.   Did I tell her, hey, when you get this money
3   you've got to pay back the loan?
4       Q.   No.  Did you discuss the matter of your loan in
5   any way?
6       A.   I don't believe it was a specific topic of
7   discuss.
8       Q.   Have you ever been paid back by Brittany
9   Garcia?
10      A.   Yes, I have.
11      Q.   Okay.  What were the circumstances of her
12  paying you back?
13      A.   It was sometime not too long after this
14  transaction.
15      Q.   Okay.  How do you know that?
16      A.   That's in my mind when it -- when payment came.
17      Q.   What was Brittany's husband's name?
18      A.   Alejandro.
19      Q.   So Alejandro, his shares ended up with
20  Clarent -- am I saying that right, Clarent -- Clarent
21  (different pronunciation)?
22      A.   I've always said Clarent.
23      Q.   Okay.
24      A.   But I'm just pronouncing it as you are.
25      Q.   Did Alejandro pay his loan back independent of

Page 242

1   Brittany?
2       A.   No, they were repaid together.
3       Q.   Okay.  And sometime after they had received
4   this money?
5       A.   Yes.
6       Q.   Okay.  Now, who wrote the checks to each of
7   these individuals?
8       A.   I don't exactly remember.  It was -- it would
9   either be Iridium Capital or potentially Chartered.
10      Q.   Okay.  Some Andrew Farmer entity?
11      A.   Some Andrew Farmer entity wrote these checks,
12  yes.
13      Q.   Okay.  Hillsmere didn't pay Robbie Austin
14  whatever 200,000 times .0225 is?
15      A.   No.
16      Q.   Okay.  Just to close it out, what -- we've
17  talked about your parents, we've talked about Alejandro
18  and Brittany.  Is there anybody else in these four pages
19  who you lent money to?  I don't believe so.
20      A.   No, I don't believe so.
21      Q.   Did everybody that you've lent money to buy IPO
22  shares pay you back?
23      A.   Yes.
24      Q.   Did everybody pay you back -- setting aside the
25  ones we've talked about, did everybody pay you back

Page 243

1   before their shares were purchased from them?
2       A.   No.
3       Q.   Did any of them pay you back before their
4   shares were purchased from them?
5       A.   I believe Ms. Leal paid me back prior to her
6   shares.  Janna and her husband didn't pay me back for
7   another six months.  Oh, and obviously my parents, but
8   we had already discussed that.
9       Q.   What are Blue Fire drill bits?
10      A.   Blue Fire was a company that Mr. Rohde put
11  together that was in the business of selling a
12  specialized type of drill bit for the use in shale
13  drilling.
14      Q.   Okay.  Was it useful in connection with
15  waterless fracking as far as you know?
16      A.   I mean, you could utilize the drill bit to
17  drill a hole that you would then use any fracking
18  technology on.  I don't believe it would be specifically
19  beneficial.  But perhaps Mr. Rohde has an answer to
20  that.
21      Q.   Why did Lydia Cotton give you authorization to
22  be an authorized trader for Oak Resources, Incorporated?
23      A.   Because Ms. Cotton is very well intentioned,
24  but she's not the person who understands enough about
25  the market to trade securities.

Page 244

1       Q.   So explain to me why you being added helps
2   that.
3       A.   Because I would be able to assist her with
4   selling her securities in the least detrimental way
5   possible.
6       Q.   Why did you need to be an authorized trader to
7   do that?
8       A.   Because the -- her -- she and I discussing
9   something and then calling the broker and her calling
10  the broker and making that trade, you could miss a
11  market opportunity.  She asked me for my assistance and
12  I said, yes, I'll help you out.  And that's what I did.
13      Q.   And you did that around August of 2012, right?
14  Do you recall?
15      A.   I don't recall.  But clearly, you have it in
16  front of you, so.
17      Q.   Yeah.  So Oak Resources, in the time before you
18  were an authorized trader for that entity, bought
19  700,000 shares of Chimera?
20      A.   I believe that's correct, yes.
21      Q.   Okay.  And after the split, that was 28 --
22  2.8 million shares?
23      A.   Yes.
24      Q.   In the -- do you know how much of that Oak
25  Resources was able to sell?

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer - Vol. 1
July 17, 2015

Page 245

1    A.  Specifically, no.
2    Q.  You think they were able to sell over 2 million
3  shares of that?
4    A.  It's possible, yeah.
5    Q.  Where would the -- where do the proceeds of
6  those resource sales go?
7    A.  I would imagine they went to the Oak Resources
8  bank account.
9    Q.  Okay.  Did any of that money end up in your
10  hands?
11    A.  It did.
12    Q.  How much of it?
13    A.  Honestly, I wouldn't know.
14    Q.  Why did some of that money end up in your
15  hands?
16    A.  Well, I had loaned substantial amounts of money
17  to Ms. Cotton over the years to -- for her to pay for
18  her lifestyle and open her first business and do other
19  things.  And she was appreciative of that.  And when she
20  had money to pay that back, she did so with interest.
21    Q.  And once she was able to start selling through
22  Oak Resources Chimera stock, is that when she had money
23  to pay it back?
24    A.  Yes.
25    Q.  Okay.  Before that, was she able to pay it

Page 246

1  back?
2    A.  No.  Before that, she was still struggling to
3  make ends meet.
4    Q.  Why are you a signatory on the Resources Chase
5  bank account?
6    A.  Because I helped her put Oak together and I
7  helped her open the bank account and she asked me to be
8  a signatory to help her pay her bills and make sure
9  things got done on time.  And I agreed to do that.
10    Q.  A similar story for amounts traded through
11  TransAmerica Trading.  That's Carolyn Austin's group?
12    A.  That's Carolyn Austin's company.  That's
13  correct.
14    Q.  They also had 2.8 million shares of Chimera
15  stock; is that right?
16    A.  That sounds appropriate.  I don't have the list
17  in front of me.
18    Q.  Do you know if they were able to sell all their
19  shares?
20    A.  I don't.
21    Q.  Okay.  Did any of the proceeds of TransAmerica
22  Trading's sale of Chimera stock end up in your hands?
23    A.  They did.
24    Q.  What for?
25    A.  There were some significant obligations that

Page 247

1  Ms. Austin owed to me that she was settling.
2    Q.  Was she able to settle those prior to her sale
3  of Chimera shares?
4    A.  Well, they -- funds that she received from --
5  or some of the funds she received from selling Chimera
6  came to me to repay those obligations.
7    Q.  Were there other Chimera proceeds, sales of --
8  I'm sorry -- proceeds of Chimera stock sales that ended
9  up in your hands from TransAmerica that were not
10  repayments of some debt owed by Carolyn Austin?
11    A.  There may have been fees or expenses that she
12  was reimbursing me for.
13    Q.  Okay.  Anything other than fees or expenses?
14    A.  Huh-uh.
15    Q.  Okay.  Chartered Investments itself ended up
16  with 2.4 million shares of Chimera after the split; is
17  that right?
18    A.  That's correct.
19    Q.  Which you sold to earn nearly $700,000; is that
20  right?
21    A.  Actually, I think that would be incorrect.
22    Q.  Okay.
23    A.  I believe I still hold the bulk of those
24  shares.  There may have been $700,000 in the proceeds
25  from sale of stock, but I'm sure in one of these

Page 248

1  binders, there's a statement from Scottsdale Capital
2  that shows I still hold the vast majority of those
3  shares.
4    Q.  Vast majority, so out of 2.4 million, about how
5  many?
6    A.  I believe I have at least half.
7    Q.  But if you sold half of those, you don't
8  dispute that you would have made $700,000 from it?
9    A.  That's your number.  I don't know what the
10  basis of it is.  You haven't shown me an account
11  statement to that effect.
12    Q.  Do you know what you made?
13    A.  No, I don't.
14    Q.  Ballpark, even?
15    A.  Not even ballpark.
16    Q.  Okay.  I've labeled -- oh, it's already
17  labeled.
18    MR. GULDE:  We've already entered that.
19    MR. VYDASHENKO:  Yeah, we did.
20    MR. GULDE:  Okay.
21    Q.  This has already been labeled Exhibit 82.  Are
22  you familiar with this document?
23    A.  I am.
24    Q.  Is it a -- is Exhibit 97 -- I'm sorry.  82 --
25    A.  82.

Page 261

1 the -- I mean, he wrote the checks for it.
2    Q. He certainly started receiving more, right?
3    A. Yes.
4    Q. Do you know if the company went through any
5 formalities to amend his executive employment agreement?
6    A. I do not know the answer to that.
7    Q. Have you ever had -- well, you've already
8 testified you've never had discussions with Charles
9 about his compensation, right?
10   A. That's correct.
11   Q. Okay.
12   A. If we're going to go much past 5:00, I need to
13 take a break.
14      MR GULDE: Let's take a break. And I'll try to
15 gather myself and see how much time I need. Okay?
16      (Break taken from 4:32 p.m. to 4:49 p.m.)
17   Q. Mr. Farmer, we talked a little bit about
18 Mr. Massey. But I wanted to make sure I understood his
19 role with Chimera as far as you understood it. So can
20 you describe to me Thomas Massey's role with Chimera?
21   A. As I understand it, Tom was the liaison to
22 Baldemar and helped Baldemar organize what was going on
23 in Mexico. And --
24   Q. Okay.
25   A. -- clearly went on all the trips to Mexico and

Page 262

1 participated in those conversations.
2    Q. And he did this without payment from Chimera?
3    A. I mean, I hate to be the guy who's going to go
4 back and point out again, but there is a check in here
5 that is payment to Mr. Massey.
6    Q. Okay. I didn't remember seeing that.
7    A. It's made out to Fair Winds. It says Baldemar
8 Rios on it, but Fair Winds is Tom Massey's company.
9    Q. What other companies do you associate with
10 Tom Massey?
11   A. Constant Consulting is a company that Tom
12 Massey owns. And I'm sure he has others.
13   Q. Constant Consulting?
14   A. Constant Consulting.
15   Q. Okay.
16   A. I'm sure he has others that I'm not aware of.
17 That was on page 135, if you were looking for it.
18      MR. GULDE: Okay. It was -- for the record it's
19 Exhibit 98. Also I should note for the record -- this
20 is not a question. I neglected to start on the right
21 number of exhibits. So we have a duplicate 81 and 82.
22 We should have started with 83. So I propose that we
23 designate that 81 and 82 that we showed Mr. Farmer today
24 as 81A and 82A respectively. Any problem with that?
25      MR. EDMUNDSON: No.

Page 263

1      MR. GULDE: Okay. So we will -- we'll refer to --
2 to the extent we need to -- any party needs to refer to
3 those two documents in any briefing, refer to those as
4 81A and 82A.
5    Q. All right. So Mr. Farmer, did you ever make
6 payments to Mr. Massey?
7    A. Related to Chimera, no.
8    Q. Did you ever make payments to Mr. Massey in any
9 respect?
10   A. Yes.
11   Q. In connection with what?
12   A. Mr. Massey has helped me out on other deals.
13 Mr. Massey was involved in a gold buying deal that I
14 did. We have had -- we bought a car together. I
15 have -- old Mercedes, a piece of junk. I have lent
16 monies to him, he's lent monies to me. There has been
17 payments back and forth.
18   Q. But as to anything related to Chimera, you have
19 not paid Mr. Massey anything?
20   A. That's correct.
21      MR. GULDE: Get 69.
22   Q. So I'm labeling this Exhibit 101.
23      (Exhibit No. 101 marked.)
24   Q. I've handed you an e-mail from Charles to
25 Thomas Massey on September 26. And it's forwarding an

Page 264

1 e-mail from Charles to you on the same date. Do you see
2 that?
3    A. I do.
4    Q. Do you believe you got this e-mail from Charles
5 on September 26th?
6    A. It appears to be, yes.
7    Q. You see that he is referring to an attached
8 expense report?
9    A. I do.
10   Q. And that he's saying that I can and will
11 provide receipts or bank statements for every line item?
12   A. I see that, yes.
13   Q. Why was he asking -- or why was he sending you
14 this attached expense report?
15   A. I have -- I mean, clearly this is not an
16 expense report. This is a, I guess, Excel-based check
17 register. That's what I assume it to be. It's not an
18 expense report. And he sent it to me and I very
19 obviously responded to him, Charles, send this to --
20 send it to Tom or whatever. And I didn't -- I don't
21 know why he would have sent it to me. Because I -- you
22 know, perhaps this was when he was about to exit the
23 company. I'm not sure. I don't know why this is here.
24 But certainly not from my approval or review or anything
25 else.

Securities and Exchange Comission v.
Andrew I Farmer, et al.

Andrew I. Farmer -  Vol. 1
July 17, 2015

Page 289

1   that doesn't exist?
2     A.  Yes.  I believe it's the head of a lion on a
3   horse's ass or something.
4     Q.  Something like that.  Okay.  Then you're aware
5   of no discussion among those guys as to the choice of
6   that name?
7     A.  No.
8     MR. GULDE:  Okay.  Well, I've got nothing else.
9     A.  It's not that I would have picked.
10    Q.  That's not what you would have picked?
11    A.  I would not have picked Chimera as the name for
12  a deal.
13    Q.  Why not?
14    A.  Because Chimera was the name of a virus in --
15    THE WITNESS:  Help me out, Nikolay.
16    MR. VYDASHENKO:  It sounds familiar.
17    A.  It was one of the --
18    Q.  It was a movie, or --
19    A.  It was a movie.
20    Q.  Yeah.
21    A.  I think it was -- don't hold me to this.  Don't
22  put me in jail over it, but I believe it was one of the
23  Mission Impossible ones when they were in Australia.
24    Q.  That's right.
25    A.  Chimera was the name of the virus.

Page 290

1     MR. VYDASHENKO:  That's right.
2     A.  So that stuck with me.  I would never use that
3   name.
4     MR. GULDE:  All right.  We'll give you a pass on
5   jail and the Mission Impossible issue.
6     THE WITNESS:  I appreciate that.
7     MR. GULDE:  And we will close for today, unless you
8   have something else.
9     MR. EDMUNDSON:  I don't.
10      (At 5:35 p.m., the deposition proceedings
11      concluded.)
12
13      _____
14        ANDREW I. FARMER
15
16
17
18
19
20
21
22
23
24
25

Page 291

1   STATE OF TEXAS          )
2                   )ss
3   COUNTY OF DALLAS        )
4     I hereby certify that the witness in the foregoing
5   deposition, ANDREW I. FARMER, was by me duly sworn to
6   testify to the truth, the whole truth and nothing but
7   the truth, in the within-entitled cause; that said
8   deposition was taken at the time and place herein named;
9   and that the deposition is a true record of the witness'
10  testimony as reported by me, a duly certified shorthand
11  reporter and a disinterested person, and was thereafter
12  transcribed into typewriting by computer.
13    I further certify that I am not interested in the
14  outcome of the said action, nor connected with nor
15  related to any of the parties in said action, nor to
16  their respective counsel.
17    IN WITNESS WHEREOF, I have hereunto set my hand this
18  28th day of July, 2015.
19  Reading and Signing was:
20  _X_ requested  __ waived  __ not requested
21
22
23       _Larissa L. McPherson_
24
25      LARISSA L. MCPHEARSON, Texas CSR NO. 8371

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Charles Grob
July 9, 2015

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF TEXAS
 3                  HOUSTON DIVISION
 4
 5    - - - - - - - - - - - - - - -
 6    SECURITIES AND EXCHANGE      )
 7    COMMISSION,                  )
 8              Plaintiff          )
 9    vs.                          ) CASE NO. 4:14-CV-02345
10    ANDREW I. FARMER, CHARLES E. )
11    GROB, JR., CAROLYN AUSTIN,   )
12    BALDEMAR P. RIOS, and CHIMERA)
13    ENERGY CORP.,                )
14              Defendants         )
15    - - - - - - - - - - - - - - -
16
17            DEPOSITION OF CHARLES GROB
18              THURSDAY, JULY 9, 2015
19
20
21          BEHMKE REPORTING AND VIDEO SERVICES, INC.
                 BY:  KELLY HANNA, CSR NO. 1654
                      160 SPEAR STREET, SUITE 300
                      SAN FRANCISCO, CALIFORNIA 94105
                           (415) 597-5600
```

**Page 2**

```
 1
 2
 3
 4
 5
 6
 7
 8          Deposition of CHARLES GROB, taken on behalf of
 9    Plaintiff, at U.S. Attorney General's Offices, 1000
10    Louisiana, Suite 2300, Houston, Texas, commencing at
11    9:18 a.m. Thursday, July 9, 2015, before Kelly Hanna,
12    Certified Shorthand Reporter No. 1654, pursuant to
13    Notice of Deposition.
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1    APPEARANCES OF COUNSEL
 2    FOR PLAINTIFF:
 3         U.S. SECURITIES AND EXCHANGE COMMISSION
 4         BY:  MATTHEW J. GULDE, ATTORNEY AT LAW
 5              NIKOLAY VYDASHENKO, ATTORNEY AT LAW
 6         801 Cherry Street, Suite 1900
 7         Fort Worth, Texas 76102
 8         Telephone: (817) 978-1410
 9         E-mail: guldem@sec.gov
10              vydashenkon@sec.gov
11
12    FOR DEFENDANT, BALDEMAR P. RIOS:
13         (APPEARING TELEPHONICALLY)
14         RICHARD D. MORENO, LLC
15         BY:  MR. RICHARD D. MORENO
16         125 West School Street
17         Lake Charles, Louisiana 70605
18         Telephone: (337) 656-8654
19         E-mail:  richard@rdmorenolaw.com
20
21
22
23
24
25
```

**Page 4**

```
 1 APPEARANCES OF COUNSEL - CONTINUED
 2 FOR DEFENDANT, CAROLYN AUSTIN:
 3      FELDESMAN TUCKER LEIFER FIDELL, LLP
 4      BY: DUHA EL-QUESNY, ATTORNEY AT LAW
 5      1129 20th Street, NW, 4th Floor
 6      Washington, D.C.  20036
 7      Telephone:  (202) 466-8960
 8      E-mail:  delquesny@ftlf.com
 9
10 FOR DEFENDANT, CHARLES E. GROB, JR.:
11      AAA LEGAL SERVICES, INC.
12      BY: JOHN GREEN, JR., ATTORNEY AT LAW
13      1135 Hodges Street
14      Lake Charles, Louisiana 70601
15      Telephone: (337) 990-0060
16      E-mail:  green@johngreenjr-atty.com
17
18
19
20
21
22
23
24
25
```

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Charles Grob
July 9, 2015

Page 5

1                    INDEX
2   THURSDAY, JULY 9, 2015
3   CHARLES GROB                            PAGE
4   Examination by Mr. Vydashenko              7
5
6                    -oOo-
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1                  EXHIBITS
2                CHARLES GROB
3   Number        Description          Page
4   Exhibit 81    Email dated August 22, 2012
5               (Massey to Grob)
6               (TM000257-257A) - 2 pages    18
7
8   Exhibit 82    Master Credit Agreement Between
9               Infinite Funding Inc., As
10              Lender, And Chimera Energy
11              Corp., As Borrower
12              (IF-000001-011) - 12 pages   45
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1          THURSDAY, JULY 9, 2015; 9:18 A.M.
2              CHARLES E. GROB, JR.,
3   having been first duly sworn, testified as follows:
4                  EXAMINATION
5      Q.  (BY MR. VYDASHENKO) Mr. Grob, my name is
6   Nikolay Vydashenko.  I represent the Securities and
7   Exchange Commission in this case; and I'll be taking
8   your deposition today.
9      A.  Okay.
10     Q.  I'll just go over a few things —
11         MR. GREEN: Can we get appearances,
12  Counsel?  Can we do appearances?
13         John Green, Jr. here on behalf of
14  Charles Grob.
15         MS. EL-QUESNY: Duha El-Quesny on behalf
16  of Carolyn Austin.
17         MR. MORENO: Richard Moreno on behalf of
18  Baldemar Rios.
19         MR. GULDE: Matt Gulde for the SEC.
20     Q.  (BY MR. VYDASHENKO) So, in order to make this
21  run more smoothly, I'll just go over a few things.
22     A.  Okay.
23     Q.  The court reporter will be taking down
24  everything I say, all my questions and all your answers.
25     A.  Sure.

Page 8

1      Q.  And for that reason it's important that only
2   one person speaks at a time.
3      A.  Right.
4      Q.  So please try to wait until we finish our
5   question before you start answering and we'll do the
6   same.  We'll try not to start a new question until you
7   finish your answer.  And if we interrupt your answer,
8   will you please let us know that so we can give you an
9   opportunity to give a full and complete answer?
10     A.  Uh-huh, yes.
11     Q.  The other thing about the court reporter
12  taking — taking everything down, she can't pick up nods
13  or shakes —
14     A.  Got you.
15     Q.  — things like that.
16     A.  Okay.
17     Q.  So would you make sure that your answers are
18  verbal?
19     A.  Yes.
20     Q.  Also, if you have any trouble understanding one
21  of my questions, let me know that.
22     A.  Okay.
23     Q.  And I'll try to rephrase, okay?
24     A.  Okay.
25     Q.  Finally, is there anything to prevent you from

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Charles Grob
July 9, 2015

Page 9

1  giving complete and truthful testimony in response to
2  our questions today?
3    A.  No.
4        MR. GREEN: Before we get started,
5  Nikolay, we'll let you know that my client intends to
6  assert his Fifth Amendment privilege. I'm directing him
7  to do so and I'm going to direct him to answer your
8  questions with the response that he's going to assert
9  his Fifth Amendment privilege.
10       MR. VYDASHENKO: Okay.
11   Q.  (BY MR. VYDASHENKO) Mr. Grob, do you know who
12  Andrew Farmer is?
13   A.  Yes.
14   Q.  How do you know Mr. Farmer?
15       MR. GREEN: Start now.
16   A.  I assert the Fifth. I assert my Fifth.
17       MR. VYDASHENKO: Okay. Let's just -- can
18  we just stipulate that when -- when Mr. Grob says "I
19  assert the Fifth," we're talking about him asserting the
20  Fifth Amendment privilege against self-incrimination?
21       MR. GREEN: Yes, sir. I'm sorry if I
22  didn't make that clear before.
23       MR. VYDASHENKO: No. That's fine. I just
24  want to make sure we're clear on that.
25   Q.  (BY MR. VYDASHENKO) Okay. Did Andrew Farmer

Page 10

1  direct you to form Chimera Energy Corp.?
2    A.  I assert my Fifth Amendment.
3    Q.  From August 2011 through February 2012, were
4  you paid a monthly salary by Andrew Farmer?
5    A.  I assert my Fifth Amendment.
6    Q.  Did you have any contact with anyone at
7  Kylemore Corp. regarding the loan extended to Chimera by
8  Kylemore Corp.?
9    A.  I assert my Fifth Amendment.
10   Q.  Did Andrew Farmer arrange for the loan to
11  Chimera from Kylemore Corp.?
12   A.  I assert my Fifth Amendment.
13   Q.  Did you believe that Chimera would be obligated
14  to pay the loan back to Kylemore Corp.?
15   A.  I assert my Fifth Amendment.
16   Q.  Do you assert the Fifth Amendment privilege
17  with respect to all questions regarding Kylemore Corp.?
18   A.  Yes.
19   Q.  Did you authorize the filing of Chimera's S-1
20  registration statements and all amendments thereto?
21   A.  I assert my Fifth Amendment.
22   Q.  Did you authorize the filing of Chimera's
23  prospectus?
24   A.  I assert my Fifth Amendment.
25   Q.  Do you believe that all the statements in the

Page 11

1  registration statement and amendments thereto are
2  accurate?
3    A.  I assert my Fifth Amendment.
4    Q.  Do you believe that all statements in the
5  prospectus and amendments thereto are accurate?
6    A.  I assert my Fifth Amendment.
7    Q.  In Chimera's registration statement and in the
8  amendments to it, there's a statement that says, quote,
9  "We are offering the shares on a self-underwritten basis
10  directly through Charles Grob or officer and director
11  named herein," end quote.
12       Is this statement true?
13   A.  I assert my Fifth Amendment.
14   Q.  The registration statement and the amendments
15  thereto also states -- and the prospectus -- also
16  states, quote, "Our officer, director, control persons
17  and affiliates do not intend to purchase any shares in
18  this offering," end quote.
19       Is this statement true?
20   A.  I assert my Fifth Amendment.
21   Q.  The registration statements -- statement to the
22  amendments to it and the prospectus also state, quote,
23  "All decisions regarding the management of our affairs
24  will be made exclusively by Charles Grob, along with the
25  outcome of all corporate transactions and other matters,

Page 12

1  and he will also have the power to prevent or cause a
2  change in control," end quote.
3        Is this statement true?
4    A.  I assert my Fifth Amendment.
5    Q.  Do you assert the Fifth Amendment privilege
6  with respect to all questions regarding the registration
7  statement and the prospectus?
8    A.  Yes.
9    Q.  Whose idea was it for Chimera to be in the
10  business of PDC Cutters?
11   A.  I assert my Fifth Amendment.
12   Q.  Do you assert your Fifth Amendment privilege
13  with respect to all questions regarding Chimera's PDC
14  Cutter business?
15   A.  Yes.
16   Q.  Did Andrew Farmer instruct you to find
17  people -- let me start over.
18       Did Andrew Farmer instruct you to find
19  investors who would subscribe to Chimera's initial
20  public offering?
21   A.  I assert my Fifth Amendment.
22   Q.  Did you give money to Brendan Eagleton to
23  invest in the initial public offering?
24   A.  I assert my Fifth Amendment.
25   Q.  Did you give money to Daniel Sorelle to invest

APP: 000039

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Charles Grob
July 9, 2015

---

Page 13

1   in the initial public offering?
2     A.  I assert my Fifth Amendment.
3     Q.  Did you give money to Ashton Stresau to invest
4   in the initial public offering?
5     A.  I assert my Fifth Amendment.
6     Q.  Did you give money to Paul Cox to invest in the
7   initial public offering?
8     A.  I assert my Fifth Amendment.
9     Q.  Did you give money to Mairi, spelled M-A-I-R-I,
10  Cox to invest in the initial public offering?
11    A.  I assert my Fifth Amendment.
12    Q.  Did you give money to Nicole Fertitta to invest
13  in the initial public offering?
14    A.  I assert my Fifth Amendment.
15    Q.  Did you tell the investors to whom you
16  attempted to sell Chimera stock in the initial public
17  offering that the investment in Chimera was risk-free
18  and that they would get their money back?
19    A.  I assert my Fifth Amendment.
20    Q.  Do you assert the Fifth Amendment privilege
21  with respect to all questions regarding your
22  participation in Chimera's initial public offering?
23    A.  Yes.
24    Q.  Did Andrew Farmer instruct you to work with
25  Pennaluna & Company to help it file a Form 211?

---

Page 14

1     A.  I assert my Fifth Amendment.
2     Q.  Did you provide full and accurate information
3   to Pennaluna & Company in connection with their Form 211
4   filing process?
5     A.  I assert my Fifth Amendment.
6     Q.  Did you make any false statements to
7   Pennaluna & Company or did you withhold any information
8   requested by Pennaluna & Company in connection with the
9   Form 211 filing process?
10    A.  I assert my Fifth Amendment.
11    Q.  Do you assert the Fifth Amendment privilege
12  with respect to all questions regarding the Form 211
13  filing process?
14    A.  Yes.
15    Q.  Was it your idea for Chimera to get into the
16  business of developing nonhydraulic fracturing
17  technology?
18    A.  I assert my Fifth Amendment.
19    Q.  Is there an entity called China Inland Oil
20  Exploration Company of Chencunzhen Guangdong Province,
21  China?
22    A.  I assert my Fifth Amendment.
23    Q.  Is the license agreement with China Inland Oil
24  Exploration Company that's attached to Chimera's
25  Form 8-K filed on July 27, 2012 a fictitious agreement?

---

Page 15

1     A.  I assert my Fifth Amendment.
2     Q.  Is nonhydraulic extraction a fictitious concept
3   developed for the purpose of pumping up Chimera's stock
4   price?
5     A.  I assert my Fifth Amendment.
6     Q.  Did you ever communicate verbally with anyone
7   at China Inland?
8     A.  I assert my Fifth Amendment.
9     Q.  Did you ever communicate by e-mail with anyone
10  at China Inland?
11    A.  I assert my Fifth Amendment.
12    Q.  Did you receive any drawings, sketches, models
13  or other technical documents from China Inland that
14  relate to nonhydraulic extraction technology?
15    A.  I assert my Fifth Amendment.
16    Q.  I'm going to refer to the Form 8-K that Chimera
17  issued on — or filed, I should say, on July 27, 2012,
18  and that's the form that contains the license agreement
19  as an exhibit.  The form — the first page of the form
20  states that on July 26, 2012, Chimera Energy Corp.
21  entered into a license agreement with a nonrelated
22  entity, China Inland Oil Exploration Company of
23  Chencunzhen, China, related to certain technologies
24  developed by China Inland.
25          Is that statement true?

---

Page 16

1     A.  I assert my Fifth Amendment.
2     Q.  Did you authorize the issuance of the Form 8-K
3   dated July 27, 2012?
4     A.  I assert my Fifth Amendment.
5     Q.  The Form 8-K further states that pursuant to
6   the terms of the license, Chimera is granted an
7   exclusive license to develop and commercialize China
8   Inland's cutting edge technologies related to
9   nonhydraulic extraction.
10          Is that statement true?
11    A.  I assert my Fifth Amendment.
12    Q.  The license agreement attached to the July 27
13  Form 8-K is signed on behalf of China Inland by a person
14  by the name of Zeng Zong.  Have you ever met Zeng Zong?
15    A.  I assert my Fifth Amendment.
16    Q.  Have you ever spoken to Zeng Zong?
17    A.  I assert my Fifth Amendment.
18    Q.  Have you ever corresponded in writing with Zeng
19  Zong?
20    A.  I assert my Fifth Amendment.
21    Q.  Do you assert the Fifth Amendment privilege
22  with respect to all questions regarding Chimera's
23  nonhydraulic extraction technology?
24    A.  Yes.
25    Q.  Do you assert the Fifth Amendment privilege

---

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Charles Grob
July 9, 2015

---

Page 13

1  in the initial public offering?
2     A.  I assert my Fifth Amendment.
3     Q.  Did you give money to Ashton Stresau to invest
4  in the initial public offering?
5     A.  I assert my Fifth Amendment.
6     Q.  Did you give money to Paul Cox to invest in the
7  initial public offering?
8     A.  I assert my Fifth Amendment.
9     Q.  Did you give money to Mairi, spelled M-A-I-R-I,
10  Cox to invest in the initial public offering?
11     A.  I assert my Fifth Amendment.
12     Q.  Did you give money to Nicole Fertitta to invest
13  in the initial public offering?
14     A.  I assert my Fifth Amendment.
15     Q.  Did you tell the investors to whom you
16  attempted to sell Chimera stock in the initial public
17  offering that the investment in Chimera was risk-free
18  and that they would get their money back?
19     A.  I assert my Fifth Amendment.
20     Q.  Do you assert the Fifth Amendment privilege
21  with respect to all questions regarding your
22  participation in Chimera's initial public offering?
23     A.  Yes.
24     Q.  Did Andrew Farmer instruct you to work with
25  Pennaluna & Company to help it file a Form 211?

---

Page 14

1     A.  I assert my Fifth Amendment.
2     Q.  Did you provide full and accurate information
3  to Pennaluna & Company in connection with their Form 211
4  filing process?
5     A.  I assert my Fifth Amendment.
6     Q.  Did you make any false statements to
7  Pennaluna & Company or did you withhold any information
8  requested by Pennaluna & Company in connection with the
9  Form 211 filing process?
10     A.  I assert my Fifth Amendment.
11     Q.  Do you assert the Fifth Amendment privilege
12  with respect to all questions regarding the Form 211
13  filing process?
14     A.  Yes.
15     Q.  Was it your idea for Chimera to get into the
16  business of developing nonhydraulic fracturing
17  technology?
18     A.  I assert my Fifth Amendment.
19     Q.  Is there an entity called China Inland Oil
20  Exploration Company of Chencunzhen Guangdong Province,
21  China?
22     A.  I assert my Fifth Amendment.
23     Q.  Is the license agreement with China Inland Oil
24  Exploration Company that's attached to Chimera's
25  Form 8-K filed on July 27, 2012 a fictitious agreement?

---

Page 15

1     A.  I assert my Fifth Amendment.
2     Q.  Is nonhydraulic extraction a fictitious concept
3  developed for the purpose of pumping up Chimera's stock
4  price?
5     A.  I assert my Fifth Amendment.
6     Q.  Did you ever communicate verbally with anyone
7  at China Inland?
8     A.  I assert my Fifth Amendment.
9     Q.  Did you ever communicate by e-mail with anyone
10  at China Inland?
11     A.  I assert my Fifth Amendment.
12     Q.  Did you receive any drawings, sketches, models
13  or other technical documents from China Inland that
14  relate to nonhydraulic extraction technology?
15     A.  I assert my Fifth Amendment.
16     Q.  I'm going to refer to the Form 8-K that Chimera
17  issued on -- or filed, I should say, on July 27, 2012,
18  and that's the form that contains the license agreement
19  as an exhibit.  The form -- the first page of the form
20  states that on July 26, 2012, Chimera Energy Corp.
21  entered into a license agreement with a nonrelated
22  entity, China Inland Oil Exploration Company of
23  Chencunzhen, China, related to certain technologies
24  developed by China Inland.
25            Is that statement true?

---

Page 16

1     A.  I assert my Fifth Amendment.
2     Q.  Did you authorize the issuance of the Form 8-K
3  dated July 27, 2012?
4     A.  I assert my Fifth Amendment.
5     Q.  The Form 8-K further states that pursuant to
6  the terms of the license, Chimera is granted an
7  exclusive license to develop and commercialize China
8  Inland's cutting edge technologies related to
9  nonhydraulic extraction.
10            Is that statement true?
11     A.  I assert my Fifth Amendment.
12     Q.  The license agreement attached to the July 27
13  Form 8-K is signed on behalf of China Inland by a person
14  by the name of Zeng Zong.  Have you ever met Zeng Zong?
15     A.  I assert my Fifth Amendment.
16     Q.  Have you ever spoken to Zeng Zong?
17     A.  I assert my Fifth Amendment.
18     Q.  Have you ever corresponded in writing with Zeng
19  Zong?
20     A.  I assert my Fifth Amendment.
21     Q.  Do you assert the Fifth Amendment privilege
22  with respect to all questions regarding Chimera's
23  nonhydraulic extraction technology?
24     A.  Yes.
25     Q.  Do you assert the Fifth Amendment privilege

---

APP: 000041

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Charles Grob
July 9, 2015

Page 17

1  with regard to all questions regarding Chimera's license
2  agreement with China Inland?
3     A.  Yes.
4     Q.  Did Chimera have a Memorandum of Understanding
5  with Pemex?
6     A.  I assert my Fifth Amendment.
7     Q.  Did you know in August of 2012 that the
8  Memorandum of Understanding with Pemex is a forgery?
9     A.  I assert my Fifth Amendment.
10       MR. VYDASHENKO: Do you have Exhibit 33?
11       THE REPORTER: No.  That's going to be
12  prior.
13       MR. GREEN: What are y'all looking for?
14       MR. GULDE: I think we just found it.
15    Q.  (BY MR. VYDASHENKO) Mr. Grob, I have handed you
16  a document that previously has been marked as
17  Exhibit 33, and this is the Memorandum of Understanding
18  that I've been referring to.  So I'll just repeat my
19  questions just so the record is clear about the
20  document.
21       Did Chimera have a Memorandum of
22  Understanding with Pemex?
23    A.  I assert my Fifth Amendment.
24    Q.  Did you know that the Memorandum of
25  Understanding that's on the second and third pages of

Page 18

1  Exhibit 33 was a forgery as of -- and did you know that
2  as of August 2012?
3     A.  I assert my Fifth Amendment.
4        (Exhibit 81 marked)
5        MR. VYDASHENKO: I've marked as Exhibit 81
6  a two-page document.  The first page is an e-mail -- the
7  first page contains two e-mails, the first being from
8  Baldemar Rios to Thomas Massey dated August 22nd, 2012;
9  the second being from Thomas Massey to Charles Grob,
10  also on August 22nd, 2012.  The second page of
11  Exhibit 81 is a -- what purports to be a letter from
12  Pemex to Chimera Energy Corp. dated August 6, 2012.  And
13  I am handing Exhibit 81 to Mr. Grob.
14    Q.  (BY MR. VYDASHENKO) Mr. Grob, directing your
15  attention to the second page of Exhibit 81, is -- is the
16  August 6 letter on the second page of Exhibit 81
17  genuine?
18    A.  I assert my Fifth Amendment.
19    Q.  As of August 2012, did you know that the
20  August 6 letter on the second page of Exhibit 81 was a
21  forgery?
22    A.  I assert my Fifth Amendment.
23    Q.  Mr. Grob, I have handed you a document that
24  previously has been marked as Exhibit 39, and I'll
25  direct your attention to the second page of Exhibit 39,

Page 19

1  which purports to be a letter from Pemex dated
2  September 14, 2012 to Chimera Energy.
3        Is the September 14 letter on the second
4  page of Exhibit 39 genuine?
5     A.  I assert my Fifth Amendment.
6     Q.  Did you know as of September 2012 that the
7  September 14 letter was a forgery?
8     A.  I assert my Fifth Amendment.
9     Q.  Mr. Grob, I have handed you a document that
10  previously has been marked as Exhibit 41 and I'll direct
11  you to the second page of that exhibit, which appears to
12  be a communication dated September 21, 2012 from
13  Dr. Fernando Sebastian Flores Avila.
14        Is the communication from Dr. Avila
15  genuine?
16    A.  I assert my Fifth Amendment.
17    Q.  Did you know as of September 2012 that the
18  communication from Dr. Avila was a forgery?
19    A.  I assert my Fifth Amendment.
20    Q.  As of August 2012, did you understand -- let me
21  restart.
22        As of August 2012, did you know that the
23  first time Chimera met with any Pemex employee or
24  representative was on October 1, 2012?
25    A.  I assert my Fifth Amendment.

Page 20

1     Q.  Immediately after the October 1, 2012 meeting
2  with Pemex, did you know that that meeting resulted in
3  Pemex declining to use nonhydraulic extraction
4  technology on its wells?
5     A.  I assert my Fifth Amendment.
6     Q.  At the October 1st, 2012 meeting with Pemex,
7  did Dr. Flores Avila ask you to provide him additional
8  data?
9     A.  I assert my Fifth Amendment.
10    Q.  At the October 1st, 2012 meeting with Pemex,
11  did Dr. Flores Avila ask you about a -- an article in
12  the Journal of Petroleum Technology reporting on
13  Chimera's business relationship with Pemex?
14    A.  I assert my Fifth Amendment.
15    Q.  At the October 1st, 2012 meeting with Pemex,
16  did you respond to Dr. Flores Avila by telling him that
17  the statements in the Journal of Petroleum Technology
18  article about Chimera's business relationship with Pemex
19  were a result of a misunderstanding between Chimera and
20  the Journal of Petroleum Technology?
21    A.  I assert my Fifth Amendment.
22    Q.  Did Pemex ever identify wells for Chimera on
23  which it could use nonhydraulic extraction technology?
24    A.  I assert my Fifth Amendment.
25    Q.  Do you assert the Fifth Amendment privilege

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Charles Grob
July 9, 2015

Page 21

1   with respect to all questions relating to Pemex?
2   A.  Yes.
3   Q.  Did Chimera ever secure a supply of helium from
4   Air Liquide?
5   A.  I assert my Fifth Amendment.
6   Q.  Do you assert the Fifth Amendment privilege
7   with respect to all questions regarding Air Liquide?
8   A.  Yes.
9   Q.  Did you order a part from America West Drilling
10  Supply based on an instruction from Tom Massey?
11  A.  I assert my Fifth Amendment.
12  Q.  Did you know -- at the time you ordered the
13  part from America West Drilling Supply, did you know how
14  that part would be used in implementing nonhydraulic
15  extraction technology?
16  A.  I assert my Fifth Amendment.
17  Q.  Do you assert the Fifth Amendment privilege
18  with respect to all questions relating to America West?
19  A.  Yes.
20  Q.  If Tom Massey told you to do something as CEO
21  of Chimera, would you do it?
22  A.  I assert my Fifth Amendment.
23  Q.  Do you assert the Fifth Amendment privilege
24  with respect to all questions regarding your
25  interactions with Tom Massey?

Page 22

1   A.  Yes.
2   Q.  On July 30, 2012, Chimera issued a press
3   release that was titled "CHMR Unveils Breakthrough Shale
4   Oil Extraction Method To Safely And Effectively Replace
5   Hydraulic Fracturing."
6           Did you authorize the issuance of this
7   press release?
8   A.  I assert my Fifth Amendment.
9   Q.  Did you have a basis to make the statements
10  that are made -- that are contained in the July 30, 2012
11  press release?
12  A.  I assert my Fifth Amendment.
13  Q.  Are the statements in the July 30, 2012 press
14  release accurate and truthful?
15  A.  I assert my Fifth Amendment.
16  Q.  On August 1st, 2012, Chimera issued a press
17  release titled "Drought May Enable CHMR's Proprietary
18  Nonhydraulic Shale Oil Extraction To Quickly Replace
19  Hydraulic Fracturing," end quote.
20          Did you authorize the issuance of the   .
21  August 1st, 2012 press release?
22  A.  I assert my Fifth Amendment.
23  Q.  Did you have a basis to make the statements
24  that are contained in the press release?
25  A.  I assert my Fifth Amendment.

Page 23

1   Q.  Are the statements contained in the August 1st,
2   2012 press release truthful?
3   A.  I assert my Fifth Amendment.
4   Q.  On August 2nd, 2012, Chimera issued a press
5   release titled "CHMR Patenting Nonhydraulic Shale Oil
6   Extraction System That Is Designed To Safely Replace
7   Hydraulic Fracturing," end quote.
8           Did you authorize the issuance of the
9   August 2nd press release?
10  A.  I assert my Fifth Amendment.
11  Q.  Did you have a basis to make the statements
12  contained in the August 2nd press release?
13  A.  I assert my Fifth Amendment.
14  Q.  Are all the statements in the August 2nd press
15  release true?
16  A.  I assert my Fifth Amendment.
17  Q.  On August 6th, 2012, Chimera issued a press
18  release titled CHMR -- titled, quote, "CHMR Discloses
19  First Purchase Order On New Shale Oil Extraction System
20  Designed To Safely Replace Hydraulic Fracturing," end
21  quote.
22          Did you authorize the issuance of the
23  August 6th press release?
24  A.  I assert my Fifth Amendment.
25  Q.  Did you have a basis to make the statements

Page 24

1   contained in the August 6th press release?
2   A.  I assert my Fifth Amendment.
3   Q.  Are the statements in the August 6th press
4   release true?
5   A.  I assert my Fifth Amendment.
6   Q.  On August 8th, 2012, Chimera issued a press
7   release titled, quote, "CHMR To Prevent New System
8   Designed To Safely Replace Hydraulic Fracturing At NAPE
9   Expo 2013," end quote.
10          Did you authorize the issuance of the
11  August 8th press release?
12  A.  I assert my Fifth Amendment.
13  Q.  Did you have a basis to make the statements
14  contained in the August 8th press release?
15  A.  I assert my Fifth Amendment.
16  Q.  Are the statements in the August 8th press
17  release true?
18  A.  I assert my Fifth Amendment.
19  Q.  On August 9th, 2012, Chimera issued a press
20  release titled, quote, "Pemex Signs Deal With CHMR For
21  New Nonhydraulic Shale Oil Extraction System Designed To
22  Safely Replace Hydraulic Fracturing," end quote.
23  A.  I assert my Fifth Amendment.
24  Q.  Did you authorize the issuance of the
25  August 9th press release?

APP. 000043

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Charles Grob
July 9, 2015

Page 25

1    A.  I assert my Fifth Amendment.
2    Q.  Did you have a basis to make the statements
3    contained in the August 9th press release?
4    A.  I assert my Fifth Amendment.
5    Q.  Are the statements in the August 9th press
6    release true?
7    A.  I assert my Fifth Amendment.
8    Q.  On August 10th, 2012, Chimera issued a press
9    release titled, quote, "Pemex And CHMR Collaboration On
10   New Nonhydraulic Shale Oil Extraction System Begins
11   Monday in Mexico City," end quote.
12       Did you authorize the issuance of the
13   August 10th press release?
14   A.  I assert my Fifth Amendment.
15   Q.  Did you have a basis to make the statements
16   contained in the August 10th press release?
17   A.  I assert my Fifth Amendment.
18   Q.  Are the statements in the August 10th press
19   release true?
20   A.  I assert my Fifth Amendment.
21   Q.  On August 13th, 2012, Chimera issued a press
22   release titled "New Deal Would Utilize CHMR's
23   Nonhydraulic Shale Oil Extraction System At Pemex
24   Location."
25   A.  I assert my Fifth Amendment.

Page 26

1    Q.  Did you authorize the issuance of the
2    August 13th press release?
3    A.  I assert my Fifth Amendment.
4    Q.  Did you have a basis to make the statements
5    contained in the August 13th press release?
6    A.  I assert my Fifth Amendment.
7    Q.  Are the statements contained in the August 13th
8    press release true?
9    A.  I assert my Fifth Amendment.
10   Q.  On August 14, 2012, Chimera issued a press
11   release titled "Weiss S.A. Steps Onboard To Integrate
12   CHMR's Nonhydraulic Shale Oil Extraction System."
13       Did you authorize the issuance of the
14   August 14th press release?
15   A.  I assert my Fifth Amendment.
16   Q.  Did you have a basis to make the statements
17   contained in the August 14th press release?
18   A.  I assert my Fifth Amendment.
19   Q.  Are the statements in the August 14th press
20   release true?
21   A.  I assert my Fifth Amendment.
22   Q.  On August 15th, 2012, Chimera issued a press
23   release titled "Pemex Green Light CHMR's New
24   Nonhydraulic Shale Oil Extraction System At Chicontepec
25   Formation Wells."

Page 27

1        Did you authorize the issuance of the
2    August 15th press release?
3    A.  I assert my Fifth Amendment.
4    Q.  Did you have a basis to make the statements
5    contained in the August 15th press release?
6    A.  I assert my Fifth Amendment.
7    Q.  Are the statements in the August 15th press
8    release true?
9    A.  I assert my Fifth Amendment.
10   Q.  On August 15th, 2012, Chimera issued another
11   press release titled "CHMR:  Government Commissioner
12   Advocates New Nonhydraulic Extraction System Designed To
13   Safely Replace Hydraulic Fracturing."
14   A.  I assert my Fifth Amendment.
15   Q.  Did you authorize the issuance of the second
16   August 15th press release?
17   A.  I assert my Fifth Amendment.
18   Q.  Did you have a basis to make the statements
19   contained in the second August 15th press release?
20   A.  I assert my Fifth Amendment.
21   Q.  Are the statements in the second August 15th
22   press release true?
23   A.  I assert my Fifth Amendment.
24   Q.  On August 20, 2012, Chimera issued a press
25   release titled "Chimera Energy Corp. President Comments

Page 28

1    On Recent Developments."
2        Did you authorize the issuance of the
3    August 20th press release?
4    A.  I assert my Fifth Amendment.
5    Q.  Did you have a basis to make the statements
6    contained in the August 20th press release?
7    A.  I assert my Fifth Amendment.
8    Q.  Are the statements in the August 20th press
9    release true?
10   A.  I assert my Fifth Amendment.
11   Q.  On August 22, 2012, Chimera issued a press
12   release titled "Chemical Engineer Announces Details Of
13   Chimera Energy Corp.'s Revolutionary Nonhydraulic Shale
14   Oil Extraction."
15       Did you authorize the issuance of the
16   August 22nd press release?
17   A.  I assert my Fifth Amendment.
18   Q.  Did you have a basis to make the statements
19   contained in the August 22nd press release?
20   A.  I assert my Fifth Amendment.
21   Q.  Are the statements in the August 22nd press
22   release true?
23   A.  I assert my Fifth Amendment.
24   Q.  On August 24th, 2012, Chimera issued a press
25   release titled "Pemex Executes Go Ahead for Three Wells

APP. 000044

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Charles Grob
July 9, 2015

Page 29

1 to use CHMR System Designed to Safely Replace Hydraulic
2 Fracturing."
3          Did you authorize the issuance of the
4 August 24th press release?
5    A.  I assert my Fifth Amendment.
6    Q.  Did you have a basis to make the statements
7 contained in the August 24th press release?
8    A.  I assert my Fifth Amendment.
9    Q.  Are the statements in the August 24th press
10 release true?
11    A.  I assert my Fifth Amendment.
12    Q.  On August 27, 2012, Chimera issued a press
13 release titled "Chimera Energy Corp. Begins Shipping
14 Equipment To Mexico For Nonhydraulic Shale Oil
15 Extraction On Pemex Wells."
16          MR. GREEN: Can we go off the record for a
17 second?
18          MR. VYDASHENKO: Let me just -- can I just
19 finish?
20          MR. GREEN: I'm sorry.
21    Q.  (BY MR. VYDASHENKO) Did you authorize the
22 issuance of the August 27th press release?
23    A.  I assert my Fifth Amendment.
24    Q.  Did you have a basis to make the statements
25 contained in the August 27th press release?

Page 30

1    A.  I assert my Fifth Amendment.
2    Q.  Are the statements in the August 27th press
3 release true?
4    A.  I assert my Fifth Amendment.
5          MR. VYDASHENKO: Let's go off the record.
6          (Recess taken from 9:53 to 10:02.)
7    Q.  (BY MR. VYDASHENKO) Mr. Grob, on August 30,
8 2012, Chimera issued a press release titled "CHMR:
9 Press Reports Mexico Friendly To Nonhydraulic Extraction
10 While U.S. Hydrocarbon Industry Ties To Research As
11 Questioned."
12          Did you authorize the issuance of the
13 August 30th press release?
14    A.  I assert my Fifth Amendment.
15    Q.  Did you have a basis to make the statements
16 contained in the August 30th press release?
17    A.  I assert my Fifth Amendment.
18    Q.  Are the statements in the August 30th press
19 release true?
20    A.  I assert my Fifth Amendment.
21    Q.  On August 31, 2012, Chimera issued a press
22 release titled "New Influential Anti-Hydraulic Fracking
23 Movement Could Be Big Boost For CHMR's New Nonhydraulic
24 Extraction."
25          Did you authorize the issuance of the

Page 31

1 August 31 press release?
2    A.  I assert my Fifth Amendment.
3    Q.  Did you have a basis to make the statements
4 contained in the August 31 press release?
5    A.  I assert my Fifth Amendment.
6    Q.  Are the statements in the August 31 press
7 release true?
8    A.  I assert my Fifth Amendment.
9    Q.  On September 5th, 2012, Chimera issued a press
10 release titled "Chimera Energy Corp. To Request
11 Consideration For Nonhydraulic Extraction To Be Secluded
12 From Francis Shellband."
13          Did you authorize the issuance of the
14 September 5th press release?
15    A.  I assert my Fifth Amendment.
16    Q.  Is the -- did you have a basis to make the
17 statements contained in the September 5th press release?
18    A.  I assert my Fifth Amendment.
19    Q.  Are the statements in the September 5th press
20 release true?
21    A.  I assert my Fifth Amendment.
22    Q.  On September 6th, 2012, Chimera issued a press
23 release titled "Hydraulic Fracking Continues To Face
24 Controversy As CHMR Proceeds With System Designed As
25 Safer Alternative."

Page 32

1          Did you authorize the issuance of the
2 September 6th press release?
3    A.  I assert my Fifth Amendment.
4    Q.  Are the statements contained in the
5 September 6th press release true?
6    A.  I assert my Fifth Amendment.
7    Q.  Did you have a basis to make the statements
8 contained in the September 6th press release?
9    A.  I assert my Fifth Amendment.
10    Q.  On September 10th, 2012, Chimera issued a press
11 release titled "Pemex Officials Deliver Logging Reports
12 On Target Wells To Chimera Energy Corp. For Use Of
13 Nonhydraulic Extraction."
14          Did you authorize the issuance of the
15 September 10th press release?
16    A.  I assert my Fifth Amendment.
17    Q.  Did you have a basis to make the statements
18 contained in the September 10th press release?
19    A.  I assert my Fifth Amendment.
20    Q.  Are the statements in the September 10th press
21 release true?
22    A.  I assert my Fifth Amendment.
23    Q.  On September 11th, 2012, Chimera issued a
24 statement titled -- excuse me -- Chimera issued a press
25 release titled "Chimera Energy Corp. Sets 90-Day

APP: 000043

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Charles Grob
July 9, 2015

Page 33

1  Schedule For Nonhydraulic Extraction Deployment In
2  Chicontepec Basin."
3         Did you authorize the issuance of the
4  September 11 press release?
5    A.  I assert my Fifth Amendment.
6    Q.  Did you have a basis to make the statements
7  contained in the September 11th press release?
8    A.  I assert my Fifth Amendment.
9    Q.  Are the statements contained in the
10 September 11th press release true?
11   A.  I assert my Fifth Amendment.
12   Q.  On September 13th, 2012, Chimera issued a press
13 release titled "Chimera Energy Corp. Sets Up
14 Nonhydraulic Extraction System Assembly in Poza Rica at
15 Chicontepec Basin."
16        Did you authorize the issuance of the
17 September 13th press release?
18   A.  I assert my Fifth Amendment.
19   Q.  Did you have a basis to make the statements
20 contained in the September 13th press release?
21   A.  I assert my Fifth Amendment.
22   Q.  Are the statements contained in the
23 September 13th press release true?
24   A.  I assert my Fifth Amendment.
25   Q.  On September 17th, 2012, Chimera issued a

Page 34

1  statement entitled "Hydraulic Fracking Faces New
2  Political Opposition in the U.S. As Mexico Embraces
3  CHMR's Waterless Alternative."
4         Did you authorize the issuance of the
5  September 17th press release?
6    A.  I assert my Fifth Amendment.
7    Q.  Did you have a basis to make the statements
8  contained in the September 17th press release?
9    A.  I assert my Fifth Amendment.
10   Q.  Are the statements contained in the
11 September 17th press release true?
12   A.  I assert my Fifth Amendment.
13   Q.  On September 19th, Chimera issued a press
14 release titled "CHMR's Nonhydraulic Extraction Does Not
15 Utilize Radioactive Equipment Like Halliburton Recently
16 Lost."
17        Did you authorize the issuance of the
18 September 19th press release?
19   A.  I assert my Fifth Amendment.
20   Q.  Did you have a basis to make the statements
21 contained in the September 19th press release?
22   A.  I assert my Fifth Amendment.
23   Q.  Are the statements contained in the
24 September 19th press release true?
25   A.  I assert my Fifth Amendment.

Page 35

1    Q.  On September 20th, 2012, Chimera issued a
2  statement -- a press release titled "Pemex Schedules
3  Chimera Energy Corp. On-Site Verification of Chicontepec
4  Wells For End Of Month."
5         Did you authorize the issuance of the
6  September 20th press release?
7    A.  I assert my Fifth Amendment.
8    Q.  Did you have a basis to make the statements
9  contained in the September 20th press release?
10   A.  I assert my Fifth Amendment.
11   Q.  Are the statements contained in the
12 September 20th press release true?
13   A.  I assert my Fifth Amendment.
14   Q.  On September 21st, 2012, Chimera issued a press
15 release titled "Chimera Energy Corp. Selects Air Liquide
16 As Supplier For Upcoming Nonhydraulic Extraction
17 Project."
18        Did you authorize the issuance of the
19 September 21st press release?
20   A.  I assert my Fifth Amendment.
21   Q.  Did you have a basis to make the statements
22 contained in the September 21st press release?
23   A.  I assert my Fifth Amendment.
24   Q.  Are the statements contained in the
25 September 21st press release true?

Page 36

1    A.  I assert my Fifth Amendment.
2    Q.  On September 24th, 2012, Chimera issued a press
3  release titled Chimera Energy Corp. Secures 2.5 million
4  Line Of Credit To Implement New Nonhydraulic Shale
5  Extraction Projects.
6         Did you authorize the issuance of the
7  September 24th press release?
8    A.  I assert my Fifth Amendment.
9    Q.  Did you have a basis to make the statements
10 contained in the September 24th press release?
11   A.  I assert my Fifth Amendment.
12   Q.  Are the statements in the September 24th press
13 release true?
14   A.  I assert my Fifth Amendment.
15   Q.  Did Chimera ever obtain a $2.5 million line of
16 credit?
17   A.  I assert my Fifth Amendment.
18   Q.  On September 24th, 2012, Chimera issued a press
19 release titled "Chimera Energy Corp. Distributes Pemex
20 Unsigned On-Site Schedule Regarding Nonhydraulic
21 Extraction."
22        Did you authorize the issuance of the
23 September 24th press release?
24   A.  I assert my Fifth Amendment.
25   Q.  Did you have a basis to make the statements

APP: 000046

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Charles Grob
July 9, 2015

Page 37

1    contained in the September 24th press release?
2        A.  I assert my Fifth Amendment.
3        Q.  Are the statements in the September 24th press
4    release true?
5        A.  I assert my Fifth Amendment.
6        Q.  Also, on September 24th, 2012, Chimera issued a
7    second press release titled "Chimera Energy Corp.
8    Distributes Pemex Signed Well Identification Letter For
9    Nonhydraulic Extraction."
10            Did you authorize the issuance of the
11   September 24th -- second September 24th press release?
12       A.  I assert my Fifth Amendment.
13       Q.  Did you have the basis to make the statements
14   contained in the second September 24th press release?
15       A.  I assert my Fifth Amendment.
16       Q.  Are the statements contained in the second
17   September 24th press release true?
18       A.  I assert my Fifth Amendment.
19       Q.  On September 25th, Chimera issued a press
20   release titled "Chimera Energy Corp. Representatives
21   Traveling To Chicontepec Basin For Pemex On-Site Well
22   Verification."
23            Did you authorize the issuance of the
24   September 25th press release?
25       A.  I assert my Fifth Amendment.

Page 38

1        Q.  Did you have a basis to make the statements
2    contained in the September 25th press release?
3        A.  I assert my Fifth Amendment.
4        Q.  Are the statements in the September 25th press
5    release true?
6        A.  I assert my Fifth Amendment.
7        Q.  On September 26th Chimera issued a press
8    release titled "Coordination Technology Management
9    Initiates Formal Request Regarding CHMR's Nonhydraulic
10   Extraction.
11            Did you authorize the issuance of the
12   September 26th press release?
13       A.  I assert my Fifth Amendment.
14       Q.  Did you have a basis to make the statements
15   contained in the September 26th press release?
16       A.  I assert my Fifth Amendment.
17       Q.  Are the statements in the September 26th press
18   release true?
19       A.  I assert my Fifth Amendment.
20       Q.  On October 9th, 2012, Chimera issued a press
21   release titled "Chimera Energy Corp. Appoints New CEO."
22            Did you authorize the issuance of the
23   September -- excuse me -- October 9th press release?
24       A.  I assert my Fifth Amendment.
25       Q.  Did you have a basis to make the statements

Page 39

1    contained in the October 9th press release?
2        A.  I assert my Fifth Amendment.
3        Q.  Are the statements contained in the October 9th
4    press release true?
5        A.  I assert my Fifth Amendment.
6        Q.  On August 10th, 2012, Chimera filed a Form 8-K
7    with the SEC to which it attached as an exhibit a press
8    release dated August 9, 2012 titled "Pemex Signs Deal
9    With CHMR For New Nonhydraulic Shale Oil Extraction
10   System Designed To Safely Replace Hydraulic Fracturing."
11            Did you authorize Chimera to file the
12   August 9th Form 8-K?
13       A.  I assert my Fifth Amendment.
14       Q.  Did you have a basis to make the statements
15   contained in the August 9th Form 8-K and exhibit
16   thereto?
17       A.  I assert my Fifth Amendment.
18       Q.  Are the statements in the August 9th Form 8-K
19   and press release attached thereto true?
20       A.  I assert my Fifth Amendment.
21       Q.  On August 28, 2012, Chimera filed with the SEC
22   a Form 8-K, which contained a letter to shareholders as
23   an exhibit and the letter is signed by you,
24   Charles Grob.
25       A.  I assert my Fifth Amendment.

Page 40

1        Q.  Did you authorize the filing of the August 28th
2    Form 8-K?
3        A.  I assert my Fifth Amendment.
4        Q.  Did you have a basis to make the statements
5    contained in the August 9th Form 8-K and the exhibit
6    thereto, which is the shareholder letter?
7        A.  I assert my Fifth Amendment.
8        Q.  Are the statements in the August 28 8-K and the
9    attached shareholder letter true?
10       A.  I assert my Fifth Amendment.
11       Q.  We might have gone over a couple of these
12   filings, but I'll just go through them again quickly.
13            On -- on October 19, 2011, Chimera filed
14   with the SEC a registration statement on Form S-1. Did
15   you authorize the filing of the registration statement
16   on Form S-1 dated October 19, 2011?
17       A.  I assert my Fifth Amendment.
18       Q.  Did you have a basis to make the statements
19   contained in the October 19 Form S-1?
20       A.  I assert my Fifth Amendment.
21       Q.  Are all the statements in the October 19
22   Form S-1 true?
23       A.  I assert my Fifth Amendment.
24       Q.  On November 22nd, 2011, Chimera filed with the
25   SEC an amended registration statement on Form S-1/A

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Charles Grob
July 9, 2015

Page 41

1  (Amendment No. 1).  Did you authorize the filing with
2  the SEC of the amended Form S-1/A on November 22nd,
3  2011?
4    A.  I assert my Fifth Amendment.
5    Q.  Did you have a basis to make the statements
6  contained in the November 22nd, 2011 Form S-1/A?
7    A.  I assert my Fifth Amendment.
8    Q.  Are all the statements in the November 22nd
9  Form S-1/A true?
10    A.  I assert my Fifth Amendment.
11    Q.  On December 5th, 2011, Chimera filed with the
12  SEC a registration statement on Form S-1/A (Amendment
13  No. 2).  Did you authorize the filing of the second
14  amended registration statement on Form S-1/A on -- on
15  December 5, 2011?
16    A.  I assert my Fifth Amendment.
17    Q.  Did you have a basis to make the statements
18  contained in the December 5th Form S-1/A?
19    A.  I assert my Fifth Amendment.
20    Q.  Are the statements contained in the
21  December 5th -- are all the statements contained in the
22  December 5th Form S-1/A true?
23    A.  I assert my Fifth Amendment.
24    Q.  On December 21st, 2011, Chimera filed with the
25  SEC a prospectus on Form 424B3.  Did you authorize the

Page 42

1  filing of the December 21st prospectus?
2    A.  I assert my Fifth Amendment.
3    Q.  Did you have a basis to make the statements
4  contained in the December 21st prospectus?
5    A.  I assert my Fifth Amendment.
6    Q.  Are all the statements contained in the
7  December 21st prospectus true?
8    A.  I assert my Fifth Amendment.
9    Q.  Who drafted Chimera's press releases?
10    A.  I assert my Fifth Amendment.
11    Q.  Do you assert your Fifth Amendment privilege
12  with respect to all questions relating to Chimera's
13  press releases?
14    A.  Yes.
15    Q.  Did you -- sorry.  I'll start over.
16        On January 13, 2012, Chimera filed a --
17  with the SEC -- a Form 10-Q for the quarter ending
18  November 30th, 2011.  Did you authorize the filing of
19  the January 13th 10-Q?
20    A.  I assert my Fifth Amendment.
21    Q.  Did you have a basis to make the statements
22  contained in the January 13th Form 10-Q?
23    A.  I assert my Fifth Amendment.
24    Q.  Are all the statements in the January 13th
25  Form 10-Q true?

Page 43

1    A.  I assert my Fifth Amendment.
2    Q.  Same questions for the Form 10-Q/A filed --
3  that Chimera filed on March 13, 2012.  Did you authorize
4  the filing of the 10-Q/A dated March 13, 2012?
5    A.  I assert my Fifth Amendment.
6    Q.  Did you have a basis to make the statements
7  contained in the March 13th 10-Q/A?
8    A.  I assert my Fifth Amendment.
9    Q.  Are the statements -- are all the statements in
10  the March 13th 10-Q/A true?
11    A.  I assert my Fifth Amendment.
12    Q.  Chimera filed a Form 10-Q/A on March 28th,
13  2012.  Did you authorize -- with the SEC.  Did you
14  authorize the filing of the March 28th Form 10-Q/A?
15    A.  I assert my Fifth Amendment.
16    Q.  Did you have a basis to make the statements
17  contained in the March 28th Form 10-Q/A?
18    A.  I assert my Fifth Amendment.
19    Q.  Are all the statements in the March 28th
20  Form 10-Q/A true?
21    A.  I assert my Fifth Amendment.
22    Q.  Chimera filed a Form 10-Q on April 13th -- with
23  the SEC -- on April 13th, 2012, and this was for the
24  quarter ended February 29, 2012.  Did you authorize the
25  filing of the April 13th Form 10-Q?

Page 44

1    A.  I assert my Fifth Amendment.
2    Q.  Did you have a basis to make the statements
3  contained in the April 13th Form 10-Q?
4    A.  I assert the Fifth Amendment.
5    Q.  Are the statements -- are all the statements in
6  the April 13th Form 10-Q true?
7    A.  I assert the Fifth Amendment.
8    Q.  On July 16, 2012, Chimera filed a Form 10-Q for
9  the quarter ended May 31st, 2012, and that was filed
10  with the SEC.  Did you authorize the filing of the
11  July 16th Form 10-Q?
12    A.  I assert the Fifth Amendment.
13    Q.  Did you have a basis to make the statements
14  contained in the July 26th Form 10-Q?
15    A.  I assert the Fifth Amendment.
16    Q.  Are all the statements in the July 26th --
17  excuse me -- in the July 16th 10-Q true?
18    A.  I assert the Fifth Amendment.
19    Q.  Now, we had discussed the April 13th, 2012
20  Form 10-Q.  That form disclosed that Chimera would pay
21  you a salary of $2,500 per month beginning on March 1st,
22  2012.  Was that statement true when it was made?
23    A.  I assert the Fifth Amendment.
24    Q.  Were you, in fact, paid by Chimera a salary of
25  $2,500 per month beginning on March 1st, 2012?

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600
APP. 000048

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Charles Grob
July 9, 2015

**Page 49**

1   Exhibit 47, before it was sent to FINRA?
2     A.  I assert the Fifth Amendment.
3     Q.  Did you have any input into the substance of
4   the October 15th letter?
5     A.  I assert the Fifth Amendment.
6     Q.  Do you assert the privilege as to all questions
7   relating to FINRA's investigation of Chimera?
8     A.  I assert the Fifth Amendment.
9     Q.  Do you assert the Fifth Amendment privilege
10  with respect to all questions regarding who had control
11  of Chimera?
12    A.  I assert the Fifth Amendment.  Yes.  Yes.
13        MR. VYDASHENKO: Let's go off the record.
14        (Recess taken from 10:33 to 10:36.)
15    Q.  (BY MR. VYDASHENKO) Was Andrew Farmer the
16  source of the funds that you provided to IPO investors
17  so that the IPO investors could purchase stock in
18  Chimera?
19    A.  I assert the Fifth Amendment.
20    Q.  Did you assist any of the IPO investors in
21  selling their shares?
22    A.  I assert the Fifth Amendment.
23    Q.  Did you assist Andrew Farmer in purchasing
24  shares from Chimera's IPO investors?
25    A.  I assert the Fifth Amendment.

**Page 50**

1     Q.  Did Andrew Farmer, either directly or
2   indirectly, pay your attorneys' fees during the SEC's
3   investigation of this matter?
4     A.  I assert the Fifth Amendment.
5     Q.  Did Andrew Farmer, either directly or
6   indirectly, pay your attorneys' fees during this
7   litigation?
8     A.  I assert the Fifth Amendment.
9     Q.  Did Andrew Farmer ever direct you in the manner
10  in which you should respond to the SEC's investigation?
11    A.  I assert the Fifth Amendment.
12        MR. VYDASHENKO: We've concluded our
13  questioning at this point.
14        I don't know, John, if you want to --
15        MR. GREEN: I have no questions.
16        MR. VYDASHENKO: Okay.  Anyone else?
17        MS. EL-QUESNY: No questions.
18        MR. GREEN: Richard?
19        MR. MORENO: No questions.
20        MR. GREEN: Thank you.  I'll talk to you
21  when I get back in town, okay?
22        MR. MORENO: Okay.  Have a good trip.
23        MR. VYDASHENKO: We'll close the record
24  unless you guys want to say anything else.
25        MR. GREEN: No.

**Page 51**

1             THE REPORTER:  Any other stipulations
2   before we close the record?
3             MR. VYDASHENKO:  No.
4             THE REPORTER:  Okay.  We're off the record
5   at 10:37.
6             (At 10:37 A.M., the deposition proceedings
7             concluded.)
8
9
10
11
12
13   _____
14             CHARLES GROB
15
16
17
18
19
20
21
22
23
24
25

**Page 52**

1   COUNTY OF HARRIS      )
2   STATE OF TEXAS        )
3        I hereby certify that the witness in the foregoing
4   deposition, CHARLES GROB, was by me duly sworn to
5   testify to the truth, the whole truth and nothing but
6   the truth, in the within-entitled cause; that said
7   deposition was taken at the time and place herein named;
8   and that the deposition is a true record of the
9   witness's testimony as reported by me, a duly certified
10  shorthand reporter and a disinterested person, and was
11  thereafter transcribed into typewriting by computer.
12       I further certify that I am not interested in the
13  outcome of the said action, nor connected with nor
14  related to any of the parties in said action, nor to
15  their respective counsel.
16       IN WITNESS WHEREOF, I have hereunto set my hand this
17  17th day of July, 2015.
18  Reading and Signing was:
19  ___ requested  _X_ waived  ___ not requested
20
21
22
23       Kelly Hanna, CSR, RMR, CRR, CMRS
24           Texas CSR 1624
25           Expiration:  12/31/2015

APP: 000049

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

---

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF TEXAS
 3                    HOUSTON DIVISION
 4
 5      - - - - - - - - - - - - - - -
 6   SECURITIES AND EXCHANGE      )
 7   COMMISSION,                  )
 8            Plaintiff           )
 9   vs.                          ) CASE NO. 4:14-CV-02345
10   ANDREW I. FARMER, CHARLES E. )
11   GROB, JR., CAROLYN AUSTIN,   )
12   BALDEMAR P. RIOS, and CHIMERA)
13   ENERGY CORP.,                )
14            Defendants          )
15      - - - - - - - - - - - - - - -
16
17            DEPOSITION OF DAVID LOEV
18            WEDNESDAY, JULY 8, 2015
19
20
21      BEHMKE REPORTING AND VIDEO SERVICES, INC.
         BY:  KELLY HANNA, CSR NO. 1654
              160 SPEAR STREET, SUITE 300
              SAN FRANCISCO, CALIFORNIA 94105
                            (415) 597-5600
```

---

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8        Deposition of DAVID LOEV, taken on behalf of
 9   Plaintiff, at U.S. Attorney General's Offices, 1000
10   Louisiana, Suite 2300, Houston, Texas, commencing at
11   9:23 a.m. Wednesday, July 8, 2015, before Kelly Hanna,
12   Certified Shorthand Reporter No. 1654, pursuant to
13   Notice of Deposition.
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1  APPEARANCES OF COUNSEL
 2  FOR PLAINTIFF:
 3      U.S. SECURITIES AND EXCHANGE COMMISSION
 4      BY:  MATTHEW J. GULDE, ATTORNEY AT LAW
 5           NIKOLAY VYDASHENKO, ATTORNEY AT LAW
 6      801 Cherry Street, Suite 1900
 7      Fort Worth, Texas 76102
 8      Telephone: (817) 978-1410
 9      E-mail: guldem@sec.gov
10           vydashenkon@sec.gov
11
12  FOR DEFENDANT, BALDEMAR P. RIOS:
13      (APPEARING TELEPHONICALLY)
14      RICHARD D. MORENO, LLC
15      BY:  MR. RICHARD D. MORENO
16      125 West School Street
17      Lake Charles, Louisiana 70605
18      Telephone: (337) 656-8654
19      E-mail: richard@rdmorenolaw.com
20
21
22
23
24
25
```

---

Page 4

```
 1  APPEARANCES OF COUNSEL - CONTINUED
 2  FOR DEFENDANT, CAROLYN AUSTIN:
 3      FELDESMAN TUCKER LEIFER FIDELL, LLP
 4      BY: DUHA EL-QUESNY, ATTORNEY AT LAW
 5      1129 20th Street, NW, 4th Floor
 6      Washington, D.C.  20036
 7      Telephone:  (202) 466-8960
 8      E-mail:  delquesny@ftlf.com
 9
10  FOR DEFENDANT, CHARLES E. GROB, JR.:
11      AAA LEGAL SERVICES, INC.
12      BY: JOHN GREEN, JR., ATTORNEY AT LAW
13      1135 Hodges Street
14      Lake Charles, Louisiana 70601
15      Telephone: (337) 990-0060
16      E-mail:  green@johngreenjr-atty.com
17
18  FOR ANDREW FARMER:
19      EDMUNDSON, PLLC
20      BY: J. KEVIN EDMUNDSON, ATTORNEY AT LAW
21      21209 Highway 71 West
22      Suite 3
23      Spicewood, Texas 78669
24      Telephone: (512) 720-0782
25      E-mail: kevin@edmundsonpllc.com
```

---

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

| | Page 5 |
|---|---|
| 1 | APPEARANCES OF COUNSEL - CONTINUED |
| 2 | FOR THE WITNESS: |
| 3 | GORDON & REES LLP |
| 4 | BY: BARRY G. FLYNN, ATTORNEY AT LAW |
| 5 | TransWestern Tower |
| 6 | 1900 West Loop South, Suite 1000 |
| 7 | Houston, Texas 77027 |
| 8 | Telephone: (713) 961-3366 |
| 9 | E-mail: bflynn@gordonrees.com |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | | Page 7 |
|---|---|---|
| 1 | EXHIBITS | |
| 2 | DAVID LOEV | |
| 3 | Number | Description | Page |
| 4 | Exhibit 49 | E-mail dated 09/22/2011 (Farmer | |
| 5 | | to dloev@loevlaw.com) (NO BATES | |
| 6 | | NUMBER) - 1 page | 24 |
| 7 | | | |
| 8 | Exhibit 50 | E-mail dated09/28/2011 (Farmer | |
| 9 | | to Loev) (NO BATES NUMBER) - 1 page | 36 |
| 10 | | | |
| 11 | Exhibit 51 | E-mail dated 10/14/2011 (Rohde | |
| 12 | | to dloev@loevlaw.com) (NO BATES | |
| 13 | | NUMBER) - 1 page | 39 |
| 14 | | | |
| 15 | Exhibit 52 | Chimer Energy Corp. Promissory | |
| 16 | | Note dated 08/22/2011 | |
| 17 | | (SEC-LoevLaw-E-0000770-773) | |
| 18 | | - 5 pages | 50 |
| 19 | | | |
| 20 | Exhibit 53 | E-mail dated 10/18/2011 (Farmer to | |
| 21 | | Loev) (NO BATES NUMBER)  - 1 page | 53 |
| 22 | | | |
| 23 | Exhibit 54 | String of e-mails dated | |
| 24 | | 10/21/2011 (NO BATES NUMBERS) | |
| 25 | | - 2 pages | 57 |

| | Page 6 |
|---|---|
| 1 | INDEX |
| 2 | WEDNESDAY, JULY 8, 2015 |
| 3 | DAVID LOEV    PAGE |
| 4 | Examination by Mr. Vydashenko    12 |
| 5 | P.M. SESSION    122 |
| 6 | Examination resumed by Mr. Vydashenko    122 |
| 7 | Examination by Mr. Edmundson    179 |
| 8 | Examination by Mr. Green    212 |
| 9 | Further Examination by Mr. Vydashenko    233 |
| 10 | Further Examination by Mr. Edmundson    245 |
| 11 | |
| 12 | -oOo- |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | | Page 8 |
|---|---|---|
| 1 | EXHIBITS - CONTINUED | |
| 2 | DAVID LOEV | |
| 3 | Number | Description | Page |
| 4 | Exhibit 55 | String of e-mails (NO BATES | |
| 5 | | NUMBERS) - 2 pages | 60 |
| 6 | | | |
| 7 | Exhibit 56 | Invoices - The Loev Law Firm, | |
| 8 | | PC (SEC-LoevLaw-E-0000065-068; | |
| 9 | | 075-076) - 12 pages | 65 |
| 10 | | | |
| 11 | Exhibit 57 | String of e-mails dated 12/05/2011 | |
| 12 | | (NO BATES NUMBERS) - 3 pages | 70 |
| 13 | | | |
| 14 | Exhibit 58 | Form S-1/A (Amendment No. 2) | |
| 15 | | Chimera Energy Corporation (NO | |
| 16 | | BATES NUMBERS) - 61 pages | 73 |
| 17 | | | |
| 18 | Exhibit 59 | String of e-mails dated 12/12/2011 | |
| 19 | | (NO BATES NUMBER) - 1 page | 76 |
| 20 | | | |
| 21 | Exhibit 60 | String of e-mails dated 12/22/2011 | |
| 22 | | (NO BATES NUMBERS) - 2 pages | 80 |
| 23 | | | |
| 24 | Exhibit 61 | String of e-mails dated 03/13/2012 | |
| 25 | | (NO BATES NUMBER) - 1 page | 90 |

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

---

Page 9

```
 1              EXHIBITS - CONTINUED
 2                 DAVID LOEV
 3   Number         Description            Page
 4   Exhibit 62    E-mail dated 07/27/2012 (Farmer
 5                 to Vasquez) with attachment (NO
 6                 BATES NUMBERS) - 6 pages        92
 7
 8   Exhibit 63    String of e-mails dated
 9                 08/10/2012 with attachment (NO
10                 BATES NUMBERS) - 8 pages        94
11
12   Exhibit 64    String of e-mails dated 08/14/2012
13                 (NO BATES NUMBER) - 1 page      96
14
15   Exhibit 65    E-mail dated 08/28/2012 (Loev
16                 to Farmer) (NO BATES NUMBER)
17                 - 1 page                       102
18
19   Exhibit 66    String of e-mails dated 08/28/2012
20                 (NO BATES NUMBER) - 1 page      102
21
22   Exhibit 67    String of e-mails with attachment
23                 (NO BATES NUMBERS) - 8 pages    106
24
25
```

---

Page 11

```
 1              EXHIBITS - CONTINUED
 2                 DAVID LOEV
 3   Number         Description            Page
 4   Exhibit 75    String of emails dated November 05,
 5                 2012 (No Bates Numbers) - 1 page   154
 6
 7   Exhibit 76    Email dated January 10, 2012
 8                 (Loev to Farmer) (No Bates
 9                 Numbers) - 1 page            156
10
11   Exhibit 77    Email dated February 03, 2012 with
12                 attachment (Loev to Farmer and
13                 Rohde) (No Bates Numbers) - 3 pages 157
14
15   Exhibit 78    Email dated June 26, 2012 (Loev to
16                 Farmer) (No Bates Numbers) - 1 page 166
17
18   Exhibit 79    Email dated July 12, 2012 (Farmer
19                 to Loev) (No Bates Numbers)
20                 - 1 page                     167
21
22   Exhibit 80    Email dated April 27, 2012
23                 (Loev to Farmer and Loev)
24                 (SEC-LoevLaw-E-0000397-398)
25                 - 2 pages                    172
```

---

Page 10

```
 1              EXHIBITS - CONTINUED
 2                 DAVID LOEV
 3   Number         Description            Page
 4   Exhibit 68    String of e-mails dated 08/14/2012
 5                 (SEC-LoevLaw-E-0000836-840)
 6                 - 5 pages                    111
 7
 8   Exhibit 69    String of e-mails dated 08/24/2012
 9                 (TM000289-290) - 2 pages      118
10
11   Exhibit 70    String of emails dated October 2,
12                 2012 (No Bates Numbers) - 3 pages  125
13
14   Exhibit 71    String of emails dated October 3,
15                 2012 (No Bates Numbers)- 2 pages   128
16
17   Exhibit 72    Securities and Exchange Commission
18                 F 8-K Chimera Energy Corp.
19                 (No Bates Numbers) - 6 pages   135
20
21   Exhibit 73    String of emails with attachment
22                 (No Bates Numbers) - 4 pages   138
23
24   Exhibit 74    String of emails with attachments
25                 (No Bates Numbers) - 6 pages   143
```

---

Page 12

```
 1           PREVIOUSLY MARKED EXHIBITS
 2                 DAVID LOEV
 3   Number         Description            Page
 4   Exhibit 48    E-mail (Park to FINRA, et al.)
 5                 - 10 pages                   151
 6
 7
 8
 9
10
```

---

APP: 000052

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

**Page 13**

1    WEDNESDAY, JULY 8, 2015; 9:23 A.M.
2    THE REPORTER: Federal Rules?
3    MR. VYDASHENKO: Yes.
4    DAVID LOEV,
5  having been first duly sworn, testified as follows:
6    EXAMINATION
7    MR. FLYNN: For purposes of the record,
8  this is Barry Flynn, attorney for the witness, and we
9  would like to just have on the record the fact that --
10 and all counsel notice that the judge on Monday of this
11 week, in fact, entered an order and the order was to --
12 that the witness testify about matters which might be
13 deemed attorney/client privilege.  Before that time the
14 witness had not so testified and not produced any
15 documents.
16    The witness believes he and the firm have
17 now complied with that request.  The witness is also
18 here pursuant to subpoena.
19    MR. VYDASHENKO: All right.  Thank you,
20 Barry.
21    Q.  (BY MR. VYDASHENKO) Mr. Loev, my name is
22 Nikolay Vydashenko.  I represent the Securities and
23 Exchange Commission in this case, and I will be taking
24 your deposition today.
25    Have you ever been deposed before?

**Page 14**

1    A.  I have.
2    Q.  Okay.  So we'll still go over the ground rules,
3  but I think this will go smoothly.  I'll be asking you
4  questions.  The court reporter will take down everything
5  I say and then she will take down your answers.  For
6  that reason it's important we don't talk over each other
7  so that the court reporter can get a clear transcript of
8  this.
9    At some point I may ask you a question
10 that I may not state well or that you don't understand
11 for some reason.  If you don't understand my question,
12 will you just let me know that so I can clarify?
13   A.  Yes.
14   Q.  And if you need a break at any time for any
15 reason, you — you can tell me or tell your attorney and
16 we'll accommodate you, okay?
17   A.  Thank you.
18   Q.  Is there any reason you cannot give full,
19 complete and accurate testimony today?
20   A.  No.
21   Q.  All right.  Now, you said you have been deposed
22 before.  How many times?
23   A.  Oh, maybe three times.
24   Q.  Let's start with the most recent time that
25 you've been deposed.

**Page 15**

1    A.  Probably four times.
2    Q.  Okay.
3    A.  I think four times come to mind.
4    Q.  Okay.  Let's start with the most recent.
5    A.  I was deposed probably about a year ago.
6    Q.  In what case?
7    A.  Jam'n Java.
8    Q.  What kind of case was that?
9    A.  It was a client of mine -- it is a client of
10 mine.  And the SEC was looking into, I guess, federal
11 securities laws.
12   Q.  So was this a deposition in the course of an
13 investigation or litigation?
14   A.  I guess in the course of investigation.
15   Q.  And that — you said that was about a year ago?
16   A.  I think so.
17   Q.  How about before that?
18   A.  I was deposed in a -- in a -- I want to say
19 criminal case, California, called M&A West matter.
20   Q.  Was that a state or federal criminal matter?
21   A.  I don't remember.
22   Q.  What was your role in that case?
23   A.  I was a witness.
24   Q.  Were you deposed in the course of an
25 investigation or litigation?

**Page 16**

1    A.  In the course of an investigation.
2    Q.  And what — what did your testimony relate to?
3    MR. FLYNN: Once again, he's not -- the
4  privilege has not been waived relative to that
5  particular client, okay, but the topics, I guess he can
6  testify to.
7    But just -- don't talk about what you said
8  to your client.
9    A.  I think it also related to different federal
10 securities law matters.
11   Q.  (BY MR. VYDASHENKO) Did you have an
12 understanding of who was — or what entity was the
13 subject of the investigation in that case?
14   A.  There was a woman that was one of the subjects
15 of the investigation.
16   Q.  And who was that?
17   A.  Her name was Zara something.
18   Q.  You don't remember her last name?
19   A.  I don't.
20   Q.  And how were you related to her?
21   A.  I wasn't related to her.  I represented the
22 entity, M&A West, and she was, I want to say, an
23 investor, possibly.
24   Q.  Do you know what ultimately happened in that
25 case?

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

**Page 37**

1  ones were not, please.
2      MR. VYDASHENKO: I will try my best to do
3  that with the caveat that I may not remember a
4  hundred percent accurately.
5      MR. GREEN: Well, my problem is, I don't
6  have them. I was never sent these documents. And so
7  this is the first time that I'm seeing them. I did see
8  the other documents that y'all forwarded. I think it
9  was a mistake that I didn't get them, but I'm a little
10  concerned about that. So I may ask from time to time
11  whether this was something that was sent before, and if
12  I have an objection about that or have some follow-up
13  questions, I may need some time.
14      MR. VYDASHENKO: That's fine.
15      Q. (BY MR. VYDASHENKO) Now, I'll just note that
16  the e-mail reflects that there is an attachment to it,
17  which we did not include here.
18      Now, in this e-mail Mr. Farmer is sending
19  to you a draft of the S-1 for Chimera Energy, right?
20      A. Correct.
21      Q. Did you have an understanding who drafted the
22  S-1 that you received in this e-mail?
23      A. I don't recall.
24      Q. At the time you received — so at the time you
25  received it, did you make any assumptions about who

**Page 38**

1  drafted this?
2      A. I don't — I don't recall.
3      Q. Now, I note that there's no one else in the
4  e-mail other than Mr. Farmer and — and yourself.
5      Do you see that?
6      A. I do.
7      Q. Did it seem strange to you that the S-1 — the
8  very first draft of the S-1 was coming from Mr. Farmer
9  and not from Mr. Grob?
10      MR. EDMUNDSON: Objection. Form.
11      MR. FLYNN: You may answer. He's going to
12  state objections to protect his record; but unless I
13  tell you not to answer, answer.
14      A. I don't recall what I thought at the time.
15      Q. (BY MR. VYDASHENKO) How about as you sit here
16  today? Do you find that strange or unusual?
17      MR. EDMUNDSON: Same objection.
18      A. Sure.
19      Q. (BY MR. VYDASHENKO) And why is that?
20      A. I would normally want to have the CEO copied on
21  this type of correspondence or I would copy them if I
22  was doing this, I would think.
23      Q. Did you respond to this e-mail or otherwise let
24  Mr. Farmer know that?
25      A. I don't believe so.

**Page 39**

1      Q. Do you remember at any point asking him why --
2  why it was that he didn't copy the CEO?
3      A. I don't recall.
4      Q. Now, in the second paragraph, there's a
5  reference to "Carlos."
6      Do you see that?
7      A. I do.
8      Q. Who is that?
9      A. That's Carlos Lopez.
10      Q. What was his role?
11      A. He was the auditor.
12      Q. He was with LBB; is that right?
13      A. Correct.
14      (Exhibit 51 marked)
15      Q. (BY MR. VYDASHENKO) I've marked as Exhibit 51 a
16  one-page document. It's an e-mail from Tyson Rohde
17  to — to you copying Mr. Farmer and Mr. Grob dated
18  October 14, 2011. This is one of the documents that
19  your firm produced to us last — yesterday.
20      Do you remember receiving the e-mail on
21  Exhibit 51?
22      A. I don't recall receiving it, but it looks like
23  I received it.
24      Q. You recognize — you recognize this as an
25  e-mail that you received at some point?

**Page 40**

1      A. I believe so.
2      Q. Now, this is coming from Tyson Rohde, right?
3      A. Yes.
4      Q. When was the first time you met Mr. Rohde?
5      A. To the best of my knowledge, probably be on or
6  around this time.
7      Q. What were the circumstances in which you met
8  Mr. Rohde?
9      A. I don't recall.
10      Q. Who introduced Mr. Rohde to you?
11      A. Best guess would be Andrew Farmer.
12      Q. At this point — at this point in time in — in
13  October 2011, did you know what Mr. Rohde did for a
14  living?
15      A. I don't recall. My recollection or best guess
16  was that he was a consultant to the company to assist
17  with this going-public process.
18      Q. He was a consultant to Chimera?
19      A. I believe so.
20      Q. Did you know whether Mr. Rohde worked with any
21  other companies at this time?
22      A. I don't remember at this time or not.
23      Q. As you sit here today, do you know whether in
24  2011 or 2012 Mr. Rohde worked with other companies?
25      A. I believe so.

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

**Page 45**

1    Q.  Did you get a sense for whether as between
2  Mr. Farmer and Mr. Rohde there was any kind of
3  hierarchy?  In other words, did Mr. Rohde report to
4  Mr. Farmer or vice versa?  Did you get a sense of how
5  that worked?
6        MR. EDMUNDSON: Objection. Form.
7    A.  I'm not sure. I thought I corresponded more
8  with Andrew Farmer, but I don't remember for sure.
9    Q.  (BY MR. VYDASHENKO) Setting -- setting aside
10  whether you corresponded more with him, did you have an
11  understanding of sort of who was more senior or who
12  reported to whom in this relationship?
13        MR. EDMUNDSON: Objection. Form.
14    A.  I don't think so.
15    Q.  (BY MR. VYDASHENKO) Now, you said that
16  Mr. Farmer was more experienced than Mr. Grob.  What was
17  the basis for that statement?
18    A.  He knew more about the process and some of the
19  regulatory organizations that are involved in the
20  process.
21    Q.  What -- what about the basis for the statement
22  that Mr. Rohde was more experienced?
23    A.  I believe he knew more about the disclosure
24  requirements with the SEC than Mr. Grob.
25    Q.  Now, in the course of your engagement as

**Page 46**

1  counsel for Chimera, who, in your view, had authority to
2  instruct you with regard to Chimera?
3    A.  Well, I think Andrew Farmer had a pretty big
4  role. I think Charles Grob had a pretty big role.
5    Q.  How about Mr. Rohde?
6    A.  I think he had a lesser role.
7    Q.  Now, focusing on the issue of authority, did
8  Mr. Farmer have authority to instruct you to perform
9  specific tasks related to Chimera engagement?
10    A.  Yes.
11    Q.  How about Mr. Rohde?
12    A.  I don't recall.
13    Q.  What was -- what's the basis of your belief
14  that Mr. Farmer had the authority to give you
15  instructions?
16    A.  Mr. Farmer called me to contact the SEC, to
17  contact DTC, those two organizations, to my
18  recollection. There may have been others, also. I
19  believe there was a lawsuit involved, that he directed
20  me to try to take action to assist with that, I believe.
21    Q.  So he gave you directions, right, or
22  instructions; but how did you know he had the authority
23  to do that?
24    A.  I believe I had a conversation, I believe, with
25  Charles Grob at some point to confirm this.

**Page 47**

1    Q.  Can you tell me about that conversation a
2  little more?
3    A.  I don't recall the conversation, but it happens
4  to me with corporate clients, who do I take instructions
5  from?  And so I typically have a conversation, which I
6  probably asked and wanted to confirm.  My goal is to
7  usually make sure that the CEO is copied on everything
8  and knows what I'm doing and have them actually approve
9  any filing like an S-1.  I wouldn't take instructions --
10  I believe, my recollection is the CEO tells me they're
11  specifically signed off -- but I was getting direction
12  from Andrew to do the filing and get it moving.
13    Q.  Do you remember the words that Mr. Grob used to
14  convey to you that Mr. Farmer had -- had this authority
15  that we've been discussing?
16    A.  I don't recall.
17    Q.  Do you remember when this conversation with
18  Mr. Grob took place?
19    A.  I would expect that it occurred pretty early in
20  this engagement.
21    Q.  Do you remember whether Mr. Farmer was a part
22  of that conversation?
23    A.  I doubt it, but I don't -- I don't recall; but
24  I don't think so. It's possible.
25    Q.  During your engagement who was your primary

**Page 48**

1  contact at Chimera?
2    A.  You've got Charles Grob and you've got
3  Andrew Farmer were probably my two primary contacts.
4    Q.  Is one of them, for lack of better words, more
5  primary than the other?
6    A.  I believe Andrew Farmer was more active. I had
7  more contact with him than Charles Grob, I believe.
8    Q.  At the time did that strike you as unusual?
9        MR. GREEN: I think he's -- I object.
10  Asked and answered. I think he's answered the question.
11    A.  I don't recall. I don't think so. I don't
12  remember.
13    Q.  (BY MR. VYDASHENKO) How about, as you sit here
14  today, does that dynamic strike you as unusual?
15    A.  Not necessarily.  The small company sometimes
16  has other parties they engage to assist them.
17    Q.  If an issue -- or when an issue came up in the
18  course of your representation of Chimera, who would you
19  call first?
20    A.  Probably Andrew Farmer, but I -- I don't
21  recall. I believe that's probably the case.
22    Q.  And why is that?
23    A.  I think he was the one most active in this
24  engagement.
25    Q.  At the beginning of your engagement with

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

Page 53

1    Q.  Do you recall making any inquiry into whether
2    Kylemore Corp. was a related party to Chimera?
3    A.  Probably.
4    Q.  Do you know what steps you took in regard to
5    that inquiry?
6    A.  I believe we would have asked "Is this loan
7    associated with any related party?"
8    Q.  Who would you have asked that?
9    A.  I assume Charles Grob would have been copied on
10   it.  Could have been Andrew Farmer as well.
11   Q.  Do you have any recollection of asking any
12   person about whether Kylemore was a related entity?  A
13   specific recollection?
14   A.  I don't.
15           (Exhibit 53 marked)
16   Q.  (BY MR. VYDASHENKO)  I have marked as Exhibit 53
17   a one-page document.  This was produced yesterday by
18   your law firm.  It contains two e-mails, both dated
19   October 18, 2011, among yourself and Mr. Farmer and
20   others.
21           Do you recognize the e-mails in
22   Exhibit 53?
23   A.  It looks familiar.
24   Q.  Are these e-mails that you -- you had received
25   in October of 2011?

Page 54

1    A.  It looks like them, yes.
2    Q.  Now, looking at the bottom e-mail, that's from
3    Andrew Farmer.  Do you see that?
4    A.  I do.
5    Q.  He copies a person at the e-mail address of
6    john@loevlaw.com.
7           Do you see that?
8    A.  Yes.
9    Q.  Who is that?
10   A.  John is an associate at my firm.
11   Q.  What's his last name?
12   A.  Gillies.
13   Q.  Can you spell that?
14   A.  G-I-L-L-I-E-S.
15   Q.  What was Mr. Gillies' role in this engagement?
16   A.  He probably reviewed this registration and
17   provided comments and feedback.
18   Q.  Now, Mr. Farmer, in the bottom e-mail, states
19   "Final clean version from Carlos."
20           Do you see that?
21   A.  Yes.
22   Q.  That's the first line.  What do you understand
23   that to mean?
24   A.  That the auditors have provided their feedback,
25   and they're probably ready for this to be EDGARized.

Page 55

1    Q.  What does it mean to EDGARize?
2    A.  Sure.  So let's assume this document is in
3    Word -- and it's typically -- or WordPerfect, but I
4    think this was in Word.  And so the SEC -- filings with
5    the SEC are done in their software, which is called
6    Edgar.  So the documents have to be converted to their
7    software.  So it's called an EDGARization process.
8    Q.  If you're filing a document with the SEC, once
9    you EDGARize it, what's the next step?
10   A.  Okay.  So then it's typically sent to the
11   different parties, the company, the auditor, the
12   attorney, to review, see if there's any other revisions
13   to alter that EDGARized document, and then approval for
14   filing.
15   Q.  Then looking at the top e-mail, there's an
16   e-mail from Mr. Farmer to you copying Mr. Gillies.
17           Do you see that?
18   A.  I do.
19   Q.  And there -- it reflects that there's an
20   attachment, which we did not provide here.  Mr. Farmer
21   says "Markup version."
22           What do you understand that to mean?
23   A.  I'm not sure if that meant the most recent one,
24   they marked up some revisions from what the auditor had.
25   I would speculate that's what is probably happening.

Page 56

1    Q.  So Mr. Farmer is sending this and Mr. Grob is
2    not on this e-mail, right?
3    A.  Correct.
4    Q.  Was it your understanding that this -- the
5    markup was Mr. Farmer's markup of the draft S-1?
6    A.  I would assume.  I'm not sure.
7    Q.  Did it strike you as unusual that Mr. Grob was
8    not copied on both of these e-mails?
9    A.  Sure.
10   Q.  Why is that?
11   A.  I -- I would -- I try to make sure that the CEO
12   is copied.  That's kind of my practice, but, sure,
13   that's what I would typically do.
14   Q.  Why do you try to make sure that the CEO is
15   copied?
16   A.  Make sure the company is in the loop and
17   authorizes everything that's happening.
18   Q.  Did you ever respond to the e-mail -- the top
19   e-mail in Exhibit 53 to check whether the company did,
20   in fact, authorize the markup that Mr. Farmer sent?
21   A.  I don't have all my e-mails in front of me.  I
22   would assume that there's another e-mail that has the
23   revised version that Charles is copied on, I would
24   assume.
25   Q.  Do you have -- independently of that, do you

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

**Page 61**

1  Charles Grob and copying you on November 16, do you see
2  that bottom e-mail?
3  A.  Yes, I do.
4  Q.  What — what is that e-mail?  What is the
5  purpose of that e-mail?
6  A.  So Jessica Dickerson is with the SEC Corporate
7  Finance Division.  And so she was reviewing the S-1
8  registration statement that was filed.  And it looks
9  like she provided a comment letter with her comments to
10  the Registration Statement filing.
11  Q.  So at this point in time — and we're in
12  November 16, 2011 — Chimera has filed a S-1 with the
13  SEC, right?
14  A.  Correct.
15  Q.  And the next step when — when that document is
16  filed is the SEC provides comments?
17  A.  Correct.
18  Q.  And this is a — one of the rounds of comments
19  that Ms. Dickerson has provided?
20  A.  Correct.
21  Q.  Now, the next e-mail up from that, it looks
22  like you are forwarding to Mr. Farmer and you have
23  copied Mr. Grob and Mr. Gillies the comment letter; is
24  that — is that right?
25  A.  Correct.

**Page 62**

1  Q.  So you say "See comment letter received for
2  Chimera.  We will coordinate with Charles regarding who
3  will be responding to which comments."
4  What did you mean by that statement?
5  A.  Sure.  So typically we receive comments and
6  then we speak to the client about who is going to
7  respond to which one.  Some may be legal, some may be
8  business oriented, some may be accounting related.  And
9  so we kind of go through and say, hey, you're going to
10  respond to these, we'll respond to these, and kind of go
11  through that.
12  Q.  So is it fair to say that you're referring here
13  to the division of labor as between legal, meaning your
14  firm, accounting, meaning Mr. Lopez's firm, and
15  business, meaning Chimera?
16  A.  Correct.
17  Q.  So you weren't talking here about coordinating
18  whether Mr. Farmer, Mr. Rohde or someone else, which one
19  of those people are going to respond?
20  A.  I believe it's like I stated before.
21  Q.  So you — when you sent this, you — did you
22  have in mind coordinating about whether Chimera would
23  deal with one part and, like, let's say your firm will
24  do another part or did you have in mind that Mr. Farmer
25  will cover something, Mr. Grob will cover something and

**Page 63**

1  Mr. Rohde will cover something else?
2  A.  I believe I thought it would be our firm,
3  Chimera and the auditors.  I don't have the letter in
4  front of me, but that's what I would think I was
5  thinking.
6  Q.  Is that typical in this kind of comment
7  process?
8  A.  Sure.
9  Q.  Okay.  Now, Mr. Farmer responds the next day on
10  November 17.  He's — he sent — he's replied to you and
11  Mr. Gillies, but he did not copy Mr. Grob.
12  Do you see that?
13  A.  I do.
14  Q.  And he says "David, We've gone ahead and
15  drafted the response letter.  I'm working on making sure
16  all the changes are made in the S-1, should be sending
17  it to you in the next 2 hours."
18  Did — from that does that help you
19  remember whether the division of labor that you
20  described in the e-mail below occurred?
21  A.  It looks like that did not occur and
22  Andrew/Chimera was taking a larger role in responding to
23  the comments.
24  Q.  Was that unusual?
25  A.  Well, some companies, in an effort to reduce

**Page 64**

1  costs, sometimes do that.  We sometimes have to rewrite
2  them anyway.
3  Q.  Did it strike you as unusual that in responding
4  to your e-mail, which included Mr. Grob, Mr. Farmer did
5  not include him in his response?
6  A.  I don't recall.
7  Q.  How about now, as you sit here today, can you
8  think of a reason why Mr. Grob — why Mr. Farmer would
9  have dropped Mr. Grob from this correspondence?
10  A.  I'll just read into it.  It looks like Andrew
11  was kind of authorized to kind of orchestrate this
12  process.
13  Q.  Now, just coming back to the e-mail below, this
14  comment letter from Ms. Dickerson, you forwarded it to
15  Andrew copying Charles, right?
16  A.  Right.
17  Q.  And you addressed your e-mail to Andrew?
18  A.  Right.
19  Q.  Why did you do that?
20  A.  I knew Charles had already received it and
21  wanted to make sure Andrew was aware of it.
22  Q.  Because of his involvement with the company?
23  A.  Correct.
24  Q.  Now, Mr. Loev, with respect to the Chimera
25  engagement, you billed Chimera by the hour; is that

APP. 000057

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

Page 69

1   A.  Their transfer agent business is called Island
2   Securities.  They develop business for compliance for
3   both companies.  I don't remember if it was one or both
4   companies.
5   Q.  What was the substance of that phone call?
6   A.  I just made an introduction.
7   Q.  At whose prompting was that introduction made?
8   A.  I believe at Andrew's prompting.
9   Q.  And Mr. Grob was not on that call, right?
10  A.  Correct.
11  Q.  And why is that?
12  A.  I think Andrew asked me to make those
13  introductions.
14  Q.  Did you understand Mr. Farmer to be the person
15  who was on Chimera's behalf heading up the — the
16  process of getting a 15c211?
17  A.  Yes.
18  Q.  Now, it says — the next thing it says after
19  the call we just discussed, it says "discuss
20  subscription agreement."
21      Do you see that?
22  A.  Yes.
23  Q.  Do you have an understanding of with whom this
24  discussion occurred?
25  A.  I'm assuming that these -- this discussion was

Page 70

1   still with Andrew.
2   Q.  And then it says "coordinate documents for
3   edgarization."
4       What does that mean?
5   A.  So, like I said, my wife, her company does the
6   EDGARization for some of our clients.  I believe she did
7   it for this company as well.  And so we would have sent
8   her these Word documents in a form to convert to the SEC
9   software.
10      (Exhibit 57 marked)
11  Q.  (BY MR. VYDASHENKO) I've marked as Exhibit 57 a
12  three-page document that your firm produced yesterday.
13  It involves e-mail correspondence among various persons,
14  including yourself and Mr. Farmer and Mr. Grob.
15      Do you recognize the e-mails on Exhibit 57
16  as ones you've sent and received?
17  A.  It looks familiar.
18  Q.  So I want to — I want to start at the end and
19  work from the second page of Exhibit 57, and that — in
20  that e-mail you — which you appear to address to
21  Charles and Andrew, you say "See acceptance of
22  correspondence filing below."
23      Do you see that?
24  A.  Yes.
25  Q.  What is that in reference to?

Page 71

1   A.  It looks like there was a response filed to the
2   SEC.
3   Q.  A response to a comment letter?
4   A.  I believe so.
5   Q.  Okay.  And then —
6   A.  It's -- I mean, it's hard to tell from this,
7   but it also says this is great news.  I don't know --
8   it's hard to know exactly what the correspondence filing
9   was with the SEC.  Maybe that they wanted one or two
10  things responded to.  I don't recall.  That's what I
11  would speculate.
12  Q.  All right.  Now, the — on the first page at
13  the bottom, Mr. Farmer responds to that.  He says "Let's
14  give them a day or" — he says "Great."  Then he says
15  "Let's give them a day or so and then ask for
16  effectiveness."
17      What does he mean by that?
18  A.  Okay.  So once you go through the registration
19  process, when you get to the point where you clear
20  comments, you have to formally request -- what's called
21  requesting acceleration.  The SEC typically likes two
22  days in advance notice and they have a certain time and
23  they actually declare the registration statement
24  effective.  That's clear comments.  And so I'm assuming
25  we must have known by filing this correspondence that we

Page 72

1   were -- the SEC must have told us, if you do this, you
2   clear comments, something like -- I'm assuming.
3   Q.  Did you follow Mr. Farmer's instruction and ask
4   for effectiveness?
5   A.  How it would work is we would prepare a
6   document and I probably would have had Charles sign it.
7   So probably Charles signed -- I'm assuming because I
8   don't have all the documents in front of me -- but
9   probably signed or approved the request for
10  acceleration.  It's a filing as well.  Another
11  correspondence filing.  I'm assuming he either signed it
12  or authorized it.
13  Q.  The work of preparing that document, would you
14  have done that in response to this instruction from
15  Mr. Farmer?
16  A.  I would anticipate that we would have done
17  that, yes.
18  Q.  Then the next sentence on that -- in that
19  bottom e-mail says "Thursday at 5pm would be great, give
20  Charles the opportunity to get started this weekend."
21      Do you know what that is referring to?
22  A.  No, I don't.
23  Q.  Do you know what "Thursday at 5pm" is referring
24  to?
25  A.  I think he was picking a time that he -- just

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

## Page 73

1 picking a request for acceleration.
2 Q. He wanted you to send the request on Thursday
3 at 5:00 p.m.?
4 A. No. I think he wanted us to request that time
5 on that day for the SEC to say you're effective.
6 Q. Okay. Once you're effective, what does that
7 enable the company to do?
8 A. Sure. So in this case I believe the company
9 registered shares for sale. And so potentially they
10 could go out to investors and try to raise capital.
11 Q. With regard to Chimera, what was your
12 understanding of their -- what their plan was to raise
13 capital?
14 A. I don't recall having any knowledge of that
15 plan.
16 Q. Did you have an understanding of who the person
17 or persons were that were going to be raising capital?
18 A. I don't recall.
19 Q. Did you -- do you know if they were going to
20 engage somebody to help them raise capital or whether
21 the company was going to do it itself?
22 A. I don't recall.
23      (Exhibit 58 marked)
24 Q. (BY MR. VYDASHENKO) I have marked as Exhibit 58
25 a document titled Form S-1/A (Amendment No. 2)

## Page 74

1 Registration Statement Under the Securities Act of 1933
2 Chimera Energy Corporation. It's a 61-page document.
3      Are you familiar with Exhibit 58?
4 A. Yes, it looks familiar.
5 Q. What is that?
6 A. This looks like an amended registration
7 statement. It looks like to register 5 million shares
8 of stock.
9 Q. Is this the registration statement that you
10 helped Chimera prepare and file?
11 A. Correct.
12 Q. Now, if you would turn to Page 23 -- and I'm
13 referring to the page numbers at the top right of the
14 document -- Page 23 of Exhibit 58. I'm going to direct
15 your attention to the heading Plan of Distribution.
16      Do you see that?
17 A. Yes, I do.
18 Q. Typically, what does that section describe?
19 A. This section typically describes who is going
20 to offer the securities for sale.
21 Q. So the first paragraph under that is talking
22 about the price and the number of shares, right?
23 A. Correct.
24 Q. And then the next paragraph states "We are
25 offering the shares on a 'self-underwritten' basis

## Page 75

1 directly through Charles Grob, our sole officer and
2 director, named herein."
3      What does that mean to you?
4 A. That means that Charles Grob is going to be the
5 one offering shares. They're not engaging a third party
6 to offer the shares.
7 Q. Does that mean that Charles Grob -- it's --
8 it's not Chimera, but literally it's Charles Grob who is
9 the person who offers the shares?
10 A. I believe the answer is yes. Charles Grob is
11 an authorized officer of the company to sell these
12 shares.
13 Q. And this -- this paragraph continues.
14 "Mr. Grob will not receive commissions or other
15 remuneration of any kind in connection with his
16 anticipation in this offering based either directly or
17 indirectly on transactions in securities. In connection
18 with the Company's selling efforts in the offering,
19 Mr. Grob will not register as a broker-dealer pursuant
20 to Section 15 of the Exchange Act of 1934, as amended,
21 but rather will rely upon the 'safe harbor' provisions
22 of SEC Rule 3a4-1, promulgated under the Exchange Act."
23      Do you have an understanding of this "safe
24 harbor" provision referenced here?
25 A. My recollection of the rule is that as an

## Page 76

1 officer of a company you can raise securities, I don't
2 know if it's once every 12 months, twice every 12
3 months -- there's some exemption for that if you're
4 associated with the company how many offerings you can
5 do.
6 Q. So that exemption is available to officers of
7 the company?
8 A. I believe so.
9 Q. Not -- not somebody affiliated with it, not
10 consultants but people who hold the title of officer?
11 A. I believe that's correct.
12 Q. Does reading this paragraph refresh your
13 recollection regarding the nature of Chimera's offering
14 and its plan of distribution?
15 A. I'm sorry. What?
16 Q. Does this help you remember how Chimera planned
17 to distribute its shares in the IPO?
18 A. Sure.
19      (Exhibit 59 marked)
20 Q. (BY MR. VYDASHENKO) Marked as Exhibit 59 is a
21 one-page document. It's an e-mail -- or it's a chain of
22 e-mails between yourself and Mr. Farmer.
23      Do you remember sending and receiving
24 these e-mails?
25 A. Looks familiar.

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

Page 77

1    Q.  Okay.  And starting at the bottom, the e-mail
2  from Mr. Farmer on December 12th, he writes just to you,
3  right?  He doesn't copy Mr. Grob?  Mr. Farmer -- on --
4  on the e-mail from Mr. Farmer, Mr. Grob is not copied;
5  is that right?
6    A.  Correct.
7    Q.  And he says "Let's reach out to the sec in the
8  morning to see where things are."
9         Do you have an understanding what he meant
10 by this?
11   A.  Sure.  I think he wanted to follow up with the
12 SEC to see if they had reviewed the filing that we had
13 cleared comments probably or if we had further comments.
14   Q.  Do you remember doing so?
15   A.  I don't remember.  I probably did.
16   Q.  The next sentence in Mr. Farmer's e-mail says
17 "Would really like to be effective no later than
18 Thursday."
19        That's a reference to the SEC declaring
20 the registration statement effective?
21   A.  I believe so, yes.
22   Q.  And then he says "Would like to get the capital
23 raise completed before everyone disappears for the
24 holidays."
25        Do you see that?

Page 78

1    A.  I do.
2    Q.  Do you know what he's referring to by the words
3  "capital raise"?
4    A.  I'm assuming that means having the shares sold
5  pursuant to this registration statement.
6    Q.  Now, we just went over the S-1 that represents
7  that Mr. Grob is going to be the one who is offering the
8  shares, right?
9    A.  Yes.
10   Q.  Does it strike you as unusual that Mr. Farmer
11 here is talking about completing the capital raise
12 before everyone disappears for the holidays?
13   A.  I don't know if -- don't know.
14   Q.  Do you know whether Mr. Farmer was involved in
15 raising capital for Chimera?
16   A.  I don't.
17   Q.  Do you think that Mr. Farmer was involved in
18 raising capital for Chimera?
19        MR. EDMUNDSON:  Objection.
20   A.  I'm not sure.
21   Q.  (BY MR. VYDASHENKO) Is that something you would
22 have wanted to know?
23   A.  I -- I believe we probably asked the question.
24   Q.  Of who did you ask that question?
25   A.  So this registration statement was sent to all

Page 79

1  parties, including Charles Grob, to make sure these
2  facts are correct.  And so I assume Charles Grob had to
3  sign off and tell us -- I assume we asked the question
4  "Who is selling the securities," and we must have been
5  told "Charles Grob is selling the securities."  I don't
6  think we would have just put that language there.  I'm
7  sure -- they could have drafted it and we would have
8  said "Please confirm."  I don't have the document in
9  front of me.  We may have highlighted it for specific
10 review.  We do that a lot of times.  You have all my
11 drafts.  So I don't remember, but I assume we asked the
12 question or made a comment.
13   Q.  Would it have been important for you to know
14 who was selling the shares?
15   A.  Sure.  If it was different than what we
16 disclosed to the SEC, we probably would have had a
17 different disclosure.
18   Q.  At the time you received the e-mail we are
19 discussing on Exhibit 59, did you -- did that raise any
20 issues or red flags for you that it was Mr. Farmer
21 discussing the capital raise?
22   A.  I don't -- I wouldn't know from this e-mail
23 whether that means that Charles Grob is -- he's still
24 raising the money or that means Andrew is involved in
25 raising the money -- I don't think I can tell that from

Page 80

1  this e-mail.
2         (Exhibit 60 marked)
3    Q.  (BY MR. VYDASHENKO)  Marked as Exhibit 60 is a
4  two-page document that your firm produced yesterday.
5  It's a series of e-mails between yourself and Mr. Grob,
6  Mr. Rohde, Mr. Farmer and Mr. Gillies.
7         Do you recognize these as e-mails that you
8  sent and received in December 2011?
9    A.  Yes, it looks familiar.
10   Q.  Now, looking at the e-mail at the bottom of the
11 first page of Exhibit 60, it looks like you've
12 circulated a subscription agreement; is that right?
13   A.  Well, we circulated a revised subscription
14 agreement, correct.
15   Q.  What is the purpose of a subscription
16 agreement?
17   A.  So a subscription agreement is a document
18 whereby investors give their information, possibly
19 provide representations, if there's -- necessary for an
20 exemption of registration.  It may not have been needed
21 here because there was a registered offering that
22 provides different information and asks different
23 information of the investor.  It also provides what the
24 investor is relying on.
25   Q.  In order to -- for a company to sell its shares

Page 85

1  A. So typically, the company files a 15c211 and
2  through that process, that gets filed with FINRA. And
3  so I assume the call was what's the status with FINRA
4  and whatever broker/dealer they must have engaged.
5  Q. And I think I asked you this before.
6  Mr. Farmer, he -- on behalf of Chimera, he took the lead
7  in that process?
8  A. Yes.
9  Q. Okay. So after that it says "amending 10-Q
10  with explanatory note and taking position 'shell
11  company'."
12  What does that mean?
13  A. So I believe they filed a 10-Q and they were
14  going to file an amended report that I think on your
15  filing you have to take the position whether you're a
16  shell or not a shell company and my guess is they must
17  have taken the position they weren't a shell company and
18  then filed an amended report saying that they were a
19  shell company and I would expect that there was an
20  explanation on that amended 10-Q.
21  Q. Was that action taken in response to FINRA's
22  comments in the c211 process?
23  A. Probably.
24  Q. What -- what are the implications of a company
25  being a shell company?

Page 86

1  A. So the disadvantage of being classified as a
2  shell company, the primary disadvantage is the company
3  is not eligible to use Rule 144 until such time as
4  they've -- I believe they're no longer a shell company
5  and have provided registration statement-type
6  information for a period of a year. Something along
7  those lines. I believe that's the primary disadvantage.
8  Q. So in practical terms, I guess, it -- it delays
9  and restricts the amount of securities of the company
10  one could sell on the -- on the market?
11  A. I would term it differently.
12  Q. Okay.
13  A. So you can sell securities. To register shares
14  would not be affected by this, like if you have the S-1,
15  if you sold shares in a private transaction, you could
16  still sell them, but you have to tell people, hey, you
17  can't sell for -- until such and such date, which may
18  never come or whatever. The disadvantage, if you buy
19  the restricted securities, until such time as the
20  company changes this classification and provides
21  information, they may not be able to sell those shares
22  publicly.
23  Q. Understood. So, for example, if Mr. Grob held
24  shares that were not registered, right, and I think he
25  did in this case, that would impair his ability in some

Page 87

1  ways to resell them?
2  A. Correct.
3  Q. Okay. Did you have a view during this period
4  of time as to whether Chimera was a shell company or
5  not?
6  A. I believe we had a view.
7  Q. And what was that view?
8  A. We probably -- we probably believed they were a
9  shell company.
10  Q. But initially they filed as not a shell
11  company, right?
12  A. I don't recall if it's in the S-1 or not.
13  Q. Well --
14  A. I believe we put a risk factor in the S-1, but
15  I'm speculating. I don't have it in front of me, but I
16  bet that we put a risk factor to that nature.
17  Q. Well, if you're amending -- if you're amending
18  the 10-Q to suggest that the company now is -- or to
19  state that the company now is a shell, that means before
20  it was not a shell, right?
21  A. Yes.
22  Q. Now, did you have any discussions with anyone,
23  with Mr. Grob, Mr. Farmer or Mr. Rohde before this issue
24  came up regarding the company's shell status?
25  A. I don't recall.

Page 88

1  Q. Did you advise either Mr. Grob, Mr. Farmer or
2  Mr. Rohde that Chimera was a shell before this issue
3  came up?
4  A. One point of clarification. So it looks to me
5  like we didn't prepare this 10-Q or have any
6  involvement, okay? So my guess is, for this specific
7  filing, we -- we weren't consulted with or given any
8  advice.
9  Q. Let me ask it this way: Throughout your
10  engagement did you always have the understanding that
11  Chimera was likely a shell or should be classified as a
12  shell?
13  A. Probably.
14  Q. You don't recall having a change of mind on
15  that one way or another?
16  A. I don't recall that.
17  Q. Okay. Coming back to Exhibit 56 in the
18  March 13 time entry, after "shell company," it continues
19  by stating "review explanatory note, review cover page
20  of amended 10-Q and coordinate for edgarization, send
21  amended 10-Q to Andrew for approval."
22  What did you mean by that?
23  A. So I assume there's a sentence in that amended
24  10-Q that says "This 10-Q is being amended to reflect
25  that the company is a shell company. So that -- we

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

Page 89

1    reviewed whatever that sentence or two was and we
2    probably assisted with EDGARization -- I don't remember
3    if the whole 10-Q was filed or just that part. We had a
4    very limited involvement. And so we assisted with
5    getting it EDGARized.
6        Q.   And when you said "send to Andrew for
7    approval," what was the approval that you were referring
8    to?
9        A.   Every time -- the amended 10-Q?
10       Q.   Yeah.
11       A.   So it sounds like I was sending it to him for
12   his approval to file.
13       Q.   Is there a reason you didn't ask Mr. Grob for
14   his approval to file?
15       A.   He may have been copied on the e-mail. This is
16   just a billing record. I may have sent it to Charles as
17   well. I assume. I don't remember.
18       Q.   At this time, if Mr. Farmer was the only person
19   to give the approval to file a company SEC filing, a
20   Chimera SEC filing, did you view that as sufficient
21   authorization for you to go ahead and file?
22       A.   Well, like I said, I don't have the e-mail in
23   front of me. I would -- I would think -- may not have.
24   You have what I have. I don't recall. I would assume I
25   would have sent it to Charles as well as to Andrew.

Page 90

1        Q.   But independent of to whom you sent it, if
2    Mr. -- at this point in time, if Mr. Farmer was the only
3    person to approve a filing of a 10-Q for Chimera, would
4    you view -- would you have viewed that as sufficient
5    authorization?
6        A.   I don't recall.
7            (Exhibit 61 marked)
8        Q.   (BY MR. VYDASHENKO) I have marked as Exhibit 61
9    a one-page document that contains two e-mails that was
10   produced by your firm yesterday. There are two e-mails
11   for March 13, 2012.
12           Do you recognize these as e-mails you sent
13   and received in March of 2012?
14       A.   Yes, it looks familiar.
15       Q.   Now, looking at the bottom e-mail that was sent
16   on March 13th, that's the same date that -- for which
17   we've been reviewing your time entry on Exhibit 56,
18   right?
19       A.   Yes.
20       Q.   So when you say "Andrew, See amended 10Q for
21   review and approval -- and approval for filing," you're
22   referring to the same 10-Q that we've been discussing
23   before, right?
24       A.   Yes.
25       Q.   And at the top Mr. Farmer responds and he says

Page 91

1    "Approved to file."
2            Do you see that?
3        A.   Yes.
4        Q.   Now, do you recall seeking Mr. Grob's approval
5    to file the 10-Q?
6        A.   I don't recall.
7        Q.   Do you think at that point in March 2012 you
8    would have needed Mr. Grob's approval to file the 10-Q
9    on Chimera's behalf?
10       A.   I don't recall the conversations where Grob had
11   said coordinate through Andrew. I don't -- I don't
12   remember.
13       Q.   Now, if you didn't seek Mr. Grob's approval to
14   file, does that mean you -- that you understood that you
15   did not need his approval and you could go ahead and
16   file?
17       A.   I don't recall if he had given approval and
18   said "You can go with what Andrew says." I don't
19   recall.
20       Q.   Well, let me put it this way: Now, in your
21   time records for this date, there's no mention of a call
22   to Mr. Grob, right?
23       A.   Correct.
24       Q.   And I'll represent to you that I did not see
25   any e-mails from Mr. Grob approving this 10-Q filing,

Page 92

1    okay?
2        A.   Correct.
3        Q.   Does that indicate to you that you felt that
4    you had the necessary approval to file the 10-Q with
5    Mr. Farmer's approval?
6            MR. EDMUNDSON: Objection. Form.
7        A.   I believe I must have felt that way.
8        Q.   (BY MR. VYDASHENKO) Now, earlier you had
9    indicated that typically you want to see the CEO approve
10   SEC filings. Do you recall whether anything had changed
11   to make it -- make you comfortable to file without
12   Mr. Grob's approval?
13       A.   I don't recall.
14           (Exhibit 62 marked)
15       Q.   (BY MR. VYDASHENKO) I have marked as Exhibit 62
16   an e-mail from Alyssa Vasquez to Andrew Farmer copying
17   you and Charles Grob dated July 27, 2012 with an
18   attachment.
19           Do you recognize, Mr. Loev, Exhibit 62 as
20   an e-mail that you received?
21       A.   It looks familiar.
22       Q.   Who is Alyssa Vasquez?
23       A.   So Alyssa was kind of a shared employee between
24   my -- myself and my wife's EDGAR firm. So this would
25   have been in connection with the EDGARization of this

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

Page 97

1  an article about Chimera and some other company, NVMN.
2  My recollection is I didn't even know who that company
3  was. It could have been -- my recollection is I didn't
4  even know who that other company is or was. And he was
5  questioning this company and our firm's involvement and
6  wrote some pretty nasty things probably about both. And
7  so I was more concerned about my -- my reputation. I
8  had a couple clients calling me and said, hey, you know,
9  we -- what are you -- we weren't really involved in the
10 company's public filings after this registration went
11 effective, what about press releases, et cetera.
12   Q.  Setting aside the allegations made with regard
13 to yourself and your law firm, do you -- what did this
14 article allege about Chimera?
15   A.  I don't recall.
16   Q.  But do you recall that the article made
17 allegations about Chimera?
18   A.  Sure.
19   Q.  How did you respond to that?
20   A.  I don't remember if I responded on behalf of
21 the company or not. I definitely responded on behalf of
22 myself and my firm.
23   Q.  Did -- did the allegations with respect to the
24 company, did those lead you to investigate further or
25 ask any questions of the company or generally make some

Page 98

1  attempt to verify whether they were accurate or not?
2    A.  I don't recall what discussions. I believe I
3  had discussions with the company.
4    Q.  Well, it sounds like somebody -- I think you
5  said somebody made some nasty allegations -- right? --
6    A.  Correct.
7    Q.  -- about the company. I mean, wouldn't that be
8  something you would want to raise with the company?
9    A.  Sure.
10   Q.  With whom did you discuss this article?
11   A.  It looks like I -- from my billing records I'm
12 looking at, it looks like I discussed it with Andrew and
13 Tyson.
14   Q.  Do you recall discussing it with Mr. Grob?
15   A.  I don't.
16   Q.  Is there a reason why you would not have
17 discussed this with Mr. Grob but you did discuss it with
18 Mr. Farmer and Mr. Rohde?
19   A.  I think that Andrew and Tyson were the more
20 active spokespersons with these different processes. So
21 my guess is whatever was in the marketplace, they
22 probably were involved or knew more about, but I don't
23 know. I'm just speculating.
24   Q.  What's that impression or speculation based on?
25   A.  They're the ones who were calling me about this

Page 99

1  article, knew about it, maybe asking me to respond.
2    Q.  What conversations did you have -- so you did
3  speak about this article with Mr. Farmer, right?
4    A.  I believe so.
5    Q.  Tell me about that conversation.
6    A.  I don't recall the conversation.
7    Q.  Do you recall anything Mr. Farmer said to you
8  in regards to this article?
9    A.  I don't.
10   Q.  Do you recall asking Mr. Farmer whether the
11 statements made about Chimera in the article were true
12 or false?
13   A.  I'm assuming they must have told me that the
14 statements were false, but I don't remember.
15   Q.  So you don't have a specific recollection of
16 Mr. Farmer denying this -- the allegations in the
17 article?
18   A.  I -- I don't remember.
19   Q.  Now, at this time Chimera was still a client of
20 yours, right?
21   A.  I'll say yes, on a limited basis, sure.
22   Q.  And, I mean, didn't it give you some pause that
23 there was somebody out there saying very negative things
24 about your client and alleging that their press releases
25 were false?

Page 100

1    A.  Sure.
2    Q.  And wouldn't you have wanted to get comfortable
3  and make sure that the company you were representing
4  is -- is not doing the things that are alleged?
5    A.  Sure.
6    Q.  So I guess my question is: Why didn't you call
7  the -- or talk to the CEO about that?
8    A.  Well, I think I spoke to Andrew and Tyson, who
9  were the people that seemed to be the people engaged and
10 have the authority to talk on behalf of the company.
11   Q.  Did you believe at this time that Andrew and
12 Tyson were in charge of the company?
13   A.  I believe they had an active role with the
14 company.
15   Q.  Do you believe that their role with the company
16 was more important than Mr. Grob's role?
17   A.  In some ways, sure.
18   Q.  In what ways is that?
19   A.  Dealing with some of these different government
20 agencies to get approval in its process of becoming a
21 public company.
22   Q.  Do you believe at this point that Mr. Farmer
23 had final say with respect to issues relating to
24 Chimera?
25   A.  I think he had authority for some of the

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

**Page 105**

1   Q. And then it says "coordinate edgarization of
2   8K, review letter exhibit." You understand that is the
3   letter exhibit to the 8-K?
4   A. I assume.
5   Q. Now, looking at Exhibit 66, the bottom line --
6   the bottom e-mail from Mr. Farmer to you where he says
7   "My Mac just crashed. I've got a few paragraphs to
8   rebuild. Can you give me another 15 minutes?"
9   A. Yes.
10  Q. Is Mr. Farmer here talking about his draft of
11  the 8-K or the letter exhibit to it?
12      MR. EDMUNDSON: Objection. Form.
13  A. Yes, I assume he's referring to the 8-K and/or
14  exhibit to the 8-K or both.
15  Q. (BY MR. VYDASHENKO) Now, you respond to him and
16  you say we can do it in the morning. And he says at the
17  top e-mail "Tell Alyssa we'll buy her lunch and flowers
18  if she stays another little bit. I'll also gladly pay
19  double the normal filing fee."
20      Do you see that?
21  A. Yes.
22  Q. Now, this is being filed on behalf of Chimera,
23  right?
24  A. Yes.
25  Q. And Chimera was the company that paid your

**Page 106**

1   bills; right?
2   A. Correct. They would have paid my wife's bill.
3   This is separate from my bill; but, yes.
4   Q. Okay. Did it strike you or surprise you as
5   unusual that Mr. Farmer is saying "I'll gladly pay
6   double the normal filing fee"?
7   A. Sure. I mean, people -- people are very pushy
8   these days. I'm just trying -- I mean, it's interesting
9   here because, I mean, they're really trying to get my
10  assistant to stay there. It's tied to my wife's
11  business more than me, but sure.
12  Q. Well, did you think it was unusual that
13  Mr. Farmer seemed to have been willing to go out of his
14  own pocket to pay double?
15  A. I doubt we charged him double; but, sure, I
16  hear you.
17  Q. Because the arrangement was Chimera would pay
18  for the filing fee, right?
19  A. Correct. I don't think -- to my recollection,
20  I don't think Andrew ever paid our firm or my wife's
21  company.
22  Q. All right.
23      (Exhibit 67 marked)
24  Q. (BY MR. VYDASHENKO) Mr. Loev, I have handed you
25  a document. It's been marked as Exhibit 67. On the

**Page 107**

1   first page is an e-mail from -- from you to Mr. Farmer
2   and there's an e-mail below that and then there's an
3   attachment, which appears to be a submission of an 8-K
4   to the SEC.
5       Do you see that?
6   A. Yes, I do.
7   Q. Do you recognize Exhibit 67 as an e-mail you
8   received?
9   A. Yes, I do.
10  Q. Or, excuse me, as an e-mail you sent?
11  A. Okay. Yes, I do.
12  Q. Now, you've asked -- at the top of the e-mail
13  you -- you're asking Mr. Farmer to confirm approval to
14  file. You're referring to the attached 8-K, right?
15  A. Correct, yes.
16  Q. And you didn't include Mr. Grob on this e-mail,
17  right?
18  A. Correct.
19  Q. So at this point did you feel that Mr. Farmer's
20  approval was sufficient to file an 8-K on behalf of
21  Chimera?
22  A. It appears that way.
23  Q. Let's take a look at the attachment to
24  Exhibit 67. The first few pages, those appear to be
25  internal to Loev Corporate Filings, right, the first

**Page 108**

1   couple pages of the attachment?
2   A. Sure. The 8-K portion?
3   Q. No. The -- the third page of the entire
4   exhibit. Do you see what I'm talking about?
5   A. I'm sorry. No, I'm not sure what you're
6   talking about.
7   Q. Okay. Looking at the second and third page of
8   the exhibit -- of Exhibit 67 --
9   A. Okay.
10  Q. -- those documents are internal to Loev
11  Corporate Filings, right?
12  A. Correct.
13  Q. And they don't have any meaning?
14  A. Correct.
15  Q. Okay. Now -- and then there's the cover page
16  of the 8-K form?
17  A. Correct.
18  Q. And then the form itself states "On August 28,
19  Chimera Energy Corp. posted to the Company's website a
20  shareholder letter from the CEO, Charles Grob," and it
21  refers to an attachment of that letter, right?
22  A. Yes.
23  Q. What role did you have with respect to the
24  preparation and filing of this 8-K?
25  A. Okay. We didn't prepare the 8-K. We didn't

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

Page 113

1    A.  I guess they're asking is the same person
2  involved with Chimera and Gankit, maybe whoever this
3  NV -- whatever -- entity is.
4    Q.  Now, do you remember generally that this
5  person, Infitialis, was alleging that there was an --
6  with respect to Chimera there was an undisclosed control
7  person who was in charge of everything?
8    A.  I wouldn't have recalled that.
9        MR. EDMUNDSON: I'm sorry.  The answer?
10       THE WITNESS: I didn't recall that.
11   Q.  (BY MR. VYDASHENKO) I'll represent to you that
12  this was an allegation that was made in the Seeking
13  Alpha article that we had discussed earlier.  One of the
14  allegations was there is somebody behind the scenes at
15  Chimera who is controlling everything, okay?
16   A.  Okay.
17   Q.  And so how would you answer that question in
18  that light?
19       MR. EDMUNDSON: Objection to form.
20       Do you have a copy of the press release or
21  the letter, whatever -- whatever it is?
22       MR. GREEN: And my objection would be is
23  the person that wrote this, even if you can identify
24  them, listed as a witness in this case?  Are -- are they
25  listed as a witness?

Page 114

1        MR. VYDASHENKO: No.
2        MR. FLYNN: My objection is I don't
3  understand the question.
4        MR. GREEN: Same objection, Nikolay.
5  Thank you.
6        MR. FLYNN: So I'm not going to let him
7  answer it until at least I understand the question.
8        MR. VYDASHENKO: Okay.  Let me try to
9  rephrase.
10   Q.  (BY MR. VYDASHENKO) What I've represented to
11  you is -- and I understand their objections in this
12  regard, which we may fix later, but what I've
13  represented to you is that the author of this Seeking
14  Alpha article, which is the same person that's writing
15  to you here, alleged that there is an undisclosed
16  control person who is in charge of Chimera.  Do you
17  understand that premise?
18   A.  Okay.  Yes.
19   Q.  And in this e-mail Infitialis is asking who is
20  the undisclosed control person orchestrating these
21  deals.  And so I am asking you how would you answer that
22  question now?
23       MR. FLYNN: And the question being who is
24  the undisclosed person?
25       MR. VYDASHENKO: Yeah.

Page 115

1        MR. EDMUNDSON: Of what?
2        Objection to form.
3        MR. FLYNN: If you understand the
4  question, feel free to answer it.
5    A.  I think the answer is -- concept is Andrew was
6  heavily involved with Chimera and may have been heavily
7  involved with Gankit.  I'm not sure.  I don't know this
8  other company -- I don't believe I have knowledge of the
9  other company they're talking about.
10   Q.  (BY MR. VYDASHENKO) All right.  Let me try to
11  simplify it.  If I were to ask you the question: Who is
12  the undisclosed control person who is in charge of
13  Chimera, what is your answer today?
14   A.  Andrew Farmer had a pretty significant role and
15  potentially should have been disclosed as a control
16  person.
17   Q.  Why do you believe he potentially should have
18  been disclosed as a control person?
19   A.  It seemed like he was taking on some roles that
20  are typically suited for an officer or director of a
21  company.
22   Q.  And specifically which roles are those?
23   A.  If he was doing authorization of SEC filings,
24  that would be a specific role.
25   Q.  Anything else?

Page 116

1    A.  Well, these other roles, whether they're
2  delegated or not, dealing with different regulatory
3  agencies as well.  They may be suited for an officer of
4  a company as well.
5    Q.  Anything else?
6    A.  Well, maybe just his interactions.  I don't
7  know.
8    Q.  His interactions with you?
9    A.  Sure.
10   Q.  Now, did you ever advise Mr. Farmer -- let me
11  rephrase that.
12       Did you ever advise Mr. Grob to disclose
13  Mr. Farmer's role?
14   A.  I don't recall.
15   Q.  Did you ever advise Mr. Farmer to disclose
16  Mr. Farmer's role?
17   A.  I -- I don't recall.  We may -- we may have
18  asked the question; but, sure, I don't recall.
19   Q.  Did you -- do you recall advising Mr. Rohde to
20  disclose Mr. Farmer's role?
21   A.  I don't recall.
22   Q.  All right.  Staying with Exhibit 68, I want to
23  direct your attention to the second page of that
24  exhibit.  At the top there's an e-mail at 2:41 p.m. from
25  Infitialis.  It begins with "You don't know Kylecorp?"

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

Page 117

1          Do you see that?
2     A.  Yes.
3     Q.  And Infitialis says "They are the company that
4  lent $100,000 to Chuck Gorb so that he could pay your
5  your legal fees.  Surely you can provide information as
6  to who is behind Kylecorp."
7          I'll just stop there.
8          Do you remember reading that statement
9  that I just read?
10    A.  I believe so.
11    Q.  Did you do any investigation to determine who
12  was behind Kylecorp?
13    A.  I don't recall.
14    Q.  Did you have any conversations with Mr. Farmer
15  regarding Kylecorp or -- I believe this person is
16  referring to Kylemore.
17    A.  To what?
18    Q.  Kylemore.
19    A.  Well, who is Kylemore?
20    Q.  Kylemore, you'll recall --
21    A.  The promissory note?
22    Q.  Yeah.  That's the lender.
23    A.  Okay.  I couldn't remember the name.  Okay.
24  Sure.  At the time I don't even remember if that was the
25  promissory note who it was with.  I didn't recall that

Page 118

1  probably.  But when we filed the registration, we would
2  have asked questions about who this party is, are they
3  related?  That would have been in our -- I believe in
4  our registration statement document questions.
5     Q.  In response to the allegation -- or the
6  statement on Page -- on Exhibit 68 regarding Kylecorp,
7  did that cause you to do anything or talk to anybody to
8  find out more?
9     A.  I -- I don't recall.
10          MR. GREEN:  Excuse me.  The -- okay.  I
11  was just making sure.  The entire string of e-mails --
12  that's from the same day, 8/14; is that right, Nikolay?
13          MR. VYDASHENKO:  Yes.
14          MR. GREEN:  Okay.
15          MR. VYDASHENKO:  Yeah.
16          MR. GREEN:  Thank you.
17          (Exhibit 69 marked)
18    Q.  (BY MR. VYDASHENKO) Mr. Loev, I have handed you
19  an exhibit that's -- or document that's been marked as
20  Exhibit 69.  It's a chain of e-mails that involve
21  Infitialis, you, Tyson Rohde and Andrew Farmer.  It
22  bears Bates No. TM000289 through 290.
23          Do you see that?
24    A.  I'm sorry.  I was scanning this stuff.
25    Q.  Excuse me.  With respect to the bottom two

Page 119

1  e-mails on Exhibit 69, do you recognize those as e-mails
2  that you sent and received in August 2012?
3     A.  Yes, I believe so.
4     Q.  And in the bottom e-mail from Infitialis, it
5  appears he sent -- sends this to Infitialis but it must
6  have -- that e-mail must have found its way to you in
7  some way, right?
8     A.  Sure.
9     Q.  And the -- on the same page in the body of the
10  e-mail it says "Recording of Rolando Galindo head of IR
11  for Pemex denying existence of Chimera Energy Contract."
12          Do you see that?
13    A.  I do.
14    Q.  And then there's a link to a YouTube video?
15    A.  Okay.
16    Q.  Or what appears to be a link to a YouTube
17  video?
18    A.  Sure.
19    Q.  Do you recall receiving that e-mail from
20  Infitialis?
21    A.  It looks familiar.
22    Q.  Did you click on the YouTube link and view the
23  video?
24    A.  I don't remember.  I don't -- I'm not sure that
25  I did.

Page 120

1     Q.  Do you have an understanding of the
2  significance of the statement regarding "Pemex denying
3  existence of Chimera Energy Contract"?
4     A.  Sure.
5     Q.  And what was -- what was the significance of
6  that?
7     A.  This company was putting out false or
8  misleading information.
9     Q.  So did you understand at this point that
10  Chimera had made some statements regarding its business
11  affiliation with Pemex?
12    A.  I -- I don't recall.  I may have just passed on
13  the message and I'm not sure I realized that this was --
14  people make these allegations and I'm not sure I
15  understood this was definitely true or whatever.
16    Q.  Did you have an understanding that this was an
17  allegation that Chimera had made a false public
18  statement?
19    A.  I don't remember if I looked into it or
20  forwarded it on or -- or what the story.  I don't --
21  I don't recall.
22    Q.  Well, did you just -- and I guess I'm not
23  asking you about what you did with it, but really in
24  terms of when you received it, did you -- did you have
25  an understanding that the nature of -- of the message

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

---

Page 121

1  was — was that there was an allegation that Chimera was
2  making false public statements?
3     A.  I'm not sure if I realized or -- or thought
4  about it.
5     Q.  Now, you forwarded this to Tyson and Rohde and
6  Andrew Farmer, right?
7     A.  Correct.
8     Q.  Why didn't you send it to Mr. Grob?
9     A.  Fair question.  I don't know the answer.
10    Q.  Did you have any discussions with Mr. Farmer or
11 Mr. Rohde regarding this message?
12    A.  I'm not sure.
13    Q.  Did you send this to Mr. Rohde and Mr. Farmer
14 because you believed that they were in charge of Chimera
15 as of August 24, 2012?
16       MR. EDMUNDSON: Objection.  Form.
17 A.  It seems that way.
18       MR. VYDASHENKO: Let's go off the record.
19       (At 12:38 P.M., a lunch recess was taken
20       until 1:34 P.M. of the same day.)
21    (Nothing omitted nor deleted.  See next page.)
22
23
24
25

---

Page 122

1        WEDNESDAY, JULY 8, 2015; P.M. SESSION
2          EXAMINATION RESUMED
3     Q.  (BY MR. VYDASHENKO) All right, Mr. Loev.  Do
4  you recall at some point Chimera and Mr. Grob being sued
5  by a company called Air Liquide?
6     A.  I vaguely remember the lawsuit, sure.
7     Q.  What is your recollection of that lawsuit?
8     A.  I believe there may have been a misstatement or
9  something that Chimera represented about Air Liquide
10 that Air Liquide took offense to and said, hey -- they
11 filed a lawsuit, I guess, to get them to either retract
12 or do something differently.
13    Q.  And do you recall that statement being made in
14 a -- in one of Chimera's press releases?
15    A.  I didn't recall that.
16    Q.  But it was -- in any event, that was a public
17 statement, right?
18    A.  I believe so.
19       MR. GREEN: What was a public statement?
20    Q.  (BY MR. VYDASHENKO) The statement --
21       MR. GREEN: The press release or the --
22    Q.  (BY MR. VYDASHENKO) The statement over which
23 Air Liquide sued Chimera and alleged that it was
24 inaccurate -- was a statement that Chimera made
25 publicly; is that right?

---

Page 123

1     A.  I believe so, yes.
2     Q.  Did you work on the Air Liquide matter?
3     A.  To some extent.  I'm a nonlitigator.  So I do
4  transaction work.  So an attorney who's a litigator
5  who's of counsel to our firm named Tim Henderson.  So he
6  probably would have handled the litigation aspects.  He
7  would bill under TH in the billing records.  So he would
8  show up differently than John and myself.
9     Q.  Got it.  So on Exhibit 56 where I see TH --
10    A.  Exactly.  That's Tim Henderson.
11    Q.  -- that's Mr. Henderson?
12    A.  Correct.
13    Q.  How did it come about that your -- your firm
14 came to represent Chimera in the Air Liquide litigation?
15    A.  I believe Andrew Farmer contacted me about this
16 matter.
17    Q.  What did Mr. Farmer say?
18    A.  I don't recall.
19    Q.  Was the result of that conversation the
20 decision that you would, through perhaps Mr. Henderson,
21 represent Chimera in this litigation?
22    A.  Yes.
23    Q.  Now, was Mr. Farmer involved in the decisions
24 relating to this litigation?
25       MR. EDMUNDSON: Objection.  Form.

---

Page 124

1     A.  I believe he was involved, yes.
2     Q.  (BY MR. VYDASHENKO) Did Mr. Farmer ever dispute
3  the Air Liquide allegations in the lawsuit?
4     A.  I don't recall.
5        MR. EDMUNDSON: Objection.  Form.
6     Q.  (BY MR. VYDASHENKO) You don't remember having
7  any conversation with Mr. Farmer where -- where he said
8  that this is not accurate or this is not right?
9     A.  I don't remember the discussions.
10    Q.  Did you have any discussions with Mr. Grob
11 about this matter?
12    A.  I think so.
13    Q.  Did Mr. Grob ever dispute the allegations of
14 Air Liquide?
15    A.  I don't recall.
16    Q.  How about Mr. Rohde?
17    A.  I don't recall him having any dispute either.
18    Q.  Now, the outcome of this matter was that it was
19 settled, right?
20    A.  Correct.
21    Q.  And do you recall that Chimera and Mr. Grob
22 agreed to enter into a permanent injunction that would
23 restrain them from making certain statements about Air
24 Liquide?
25    A.  I vaguely remember that, yes.

---

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

Page 129

1    A.  Yes.
2    Q.  Now, at the bottom -- on the bottom e-mail that
3    you address to Charles, you say you're following up on
4    my e-mail from yesterday.  Is that a reference to the
5    e-mail that we've marked as Exhibit 70 where you've
6    asked him to confirm whether he agrees with -- whether
7    the settlement terms are acceptable?
8    A.  Yes, I believe so.
9    Q.  So Mr. Grob responds on the e-mail above and he
10   says -- copying Mr. Farmer and Mr. Rohde.  He says
11   "David, The terms look fine to me pending Andrew's
12   approval."
13         Do you see that?
14   A.  I do, yes.
15   Q.  So it seems like Mr. Farmer is still involved
16   with Chimera at this point, right?
17   A.  Yes.
18   Q.  Because the CEO of a company is -- is
19   essentially saying the settlement with the company is
20   contingent on his approval.  Is that how you read that?
21         MR. EDMUNDSON: Objection.  Form.
22   A.  Maybe. I don't know.
23   Q.  (BY MR. VYDASHENKO) Well, so on the e-mail
24   above, you -- you e-mail Mr. Farmer and you say let me
25   know your thoughts so I can communicate with the other

Page 130

1    attorney.
2         Do you see that?
3    A.  Yes.
4    Q.  Does that reflect that you had understood that
5    Mr. Farmer's approval was required for the settlement to
6    be effectuated?
7    A.  Sure.
8         MR. EDMUNDSON: Objection.  Form.
9    A.  Sure.
10   Q.  (BY MR. VYDASHENKO) Now, earlier you had told
11   me that as you first understood it, Mr. Farmer's role
12   and also Mr. Rohde's role was consulting a company with
13   regards to the S-1 filing, right?
14   A.  Yes.
15   Q.  Now, this is happening on October 3rd, 2012 and
16   that's almost a year after the S-1 filing, right?
17   A.  Yes.
18   Q.  And they're still involved with the company,
19   right?
20   A.  Yes.
21   Q.  So is it fair to say that in this point in time
22   their role was -- went beyond consulting the company
23   with the S-1 filing?
24   A.  Yes.
25   Q.  By this point in time, did you have an

Page 131

1    understanding what their role was?  And by "their" I
2    meant Mr. Farmer and Mr. Rohde.  And we can take those
3    one at a time.
4    A.  I think we went from filing the S-1 to really
5    having a limited role and then getting involved with
6    this litigation matter.  So I wasn't -- I don't know
7    much about what they were doing with the company I think
8    is an accurate statement.  So I don't know who was doing
9    what in between that time of that S-1 getting effective
10   all the way down to this litigation.  I -- I don't
11   recall, but I don't think I had that much interaction
12   with the company.
13   Q.  But would you agree that at this point in time,
14   October -- early October 2012, Mr. Farmer's role went
15   beyond that of a consultant to Chimera for the purposes
16   of doing the S-1?
17   A.  Yes.
18   Q.  Would your answer be the same with respect to
19   Mr. Rohde?
20   A.  Yes.
21   Q.  I want to direct your attention to -- back to
22   Exhibit 56, your time entries.
23   A.  Yes.
24   Q.  Looking at the -- the invoice for the month of
25   October 2012, I just want to ask a few things with

Page 132

1    respect to the entries for that month.  The entry for
2    December 1st, 2012, the second-to-last line --
3    A.  I'm sorry.  What date?
4         MR. FLYNN: Yeah, what date was that?
5    Q.  (BY MR. VYDASHENKO) Sorry.  October 1st, 2012.
6    A.  Okay.
7    Q.  I'm going to read starting with the words
8    "Phone call" on the second-to-last line of that day's
9    entry.  It says "Phone call with Andrew regarding
10   documents received, discuss drafting of press release."
11   What does that refer to, the words
12   "discuss drafting of press release"?
13   A.  I assume it's in connection with the
14   settlement, but I'm speculating.  I don't know.
15   Q.  Do you ever recall yourself drafting a press
16   release or anybody at your firm drafting a press release
17   on behalf of Chimera?
18   A.  I don't think so.  Not to my recollection.
19   Q.  In the entry for October 2nd, 2012, that
20   line -- that entry reads "Phone call with Charles
21   regarding shareholder."  Do you know what that's about?
22   A.  I don't.
23   Q.  Then it says "comma TRO, not stating their
24   name." Do you know what that's about?
25   A.  I don't remember.

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

David Loev
July 8, 2015

Page 245

1   more questions.
2           THE REPORTER: Okay.  Well, I didn't get
3   the last one.
4           MR. GREEN: He said he withdrew the
5   question.
6           THE REPORTER: Okay.
7           MR. MORENO: No more questions.
8           THE REPORTER: Okay.
9           MR. EDMUNDSON: I've got two on recross.
10          FURTHER EXAMINATION
11  Q.  (BY MR. EDMUNDSON) Mr. Farmer was your primary
12  point of contact?
13  A.  Correct.
14  Q.  Okay.  That doesn't necessarily mean that he
15  was the control person of the company, does it?
16  A.  Correct.
17  Q.  You understood that to the extent that
18  Mr. Farmer, as the SEC suggests, authorized the filing
19  of certain public filings with the Commission, it's your
20  understanding that his authority derived through
21  delegation from a corporate officer; isn't that correct?
22  A.  I think that's probably correct.
23          MR. EDMUNDSON: All right.  No further
24  questions.
25          MR. GREEN: Nothing further.

Page 246

1           MR. MORENO:  Nothing further.
2           THE REPORTER:  Any other stipulations
3   before we close the record?
4           MR. FLYNN:  Other than we would like to
5   read and sign the deposition.  The witness will not be
6   waiving that.
7           THE REPORTER:  Okay.  We're off the record
8   at 4:52.
9           (At 4:52 P.M., the deposition proceedings
10              concluded.)
11
12
13
14
15
16          _____
17                  DAVID LOEV
18
19
20
21
22
23
24
25

Page 247

1   COUNTY OF HARRIS        )
2   STATE OF TEXAS          )
3       I hereby certify that the witness in the foregoing
4   deposition, DAVID LOEV, was by me duly sworn to testify
5   to the truth, the whole truth and nothing but the truth,
6   in the within-entitled cause; that said deposition was
7   taken at the time and place herein named; and that the
8   deposition is a true record of the witness's testimony
9   as reported by me, a duly certified shorthand reporter
10  and a disinterested person, and was thereafter
11  transcribed into typewriting by computer.
12      I further certify that I am not interested in the
13  outcome of the said action, nor connected with nor
14  related to any of the parties in said action, nor to
15  their respective counsel.
16      IN WITNESS WHEREOF, I have hereunto set my hand this
17  16th day of July, 2015.
18  Reading and Signing was:
19  _X__ requested ___ waived ___ not requested
20
21          _Kelly Hanna_
22
23          Kelly Hanna, CSR, RMR, CRR, CMRS
24              Texas CSR 1624
25              Expiration:  12/31/2015

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Baldemar P. Rios
July 7, 2015

---

Page 1

```
1            IN THE UNITED STATES DISTRICT COURT
2         FOR THE SOUTHERN DISTRICT OF TEXAS
3                    HOUSTON DIVISION
4
5   - - - - - - - - - - - - -
6   SECURITIES AND EXCHANGE   )
7   COMMISSION,               )
8          Plaintiff,         )
9   VS.                       ) CASE NO.
10  ANDREW I. FARMER, CHARLES ) 4:14-CV-02345
11  E. GROB, JR., CAROLYN     )
12  AUSTIN, BALDEMAR P. RIOS, )
13  and CHIMERA ENERGY CORP.  )
14         Defendants.        )
15  - - - - - - - - - - - - -
16
17            DEPOSITION OF BALDEMAR P. RIOS
18               TUESDAY, JULY 7, 2015
19
20
21         BEHMKE REPORTING AND VIDEO SERVICES, INC.
22              BY: DONNA WORLEY, CSR. NO. 7390
23                    160 SPEAR STREET, SUITE 300
24                  SAN FRANCISCO, CALIFORNIA 94105
25                               (415) 597-5600
```

---

Page 2

```
1
2
3
4
5
6
7       Deposition of BALDEMAR P. RIOS, Volume 1, taken on
8   behalf of Plaintiff, at U.S. Attorney's Office for the
9   Southern District of Texas, 1000 Louisiana, Suite 2300,
10  Houston, Texas, commencing at 9:28 a.m., TUESDAY, JULY 7,
11  2015, before Donna Worley, Certified Shorthand Reporter
12  No. 7390, pursuant to Notice of Deposition.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
1   APPEARANCES OF COUNSEL:
2   FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION:
3       UNITED STATES SECURITIES AND EXCHANGE COMMISSION
4       BY:  NIKOLAY VYDASHENKO, ATTORNEY AT LAW
5            MATTHEW J. GULDE, ATTORNEY AT LAW
6       801 Cherry Street, Suite 1900
7       Fort Worth, Texas  76102
8       Telephone:  (817) 978-1410
9       E-mail:  vydashenkon@sec.gov
10               guldem@sec.gov
11
12  FOR DEFENDANT BALDEMAR P. RIOS:
13      RICHARD D. MORENO, LLC
14      BY:  RICHARD D. MORENO, ATTORNEY AT LAW
15      125 West School Street
16      Lake Charles, Louisiana  70605
17      Telephone:  (337) 656-8654
18      E-mail:  richard@rdmorenolaw.com
19
20
21
22
23
24
25
```

---

Page 4

```
1  APPEARANCES OF COUNSEL - CONTINUED
2  FOR DEFENDANT CAROLYN AUSTIN:
3      FELDESMAN TUCKER LEIFER FIDELL, LLP
4      BY: DUHA EL-QUESNY, ATTORNEY AT LAW
5      1129 20th Street, NW, 4th Floor
6      Washington, D.C.  20036
7      Telephone: (202) 466-8960
8      E-mail: delquesny@ftlf.com
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

APP: 000070

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Baldemar P. Rios
July 7, 2015

---

Page 9

```
 1              EXHIBITS - CONTINUED
 2         BALDEMAR P. RIOS - VOLUME 1
 3  Number        Description              Page
 4  Exhibit 46   E-mail string between Mr. Farmer,
 5               Mr. Massey, and Mr. Rios, 10-10-12,
 6               re:  8-K on Baldemar
 7               (TM000613-616) - 4 pages         210
 8  Exhibit 47   E-mail string between Melinda Park,
 9               Mr. Grob, Mr. Massey, Mr. Farmer,
10               with cc to Mr. Rios, re:  Questions
11               regarding CHMR
12               (TM000229-237) - 9 pages         215
13  Exhibit 48   E-mail from Mr. Rios to Ms. Park,
14               with cc to Mr. Grob, 10-15-12,
15               re:  Chimera Energy Corp.
16               (SEC-LoovLaw-E-0000340-348) - 10 pages  231
17
18
19
20
21
22
23
24
25
```

---

Page 11

1   A. No.
2   Q. Have you given testimony in a court of law since
3   that time?
4   A. Or in any other case different than this one?
5   Q. Any case. Any case.
6   A. Yes, I've been in a court, yes, before.
7   Q. What was the -- what was the nature of that
8   proceeding?
9   A. It was a bankruptcy issue that I had.
10  Q. Okay.
11  A. Personal, yeah.
12  Q. And I'll ask a little bit more about that, but
13  let me give you a couple of thoughts on the rules for
14  the road today, how we'll proceed. I'm going to -- I'm
15  going to ask you questions. I'm going to do my very
16  best to speak slowly and make myself understood, and the
17  most important thing is that the court reporter can get
18  down every single word that we both say.
19  A. Okay.
20  Q. So before you start answering, go ahead and let
21  me finish -- make sure I finish my question.
22  A. Yes.
23  Q. And that may lead to moments like that where you
24  wonder if I've stopped talking, but that's fine because
25  the most important thing is that we don't talk over each

---

Page 10

1         TUESDAY, JULY 7, 2015; 9:28 A.M.
2
3         THE REPORTER: Would y'all like to
4   stipulate to read the introduction?
5         MR. GULDE: Do you guys need to hear it?
6         MR. MORENO: No, use your stipulation.
7         MR. GULDE: Yeah, we'll stipulate.
8         BALDEMAR P. RIOS,
9   having been first duly sworn, testified as follows:
10              EXAMINATION
11  BY MR. GULDE:
12  Q. Would you state your name for the record,
13  please?
14  A. Yes. Baldemar Rios.
15  Q. Mr. Rios, I'm Matt Gulde. I introduced myself
16  earlier. I work for the Securities and Exchange
17  Commission. This is called a deposition.
18       Do you remember sitting down with Nikolay
19  and another man from our office back in January of 2013?
20  A. Yes.
21  Q. That -- I'll refer to that occasionally today as
22  your prior testimony, okay?
23  A. Yes.
24  Q. Have you sat down and given testimony at any
25  time since that time?

---

Page 12

1   other.
2   A. All right.
3   Q. And if we start getting that messed up, we'll
4   remind you and you can remind me; and we'll figure it
5   out.
6         Is there any reason, any medical reason,
7   any medication you're on that you can't testify
8   truthfully and accurately today?
9   A. No.
10  Q. Okay. Now, you mentioned your -- you mentioned
11  your personal bankruptcy. When was this?
12  A. It was in 2000 -- it was basically -- it was --
13  I can't remember. I think it was in 2011.
14  Q. You filed bankruptcy --
15  A. Yes.
16  Q. -- in 2011?
17  A. Yes.
18  Q. Okay. And where -- what is the status of your
19  personal bankruptcy?
20  A. Well, it's already over.
21  Q. Okay. How was it resolved?
22  A. Well, they resolve that -- I mean, we went
23  through all the process and the bankruptcy finish. When
24  you say -- well, you -- well, you just -- I mean, I
25  think all the issues that -- well, there was --

---

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600
APP. 000071

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Baldemar P. Rios
July 7, 2015

Page 57

1    Q.  Looking a couple of pages into this, when it
2  says, "General Drilling Proposal," it looks like it's
3  referring to a proposal by a company called Turnkey E&P,
4  Incorporated.  Are you familiar with them?
5    A.  Which page you say?
6    Q.  It's the page Bates labeled on the bottom
7  TM000214.
8    A.  Okay.  Oh, this is -- this one, yeah.
9    Q.  Do you see at the bottom of that page, it says,
10  Turnkey proposes?
11    A.  Yeah.  (Witness reading to himself.)
12    Q.  Does that refresh your recollection as to how
13  you might have gotten this document?
14    A.  No.
15    Q.  Do you have any interaction -- had you had any
16  prior interaction with Turnkey E&P, Incorporated?
17    A.  No.
18    Q.  Had you had any prior access to documents that
19  might have been like this, a proposal from Turnkey?
20    A.  No.
21    Q.  Do you know if Jose Luis Ochoa had any
22  involvement with Turnkey E&P?
23    A.  No, because I can't remember nothing he had told
24  me, no.
25    Q.  Do you have any idea if Jose Quiroga had any

Page 58

1  interaction with Turnkey E&P?
2    A.  No, neither.  No, I wouldn't know.
3    Q.  Okay.  As you sit here today, you have no idea
4  where this document came from?
5    A.  Yes, exactly, yeah.
6    Q.  But it's pretty clear that you got it and you
7  sent it on to Thomas Massey, correct?
8    A.  I might have sent it, yes.
9    Q.  And someone, at least, changed this cover page
10  in this attachment to reflect Chimera -- that it could
11  at least become a proposal by Chimera?
12    A.  Well, I don't remember if that was the reason.
13  I wouldn't remember, no.
14    Q.  Well, you don't remember who did it, but someone
15  has written Chimera on the -- on the cover page of
16  this --
17    A.  Yes.
18    Q.  -- attachment?
19    A.  Yes.
20    Q.  And in the e-mail, you're telling Thomas Massey
21  that you will correct it --
22    A.  Uh-huh.
23    Q.  -- correct?
24    A.  Yes.
25    Q.  But you don't recall any of this?

Page 59

1    A.  Yes.  Well, I -- I -- I don't remember -- you
2  know, I don't remember -- I have sent this e-mail, but I
3  don't remember it --
4    Q.  Okay.
5    A.  -- you know, exactly that it...
6    Q.  That second part of the personal e-mail to
7  Thomas Massey says, "The person who sent me this at
8  midnight yesterday did not do it what he's supposed to
9  do it, I will get the letter that you want late
10  tonight."
11         Does any of that refresh your recollection
12  as to who made this attachment to Exhibit 34?
13    A.  No.  And I don't remember either which -- which
14  letter -- no, I don't remember exactly what -- I mean,
15  what I'm -- exactly what it was that --
16    Q.  Okay.
17    A.  -- which --
18    Q.  Does it help you understand why Thomas Massey
19  wanted it?
20    A.  No, no, no.  Either, you know, he -- I just
21  remember, you know, that -- that that, you know, I was asked
22  to do -- or to do -- because we were working on a
23  plan -- we were working on a plan to -- to put together
24  something on the -- on the technology.  I mean, but of
25  course, I am not the person who created the technology,

Page 60

1  you know.  I don't remember.
2    Q.  You were the only engineer involved as far as
3  you knew in this process, correct?
4    A.  Well, I didn't know any -- any other engineer.
5  I didn't know when I was -- when I was offered to help
6  by Charles, I was, you know, let's say hired to help on
7  the technically.  When Charles offered me, he didn't
8  tell me; just ask if there were some other
9  engineers working.  I just say I just need you to feed
10  me with technical information that the company has on
11  this technology.  And I didn't ask him any -- you know,
12  who is the person, so I don't know.
13    Q.  Charles Grob himself was not an engineer?
14    A.  I asked him if he was an engineer, and he said
15  he was not.
16    Q.  Okay.  Thomas Massey, what he an engineer?
17    A.  I don't think he's an engineer.  I never
18  asked -- no, I don't think he's an engineer.
19    Q.  Okay.  And you're saying those men never offered
20  to you information about other engineers and you never
21  asked whether there were any other engineers?
22    A.  Yeah, I didn't ask.
23    Q.  When you later became CEO of Chimera, did you
24  discover that there were, in fact, other engineers
25  working on there?

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600
APP. 000072

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Baldemar P. Rios
July 7, 2015

Page 61

1    A.  There was just a short period of time when I was
2    there -- that I was in Mexico.  I just was in Mexico
3    every day, months without being here.  So when I was
4    over that -- that position, you know, it was just I was
5    in Mexico -- I think I came here, and then I was in
6    Mexico.  And then later, they called me, Charles called
7    me, hey, you stop everything that you are still doing
8    with Chimera.
9    Q.  My question to you was:  When you were CEO of
10   Chimera, did you find out that there were any other
11   engineers working out there?
12   A.  I didn't try because one short period of time I
13   didn't even try to find out how many people that were --
14   I mean, it was a short period for me, but I didn't even
15   try.  There was no time for me.  There were only weeks
16   that I was there.  I don't even have the time to ask
17   things on -- like this one that you say or any other.
18   Q.  Who would you have asked?
19   A.  Like Charles.  Charles.
20   Q.  Who were the other employees of Chimera?
21   A.  I don't know.  I never asked -- I never asked
22   him for employees.  He just say I going to be doing some
23   other things, and I -- I -- I would like you to help me
24   with this and -- and you're going to be offered, you
25   know, in the future, you know, you're going to get some

Page 62

1    stocks in the future and -- but I never asked, you know.
2    I mean --
3    Q.  As CEO, did you ever ask how many employees
4    Chimera had?
5    A.  No, I -- because he -- they say they wanted --
6    Charles says I want you to -- because I am going to be
7    doing some other things, I am going to be working on
8    other project.  He didn't tell me which project.  I
9    never asked him which project.  And of course, I never
10   asked him how many employees the company have or
11   anything like that because I didn't even -- I didn't
12   have -- let's say, I didn't even think myself; and I
13   didn't have the -- the time to react -- you know, to
14   react and ask those kind of things.  And then the
15   company was shut down, you know, so it was short time.
16   It was not like -- maybe I could have asked all these
17   kind of questions if the time would had been longer
18   time.
19   Q.  And when you're talking about the very short
20   time, you're talking about your period, your short stint
21   as CEO, right?
22   A.  Yes, that's right.
23   Q.  Okay.  Back in August of 2012, you had a little
24   more time, right?
25   A.  Yeah, but I was involved only on the -- on the

Page 63

1    technical information, on the --
2    Q.  Okay.
3    A.  -- only that so I didn't ask.  I was just asking
4    for more specific information on the technology.
5    Q.  And if this technology existed, it would be
6    earth-changing technology, correct?
7    A.  Yeah, if anything, it -- and this is something
8    that I agreed -- I agreed with what I read on that
9    technology, and it makes sense.  It made --
10   Q.  Weren't you interested in talking to the other
11   engineers, if there were any?
12   A.  Well, I asked him -- I asked him -- I asked him
13   I don't know how many times to -- you know, to send me
14   that information.  I don't remember if I asked him -- if
15   I asked him to let me talk to someone about that.  But I
16   ask him, I need information on the technology.  I asked
17   him, you know, and he said, "Yeah, I will send the
18   information."  He -- I mean, he always say that he was
19   going to send me the information.
20   Q.  In your career as an engineer, don't you find it
21   frustrating to --
22   A.  Well, yeah.
23   Q.  Let me finish this question.
24         Don't you find it frustrating to get
25   technical information coming from an engineer, but

Page 64

1    spoken through the words of somebody who doesn't
2    understand the technology?  Doesn't that frustrate you?
3    A.  Yeah, the thing is -- you know.  So I wasn't --
4    I didn't want to be disrespectful with him, so this is
5    why I say I will allow you to feed me on this and -- and
6    it was frustrating of course, you know.  But then --
7    Q.  And when you say it was frustrating, it was his
8    continued failure to give you the technical
9    specifications for the non-hydraulic frac- --
10   A.  Yeah, they don't -- the don't release and I
11   say -- well, I say it may be something that they want to
12   keep it very confidential or -- I don't know, but I have
13   to have the access.  And I say if this works, I think it
14   will be something good, I mean, for -- a good
15   opportunity, you know.
16   Q.  Did Mr. Massey or Mr. Grob say to you, "This is
17   confidential, so we can't give it to you, Mr. Rios"?
18   A.  No, no.  That's what I told myself, why -- why
19   they don't release it, why Charles doesn't want to
20   release it, you know.  And of course maybe it was one
21   time I have -- I might have told Mr. Massey I don't get
22   the information from Charles, you know, because Charles
23   was the CEO and he's supposed to have access to
24   everything.
25         (Exhibit No. 35 marked.)

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Baldemar P. Rios
July 7, 2015

Page 105

1    A.  Yeah.  We would expect at least to -- to -- in
2    the meeting, you know, to have the -- some information
3    from them, also from the -- from the wells.  So they --
4    they -- the -- they could be used to make the proposal.
5    Q.  Well, read that last sentence to me again
6    starting with "creemos" again.
7    A.  Yeah, the last sentence.  (As translated)  We
8    believe that with this visit, you -- I mean, Chimera --
9    you could define -- you could define all the important
10   points of your proposal.
11   Q.  And you knew that you were not in a position to
12   define all the important points of your proposal?
13   A.  Yeah.  So this is why we say -- we say here that
14   in the visit, those points could be defined.  That's
15   what it means.  We believe that with this visit of
16   yours, all these points, all the points, all the
17   important points, meaning the proposal, could be --
18   could be defined -- could be defined for your proposal
19   to PEMEX.
20   Q.  That sounds like it's Chimera that's got to do
21   the defining.
22   A.  Yeah, yeah, with this meeting.  With this
23   meeting, yeah.
24   Q.  Okay.  And you knew — you knew that Chimera was
25   not in a position technologically to describe what it

Page 106

1    was hoping to do yet?
2    A.  Well, it could have been a proposal, but we
3    don't know -- we don't know it was going to be -- how
4    much ready could be the proposal.  We could have a
5    proposal, but I don't know how much ready it could be,
6    if even could be ready, this proposal.
7    Q.  I mean, you're the brains of this operation at
8    this point, right?
9    A.  Well, I was — I am not -- I am not the
10   technology creator.  It's like, you know -- just to put
11   you an example.  I have -- I have managed chemical
12   plants, and I am not creative in the process.  I just
13   use the technology guy or the whoever created the
14   technology, say, okay, we need a chemical engineer to
15   operate this.  So here is the information.  You chemical
16   engineer do that process or manage the process.  And
17   somebody who created the technology who --
18   Q.  Who was the technology creator in this case?
19   A.  I don't know who -- who created.  I was a --
20   Chimera -- to me, Chimera is the one that owned the
21   technology.  I didn't create the technology.
22   Q.  Chimera owned the technology, but you didn't
23   know who created the technology?
24   A.  Exactly, I don't know who.
25   Q.  Did anyone ever tell you that this technology

Page 107

1    had been licensed from a company in China?
2    A.  No, no, I -- I wasn't told that.
3    Q.  Did you ever ask -- did you ever say in the same
4    way you just asked me, here's what a chemical engineer
5    does, we don't create the technology, we run the
6    technology?
7    A.  Yeah, well we --
8    Q.  Did you ever say that to Mr. Grob or Mr. Massey?
9    A.  No, no.  I always say what I say before, please
10   give me the details -- the detail information of the
11   technology so I can help, so I can -- I understand the
12   technology, makes sense the way I read in the brochures
13   and all that, it makes sense; but I need information so
14   I can put my input, you know, because sometimes you as a
15   professional, you will change and say, okay, and then
16   you will say or write down what changes you do and why.
17   Q.  And you never — they never responded to that
18   request for more technological detail?
19   A.  Yes.
20   Q.  And you never asked them even who invented this?
21   A.  No, I never asked who invented this, because I
22   say -- I say only I thought was can finish -- something
23   can finish, but they didn't want to release.  That was
24   only my assumption.
25   Q.  Did you ever ask if it had been successfully

Page 108

1    used anywhere on earth?
2    A.  Yes.  I asked -- I asked in the conversation
3    that I have to -- in the conversation that I have
4    with -- over the phone with the gentleman John, I guess,
5    and he -- and he mentioned -- he mentioned that he
6    had -- he mentioned that he knew about something in
7    Russia.  That's what I can remember, but that was all
8    verbal as well, not in writing.
9    Q.  Was it in that same conversation that you were
10   mentioning earlier?
11   A.  Yes, yes.
12   Q.  And you only ever had that one conversation with
13   John?
14   A.  Yes.
15   Q.  He mentioned that it — there was no specifics,
16   that it might have been successful in — in — might
17   have been employed in —
18   A.  In Russia, yeah, somebody -- he knew
19   something -- something -- he put an example not specific
20   to this technology, but he put an example of the -- of
21   the brains of the technology that something was being
22   done or had been done in Russia because of the lower
23   temperatures inside there, yeah, you know, something, I
24   don't remember what exactly the sentence that he say.
25   Q.  It was probably below zero a lot in Siberia?

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Baldemar P. Rios
July 7, 2015

---

Page 253

1  your phone?
2  A. Yes.
3  Q. Do you have Andrew Farmer's?
4  A. No. I never have his phone number, Mr. Farmer.
5  Q. Do you have Mr. Ochoa?
6  A. No, I don't -- I don't have his.
7  Q. Mr. Quiroga?
8  A. No, I don't.
9  Q. Ricardo Ponce de Leon?
10  A. Yes, I do.
11  Q. Can you give me his number after you —
12  A. Mr. Ponce de Leon, yes. Usually I know
13  Mr. Ponce de Leon name by -- let me see. This is
14  Mr. Ponce de Leon. You have 011521 -- this is a cell
15  phone. And in Mexico, when you dial a cell phone you
16  have to use No. 1. When it's a regular phone, you don't
17  have to use the 1.
18  Q. Great. Thank you.
19  A. Yeah. I said Transformaciones Industriales, I
20  was looking exactly how it's spelled, but if I am wrong.
21  If I use any other companies that they have, they always
22  pay me through that company.
23  Q. Okay. And that's the organization that has paid
24  you something less than $100,000 in the last six months?
25  A. Yes, yes, in the last six months.

---

Page 254

1  Q. Okay. Any other entities that have paid you in
2  the last six months?
3  A. No. Basically that one because they have
4  several projects and they have many more companies, but
5  they always pay me through that company. I mean, we had
6  done some other projects in some other companies, but
7  they always pay me through this company.
8  MR. GULDE: All right. I'll pass the
9  witness.
10  MR. MORENO: No questions.
11  MS. EL-QUESNY: No questions.
12  MR. GULDE: We're finished. Off the
13  record.
14  THE REPORTER: Okay. Is he going to
15  read -- going to read and sign his transcript? And is
16  this going to this address in Houston?
17  MR. MORENO: Is that good to read it and
18  make any corrections?
19  THE WITNESS: Yes.
20  MR. MORENO: Okay. Would you rather she
21  send it to me and I can --
22  THE WITNESS: Yes. I would prefer you send
23  to my lawyer so we can -- because I have been
24  concentrating on this, but I think we have been...
25  THE REPORTER: Thank you.

---

Page 255

1  (Discussion off the record.)
2  (At 4:31 P.M., the deposition proceedings
3  concluded.)
4
5
6
7  _____
7  Baldemar P. Rios
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 256

1  COUNTY OF HARRIS      )
2  STATE OF TEXAS        )
3  I hereby certify that the witness in the foregoing
4  deposition, BALDEMAR P. RIOS, was by me duly sworn to
5  testify to the truth, the whole, truth and nothing but
6  the truth, in the within-entitled cause; that said
7  deposition was taken at the time and place herein named;
8  and that the deposition is a true record of the
9  witness's testimony as reported by me, a duly certified
10  shorthand reporter and a disinterested person, and was
11  thereafter transcribed into typewriting by computer.
12  I further certify that I am not interested in the
13  outcome of said action, nor connected with nor related
14  to any of the parties in said action, nor to their
15  respective counsel.
16  IN WITNESS WHEREOF, I have hereunto set my hand this
17  16th day of July, 2015.
18  Reading and Signing was:
19  X  requested ___ waived ___ not requested
20
21
22  _Donna Worley_
23  Donna Worley, CSR
24  Texas CSR 7390
25  Expiration Date: 12/31/15

---

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Fernando Flores Avila, Ph.D.
June 18, 2015

---

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE SOUTHERN DISTRICT OF TEXAS
 3                    HOUSTON DIVISION
 4
 5    - - - - - - - - - - - - - - -
 6    SECURITIES AND EXCHANGE        )
 7    COMMISSION,                    )
 8            Plaintiff       ) CASE NO.
 9    vs.                     )  4:14-CV-02345
10    ANDREW I. FARMER, CHARLES E.  )
11    GROB, JR., CAROLYN AUSTIN,    )
12    BALDEMAR P. RIOS, and CHIMERA )
13    ENERGY CORP.,                 )
14            Defendants            )
15    - - - - - - - - - - - - - - -
16
17    VIDEOTAPED DEPOSITION OF FERNANDO FLORES AVILA, Ph.D.
18               THURSDAY, JUNE 18, 2015
19
20
21            BEHMKE REPORTING AND VIDEO SERVICES, INC.
22                 BY:  KELLY HANNA, CSR NO. 1654
23                 160 SPEAR STREET, SUITE 300
24               SAN FRANCISCO, CALIFORNIA 94105
25                        (415) 597-5600
```

---

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8      Videotaped Deposition of FERNANDO FLORES AVILA,
 9    Ph.D., taken on behalf of Plaintiff, at Hanna & Hanna,
10    1225 North Loop West, Suite 327, Houston, Texas,
11    commencing at 9:54 A.M. THURSDAY, JUNE 18, 2015, before
12    Kelly Hanna, Certified Shorthand Reporter No. 1654,
13    pursuant to Notice of Videotaped Deposition.
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1    APPEARANCES OF COUNSEL:
 2    FOR PLAINTIFF:
 3        U.S. SECURITIES AND EXCHANGE COMMISSION
 4        BY:  MATTHEW J. GULDE, ESQUIRE
 5             NIKOLAY VYDASHENKO, ESQUIRE
 6        801 Cherry Street, Suite 1900
 7        Fort Worth, Texas 76102
 8        Telephone: (817) 978-1410
 9        Fax:  (817) 978-4927
10        Email: guldem@sec.gov
11
12    FOR THE WITNESS:
13        CLEARY GOTTLIEB STEEN & HAMILTON LLP
14        BY:  JONATHAN S. KOLODNER, ESQUIRE
15             SARA B. MILSTEIN, ESQUIRE
16        One Liberty Plaza
17        New York, New York 10006
18        Telephone: (212) 225-2690
19        Fax:  (212) 225-3999
20        Email: jkolodner@cgsh.com
21
22
23
24
25
```

---

Page 4

```
 1    APPEARANCES OF COUNSEL - (CONTINUED):
 2    FOR DEFENDANT, BALDEMAR P. RIOS - (TELEPHONICALLY):
 3        RICHARD D. MORENO, LLC
 4        BY:  RICHARD D. MORENO, ESQUIRE
 5        125 West School Street
 6        Lake Charles, Louisiana 70605
 7        Telephone: (337) 656-8654
 8
 9    FOR DEFENDANT, CHARLES E. GROB, JR. - (TELEPHONICALLY):
10        AAA LEGAL SERVICES, INC.
11        BY:  JOHN GREEN, JR., ESQUIRE
12        1135 Hodges Street
13        Lake Charles, Louisiana 70601
14        Telephone: (337) 990-0060
15
16    FOR DEFENDANT, CAROLYN AUSTIN - (TELEPHONICALLY):
17        FELDMAN, TUCKER, LEIFER, FIDELL, LLP
18        BY:  DUHA EL-QUESNY, ESQUIRE
19        1129 20th Street, NW, 4th Floor
20        Washington, D.C. 20036
21        Telephone: (202) 466-8960
22
23    ALSO PRESENT:
24        JON VANDAVEER, LEGAL VIDEO SPECIALIST
25
```

---

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Fernando Flores Avila, Ph.D.
June 18, 2015

---

**Page 9**

EXHIBITS - (CONTINUED)

FERNANDO FLORES AVILA, Ph.D.

| Number | Description | Page |
|--------|-------------|------|
| Exhibit 28 | Chimera Energy Corp Sets 90-Day Schedule for Non-Hydraulic Extraction Deployment in Chicontepic Basin (CHM000065) - 1 page | 132 |
| Exhibit 29 | Coordination Technology Management Initiates Formal Request Regarding CHMR's Non-Hydraulic Extraction (CHM000074) - 1 page | 135 |
| Exhibit 30 | Letter dated October 15, 2012 (Rios to Park) (SEC-Grob-E-0000238-245) - 8 pages | 137 |

---

**Page 10**

PREVIOUSLY MARKED EXHIBITS

FERNANDO FLORES AVILA, Ph.D.

| Number | Description | Page |
|--------|-------------|------|
| Exhibit 6 | Letter dated September 21, 2012 (CHM 000089)- 1 page | 68 |
| Exhibit 11 | PEMEX Officials Deliver Logging Reports on Target Wells to Chimera Energy Corp. for Use of Non-Hydraulic Extraction (CHM 000061) - 1 page | 121 |

---

**Page 11**

1    THURSDAY, JUNE 18, 2015; 9:54 A.M.
2         THE VIDEOGRAPHER: Here begins DVD No. 1
3  in the deposition of Dr. Fernando Sebastian Flores Avila
4  in the matter of Securities and Exchange Commission v.
5  Andrew I. Farmer, et al. in the United States District
6  Court for the Southern District of Texas, Houston
7  Division, Case No. 4:14-CV-02345.
8         Today's date is June 18th, 2015.  The time
9  on the video monitor is 9:54.  The video operator today
10  is John Vandaveer contracted by Behmke Reporting and
11  Video Services, Inc., 160 Spears Street, Suite 300, San
12  Francisco, California.
13         The video deposition is taking place at
14  1225 North Loop West, Houston, Texas and was noticed by
15  Matthew J. Gulde, Esq., Securities and Exchange
16  Commission.
17         Counsel, please voice identify yourselves
18  and state whom you represent.
19         MR. GULDE: Matt Gulde for the United
20  States Securities and Exchange Commission.
21         MR. VYDASHENKO: Nikolay Vydashenko for
22  the United States Securities and Exchange Commission.
23         MR. MORENO: Richard Moreno for
24  Baldemar Rios, defendant.
25         MR. GREEN: John Green, Jr. here for

---

**Page 12**

1  Charles Grob.
2         MS. EL-QUESNY: Duha El-Quesny for Carolyn
3  Austin.
4         MR. KOLODNER: You have Jonathan Kolodner
5  and Sara Milstein for Dr. Flores, who is the witness.
6         MR. GULDE: And we'll note that Misters
7  Moreno, Green and Ms. El-Que -- I'm not sure how to
8  pronounce your last name correctly.  Can you tell me
9  again?
10         MS. EL-QUESNY: Yes.  It's El-Quesny.
11         MR. GULDE: El-Quesny.  Okay.  I keep
12  wanting to keep that S silent.
13         MS. EL-QUESNY: No problem.
14         MR. GULDE: -- Ms. El-Quesny are all
15  participating via telephone.
16         MS. EL-QUESNY: It's supposed to be -- to
17  be noted that Cary Feldman for Carolyn Austin will be in
18  and out of the conference as well.
19         MR. GREEN: Yeah, and also I want to let
20  everybody know that I spoke with Kevin Edmundson this
21  morning and he's not going to be present.  He has
22  another -- he has a conflict.
23         MR. GULDE: And I'll remind counsel who
24  are participating via telephone and I guess just the --
25  the two male counsel, because we can tell Duha's voice,

---

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Fernando Flores Avila, Ph.D.
June 18, 2015

Page 13

1  to identify yourself whenever you chime in. We know
2  that was John who said that.
3          So swear the witness.
4          FERNANDO SEBASTIAN FLORES AVILA,
5  having been first duly sworn, testified as follows:
6              EXAMINATION
7  Q. (BY MR. GULDE) Good morning.
8  A. Good morning.
9  Q. Dr. Flores, my name is Matt Gulde. I work with
10 the Securities and Exchange Commission. I want to give
11 you an idea of the rules of the road here that we'll
12 proceed by, but I want to ask, have you ever been
13 deposed before?
14 A. No, sir.
15 Q. Have you ever testified?
16 A. No. This is the first time.
17 Q. Never testified in a court of law?
18 A. No, never.
19 Q. Okay. Either in the United States or in
20 Mexico?
21 A. No, never have anywhere.
22 Q. Okay. Well, sitting to my left is the court
23 reporter and you'll notice that she is taking down every
24 word that everybody says in here. So our first
25 obligation is to make sure she understands everything we

Page 14

1  say. So I would ask that when you hear a question from
2  me or from somebody on the phone or any other lawyer
3  here, please respond with an oral response and not just
4  a shake of the head, okay?
5  A. Okay.
6  Q. One other important thing is that we don't talk
7  over each other. And so make sure that whoever is
8  asking questions have — have finished talking before
9  you start your answer, okay?
10 A. All right.
11 Q. Okay. Now, you and I are speaking in English.
12 Do you also speak Spanish?
13 A. Yes, speak Spanish.
14 Q. What is your first language?
15 A. Spanish. That's my mother tongue.
16 Q. Okay. How long have you been speaking English?
17 A. Well, since I was in high school.
18 Q. Do you consider yourself fluent in English?
19 A. Yes.
20 Q. Okay. Will you stop me if you need
21 clarification for any English word that I've used?
22 A. That's right. I will stop.
23 Q. Okay. And there — there may be a time when
24 the answer requires you to speak in Spanish, so we may
25 stop you and ask you to say it slowly or clarify with

Page 15

1  spelling. Is that okay?
2  A. Okay. That's okay.
3  Q. Okay. Where are you from, Dr. Flores?
4  A. I'm from Mexico City. I was born in Mexico
5  City.
6  Q. Okay. Can you tell us about your education?
7  A. Yes. I attended my education in — in Mexico,
8  in Mexico City, actually, high school and then — then I
9  did my — my — my career in Mexico City at the National
10 University Autonomous of Mexico. I get my degree in
11 petroleum engineering. Then I did my master's, also in
12 petroleum engineering, at the same university. And
13 finally I did my Ph.D. at — under a grant of — a full
14 grant at Louisiana State University in Baton Rouge,
15 Louisiana.
16 Q. What was the focus of your Ph.D.?
17 A. My focus is petroleum engineering. I did it on
18 the drilling, on the drilling area of petroleum
19 engineering.
20 Q. And how long were you in Baton Rouge pursuing
21 that Ph.D.?
22 A. I stayed four years in Baton Rouge doing my
23 studies, my Ph.D.
24 Q. Okay. And were you awarded a doctorate at the
25 end of that?

Page 16

1  A. That's right. I earned my doctorate degree
2  after my studies.
3  Q. Okay. Were all of those studies conducted in
4  the English language?
5  A. That's right. All of them in English.
6  Q. Okay. Can you tell us about your employment?
7  A. That's right. I worked for PEMEX Exploration
8  and Production.
9  Q. And what is PEMEX?
10 A. PEMEX is by now the national oil company in
11 Mexico, which right now it's going through a new law, a
12 new change and by the time it is the national company
13 which charts all exploration and production and all
14 the — the upstream and downstream part of the — of the
15 industry.
16 Q. Is PEMEX an — an acronym? Do those letters
17 stand for something?
18 A. Acronym?
19 Q. Yeah, is —
20 A. I don't understand.
21 Q. Okay. By acronym I mean do the letters
22 P-E-M-E-X stand for something?
23 A. Stands for Petroleos Mexicanos.
24 Q. Okay. How long have you worked for PEMEX?
25 A. I've been working for about 18 years with

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Fernando Flores Avila, Ph.D.
June 18, 2015

Page 17

1 PEMEX.
2    Q.  Is that -- did you start with PEMEX right after
3 your Ph.D.?
4    A.  Yes, that's right.
5    Q.  What was your first job with PEMEX?
6    A.  I started in charge of technology, of
7 unilateral technology, to -- to get the new technology
8 into -- into PEMEX and see in which projects of PEMEX in
9 unilateral technology will -- will be be -- will create
10 value.
11       Later on I continue in the same technical
12 area. And finally, right now, I am in charge of the
13 Northern Region technology.
14    Q.  Let's talk about your current duties. You said
15 you're in charge of technology in the Northern District?
16    A.  That's correct. My position is technology
17 coordinator from exploration and production in the
18 Northern Region.
19    Q.  Okay. And I used the word "district." When
20 you're talking about the area that you cover, do you use
21 the word "region"?
22    A.  That's correct. PEMEX is divided in four
23 different regions. The northern Region, which takes
24 from -- the border from the U.S.A. in Reynosa, down to
25 the state of the -- southern state of Veracruz in

Page 18

1 Mexico. Then we have the Southern Region, which takes
2 from Veracruz up to Tabasco state. And then we have two
3 offshore regions.
4    Q.  Are you familiar with an area called
5 Chicontepec?
6    A.  That's correct.
7    Q.  Is that within the Northern Region?
8    A.  That's correct. Chicontepec is in the -- it's
9 in the Northern Region.
10    Q.  Okay. So is Chicontepec within your area of --
11 of control --
12    A.  Yes.
13    Q.  -- in your job?
14    A.  Yes, it is.
15    Q.  Okay. Describe for us what you do with new
16 technology. How -- how -- what is your day-to-day job?
17    A.  Okay. We have different projects right now in
18 the Northern Region and regarding exploration and
19 production. My duties is to look for new technologies
20 that we create value to our projects in the exploration
21 and production area. So any new technologies that will
22 arrive to PEMEX for these areas, they've got to go
23 through a trial test and be approved technically. So my
24 duties are to investigate the technologies to see which
25 ones will create value and by create value I mean that

Page 19

1 it is not just the technical benefit but also
2 economical, right? So to make sure that they will
3 create value to our -- our projects to incorporate them
4 into the -- into the industry.
5    Q.  So if there were a new way to accomplish
6 fracking that could be used on wells in the Northern
7 Region, then implementing and investigating that
8 technology would be squarely within your job
9 description?
10    A.  That is correct.
11    Q.  Okay. Are you personally and professionally
12 motivated to find new and efficient ways to -- to make
13 oil wells more productive?
14    A.  That is correct. That is part of our -- our
15 challenge, to start looking for new technologies every
16 day.
17    Q.  You would like -- you would personally like to
18 find a better way to frac wells, if you could?
19    A.  Yes, that's right.
20    Q.  Okay. Have you ever heard of a company called
21 Chimera Energy Corp.?
22    A.  Yes.
23    Q.  Do you remember the first time you ever heard
24 of that company?
25    A.  The first time I heard about the company, it

Page 20

1 was in a publication from the Journal of Petroleum
2 Technology.
3    Q.  How did -- how did --
4       MR. GREEN: Excuse me, Matt.
5       MR. GULDE: Yeah, go ahead.
6       MR. GREEN: Could you get him to repeat
7 that, please. I didn't catch it.
8       MR. GULDE: Sure.
9    Q.  (BY MR. GULDE) How did you first come -- become
10 aware of Chimera Energy Corporation?
11    A.  Because a publication in the Journal of
12 Petroleum Technology.
13       MR. GREEN: The Journal of Petroleum
14 Technology?
15       THE WITNESS: That is correct.
16       MR. GREEN: Thank you.
17       MR. GULDE: So August 10. It's in the
18 front.
19       I'm going to hand the court reporter a
20 document that is Bates labeled PEMEX a bunch of zeros
21 14.
22       (Exhibit 14 marked)
23       MR. GULDE: People on the phone, tell me
24 whenever you're looking at that. It's August 10th,
25 2012, JPT Online article.

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Fernando Flores Avila, Ph.D.
June 18, 2015

Page 21

1       MS. EL-QUESNY: Got it.
2       MR. GREEN: Go ahead.
3    Q. (BY MR. GULDE) Dr. Flores, is this what you
4  were talking about?
5    A. Yes, this is it.
6    Q. Now, I've handed you -- this is Exhibit 14 and
7  it's titled -- well, first of all, based on a header, it
8  says "JPT Online." What is --
9       MR. GREEN: Excuse me, Matt.
10      MR. GULDE: Yeah.
11      MR. GREEN: When you're saying Exhibit 14,
12 you're picking up from the ones from yesterday?
13      MR. GULDE: Yeah.
14      MR. GREEN: Wouldn't it be easier just to
15 start them 1 through whatever since it's two separate
16 depositions?
17      MR. GULDE: I'm just going to -- I'm just
18 going to go through 1 through X through -- through --
19 through this litigation. We don't have -- we don't have
20 a ton of depositions to keep track of.
21      MR. GREEN: Okay. That's fine. I was
22 just curious.
23      MR. GULDE: Yeah.
24      MR. GREEN: Thank you.
25    Q. (BY MR. GULDE) So you see up top where it says

Page 22

1  "JPT Online"?
2    A. Yes.
3    Q. Is that what you were talking about? Does JPT
4  stand for Journal of Petroleum Technology?
5    A. Technology, that is correct.
6    Q. Okay. Is this the article that you saw when
7  you became -- when you said you became aware of Chimera?
8    A. Yes, that's right.
9    Q. Okay. Now, we'll -- we'll come back to that in
10 a minute. Well, I guess, at this time let me -- let me
11 stay on it for just a second.
12      At the time you saw this article, did you
13 read this first part where it says: Chimera Energy said
14 it entered a memorandum of understanding with Petroleos
15 Mexicanos (Pemex) for the use of its, quote, "waterless"
16 shale oil production method?
17    A. Yes, I -- I saw that.
18    Q. Do you remember seeing that at the time?
19    A. Yes.
20    Q. Were you aware of any Memorandum of
21 Understanding with --
22    A. No.
23    Q. -- between Chimera --
24    A. Not at all. I -- I didn't know anything about
25 a Memorandum of Understanding.

Page 23

1    Q. And this is -- this is one time I'll -- I'll
2  remind you that -- that we're talking over each other
3  just a little bit. So make sure I finish asking my
4  question before you -- you start giving your answer.
5       You were not aware of any -- any such
6  memorandum?
7    A. That's correct. I was not aware.
8    Q. Okay. After seeing this did you subsequently
9  hear -- after that, did you hear from Chimera?
10    A. No, I didn't hear from Chimera after -- after
11 this. What I did is it surprised me because as I am in
12 charge of technology in the Northern Region in -- so
13 I've -- I've never heard anything about this technology.
14 What I did is I called my colleagues, right, at the vice
15 president -- vice presidency of technology to see if
16 they were aware of them and none of them were aware of --
17 of any agreement between this company.
18    Q. You have an assistant named Javier Martinez?
19    A. That -- that's correct. I have an assistant,
20 Javier.
21    Q. Tell me his full name.
22    A. Marco Javier Martinez.
23    Q. Okay. Do you know if Mr. Martinez had any
24 communication with Chimera Energy?
25    A. Not so far at that moment.

Page 24

1    Q. Okay. Do you know if -- if he eventually had
2  any communication with Chimera?
3    A. After that he was the first contact with --
4  they -- they -- Chimera contacted Marcos Javier to make
5  an appointment to present the technology in our offices.
6    Q. And do you know when that was?
7    A. Not exactly. The date, I don't have it in --
8  in mind.
9       MR. GULDE: Okay. Give me the very first
10 document.
11    A. They are in the -- I think in my -- what's the
12 name of the paper?
13    Q. (BY MR. GULDE) Oh, I'm sure the date is in your
14 affidavit, but I'll --
15    A. Affidavit, that's correct.
16    Q. I'll hand you a document that we'll go ahead
17 and label Exhibit 15.
18      (Exhibit 15 marked)
19      MR. GULDE: Now, I've handed Dr. Flores a
20 document Bates labeled PEMEX a bunch of zeros and 1.
21 It's -- purports to be a -- it's a Spanish language
22 e-mail on September 21st, 2012. Tell me when you guys
23 see that.
24      MS. EL-QUESNY: Got it.
25      MR. GREEN: We have it.

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Fernando Flores Avila, Ph.D.
June 18, 2015

Page 45

1    A.  Yes, that is correct.
2    Q.  What was your -- without looking at -- at the
3    minutes now, just tell me, what is your reaction and
4    what was your reaction at the time to their
5    presentation, their technological presentation?
6    A.  They make -- they presented us like a movie
7    describing what they were offering, and it is -- it
8    sounds like, to my point of view, like science fiction.
9    Q.  I'm sorry.  You said science fiction?
10   A.  Fiction, that is correct.
11   Q.  Okay.  As in this technology doesn't really
12   work?
13   A.  I can't say that it doesn't really work because
14   I've never seen it before.
15   Q.  Okay.
16   A.  But according to the principles that they show,
17   it is very difficult to be used in a well.
18   Q.  Did you ask them any questions to figure out
19   whether it could be used in your well?
20   A.  Yes, I did.
21   Q.  What did you ask them?
22   A.  I asked them many technical -- specific
23   technical questions like, for example, if, first of all,
24   if they have used this technology somewhere and the
25   results of the technology, how they control the energy

Page 46

1    released in the reaction, how it is affecting our
2    permanent infrastructure of the well, regarding casings,
3    cement, cement bound, all of that.
4    Q.  And how did the representatives from Chimera
5    respond to your questions?
6    A.  They -- they didn't give any response,
7    technical response on that.
8    Q.  Did they -- did any of those representatives
9    claim to have technical experience?
10   A.  No.
11   Q.  Did they promise any sort of response on those
12   particular questions?
13   A.  No, they didn't.
14   Q.  Okay.  Did you share with them any experience
15   that you had with -- that would be relevant to the
16   idea of a helium capsule being used to frac a well?
17   A.  I -- what I tell them is that we have tried
18   some other technologies that make an explosion in -- in
19   the well, but with some other principles in which we
20   have regulated the energy which have not worked, but I
21   didn't went into details with them.
22   Q.  But you -- you told them you had tried
23   introducing some sort of explosion within a well to
24   attempt to fracture it; is that right?
25   A.  That is correct.

Page 47

1    Q.  And that previously it had not worked?
2    A.  That is correct.
3    Q.  Did any representative from Chimera tell you on
4    that day why their technology was different?
5    A.  Yes, they told -- told us why it was different.
6    Q.  Did they tell you why it would succeed where
7    the other technology that you described had failed?
8    A.  No.  They -- they just said that -- that it
9    will work, but they didn't show us any evidence of that.
10   Q.  Okay.  Let's look at Item No. 2 here.  Can you
11   read that to yourself and then translate it to us.
12   A.  Okay.  Okay.  It says Dr. Fernando Flores asked
13   the company, make a question to the company of the
14   publications on the JPT of SPE related to the
15   application of this technology into the wells of
16   Chicontepec at PEMEX, which is false.
17   Q.  Let me back you up here.  It sounds like you're
18   referring -- you said JPT.  Is -- is that the same
19   publication that we talked about earlier?
20   A.  Yeah, that is correct.
21   Q.  Can you tell me what JPT stands for?
22   A.  Journal of Petroleum Technology.
23   Q.  Okay.  So continue.  I'm sorry.
24   A.  Okay.  Which is false and the company respond
25   that it was a misunderstanding between the release

Page 48

1    from -- that they make to the -- to the magazine and
2    that it was a misunderstanding and they apologized for
3    that and they accept that they haven't tried that
4    technology in the fields.
5    Q.  And when you say "they," do you remember any
6    specific individual telling you that this article was
7    the result of a misunderstanding?
8    A.  Yes, Mr. Charles Grob.
9    Q.  By the way, were all of the members of
10   the Chimera group present for the entire meeting?
11   A.  Yes, they were.
12   Q.  Were all of the members of your group present
13   for the entire meeting?
14   A.  Yes.
15   Q.  Would Mr. Rios have been able to hear Mr. Grob
16   saying that the JPT article was the result of a
17   misunderstanding?
18   A.  Yes.
19   Q.  Okay.  Now, this item that you're -- first of
20   all, this description in Item No. 2 of the minutes on
21   Exhibit 18, is that consistent with your recollection of
22   what -- what you told Mr. Grob and the rest of the
23   Chimera representatives?
24   A.  Yes, it is.
25   Q.  Okay.  And the JPT article, is that the


Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Fernando Flores Avila, Ph.D.
June 18, 2015

Page 89

1   Q.  Yeah?
2   A.  That's -- that's correct.
3   Q.  That's happened to you where you've told
4   somebody they need to come back with a uniform shirt on?
5   A.  No.  Because all the people that I have on my
6   team, we all wear uniforms.
7   Q.  Everybody does.
8   A.  That is not part of a question.
9   Q.  Now, you used the phrase "onsite" just a second
10  ago.  Is there a common understanding in the oil and gas
11  industry about what -- what that phrase "onsite" means?
12  A.  Yes.
13  Q.  What does it mean?
14  A.  Onsite means that you are at the well location.
15  Q.  Okay.  If someone were telling you in common
16  industry usage they want to be onsite, would you
17  understand it as being at the office in Poza Rica or
18  onsite at the well?
19  A.  Onsite at the well.
20  Q.  Okay.  Now, hold Exhibits 20 and 21 kind of
21  close to each other so you can see the first paragraph
22  of both.
23  A.  Uh-huh.
24  Q.  I will do it myself.  Looking at Exhibit 20, do
25  you see starting in the -- at the end of the third line,

Page 90

1   it says:  The onsite efforts were initiated by earlier
2   invitation by PEMEX requesting that Chimera Energy Corp
3   personnel be onsite?
4        Do you see that?
5   A.  Uh-huh, yes.
6   Q.  Now, you've said already that -- that that
7   wasn't true, correct?
8   A.  That is correct.  That was not true.
9   Q.  Now, looking at Exhibit 21, there's a similar
10  sentence, but it ends slightly differently.  It says
11  "The efforts were initiated by earlier invitation by
12  PEMEX requesting that Chimera Energy Corp personnel meet
13  with PEMEX representatives at the Central Tajin Area to
14  verify the first wells for intended use.
15       Does -- does that fix the problem?  Is
16  that now a true statement?
17  A.  No, it is not a true statement.
18  Q.  Okay.  And what's false about that?
19  A.  We -- we never make any efforts to initiate
20  any -- any work and visiting -- visiting any -- any
21  locations.
22  Q.  Okay.  Are you saying -- are you taking issue
23  with the word "initiated" because it wasn't PEMEX's
24  idea?
25  A.  No, because we didn't even go that far to -- to

Page 91

1   make any -- any visit to the locations.
2   Q.  Okay.  You never got far enough to actually get
3   to the Tajin Area?
4   A.  That is correct.
5   Q.  Okay.  And when I say "far enough," I mean far
6   enough in the -- in the talks?
7   A.  In the talks.
8        MR. GULDE:  Okay.  I'm asking the court
9   reporter to label as Exhibit 22 a document that is a
10  Securities and Exchange Form 8-K.  The date of the
11  report is October 10th, 2012.  I'm handing that to the
12  witness.  It was in our -- our packet to defense
13  counsel.  So let me know when you guys have the 8-K in
14  front of you.
15       (Exhibit 22 marked)
16       MS. EL-QUESNY:  Got it.
17       MR. GREEN:  You can go ahead.
18  Q.  (BY MR. GULDE)  Now, have you ever seen this
19  document before --
20  A.  No, sir.
21  Q.  -- Dr. Flores?
22       I'd like you to go ahead and turn to the
23  fifth page in document -- Exhibit 22.
24       MR. KOLODNER:  Next one.
25  A.  Okay.

Page 92

1        MR. KOLODNER:  Next one.  There you go.
2   Q.  (BY MR. GULDE)  Do you see what appears to be a
3   letter here that says "Dear Chimera Shareholders" at the
4   top of it?
5   A.  Yes.
6   Q.  Okay.  Turn to the next page and tell me who is
7   on the signature line of this document.
8   A.  Baldemar Rios.
9   Q.  Okay.  Is that one of the people who was
10  present at the October 1st meeting in Poza Rica?
11  A.  Yes.
12  Q.  Okay.  Somebody you met personally?
13  A.  Yes.
14  Q.  Okay.  And he was present for the entire
15  meeting?
16  A.  Yes.
17  Q.  Okay.  I'd like you to -- well, go ahead and
18  read -- go ahead and read his letter to Chimera's
19  shareholders and then I will ask you a few specific
20  questions on it, but take your time.
21  A.  (Witness reviews document.)
22  Q.  And, actually, if you've gotten into the second
23  page, I think that's stuff that I'm -- I'm not going to
24  be bugging you about.  So let me know when you get to
25  the second page.

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Fernando Flores Avila, Ph.D.
June 18, 2015

Page 93

1   A. Okay.
2   Q. I'll make a further deletion. Don't worry
3   about the last paragraph. I'm not — of the first page.
4   I'm not going to bug you about that either. So if
5   you're talking about short selling, that's — that's not
6   something I'll ask.
7       MR. KOLODNER: So he doesn't have to read
8   the last paragraph? You don't have to read that.
9       THE WITNESS: Okay.
10  Q. (BY MR. GULDE) Yeah. Stop at No. 6.
11  A. Uh-huh.
12  Q. Okay. Now, I recognize you're not an expert on
13  everything Chimera Energy Corp. has — has done or was
14  doing on October 10th, 2012, but I'd like to ask you a
15  few questions about this document, okay?
16  A. Okay.
17  Q. And I'm going to ask first specifically and
18  then ask generally if there's anything — anything else
19  you want to add about this document, but specifically,
20  do you see where Mr. Rios claims in the third line of
21  the first paragraph that he has been a consultant to
22  Chimera for the past several months?
23      Do you see that?
24  A. Yes, I see here.
25  Q. Yes. And working directly with Petroleos

Page 94

1   Mexicanos, also known as PEMEX?
2   A. Uh-huh.
3   Q. Is it true that Chimera had been working for
4   several months with PEMEX?
5   A. No, that's false.
6   Q. Okay. Is — and how do you know that's false?
7   A. Because we have just that — that meeting.
8   That was all.
9   Q. That was the only interaction between PEMEX and
10  Chimera?
11  A. That's correct.
12  Q. Okay. Is PEMEX one of the largest producers of
13  oil and gas in the Americas?
14  A. In — yes, in Mexico, it's the only company.
15  It's a state-owned company.
16  Q. Okay. So that part is true?
17  A. Yes.
18  Q. And you — do you know anything about
19  Baldemar Rios' experience in energy-related industries?
20  A. No.
21  Q. Okay.
22  A. I don't know.
23  Q. Do you know if he was a chemical engineer for
24  PEMEX?
25  A. No, I don't know.

Page 95

1   Q. Did he ever claim to be in that meeting on
2   October 1st?
3   A. Yes. He said that he was retired.
4   Q. Okay. We call it playing the name game. If —
5   if I know somebody who Jonathan worked with, I — I
6   might say, hey, do you know John Smith. Did you and
7   Mr. Rios play the name game?
8   A. No, because he's from --
9       MR. GREEN: Object to the leading on that.
10  Q. (BY MR. GULDE) You can go ahead and answer.
11  A. No, because he claimed to be from another area.
12  We are exploration and production, and he claimed to be
13  from refinery.
14  Q. Okay. Does that mean that you — it's not
15  likely you would have common friends?
16  A. That is correct.
17  Q. Okay. Now, in the second paragraph, Mr. Rios
18  claims that "Over the past several months we have worked
19  tirelessly with our contacts at PEMEX."
20      Do you see that?
21  A. Yes.
22  Q. Is that true?
23  A. No, that's false.
24  Q. Why is that false?
25  A. Because we never worked with — with them.

Page 96

1   Q. Okay. And they describe what they're working
2   on right after that and it says "to finalize the Master
3   Service Agreement and get our technology into the field
4   for testing."
5       Is that true or false?
6   A. That's false.
7   Q. Why is it false?
8   A. Because we never worked together in any service
9   agreement.
10  Q. Did any representative of Chimera ever show you
11  a Master Service Agreement?
12  A. No, never.
13  Q. Did they ever suggest to you that that was the
14  next step?
15  A. No, never.
16  Q. Did you ever suggest to them that a Master
17  Service Agreement could be put into place?
18  A. No, never.
19  Q. What is your reaction to seeing the word
20  "finalize" right there?
21  A. That -- that's -- that's a lie. We didn't even
22  start negotiation.
23  Q. Okay. The next sentence says: While the
24  process has, at times, been exasperating, we are
25  confident that we have made the right connections and

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Fernando Flores Avila, Ph.D.
June 18, 2015

Page 97

1  are positioned to move forward with real-world testing
2  of the technology.
3       Do you see that?
4  A.  Yes, I see.
5  Q.  Was there anything in your interaction with
6  Chimera representatives that you believe gave them
7  confidence that they are positioned to move forward with
8  real world — real-world testing?
9  A.  No, not at all.
10  Q.  Okay.  And you see it says "real-world testing
11  of the technology on several wells selected by PEMEX"?
12       Do you see that?
13  A.  Yes.
14  Q.  Is that true or false?
15  A.  That's false.
16  Q.  Why is that false?
17  A.  Because we never even go that far to select any
18  well for the technology.
19  Q.  Okay.  Now, let's look a little further down
20  the page at Mr. Rios' letter.  He gives — he says:  I
21  thought it would be worthwhile to give everyone a
22  summary of what we have accomplished to date.
23       Do you see that?
24  A.  Yes.
25  Q.  And then he has six numbered paragraphs.

Page 98

1       Do you see that?
2  A.  Yes.
3  Q.  Let's talk about the first one.  It says:  We
4  have executed Memorandum of Understanding with PEMEX
5  related to our Non-Hydraulic Fracturing technology.
6       Do you see that?
7  A.  Yes, I see it.
8  Q.  Is that true or false?
9  A.  That's false.
10  Q.  Did you ever execute a Memorandum of
11  Understanding with PEMEX?
12  A.  No, we didn't.
13  Q.  Did PEMEX ever execute a Memorandum of
14  Understanding?
15  A.  No, never.
16  Q.  As part of your role implementing new
17  technology in the Northern Region, would you know if
18  PEMEX had executed a memorandum — Memorandum of
19  Understanding with Chimera?
20  A.  Yes, I would have to know.
21  Q.  Okay.  And you're saying that's something that
22  has not happened?
23  A.  That is correct.  It's never happened.
24  Q.  Let's talk about the next paragraph.  It says:
25  We have received a formal proposal request from PEMEX

Page 99

1  relating to the use of our technology on three wells
2  identified and designated by PEMEX.
3       Do you see that?
4  A.  Yes.
5  Q.  Is that true or false?
6  A.  That's false.
7  Q.  And why is it false?
8  A.  Because we never selected three wells or
9  identified three wells to make any proposal.
10  Q.  Did PEMEX ever send a formal proposal request?
11  A.  No, never.
12  Q.  Turning to Paragraph 3, do you see where it
13  says:  We have had extensive discussions with the PEMEX
14  technology department related to our technology and how
15  it can be deployed in the selected wells?
16  A.  That's false.
17  Q.  Why is that false?
18  A.  Because we never have discussions on — on —
19  on how to deploy technology in our wells.
20  Q.  How would you characterize that October 1st
21  meeting?  If it's not — if it's not a discussion on how
22  to deploy in selected wells, how would you discuss —
23  how would you describe that discussion?
24  A.  During the meeting?
25  Q.  Yes.

Page 100

1  A.  They just show kind of a movie of how the
2  technologies pretended to work in which we saw that —
3  that — that was kind of a dream, a concept.  It's not
4  possible.  So we didn't even go that far to see how to
5  deploy the technology in a well.
6  Q.  Okay.  So are you saying it's the last part of
7  that — of that sentence, "how it can be deployed in the
8  selected wells," is that what makes that sentence a
9  problem?
10  A.  Yes.
11  Q.  Okay.  Paragraph No. 4, do you know one way or
12  the other whether Chimera had commissioned in
13  October 10th, 2012, a Mexican fabrication shop to
14  engineer and develop the prototype device for field
15  testing?
16  A.  No, I didn't know.
17  Q.  You don't know one way or the other?
18  A.  No.
19  Q.  Is that something that Chimera representatives
20  talked to you about in the meeting?
21  A.  No, they never say anything.
22  Q.  Did they say anything about where these helium
23  capsules might be fabricated?
24  A.  No.
25  Q.  Did you guys ask about that?

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Fernando Flores Avila, Ph.D.
June 18, 2015

Page 101

1   A. No.
2   Q. Is this another one of those things where you
3  didn't get that far?
4   A. That is correct.
5   Q. Paragraph No. 5 says: We anticipate a further
6  set of meetings with the production engineering and
7  technology departments of PEMEX. Now, let's stop there
8  for a second. Does PEMEX have a production engineering
9  department?
10   A. No. In each asset we have a productivity area
11  which takes care of production engineering.
12   Q. So this sentence talking about the production
13  engineering and technology departments, is that a
14  correct description of how PEMEX does things?
15   A. No, it is not a correct way we are structured.
16   Q. How about the technology department?
17   A. The technology department is -- is the ones
18  that I handle.
19   Q. Okay. So to the extent they're talking about
20  the technology department at PEMEX, at least in the
21  Northern Region, that's you?
22   A. That is correct.
23   Q. Okay. And Paragraph 5 goes on to say -- it's
24  talking about "a further set of meetings as we move
25  closer to the final engineering plans for the

Page 102

1  demonstration of the technology."
2       Was there anything in your interaction
3  with Chimera personnel that would create a basis for
4  them to anticipate more meetings -- more meetings with
5  PEMEX?
6   A. No, there was no -- not -- it was clear that
7  that was the end of the -- of the -- of the talk. We
8  were not interested on our behalf.
9   Q. Was -- is there any basis in any of your
10  interactions with Chimera personnel to suggest that they
11  are moving closer to the final engineering plans?
12   A. No, not -- not a word on that.
13   Q. Did you ever see anything that could be
14  described as engineering plans?
15   A. No engineering. They didn't show any
16  engineering. No -- no calculations, no physics, no
17  anything.
18   Q. You talked about a movie that they showed?
19   A. Yes.
20   Q. On October 1st?
21   A. Yes.
22   Q. Did that -- could anybody call -- well, would
23  you call that an engineering presentation?
24   A. No, it's not an engineering presentation. That
25  was a sales presentation.

Page 103

1   Q. And what would that presentation have needed to
2  make it an engineering presentation?
3   A. Well, to go ahead and address some of the
4  physical aspects of the technology, talking about
5  energy, talking about pressures, talking about
6  measurements and stresses in the reservoir, all those
7  technical issues that we address in hydraulic
8  fracturing.
9   Q. Is it a question of simply moving from broad
10  concepts into details?
11   A. Can you repeat that? I don't understand the
12  question.
13   Q. I don't think it was an important question.
14  I'm not going to -- I'm not going to bother you with it.
15       Let's take a look at Paragraph No. 6. It
16  says: In addition to our developing relationship with
17  PEMEX we have been contacted by several independent
18  production companies in the United States asking about a
19  demonstration of our technology.
20       Do you see that?
21   A. Yes.
22   Q. Is that something that any representative of
23  Chimera represented to you as happening?
24   A. No.
25   Q. Did they say "we're also working with this

Page 104

1  other big company"?
2   A. No, and that is actually -- that -- that was
3  one of our first questions that we made them, okay, if
4  you've done it, who are your customers? Where have you
5  done it? And they said that they haven't performed
6  any -- any of those jobs anywhere in the world.
7   Q. Did they say "We haven't performed any, but
8  there are some in the works"?
9   A. No.
10       MR. GULDE: I apologize for the delay.
11  I'm looking for a document. Let me see. Forty-three.
12       MR. KOLODNER: You okay, Dr. Flores? Do
13  you need a break or are you okay?
14       THE WITNESS: Yes. No, I'm okay.
15       MR. GULDE: I'm handing the court reporter
16  a two-page document. This is Bates labeled CHM000043
17  and actually just -- it's a one-page document. Let's
18  just do 43.
19       (Exhibit 23 marked)
20       MS. EL-QUESNY: Got it.
21       MR. GREEN: We've got it. Thanks.
22   Q. (BY MR. GULDE) Okay. Dr. Flores, do you see
23  Exhibit --
24       MR. GULDE: What exhibit is that?
25   Twenty --

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Fernando Flores Avila, Ph.D.
June 18, 2015

Page 109

1        MR. GULDE: I need August 22nd.
2    Q. (BY MR. GULDE) This is Chimera 48 and 49,
3    August 22nd press release. I'm going to ask that it be
4    labeled Exhibit 24.
5        (Exhibit 24 marked)
6        MR. GULDE: Do you guys see that?
7        MS. EL-QUESNY: Yes.
8        MR. GREEN: We have it.
9    Q. (BY MR. GULDE) "Mr. Rios," I've handed you
10   Exhibit 24. It purports to be an August 22nd, 2012
11   press release.
12       Do you see that?
13   A. Uh-huh.
14   Q. Have you -- have you ever seen this press
15   release before titled Chemical Engineer Announces
16   Details of Chimera Energy Corp's Revolutionary
17   Non-Hydraulic Shale Oil Extraction?
18   A. No.
19   Q. You -- you personally -- are you an engineer?
20   A. Yes, I am.
21   Q. Do you teach engineering, by the way?
22   A. Yeah, that's -- that's correct. I teach
23   engineering classes at the University of Veracruz and
24   I've been teaching classes at Louisiana State University
25   and the university -- National University of Mexico.

Page 110

1    Q. Where is the University of Veracruz?
2    A. It's located in -- in the campus that I teach,
3    it's located in Poza Rica, Veracruz.
4    Q. What classes do you teach there?
5    A. I teach reservoir engineering, as well as gas
6    engineering and completion engineering.
7    Q. And you said you also teach at LSU?
8    A. That's correct.
9    Q. Do you -- do you teach an online course there?
10   A. Yes, that -- no, no. At present, when I was
11   doing my Ph.D. --
12   Q. Okay.
13   A. -- I also teach some undergraduate classes.
14   Q. Okay. So you've taught in the past at
15   Louisiana State?
16   A. That's correct. That was back in 2000.
17   Q. While you were getting your Ph.D.?
18   A. That's correct.
19   Q. Okay. And then you mentioned one more school?
20   A. Yes, at the National University Autonomous of
21   Mexico.
22   Q. Okay. And where is the National University
23   campus that you taught at?
24   A. I -- it is in Mexico City.
25   Q. And do you currently teach there or is that in

Page 111

1    the past?
2    A. No. That was in the past, too.
3    Q. Okay. What -- what class or classes did you
4    teach there -- did you teach there?
5    A. I -- I -- I taught completions and workover for
6    the graduate course and deepwater completion in -- for
7    the undergraduate course.
8    Q. Okay. And how many years experience do you
9    have in engineering?
10   A. In engineering? Roughly 30 years.
11   Q. And how much --
12       MR. GREEN: Hey, Matt.
13       MR. GULDE: Yes.
14       MR. GREEN: Do you think we can take our
15   lunch break right now for about 20 minutes?
16       MR. GULDE: Yeah. Yeah, I do. And -- and
17   let me -- let me tell you guys, I really don't have much
18   after this. I have just -- just a handful of documents
19   I want to run through. I don't expect any of them to
20   take too long. I would expect being finished with
21   Dr. Flores' direct exam probably no longer than 30, 40
22   minutes after we resume.
23       MR. GREEN: Okay. Great. We're just
24   going to leave the line open and we'll come back in 20
25   minutes.

Page 112

1        MR. GULDE: That's fine. You might --
2    let's go ahead and take a half hour because I've got a
3    couple things I need to -- I need to look at. Let's go
4    off the record.
5        THE VIDEOGRAPHER: Going off the record at
6    12:20. This completes Disk 2.
7        (At 12:20 P.M., a lunch recess was taken
8        until 12:55 P.M. of the same day.)
9    (Nothing omitted nor deleted. See next page.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Fernando Flores Avila, Ph.D.
June 18, 2015

Page 161

1    Q. Yes, sir.
2    A. No, what's --
3    Q. Let me see if I can help you with the
4  translation.
5          Have you ever heard of the Congress
6  Federal Audit Office before?
7    A. Congress what?
8          MR. KOLODNER: Congress Federal Audit
9  Office.
10         MR. GREEN: Does he -- do you need me to
11  ask him again?
12         MR. KOLODNER: I just --
13   Q. (BY MR. GREEN) Are you familiar with the
14  Federal Audit Office --
15   A. Federal --
16   Q. -- which is known in Mexico by S -- excuse
17  me -- ASF?
18   A. AFF?
19         MR. KOLODNER: ASF, I think.
20         THE WITNESS: A --
21         MR. KOLODNER: Was it ASF?
22         MR. GREEN: Yes, sir.
23   A. ASF.
24         MR. GREEN: A, as in "Alice," S, as in
25  "Sally," F, as in "Frank." Does he know -- does he know

Page 162

1  anything about the Federal Audit Office?
2    A. No.
3          MR. GREEN: Has he ever heard of that?
4    A. No.
5    Q. (BY MR. GREEN) Are you familiar with a contract
6  entered into by PEMEX with a company called Unigel?
7    A. No.
8    Q. You've never heard of that before?
9    A. No.
10   Q. Have you ever heard of an individual named --
11  hold on a second -- "Pancho" Colorado?
12   A. No, I don't know him.
13   Q. You -- I'm going to try to refresh your memory.
14  He was a -- he was a member of the Zeta -- allegedly a
15  member of the Zeta cartel in Mexico.
16   A. Uh-huh.
17   Q. Does that refresh your memory at all?
18   A. Yes, I recall to hear that -- that name in the
19  news.
20   Q. Do you have any -- did you know that PEMEX
21  dealt -- had contracts with him directly --
22   A. No, I didn't know. I don't know what --
23   Q. -- through two separate companies?
24   A. No, because --
25   Q. Did you know about those contracts?

Page 163

1    A. No, because I don't work in the -- in the legal
2  and contract department.
3    Q. Were you aware that PEMEX entered a contract
4  where they paid $9 million to have a rig moved from
5  Saudi Arabia to the Gulf of Mexico, but it turned out
6  that rig was already in the Gulf of Mexico? Had you
7  heard of that before?
8    A. No, because I don't work in the hiring part of
9  PEMEX.
10   Q. Well, as a general -- as a general question,
11  are you aware that PEMEX has had any problems at all
12  with PEMEX employees entering into contracts with third
13  parties where those contracts are either fraudulent or
14  overcharged?
15   A. No, I'm not aware because I don't work in the
16  legal or contract department. I'm just in charge of
17  technology.
18   Q. Sure. And if it turns out that these things
19  I'm telling you are true, that would mean only that you
20  don't know everything that goes on in the company,
21  correct?
22   A. I -- that's correct. I just know about what
23  happens in technology in the Northern Region.
24         MR. GREEN: Just give me a minute. I
25  think I may be done.

Page 164

1          Dr. Flores, thank you very much for
2  traveling here. We appreciate it, and I don't have any
3  other questions.
4          MR. MORENO: Richard Moreno. I do not
5  have any questions.
6          MS. EL-QUESNY: This is Duha El-Quesny,
7  and we don't have any questions.
8          MR. GULDE: I've got -- this is Matt
9  Gulde.
10         FURTHER EXAMINATION
11   Q. (BY MR. GULDE) Dr. Flores, why did you call it
12  science fiction?
13   A. Because it's just an idea of doing that
14  technology in a well. There's no way, as far as my
15  knowledge, to control the energy that is liberated in
16  this process which can cause a lot of damage into the
17  structure of the -- of the well itself and to the
18  formation.
19   Q. What -- what would Chimera representatives have
20  had to do to make it not science fiction for you?
21   A. To test in one well and see the results to see
22  if we lose integrity in the well and if -- after the
23  work job, the well produces in a safely manner.
24   Q. Would they also have to give you some details
25  and some engineering calculations?

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Fernando Flores Avila, Ph.D.
June 18, 2015

Page 165

1   A.  Yes.

2   Q.  Okay.  Did they do any of that?

3   A.  No, they didn't.

4   Q.  Okay.

5        MR. GULDE: I have no further questions,

6 you guys.

7        MR. MORENO: Nor do we.

8        MR. GULDE: So we'll go ahead and close

9 and request that the witness be allowed to review the

10 transcript in accordance with Rule 30(e).  And --

11        MR. GREEN: Matt?

12        MR. GULDE: Yeah.

13        MR. GREEN: Would you mind calling me back

14 at my office, Richard and I are here and we'd like to

15 speak with you --

16        MR. GULDE: Yeah.

17        MR. GREEN: -- when you get a minute.

18        MR. GULDE: No problem.  Let's go off the

19 record.

20        MR. GREEN: Okay.

21        THE VIDEOGRAPHER: This concludes the

22 deposition of Dr. Avila.  The number of DVDs used was

23 three.  We're off the record, 2:14.

24

25

Page 166

1       (At 2:14 P.M., the deposition proceedings

2       concluded.)

3

4

5      _____

6       FERNANDO FLORES AVILA, Ph.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 167

1 COUNTY OF HARRIS   )

2 STATE OF TEXAS   )

3     I hereby certify that the witness in the foregoing

4 deposition, FERNANDO FLORES AVILA, was by me duly sworn

5 to testify to the truth, the whole truth and nothing but

6 the truth, in the within-entitled cause; that said

7 deposition was taken at the time and place herein named;

8 and that the deposition is a true record of the

9 witness's testimony as reported by me, a duly certified

10 shorthand reporter and a disinterested person, and was

11 thereafter transcribed into typewriting by computer.

12     I further certify that I am not interested in the

13 outcome of the said action, nor connected with nor

14 related to any of the parties in said action, nor to

15 their respective counsel.

16     IN WITNESS WHEREOF, I have hereunto set my hand this

17 30th day of June, 2015.

18 Reading and Signing was:

19 _X_ requested  ___ waived ___  not requested

20

21

22

23     Kelly Hanna, CSR, RMR, CRR, CMRS

24     Texas CSR 1624

25     Expiration: 12/31/2015

APP: 000088

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Carmina Moreno Sanchez - Vol. 1
June 17, 2015

---

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF TEXAS
 3                 HOUSTON DIVISION
 4
 5   - - - - - - - - - - - - - - -
 6   SECURITIES AND EXCHANGE       )
 7   COMMISSION,                   )
 8            Plaintiff           )
 9   vs.                          ) CASE NO.
10   ANDREW I. FARMER, CHARLES E. ) 4:14-CV-02345
11   GROB, JR., CAROLYN AUSTIN,    )
12   BALDEMAR P. RIOS, and CHIMERA )
13   ENERGY CORP.,                 )
14            Defendants         )
15   - - - - - - - - - - - - - - -
16
17     VIDEOTAPED DEPOSITION OF CARMINA MORENO SANCHEZ
18              WEDNESDAY, JUNE 17, 2015
19              PAGEs 1-133; VOLUME 1
20
21        BEHMKE REPORTING AND VIDEO SERVICES, INC.
22          BY:  KELLY HANNA, CSR NO. 1654
23              160 SPEAR STREET, SUITE 300
24           SAN FRANCISCO, CALIFORNIA 94105
25                        (415) 597-5600
```

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8        Videotaped Deposition of CARMINA MORENO SANCHEZ,
 9   Volume 1, taken on behalf of Plaintiff, at Hanna & Hanna,
10   1225 North Loop West, Suite 327, Houston, Texas,
11   commencing at 9:56 a.m. Wednesday, June 17, 2015, before
12   Kelly Hanna, Certified Shorthand Reporter No. 1654,
13   pursuant to Notice of Videotaped Deposition.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES OF COUNSEL
 2   FOR PLAINTIFF:
 3        U.S. SECURITIES AND EXCHANGE COMMISSION
 4        BY:  MATTHEW J. GULDE, ESQUIRE
 5             NIKOLAY VYDASHENKO, ESQUIRE
 6        801 Cherry Street, Suite 1900
 7        Fort Worth, Texas 76102
 8        Telephone: (817) 978-1410
 9        Fax:  (817) 978-4927
10        E-mail: guldem@sec.gov
11
12   FOR THE WITNESS:
13        CLEARY GOTTLIEB STEEN & HAMILTON LLP
14        BY:  JONATHAN S. KOLODNER, ESQUIRE
15             SARA B. MILSTEIN, ESQUIRE
16        One Liberty Plaza
17        New York, New York 10006
18        Telephone: (212) 225-2690
19        Fax:  (212) 225-3999
20        E-mail: jkolodner@cgsh.com
21
22
23
24
25
```

Page 4

```
 1 APPEARANCES OF COUNSEL - CONTINUED:
 2 FOR DEFENDANT, BALDEMAR P. RIOS:
 3     (APPEARING TELEPHONICALLY)
 4     RICHARD D. MORENO, LLC
 5     BY: RICHARD D. MORENO, ATTORNEY AT LAW
 6     125 West School Street
 7     Lake Charles, Louisiana 70605
 8     Telephone: (337) 656-8654
 9
10 FOR DEFENDANT, CHARLES E. GROB, JR.:
11     (APPEARING TELEPHONICALLY)
12     AAA LEGAL SERVICES, INC.
13     BY: JOHN GREEN, JR., ATTORNEY AT LAW
14     1135 Hodges Street
15     Lake Charles, Louisiana 70601
16     Telephone: (337) 990-0060
17
18 FOR DEFENDANT, CAROLYN AUSTIN:
19     (APPEARING TELEPHONICALLY)
20     FELDMAN, TUCKER, LEIFER, FIDELL, LLP
21     BY: DUHA EL-QUESNY, ATTORNEY AT LAW
22     1129 20th Street, NW, 4th Floor
23     Washington, D.C. 20036
24     Telephone: (202) 466-8960
25
```

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Carmina Moreno Sanchez - Vol. 1
June 17, 2015

Page 5

```
1   APPEARANCES - CONTINUED:
2   ALSO PRESENT:
3        Jon Vandaveer, Legal Video Specialist
4
5
6
7
8
9
10
11
12
13
14          .
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
1              INDEX
2   WEDNESDAY, JUNE 17, 2015
3   CARMINA MORENO SANCHEZ - VOLUME 1          PAGE
4      Examination by Mr. Vydashenko             12
5   P.M. SESSION                                 91
6      Examination resumed by Mr. Vydashenko     91
7      Examination by Mr. Green                 108
8      Examination by Mr. Moreno                122
9      Examination by Ms. El-Quesny             127
10     Further Examination by Mr. Vydashenko    128
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
1                    EXHIBITS
2         CARMINA MORENO SANCHEZ - VOLUME 1
3   Number           Description              Page
4   Exhibit 1    Letter dated August 6, 2012
5                (CHM 000091) - 1 page           32
6   Exhibit 2    Letter dated September 14, 2012
7                (CHM 000094) - 1 page           47
8   Exhibit 3    Memorandum of understanding
9                agreement between Chimera
10               Energy USA and PEMEX (CHM
11               000035-036) - 2 pages           60
12  Exhibit 4    New Deal Would Utilize CHMR's
13               Non-Hydraulic Shale Oil
14               Extraction System at PEMEX
15               Location dated August 13, 2012
16               (CHM 000038) - 1 page           72
17  Exhibit 5    CHMR: Government Commissioner
18               Advocates New Non-Hydraulic
19               Extraction System Designed to
20               Safely Replace Hydraulic
21               Fracturing dated August 15,
22               2012 (CHM 000045) -  1 page     79
23
24
25
```

Page 8

```
1           EXHIBITS - CONTINUED
2         CARMINA MORENO SANCHEZ - VOLUME 1
3   Number           Description              Page
4   Exhibit 6    Letter dated September 21, 2012
5                (CHM 000089) - 1 page           81
6   Exhibit 7    PEMEX Signs Deal with CHMR for
7                New Non-Hydraulic Shale Oil
8                Extraction System Designed to
9                Safely Replace Hydraulic
10               Fracturing dated August 9, 2012
11               (CHM 000034) - 1 page           92
12  Exhibit 8    Chimera Energy Corp Distributes
13               PEMEX Signed Onsite Schedule
14               Regarding Non-Hydraulic
15               Extraction with attachment
16               (SEC-MACREPORT-P-0000025-026)
17               - 2 pages                       95
18  Exhibit 9    Chimera Energy Corp Distributes
19               PEMEX Signed Well
20               Identification Letter for
21               Non-Hydraulic Extraction with
22               attachment
23               (SEC-MACREPORT-P-0000023-024)
24               - 2 pages                       98
25
```

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Carmina Moreno Sanchez - Vol. 1
June 17, 2015

Page 9

```
 1              EXHIBITS - CONTINUED
 2        CARMINA MORENO SANCHEZ - VOLUME 1
 3   Number          Description           Page
 4   Exhibit 10      PEMEX Executes Go Ahead for
 5                   Three Wells to use CHMR System
 6                   Designed to Safely Replace
 7                   Hydraulic Fracturing (CHM
 8                   000054) - 1 page              99
 9   Exhibit 11      PEMEX Officials Deliver Logging
10                   Reports on Target Wells to
11                   Chimera Energy Corp. for Use
12                   of Non-Hydraulic Extraction
13                   (CHM 000061) - 1 page         103
14   Exhibit 12      PEMEX Schedules Chimera Energy
15                   Corp Onsite Verification of
16                   Chicontepic Wells for End of
17                   Month (CHM 000069) - 1 page   104
18   Exhibit 13      Coordination Technology
19                   Management Initiates Formal
20                   Request Regarding CHMR's
21                   Non-Hydraulic Extraction (CHM
22                   000074) - 1 page              106
23
24
25
```

Page 11

```
 1   Rios.
 2        MS. EL-QUESNY: Duha El-Quesny for Carolyn
 3   Austin.
 4        MR. GREEN: And, for the record, I spoke
 5   with Kevin Edmundson. He has a conflict and cannot
 6   attend.
 7        THE REPORTER: And who was speaking?
 8        MR. GREEN: John Green, Jr.
 9        THE REPORTER: Thank you.
10        MR. KOLODNER: And you also have
11   Jon Kolodner and Sara Milstein for the witness.
12        MR. GREEN: Say those names again, please.
13        MR. KOLODNER: Sure. Jon Kolodner and
14   Sara Milstein for the witness.
15        MR. VYDASHENKO: Counsel, since --
16        MR. GREEN: Can you spell the last names,
17   please.
18        MR. KOLODNER: K-O-L-O-D-N-E-R is
19   Kolodner, and Milstein is M-I-L-S-T-E-I-N.
20        MR. VYDASHENKO: Counsel, just -- just to
21   make the court reporter's job easier -- and I'm talking
22   to the counsel on the phone -- just would you please
23   identify yourself before speaking so we can keep the
24   transcript clear.
25        MR. GREEN: Sure.
```

Page 10

```
 1        WEDNESDAY, JUNE 17, 2015; 9:56
 2        THE VIDEOGRAPHER: Here begins DVD No. 1
 3   in the deposition of Carmina Moreno Sanchez in the
 4   matter of Securities and Exchange Commission v.
 5   Andrew I. Farmer, et al. in the United States District
 6   Court, District for Southern District of Texas, Houston
 7   Division, Case No. 4:14-CV-02345.
 8        Today's date is June 17th, 2015. The time
 9   on the video monitor is 9:56. The video operator today
10   is John Vandaveer contracted by Behmke Reporting and
11   Video Services, Inc., 160 Spears Street, Suite 300, San
12   Francisco, California.
13        This video deposition is taking place at
14   1225 North Loop West, Houston, Texas and was noticed by
15   Matthew J. Gulde, Esq., Securities and Exchange
16   Commission.
17        Counsel, please identify yourselves for
18   the record and whom you represent, please.
19        MR. VYDASHENKO: This is
20   Nikolay Vydashenko for the United States Securities and
21   Exchange Commission.
22        MR. GULDE: Matt Gulde for the SEC.
23        MR. GREEN: John Green, Jr. here for
24   Charles Grob.
25        MR. MORENO: Richard Moreno for Baldemar
```

Page 12

```
 1        MR. VYDASHENKO: Thank you.
 2        MR. GREEN: That was John Green.
 3        CARMINA MORENO SANCHEZ,
 4   having been first duly sworn, testified as follows:
 5                 EXAMINATION
 6     Q. (BY MR. VYDASHENKO) Thank you for being here,
 7   Ms. Moreno. My name is Nikolay Vydashenko. I represent
 8   the SEC, and I will be taking your deposition today.
 9   Have you ever been deposed before?
10     A. No.
11     Q. I'll just go over a few of the ground rules
12   with you for this deposition so that we have the same
13   understanding. I will be asking you questions. My
14   questions and your answers will be recorded by the court
15   reporter and the videographer. You understand that
16   you'll need to speak up to answer so that the court
17   reporter can hear you and the recording equipment can
18   pick up your voice?
19     A. Yes.
20     Q. And also the court reporter will not be able to
21   record nods or shakes of the head. So you understand
22   that you will need to answer verbally?
23     A. Yes, I understand.
24     Q. The court reporter will also have trouble if we
25   talk over each other. So we ask that you wait for me to
```

APP: 000091

Securities and Exchange Commission v.
Andrew I. Farmer, et al.

Carmina Moreno Sanchez - Vol. 1
June 17, 2015

Page 53

1  they're actually using the English name of the
2  technology, "non-hydraulic." That is not usual -- that
3  is not the way we usually use them. We actually use
4  them in Spanish. We translate the -- the words that are
5  in another language.
6       And then on the second paragraph that
7  starts with the word "Creemos," there is a word missing.
8  The second line of the second paragraph after the word
9  "propuesta," there is a letter "a" missing.
10  Q. What does the letter "a" mean?
11  A. It's "to."
12  Q. So -- and "propuesta" -- the word "propuesta"
13  means proposal? Is that --
14  A. Proposal, yes.
15  Q. So to make sense, you would have to say
16  "proposal to PEMEX"? Proposal a -- "propuesta a PEMEX"?
17  A. That is correct.
18  Q. And as -- as it stands on Exhibit 2, it just
19  says "proposal PEMEX"?
20  A. That is correct.
21  Q. Okay. And then you finally mentioned there
22  was -- you had some difficulty understanding the line,
23  the sentence beginning with "Quedamos"?
24  A. That is correct.
25  Q. What do you see that's -- that makes it

Page 54

1  difficult for you to understand that?
2  A. I'm -- I'm going to literally translate what it
3  says right now. It's "We remain of you at your
4  service."
5  Q. Okay. So you think the attempt was to say "We
6  remain at your service"?
7  A. Exactly.
8  Q. Okay. What would you need to do to make that
9  sentence correct or to make sense?
10  A. Basically, you would have to eliminate the
11  words "de" and "ustedes."
12  Q. Okay.
13  A. So it -- it would read we -- "We remain at your
14  service."
15  Q. So it would just say "Quedamos a sus ordenes"?
16  A. That is correct.
17  Q. Now, is -- based on the content of Exhibit 2,
18  is this the type of letter that you would expect to be
19  issued by PEMEX in a oficio format that we discussed
20  earlier?
21  A. I believe so, yes.
22  Q. And looking at Exhibit 2, can you tell whether
23  or not this is in an oficio format?
24  A. It's not an officio format.
25  Q. And is that for the same reasons as we

Page 55

1  discussed in -- with respect to Exhibit 1?
2  A. Yes.
3  Q. Now, did you form any conclusions with regard
4  to the authenticity of Exhibit -- let's start with
5  Exhibit 1? After having reviewed Exhibit 1, what did
6  you think?
7  A. Well, are you asking me back then what was my
8  conclusion?
9  Q. Let's talk about back then.
10  A. Okay. So due to everything we have discussed
11  and the fact also that these communications were written
12  in Spanish, very poor Spanish, and the first -- the
13  conclusion I arrived at was that these were not
14  legitimate communications, that these -- that -- that
15  these were not -- they didn't -- they weren't issued by
16  PEMEX or any PEMEX employee.
17  Q. And was that the same conclusion you had -- did
18  you have the same conclusion with respect to Exhibit 2?
19  A. Yes.
20  Q. Has that conclusion changed at all since the
21  time you first arrived at that -- at the conclusion?
22  A. No.
23  Q. Now, you had mentioned that you did not believe
24  this was -- Exhibits 1 or 2 were sent by any PEMEX
25  employee. I see that Exhibits 1 and 2 are signed by a

Page 56

1  Jose Quiroga, right?
2  A. That is correct.
3  Q. Did you make any attempt to determine if Jose
4  Quiroga was a PEMEX employee?
5  A. Yes, I did.
6  Q. Tell us what you did to determine that.
7  A. The first thing I did was make a search in
8  PEMEX's corporate address book, electronic address book,
9  in order to find his contact information.
10  Q. What does that electronic address book look
11  like?
12  A. It is basically on Outlook. It is an Outlook
13  database.
14  Q. Outlook, the e-mail program?
15  A. Exactly. Microsoft Outlook.
16  Q. Okay. So you searched for him -- for the name
17  Jose Quiroga on this Outlook database?
18  A. Correct.
19  Q. When did you conduct that search?
20  A. It was in the third quarter of 2012.
21  Q. What were the results or what was the result of
22  that search?
23  A. I couldn't find an employee with that name nor
24  while searching people working in that specific area, in
25  the Northern Region in PEMEX Exploration and Production,

Page 93

1    A.  I -- this is one of the documents that were
2  uploaded -- well, that were present in Chimera's
3  website.
4    Q.  Apart from the website, is it possible that you
5  could have seen Exhibit 7 elsewhere?
6    A.  Yes.  From the -- since the moment I noticed
7  there was an issue going on between Chimera Energy and
8  PEMEX, I -- I kept an alarm, a Google alarm on my
9  computer so whenever there was a news or a mention of
10  Chimera Energy on the Internet, I get such information.
11        So I -- I've seen this document also from
12  the Internet.
13    Q.  And is that true for the prior exhibits that
14  we've reviewed as well?
15    A.  Yes.  Yes, that's also true.
16    Q.  Now, have you had a chance now to read
17  Exhibit 7?  And if you haven't, if you could just
18  read -- read it to yourself, please.
19    A.  No, I have -- I have read it, yeah.
20    Q.  Now, I'll just read the headline to you of
21  Exhibit 7, which is PEMEX Signs Deal with CHMR for New
22  Non-Hydraulic Shale Oil Extraction System Designed to
23  Safely Replace Hydraulic Fracturing.
24        Do you see that?
25    A.  Yes, I do.

Page 94

1    Q.  And then the press release goes on to say
2  that -- in the next paragraph -- that "Chimera Energy
3  Corp announced today that they have executed a
4  Memorandum of Understanding with PEMEX, also known as
5  Petroleos Mexicanos, regarding the utilization of CHMR's
6  revolutionary exothermic Non-Hydraulic Extraction method
7  throughout Latin America."
8        Do you see that?
9    A.  Yes, I do.
10    Q.  Based on your knowledge and inquiry into
11  Chimera's claims, do you have an opinion on whether
12  these -- the statements I just read on Exhibit 7 are
13  accurate?
14    A.  Those statements --
15    Q.  Yes.
16    A.  -- you read?  Well, yes, this -- I am not aware
17  that there was a Memorandum of Understanding between
18  PEMEX and Chimera, that there was ever a
19  memorandum of -- Memorandum of Understanding between
20  PEMEX and Chimera regarding any issue, not only this
21  exothermic non-hydraulic extraction method.
22    Q.  Given that, do you believe that this --
23  Exhibit 7 accurately describes the relationship between
24  PEMEX and Chimera as it existed at the time of its
25  issuance on August 9, 2012?

Page 95

1    A.  I believe that this information does not
2  accurately describe the relationship between PEMEX and
3  Chimera Energy.
4        (Exhibit 8 marked)
5        THE WITNESS:  Thank you.
6        MR. VYDASHENKO:  The court reporter has
7  marked as Exhibit 8 and handed to the witness a document
8  bearing Bates No. SEC-MACREPORT spelled
9  MACREPORT-P-0000025 through 26.  It's a two-page
10  document.
11        If defense counsel would let me know when
12  they're -- when they have it and are ready, please.
13        MR. GREEN:  Go ahead.
14        MS. EL-QUESNY:  I have it.
15    Q.  (BY MR. VYDASHENKO) Ms. Moreno, have you seen
16  Exhibit 8 before?
17    A.  Honestly, I'm not sure.
18    Q.  So I'll -- I'll represent to you that this is a
19  copy of a Chimera Energy Corp press release dated
20  September 24th, 2012.  Let me know when you've had a
21  chance to review Exhibit 8.
22    A.  I'm -- I am ready.
23    Q.  Now, Exhibit 8 contains a copy of a letter
24  dated September 14, 2012.
25        Do you see that letter?

Page 96

1    A.  Yes, I do.
2    Q.  Does that letter look identical to the letter
3  that we reviewed and marked as Exhibit 2?
4    A.  Yes, it is.
5    Q.  And at the top of Exhibit 8 -- well, it's --
6  it's titled Chimera Energy Corp. Distributes PEMEX
7  Signed Onsite Schedule Regarding Non-Hydraulic
8  Extraction.
9        Do you see that?
10    A.  Yes, I do.
11    Q.  And then it goes on to read that
12  "Chimera Energy Corp announced distribution of the
13  signed PEMEX onsite schedule letter dated September 14,
14  2012 regarding CHMR's Non-Hydraulic Extraction.
15        Do you see that?
16    A.  Yes, I do.
17    Q.  Does this -- does Exhibit 8 -- do you have a
18  belief as to whether Exhibit 8 is a -- is accurate in
19  how it represents the letter that's depicted on it?
20    A.  Well, I -- I don't think this is a schedule
21  letter, whatever that might mean, but whenever PEMEX
22  elaborates a schedule regarding certain works to be
23  carried out, specifically operating works, they are far
24  more complex documents and they detail what kind of --
25  specifically what day they're going to take place in --

Page 101

1    Q.  (BY MR. VYDASHENKO) Let's look, first, at the
2    headline, which states:  PEMEX Executes Go Ahead for
3    Three Wells to use CHMR System Designed to Safely
4    Replace Hydraulic Fracturing.
5        Do you see that?
6    A.  Yes, I do.
7    Q.  Do you have a belief as to whether that
8    headline accurately represents -- represents PEMEX's
9    relationship with Chimera as of the date of this press
10   release, which is August 24, 2012?
11   A.  No, it doesn't.
12   Q.  And is that belief based on all of the -- all
13   of the items we discussed that were part of your
14   investigation?
15   A.  Yes.
16   Q.  Let's go to the next -- the first paragraph of
17   that -- of Exhibit 10.  It reads:  Chimera Energy Corp
18   President Charles Grob announced the receipt of the
19   official signed document from PEMEX to utilize the
20   Company's new Non-Hydraulic Shale Oil Extraction system
21   on Central Tajin Area wells number 4, 5 and 6 in the
22   Chicontepec Basin of Mexico.
23       Do you see that?
24   A.  Yes, I do.
25   Q.  Did you form a belief as to the accuracy of the

Page 102

1    statement I just read?
2    A.  I'm sorry.  I'm not getting the question.
3    Q.  Sorry.  Do you believe the statement I just
4    read is accurate?
5    A.  No.
6    Q.  And why is that?
7    A.  Because I -- at the time I had -- I had
8    information that suggested that there wasn't an
9    agreement or a contract or an MOU signed or entered into
10   between Chimera Energy and PEMEX.
11   Q.  And has -- has this belief changed -- or has
12   this understanding changed for you over time or is
13   this --
14   A.  No.
15   Q.  -- still the same?
16   A.  It's the same, yes.
17   Q.  Now, I'll direct your attention to the fourth
18   paragraph on Exhibit 10 that begins with the word
19   "PEMEX."  And it reads:  PEMEX, also known as Petroleos
20   Mexicanos, has been working with Chimera Energy Corp to
21   utilize CHMR's revolutionary exothermic Non-Hydraulic
22   Extraction method throughout Latin America.
23       Do you see that sentence?
24   A.  Yes.
25   Q.  Does the sentence I read -- I just read

Page 103

1    accurately reflect PEMEX's relationship with Chimera as
2    of the date of this press release?
3    A.  No, it doesn't.
4        (Exhibit 11 marked)
5        THE WITNESS:  Thank you.
6        MR. VYDASHENKO:  The court reporter has
7    marked as Exhibit 11 and handed to the witness a
8    one-page document bearing Bates No. CHM000061.  It's a
9    press release dated September 10, 2012.
10       MS. EL-QUESNY:  Got it.
11       MR. GREEN:  Go ahead.
12   Q.  (BY MR. VYDASHENKO) Ms. Moreno, have you seen
13   Exhibit 11 before?
14   A.  I don't recall.
15   Q.  Let's go through some of the statements on
16   Exhibit 11.  And, first, I'll just read the headline.
17   It states:  PEMEX Officials -- well, first, I'll note
18   that Exhibit 11 is a press release dated September 10,
19   2012.
20       Do you see that?
21   A.  Yes, I do.
22   Q.  And it's a Chimera Energy press release.  The
23   headline states:  PEMEX Officials Deliver Logging
24   Reports on Target Wells to Chimera Energy Corp. for Use
25   of Non-Hydraulic Extraction.

Page 104

1        Do you see that headline?
2    A.  Yes, I do.
3    Q.  Is that -- does that headline accurately
4    describe interactions between PEMEX and Chimera?
5    A.  No.
6    Q.  The next paragraph reads:  Chimera Energy Corp.
7    announced today that officials with PEMEX delivered well
8    data and logging reports to CHMR on Saturday in Poza
9    Rica, Mexico for Company use in dialing in
10   specifications for the use of Non-Hydraulic Extraction
11   there.
12       Does that sentence accurately describe
13   interactions between PEMEX and Chimera as of
14   September 10, 2012?
15   A.  Not anything that I'm aware of.
16   Q.  And the next sentence reads:  PEMEX and
17   Chimera Energy Corp. executed a Memorandum of
18   Understanding last month regarding the utilization of
19   CHMR's revolutionary exothermic Non-Hydraulic Extraction
20   method throughout Latin America.
21       Do you believe that sentence is accurate?
22   A.  Not to my knowledge.
23       (Exhibit 12 marked)
24       THE WITNESS:  Thank you.
25       MR. VYDASHENKO:  I've -- the court

1 reporter has marked as Exhibit 12 and handed to the
2 witness a document -- one-page document bearing Bates
3 No. CHM000069. It's a Chimera Energy press release
4 dated September 20, 2012.
5       MS. EL-QUESNY: Got it.
6       MR. GREEN: Got it. Go ahead.
7   Q. (BY MR. VYDASHENKO) Ms. Moreno, have you seen
8 Exhibit 12 before?
9   A. Yes, I have.
10   Q. When did you first see it?
11   A. On the Internet while seeking information.
12   Q. This is back during your inquiry in the third
13 quarter of 2012?
14   A. Yes, that's correct.
15   Q. I'll -- I'll read the headline to you of -- of
16 Exhibit 12. It states: PEMEX Schedules PEMEX Energy
17 Corp Onsite Verification of Chicontepec Wells for End of
18 Month.
19       Do you see that?
20   A. Yes, I do.
21   Q. Do you believe that to be an accurate
22 statement?
23   A. No, I don't.
24   Q. The next paragraph states: Chimera Energy Corp
25 announces receipt of the schedule from PEMEX requesting

1 that Chimera Energy Corp personnel be onsite with PEMEX
2 representatives at the Central Tajin Area to verify the
3 first wells for intended use of Non-Hydraulic Shale Oil
4 Extraction.
5       Do you see that sentence?
6   A. Yes, I do.
7   Q. Is that an accurate statement?
8   A. Not -- no, not that I'm aware of.
9       (Exhibit 13 marked)
10       MR. VYDASHENKO: The court reporter has
11 marked as Exhibit 13 a document bearing Bates No.
12 CHM000074. It's a one-page document dated September 26,
13 2012.
14       You guys have -- does plaintiff's counsel
15 have this document in front of them? I think we might
16 have given it to you earlier.
17       MR. KOLODNER: Yes, we have it.
18       MS. EL-QUESNY: Got it.
19       MR. GREEN: Good. Go ahead.
20   Q. (BY MR. VYDASHENKO) Have you -- Ms. Moreno,
21 have you seen Exhibit 13 before?
22   A. Yes.
23   Q. When did you see it?
24   A. I saw it when I was researching and keeping
25 up-to-date with -- with what Chimera Energy was doing

1 regarding PEMEX.
2   Q. Okay. And I'll just, again, read a few
3 statements from this exhibit and I'll note that it's a
4 Chimera Energy exhibit dated September 26, 2012. The
5 headline states: Coordination Technology Management
6 Initiates Formal Request Regarding CHMR's Non-Hydraulic
7 Extraction. And the next paragraph goes on to say:
8 Chimera Energy Corp disclosed today that the Company has
9 received a new formal request letter from Dr. Fernando
10 Sebastian Flores Avila, Coordination of Technology
11 Management Northern Region, Management Branch Technology
12 Resources at PEMEX for scientific level presentation
13 review.
14       Do you see the -- those sentences?
15   A. Yes, I do.
16   Q. Are those statements accurate?
17   A. Not to my -- not to my knowledge.
18       MR. VYDASHENKO: Let's take a quick break,
19 Counsel, just five minutes.
20       MS. EL-QUESNY: Okay.
21       MR. VYDASHENKO: Thanks. Let's go off the
22 record.
23       THE VIDEOGRAPHER: Going off the record,
24 1:38.
25       (Recess taken from 1:38 to 1:52.)

1       THE VIDEOGRAPHER: Going back on the
2 record, 1:52.
3       MR. VYDASHENKO: At this time we don't
4 have any further questions. So we'll turn it over to
5 defense counsel for any cross-examination.
6       MR. GREEN: I have a few questions. This
7 is John Green.
8         EXAMINATION
9   Q. (BY MR. GREEN) Ms. Moreno, can you hear me?
10   A. Yes, I can.
11   Q. Okay. I'm trying to get a little better time
12 line on when you first started investigating Chimera.
13       Did you begin your investigation before or
14 after the meeting that took place in -- in Mexico on
15 October the 1st?
16   A. I don't recall specifically neither the date
17 of -- the date I started researching these -- this case
18 specifically nor the date of that specific meeting.
19   Q. Well, the meeting that I'm talking about would
20 be -- would have been attended by -- it would have been
21 in Poza Rica. Do you know anything about a meeting in
22 Poza Rica in October -- on October 1st, 2012?
23   A. Yes.
24   Q. Was that a "Yes"?
25   A. Yes.

Privileged & Confidential
Attorney Work Product
Attorney-Client Communication
·7/30/2015

**ERRATA SHEET**

NAME OF CASE:     SEC v. Andrew I. Farmer, et al., No. 4:14-CV-2345 (S.D. Tex. Aug. 14, 2014)

DATE OF DEPOSITION:     June 17, 2015

NAME OF WITNESS:     Carmina Moreno Sánchez

| PAGE | LINE(S) | FROM | TO | REASON FOR CHANGE |
|---|---|---|---|---|
| 23 | 10-11 | "we call an asset of a rock formation" | "we call a rock formation an asset" | Witness misstatement |
| 25 | 1 | "a mentioned" | "the mentioned" | Transcription error |
| 29 | 17-18 | "publish Tombstone" | "publish a Tombstone" | Transcription error |
| 42 | 14 | "generally" | "general" | Transcription error |
| 54 | 24 | "an" | "in" | Transcription error |
| 59 | 4 | "recited" | "rested" | Transcription error |
| 86 | 11 | "'assistant'" | "'asistan'" | Transcription error |
| 87 | 9 | "jointly" | "joint" | Transcription error |
| 88 | 8 | "'assistant'" | "'asistan'" | Transcription error |
| 88 | 14 | "assist to" | "attend at" | Witness misstatement |
| 91 | 17 | "'assistant,' 'assistant'" | "'asistan,' 'asistan'" | Transcription error |
| 111 | 9 | "Dr. Avia" | "Dr. Ávila" | Transcription error |
| 111 | 13 | "Dr. Avia" | "Dr. Ávila" | Transcription error |

**ACKNOWLEDGEMENT OF DEPONENT**

I, Carmina Moreno Sánchez, hereby certify under penalty of perjury under the laws of the United States of America that I have read the transcript of my testimony taken under affirmation in my deposition of June 17, 2015 and that, subject to the corrections noted above, the transcript is a true and correct record of my testimony.

Executed on: JULY 30, 2015                    Signature: [signature]

RECEIVED
JUL 30 2015
BEHMKE REPORTING AND
VIDEO SERVICES, INC.

**Page 1**

1 UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3 In the Matter of:        )

4                          ) File No. FW-03772-A

5 CHIMERA ENERGY CORPORATION   )

6

7 WITNESS:  Thomas Galen Massey

8 PAGES:   1 through 33

9 PLACE:    Securities and Exchange Commission

10         Ft. Worth Regional Office

11         801 Cherry Street, 19th Floor

12         Fort Worth, TX 76102

13 DATE:    Tuesday, August 20, 2013

14

15      The above-entitled matter came on for hearing,

16 pursuant to notice, at 10:45 a.m.

17

18

19

20

21

22

23

24      Diversified Reporting Services, Inc.

25         (202) 467-9200

**Page 2**

1 APPEARANCES:

2

3 On behalf of the Securities and Exchange Commission:

4     NIKOLAY VYDASHENKO, ESQ.

5     Securities & Exchange Commission

6     Division of Enforcement

7     801 North Cherry Street, Suite 1900

8     Fort Worth, Texas 76102-6882

9     vydashenkon@sec.gov

10

11 On behalf of the Witness:

12     GERALD J. CASEY, ESQ.

13     Law Office of Gerald J. Casey

14     613 Alamo Street

15     Lake Charles, Louisiana 70601

16

17

18

19

20

21

22

23

24

25

**Page 3**

1          C O N T E N T S

2

3 WITNESS:                    EXAMINATION

4 Thomas Galen Massey                  4

5

6 EXHIBITS:

7 None

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 4**

1          P R O C E E D I N G S

2     MR. VYDASHENKO:  We're on the record at

3 10:45 a.m. on August 20, 2013.

4     Mr. Massey, please raise your right hand.

5     Do you swear or affirm to tell the truth, the

6 whole truth and nothing but the truth?

7     MR. MASSEY:  Yes.

8 Whereupon,

9          THOMAS GALEN MASSEY

10 was called as a witness and, been duly sworn, was

11 examined and testified as follows:

12          EXAMINATION

13     BY MR. VYDASHENKO:

14     Q   Please state your full name and spell your

15 name for the record.

16     A   Thomas Galen Massey, T-h-o-m-a-s G-a-l-e-n

17 M-a-s-s-e-y.

18     Q   Thank you.  I'm Nikolay Vydashenko, and I'm an

19 officer of the Commission for purposes of this

20 proceeding.  Before we get into your testimony I need to

21 provide you with some information that I'm going to read

22 and also go through a few preliminary questions with

23 you.

24     This is an investigation by the U.S.

25 Securities and Exchange Commission in the matter of

**Page 17**

1 Petróleos Mexicanos?
2    A    I decline to answer.
3    Q    Were you compensated for work or services you
4 performed relating to Chimera, whether payments were
5 made to you personally or to entities you controlled?
6    A    I decline to answer.
7    Q    Do you assert the Fifth Amendment privilege
8 against self-incrimination with respect to all questions
9 concerning your involvement with Chimera?
10   A    I decline to answer.
11   Q    Do you know that some of Chimera's public
12 statements in 2012 contained false or misleading
13 information and omitted information such that these
14 statements were misleading to Chimera investors?
15   A    I decline to answer.
16   Q    Do you assert the Fifth Amendment privilege
17 against self-incrimination with respect to all questions
18 concerning Chimera's public statements?
19   A    I decline to answer.
20   Q    Are you familiar with a person by the name of
21 Andrew Farmer?
22   A    I decline to answer.
23   Q    Did you perform any work or services on behalf
24 of Andrew Farmer or any entity he controls?
25   A    I decline to answer.

**Page 18**

1    Q    Did you perform any work or services for
2 Andrew Farmer or any entities he controls relating to
3 Chimera?
4    A    I decline to answer.
5    Q    Did you discuss Chimera with Andrew Farmer?
6    A    I decline to answer.
7    Q    Did you report to Andrew Farmer with respect
8 to work or services you performed relating to Chimera?
9    A    I decline to answer.
10   Q    Did Andrew Farmer have any control or did he
11 direct or supervise in any way the work or services you
12 performed relating to Chimera?
13   A    I decline to answer.
14   Q    Were you or any entity that you controlled
15 compensated by Andrew Farmer or any entity he controlled
16 for your performance of any work or services related to
17 Chimera?
18   A    I decline to answer.
19   Q    Do you assert the Fifth Amendment privilege
20 against self-incrimination with respect to all questions
21 concerning Andrew Farmer?
22   A    I decline to answer.
23   Q    Are you familiar with a person by the name of
24 John Brotherton?
25   A    I decline to answer.

**Page 19**

1    Q    Did you discuss Chimera with John Brotherton?
2    A    I decline to answer.
3    Q    Did you report to John Brotherton with respect
4 to work or services you performed relating to Chimera?
5    A    I decline to answer.
6    Q    Did John Brotherton have any control or did he
7 direct or supervise in any way the work or services you
8 performed relating to Chimera?
9    A    I decline to answer.
10   Q    Did John Brotherton perform any work or
11 services relating to Chimera?
12   A    I decline to answer.
13   Q    Did John Brotherton draft Chimera's public
14 statements?
15   A    I decline to answer.
16   Q    Do you assert the Fifth Amendment privilege
17 against self-incrimination with respect to all questions
18 concerning John Brotherton?
19   A    I decline to answer.
20   Q    Are you familiar with a person by the name of
21 Robert Hines?
22   A    I decline to answer.
23   Q    Did you discuss Chimera with Robert Hines?
24   A    I decline to answer.
25   Q    Did Robert Hines or any entity he controls or

**Page 20**

1 controlled perform any work or services relating to
2 Chimera?
3    A    I decline to answer.
4    Q    Do you assert the Fifth Amendment privilege
5 against self-incrimination with respect to all questions
6 concerning Robert Hines?
7    A    I decline to answer.
8    Q    Are you familiar with a person by the name of
9 Michael Franklin?
10   A    I decline to answer.
11   Q    Did you discuss Chimera with Michael Franklin?
12   A    I decline to answer.
13   Q    Did Michael Franklin or any entity he
14 controlled perform any work or services relating to
15 Chimera?
16   A    I decline to answer.
17   Q    Do you assert the Fifth Amendment privilege
18 against self-incrimination with respect to all questions
19 concerning Michael Franklin?
20   A    I decline to answer.
21   Q    Are you familiar with Lydia Cotton?
22   A    I decline to answer.
23   Q    Did you discuss Chimera with Lydia Cotton?
24   A    I decline to answer.
25   Q    Do you assert the Fifth Amendment privilege

# Appendix

# Exhibit C

July 30, 2012 08:00 AM Eastern Daylight Time

**CHMR Unveils Breakthrough Shale Oil Extraction Method to Safely and Effectively Replace Hydraulic Fracturing**

HOUSTON--(BUSINESS WIRE)--Chimera Energy Corp (OTCBB: CHMR) announced today that they have licensed Non-Hydraulic Extraction, which is a shale oil extraction technology that is designed to safely replace hydraulic fracturing (AKA fracking and fracing) without negative environmental impacts. Originally developed for shale oil extraction in geographic areas that were far too cold to use water due to freezing, Non-Hydraulic Extraction has recently emerged to be asserted as a cheaper and more effective extraction method that does not affect groundwater at all.

Chimera Energy Corp has put in place their procedure for engineering this new method for mass production, patenting, licensing and sales. For a description of how Non-Hydraulic Extraction works, high-speed broadband users may visit www.zerowaterfracking.com.
All other Internet speed connections may visit www.chimeraenergyusa.com/investors.html.

**About Chimera Energy Corp (OTCBB: CHMR)**
Chimera Energy Corp is a Texas corporation listed on the OTCBB under the trading symbol CHMR. Chimera Energy Corp (CHMR) acquires, develops, licenses and sells new energy technology and products that are designed to profit from the current domestic shale oil boom. CHMR competes in an industry sector that includes Halliburton, Schlumberger, EnCana Corporation and Continental Resources, Inc.

More information on Chimera Energy Corp can be seen at http://www.chimeranergyusa.com.

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: This news release contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements that include the words "believes," "expects," "anticipate" or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the company to differ materially from those expressed or implied by such forward-looking statements. In addition, description of anyone's past success, either financial or strategic, is no guarantee of future success. This news release speaks as of the date first set forth above and the company assumes no responsibility to update the information included herein for events occurring after the date hereof.

Photos/Multimedia Gallery Available: http://www.businesswire.com/cgi-bin/mmg.cgi?eid=50357661&lang=en

**Contacts**
Chimera Energy Corp  Charles Grob, 832-390-2334

CHM
000017

August 01, 2012 08:30 AM Eastern Daylight Time

**Drought May Enable CHMR's Proprietary Non-Hydraulic Shale Oil Extraction to Quickly Replace Hydraulic Fracturing**

HOUSTON--(BUSINESS WIRE)--Chimera Energy Corp (OTCBB: CHMR): According to CNNMoney yesterday, in an article written by Steve Hargreaves, the current U.S. drought is causing water shortages for the hydraulic fracturing process across the Midwest. This shortage of water, the key ingredient in hydraulic fracturing, is causing scheduled fracturing projects to be cancelled and straining U.S. oil production. CHMR's new Non-Hydraulic Shale Oil Extraction uses zero water, which means the drought would have no impact on their new process. The full article can be seen at http://money.cnn.com/2012/07/31/news/economy/drought-oil-us/index.htm

CHMR announced on Monday that they have licensed Non-Hydraulic Extraction, which is a shale oil extraction technology that is designed to safely replace hydraulic fracturing (AKA fracking and fracing) without negative environmental impacts.

Originally developed for shale oil extraction in geographic areas that were far too cold to use water due to freezing, Non-Hydraulic Extraction has recently emerged to be asserted as a cheaper and more effective extraction method that does not affect groundwater at all.

Chimera Energy Corp has put in place their procedure for engineering this new method for mass production, patenting, licensing and sales. For a description of how Non-Hydraulic Extraction works, high-speed broadband users may visit www.zerowaterfracking.com

All other Internet speed connections may visit www.chimeraenergyusa.com/investors.html

**About Chimera Energy Corp (OTCBB: CHMR)**
Chimera Energy Corp is a Texas corporation listed on the OTCBB under the trading symbol CHMR. Chimera Energy Corp (CHMR) acquires, develops, licenses and sells new energy technology and products that are designed to profit from the current domestic shale oil boom. CHMR competes in an industry sector that includes Halliburton, Schlumberger, EnCana Corporation and Continental Resources, Inc. More information on Chimera Energy Corp can be seen at http://www.chimeranergyusa.com

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: This news release contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements that include the words "believes," "expects," "anticipate" or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the company to differ materially from those expressed or implied by such forward-looking statements. In addition, description of anyone's past success, either financial or strategic, is no guarantee of future success. This news release speaks as of the date first set forth above and the company assumes no responsibility to update the information included herein for events occurring after the date hereof.

**Contacts**
Chimera Energy Corp  Charles Grob, 832-390-2334

CHM
000023

August 02, 2012 08:00 AM Eastern Daylight Time

**CHMR Patenting Non-Hydraulic Shale Oil Extraction System That is Designed to Safely Replace Hydraulic Fracturing**

HOUSTON--(BUSINESS WIRE)--Chimera Energy Corp (OTCBB: CHMR) disclosed today that they have engaged the prominent Intellectual Property legal firm of Hulsey LP of Austin, Texas to protect the Company's breakthrough Non-Hydraulic Shale Oil Extraction process and its economic benefits from any potential copycats. Hulsey LP is also tasked with filing the patent for this breakthrough technology that is designed to extract Shale Oil using zero water.

Earlier this week, CHMR announced the new Non-Hydraulic Extraction process, which is a revolutionary Shale Oil extraction technology designed to safely replace hydraulic fracturing (AKA fracking and fracing) without negative environmental impacts. The new process uses no water and was originally developed for Shale Oil extraction in geographic areas that were far too cold to use water due to freezing. Non-Hydraulic Extraction has recently emerged to be asserted as a cheaper and more effective extraction method that does not affect groundwater at all.

Chimera Energy Corp has begun reengineering this new method for mass production, relicensing and sales. For a description of how Non-Hydraulic Extraction works, high-speed broadband users may visit www.zerowaterfracking.com

Or you may alternatively visit www.chimeraenergyusa.com/investors.html

Chimera Energy Corp is a Texas corporation listed on the OTCBB under the trading symbol CHMR. Chimera Energy Corp (CHMR) acquires, develops, licenses and sells new energy technology and products that are designed to profit from the current domestic shale oil boom. CHMR competes in an industry sector that includes Halliburton (NYSE: HAL), Schlumberger (NYSE: SLB), EnCana Corporation (NYSE: ECA) and Continental Resources, Inc. (NYSE: CLR).

More information about Chimera Energy Corp may be found at www.ChimeraEnergyUSA.com

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: This news release contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements that include the words "believes," "expects," "anticipate" or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the company to differ materially from those expressed or implied by such forward-looking statements. In addition, description of anyone's past success, either financial or strategic, is no guarantee of future success. This news release speaks as of the date first set forth above and the company assumes no responsibility to update the information included herein for events occurring after the date hereof.

Photos/Multimedia Gallery Available: http://www.businesswire.com/cgi-bin/mmg.cgi?eid=50364393&lang=en

**Contacts**
Chimera Energy Corp  Charles Grob, 832-390-2334

CHM
000024

August 06, 2012 08:30 AM Eastern Daylight Time

**CHMR Discloses First Purchase Order on New Shale Oil Extraction System Designed to Safely Replace Hydraulic Fracturing**

HOUSTON--(BUSINESS WIRE)--Chimera Energy Corp (OTCBB: CHMR) disclosed today that they have executed a purchase order with America West Drilling Supply regarding an integral component necessary for Non-Hydraulic Extraction that is known as a "casing perforator". In the process of extracting oil from shale, the well casing is first perforated to create new ducts for oil to flow. Chimera Energy Corp is purposely using a type of perforator that is pneumatically operated, excluding any technology for perforation that requires water, ballistics, blasting or any potentially toxic chemicals.

CHMR announced their new Non-Hydraulic Extraction process last week. The process is a revolutionary Shale Oil extraction technology designed to safely replace hydraulic fracturing (AKA fracking and fracing) without negative environmental impacts. The new process uses no water and was originally developed for Shale Oil extraction in geographic areas that were far too cold to use water due to freezing. Non-Hydraulic Extraction has recently emerged to be asserted as a cheaper and more effective extraction method that does not affect groundwater at all.

Company management is making plans to publicly display the system in action and is patenting the system that is placed in service after the casing is perforated.        .
Chimera Energy Corp is in the process of reengineering this new method for mass production, relicensing and sales. For a description of how Non-Hydraulic Extraction works, high-speed broadband users may visit www.zerowaterfracking.com

Or you may alternatively visit www.chimeraenergyusa.com/investors.html

Chimera Energy Corp is a Texas corporation listed on the OTCBB under the trading symbol CHMR. Chimera Energy Corp (CHMR) acquires, develops, licenses and sells new energy technology and products that are designed to profit from the current domestic shale oil boom. CHMR competes in an industry sector that includes Halliburton (NYSE: HAL), Schlumberger (NYSE: SLB), EnCana Corporation (NYSE: ECA) and Continental Resources, Inc. (NYSE: CLR).

More information about Chimera Energy Corp may be found at www.ChimeraEnergyUSA.com

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: This news release contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements that include the words "believes," "expects," "anticipate" or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the company to differ materially from those expressed or implied by such forward-looking statements. In addition, description of anyone's past success, either financial or strategic, is no guarantee of future success. This news release speaks as of the date first set forth above and the company assumes no responsibility to update the information included herein for events occurring after the date hereof.

**Contacts**
Chimera Energy Corp  Charles Grob, 832-390-2334

CHM
000025

August 08, 2012 08:30 AM Eastern Daylight Time

**CHMR to Present New System Designed to Safely Replace Hydraulic Fracturing at NAPE Expo 2013**

HOUSTON--(BUSINESS WIRE)--Chimera Energy Corp (OTCBB: CHMR) announced today that they will be an exhibitor at the North American Prospect Expo. The Company will be presenting their new Non-Hydraulic Shale Oil Extraction system at the Expo, scheduled to take place February 5th through February 8th at the George R. Brown Convention Center in Houston, Texas. The NAPE Expo provides a marketplace for the buying, selling and trading of oil and gas prospects and producing properties via exhibit booths. NAPE is the premier E&P networking venue - where one can see what's going on throughout the entire oil patch in two days.

CHMR announced their new Non-Hydraulic Extraction process last week. The process is a revolutionary Shale Oil extraction technology designed to safely replace hydraulic fracturing (AKA fracking and fracing) without negative environmental impacts. The new process uses no water and was originally developed for Shale Oil extraction in geographic areas that were far too cold to use water due to freezing. Non-Hydraulic Extraction has recently emerged to be asserted as a cheaper and more effective extraction method that does not affect groundwater at all.

Company management is making plans to publicly display the system in action in the near future and Company management will keep the public informed as the schedule proceeds.
Chimera Energy Corp is in the process of reengineering this new method for mass production, relicensing and sales. For a description of how Non-Hydraulic Extraction works, high-speed broadband users may visit www.zerowaterfracking.com

Or you may alternatively visit www.chimeraenergyusa.com/investors.html

Chimera Energy Corp is a Texas corporation listed on the OTCBB under the trading symbol CHMR. Chimera Energy Corp (CHMR) acquires, develops, licenses and sells new energy technology and products that are designed to profit from the current domestic shale oil boom. CHMR competes in an industry sector that includes Halliburton (NYSE: HAL), Schlumberger (NYSE: SLB), EnCana Corporation (NYSE: ECA) and Continental Resources, Inc. (NYSE: CLR).

More information about Chimera Energy Corp may be found at www.ChimeraEnergyUSA.com

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: This news release contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements that include the words "believes," "expects," "anticipate" or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the company to differ materially from those expressed or implied by such forward-looking statements. In addition, description of anyone's past success, either financial or strategic, is no guarantee of future success. This news release speaks as of the date first set forth above and the company assumes no responsibility to update the information included herein for events occurring after the date hereof.

**Contacts**
Chimera Energy Corp  Charles Grob, 832-390-2334

August 09, 2012 08:15 AM Eastern Daylight Time

**PEMEX Signs Deal with CHMR for New Non-Hydraulic Shale Oil Extraction System Designed to Safely Replace Hydraulic Fracturing**

HOUSTON--(BUSINESS WIRE)--Chimera Energy Corp (OTCBB:CHMR) announced today that they have executed a Memorandum of Understanding with PEMEX, also known as Petroleos Mexicanos, regarding the utilization of CHMR's revolutionary exothermic Non-Hydraulic Extraction method throughout Latin America. The Non-Hydraulic Extraction method is a revolutionary Shale Oil extraction technology designed to safely and economically replace hydraulic fracturing (AKA fracking and fracing) without negative environmental impacts. The new process uses no water.

PEMEX is the largest company in both Mexico and all of Latin America. Some of the largest concentrations of Shale Oil in the world are located throughout Latin America. The MOU precedes a supplemental encompassing agreement.

Non-Hydraulic Extraction has recently emerged to be asserted as a cheaper and more effective extraction method that does not affect groundwater at all. Chimera Energy Corp is in the process of reengineering this new method for mass production, relicensing and sales. For a description of how Non-Hydraulic Extraction works, high-speed broadband users may visit www.zerowaterfracking.com

Or you may alternatively visit www.chimeraenergyusa.com/investors.html

Chimera Energy Corp is a Texas corporation listed on the OTCBB under the trading symbol CHMR. Chimera Energy Corp (CHMR) acquires, develops, licenses and sells new energy technology and products that are designed to profit from the current domestic shale oil boom. CHMR competes in an industry sector that includes Halliburton (NYSE: HAL), Schlumberger (NYSE: SLB), EnCana Corporation (NYSE: ECA) and Continental Resources, Inc. (NYSE: CLR).

More information about Chimera Energy Corp may be found at www.ChimeraEnergyUSA.com

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: This news release contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements that include the words "believes," "expects," "anticipate" or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the company to differ materially from those expressed or implied by such forward-looking statements. In addition, description of anyone's past success, either financial or strategic, is no guarantee of future success. This news release speaks as of the date first set forth above and the company assumes no responsibility to update the information included herein for events occurring after the date hereof.

Photos/Multimedia Gallery Available: http://www.businesswire.com/cgi-bin/mmg.cgi?eid=50371952&lang=en

Contacts
Chimera Energy Corp  Charles Grob, 832-390-2334



FW-3772
CHIMERA ENERGY CORP
EXHIBIT
6

CHM
000034

August 10, 2012 08:15 AM Eastern Daylight Time

**PEMEX and CHMR Collaboration on New Non-Hydraulic Shale Oil Extraction System Begins Monday in Mexico City**

HOUSTON--(BUSINESS WIRE)--Chimera Energy Corp (OTCBB: CHMR) has announce that Company management has been scheduled to directly meet with PEMEX associates in Mexico City beginning this Monday regarding a collaboration for utilizing CHMR's revolutionary exothermic Non-Hydraulic Extraction method throughout Latin America. The initial deal between the two companies was publicly announced yesterday. The Non-Hydraulic Extraction method is a revolutionary Shale Oil extraction technology designed to safely and economically replace hydraulic fracturing (AKA fracking and fracing) without negative environmental impacts. The new process uses no water.

PEMEX is the largest company in both Mexico and all of Latin America. Some of the largest concentrations of Shale Oil in the world are located throughout Latin America. The MOU precedes a supplemental encompassing agreement.

Non-Hydraulic Extraction has recently emerged to be asserted as a cheaper and more effective extraction method that does not affect groundwater at all. Chimera Energy Corp is in the process of reengineering this new method for mass production, relicensing and sales. For a description of how Non-Hydraulic Extraction works, high-speed broadband users may visit www.zerowaterfracking.com

Or you may alternatively visit www.chimeraenergyusa.com/investors.html

Chimera Energy Corp is a Texas corporation listed on the OTCBB under the trading symbol CHMR. Chimera Energy Corp (CHMR) acquires, develops, licenses and sells new energy technology and products that are designed to profit from the current domestic shale oil boom. CHMR competes in an industry sector that includes Halliburton (NYSE: HAL), Schlumberger (NYSE: SLB), EnCana Corporation (NYSE: ECA) and Continental Resources, Inc. (NYSE: CLR).

More information about Chimera Energy Corp may be found at www.ChimeraEnergyUSA.com

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: This news release contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements that include the words "believes," "expects," "anticipate" or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the company to differ materially from those expressed or implied by such forward-looking statements. In addition, description of anyone's past success, either financial or strategic, is no guarantee of future success. This news release speaks as of the date first set forth above and the company assumes no responsibility to update the information included herein for events occurring after the date hereof.

Contacts
Chimera Energy Corp  Charles Grob, 832-390-2334



FW-3772
CHIMERA ENERGY CORP
**EXHIBIT**
8

CHM
000037

August 13, 2012 08:15 AM Eastern Daylight Time

New Deal Would Utilize CHMR's Non-Hydraulic Shale Oil Extraction System at PEMEX Location

HOUSTON--(BUSINESS WIRE)--Chimera Energy Corp (OTCBB:CHMR) disclosed that Company management arrives in Mexico City this morning for their direct meetings with PEMEX to collaborate on utilizing CHMR's revolutionary exothermic Non-Hydraulic Extraction system throughout Latin America. The initial deal between the two companies was publicly announced last week. The Non-Hydraulic Extraction system is a revolutionary Shale Oil extraction technology designed to safely and economically replace hydraulic fracturing (AKA fracking and fracing) without negative environmental impacts. The new process uses no water. Under the initial deal, the parties agreed that PEMEX will provide the first location for utilizing the new system in the Western Hemisphere.

PEMEX is the largest company in both Mexico and all of Latin America. Some of the largest concentrations of Shale Oil in the world are located throughout Latin America.

Non-Hydraulic Extraction has recently emerged to be asserted as a cheaper and more effective extraction method that does not affect groundwater at all. Chimera Energy Corp is in the process of reengineering this new method for mass production, relicensing and sales. For a description of how Non-Hydraulic Extraction works, high-speed broadband users may visit www.zerowaterfracking.com.

Or you may alternatively visit www.chimeraenergyusa.com/investors.html.

Chimera Energy Corp is a Texas corporation listed on the OTCBB under the trading symbol CHMR. Chimera Energy Corp (CHMR) acquires, develops, licenses and sells new energy technology and products that are designed to profit from the current domestic shale oil boom. CHMR competes in an industry sector that includes Halliburton (NYSE: HAL), Schlumberger (NYSE: SLB), EnCana Corporation (NYSE: ECA) and Continental Resources, Inc. (NYSE: CLR).

More information about Chimera Energy Corp may be found at www.ChimeraEnergyUSA.com.

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: This news release contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements that include the words "believes," "expects," "anticipate" or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the company to differ materially from those expressed or implied by such forward-looking statements. In addition, description of anyone's past success, either financial or strategic, is no guarantee of future success. This news release speaks as of the date first set forth above and the company assumes no responsibility to update the information included herein for events occurring after the date hereof.

Photos/Multimedia Gallery Available: http://www.businesswire.com/cgi-bin/mmg.cgi?eid=50374459&lang=en

Contacts
Chimera Energy Corp  Charles Grob, 832-390-2334



FW-3772
CHIMERA ENERGY CORP
EXHIBIT
9

CHM
000038

**APP. 000107**

August 14, 2012 09:10 AM Eastern Daylight Time

Weis S.A. Steps Onboard to Integrate CHMR's Non-Hydraulic Shale Oil Extraction System

HOUSTON--(BUSINESS WIRE)--Chimera Energy Corp (OTCBB: CHMR) proudly announce today that Oil and Gas stalwart Weis S.A. has come aboard to oversee the integration of CHMR's new Non-Hydraulic Shale Oil Extraction system with PEMEX and other potential customers. Company management has already begun their direct meetings with PEMEX to collaborate on utilizing CHMR's revolutionary exothermic Non-Hydraulic Extraction system throughout Latin America, pursuing an initial deal between the two companies that was executed last week. Weis S.A. is also headquartered in Mexico City. Chimera Energy Corp management sees the addition of Weis S.A. as a very positive event for the Company, given the likely prospects for the use of their new technology throughout Latin America.

"We are making this impressive new technology our highest priority"

The Non-Hydraulic Extraction system is a revolutionary Shale Oil extraction technology designed to safely and economically replace hydraulic fracturing (AKA fracking and fracing) without negative environmental impacts. The new process uses no water.

"We are making this impressive new technology our highest priority," stated Valdamar Rios, Director of Weis S.A. "We believe that our presence on this project further insures its successful implementation and decreases the timing segment for ongoing manufacturing-to-sales for the product."

Non-Hydraulic Extraction has recently emerged to be asserted as a cheaper and more effective extraction method that does not affect groundwater at all. Chimera Energy Corp is in the process of reengineering this new method for mass production, relicensing and sales. For a description of how Non-Hydraulic Shale Oil Extraction works, please visit www.chimeraenergyusa.com/investors.html

Chimera Energy Corp is a Texas corporation listed on the OTCBB under the trading symbol CHMR. Chimera Energy Corp (CHMR) acquires, develops, licenses and sells new energy technology and products that are designed to profit from the current domestic shale oil boom. CHMR competes in an industry sector that includes Chesapeake Energy Corporation (NYSE: CHK), Continental Resources, Inc. (NYSE: CLR), Heckmann (NYSE: HEK), Exco (NYSE: XCO) and Xylem (NYSE: XYL).

More information about Chimera Energy Corp may be found at www.ChimeraEnergyUSA.com

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: This news release contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements that include the words "believes," "expects," "anticipate" or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the company to differ materially from those expressed or implied by such forward-looking statements. In addition, description of anyone's past success, either financial or strategic, is no guarantee of future success. This news release speaks as of the date first set forth above and the company assumes no responsibility to update the information included herein for events occurring after the date hereof.

Photos/Multimedia Gallery Available: http://www.businesswire.com/cgi-bin/mmg.cgi?eid=50376076&lang=en

Contacts
Chimera Energy Corp  Charles Grob, 832-390-2334


FW-3772
CHIMERA ENERGY CORP
EXHIBIT
10

CHM
000039

August 15, 2012 08:00 AM Eastern Daylight Time

PEMEX Green Lights CHMR's New Non-Hydraulic Shale Oil Extraction System on Chicontepec Formation Wells

HOUSTON--(BUSINESS WIRE)--Chimera Energy Corp (OTCBB: CHMR) disclosed that meetings with PEMEX in Mexico City are progressing exceedingly well, with an early development being that PEMEX has already identified three Chicontepec Formation wells for use of Chimera's new Non-Hydraulic Shale Oil Extraction system. The meetings include PEMEX officials, Chimera Energy Corp President Charles Grob, Weis S.A.'s representative and other officials. The purpose of the meetings is for PEMEX and Chimera Energy Corp to collaborate on utilizing CHMR's revolutionary exothermic Non-Hydraulic Extraction system throughout Latin America, pursuing an initial deal between the two companies that was executed last week. The Non-Hydraulic Extraction system is a revolutionary Shale Oil extraction technology designed to safely and economically replace hydraulic fracturing (AKA fracking and fracing) without negative environmental impacts. The new process uses no water.

The development of using the new process on Chicontepec Formation wells is very significant, as this basin is considered Mexico's largest certified hydrocarbon reserve, totaling more than 139 billion barrels of oil (22.1×109 m3).

Company President Grob expects to announce several major business developments, once the meetings in Mexico City have concluded.

Non-Hydraulic Extraction has recently emerged to be asserted as a cheaper and more effective extraction method that does not affect groundwater at all. Chimera Energy Corp is in the process of reengineering this new method for mass production, relicensing and sales. For a description of how Non-Hydraulic Shale Oil Extraction works, please visit www.chimeraenergyusa.com/investors.html

Chimera Energy Corp is a Texas corporation listed on the OTCBB under the trading symbol CHMR. Chimera Energy Corp (CHMR) acquires, develops, licenses and sells new energy technology and products that are designed to profit from the current domestic shale oil boom. CHMR competes in an industry sector that includes Chesapeake Energy Corporation (NYSE: CHK), Continental Resources, Inc. (NYSE: CLR), Heckmann (NYSE: HEK), Exco (NYSE: XCO) and Xylem (NYSE: XYL).

More information about Chimera Energy Corp may be found at www.ChimeraEnergyUSA.com

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: This news release contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements that include the words "believes," "expects," "anticipate" or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the company to differ materially from those expressed or implied by such forward-looking statements. In addition, description of anyone's past success, either financial or strategic, is no guarantee of future success. This news release speaks as of the date first set forth above and the company assumes no responsibility to update the information included herein for events occurring after the date hereof.

Photos/Multimedia Gallery Available: http://www.businesswire.com/cgi-bin/mmg.cgi?eid=50377869&lang=en

Contacts
Chimera Energy Corp Charles Grob, 832-390-2334



FW-3772
CHIMERA ENERGY CORP
EXHIBIT
11

CHM
000043

**APP. 000109**

August 15, 2012 02:07 PM Eastern Daylight Time

**CHMR: Government Commissioner Advocates New Non-Hydraulic Extraction System Designed to Safely Replace Hydraulic Fracturing**

HOUSTON--(BUSINESS WIRE)--Chimera Energy Corp (OTCBB: CHMR) has announced that Dr. Nestor Martinez Romero, Commissioner of the National Commission of Hydrocarbons of Mexico, has voiced his support of CHMR's revolutionary new Non-Hydraulic Shale Oil Extraction system.

**"This technology can be a game changer for Mexico's oil production"**

"This technology can be a game changer for Mexico's oil production," Dr. Romero stated. The National Commission of Hydrocarbons is translated as Comision Nacional de Hidrocarburos and known as the CNH. The Commission's website may be seen at www.cnh.gob.mx

The Non-Hydraulic Extraction system is a revolutionary Shale Oil extraction technology designed to safely and economically replace hydraulic fracturing (AKA fracking and fracing) without negative environmental impacts. The new process uses no water.

Chimera Energy Corp and PEMEX have been in meetings in Mexico city this week to collaborate on utilizing CHMR's revolutionary exothermic Non-Hydraulic Extraction system throughout Latin America, pursuing an initial deal between the two companies that was executed last week. As a result of these meetings, PEMEX has already identified using the new process on Chicontepec Formation wells. The Chicontepec Formation is considered Mexico's largest certified hydrocarbon reserve, totaling more than 139 billion barrels of oil (22.1×109 m3).

Company President Grob expects to announce several major business developments, once the meetings in Mexico City have concluded.

Non-Hydraulic Extraction has recently emerged to be asserted as a cheaper and more effective extraction method that does not affect groundwater at all. Chimera Energy Corp is in the process of reengineering this new method for mass production, relicensing and sales. For a description of how Non-Hydraulic Shale Oil Extraction works, please visit www.chimeraenergyusa.com/investors.html

Chimera Energy Corp is a Texas corporation listed on the OTCBB under the trading symbol CHMR. Chimera Energy Corp (CHMR) acquires, develops, licenses and sells new energy technology and products that are designed to profit from the current domestic shale oil boom. CHMR competes in an industry sector that includes Chesapeake Energy Corporation (NYSE: CHK), Continental Resources, Inc. (NYSE: CLR), Heckmann (NYSE: HEK), Exco (NYSE: XCO) and Xylem (NYSE: XYL).

More information about Chimera Energy Corp may be found at www.ChimeraEnergyUSA.com

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: This news release contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements that include the words "believes," "expects," "anticipate" or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the company to differ materially from those expressed or implied by such forward-looking statements. In addition, description of anyone's past success, either financial or strategic, is no guarantee of future success. This news release speaks as of the date first set forth above and the company assumes no responsibility to update the information included herein for events occurring after the date hereof.

Contacts
Chimera Energy Corp  Charles Grob, 832-390-2334

**APP. 000110**

FW-3772
CHIMERA ENERGY CORP
EXHIBIT
12 $\rho^\flat$

CHM
000045

August 20, 2012 08:30 AM Eastern Daylight Time

Chimera Energy Corp President Comments on Recent Developments

HOUSTON--(BUSINESS WIRE)--Chimera Energy Corp (OTCBB: CHMR) President Charles Grob stated today: "Chimera and I are committed to implementing our business model as outlined and described in our filings, on our website and in our press releases.

**"Chimera and I are committed to implementing our business model as outlined and described in our filings, on our website and in our press releases."**

Recent comments from third parties have apparently contributed to a decline in our stock price over the last few trading sessions. Many of those comments have been made by anonymous bloggers and admitted shorters, and they have likely profited from the decline.

There will always be Naysayers in any new business venture, and we have ours. I and all those associated with Chimera are excited about our prospects and encouraged by our progress. We are moving forward at a deliberate pace!"

President Grob has just returned from fruitful meetings in Mexico City, where PEMEX and Chimera have begun to collaborate on utilizing CHMR's revolutionary exothermic Non-Hydraulic Extraction system throughout Latin America. The Non-Hydraulic Extraction system is a revolutionary Shale Oil extraction technology designed to safely and economically replace hydraulic fracturing (AKA fracking and fracing) without negative environmental impacts. The new process uses no water. As a result of the meetings, PEMEX has already identified using the new process on Chicontepec Formation wells. The Chicontepec Formation is considered Mexico's largest certified hydrocarbon reserve, totaling more than 139 billion barrels of oil.

President Grob is scheduling to follow up with a meeting in Houston with Dr. Nestor Martinez Romero, Commissioner of the National Commission of Hydrocarbons of Mexico, also known as the CNH. Dr. Romero has already voiced his support for the new technology, saying it could be a "game changer for Mexico's oil production".

Non-Hydraulic Extraction has recently emerged to be asserted as a cheaper and more effective extraction method that does not affect groundwater at all. Chimera Energy Corp is in the process of reengineering this new method for mass production, relicensing and sales. Due to the recent positive developments in Mexico, the Company now expects to utilize their new relationship with Weis S.A. to complete much of this work in Mexico City. President Grob expects to disclose these new developments as they are finalized.

About Chimera Energy Corp.
Chimera Energy Corp is a Texas corporation listed on the OTCBB under the trading symbol CHMR. Chimera Energy Corp (CHMR) acquires, develops, licenses and sells new energy technology and products that are designed to profit from the current domestic shale oil boom.

More information about Chimera Energy Corp may be found at www.ChimeraEnergyUSA.com

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: This news release contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements that include the words "believes," "expects," "anticipate" or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the company to differ materially from those expressed or

CHM
000046

implied by such forward-looking statements. In addition, description of anyone's past success, either financial or strategic, is no guarantee of future success. This news release speaks as of the date first set forth above and the company assumes no responsibility to update the information included herein for events occurring after the date hereof.

Photos/Multimedia Gallery Available: http://www.businesswire.com/cgi-bin/mmg.cgi?eid=50381688&lang=en

**Contacts**
Chimera Energy Corp  Charles Grob, 832-390-2334

CHM
000047

August 22, 2012 08:00 AM Eastern Daylight Time

Chemical Engineer Announces Details of Chimera Energy Corp's Revolutionary Non-Hydraulic Shale Oil Extraction

HOUSTON--(BUSINESS WIRE)--Chimera Energy Corp (OTCBB: CHMR): With the purpose of dispelling incorrect rumors regarding CHMR's Non- Hydraulic Extraction process, Valdamar Perez Rios, Director of Weis S.A. has announced scientific portions of the new process that differentiate it from any prior technology.

"The new non-hydraulic or exothermic extraction process does not use steam, LPG gel, natural gas or the pumping of anything hot into the well being used. The central operation in the process uses only inert elements. These elements are non-toxic or caustic in any way"

"The new non-hydraulic or exothermic extraction process does not use steam, LPG gel, natural gas or the pumping of anything hot into the well being used. The central operation in the process uses only inert elements. These elements are non-toxic or caustic in any way," stated Rios. "In a typical well that would use this process, you have a vertical section and a horizontal section. The horizontal section is where most of the operation takes place. First, the horizontal well casing is perforated pneumatically. This allows the extraction process to reach the target area surrounding the casing. Depending on the size of the casing in the well, moveable pressure plugs are placed at optimum distances to segment the horizontal section and allow for engineered pressures."

"Then Helium, beginning in its liquid state, is used to create the pressures needed to open up existing fractures and form new ones. Under exothermic control, Helium will increase in volume 757 times in transitioning from a liquid to gaseous form. With plentiful pressure available, engineering the segmenting distances multiply the effect. Helium is the 2nd most abundant element in the Universe and it is less water soluble than any other gas known. Helium's diffusion rate through solids extremely high, negating the need for solvents in the process. Without disclosing the very unique intellectual property of the Company, you can see that CHMR's Non-Hydraulic Extraction is quite different than any other proposed process. It is as unique as the special properties of Helium itself. To see what I mean, you can go to http://www.youtube.com/watch?v=2Z6UJbwxBZI."

Chimera Energy Corp is in the process of reengineering this new method of Shale Oil extraction for mass production, relicensing and sales. Due to the recent positive developments in Mexico, the Company now expects to complete much of this work in Mexico with some opportunities in PEMEX. More on the revolutionary process can be seen at www.zerowaterfracking.com.

Valdamar Perez Rios holds a Master Degree in Chemical Engineering from the University of California San Jose. Mr. Rios has an extensive background in oil & gas, including working with PEMEX for several years.

**About Chimera Energy Corp.**
Chimera Energy Corp is a Texas corporation listed on the OTCBB under the trading symbol CHMR. Chimera Energy Corp (CHMR) acquires, develops, licenses and sells new energy technology and products that are designed to profit from the current domestic shale oil boom. Chimera Energy Corp operates in an industry sector that includes Halliburton (NYSE: HAL), Schlumberger (NYSE: SLB), EnCana Corporation (NYSE: ECA) and Continental Resources, Inc. (NYSE: CLR).

contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements that

FW-3772
CHIMERA ENERGY CORP
EXHIBIT
15

CHM
000048

**APP. 000113**

include the words "believes," "expects," "anticipate" or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the company to differ materially from those expressed or implied by such forward-looking statements. In addition, description of anyone's past success, either financial or strategic, is no guarantee of future success. This news release speaks as of the date first set forth above and the company assumes no responsibility to update the information included herein for events occurring after the date hereof.

**Contacts**
Chimera Energy Corp  Charles Grob, 832-390-2334

CHM
000049

**PEMEX Executes Go Ahead for Three Wells to use CHMR System Designed to Safely Replace Hydraulic Fracturing**

HOUSTON, Aug 24, 2012 (BUSINESS WIRE) -- Chimera Energy Corp (OTCBB: CHMR) President Charles Grob announced the receipt of the official signed document from PEMEX to utilize the Company's new Non-Hydraulic Shale Oil Extraction system on Central Tajin Area wells number 4, 5 and 6 in the Chicontepic Basin of Mexico.

"I am elated to have this signed official document physically in my hands from the largest company in all of Latin America. I cannot overstate the significance of this achievement for Chimera Energy Corp. A lot of science, planning and hard work got us to this point. Next week is sure to be a very busy and rewarding week for us," stated President Grob.

Chimera Energy Corp's Non-Hydraulic Extraction system is a revolutionary Shale Oil extraction technology designed to safely and economically replace hydraulic fracturing (AKA fracking and fracing) without negative environmental impacts. The new process uses no water and also does not use steam, LPG gel, natural gas or the pumping of anything hot into the well.
PEMEX, also known as Petroleos Mexicanos, has been working with Chimera Energy Corp to utilize CHMR's revolutionary exothermic Non-Hydraulic Extraction method throughout Latin America. The Chicontepec Basin is considered Mexico's largest certified hydrocarbon reserve, totaling more than 139 billion barrels of oil (22.1x109 m3).

Non-Hydraulic Extraction has recently emerged to be asserted as a cheaper and more effective extraction method that does not affect groundwater at all. Chimera Energy Corp is in the process of reengineering this new method for mass production, relicensing and sales. For a description of how Non-Hydraulic Shale Oil Extraction works, please visit www.zerowaterfracking.com
About Chimera Energy Corp.

Chimera Energy Corp is a Texas corporation listed on the OTCBB under the trading symbol CHMR. Chimera Energy Corp (CHMR) acquires, develops, licenses and sells new energy technology and products that are designed to profit from the current domestic shale oil boom. Chimera Energy Corp operates in an industry sector that includes Chesapeake Energy Corporation (NYSE: CHK), Chevron Corporation (NYSE: CVX), Exxon Mobil Corporation (NYSE: XOM) and ConocoPhillips (NYSE: COP).

More information about Chimera Energy Corp may be found at www.ChimeraEnergyUSA.com

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: This news release contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements that include the words "believes," "expects," "anticipate" or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the company to differ materially from those expressed or implied by such forward-looking statements. In addition, description of anyone's past success, either financial or strategic, is no guarantee of future success. This news release speaks as of the date first set forth above and the company assumes no responsibility to update the information included herein for events occurring after the date hereof.
Photos/Multimedia Gallery Available: http://www.businesswire.com/cgi-bin/mmg.cgi?eid=50386844&lang=en
SOURCE: Chimera Energy Corp

CONTACT:
Chimera Energy Corp
Charles Grob, 832-390-2334

CHM
000054

**Chimera Energy Corp Begins Shipping Equipment to Mexico for Non-Hydraulic Shale Oil Extraction on PEMEX Wells**

HOUSTON, Aug 27, 2012 (BUSINESS WIRE) — Chimera Energy Corp (OTCBB: CHMR) announced that they have begun shipping equipment to Mexico to utilize the Company's new Non-Hydraulic Shale Oil Extraction system on PEMEX Central Tajin Area wells number 4, 5 and 6 in the Chicontepic Basin of Mexico. Last Friday, the Company announced the receipt of the official signed document from PEMEX to utilize the Company's new Non-Hydraulic Shale Oil Extraction system on the wells.

Chimera Energy Corp President Charles Grob is expecting to announce a schedule for the operations at the PEMEX wells this week. Chimera's engineering and planning associates have been in Houston making arrangements to coordinate the Mexico project.

Chimera Energy Corp's Non-Hydraulic Extraction system is an unprecedented Shale Oil extraction system designed to safely and economically replace hydraulic fracturing (AKA fracking and fracing) without negative environmental impacts. The new process uses no water and also does not use steam, LPG gel, natural gas or the pumping of anything hot into the well.

PEMEX, also known as Petroleos Mexicanos, has been working with Chimera Energy Corp to utilize CHMR's revolutionary exothermic Non-Hydraulic Extraction method throughout Latin America. The Chicontepec Basin is considered Mexico's largest certified hydrocarbon reserve, totaling more than 139 billion barrels of oil (22.1x109 m3).

Non-Hydraulic Extraction has recently emerged to be asserted as a cheaper and more effective extraction method that does not affect groundwater at all. Chimera Energy Corp is in the process of reengineering this new method for mass production, relicensing and sales. For a description of how Non-Hydraulic Extraction works, please visit www.zerowaterfracking.com

About Chimera Energy Corp.
Chimera Energy Corp is a Texas corporation listed on the OTCBB under the trading symbol CHMR. Chimera Energy Corp (CHMR) acquires, develops, licenses and sells new energy technology and products that are designed to profit from the current domestic shale oil boom. Chimera Energy Corp operates in an industry sector that includes Chesapeake Energy Corporation (NYSE: CHK), Chevron Corporation (NYSE: CVX), Exxon Mobil Corporation (NYSE: XOM) and ConocoPhillips (NYSE: COP).

More information about Chimera Energy Corp may be found at www.ChimeraEnergyUSA.com

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: This news release contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements that include the words "believes," "expects," "anticipate" or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the company to differ materially from those expressed or implied by such forward-looking statements. In addition, description of anyone's past success, either financial or strategic, is no guarantee of future success. This news release speaks as of the date first set forth above and the company assumes no responsibility to update the information included herein for events occurring after the date hereof.
Photos/Multimedia Gallery Available: http://www.businesswire.com/cgi-bin/mmg.cgi?eid=50387867&lang=en
SOURCE: Chimera Energy Corp

CONTACT:
Chimera Energy Corp Charles Grob, 832-390-2334