## SUBSCRIPTION AGREEMENT

## SUBSCRIPTION AGREEMENT FOR CHIMERA ENERGY CORPORATION

Persons interested in purchasing shares of Chimera Energy Corporation (the "**Company**") must return this completed subscription agreement along with a wire transfer, check or money order for their total payment, payable only to:

**CHIMERA ENERGY CORPORATION**
**2800 POST OAK BLVD., SUITE 4100**
**HOUSTON, TX 77056**

If and when accepted by us, this subscription agreement shall constitute a subscription for share(s) of our common stock subject to the terms and conditions set forth in this subscription agreement and the Company's Final Prospectus filed with the Securities and Exchange Commission on December 22, 2011 (the "**Prospectus**"). It is understood that this subscription is not binding upon the Company until accepted by the Company, and that the Company has the right to accept or reject this subscription, in whole or in part, in its sole and complete discretion.

An accepted copy of this agreement will be returned to you as your receipt, and certificates for your stock and warrants will be issued to you shortly thereafter.

Method of payment: [X] Check or [ ] Money Order payable only to: **Chimera Energy Corporation**

I hereby irrevocably tender this subscription agreement for the purchase of _200,000_ shares at $0.015 per share. With this subscription agreement, I tender payment in the amount of $ _3000.00_ for the shares subscribed.

In connection with this investment, I represent, warrant and covenant as follows:

(a)     I am a bona fide resident of the State of _TEXAS_                .

(b)     I have been provided a copy of and have read, reviewed and have been provided an opportunity to ask questions regarding the Company's Prospectus and have no outstanding or unanswered questions regarding the Company or the Prospectus as of the date of this subscription agreement.

(c)     That no person has made any written or oral representation to me that: (a) any person will resell or purchase the shares subscribed for; (b) any person will refund the purchase price of the shares; or (c) as to the future price or value of the shares.

(d)     I have been provided with all materials and information requested by either me, my counsel, or others representing me, including any information requested to verify information furnished. There has been made available to both myself and my advisors the opportunity to ask questions of, and receive answers from the Company and its directors, officers, employees and representatives concerning the terms and conditions of this offering and to obtain any additional information desired necessary to verify the accuracy of the information provided.

(e)     I have sufficient assets to easily pay my subscription to the Company, and my subscription to the Company is not unreasonably large when compared with my total financial capability.

(f)     I am under no legal disability nor am I subject to any order, which would prevent or interfere with my execution, delivery and performance of this Subscription Agreement or my purchase of the shares. The shares are being purchased solely for my own account and not for the account of others and for investment purposes only. I have no present plans to enter into any contract, undertaking, agreement or arrangement with respect to the transfer, assignment, resale or distribution of any of the shares.

CHM
000294

(g)    The representations and warranties of subscriber shall survive the purchase of the shares and the consummation of the transactions contemplated herein.

**THE PURCHASE OF SHARES OF CHIMERA ENERGY CORPORATION INVOLVES A HIGH DEGREE OF RISK AND SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN BEAR THE RISK OF THE LOSS OF THEIR ENTIRE INVESTMENT.**

**EVERY POTENTIAL INVESTOR, PRIOR TO ANY INVESTMENT OR PURCHASE OF CHIMERA ENERGY CORPORATION SHARES SHOULD THOROUGHLY READ THE PROSPECTUS RELATING TO THIS OFFERING, INCLUDING, BUT NOT LIMITED TO THE "RISK FACTORS" INCLUDED THEREIN.**

<u>**Type of ownership**</u> : (You must check one box)

| | | | |
|---|---|---|---|
| ☒ | Individual | ☐ | Custodian for _____ |
| ☐ | Tenants in Common | ☐ | Uniform Gifts to Minors Act of the State of: _____ |
| ☐ | Joint Tenants with rights of Survivorship | ☐ | Corporation (Inc., LLC, LP) – Please List all officers, directors, partners, managers, etc.: |
| ☐ | Trust | | |
| ☐ | Community Property | ☐ | Other (please explain) _____ |

**IN WITNESS WHEREOF,** I have executed this Subscription Agreement this 6th day of JANUARY , 2012.

SHARA SAMIUDDIN
Name (Please Print)*[if Tenants in Common or Joint Tenants, all subscribers should sign]*

_____
Signature

_____
If entity, name of entity and signatory's position with entity

▉▉▉▉▉-7779
Social Security, Social Insurance or Tax Identification Number

<u>Principal Address of Subscriber</u>

5616 JACKSON ST
Street Address

HOUSTON, TX    77004
City & State/Province    Zip or Postal Code

This Subscription for 200,000    Shares is hereby accepted this 6 day of January , 2012 .

**CHIMERA ENERGY CORPORATION**

By: _____
Printed Name: Charles Grob
Its: President & CEO

Page 2 of 2

CHM
000295



| 0068647 | 11-24 | **CASHIER'S CHECK** | 6864703322 |

Office AU #   1210(8)

Operator I.D.: tx007260          tx007260

PAY TO THE ORDER OF     ***CHIMERA ENERGY CORPORATION***

**January 06, 2012**

***Three thousand dollars and no cents***

**\*\*$3,000.00\*\***

WELLS FARGO BANK, N.A.
9413 KATY FWY
HOUSTON, TX 77024
FOR INQUIRIES CALL (480) 394-3122

VOID IF OVER US $  3,000.00

*Richard Long*

**CONTROLLER**

⑈6864703322⑈ ⑆121000248⑈4861 5057091⑈

CHM
000296

## SUBSCRIPTION AGREEMENT

## SUBSCRIPTION AGREEMENT FOR CHIMERA ENERGY CORPORATION

Persons interested in purchasing shares of Chimera Energy Corporation (the "**Company**") must return this completed subscription agreement along with a wire transfer, check or money order for their total payment, payable only to:

**CHIMERA ENERGY CORPORATION**
**2800 POST OAK BLVD., SUITE 4100**
**HOUSTON, TX 77056**

If and when accepted by us, this subscription agreement shall constitute a subscription for share(s) of our common stock subject to the terms and conditions set forth in this subscription agreement and the Company's Final Prospectus filed with the Securities and Exchange Commission on December 22, 2011 (the "**Prospectus**"). It is understood that this subscription is not binding upon the Company until accepted by the Company, and that the Company has the right to accept or reject this subscription, in whole or in part, in its sole and complete discretion.

An accepted copy of this agreement will be returned to you as your receipt, and certificates for your stock and warrants will be issued to you shortly thereafter.

Method of payment: [ ] Check or [ ] Money Order payable only to: **Chimera Energy Corporation**

I hereby irrevocably tender this subscription agreement for the purchase of *100,000* shares at $0.015 per share. With this subscription agreement, I tender payment in the amount of $ *1,500.00* for the shares subscribed.

In connection with this investment, I represent, warrant and covenant as follows:

(a)     I am a bona fide resident of the State of *Texas* .

(b)     I have been provided a copy of and have read, reviewed and have been provided an opportunity to ask questions regarding the Company's Prospectus and have no outstanding or unanswered questions regarding the Company or the Prospectus as of the date of this subscription agreement.

(c)     That no person has made any written or oral representation to me that: (a) any person will resell or purchase the shares subscribed for; (b) any person will refund the purchase price of the shares; or (c) as to the future price or value of the shares.

(d)     I have been provided with all materials and information requested by either me, my counsel, or others representing me, including any information requested to verify information furnished. There has been made available to both myself and my advisors the opportunity to ask questions of, and receive answers from the Company and its directors, officers, employees and representatives concerning the terms and conditions of this offering and to obtain any additional information desired necessary to verify the accuracy of the information provided.

(e)     I have sufficient assets to easily pay my subscription to the Company, and my subscription to the Company is not unreasonably large when compared with my total financial capability.

(f)     I am under no legal disability nor am I subject to any order, which would prevent or interfere with my execution, delivery and performance of this Subscription Agreement or my purchase of the shares. The shares are being purchased solely for my own account and not for the account of others and for investment purposes only. I have no present plans to enter into any contract, undertaking, agreement or arrangement with respect to the transfer, assignment, resale or distribution of any of the shares.

Page 1 of 2

CHM
000297

(g)     The representations and warranties of subscriber shall survive the purchase of the shares and the consummation of the transactions contemplated herein.

**THE PURCHASE OF SHARES OF CHIMERA ENERGY CORPORATION INVOLVES A HIGH DEGREE OF RISK AND SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN BEAR THE RISK OF THE LOSS OF THEIR ENTIRE INVESTMENT.**

**EVERY POTENTIAL INVESTOR, PRIOR TO ANY INVESTMENT OR PURCHASE OF CHIMERA ENERGY CORPORATION SHARES SHOULD THOROUGHLY READ THE PROSPECTUS RELATING TO THIS OFFERING, INCLUDING, BUT NOT LIMITED TO THE "RISK FACTORS" INCLUDED THEREIN.**

<u>Type of ownership</u> : (You must check one box)

| | |
|---|---|
| ☑ Individual | ☐ Custodian for _____ |
| ☐ Tenants in Common | Uniform Gifts to Minors Act of the State of: _____ |
| ☐ Joint Tenants with rights of Survivorship | ☐ Corporation (Inc., LLC, LP) – Please List all officers, directors, partners, managers, etc.: _____ |
| ☐ Trust | |
| ☐ Community Property | ☐ Other (please explain) _____ |

IN WITNESS WHEREOF, I have executed this Subscription Agreement this ___5___ day of _January_ , 2012.

_Daniel O. SoRelle_

Name (Please Print) *[if Tenants in Common or Joint Tenants, all subscribers should sign]*

_Daniel D. SoRelle_
Signature

_____
If entity, name of entity and signatory's position with entity

███████-3500
Social Security, Social Insurance or Tax Identification Number

<u>Principal Address of Subscriber</u>

_2159 Pelham Dr._
Street Address

_Houston, TX. 77019_
City & State/Province    Zip or Postal Code

This Subscription for _100,000_ Shares is hereby accepted this _5_ day of _January_ , 2012.

**CHIMERA ENERGY CORPORATION**

By: _____
Printed Name: _Charles Grob_
Its: _President & CEO_

CHM
000298

**APP. 000483**



**DANIEL D. SORELLE**
2159 PELHAM DR.
HOUSTON, TX 77019-3544

88-9377/1119
4443158161

**1064**

DATE _1-5-11_

PAY TO THE ORDER OF _Chimera Energy Corporation_ | $ _1,500.00_

_Fifteen Hundred_ _⁰⁰/100_                          DOLLARS

🏦 **Washington Mutual**

Washington Mutual Bank, FA
West Grey Financial Center 1864
1934 W Grey Street
Houston, TX 77019

1-800-788-7000
24 hour Customer Service

APP. 000484

CHM
000299

NOTES

APP. 000484

## SUBSCRIPTION AGREEMENT

### SUBSCRIPTION AGREEMENT FOR CHIMERA ENERGY CORPORATION

Persons interested in purchasing shares of Chimera Energy Corporation (the "**Company**") must return this completed subscription agreement along with a wire transfer, check or money order for their total payment, payable only to:

**CHIMERA ENERGY CORPORATION**
**2800 POST OAK BLVD., SUITE 4100**
**HOUSTON, TX 77056**

If and when accepted by us, this subscription agreement shall constitute a subscription for share(s) of our common stock subject to the terms and conditions set forth in this subscription agreement and the Company's Final Prospectus filed with the Securities and Exchange Commission on December 22, 2011 (the "**Prospectus**"). It is understood that this subscription is not binding upon the Company until accepted by the Company, and that the Company has the right to accept or reject this subscription, in whole or in part, in its sole and complete discretion.

An accepted copy of this agreement will be returned to you as your receipt, and certificates for your stock and warrants will be issued to you shortly thereafter.

Method of payment: [ ] Check or [ ] Money Order payable only to: **Chimera Energy Corporation**

I hereby irrevocably tender this subscription agreement for the purchase of 50,000 shares at $0.015 per share. With this subscription agreement, I tender payment in the amount of $ 750.00 for the shares subscribed.

In connection with this investment, I represent, warrant and covenant as follows:

(a)    I am a bona fide resident of the State of _Texas_.

(b)    I have been provided a copy of and have read, reviewed and have been provided an opportunity to ask questions regarding the Company's Prospectus and have no outstanding or unanswered questions regarding the Company or the Prospectus as of the date of this subscription agreement.

(c)    That no person has made any written or oral representation to me that: (a) any person will resell or purchase the shares subscribed for; (b) any person will refund the purchase price of the shares; or (c) as to the future price or value of the shares.

(d)    I have been provided with all materials and information requested by either me, my counsel, or others representing me, including any information requested to verify information furnished. There has been made available to both myself and my advisors the opportunity to ask questions of, and receive answers from the Company and its directors, officers, employees and representatives concerning the terms and conditions of this offering and to obtain any additional information desired necessary to verify the accuracy of the information provided.

(e)    I have sufficient assets to easily pay my subscription to the Company, and my subscription to the Company is not unreasonably large when compared with my total financial capability.

(f)    I am under no legal disability nor am I subject to any order, which would prevent or interfere with my execution, delivery and performance of this Subscription Agreement or my purchase of the shares. The shares are being purchased solely for my own account and not for the account of others and for investment purposes only. I have no present plans to enter into any contract, undertaking, agreement or arrangement with respect to the transfer, assignment, resale or distribution of any of the shares.

**CHM
000300**

(g)     The representations and warranties of subscriber shall survive the purchase of the shares and the consummation of the transactions contemplated herein.

**THE PURCHASE OF SHARES OF CHIMERA ENERGY CORPORATION INVOLVES A HIGH DEGREE OF RISK AND SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN BEAR THE RISK OF THE LOSS OF THEIR ENTIRE INVESTMENT.**

**EVERY POTENTIAL INVESTOR, PRIOR TO ANY INVESTMENT OR PURCHASE OF CHIMERA ENERGY CORPORATION SHARES SHOULD THOROUGHLY READ THE PROSPECTUS RELATING TO THIS OFFERING, INCLUDING, BUT NOT LIMITED TO THE "RISK FACTORS" INCLUDED THEREIN.**

**Type of ownership** : (You must check one box)

| | |
|---|---|
| ☒ Individual | ☐ Custodian for _____ |
| ☐ Tenants in Common | ☐ Uniform Gifts to Minors Act of the State of: _____ |
| ☐ Joint Tenants with rights of Survivorship | ☐ Corporation (Inc., LLC, LP) – Please List all officers, directors, partners, managers, etc.: _____ |
| ☐ Trust | |
| ☐ Community Property | ☐ Other (please explain) _____ |

**IN WITNESS WHEREOF,** I have executed this Subscription Agreement this _3_ day of _January_ , 201_2_ .

_M. Ashton Stresau_
Name (Please Print)/*if Tenants in Common or Joint Tenants, all subscribers should sign]*

_M. A_____
Signature

If entity, name of entity and signatory's position with entity

_8426_
Social Security, Social Insurance or Tax Identification Number

**Principal Address of Subscriber**

_8001 Burgoyne Rd #16_
Street Address

_Houston , TX 77063_
City & State/Province    Zip or Postal Code

This Subscription for _50,000_ Shares is hereby accepted this _3_ day of _January_ , 201_2_ .

**CHIMERA ENERGY CORPORATION**

By: _____
Printed Name: _Charles Grob_
Its: _President & CEO_



MICHAEL ASHTON STRESAU
8001 BURGOYNE RD
UNIT 16
HOUSTON, TX 77063-1955

1003

37-65/1119 8006
3650315470

DATE 1/4/11

PAY TO THE ORDER OF Chimera Energy Corp. | $ 750.00

Seven hundred and fifty and 00/100 DOLLARS

Wells Fargo Bank, N.A.
Texas
wellsfargo.com

FOR _____

⑆1119006 59⑆ ████████⑆ 01003

CHM
000302

## SUBSCRIPTION AGREEMENT

### SUBSCRIPTION AGREEMENT FOR CHIMERA ENERGY CORPORATION

Persons interested in purchasing shares of Chimera Energy Corporation (the "**Company**") must return this completed subscription agreement along with a wire transfer, check or money order for their total payment, payable only to:

**CHIMERA ENERGY CORPORATION**
**2800 POST OAK BLVD., SUITE 4100**
**HOUSTON, TX 77056**

If and when accepted by us, this subscription agreement shall constitute a subscription for share(s) of our common stock subject to the terms and conditions set forth in this subscription agreement and the Company's Final Prospectus filed with the Securities and Exchange Commission on December 22, 2011 (the "**Prospectus**"). It is understood that this subscription is not binding upon the Company until accepted by the Company, and that the Company has the right to accept or reject this subscription, in whole or in part, in its sole and complete discretion.

An accepted copy of this agreement will be returned to you as your receipt, and certificates for your stock will be issued to you shortly thereafter.

Method of payment: [X] Check or [ ] Money Order payable only to: **Chimera Energy Corporation**

I hereby irrevocably tender this subscription agreement for the purchase of **200,000** shares at $0.015 per share. With this subscription agreement, I tender payment in the amount of **$3,000** for the shares subscribed.

In connection with this investment, I represent, warrant and covenant as follows:

(a)     I am a bona fide resident of the State of Texas.

(b)     I have been provided a copy of and have read, reviewed and have been provided an opportunity to ask questions regarding the Company's Prospectus and have no outstanding or unanswered questions regarding the Company or the Prospectus as of the date of this subscription agreement.

(c)     That no person has made any written or oral representation to me that: (a) any person will resell or purchase the shares subscribed for; (b) any person will refund the purchase price of the shares; or (c) as to the future price or value of the shares.

(d)     I have been provided with all materials and information requested by either me, my counsel, or others representing me, including any information requested to verify information furnished. There has been made available to both myself and my advisors the opportunity to ask questions of, and receive answers from the Company and its directors, officers, employees and representatives concerning the terms and conditions of this offering and to obtain any additional information desired necessary to verify the accuracy of the information provided.

(e)     I have sufficient assets to easily pay my subscription to the Company, and my subscription to the Company is not unreasonably large when compared with my total financial capability.

(f)     I am under no legal disability nor am I subject to any order, which would prevent or interfere with my execution, delivery and performance of this Subscription Agreement or my purchase of the shares. The shares are being purchased solely for my own account and not for the account of others and for investment purposes only. I have no present plans to enter into any contract, undertaking, agreement or arrangement with respect to the transfer, assignment, resale or distribution of any of the shares.

**CHM**
**000303**

(g)    The representations and warranties of subscriber shall survive the purchase of the shares and the consummation of the transactions contemplated herein.

**THE PURCHASE OF SHARES OF CHIMERA ENERGY CORPORATION INVOLVES A HIGH DEGREE OF RISK AND SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN BEAR THE RISK OF THE LOSS OF THEIR ENTIRE INVESTMENT.**

**EVERY POTENTIAL INVESTOR, PRIOR TO ANY INVESTMENT OR PURCHASE OF CHIMERA ENERGY CORPORATION SHARES SHOULD THOROUGHLY READ THE PROSPECTUS RELATING TO THIS OFFERING, INCLUDING, BUT NOT LIMITED TO THE "RISK FACTORS" INCLUDED THEREIN.**

<u>Type of ownership</u> : (You must check one box)

| | | |
|---|---|---|
| [x] Individual | | [ ] Custodian for _____ |
| [ ] Tenants in Common | | [ ] Uniform Gifts to Minors Act of the State of: _____ |
| [ ] Joint Tenants with rights of Survivorship | | [ ] Corporation (Inc., LLC, LP) – Please List all officers, directors, partners, managers, etc.: _____ |
| [ ] Trust | | |
| [ ] Community Property | | [ ] Other (please explain) _____ |

**IN WITNESS WHEREOF,** I have executed this Subscription Agreement this 8th day of January 2012.

Anna Tikhonova
Name (Please Print)*[if Tenants in Common or Joint Tenants, all subscribers should sign]*

_____
Signature

_____
If entity, name of entity and signatory's position with entity

▉▉▉ 6134
Social Security, Social Insurance or Tax Identification Number

<u>Principal Address of Subscriber</u>

5005 Hidalgo Street #619
Street Address

Houston, TX         77056
City & State/Province   Zip or Postal Code

This Subscription for 200,000 Shares is hereby accepted this 09 day of January, 2012.

CHIMERA ENERGY CORPORATION

By: _____
Printed Name: Charles Grob
Its: Chairman and CEO

CHM
000304



РОССИЙСКАЯ ФЕДЕРАЦИЯ
**RUSSIAN FEDERATION**

Подпись владельца
Holder's signature

РОССИЙСКАЯ ФЕДЕРАЦИЯ

ПАСПОРТ/ PASSPORT

Тип/Type   Код государства / Code of   № паспорта / Passport No.
**P**   выдачи RUS issuing State

**ТИХОНОВА/**
**TIKHONOVA**
Имя / Given names

**АННА ИГОРЕВНА/**
**ANNA**
Гражданство / Nationality
**РОССИЙСКАЯ / RUSSIAN**    Личный код / Personal No.
**ФЕДЕРАЦИЯ / FEDERATION**
Дата рождения / Date of birth

**1987**   Место рождения / Place of birth
Пол / Sex   **СВЕРДЛОВСК/ USSR**
**Ж/F**
Дата выдачи / Date of issue   Дата окончания срока действия / Date of expiry
**2009**   **18.09.2014**
Орган, выдавший документ / Authority
**Г/К РОССИИ, ХЬЮСТОН**

P<RUSTIKHONOVA<<ANNA<<<<<<<<<<<<<<<<<<<<<<<<<<
5141554535RUS8706065F1409183<<<<<<<<<<<<<<<<8

CHM
000305

| 0065628 | 11-24 |
| Office AU # | 1210(8) |

Operator I.D.:  tx098768

## CASHIER'S CHECK

6862803792

January 09, 2012

PAY TO THE ORDER OF   ***CHIMERA ENERGY CORP***
***RE: ANNA TIKHONOVA***

***Three thousand dollars and no cents***

**$3,000.00**

WELLS FARGO BANK, N.A.
4906 SAN FELIPE ST
HOUSTON, TX 77056
IQUIRIES CALL (480) 394-3122

VOID IF OVER US $  3,000.00

*Richard Levy*

CONTROLLER

⑆686 280 3 79 2⑆  ⑈ 1 2 1000 248⑈486 1   5057 09⑈

CHM
000306

## SUBSCRIPTION AGREEMENT

## SUBSCRIPTION AGREEMENT FOR CHIMERA ENERGY CORPORATION

Persons interested in purchasing shares of Chimera Energy Corporation (the "**Company**") must return this completed subscription agreement along with a wire transfer, check or money order for their total payment, payable only to:

### CHIMERA ENERGY CORPORATION
### 2800 POST OAK BLVD., SUITE 4100
### HOUSTON, TX 77056

If and when accepted by us, this subscription agreement shall constitute a subscription for share(s) of our common stock subject to the terms and conditions set forth in this subscription agreement and the Company's Final Prospectus filed with the Securities and Exchange Commission on December 22, 2011 (the "**Prospectus**"). It is understood that this subscription is not binding upon the Company until accepted by the Company, and that the Company has the right to accept or reject this subscription, in whole or in part, in its sole and complete discretion.

An accepted copy of this agreement will be returned to you as your receipt, and certificates for your stock and warrants will be issued to you shortly thereafter.

Method of payment: [ ] Check or [ ] Money Order payable only to: **Chimera Energy Corporation**

I hereby irrevocably tender this subscription agreement for the purchase of 50,000 shares at $0.015 per share. With this subscription agreement, I tender payment in the amount of $ 750 for the shares subscribed.

In connection with this investment, I represent, warrant and covenant as follows:

(a)     I am a bona fide resident of the State of ____Texas____.

(b)     I have been provided a copy of and have read, reviewed and have been provided an opportunity to ask questions regarding the Company's Prospectus and have no outstanding or unanswered questions regarding the Company or the Prospectus as of the date of this subscription agreement.

(c)     That no person has made any written or oral representation to me that: (a) any person will resell or purchase the shares subscribed for; (b) any person will refund the purchase price of the shares; or (c) as to the future price or value of the shares.

(d)     I have been provided with all materials and information requested by either me, my counsel, or others representing me, including any information requested to verify information furnished. There has been made available to both myself and my advisors the opportunity to ask questions of, and receive answers from the Company and its directors, officers, employees and representatives concerning the terms and conditions of this offering and to obtain any additional information desired necessary to verify the accuracy of the information provided.

(e)     I have sufficient assets to easily pay my subscription to the Company, and my subscription to the Company is not unreasonably large when compared with my total financial capability.

(f)     I am under no legal disability nor am I subject to any order, which would prevent or interfere with my execution, delivery and performance of this Subscription Agreement or my purchase of the shares. The shares are being purchased solely for my own account and not for the account of others and for investment purposes only. I have no present plans to enter into any contract, undertaking, agreement or arrangement with respect to the transfer, assignment, resale or distribution of any of the shares.

CHM
000307

(g)   The representations and warranties of subscriber shall survive the purchase of the shares and the consummation of the transactions contemplated herein.

**THE PURCHASE OF SHARES OF CHIMERA ENERGY CORPORATION INVOLVES A HIGH DEGREE OF RISK AND SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN BEAR THE RISK OF THE LOSS OF THEIR ENTIRE INVESTMENT.**

**EVERY POTENTIAL INVESTOR, PRIOR TO ANY INVESTMENT OR PURCHASE OF CHIMERA ENERGY CORPORATION SHARES SHOULD THOROUGHLY READ THE PROSPECTUS RELATING TO THIS OFFERING, INCLUDING, BUT NOT LIMITED TO THE "RISK FACTORS" INCLUDED THEREIN.**

**Type of ownership :** (You must check one box)

| | |
|---|---|
| ☑ Individual | ☐ Custodian for _____ |
| ☐ Tenants in Common | ☐ Uniform Gifts to Minors Act of the State of: ____ |
| ☐ Joint Tenants with rights of Survivorship | ☐ Corporation (Inc., LLC, LP) – Please List all officers, directors, partners, managers, etc.: ____ |
| ☐ Trust | |
| ☐ Community Property | ☐ Other (please explain) _____ |

IN WITNESS WHEREOF, I have executed this Subscription Agreement this _3_ day of _April_, 201_2_

_Nicole Cittha_
Name (Please Print)*[if Tenants in Common or Joint Tenants, all subscribers should sign]*

_Nicole Cittha_
Signature

_____
If entity, name of entity and signatory's position with entity

_____-9773_
Social Security, Social Insurance or Tax Identification Number

Principal Address of Subscriber

_38 E Brook Oaks_
Street Address

_Houston TX 77056_
City & State/Province          Zip or Postal Code

This Subscription for _50,000_ Shares is hereby accepted this _3_ day of _April_, 201_2_

**CHIMERA ENERGY CORPORATION**

By: _____
Printed Name: _Charles Grob_
Its: _President & CEO_

CHM
000308



# Hancock Bank.

Current Date:          April 09, 2012

Account Number:        ●●●●●●●4901
Capture Date:          April 05, 2012
Item Number:           95050000006675
Posted Date:           April 05, 2012
Posted Item Number:    350235291
Amount:                750.00
Record Type:           Foreign Item (Not On Us)
RT Number:             111014325
Run Number:            914
Serial Number:         1605
Batch Number:          95050003



CHM
000309

**CHIMERA**
ENERGY CORPORATION

January 6, 2012

Joel Felix
269 South Beverley Drive
PMB 545
Los Angeles, CA 90212

Mr. Felix:

Thank you for your interest in Chimera Energy Corp. We are in receipt of your subscription agreement and personal check in the amount of $500.00.

Unfortunately, we are unable to accept your investment at this time due to the following reasons:

1. The subscription agreement you sent to us is not the final form of the subscription agreement filed as an exhibit to our Registration Statement on Form S-1 with the Securities and Exchange Commission;

2. The Company is not accepting unsolicited subscriptions; and

3. As of today the capital raise is fully subscribed.

Enclosed is a Cashier's Check in the amount of $500.00 representing the return of your investment as well as your original subscription agreement. To clarify, the company has rejected your subscription, returned your funds and you have no ownership interest in the company.

Sincerely,


Charles Grob
President and CEO

CHM
000310

# CASHIER'S CHECK

№ 29521330

REMITTER

CHIMERA ENERGY

DATE  01-05-2012    14-17 / 650

PAY TO THE
ORDER OF  JOEL FELIX * * * * * * * * * * * * * * * *    $  500.00

WHITNEY BANK $500.00

THIS DOCUMENT HAS A MICRO-PRINT SIGNATURE LINE, WATERMARK AND THERMOCHROMIC INK; ABSENCE OF THESE FEATURES WILL INDICATE A COPY    DOLLARS

WHITNEY BANK
New Orleans, La.

⑈29521330⑈ ⑆065000171⑆ 295924116 10⑈

---

PURCHASER'S RECEIPT

WHITNEY BANK
New Orleans, La.

№ 29521330

REMITTER

CHIMERA ENERGY

01-05-2012    14-17 / 650

JOEL FELIX * * * * * * * * * * * * * * * *    500.00

PAYABLE TO

WHITNEY BANK $500.00

NOT NEGOTIABLE

⑈29521330⑈ ⑆555010826⑆ 295924116 10⑈

CHM
000311

**SUBSCRIPTION AGREEMENT**

**SUBSCRIPTION AGREEMENT FOR CHIMERA ENERGY CORPORATION**

Persons interested in purchasing shares of Chimera Energy Corporation must return this completed subscription agreement along with a wire transfer, check or money order for their total payment, payable only to:

**CHIMERA ENERGY CORPORATION**
**2800 POST OAK BLVD., SUITE 4100**
**HOUSTON, TX 77056**

If and when accepted by us, this subscription agreement shall constitute a subscription for one share(s) of our common stock.

An accepted copy of this agreement will be returned to you as your receipt, and certificates for your stock and warrants will be issued to you shortly thereafter.

Method of payment: [X] Check, [ ] Money Order payable only to: **Chimera Energy Corporation**

I hereby irrevocably tender this subscription agreement for the purchase of 33,333 shares at $0.015 per share. With this subscription agreement, I tender payment in the amount of $ 500 for the shares subscribed.

In connection with this investment, I represent and warrant as follows:

(a) I am the sole officer and director of the Company.
(b) I am a bona fide resident of the State of _____ CA _____.

Please issue the securities, which I am purchasing as follows:

Individual(s)—if more than one owner, please issue as follows: **Sole Individual Ownership** (single investor has sole ownership)

JOEL FELIX                269 S. Beverly Drive #545
                          LA, CA  90212

**Tenants-in-Common** (joint owners with no rights of survivorship, all parties must sign, each investor has an undivided interest)

_____

**Joint Tenants with Right of Survivorship** ( joint owners, each has right of survivorship, all parties must sign)

_____

CHM
000312

**JOEL FELIX**
PO BOX 361 (310) 600-0180
SANTA MONICA, CA 90408

363

12/22/11 Date

14-88/1220
2135

Pay to the
Order of _Chimera Energy Corp_ | $ 500

_five hundred oo/100_ Dollars

**Bank of America**
El Segundo
835 N Sepulveda Blvd
El Segundo CA
310.884.1870

Customer Since 1991

For _33,333 shares_

CHM
000313

# Appendix

# Exhibit U

| From: | Eddie Austin, Jr. |
|---|---|
| To: | Culley Adamson, Grace; Feldman, Cary M. |
| Sent: | 6/20/2013 10:50:39 AM |
| Subject: | Fw: Chimera Subscription Agreement |

----- Forwarded Message -----
**From:** Eddie Austin <eddieaustinjr@yahoo.com>
**To:** Andrew Farmer <andrew.farmer@iridiumcapitallimited.com>
**Sent:** Sunday, December 25, 2011 2:47 PM
**Subject:** Re: Chimera Subscription Agreement

K. Thx

Sent from my iPhone

On Dec 25, 2011, at 9:17 AM, Andrew Farmer <andrew.farmer@iridiumcapitallimited.com> wrote:

1. delete "and warrants" Can't believe nobody else caught that, your's truly included.
2. Copy of the Final prospectus is attached.
3. The vehicle will be substantially harder to sell if we can't deliver 99%+ to the buyer.  Unless we are going to be the buyer the shares turned over prior to the sale.

Thanks,

Andrew Farmer
**Iridium Capital Limited**
(832) 364-6317
(832) 553-3080 Fax
(619) 247-2680 Cell

---

**From:** Eddie Austin <eddieaustinjr@yahoo.com>
**Date:** Sun, 25 Dec 2011 06:50:38 -0600
**To:** Andrew Farmer <andrew.farmer@iridiumcapitallimited.com>
**Subject:** Re: Chimera Subscription Agreement

Third fundamental question(s)  Does the subscriber have the option of holding the stock and selling it whenever they want in the open market? When do the shares become free trading shares?

Sent from my iPhone

On Dec 24, 2011, at 8:38 PM, Andrew Farmer <andrew.farmer@iridiumcapitallimited.com> wrote:

Eddie,

Here is the subscription agreement.  I've sent a blank one as well as one that is filled out already.

Let me know if you have any questions.

Thanks,

Andrew Farmer
**Iridium Capital Limited**

EA0000217

# Appendix

# Exhibit V

| | |
|---|---|
| **From:** | Eddie Austin, Jr. |
| **To:** | Culley Adamson, Grace; Feldman, Cary M. |
| **Sent:** | 6/20/2013 10:49:40 AM |
| **Subject:** | Fw: Chimera Subscription Agreement |
| **Attachments:** | Chimera - Final Prospectus.pdf |

----- Forwarded Message -----
**From:** "Eddie Austin, Jr." <eddieaustinjr@yahoo.com>
**To:** Andrew Austin <redguts@gmail.com>; Robbie Paul Austin <contrabandbayou@yahoo.com>; Kellie <kellieraustin@yahoo.com>; David Parisi <daparisi2001@yahoo.com>; Nicole Miller <nicole_housing@yahoo.com>; Brian <berryo@aol.com>
**Sent:** Tuesday, January 10, 2012 11:53 AM
**Subject:** Fw: Chimera Subscription Agreement

Back with ya soon on this

---- Forwarded Message ----
**From:** Andrew Farmer <andrew.farmer@iridiumcapitallimited.com>
**To:** Eddie Austin <eddieaustinjr@yahoo.com>; Carolyn Bryant <carolynpaustin@yahoo.com>
**Sent:** Sunday, December 25, 2011 9:01 PM
**Subject:** Re: Chimera Subscription Agreement

Here is the prospectus.

Thanks,

Andrew Farmer
**Iridium Capital Limited**
(832) 364-6317
(832) 553-3080 Fax
(619) 247-2680 Cell

---
**From:** Andrew Farmer <andrew.farmer@iridiumcapitallimited.com>
**Date:** Sun, 25 Dec 2011 20:17:59 +0500
**To:** Eddie Austin <eddieaustinjr@yahoo.com>
**Subject:** Re: Chimera Subscription Agreement

1. delete "and warrants" Can't believe nobody else caught that, your's truly included.
2. Copy of the Final prospectus is attached.
3. The vehicle will be substantially harder to sell if we can't deliver 99%+ to the buyer. Unless we are going to be the buyer the shares turned over prior to the sale.

Thanks,

Andrew Farmer
**Iridium Capital Limited**
(832) 364-6317
(832) 553-3080 Fax
(619) 247-2680 Cell

---
**From:** Eddie Austin <eddieaustinjr@yahoo.com>
**Date:** Sun, 25 Dec 2011 06:50:38 -0600
**To:** Andrew Farmer <andrew.farmer@iridiumcapitallimited.com>

EA0000157

**Subject:** Re: Chimera Subscription Agreement

Third fundamental question(s)  Does the subscriber have the option of holding the stock and selling it whenever they want in the open market? When do the shares become free trading shares?

Sent from my iPhone

On Dec 24, 2011, at 8:38 PM, Andrew Farmer <andrew.farmer@iridiumcapitallimited.com> wrote:

Eddie,

Here is the subscription agreement.  I've sent a blank one as well as one that is filled out already.

Let me know if you have any questions.

Thanks,

Andrew Farmer
**Iridium Capital Limited**
(832) 364-6317
(832) 553-3080 Fax
(619) 247-2680 Cell
<Chimera - S-1 Subscription Agreement - Farmer.docx>
<Chimera - S-1 Subscription Agreement.docx>

EA0000158

Filed Pursuant to Rule 424(b)(3)
Registration No. 333-177406

**PROSPECTUS**

**CHIMERA ENERGY CORPORATION**

**5,000,000 SHARES OF COMMON STOCK**

**Initial Public Offering**

Prior to this registration, there has been no public trading market for the common Stock of CHIMERA ENERGY CORPORATION ("CEC", the "Company", "us", "we", and "our") and it is not presently traded on any market or securities exchange.   A total of 5,000,000 shares of common stock are being offered for sale by the Company to the public.

The offering of the 5,000,000 shares is being conducted on a self-underwritten, "best efforts" basis, which means that our director and officer, Charles Grob, will use his best efforts to sell the common stock and there is no commitment by any person to purchase any shares.  This prospectus will permit our president to sell the shares directly to the public, with no commission or other remuneration payable to him for any shares he may sell.  In offering the securities on our behalf, he will rely on the safe harbor from broker-dealer registration set out in Rule 3a4-1 under the Securities and Exchange Act of 1934.  The shares will be offered at a fixed price of $0.015 per share for the duration of the offering.  There is no minimum number of shares required to be sold to close the offering.  This offering will continue until the earlier of: (i) 90 days after this registration statement becomes effective with the Securities and Exchange Commission, or (ii) the date on which all 5,000,000 shares registered hereunder have been sold; provided that we may at our discretion extend the offering for an additional 90 days.  Proceeds from the sale of the shares will be used to fund the initial stages of our business development.  The Company will deliver stock certificates attributable to shares of common stock purchased directly to the purchasers within ninety (90) days of the close of the offering.  The offering date is the date by which this registration statement becomes effective.  This is a direct participation offering since we, and not an underwriter, are offering the stock.

| SHARES OFFERED BY COMPANY | | PRICE TO PUBLIC | SELLING AGENT COMMISSIONS | PROCEEDS TO THE COMPANY | |
|---|---|---|---|---|---|
| Per Share | $ | 0.015 | Not applicable | $ | 0.015 |
| Minimum Purchase | | None | Not applicable | | Not applicable |
| Total (5,000,000 shares) | $ | 75,000 | Not applicable | $ | 75,000 |

The Company currently has a limited operating history.  Any investment in the shares offered herein involves a high degree of risk.  You should only purchase shares if you can afford a loss of your investment.  Our independent registered public accountant has issued an audit opinion for the Company which includes a statement expressing substantial doubt as to our ability to continue as a going concern.

There has been no market for our securities and a public market may never develop, or, if any market does develop, it may not be sustained.  Our common stock is not traded on any exchange or on the over-the-counter market.  After the effective date of the registration statement relating to this prospectus, we hope to have a market maker file an application with the Financial Industry Regulatory Authority ("FINRA") for our common stock to be eligible for trading on the Over-the-Counter Bulletin Board or OTCQB Market.  We do not yet have a market maker who has agreed to file such application. There can be no assurance that our common stock will ever be quoted on a stock exchange or a quotation service or that any market for our stock will develop.

Neither the Securities and Exchange Commission nor any state regulatory authority has approved or disapproved of these securities, endorsed the merits of this offering, or determined that this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

AN INVESTMENT IN OUR SECURITIES IS SPECULATIVE. INVESTORS SHOULD BE ABLE TO AFFORD THE LOSS OF THEIR ENTIRE INVESTMENT. SEE THE SECTION ENTITLED "RISK FACTORS" BEGINNING ON PAGE 5 OF THIS PROSPECTUS.

THIS PROSPECTUS SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY THESE SECURITIES AND WE SHALL NOT SELL ANY OF THESE SECURITIES IN ANY STATE WHERE SUCH AN OFFER OR SOLICITATION WOULD BE UNLAWFUL BEFORE REGISTRATION OR QUALIFICATION UNDER SUCH STATE'S SECURITIES LAWS.

You should rely only on the information contained in this prospectus. We have not authorized anyone to provide you with information different from that contained in this prospectus.

**DATED DECEMBER 21, 2011**

# Appendix

# Exhibit W

| | |
|---|---|
| **From:** | Eddie Austin, Jr. |
| **To:** | Culley Adamson, Grace; Feldman, Cary M. |
| **Sent:** | 6/20/2013 10:46:34 AM |
| **Subject:** | Fw: Chimera Subscription Agreement |

----- Forwarded Message -----
**From:** Kellie Austin <kellieraustin@yahoo.com>
**To:** "Eddie Austin, Jr." <eddieaustinjr@yahoo.com>
**Sent:** Tuesday, January 10, 2012 4:57 PM
**Subject:** Re: Chimera Subscription Agreement

My phone is messing up again, please call my house if you need me
564-5742.

Thanks,

Kellie

---

**From:** "Eddie Austin, Jr." <eddieaustinjr@yahoo.com>
**To:** Kellie <kellieraustin@yahoo.com>; Robbie Paul Austin <contrabandbayou@yahoo.com>; Nicole Miller <nicole_housing@yahoo.com>; Andrew Austin <redguts@gmail.com>
**Sent:** Tuesday, January 10, 2012 3:45 PM
**Subject:** Fw: Chimera Subscription Agreement

Hi Everyone

I will call you tonight to talk about this.

Thanks

Padre

---- Forwarded Message ----
**From:** "Eddie Austin, Jr." <eddieaustinjr@yahoo.com>
**To:** Eddie Austin Jr. <eddieaustinjr@yahoo.com>
**Sent:** Tuesday, January 10, 2012 12:17 PM
**Subject:** Fw: Chimera Subscription Agreement

---- Forwarded Message ----
**From:** Andrew Farmer <andrew.farmer@iridiumcapitallimited.com>
**To:** Eddie Austin <eddieaustinjr@yahoo.com>; Carolyn Bryant <carolynpaustin@yahoo.com>
**Sent:** Saturday, December 24, 2011 8:38 PM
**Subject:** Chimera Subscription Agreement

Eddie,

EA0000223

Here is the subscription agreement.  I've sent a blank one as well as one that is filled out already.

Let me know if you have any questions.

Thanks,

Andrew Farmer
**Iridium Capital Limited**
(832) 364-6317
(832) 553-3080 Fax
(619) 247-2680 Cell

EA0000224

# Appendix

# Exhibit X

| | |
|---|---|
| **From:** | Eddie Austin, Jr. |
| **To:** | Culley Adamson, Grace; Feldman, Cary M. |
| **Sent:** | 6/20/2013 10:37:23 AM |
| **Subject:** | Fw: Chimera |

----- Forwarded Message -----
**From:** Andrew Farmer <apfarmer@yahoo.com>
**To:** "kellieraustin@yahoo.com" <kellieraustin@yahoo.com>
**Cc:** "Eddie Austin, Jr." <eddieaustinjr@yahoo.com>
**Sent:** Wednesday, January 11, 2012 3:36 PM
**Subject:** Re: Chimera

Thanks.

Please email the tracking number when you have it.

Andrew

---

**From:** "Eddie Austin, Jr." <eddieaustinjr@yahoo.com>
**To:** Andrew Farmer <apfarmer@yahoo.com>
**Sent:** Wednesday, January 11, 2012 2:23 PM
**Subject:** Fw: Chimera

----- Forwarded Message -----
**From:** Kellie Austin <kellieraustin@yahoo.com>
**To:** Eddie Austin <eddieaustinjr@yahoo.com>; carolyn austin <carolynpaustin@yahoo.com>
**Sent:** Wednesday, January 11, 2012 2:20 PM
**Subject:** Chimera

4 of 4 emails. Sorry i had to send them this way due to the size. Let us know if something is missing or wrong.

thanks,
james &Kellie

EA0000225

# Appendix

# Exhibit Y

| | |
|---|---|
| **From:** | Eddie Austin, Jr. |
| **To:** | Culley Adamson, Grace; Feldman, Cary M. |
| **Sent:** | 6/20/2013 10:48:19 AM |
| **Subject:** | Fw: Chimera Subscription Agreement |
| **Attachments:** | Chimera - Final Prospectus.pdf |

----- Forwarded Message -----
**From:** "Eddie Austin, Jr." <eddieaustinjr@yahoo.com>
**To:** Eddie Austin Jr. <eddieaustinjr@yahoo.com>
**Sent:** Tuesday, January 10, 2012 12:16 PM
**Subject:** Fw: Chimera Subscription Agreement

----- Forwarded Message -----
**From:** Andrew Farmer <andrew.farmer@iridiumcapitallimited.com>
**To:** Eddie Austin <eddieaustinjr@yahoo.com>; Carolyn Bryant <carolynpaustin@yahoo.com>
**Sent:** Sunday, December 25, 2011 9:01 PM
**Subject:** Re: Chimera Subscription Agreement

Here is the prospectus.

Thanks,

Andrew Farmer
**Iridium Capital Limited**
(832) 364-6317
(832) 553-3080 Fax
(619) 247-2680 Cell

---

**From:** Andrew Farmer <andrew.farmer@iridiumcapitallimited.com>
**Date:** Sun, 25 Dec 2011 20:17:59 +0500
**To:** Eddie Austin <eddieaustinjr@yahoo.com>
**Subject:** Re: Chimera Subscription Agreement

1. delete "and warrants" Can't believe nobody else caught that, your's truly included.
2. Copy of the Final prospectus is attached.
3. The vehicle will be substantially harder to sell if we can't deliver 99%+ to the buyer.  Unless we are going to be the buyer the shares turned over prior to the sale.

Thanks,

Andrew Farmer
**Iridium Capital Limited**
(832) 364-6317
(832) 553-3080 Fax
(619) 247-2680 Cell

---

**From:** Eddie Austin <eddieaustinjr@yahoo.com>
**Date:** Sun, 25 Dec 2011 06:50:38 -0600
**To:** Andrew Farmer <andrew.farmer@iridiumcapitallimited.com>
**Subject:** Re: Chimera Subscription Agreement

Third fundamental question(s)  Does the subscriber have the option of holding the stock and selling it whenever they want in the

EA0000032

# Appendix

# Exhibit Z

Release No. 41110 (S.E.C. Release No.), Release No. 34-41110, 69 S.E.C. Docket 475, 1999 WL 95487
17 CFR Part 240

Securities and Exchange Commission (S.E.C.)
Securities and Exchange Act of 1934

SECURITIES AND EXCHANGE COMMISSION (S.E.C.)

PUBLICATION OR SUBMISSION OF QUOTATIONS WITHOUT SPECIFIED INFORMATION

File No. S7-5-99
RIN: 3235-AH40
February 25, 1999

**\*1AGENCY:** Securities and Exchange Commission.

**ACTION:** Reproposed rule.

**SUMMARY:** The Securities and Exchange Commission is reproposing for comment amendments to Rule 15c2-11 under the Securities Exchange Act of 1934 (Exchange Act). Rule 15c2-11 governs the publication of quotations for securities in a quotation medium other than a national securities exchange or Nasdaq. Also, we are reproposing a companion amendment to relocate in Rule 17a-4 under the Exhange Act the record retention requirement currently contained in Rule 15c2-11. The original proposal was issued in February 1998 in response to concerns about increased incidents of fraud and manipulation in over-the-counter (OTC) securities, which typically involve thinly-traded securities of thinly-capitalized issuers (i.e., microcap securities).

The reproposed amendments are more limited than the initial proposal and focus the Rule on those securities the Commission believes are more likely to be prone to fraud and manipulation. The reproposal is part of the Commission's continuing efforts in regulatory, inspections, enforcement, and investor education areas that are key to deterring microcap fraud.

In addition, the reproposal will increase the information that broker-dealers must review before publishing quotations for non-reporting issuers' securities, and will ease the Rule's recordkeeping requirements when broker-dealers have electronic access to information about reporting issuers. Finally, we are giving guidance to broker-dealers on the scope of the review required by the Rule and providing examples of "red flags" that they should look for when reviewing issuer information.

**DATES:** Comments must be received on or before [30 days following the date of publication in the Federal Register].

**ADDRESSES:** Comments should be submitted in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, N.W., Mail Stop 6-9, Washington, D.C. 20549. Comments may also be submitted electronically at the following E-mail address: rule-comments@sec.gov. All comment letters should refer to File No. S7-5-99. All comments received will be available for public inspection and copying in the Commission's Public Reference Room, 450 Fifth Street, N.W., Washington, D.C. 20549. Electronically submitted comment letters will be posted on the Commission's Internet website (http:// www.sec.gov).

**FOR FURTHER INFORMATION CONTACT:** Any of the following attorneys in the Division of Market Regulation, Securities and Exchange Commission, 450 Fifth Street, N.W., Mail Stop 10-1, Washington, D.C. 20549, at (202) 942-0772: Nancy J. Sanow, Irene A. Halpin, Florence E. Harmon, Chester A. McPherson, or Jerome J. Roche.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents:**

**\*2** I. Executive Summary
A. Overview of the microcap fraud problem and efforts to prevent further abuses

B. Background of Rule 15c2-11 and recent proposed amendments

II. Overview of Reproposed Amendments

III. Discussion of Amendments
A. Securities excluded from the Rule
1. Securities satisfying a trading value test

2. Securities satisfying a bid price test

3. Securities of issuers satisfying a net tangible assets test

4. Non-convertible debt, non-participatory preferred stock, and asset-backed securities

5. Other Exceptions

B. Quotations subject to the Rule
1. The initial quotation for a covered OTC security

2. Priced quotations

3. Annual review

C. Information required under the Rule
1. Reporting issuers delinquent in their filings

2. Issuers in bankruptcy
a. Reporting issuers

b. Non-reporting issuers emerging from bankruptcy

3. Non-reporting foreign private issuers

4. Other non-reporting issuers

D. Information available upon request

E. Information repository

F. Definitions

G. Preservation of documents and information

H. Transition and exemptive authority provisions

I. Information submitted to the NASD

2

IV. General Request For Comments

V. Effects on Efficiency, Competition, and Capital Formation

VI. Costs and Benefits of the Amendments
A. Benefits

B. Costs


VII. Initial Regulatory Flexibility Act

VIII. Paperwork Reduction Act
A. Collection of information under the amendments

B. Proposed use of information

C. Respondents

D. Total annual reporting and recordkeeping burden
1. Burden-hours for broker-dealers

2. Burden-hours for issuers

3. Total burden-hour costs to broker-dealers and issuers

4. Capital cost to broker-dealers and issuers


E. General information about the collection of information

F. Request for comments


IX. Statutory Basis and Text of Proposed Amendments and Rule

## Appendix

I. Inroduction

II. Quotation Events Triggering the Review Requirement

III. The Review Process
A. Introduction

B. Source reliability
1. Determining whether a source is reliable

2. Examples of unreliable sources


C. Document review obligations

D. Scope of review following a trading suspension

IV. Examples of Red Flags

**I. Executive Summary**

**A. Overview of the microcap fraud and problem and efforts to prevent further abuses**

Because incidents of fraud manipulation involving microcap securities are a serious concern, the Commission, along with other regulators, has made combating microcap fraud one of its top priorities. Microcap securities generally are characterized by low share prices and little or no analyst coverage.[1] The issuers of microcap securities typically are thinly-capitalized and information about them often is limited, particularly when they are not subject to the Commission's periodic disclosure requirements. Securities of microcap companies usually are quoted on the OTC Bulletin Board operated by the National Association of Securities Dealers, Inc. (NASD), or in the Pink Sheets published by the National Quotation Bureau, Inc. (NQB), but they are not exclusive to these quotation mediums.[2]

**\*3** Microcap fraud often involves schemes such as "pump and dump" operations, in which unscrupulous brokers sell the securities of less-seasoned issuers to retail customers by using high pressure sales tactics and a supply of securities under the firm's control. The fraudsters create interest in the security by disseminating false or misleading information about the issuer through, for example, oral statements, press releases, or the Internet. To further the manipulative scheme, the retail broker frequently acts as a market maker in the security or, either on its own or through the issuer's promoter, induces other firms to act as market makers.

By publishing quotations, the market maker raises the profile of the security, even though the market maker is not an active participant in the fraud and publishes quotations solely in response to increased demand for the security. The broker, promoter, or others orchestrating the fraud can point to quotations for the security to "validate" its worth. The perpetrators of the fraud then dispose of their stake at an inflated price. Once they no longer need to stimulate interest in the security, the market for it collapses and innocent investors are left holding stock with little or no value.

The defrauded victims of microcap fraud activities are not the only ones harmed. When other investors become reluctant or unwilling to invest in the kinds of securities they perceive as prone to fraud, liquidity for those securities can be impaired. As a result, existing shareholders can face difficulty in disposing of their holdings and legitimate issuers of lower-priced stocks can find it hard to raise capital to start up or expand operations or services. In short, continuing incidents of microcap fraud are detrimental so the integrity of our nation's capital markets.

To combat microcap abuses, we have initiated several enforcement, examination, education, and regulatory measures. These actions include the following:
• In September 1998, we filed 13 enforcement actions against 41 defendants for their involvement in fraudulent microcap schemes that bilked investors of more than $25 million.[3]

• We conducted a nationwide sweep to combat fraud through the Internet, which resulted in 23 enforcement actions against 44 stock promoters of microcap stocks in October 1998.[4]

• We initiated examination sweeps of several firms that are active in the microcap market. Our examination staff conducted complex and resource-intensive reviews of these firms' records for evidence of the hallmarks of microcap fraud, such as patterns of "bait and switch" sales techniques, misrepresentations and exaggerated claims, unauthorized trading and refusals to sell securities, market manipulation, and lax or nonexistent supervision.

• We have held numerous investors' town meetings across the country to educate people about investing wisely, and we have put together several brochures to assist investors.[5]

**\*4** • We are cooperating with self-regulatory organizations (SROs) to improve supervision and regulation of the OTC securities market. For example, we recently approved NASD rule changes that limit quotations on the OTC Bulletin Board to the securities of issuers that are current in their reports filed with the Commission or other regulatory authority.[6]

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

• We have taken steps to strengthen our regulations and close loopholes to help reduce incidents of microcap fraud.

Today, we are taking action on several additional regulatory measures aimed at preventing further incidents of microcap fraud. In addition to adopting amendments to Form S-8[7] under the Securities Act of 1933 (Securities Act)[8] and adopting amendments to Regulation D,[9] we are reproposing amendments to Rule 15c2-11[10] under the Securities Exchange Act of 1934 (Exchange Act),[11] our rule that governs the quotations by broker-dealers for OTC securities.[12] Rule 15c2-11 is intended to prevent broker-dealers from becoming involved in the fraudulent manipulation of OTC securities. However, even if a broker-dealer technically complies with the Rule's requirements, it would be subject to liability under other antifraud provisions of the securities laws such as Rule 10b-5, if it publishes quotations as part of a fraudulent or manipulative scheme.[13]

### B. Background of Rule 15c2-11 and recent proposed amendments

Rule 15c2-11 contains requirements that are intended to deter broker-dealers from initiating or resuming quotations for covered OTC securities that may facilitate a fraudulent or manipulative scheme. The Rule currently prohibits a broker-dealer from publishing (or submitting for publication) a quotation for a covered OTC security in a quotation medium unless it has obtained and reviewed current information about the issuer.[14] The broker-dealer must also have a reasonable basis for believing that the issuer information, when considered along with any supplemental information, is accurate and is from a reliable source.[15]

The Rule currently contains several exceptions to its prohibitions. Under the "piggyback" exception, the Rule's information requirements do not apply when a broker-dealer publishes, in an interdealer quotation system, a quotation for a covered OTC security that was already the subject of regular and frequent quotations in the same interdealer quotation system.[16] A broker-dealer is able to "piggyback" on either its own or other broker-dealers' previously published quotations. This exception assumes that regular and frequent quotations for a security generally reflect market supply and demand and are based on independent, informed pricing decisions. However, as a result of the piggyback provision, the Rule's application is essentially limited to just the first broker-dealer publishing quotes.

In February 1998, the Commission published for comment amendments to the Rule that were designed to curb fraud in microcap securities.[17] This proposal would have eliminated the piggyback provision by requiring all broker-dealers to review current issuer information before publishing their first quotation for a covered OTC security, without regard to whether the quotation was priced or unpriced, and to thereafter review current issuer information annually if they published priced quotations. With limited exceptions, the proposal would have applied to any security quoted in a quotation medium other than a national securities exchange or Nasdaq. The proposal would also have expanded the information required for issuers that do not file periodic reports with the Commission (e.g., non-reporting issuers). In addition, broker-dealers would have been required to make the issuer information available to anyone who requested it.

**\*5** In response to the Proposing Release, we received 199 comment letters from 193 commenters.[18] The majority of commenters, which included broker-dealers, issuers, attorneys, and individuals, opposed many of the proposed changes. Broker-dealers were especially concerned that they would be exposed to potential liability in civil actions as a result of their increased review obligations under the proposal. Commenters also expressed views about the possibility of reduced liquidity in covered OTC securities if broker-dealers stopped making markets; less transparent markets if broker-dealers did not publish priced quotes to avoid the annual review requirement; less competitive pricing for covered OTC securities; impaired access to capital by issuers; and increased compliance costs for broker-dealers. In addition, some commenters pointed out that the proposal would not cover Nasdaq SmallCap securities, which, they noted, have also been the subject of abusive activities. Some commenters also remarked that the proposal would not stop microcap fraud, which, in their view, is really a sales abuse problem.

Several commenters, principally state securities regulators and their national association, supported the proposal. They believed that microcap fraud would be deterred if broker-dealers are required to review issuer information and make their own independent and substantiated determinations before publishing quotations. Further, commenters favoring the proposal stated that the availability of information via EDGAR and the speed of communication via the Internet would ease any

APP. 000517

increased burden on broker-dealers created by the Rule amendments. Finally, a number of commenters were more neutral in their approach and offered views or suggestions on specific provisions.

## II. Overview of Reproposed Amendments

The Commission is issuing a revised proposal to amend Rule 15c2-11 to help curtail abuses in the offer, sale and trading of microcap securities. Because these amendments will significantly change the Rule's scope, we are publishing them to give interested persons an opportunity to provide us with their comments and views.

The amendments are intended to have broker-dealers "stop, look and listen" before they begin to quote a covered OTC security in a quotation medium other than a national securities exchange or Nasdaq. However, the amendments reflect commenters' concerns about the earlier proposal by limiting the scope of the Rule principally to priced quotations and to those securities that the Commission believes are more likely to be the subject of improper activities. Under these amendments, the Rule will no longer apply to securities of larger issuers, or to securities that have a substantial trading price or that meet a minimum dollar value of average daily trading volume. In addition, the Rule will only cover priced quotations, except in the case of the first quotation for a covered OTC security. The provisions relating to the broker-dealer's obligations under the Rule and the issuer information that the broker-dealer must review are little changed from the initial proposal.

**\*6** We also are providing guidance regarding the steps broker-dealers should take and "red flags" they should consider when reviewing the Rule's required information. In response to commenters' concerns about broker-dealer liability, we stress that broker-dealers will have no obligation to continuously update their Rule 15c2-11 materials. The broker-dealer's review obligations under the Rule occur only at the specific times identified in the Rule.

In general, the amendments would:
• limit the Rule primarily to priced quotations;[19]

• eliminate the Rule's piggyback provision and require all broker-dealers to review current issuer information before publishing priced quotations for a security;

• require broker-dealers publishing priced quotations for a security to review current information about the issuer annually and upon the occurrence of specified events;

• expand the information required for certain non-reporting issuers;

• require documentation of the broker-dealer's compliance with the Rule; and

• require broker-dealers publishing quotes in compliance with the Rule to provide the issuer information upon request to customers, prospective customers, information repositories, and other broker-dealers.

In addition, the amendments would exclude from the Rule's coverage:
• securities with a worldwide average daily trading volume value of at least $100,000 during each month of the six full calendar months immediately preceding the date of publication of a quotation, and convertible securities where the underlying security satisfies this threshold;

• securities with a bid price of at least $50 per share;

• securities of issuers with net tangible assets in excess of $10,000,000, as demonstrated by audited financial statements;

• non-convertible debt and non-participatory preferred stock; and

• asset-backed securities that are rated as investment grade by at least one nationally recognized statistical rating organization;

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

These amendments are intended to enhance the integrity of quotations for securities in this market sector, to improve the quality of information about smaller, lesser-known issuers, and to foster greater access to this information by investors. The amendments also reorganize and simplify the Rule's provisions consistent with the Commission's Plain English program.

### III. Discussion of Amendments

The amendments restructure Rule 15c2-11 by setting forth more clearly the quotation events that trigger the Rule, the requirements that the broker-dealer must satisfy, and the nature of the information that the broker-dealer must review. The amendments state that no broker-dealer, directly or indirectly, may publish the described kinds of quotations for a security in any quotation medium, without first complying with the Rule's provisions. The Rule will only apply at specified points in time, namely, when a broker-dealer publishes:
• the first quotation for a security;

*7 • its first quotation at a specified price for a security after another broker or dealer published the first quotation for the same security;

• the first quotation following the termination of a Commission trading suspension ordered pursuant to section 12(k) of the Exchange Act[20] in any security of the issuer of the suspended security;

• a quotation at a specified price for a security after a period of five or more consecutive business days when it did not publish any quotations at a specified price for that security;

• its first quotation at a specified price for a security after the date that is four months after the end of the issuer's fiscal year, unless the issuer is a foreign private issuer; or

• its first quotation at a specified price for a security of a foreign private issuer after the date that is seven months after the end of the issuer's fiscal year.

The broker-dealer's information gathering and review requirements are substantially the same as the initial proposal.[21] If the Rule applies, the broker-dealer must:
• review the Rule's specified information;

• determine that it has a reasonable basis for believing that the information is accurate in all material respects and was obtained from reliable sources;

• record the date it reviewed the specified information, the sources of the information, and the person at the firm responsible for the broker-dealer's compliance with the Rule; and

• preserve the specified information in accordance with Rule 17a-4.[22]

Commenters on the Proposing Release did not object to the standards set forth in these review and documentation requirements. Rather, they expressed concerns about the scope of a broker-dealer's review obligations under the earlier proposal, particularly as some of them misconstrued the proposal to require continuous updating of information. To assist broker-dealers publishing quotations for covered OTC securities, we are giving guidance in an appendix to this release about the nature of the review we expect broker-dealers to conduct under both the current Rule and the proposed amendments.

### A. Securities excluded from the Rule

Several commenters suggested that the Rule should cover only those securities that have the characteristics that have led to abuses in the microcap market.[23] These commenters noted that, while the earlier proposal was intended to focus on microcap abuses, it covered quotations for a number of non-reporting foreign and domestic issuers' securities that are unlikely to be the

APP. 000519

targets of microcap schemes. They suggested that the amendments be crafted to cover only those equity securities most likely to be prone to abusive activities.

We agree that applying the Rule to the securities of larger issuers, more liquid securities, and certain fixed-income debt securities is not directly related to microcap fraud concerns.[24] We therefore are proposing to exclude from Rule 15c2-11 those securities satisfying any one of three alternative tests based on: the value of the security's average daily trading volume (ADTV); the security's bid price; or the issuer's net tangible assets.[25] We are also proposing to exclude debt securities, non-participatory preferred stock, and investment grade asset-backed securities.

### 1. Securities satisfying a trading value test

**\*8** To tailor the Rule to transactions that we believe are most likely to involve microcap fraud, the amendments exclude securities with a value of worldwide ADTV of at least $100,000 during each month of the six full calendar months immediately preceding the date of publication of a quotation.[26] Convertible securities will also be excluded when the underlying security satisfies this threshold.

The majority of OTC stocks of U.S. companies that are not listed on an exchange or Nasdaq trade infrequently and will not satisfy for a test based on a value of ADTV of $100,000 or more during each month over a six month measuring period. However, there are a number of non-reporting issuers having securities with significant trading levels, particularly larger foreign issuers with actively traded securities in their home markets. We think that it is appropriate to take this trading activity into account in applying the value of ADTV test.

The price of a microcap security that is the subject of a fraud often is manipulated upward rapidly so that those involved in the manipulation can quickly sell stock at a significant profit, to the detriment of innocent investors. Microcap securities involved in such manipulations often are thinly traded, and the daily trading volume for such securities rarely reaches a value of $100,000 over an extended period of time. We believe that measuring the value of the security's ADTV over a six month period is a way to ensure that the securities qualifying for this exclusion are not involved in the type of short-term price manipulations frequently seen in microcap schemes.

A broker-dealer should determine the value of a security's ADTV from information that is publicly available and that the broker-dealer has a reasonable basis for believing that the information is reliable.[27] In calculating the value of ADTV in U.S. dollars, any reasonable and verifiable method may be used.[28] For example, it may be derived from multiplying the number of shares by the price in each trade. The NASD may also be able to assist broker-dealers in determining whether a particular security is eligible for the exclusion.

Q1. Should the dollar value of ADTV for this exclusion be higher than $100,000, e.g., $500,000 or $1 million, or should it be a lower amount, e.g., $50,000? Commenters should provide data and analysis to support suggested revisions to this proposed threshold.

Q2. Should the dollar value of ADTV measuring period be longer than six months, e.g., twelve months, or be shorter, e.g., three months? Should the length of the measuring period depend on the amount of the value of ADTV threshold, i.e., should a lower value of ADTV threshold be allowed but require a longer measuring period?

Q3. Should the exclusion based on ADTV value also incorporate a value of public float test, like Regulation M does? If so, should the public float value be $25 million or some higher or lower amount? Would public float information be easy or difficult to obtain for non-reporting issuers?[29]

**\*9** Q4. Rule 101 under the Commission's Regulation M excludes from that rule's trading prohibitions securities with a value of ADTV of $1 million or more, using a two month measuring period, if the issuer has a public float value of at least $150 million. Should Rule 15c2-11's exclusion parallel the terms of this exclusion?

### 2. Securities satisfying a bid price test

To limit the Rule to transactions that the Commission believes are most likely to involve microcap fraud, we are proposing an

amendment to exclude securities with a bid price of at least $50 per share at the time the quotation is published in the quotation medium.[30] While the vast majority of OTC stocks are quoted at lower prices and will not typically satisfy for a test based on a bid price of at least $50 per share, there are securities of closely-held issuers that are quoted at significant share prices. The broker-dealer publishing the quotation can use its own bona fide quotation to satisfy the test. The broker-dealer cannot use its own or another broker-dealer's unpriced quotation to rely on this test, even if the broker-dealer publishing a name-only quotation provides a bid price of at least $50 per share upon inquiry. If a security is a unit composed of one or more securities, the bid price of the unit, when divided by the number of shares of the unit that are not warrants, options, rights, or similar securities, must be at least $50 to be excepted from the Rule.[31]

Q5. Should this exclusion be based on a bid price higher than $50 per share, e.g., $100 per share or lower, e.g., $20 per share? Commenters should provide data and analysis to support suggested alternatives to the proposed threshold.

Q6. Should this exclusion be available only if the security has a bid price of $50 over a specified period of time?

Q7. Should this test be based instead on the security's last sale price? If so, should there be a time limit added to such a test so that a stale last sale price cannot be used?

### 3. Securities of issuers satisfying a net tangible assets test

Microcap fraud schemes generally involve issuers with limited assets.[32] We are therefore proposing to exclude securities of issuers having net tangible assets in excess of $10,000,000, as determined by audited financial statements.

If the issuer is not a foreign private issuer, a broker-dealer should make this determination using the most recent financial statements for the issuer that have been audited and reported on by an independent public accountant in accordance with the provisions of Rule 2-02 of Regulation SX.[33] If the issuer is a foreign private issuer, a broker-dealer should make this determination using the most recent financial statements for the issuer (dated less than 18 months prior to the date of the publication of the quotation) that are prepared in accordance with a comprehensive body of accounting principles, audited in compliance with requirements of the country of incorporation, and reported on by an accountant duly registered and in good standing under the regulations of that jurisdiction.[34] If audited financial statements are unavailable, the broker-dealer may not rely on this exception.

\*10 Some commenters suggested that we look to the current definition of "penny stock" in assessing the scope of Rule 15c2-11. Exchange Act Rule 3a51-1 excludes from the definition of penny stock a security of an issuer having net tangible assets in excess of $2 million, if the issuer has been in continuous operation for at least 3 years, or $5 million, if the issuer has been in continuous operation for less than three years.[35] We preliminarily believe that, for purposes of an exclusion from the Rule, the net tangible assets amount should be higher, and, unlike the definition of penny stock, the threshold need not distinguish between newer and more seasoned issuers.

Q8. Should the threshold amount for this net tangible assets test be higher than $10 million, e.g., $20 million? Under what circumstances would it be appropriate to permit a lower threshold amount? Commenters should provide data and analysis to support their views on whether the threshold amount should be raised or lowered.

Q9. For ease of compliance with both Commission and NASD rules, should this exclusion parallel the exclusion contained in the NASD's proposed rule that would require broker-dealers to review current information about the issuer of an OTC security before recommending a transaction in the security?[36] The NASD proposal would exclude the securities of issuers having total assets of at least $100 million and shareholders' equity of at least $10 million, based on audited financial statements.

Q10. Will there be sufficient information in financial statements, particularly those of non-reporting issuers, to permit broker-dealers to make the net tangible assets calculation?

Q11. Should the use of financial statements of a foreign private issuer be limited to financial statements prepared in accordance with U.S. generally accepted accounting principles (GAAP)?

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Q12. Should the use of financial statements of a foreign private that are not prepared in accordance with U.S. GAAP be limited to financial statements prepared in accordance with the accounting standards promulgated by the International Accounting Standards Committee (IASC)?[37]

Commenters are invited to provide us with their views on the alternative tests for an exclusion from Rule 15c2-11, as described above.

Q13. Should all three of the tests based on value of ADTV, bid price, and net tangible assets be incorporated into Rule 15c2-11?

Q14. Should the proposed exclusions from the Rule be limited to those securities that satisfy at least two of the three tests?

Q15. Are there other tests that are more appropriate to exclude the securities of larger, more seasoned issuers from Rule 15c2-11? For example, should a security that has no or very minimal trading volume be excluded from the Rule's requirements? What would be an appropriate low volume threshold? If trading volume suddenly exceeded the low volume threshold, would broker-dealers publishing quotes find it easy or difficult to have to obtain and review information before continuing to publish priced quotations?

#### 4. Non-convertible debt, non-participatory preferred stock, and asset-backed securities

**\*11** We are proposing to exclude non-convertible debt securities, non-participatory preferred stock,[38] and asset-backed securities that are rated by at least one nationally recognized statistical rating organization, as that term is used in Rule 15c3-1 under the Exchange Act,[39] in one of its generic rating categories that signifies investment grade.[40] Commenters on this issue generally supported excluding fixed-income securities from the Rule.

The fraud and manipulation that we have observed in the microcap securities have not been evident in the fixed-income market. In addition, non-convertible debt securities, non-participatory preferred stock, and investment grade asset-backed securities generally trade at prices and in denominations that make them less likely targets for manipulation. Further, the type of issuer information required by the Rule is much less relevant to the pricing and trading of these types of securities.

Q16. Should this exclusion apply to all asset-backed securities or should the exclusion apply only to asset-backed securities that are rated investment grade on the basis that those securities are even less likely to be subject to fraudulent activities?

Q17. Should the Rule exclude all non-convertible debt and non-participatory preferred stock or should the exclusion apply only to non-convertible debt and non-participatory preferred stock that are rated investment grade?

#### 5. Other Exceptions

The exceptions relating to quotations for exchange-listed and Nasdaq securities, quotations representing a customer's unsolicited order, and quotations for exempted securities remain substantively the same as currently in the Rule. As we indicated in the Proposing Release, the unsolicited status of the customer orders would be called into question if a broker-dealer repeatedly publishes quotations on the basis of the unsolicited customer order exception.[41]

Q18. Should unsolicited customer orders be required to be identified as such in the quotation medium? Is it feasible for quotation mediums to show that the quote represents an unsolicited customer order?

#### B. Quotations subject to the Rule

#### 1. The initial quotation for a covered OTC security

As indicated above, the Rule's requirements will apply at the time of discrete quotation events. Subject to the Rule's exceptions, the amendments will prohibit the first broker-dealer from publishing a priced or unpriced quotation for a covered OTC security in a quotation medium unless it has obtained and reviewed specified information about the issuer and the security. Further, this information will need to be submitted to the NASD, in accordance with the NASD's rules, at least three

**APP. 000522**

business days before the quotation is published.[42] There is one situation that "restarts" the Rule's requirements: following the termination of a Commission trading suspension ordered pursuant to Exchange Act Section 12(k),[43] the broker-dealer publishing the first quote, whether it is priced or unpriced, must comply with Rule 15c2-11. In essence, this is the way the Rule currently works.

**\*12** We believe that the Rule should cover the first quotation as a means to assure that there is basic information about the issuer available to the marketplace before trading in the security begins and to alert regulators that trading in the security will be starting. The NASD uses Rule 15c2-11 submissions for surveillance and enforcement purposes and routinely provides copies of this information to the Commission.

### 2. Priced quotations

While the first broker-dealer must obtain the required information for the initial quotation (priced or unpriced) for a covered OTC security as discussed above, thereafter the Rule will only apply to broker-dealers submitting their first priced quotations. The Rule's review requirements are also triggered when a broker-dealer first publishes a priced quotation following the lapse of five or more business days of its priced quotations for the security. In addition, as discussed below, a broker-dealer must satisfy the Rule's requirements if it publishes a priced quotation as of a specific date following the end of the issuer's fiscal year.

We propose to focus the Rule's requirements after publication of the first quote on priced quotations, because recent microcap manipulation schemes have primarily involved priced quotations. In addition, priced quotes are used as indicia of value for a variety of purposes (e.g., bank loans or pledges of securities). This revision also responds to the concerns of several commenters that the earlier proposal could have resulted in some broker-dealers being precluded from publishing any quotations if they could not obtain the Rule's required information. We solicit commenters' views, however, on whether unpriced indications of interest will be used more often in unlawful microcap activities, and, if so, whether the Rule should cover all initial quotations.

### 3. Annual review

The amendments require a broker-dealer to review the specified information annually if the broker-dealer publishes priced quotations for the security. The date by which the annual review must be performed depends on whether the issuer is a domestic or a foreign company:

• Domestic Issuers: The annual review must occur prior to the first priced quotation that is more than four months after the end of the issuer's fiscal year.

• Foreign Private Issuers: The annual review must occur prior to the first priced quotation that is more than seven months following the end of the issuer's fiscal year.

The purpose of this requirement is to make sure that the broker-dealer periodically reviews fundamental information about the issuer if the broker-dealer continues to publish priced quotations. The broker-dealer should know if no current information about the issuer exists or if current information reflects a significant change in the issuer's ownership, operations, or financial condition.

While we originally proposed two alternative dates for conducting the annual review, to simplify the Rule we are reproposing only one date for each type of security.[44] Four months after the end of the issuer's fiscal year, a broker-dealer publishing priced quotes for a covered OTC security of a domestic issuer must have conducted the annual review. In the case of a foreign private issuer's security, the annual review must occur before the broker-dealer publishes a priced quote following the date that is seven months after the issuer's fiscal year end. We believe that these time periods give a broker-dealer sufficient time to obtain and review updated issuer information for both reporting and non-reporting issuers.

**\*13** Some commenters opposed the annual review requirement because of potential recordkeeping burdens, the perceived difficulty of obtaining the required information, and the loss of liquidity that could potentially occur if broker-dealers could not publish priced quotes because current issuer information was unavailable.[45] Commenters stated that the Rule's review requirements represented a shift from the Commission and the SROs to broker-dealers of the burdens of overseeing issuer

compliance with regulatory requirements.[46] Some commenters wrote that the annual review is only appropriate for certain non-reporting companies or issuers for which only limited information is available. Other commenters stated that the annual review should not apply to issuers that are current in their reporting requirements because this information is available on EDGAR.[47] A number of commenters, however, generally supported some sort of required annual review for broker-dealers publishing priced quotations, although they differed as to the securities that should be subject to this provision.[48]

The amendments will apply the annual review requirement to priced quotations for both reporting and non-reporting issuers' securities. We believe that an annual review requirement for both reporting and non-reporting issuers' securities fulfills the objectives of the Rule without imposing significant burdens on broker-dealers. This is especially so because we are revising the Rule to cover only those securities that, in our view, are most likely to be the subject of microcap fraud schemes and are also limiting the scope of the annual review to priced quotations. We also note that because information about reporting issuers is available on the Commission's website, the review of information about these issuers can be accomplished quite easily.

Commenters are requested to provide us with their views on the reproposal's focus on priced quotations.

Q19. Should the Rule cover all broker-dealers' initial quotations, whether priced or unpriced, as the earlier proposal would have? Will the reproposal cause broker-dealers to publish unpriced quotes to avoid complying with the Rule?

Q20. Should the Rule apply exclusively to priced quotes, i.e., the Rule would not cover any unpriced quotes?

Q21. Are there other approaches that would be more appropriate, e.g., to cover any initial quote for a covered OTC security by a broker-dealer, whether priced or unpriced, but not to apply the Rule or at least the annual review requirement to reporting issuers' securities? How would such a proposal help reduce instances of microcap fraud?

Q22. Is the Rule text sufficiently clear in identifying the quotation events that are subject to the Rule's provisions? Are there other quotation events that should be covered by the Rule?

Q23. Should the provision pertaining to a lapse in quotations of five consecutive business days or more provide for a longer time period, e.g., ten consecutive business days without a priced quotation, or a shorter time period, e.g., three consecutive business days without a priced quotation?

**\*14** Q24. Should the Rule give broker-dealers the option to conduct the annual review as of the anniversary date of the initial quotation by the broker-dealer?

### C. Information required under the Rule

The amendments are substantially identical to the earlier proposal with respect to the issuer information that a broker-dealer must review before publishing a quotation for a covered OTC security. Under the reproposal, a broker-dealer subject to the Rule must gather, review, and maintain in its records the following issuer information:

• For an issuer that has conducted a recent public offering either registered under the Securities Act of 1933 (Securities Act) or effected pursuant to Regulation A under the Securities Act, a copy of the prospectus or offering circular;

• For an issuer that files reports with the Commission pursuant to Sections 13 or 15(d) of the Exchange Act[49] (reporting issuer), the issuer's most recent annual or semi-annual report and any subsequent quarterly and current reports;

• For an issuer that is an insurance company of the kind specified in Section 12(g)(2)(G) of the Exchange Act,[50] the issuer's most recent annual statement referred to in Section 12(g)(2)(G)(i);

• For an issuer that is not required to file reports pursuant to Sections 13 or 15(d) of the Exchange Act and that is a bank or savings association, the issuer's most recent annual report and any subsequent reports filed with its appropriate federal or state banking authority; and

• For any other issuer, the information, including certain financial information, specified in proposed paragraph (c)(6) of the

APP. 000524

Rule, which must be reasonably current in relation to the day a quotation is submitted.

The broker-dealer also must obtain and review the supplemental information contained in paragraph (d) of the reproposed Rule. A broker-dealer must review a copy of any trading suspension order issued under Section 12(k) for any of the issuer's securities during the 12 months preceding the publication of the quotation, as well as any other material information, including adverse information, that comes to the broker-dealer's knowledge or possession before publication of the quotation. A broker-dealer must consider this supplemental information, along with the issue information, when it determines whether it has a reasonable basis for believing that the issuer information is accurate and from reliable sources. While we are not including a requirement that the broker-dealer obtain and review any trading suspension for a foreign security that was issued by a foreign financial regulatory authority, this information must be taken into account by the broker-dealer if it comes to the broker-dealer's knowledge or possession at the time that a review is required.

In addition, the broker-dealer must make a record of the significant relationship information contained in paragraph (e) of the reproposed Rule, which is unchanged from the Proposing Release. Under this provision, a broker-dealer would have to document specified information such as whether the broker-dealer has any affiliation with the issuer or arrangements to receive any consideration to publish the quote, and whether the quote is being published on behalf of another broker-dealer or the issuer, any of its insiders, or any large shareholder.

**\*15** Commenters generally did not object to the issuer, significant relationship, and supplemental information requirements; in fact, some commenters favored the enhanced information requirements for non-reporting issuers.[51] Therefore, we are reproposing these requirements without any substantive changes, other than revisions relating to financial statements for non-reporting issuers, as discussed below in Part III.C.4. We are addressing below specific points that a few commenters raised about the information requirements and other provisions. Commenters are welcome to provide their views on the information requirements for the various categories of issuers and should consult the Proposing Release for a more detailed description of these provisions.[52]

### 1. Reporting issuers delinquent in their filings

In the case of an issuer delinquent in its reporting obligations, a broker-dealer will not be able to publish an initial priced quotation, or continue to publish priced quotations after the annual review date, because it will not be able to obtain the specified reports. A few commenters indicated concern about the possible adverse implications for the market for delinquent issuers' securities if broker-dealers could not publish quotes when current issuer information was unavailable.[53] As noted above, we are revising the Rule to permit broker-dealers to publish unpriced quotations, even in the absence of current issuer information (except in the case of the first quotation for the security).

### 2. Issuers in bankruptcy

### a. Reporting issuers

A few commenters urged us to permit broker-dealers to continue to quote the securities of reporting issuers that had filed for reorganization under federal bankruptcy law because it would provide liquidity for these securities.[54] They noted that it was often burdensome for small companies that had filed for reorganization under Chapter 11 of the Bankruptcy Code[55] to produce audited financial statements to comply with Exchange Act reporting requirements.

Commenters suggested that broker-dealers could satisfy the Rule's requirements by reviewing bankruptcy court filings made by an issuer in Chapter 11 reorganization when current Exchange Act reports were unavailable. One commenter also suggested that the Commission permit delinquent reporting companies that experience a 51% ownership change as a result of a confirmed plan of reorganization to begin reporting from the effective date of the reorganization plan with a filing with the Commission, attaching the court-approved disclosure statement together with a certified audited balance sheet as of the effective date.[56]

The reproposal will require a broker-dealer publishing quotations for a reporting issuer's securities to obtain the issuer's Exchange Act reports, even if the reporting issuer has filed for Chapter 11 reorganization. Thus, if a reporting issuer that has

filed for Chapter 11 reorganization becomes delinquent in its reporting obligations, a broker-dealer will not be able to publish priced quotations covered by the Rule. For example, a broker-dealer could not continue to publish priced quotations as of the annual review date for a covered security of a reporting debtor that has become delinquent in its reporting obligations.[57]

**\*16** The bankruptcy court filings for an issuer undergoing reorganization under Chapter 11 are not adequate to satisfy the Rule's requirements. These Rule 2015 bankruptcy reports ordinarily contain only data about issuer receipts and disbursements and not the type of issuer financial information contemplated by Rule 15c2-11.[58] In some cases, our Division of Corporation Finance may grant issuers in bankruptcy no-action relief with respect to Exchange Act filing requirements.[59] These no-action positions, however, are predicated on little or no trading occurring in the debtor's securities. The Rule 2015 bankruptcy reports that the Division of Corporation Finance accepts under its no-action position do not satisfy Rule 15c2-11 because this financial report usually contains only information about issuer receipts and disbursements. Where a reporting issuer receives this type of no-action position, a broker-dealer would not be able to obtain the issuer information required by the Rule until the debtor's reorganization plan becomes effective, and the debtor files a Form 8-K, which instead of attaching the Rule 2015 bankruptcy reports, now includes the issuer's audited balance sheet. Under Rule 15c2-11, broker-dealers could review this 8-K, which contains an issuer's audited balance sheet, and then publish priced quotations. From then on, the issuer must file its Exchange Act periodic reports for all periods that begin after the plan becomes effective.[60] The publication of quotations by a broker-dealer indicates that a market exists for the issuer's securities. It would be inconsistent with the premise of the no-action position (i.e., that there is no trading in the issuer's securities) if a broker-dealer were able to stimulate trading by publishing quotations without having the issuer's Exchange Act reports.

Q25. Are there circumstances in which a broker-dealer should be permitted to publish priced quotations for the securities of delinquent reporting issuers in bankruptcy? Please describe these circumstances. Should the Rule prohibit broker-dealers from publishing unpriced quotes for the securities of these issuers?

### b. Non-reporting issuers emerging from bankruptcy

The Proposing Release contained amendments to permit broker-dealers that quote the securities of non-reporting companies emerging from bankruptcy to review the bankruptcy court-approved disclosure statement and issuer financial information required by the Rule from the date that the bankruptcy court confirms the reorganization plan.[61] The commenters who addressed this issue supported the proposal to limit a broker-dealer's review to the post-reorganization information.[62] The amendments are unchanged from the original proposal.

### 3. Non-reporting foreign private issuers

In the case of a foreign private issuer that relies on an exemption from registration under Section 12(g)[63] of the Exchange Act by complying with Exchange Act Rule 12g3-2(b), Rule 15c-211 specifies that a broker-dealer must review the information submitted to the Commission under Rule 12g3-2(b).[64] To qualify for the registration exemption, the issuer must furnish to the Commission information that the issuer has made or is required to make public under the law of the country in which the foreign private issuer is domiciled or incorporated; has filed or is required to file with a stock exchange on which the securities are traded and which the exchange has made public; or has distributed or is required to distribute to its securityholders. For foreign private issuers that do not furnish the Commission with information under Rule 12g3-2(b), the Rule currently requires broker-dealers to obtain and review the same kind of information, including financial information, as required for non-reporting domestic issuers.

**\*17** We note that Rule 12g3-2(b) contains no specific requirements governing the categories of information the issuer must furnish to the Commission under the exemption. As a result, there is no assurance that broker-dealers publishing quotes will obtain the same type of information for each foreign private issuer that claims the Rule 12g3-2(b) exemption as they must for other non-reporting foreign private issuers. This can be problematic since a number of issuers claiming the Rule 12g3-2(b) exemption are foreign microcap companies that can potentially be subject to the same kinds of abusive practices as their U.S. counterparts.

Therefore, we are proposing to change Rule 15c2-11 requirements with respect to quotations for the securities of foreign issuers complying with Rule 12g3-2(b). Broker-dealers publishing quotations for the securities of Rule 12g3-2(b) issuers will have to obtain and review the information specified in paragraph (c)(6) of the reproposed Rule.[65] However, as described in

APP. 000526

more detail below, we propose to revise the financial statements that must be reviewed for nonreporting foreign private issuers to recognize the foreign status of these issuers.[66] By eliminating the provision for Rule 12g3-2(b) issuers, all non-reporting foreign private issuers will be treated similarly under Rule 15c2-11.

Commenters were divided on whether we should amend the provisions of the Rule governing the review of information for non-reporting foreign private issuers.[67] Because the reproposal excludes the securities of many larger foreign issuers from Rule 15c2-11 and also distinguishes between U.S. and foreign accounting standards for those foreign issuers that continue to be covered, many of the reasons for permitting broker-dealers to rely on Rule 12g3-2(b) information have been addressed.

Q26. Should broker-dealers be required to obtain and review the same type of issuer information with respect to non-reporting foreign private issuers providing information under Rule 12g3-2(b) as they must for other non-reporting foreign issuers? Are there reasons to retain a special provision in Rule 15c2-11 for foreign issuers furnishing information under Rule 12g3-2(b)?

Q27. What is the experience of broker-dealers under the Rule when the foreign issuer has not furnished information to the Commission under Rule 12g3-2(b)? How difficult or easy will it be for broker-dealers to obtain the paragraph (c)(6) information for a non-reporting foreign private issuer?

**4. Other non-reporting issuers**

The amendments parallel the Proposing Release in their treatment of non-reporting issuers (i.e., those non-reporting issuers that are not financial institutions covered by paragraph (c)(4)), except for the new exclusions discussed in Part III.A. above and the revisions to the required financial information for non-reporting issuers. As in the Proposing Release, the Rule will require broker-dealers to review more information than currently required about the issuer's outstanding securities; the issuer's insiders, including their disciplinary history; and certain significant events involving the issuer, among other items. This information will provide a broker-dealer that is considering whether to publish quotations for such an issuer greater understanding of the issuer's operations and a better indication of whether potential or actual fraud or manipulation may be present.

**\*18** Several commenters supported the requirement for a broker-dealer to review the disciplinary information about the insiders of non-reporting issuers. One commenter believed that if broker-dealers are allowed to publish quotations without obtaining this disciplinary information, it would create a loophole for issuers to avoid disclosing information that would be of utmost importance and would thereby defeat the goal of the Commission.[68] While no commenters directly opposed the requirement to obtain disciplinary information, several commenters objected to the enhanced information requirements in general as too difficult and burdensome, especially when issuers are unwilling to volunteer information.[69]

Q28. Should the Rule require the disciplinary history information for the insiders of all issuers of covered OTC securities, and not just insiders of non-reporting issuers, on the basis that microcap fraud can involve issuers whose insiders have histories of prior misconduct?

We are proposing to amend the financial information that a broker-dealer must review when publishing quotations of both domestic and foreign non-reporting issuers. The reproposal lists the financial statements required for a domestic issuer, which must be prepared in accordance with U.S. GAAP, and sets forth when these financial statements will be presumed "current" under the Rule. Absent contrary information, a domestic issuer's balance sheet will be considered current if it is as of a date that is less than 15 months before the quotation is published, rather than less than 16 months as now specified in the Rule.[70] This revision comports with existing Exchange Act requirements regarding when a domestic reporting issuer's financial statements are considered current. The reproposal also will require broker-dealers to review the specified financial information for such part of the two preceding fiscal years (in the case of the balance sheet, the preceding fiscal year) that the issuer (or any predecessor) has been in existence.

The reproposal also will revise the requirements with respect to the financial statements that broker-dealers must review when publishing a quotation for a non-reporting foreign private issuer's security. The reproposal lists the financial statements that the broker-dealer must review, which must be prepared in accordance with a comprehensive body of accounting principles, and sets forth when these financial statements will be considered current under the Rule. For a non-reporting

APP. 000527

foreign private issuer, its balance sheet will be presumed current if it is as of a date less than 18 months before the quotation is published.[71] Also, if the balance sheet is as of a date more than 9 months before the quotation is published, the broker-dealer must obtain more current financial information only to the extent that the issuer has prepared it. The broker-dealer must obtain the specified financial information for the two preceding fiscal years (one year with respect to the balance sheet) that the issuer has been in existence.

**\*19** Q29. Are the financial statement requirements, including the presumption regarding when the information is considered current, clear and capable of being complied with by broker-dealers publishing quotations? Should there be longer time periods for the presumption regarding when the financial statements for a non-reporting foreign private issuer are considered current? If so, what time periods would be appropriate?

Q30. Are there any information requirements for non-reporting issuers that should be added or removed from reproposed paragraph (c)(6)?

### D. Information available upon request

We believe that some microcap frauds could be prevented if there were greater investor access to information about those securities and their issuers. Accordingly, we are reproposing, with some revisions, the requirement that a broker-dealer publishing quotations for any covered OTC security make the information promptly available upon request. In response to the Proposing Release, several commenters suggested that we restrict the types of persons and entities to which a broker-dealer must provide the information.[72] The amendments require a broker-dealer to provide information upon request to any current customer, prospective customer, information repository, or other broker-dealer.

A few commenters asserted that broker-dealers should not be required to provide information that already is generally available to the public from other sources (e.g., information for reporting companies that is available on EDGAR).[73] We are addressing these concerns in the amendments by requiring broker-dealers to provide the required information that is not accessible through EDGAR, any other federal or state electronic information system, or an information repository. Further, most commenters responding to this issue were concerned about the cost of providing information to others upon request.[74] We believe that the cost of requiring broker-dealers to make the information available (including to other broker-dealers) upon request is minimal.[75]

The amendments retain in substantial form the clause that providing information to others does not constitute a representation by the broker-dealer that the information is accurate. Rather, providing the information to others constitutes a representation that the information is current in relation to the date the information was reviewed, and that the broker-dealer has a reasonable basis for believing that the information was accurate as of the date recorded and was obtained from reliable sources.

Q31. Should we require broker-dealers to make the information available to anyone who requests it, particularly if broker-dealers are permitted to charge reasonable fees? Should broker-dealers be required to provide information to fewer classes of persons?

### E. Information repository

The amendments, as in the Proposing Release, eliminate the piggyback provision of the Rule. The elimination of the piggyback provision and the potential for increased costs of compliance suggest the desirability of having a data base of information about the non-reporting issuers of covered OTC securities.[76] Such a data base also would enhance the availability of information about little-known issuers to investors, other professionals, and regulators. The consensus among the commenters who specifically addressed this issue was that the creation of a repository would foster access to information about issuers that do not participate in the public disclosure system.[77] For these reasons, we encourage the development of one or more repositories of Rule 15c2-11 information, but we note that the existence of a repository will not be necessary for broker-dealers to comply with the Rule.

**\*20** The amendments establish that the Commission may, upon written application, designate an entity as an information repository.[78] In determining whether to grant or deny such a designation, the Commission will consider whether an entity:

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

APP. 000528

• Collects information about a substantial segment of issuers of securities subject to the Rule;

• Maintains current and accurate information about such issuers;

• Has effective acquisition, retrieval, and dissemination systems;

• Places no inappropriate limits on the issuers from or about which it will accept or request information;

• Provides access to the documents deposited with it to anyone willing and able to pay the applicable fees; and

• Charges reasonable fees.

In general, the Commission will consider whether an entity wishing to act as an information repository is so organized and has the capacity to be able reasonably to obtain and provide to others current information required by the Rule. An information repository will be required to notify the Commission of any material changes in the facts and circumstances of their application for designation as an information repository. In the event that an information repository no longer satisfies these attributes, we may withdraw such designation.

Some commenters suggested that the Commission assume the task of serving as the Rule 15c2-11 information repository.[79] Because the issuers that would be the focus of any information repository generally would not be required to file periodic reports with the Commission, this is not a function that we can assume at this time. The NASD has also advised us preliminarily that it is unable to undertake the responsibility of serving as an information repository at the present time. Therefore, we encourage private sector initiatives for the creation of one or more Rule 15c2-11 information repositories.

Q32. Are there other criteria that should be used to determine the information repository designation?

### F. Definitions

Reproposed paragraph (j) of the Rule sets forth the definitions applicable to all provisions of the Rule. Most of the definitions are unchanged from the Proposing Release, but a few definitions are revised to respond to commenters' suggestions or to add clarity to the amendments.

Quotation Medium. The current definition of "interdealer quotation system" will be incorporated into the definition of "quotation medium" in paragraph (j)(12).[80] This definition of quotation medium is quite inclusive: it covers any publication, alternative trading system (ATS), or other device that is used by brokers or dealers to make known to others their interest in transactions in any security, including offers to buy or sell at a stated price or otherwise, or invitations of offers to buy or sell.[81] A few ATSs expressed concern about whether they would have to comply with the Rule's information review requirements with regard to any covered OTC security that is traded on their systems by broker-dealer subscribers to such ATSs.[82] ATSs are included in the definition of "quotation medium" if they display subscriber orders to any person other than ATS employees. The Rule's information review requirements, however, apply only to the broker-dealers that submit quotations for publication by the ATS, and not to the ATS functioning as the quotation medium for them. The Rule will apply to an ATS only if, as a registered broker-dealer, it displays its own orders in the ATS.

**\*21** An issue has also been raised about whether Rule 15c2-11 applies to broker-dealers submitting orders through an ATS. We understand that some broker-dealers have taken the position that compliance with Rule 15c2-11 is not necessary when they submit an order through an ATS.[83] They have viewed such an order for the security as not constituting a quotation within the meaning of Rule 15c2-11. These orders may represent transactions for the broker-dealer's own account. The Rule's definition of quotation makes clear that the Rule covers any indication of interest by a broker or dealer in receiving bids or offers from others for a security, or any indication by a broker or dealer that it wishes to advertise its general interest in buying or selling a particular security. Thus, broker-dealers are subject to the Rule when they place any indication of interest in any quotation medium, including an ATS, that they wish to receive bids or offers in a covered OTC security, unless they can rely on one of the Rule's exceptions.[84]

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.