Also, we are clarifying the Rule's application to broker-dealers that publish quotations in multiple quotation mediums or move their quotations from one quotation medium to another. If the broker-dealer complies with the Rule's provisions, based upon a review of information, it may publish quotations in one or more quotation mediums.[85]

Net tangible assets. We are proposing to add a definition to the Rule to assist broker-dealers in assessing whether or not a security can meet the proposed exception to the Rule for securities of issuers with net tangible assets exceeding $10 million. Net tangible assets means total assets less intangible assets and liabilities and this determination must be based on the issuer's current financial statements, which must be audited.

## G. Preservation of documents and information

To facilitate compliance with the Rule's recordkeeping requirements, we believe that it is appropriate to codify the Rule's record preservation requirements in Rule 17a-4,[86] rather than in Rule 15c2-11. Rule 17a-4 obligates broker-dealers to preserve documents and information that they must compile pursuant to Commission rules for the time period and in the manner specified in the various provisions of Rule 17a-4. As in the Proposing Release, Rule 17a-4 would be amended to add the information specified in reproposed paragraphs (c), (d), and (e) of Rule 15c2-11 to the other information that broker-dealers are already required to preserve under Rule 17-a4.[87]

With regard to issuer information that is accessible to broker-dealers through our EDGAR system, any other federal or state electronic information system,[88] or an information repository, the amendments provide different requirements. If broker-dealers obtain and review the information contained on such systems, they will not need to preserve such information separately, as long as they document the review and the information is accessible on such system for the same period of time that the broker-dealers are obligated to preserve such information pursuant to Rule 17a-4.

## H. Transition and exemptive authority provisions

**\*22** We are reproposing the transition provision covering quotations by broker-dealers that were initiated prior to the effective date of the proposed amendments and, with a slight modification, the provision giving the Commission the authority to grant exemptions from the Rule.[89] These proposed provisions were viewed as adequate by the few commenters who discussed them.[90]

## I. Information submitted to the NASD

Rule 15c2-11 currently requires any broker-dealer covered by the Rule to submit the information required under paragraph (a)(5) (i.e., for non-reporting issuers) to the interdealer quotation system, in the form prescribed by the system, at least three business days before submitting a quotation for publication. We intend to amend this obligation by requiring broker-dealers to submit the information that they must review only to the NASD, in accordance with the NASD's rules.

The amendments are substantially the same as originally proposed, except for one change. Under the Proposing Release, a broker-dealer would be in compliance with the requirement to obtain current reports filed by a reporting issuer, if the broker-dealer obtained all current reports filed with the Commission by an issuer as of a date up to three business days before the earlier of the date the broker-dealer submitted the quotations to the quotation medium and the date the broker-dealer submitted information to the NASD. To reduce the chance that a broker-dealer would overlook a recently filed report containing material issuer information, we are proposing to eliminate the reference to the date the information was submitted to the NASD. This means that a broker-dealer would be required to obtain current reports filed by a reporting issuer after the broker-dealer had submitted information to the NASD, if such reports were filed more than three business days in advance of the publication of the quotation.

## IV. General Request For Comments

We solicit comment on all aspects of the amendments to Rule 15c2-11, as well as on any other matter that might have an impact on the reproposal discussed above. In particular, we seek comment on the whether the reproposal will help focus the Rule on those securities and quotations most likely to be involved in microcap fraud. Commenters are requested to address whether there are other ways to amend the Rule that would help reduce fraud and manipulation in the OTC market.

APP. 000530

Commenters also are invited to address whether the Rule's text is sufficiently clear and understandable, or whether it can be simplified without sacrificing its purposes. We also request commenters to provide us with their views regarding whether the original proposal, or aspects of it, are preferable to the reproposal.

We encourage commenters to focus on the various provisions of the reproposal and bring to our attention any compliance or other specific issues that they may encounter if the reproposal is adopted. Commenters are urged to provide us with their views as expeditiously as possible so that we can complete our review of Rule 15c2-11.

## V. Effects on Efficiency, Competition, and Capital Formation

**\*23** Section 23(a)(2) of the Exchange Act requires the Commission, in adopting rules under the Exchange Act, to consider the anti-competitive effects of any rules it adopts thereunder, and to not adopt any rule that would impose a burden on competition not necessary or appropriate in the public interest.[91] Furthermore, Section 3(f) of the Exchange Act[92] requires the Commission, when engaged in rulemaking, to consider or determine whether an action is necessary or appropriate in the public interest, and whether the action will promote efficiency, competition, and capital formation.

We preliminarily believe that the reproposal would not have any anti-competitive effects that are not necessary or appropriate in the public interest. By applying the Rule to the first broker-dealer publishing any quotations for a security in a quotation medium and to other broker-dealers publishing priced quotations thereafter, the availability of information about issuers of covered OTC securities should be increased. This should help improve the level of competition among broker-dealers publishing priced quotations and enhance the extent of information about OTC issuers that is available to the investing public. Moreover, by excluding unpriced quotations from the Rule, anti-competitive burdens will be reduced because broker-dealers that cannot, or do not want to, obtain the specified information can still advertise their interest in buying or selling a particular OTC security in a quotation medium. Finally, the reproposal should have a beneficial impact on capital formation because microcap fraud ultimately increases the costs of raising capital for legitimate smaller issuers. Investors may be less willing to commit their resources if they are concerned about fraudulent activities in OTC securities.

We request comments on the benefits, as well as the adverse consequences, that may result with respect to efficiency, competition and capital formation, if the reproposal is adopted.

## VI. Costs and Benefits of the Amendments

We request commenters to evaluate the costs and benefits associated with the amendments to Rule 15c2-11. We have identified certain costs and benefits relating to the reproposal, which are discussed below, and encourage commenters to discuss any additional costs or benefits. In particular, we request comments on the potential costs for any necessary modifications to information gathering, management, and reporting systems or procedures that would be necessary to implement the amendments, as well as any potential benefits resulting from the reproposal for issuers, investors, broker-dealers, securities industry professionals, regulators or others. Commenters should provide analysis and data to support their views on the costs and benefits associated with the amendments.

## A. Benefits

Incidents of microcap fraud frequently involve issuers for which public information is limited.[93] Without information, it is difficult for investors, securities professionals, and others to evaluate the risks presented by these securities. Consequently, many investors fall prey to persons who make false representations and unrealistic predictions about these securities. The publication of quotations by broker-dealers can facilitate the fraudulent promotion of microcap securities.

**\*24** In our view, the reproposal generally would improve the quality of the markets for securities subject to Rule 15c2-11 and would help protect investors from fraudulent schemes involving these securities. The reproposal is focused on the OTC-quoted securities of smaller issuers. Absent the amendments, we believe that some broker-dealers would submit quotations without regard to basic information about relatively unknown issuers. In our view, when broker-dealers must review specified issuer information before publishing priced quotations, they are less likely to become unwitting participants in unlawful schemes of unscrupulous broker-dealers or promoters. Market makers in the securities of legitimate microcap issuers, as well as the issuers themselves, also would benefit from improving the integrity of this market sector. One benefit

APP. 000531

of the reproposal is that the scope of the Rule will be revised so that broker-dealers will not have to obtain information about those securities that satisfy any one the proposed alternative tests.

We also believe that the amendments will serve an important surveillance function. Currently, only the first broker-dealer quoting a security in a quotation medium must gather, review, and preserve the information. The amendments will require the first broker-dealer initiating any quotation and all broker-dealers initiating priced quotations thereafter to satisfy the Rule's information review requirements. Moreover, under NASD Rule 6740,[94] broker-dealers demonstrate their compliance with that rule by filing the Rule 15c2-11 information with the NASD. Recently, the review of Forms 211 filed with the NASD has resulted in a number of Commission trading suspensions and other enforcement actions.

The amendments require broker-dealers publishing quotes in compliance with the Rule to provide the information upon request to any customer, prospective customer, other broker-dealers, or information repository unless the information is available through a government sponsored database. This amendment will help make information about non-reporting issuers more widely available to the public.

We also believe that the amendments will ease significantly the Rule's recordkeeping requirement because broker-dealers will not have to retain information that is available on the Commission's EDGAR system or on the information systems of other federal or state authorities. Access to EDGAR and similar government-sponsored information systems is free on the Internet. Given that approximately 60% of securities on the OTC Bulletin Board and Pink Sheets are issued by reporting companies, whose reports are included on EDGAR, a significant recordkeeping costy savings to broker-dealers should result.

We do not have the data to quantify the value of the benefits described above. We seek comments on the value of these benefits and on any benefits, not already identified, that may result from the adoption of the amendments.

**B. Costs**

**\*25** We anticipate that the elimination of the piggyback provision will create the most significant costs that the industry will incur. Currently, only those broker-dealers that publish quotations during the first 30 days of the security's trading are required to obtain and review the specified information before they initiate quotations. As reproposed, the Rule will continue to require the first broker-dealer, before initiating a priced or unpriced quotation for a covered OTC security in a quotation medium, to review the specified information. Thereafter, the reproposed Rule will impose the review requirement only on broker-dealers publishing priced quotations, including in connection with the annual review requirement. Of course, if the Commission suspends trading under Exchange Act Section 12(k) for any of the issuer's securities, the Rule's requirements are triggered.

The first broker-dealer, before initiating any quotation for a covered OTC security, is currently required to incur the cost of having to gather and review the issuer information. As a result of the amendments, that broker-dealer will incur the cost to update that information annually if it continues to publish priced quotations. Thereafter, any broker-dealer publishing priced quotations for a covered OTC security will incur costs when it first publishes a priced quotation and when it conducts the required annual review. To the extent a broker-dealer does not already have the required information, it will incur costs for the collection and review of this information. Moreover, a broker-dealer also will incur costs associated with creating the records required by the Rule and retaining the Rule's required information for the specified period of time under the amendment to Rule 17a-4.

We estimate that approximately 60% of the issuers of OTC stocks are reporting issuers, while the remaining 40% are non-reporting issuers. Based on this assumption, broker-dealers publishing priced quotations for the OTC securities of reporting issuers should be able to obtain the prescribed information required by the reproposed Rule from the Commission's EDGAR system and therefore should incur minimal costs to comply with the Rule. We believe that it will take a broker-dealer a maximum of 4 hours to collect, review, record, retain, and supply to the NASD the information pertaining to a reporting issuer, and a maximum of 8 hours to collect, review, record, retain, and supply to the NASD the information pertaining to a non-reporting issuer.[95] We estimate that it will cost a broker-dealer an average cost of \$40 per hour (based on a blended compensation rate for clerical and supervisory compliance staff) to obtain and review the necessary information required by the Rule.[96]

We recently approved changes to NASD Rules 6539 and 6540 to limit the quotations on the OTC Bulletin Board to securities of issuers that are current in their reports filed with us or other regulatory authority, and to prohibit NASD members from quoting a security on the OTC Bulletin Board unless the issuer has made current filings with us.[97] While these NASD Rule changes may result in more issuers choosing to become reporting issuers in order to continue to qualify for quotation on the OTC Bulletin Board, we are at this time unable to adequately quantify the cost impact or burden that the reproposal imposes in relation to these rule changes. However, we believe that, generally, any increase in the number of reporting issuers subject to the Rule will cause a reduction in the number of the burden hours and associated costs. We are of the view that because reporting issuer information is readily available from the Commission's EDGAR system and, because we estimate that broker-dealers only have to spend 4 hours reviewing reporting issuer information, instead of the estimated 8 hours to review non-reporting issuer information, the reduced time spent reviewing issuer information will result in lower costs to broker-dealers.

**\*26** However, broker-dealers publishing priced quotations for the OTC securities of non-reporting issuers are likely to incur greater costs in complying with the Rule. For purposes of the Paperwork Reduction Act, we estimate the total burden hours for all broker-dealers to be 143,278 hours and the total cost to be $5,731,120. Some broker-dealers may not want to expend the time or the cost to obtain the non-reporting issuer information and may therefore choose not to publish priced quotes. On the other hand, the costs broker-dealers incur in obtaining and reviewing information about non-reporting issuers may be reduced if one or more on-line information repositories of this information are established. We seek comments on the reasonableness of these estimates for annual hourly and dollar costs to broker-dealers. We also seek comments on the extent to which these cost estimates will be affected by the new NASD rule to limit the OTC Bulletin Board to the securities of issuers current in their periodic filings.

Although Rule 15c2-11 does not regulate issuers, there may be some indirect costs imposed on issuers, particularly non-reporting issuers, because they may be contacted by broker-dealers to provide the information specified in the Rule. Non-reporting issuers would incur the cost of having to collect and provide the requested information to each requesting broker-dealer. However, we are assuming that non-reporting issuers maintain their financial information in compliance with prevailing accounting standards and, in most instances, would have available updated financial information prepared in accordance with generally accepted accounting principles (GAAP). The NASD has informed us that financial statements submitted with the Form 211 generally are prepared in accordance with GAAP, and many are audited.

Regarding start-up, operating, and maintenance costs, we believe that broker-dealers that collect, review, and retain the information currently required by the Rule, would incur only marginal start-up, operating, and maintenance costs (i.e., to expand systems already in place) to comply with the Rule as reproposed. Further, some broker-dealers already may be collecting the required information for other purposes. However, we believe that some broker-dealers may not have adequate systems in place to retain issuer information and would, therefore, incur start-up, operating, and maintenance costs in order to comply with the requirements of the amendments.

We estimate that about 100 broker-dealers in the aggregate will incur start-up, operating, and maintenance costs of $100,000 ($1,000 x 100) associated with reporting issuer information, and $400,000 ($4,000 x 100) associated with non-reporting issuer information. Total start-up, operating and maintenance cost burden for broker-dealers is estimated to be $500,000 ($100,000 + $400,000) or an average of $5,000 for each broker-dealer.

We assume that non-reporting issuers, because they generally maintain their financial information in compliance with prevailing accounting standards, will not incur any start-up costs to prepare the required information in response to broker-dealers' requests. We also believe that reporting issuers of covered OTC securities will not incur start-up costs as a result of the amendments since such issuers already provide the required information to the Commission under the federal securities laws. Therefore, we believe issuers will not incur start-up costs as a consequence of the adoption of the Rule amendments, as reproposed.

**\*27** Finally, the Rule, as modified by the amendments, could affect the liquidity of some securities. If broker-dealers are unable to obtain the required issuer information, they would have to refrain from publishing priced quotations in that security. This could make it somewhat more difficult for investors to determine what prices other market participants are willing to bid or offer for the security, although they could call a broker-dealer publishing a name-only quotation to obtain a priced quotation. Thus, while investors are still able to obtain price information, the cost of obtaining this information may increase.

APP. 000533

However, under the reproposal, after the first quotation for a security is published, broker-dealers could publish unpriced quotes without complying with the Rule's provisions. In addition, broker-dealers could rely on the exception that permits them to publish quotes representing unsolicited customer orders.

Any effect on liquidity must be weighed against the benefit of reducing instances of fraud or manipulation. Greater investor access to information should result in more informed investor decisions and potentially could result in additional trading, and thus liquidity, for covered OTC securities. We have modified the proposals to permit broker-dealers to publish unpriced quotations for OTC securities without reviewing the specified information (other than the first broker-dealer to quote the security). This revision responds to the views of those commenters that expressed concerns about the Rule's impact on liquidity.

**VII. Initial Regulatory Flexibility Act**

We have prepared an Initial Regulatory Flexibility Analysis (IRFA)[98] regarding the amendments to Rule 15c2-11 and the reproposed companion amendment to Rule 17a-4 under the Exchange Act. The following summarizes the IRFA.

As discussed in the IRFA, the amendments specify the information that a broker-dealer must gather and review before publishing quotations for covered OTC securities. The reproposed Rule is intended to prevent broker-dealers from publishing quotations for covered OTC securities in a quotation medium without obtaining, reviewing, and retaining current information about the issuer. The reproposed Rule applies primarily to priced quotations.

The amendments to the Rule would affect all broker-dealers, including a number of small broker-dealers, seeking to publish quotations for covered OTC securities.[99] The number of small broker-dealers that submit quotations for covered OTC securities in quotation mediums is not known at this time. However, we recently estimated that about 13% of all registered broker-dealers would be characterized as small.[100] We estimate that, at any given time, there are approximately 400 broker-dealers, including small broker-dealers, that submit quotations for covered OTC securities. Therefore, based on this estimate, we believe that approximately 52 small broker-dealers (400 x 13%) would be affected by the amendments. In fact, it is possible that few, if any, broker-dealers publishing quotations for covered OTC securities would be classified as a small business, because as market makers they typically require more than $500,000 in capital to support their market making activities. In the Proposing Release, we solicited but did not receive any comments on the number of small broker-dealers that would be affected by the amendments. We are again soliciting comments on the number of small broker-dealers that would be affected by the amendments.

**\*28** The amendments would indirectly have an impact on those small issuers that may be requested to provide the information required by the Rule to broker-dealers publishing quotations in those issuers' securities. Based on Exchange Act Rule 0-10(a), a small issuer is one that on the last day of its most recent fiscal year had total assets of $5,000,000 or less. In the Proposing Release, we solicited but did not receive any comments on the total number of issuers of covered OTC securities; the number (or percentages) of these issuers that are small issuers; and the total number (or percentage) of small issuers of covered OTC securities that are reporting and non-reporting issuers, respectively. We are again seeking comments on these issues.

The IRFA notes that the availability of the Commission's EDGAR system and similar systems sponsored by federal or state authorities should assist broker-dealers in collecting and reviewing the reports required by the Rule. In addition, the prevalent use of computers and the Internet, on which access to EDGAR is free, should also reduce the recordkeeping and compliance costs for all broker-dealers by automating the information collection and retention process.

The IRFA recognizes that the amendments indirectly affect certain issuers, particularly non-reporting issuers. The amendments would require the first broker-dealer to publish any quotation for a covered security to review the Rule's information. Thereafter, other broker-dealers must review information about the issuer when they first publish or resume publishing a priced quotation for a covered security, and all broker-dealers publishing priced quotations must conduct an annual review. We are not aware of any information repository, electronically accessible or otherwise, now in existence that covers all of the information about non-reporting issuers that broker-dealers must gather to comply with the Rule. Consequently, non-reporting issuers must collect and provide the required information to each requesting broker-dealer. We assume that non-reporting issuers maintain their financial information in compliance with generally accepted accounting

APP. 000534

standards and that the costs incurred by non-reporting issuers to prepare the necessary information in response to broker-dealers' requests would be minimal.

The IRFA discusses the kinds of possible alternative proposals that we have considered. These include, among others, creating differing compliance or reporting requirements or timetables that take into account the resources available to small entities, and whether such entities could be exempted from the reproposed rule, or any part thereof. Therefore, having considered the foregoing alternatives in the context of the amendments, we do not believe they would accomplish the stated objectives of the proposal.

We encourage the submission of written comments regarding any aspect of the IRFA. In particular, we seek comments on: (i) the number of small entities that would be affected by the amendments, including the number of small broker-dealers and issuers; (ii) the number of small entities that are issuers of covered OTC securities; and (iii) the number of small entities that are reporting and non-reporting issuers of covered securities, respectively. Comments should also specify the costs of compliance with the amendments, and suggest alternatives that would meet the objectives of the amendments in a more effective manner, while imposing costs equal to or less than the amendments. In describing the nature of any impact that the amendments would have, empirical data supporting these views should be provided.

**\*29** For purposes of the Small Business Regulatory Enforcement Fairness Act of 1996, we are also requesting information regarding the potential impact of the proposed amendments on the economy on an annual basis. In particular, comments should address whether the proposed changes, if adopted, would have a \$100,000,000 annual effect on the economy, cause a major increase in costs or prices, or have a significant adverse effect on competition, investment, or innovations. Commenters should provide empirical data to support their views.

Comments should be submitted in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549. Comments may also be submitted electronically at the following E-mail address: rule-comments@sec.gov. All comment letters should refer to File No. S7-5-99; this file number should be included on the subject line if E-mail is used. Comment letters will be available for public inspection and copying the Commission's Public Reference Room, 450 Fifth Street, N.W., Washington, D.C. 20549. Electronically submitted comment letters will also be posted on the Commission's Internet website (http://www.sec.gov).

A copy of the Initial Regulatory Flexibility Analysis may be obtained by contacting Chester A. McPherson, Office of Risk Management and Control, Division of Market Regulation, Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549, at (202) 942-0772.

**VIII. Paperwork Reduction Act**

Certain provisions of the amendments contain "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995 (PRA).[101] The title for the collection of information is: "Publication or submission of quotations without specified information." Accordingly, the collection of information requirements contained in the Rule and the initial proposal were submitted to the Office of Management and Budget (OMB) for review, in accordance with 44 U.S.C. 3507(d) and 5 CFR 1320.11, and were approved by OMB. The Rule has been assigned OMB Control No. 3235-0202.[102]

**A. Collection of information under the amendments**

As reproposed, the Rule would require the first broker-dealer, before initiating a priced or unpriced quotation for a covered OTC security in a quotation medium, to gather and review the issuer information, and to review updated information annually if it continues to publish priced quotations. This review requirement would also be imposed on any other broker-dealer publishing a priced quotation for a covered OTC security. Broker-dealers submitting priced quotations for the security would be required to collect, review, and retain the Rule's specified information annually. Broker-dealers would also have to record the sources of their information, the date their review occurred, and the person responsible for the review. Also, the proposals would require broker-dealers publishing quotations for a covered OTC security to collect, review, and retain more information than is required currently.

**\*30** Under Rule 15c2-11, the information that is collected pursuant to the Rule must be submitted to the NASD at least three

APP. 000535

business days before any quotation is published.[103] Finally, the amendments would require broker-dealers to provide the information specified to any customer, prospective customer, other broker-dealer or information repository that requests it.

## B. Proposed use of information

Broker-dealers must collect and review the information required under the amendments if they publish the first quotation for a covered OTC security or if they publish priced quotations. Moreover, the Rule requires that broker-dealers have a reasonable basis for believing that the information about the issuer and related persons is accurate and from reliable sources. This information collection protects investors by deterring fraudulent or manipulative quotations for thinly-traded securities whose issuers are relatively unknown. Because information about these issuers is not widely disseminated and often is not current, fraudulent and manipulative schemes are easier to perpetrate. Moreover, this collection of information helps broker-dealers guard against becoming unwitting participants in fraudulent or manipulative schemes. The Rule 15c2-11 information gathering requirements also serve an important surveillance function for both the Commission and the NASD. Recently, the Commission has used the Rule 15c2-11 information to suspend trading in the issuers' securities pursuant to Section 12(k) of the Exchange Act where publicly available information about the issuer raised questions about the accuracy and adequacy of the issuers' disclosures.

## C. Respondents

The amendments would apply to those broker-dealers that publish quotations for a covered OTC security in a quotation medium as of specified quotation events. The amendments also indirectly affect issuers that are asked by broker-dealers to provide this information. Most of the Rule 15c2-11 information that would be required for issuers that publicly file periodic reports with the Commission (reporting issuers) is available electronically on EDGAR or through the Internet. Thus, the reproposal is likely to have a greater paperwork burden when broker-dealers publish quotations for the securities of issuers that do not participate in the Commission's public reporting program, (i.e., non-reporting issuers) or do not file reports with other federal or state regulatory authorities.

## D. Total annual reporting and recordkeeping burden

The amendments would require broker-dealers to collect, review, retain, and record certain issuer and supplemental information when they are the first broker-dealer to quote the security; when they first publish priced quotations for a covered OTC security; and if they are publishing priced quotations as of the annual review requirement. The discussion below estimates the collection of information burden one year after the anticipated date of effectiveness of the amendments when broker-dealers that publish quotes for covered OTC securities qualifying for the reproposed transition provision must fully comply with the Rule's information requirements. The discussion below also provides estimates for the same period for issuers that may be contacted to provide the information. In particular, the following analysis measures the cost to broker-dealers of: (1) collecting, reviewing, recording, and retaining the required issuer information and supplying it to the NASD; (2) responding to requests for issuer information from customers, prospective customers, other broker-dealers and information repositories; and (3) starting-up or maintaining systems for the collection and retention of issuer information. The analysis below also addresses the indirect cost to issuers who must furnish information to requesting broker-dealers.

### 1. Burden-hours for broker-dealers

**\*31** Based on information provided by the NASD and NQB, we estimate that as of December 31, 1998, there were approximately 6,625 covered OTC securities quoted in the OTC Bulletin Board and 3,225 quoted in the Pink Sheets for a total of 9,850 covered OTC securities.[104] We also believe that approximately 10% (985) of these securities would not be subject to the Rule, based on the exceptions that are included in this reproposing Release and that approximately 8,865 securities would be subject to the Rule. According to NASD estimates, we also believe that approximately 1,400 new applications from broker-dealers to initiate or resume publication of covered equity securities in the OTC Bulletin Board and/or the Pink Sheets or other quotation mediums were approved by the NASD for the 1998 calendar year. We have estimated that 60% of the covered OTC securities were issued by reporting issuers, while the other 40% were issued by non-reporting issuers. We also estimate that broker-dealers publish priced quotations for approximately 90% of the covered OTC securities quoted in the OTC Bulletin Board and publish priced quotes for about 10% of the covered OTC securities quoted in the Pink Sheets. According to NASD and NQB estimates, we believe that, on average, there are approximately 4.3

broker-dealers publishing priced quotations for each covered OTC security, and that at any given time there are no more than 400 broker-dealers that submit priced quotations for covered OTC securities. Finally, the reproposed Rule's transition provision would not subject the broker-dealers quoting the securities of the estimated 8,865 potentially covered securities currently quoted in the OTC Bulletin Board and/or the Pink Sheets until the annual review requirement is triggered. Therefore, only those new applications that are submitted after the reproposal becomes effective would be subject to the initial review requirement.

Because the amendments would require the first broker-dealer publishing a quotation, priced or unpriced, for a particular security to collect issuer information, we believe that during the first year after the amendments are effective, broker-dealers that are publishing the first quotations (whether priced or unpriced) for covered OTC securities in the aggregate would have to conduct approximately 1,260 initial reviews of issuer information.[105] We believe that it will take a broker-dealer about 4 hours to collect, review, record, retain, and supply to the NASD the information pertaining to a reporting issuer, and about 8 hours to collect, review, record, retain, and supply to the NASD the information pertaining to a non-reporting issuer.

We therefore estimate that after the reproposal has become effective, the broker-dealers who are the first to publish the first quote for a covered OTC security of a reporting issuer (priced or unpriced) will require 3,024 hours (1,260 x 60% x 4) to collect, review, record, retain, and supply to the NASD the information required by the Rule as reproposed. We estimate that after the reproposal has become effective the broker-dealers who are the first to publish the first quote for a covered OTC security of a non-reporting issuer (priced or unpriced) will require 4,032 hours (1,260 x 40% x 8) to collect, review, record, retain, and supply to the NASD the information required by the Rule as reproposed. We therefore estimate the total annual burden hours for the first broker-dealers to be 7,056 hours (3,024 + 4,032).

**\*32** The Rule also would require an annual review for broker-dealers publishing priced quotations for covered OTC securities. We have estimated that each issuer is quoted by about 4.3 broker-dealers. We are assuming that of the universe of approximately 8,865 potentially affected covered OTC securities, broker-dealers would publish priced quotations for approximately 90% of the OTC Bulletin Board securities or 5,366 securities ((6,625 x 90%) x 90%) and for 10% of the Pink Sheet securities or 290 securities (3,225 x 90%) x 10%).[106] Therefore, we estimate that priced quotations will be published for approximately 5,656 (5,366 + 290) covered OTC securities. Given that about 60% of OTC stocks are issued by reporting issuers and the other 40% by non-reporting issuers, and that it would take a broker-dealer 4 and 8 hours, respectively, to meet the requirements of the reproposed Rule for these issuers, we estimate the burden hours as follows: for reporting issuers we estimate approximately 58,375 hours (3,394 x 4.3 x 4), and for non-reporting issuers we estimate approximately 77,847 hours (2,263 x 4.3 x 8). Therefore, we estimate the total annual paperwork burden hours for all broker-dealers to be 143,278 hours (7,056 + 58,375 + 77,847).

## 2. Burden-hours for issuers

Regarding the burden on issuers to provide broker-dealers with the required information, we believe that the 5,319 issuers of covered OTC securities (based on our estimate that 60% of the 8,865 potentially covered OTC securities are reporting issuers) will not bear any additional hourly burdens under the amendments because these issuers already report the required information to the Commission through mandated periodic filings. Further, reporting issuer information is widely available to broker-dealers through a variety of media. However, non-reporting issuer information is not widely available. Consequently, these issuers must provide the information required by the amendments to requesting broker-dealers before quotations in their securities can be published. We believe that the 3,546 issuers of non-reporting covered OTC securities (based on an estimate that 40% of the 8,865 potentially covered OTC securities are non-reporting) will spend an average of 9 hours each to collect, prepare, and supply the information required by the proposals to the first broker-dealer that requests this information. Thereafter, we estimate that it will take an average of 1 hour for an issuer to provide the same information to the remaining 3.3 broker-dealers that request the information. Accordingly, we estimate the 3,546 non-reporting issuers annually will incur 31,914 hours (3,546 x 9 x 1) to comply with the first broker-dealer's request for information, and 11,702 hours (3,546 x 1 x 3.3) to comply with the subsequent 3.3 broker-dealer requests for an annual total of 43,616 burden hours (31,914 + 11,702). On average, therefore, each non-reporting issuer would spend approximately 12.3 burden hours (43,616/3,546) per year to comply with these requests.

## 3. Total burden-hour costs to broker-dealers and issuers

**\*33** We estimate the collection of information will require approximately 186,894 burden hours annually (143,278 + 43,616) from approximately 3,946 respondents (400 broker-dealers and 3,546 issuers).

### 4. Capital cost to broker-dealers and issuers

We believe that broker-dealers that now collect, review, and retain the information required by the current Rule will not incur any significant start-up costs to expand systems already in place. Further, broker-dealers that are collecting the information required by the proposals for other purposes also will not incur significant start-up costs. However, we believe some broker-dealers may not have adequate systems in place to retain issuer information and will incur start-up costs in order to comply with the requirements of the amendments. We assume that of the 400 broker-dealers that provide quotations for covered OTC securities, about 100 broker-dealers will incur additional start-up costs, while the remaining 300 broker-dealers will only incur incremental costs. Because the information for reporting issuers will be generally available on EDGAR and such availability satisfies the recordkeeping requirements of the proposals, we are assuming that the start-up costs associated with retaining information on reporting issuers will average $1,000 per broker-dealer, whereas the same costs will be $4,000 per broker-dealer for non-reporting issuer information. We estimate that broker-dealers in the aggregate will incur start-up, operating, and maintenance costs of $100,000 ($1,000 x 100) associated with reporting issuer information, and $400,000 ($4,000 x 100) associated with non-reporting issuer information. Total start-up, operating and maintenance cost burden for broker-dealers is estimated to be $500,000 ($100,000 + $400,000) or an average of $5,000 for each broker-dealer.

We assume that non-reporting issuers, because they maintain their financial information in compliance with prevailing accounting standards, will not incur any start-up costs to prepare the required information in response to broker-dealers' requests. We also believe that reporting issuers of covered OTC securities will not incur start-up costs as a result of the amendments since such issuers already provide the required information to the Commission under the federal securities laws. Therefore, we believe issuers will not incur start-up costs as a consequence of the adoption of the rule amendments, as reproposed.

### E. General information about the collection of information

The collection of information under the amendments is mandatory and would be required at periodic intervals: by the first broker-dealer to publish any quote for a covered OTC security, by broker-dealers publishing priced quotes thereafter, and by broker-dealers publishing priced quotes at the time of the annual review requirement. Broker-dealers would be required to retain the information they collect for a period of not less than three years. Information collected under the Rule would not be kept confidential. Any agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid control number

### F. Request for comments

**\*34** Pursuant to 44 U.S.C. § 3506(c)(2)(B), we are soliciting comments to:

(i) evaluate whether the reproposed collection of information is necessary for the proposed performance of the functions of the agency, including whether the information will have practical utility;

(ii) evaluate the accuracy of our estimates of the burden of the reproposed collection of information;

(iii) enhance the quality, utility, and clarity of the information to be collected; and

(iv) minimize the burden of collection of information on those who are to respond, including through the use of automated collection techniques or other forms of information technology. We seek data about quotations for covered OTC securities in OTC quotation mediums other than the OTC Bulletin Board and the Pink Sheets. We seek comments on our estimate of the number of issuers affected by the reproposed Rule and on the time estimates made for broker-dealers and issuers to comply with the information collection requirements.

Persons desiring to submit comments on the collection of information requirements should direct them to the Office of Management and Budget, Attention: Desk Officer for the Securities and Exchange Commission, Office of Information and

APP. 000538

Regulatory Affairs, Room 10102, New Executive Office Building, Washington, D.C. 20503, and should also send a copy of their comments to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549, and refer to File No. S7-5-99. OMB is required to make a decision concerning the collections of information between 30 and 60 days after publication of this release in the Federal Register, so a comment to OMB is best assured of having its full effect if OMB receives it within 30 days of this publication.

### IX. Statutory Basis and Text of Proposed Amendments and Rule

The rule amendments are being proposed pursuant to Sections 3, 10(b), 15(c), 15(g), 17(a), and 23(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78c, 78j(b), 78*o*(c), 78*o*(g), 78q(a), and 78w(a).

### LIST OF SUBJECTS IN 17 CFR PART 240

Broker-dealers, Fraud, Reporting and recordkeeping requirements, Securities.

### Text of Reproposed Rule

In accordance with the foregoing, Title 17, chapter II, part 240 of the Code of Federal Regulations is proposed to be amended as follows:

### PART 240-GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934

1. The authority citation for part 240 continues to read, in part, as follows:

**Authority:**15 U.S.C. §§ 77c, 77d, 77g, 77j, 77s, 77z-2, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78d, 78f, 78i, 78j, 78j-1, 78k, 78k-1, 78l, 78m, 78n, 78*o*, 78p, 78q, 78s, 78u-5, 78w, 78x, 78ll(d), 78mm, 79q, 79t, 80a-20, 80a-23, 80a-29, 80a-37, 80b-3, 80b-4 and 80b-11, unless otherwise noted.

\*\*\*\*\*

2. Section 240.15c2-11 and the section heading are revised to read as follows:

### §240.15c2-11 Publication or submission of quotations without current information.

**\*35**Preliminary Note: As a means reasonably designed to prevent fraudulent, deceptive, or manipulative acts or practices, this section prevents a broker or dealer from publishing a quotation for a security or, directly or indirectly, submitting a quotation for a security for publication in a quotation medium, unless the broker or dealer complies with the provisions of this section or relies on an exception contained in paragraph (h) of this section. As used in this section, the term "you" refers to a broker or dealer.

(a) When a broker or dealer must comply with this section. You must comply with paragraph (b) of this section when you publish:

(1) The first quotation for a security;

(2) The first quotation following the termination of a Commission trading suspension ordered pursuant to section 12(k) of the Act (15 U.S.C. 78 l(k)) in any security of the issuer of the suspended security;

(3) Your first quotation at a specified price for the same security after another broker or dealer publishes the first quotation for a security as described in paragraph (a)(1) or (a)(2) of this section;

(4) A quotation at a specified price for a security after a period of five or more consecutive business days when you did not publish any quotations at a specified price for that security;

APP. 000539

(5) Your first quotation at a specified price for a security after the date that is four months after the end of the issuer's fiscal year, unless the issuer is a foreign private issuer; or

(6) Your first quotation at a specified price for a security of a foreign private issuer after the date that is seven months after the end of the issuer's fiscal year.

(b) The steps a broker or dealer must take to comply with this section. For each security in which you publish any of the quotations listed in paragraph (a) of this section, you must:

(1) Review the issuer information described in paragraph (c) of this section and the supplemental information described in paragraph (d) of this section;

(2) Determine that you have a reasonable basis under the circumstances for believing that the issuer information described in paragraph (c) of this section, when considered in conjunction with the supplemental information described in paragraph (d) of this section, is accurate in all material respects and was obtained from reliable sources;

(3) Make a record of:

(i) The issuer information described in paragraph (c) of this section, the supplemental information described in paragraph (d) of this section, and the sources from which you obtained the information. You will be considered to have obtained the issuer information described in paragraphs (c) or (d)(1) of this section if you obtained it through the EDGAR system, any other federal or state electronic information system, or an electronic information system operated by an information repository, and you have the means to access the information for the period required under § 240.17a-4(b)(11);

**36** (ii) Any significant relationship information described in paragraph (e) of this section;

(iii) The date that you reviewed the information described in paragraphs (c), (d), and (e) of this section; and

(iv) The person responsible for your compliance with the requirements of this section; and

(4) Preserve the records required to be made under paragraph (b)(3) of this section in accordance with § 240.17a-4(b)(11).

(c) The issuer information that a broker or dealer must review. The type of information that is considered "issuer information" and that must be reviewed under paragraph (b) of this section depends on the status of the issuer.

(1) Issuers with a recent public offering. If the issuer filed a registration statement under the Securities Act (other than a registration statement on Form F-6 (17 CFR 239.36)) that became effective less than 90 calendar days before you publish the quotation, and that is not the subject of a stop order, the issuer information is the prospectus specified by section 10(a) of the Securities Act (15 U.S.C. 77j(a)).

(2) Issuers with a recent Regulation A offering. If the issuer filed a notification under Regulation A under the Securities Act (17 CFR 230.251 through 230.263) and was authorized to commence the offering less than 40 calendar days before you publish a quotation, and the offering circular provided for under Regulation A is not the subject of a suspension order, the issuer information is the offering circular.

(3) Certain reporting issuers. If the issuer is current in filing annual or semi-annual reports required under section 13 or 15(d) of the Act (15 U.S.C. 78m or 78o(d)) or section 30(a) of the Investment Company Act of 1940 (15 U.S.C. 80a-29(a)), the issuer information is the issuer's most recent annual or semi-annual report and any quarterly and current reports filed by the issuer after such annual or semi-annual report. You will be considered in compliance with the requirement to obtain current reports filed by the issuer if you obtain all current reports filed by that issuer as of the date that is three business days before you publish the quotation. However, until the issuer has filed its first annual or semi-annual report, the issuer information is:

(i) The prospectus specified by section 10(a) of the Securities Act (15 U.S.C. 77j(a)) that was included in a registration statement filed by the issuer under the Securities Act and that became effective within the prior 15 months; or

(ii) The registration statement filed by the issuer under section 12 of the Act (15 U.S.C. 78l) that became effective within the prior 15 months (other than a registration statement on Form F-6 (17 CFR 239.36)), and any quarterly and current reports filed by the issuer after the registration statement became effective.

(4) Certain financial institutions. If the issuer is not required to file reports under sections 13 or 15(d) of the Act and is a bank or savings association, as those terms are defined in 12 U.S.C. 1813, the issuer information is the issuer's most recent annual report and any subsequent reports filed with the issuer's appropriate Federal banking agency or State bank supervisor, as those terms are defined in 12 U.S.C. 1813.

**\*37** (5) Certain exempted insurance companies. If the issuer is exempt from section 12(g) of the Act (15 U.S.C. 78l(g)) by complying with section 12(g)(2)(G) of the Act (15 U.S.C. 78l(g)(2)(G)), the issuer information is the issuer's most recent annual statement referred to in section 12(g)(2)(G)(i) of the Act (15 U.S.C. 78l(g)(2)(G)(i)).

(6) Other issuers. If the issuer is not covered by paragraphs (c)(1) through (c)(5) of this section, the issuer information is the information listed below in paragraphs (c)(6)(i) through (c)(6)(xiii) of this section. Except as specified in paragraph (c)(6)(xiii) of this section, this information is presumed to be current if it is as of a date within 12 months before you publish the quotation and must be the most current information that you know or have reason to know is available:

(i) The exact name of the issuer and any predecessor;

(ii) The address and telephone number of the issuer's principal executive offices;

(iii) The state of incorporation of the issuer, if it is a corporation;

(iv) The date on which the issuer's fiscal year ends;

(v) For each class of the issuer's securities outstanding:

(A) The exact title of the security;

(B) The par or stated value of the security;

(C) The number of securities or total principal amount outstanding of the security;

(D) The class and number of securities issuable upon the security's exercise, exchange or conversion, if applicable; and

(E) The total number of securityholders of record for the security as of the end of the issuer's most recent fiscal year or a more recent date;

(vi) The exact title and class of the security to be quoted;

(vii) The name, address and telephone number of the transfer agent;

(viii) A description of the issuer's business and facilities;

(ix) A description of the issuer's products or services;

(x) The full names and business addresses of the executive officers, directors, general partners, promoters, and control persons of the issuer, and the number of securities of each class of the issuer's securities that are beneficially owned by each such person as of the end of the issuer's last fiscal year or a more recent date;

(xi) The following information:

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

(A) A description of any of the following actions to which any executive officer, director, general partner, promoter, or control person of the issuer has been the subject during the prior five years:

(1) A conviction in a criminal proceeding or named as a defendant in a pending criminal proceeding (excluding traffic violations and other minor offenses);

(2) The entry of an order, judgment, or decree, not subsequently reversed, suspended or vacated, by a court of competent jurisdiction that permanently or temporarily enjoins, bars, suspends or otherwise limits involvement in any type of business, securities, commodities, or banking activities;

(3) A finding or judgment by a court of competent jurisdiction (in a civil action), the Commission, the Commodity Futures Trading Commission, or a state securities regulator of a violation of federal or state securities or commodities law, which has not been reversed, suspended, or vacated; and

**\*38** (4) The entry of an order by a self-regulatory organization that permanently or temporarily bars, suspends or otherwise limits involvement in any type of business or securities activities; or

(B) A statement from the issuer that no executive officer, director, general partner, promoter, or control person of the issuer is the subject of any of the actions listed in paragraphs (c)(6)(xi)(A)(1) through (4) of this section; or

(C) A description of the steps you have taken to obtain from the issuer the information needed to comply with paragraphs (c)(6)(xi)(A) or (c)(6)(xi)(B) of this section and a statement that the issuer failed or refused to provide this information;

(xii) The following information:

(A) A description of any of the following events involving the issuer, its predecessor, or any of its majority-owned subsidiaries that occurred in the prior two years:

(1) A change in control;

(2) An increase of 10 percent or more of the same class of outstanding equity securities;

(3) A merger, acquisition, or business combination;

(4) An acquisition or disposition of significant assets;

(5) A bankruptcy proceeding; and

(6) The delisting of securities by any securities exchange or Nasdaq; or

(B) A statement from the issuer that the issuer, its predecessor, and its majority-owned subsidiaries have not been the subject of any of the actions or events listed in paragraphs (c)(6)(xii)(A)(1) through (6) of this section; or

(C) A description of the steps you have taken to obtain from the issuer the information needed to comply with paragraphs (c)(6)(xii)(A) or (c)(6)(xii)(B) of this section and that the issuer failed or refused to provide this information; and

(xiii) The financial information listed below in paragraphs (c)(6)(xiii)(A) or (c)(6)(xiii)(B) and (c)(6)(xiii)(C) of this section:

(A) If the issuer is not a foreign private issuer, the issuer's most recent balance sheet, statement of cash flows, statement of comprehensive income, and statement of operations (income), prepared in accordance with U.S. generally accepted accounting principles. Unless you know or have reason to know that more current information is available, this information will be presumed to be current if:

(1) The balance sheet is as of a date that is less than 15 months before you publish the quotation;

APP. 000542

(2) The statement of cash flows, statement of comprehensive income, and statement of operations (income) are for the 12 months preceding the date of such balance sheet; and

(3) If the balance sheet is as of a date that is more than 6 months before you publish the quotation, it must be accompanied by an additional statement of cash flows, statement of comprehensive income, and statement of operations (income) for the period from the date of such balance sheet to a date that is less than 6 months before you publish the quotation.

(B) If the issuer is a foreign private issuer, the issuer's most recent balance sheet and statement of operations (income), and to the extent prepared by the issuer, statement of cash flows, statement of comprehensive income, and statement of changes in shareholders' equity, prepared in accordance with a comprehensive body of accounting principles. Unless you know or have reason to know that more current information is available, this information will be considered current if:

**\*39** (1) The balance sheet is as of a date that is less than 18 months before you publish the quotation;

(2) The statement of cash flows, statement of comprehensive income, statement of operations (income), and statement of changes in shareholders' equity are for the 12 months preceding the date of such balance sheet; and

(3) If the balance sheet is as of a date that is more than 9 months before you publish the quotation, it must be accompanied by an additional statement of cash flows, statement of comprehensive income, statement of operations (income), and statement of changes in shareholders' equity for the period from the date of such balance sheet until a date that is less than 9 months before you publish the quotation, if any such statements have been prepared by the issuer.

(C) The same financial information required by paragraph (c)(6)(xiii)(A) and (B) of this section for such part of the two preceding fiscal years as the issuer or any predecessor has been in existence (one year with respect to the balance sheet), prepared in accordance with U.S. generally accepted accounting principles (or prepared in accordance with a comprehensive body of accounting principles in the case of a foreign private issuer). However, if the issuer has emerged from reorganization pursuant to Chapter 11 of the Bankruptcy Code (11 U.S.C. 1101 et seq.) and the reorganization plan has been in effect less than two years, the financial information required under this paragraph (c)(6)(xiii) is the court-approved disclosure statement filed under 11 U.S.C. 1125 and the financial information described in this paragraph (c)(6)(xiii) from the date of the entry of the bankruptcy court order confirming the issuer's reorganization plan pursuant to 11 U.S.C. 1129.

(d) The supplemental information that a broker or dealer must review. The type of information that is considered "supplemental information" and that you must review under paragraph (b) of this section is the following:

(1) A copy of any trading suspension order issued by the Commission under section 12(k) of the Act (15 U.S.C. 78l(k)) for any securities of the issuer or its predecessor (if any) during the 12 months before you publish the quotation, or a copy of the public release issued by the Commission announcing such trading suspension order; and

(2) A copy or a written record of any other material information (including adverse information) about the issuer that comes to your knowledge or possession before you publish a quotation.

(e) The significant relationship information that the broker or dealer must make and keep a record of. The type of information that is considered "significant relationship" information and that you must make and keep a record of under paragraph (b) of this section is the following:

(1) Any direct or indirect affiliation between the issuer and you or between the issuer and any of your associated persons;

(2) Whether you are publishing the quotation on behalf of any other broker or dealer, or any of its associated persons, and, if so, the name of such broker or dealer, or the associated person, and the terms of the arrangement;

**\*40** (3) Whether you have received, or have any arrangement to receive, any monetary or other consideration from any person for publishing the quotation and, if so, a description of the consideration and the name of the person providing the consideration; and

(4) Whether you are publishing the quotation directly or indirectly on behalf of the issuer, or any executive officer, director, general partner, promoter, control person, or any person, who is directly or indirectly the beneficial owner of more than 10 percent of the outstanding units or shares of any equity security of the issuer, and, if so, the name of such person, and the basis for any exemption under the federal securities laws for any sales of such securities on behalf of such person.

(f) The information a broker or dealer must submit to the NASD. At least three business days before you publish a quotation covered by paragraph (a) in this section, you must submit to the NASD, in accordance with NASD rules, the information required in paragraphs(c), (d), and (e) of this section.

(g) The broker or dealer must make certain information required by this section available upon request.

(1) If you publish a quotation for a security in compliance with this section, you must make the issuer, supplemental, and significant relationship information specified in paragraphs (c)(5), (c)(6), (d), and (e) of this section promptly available upon request to any customer, prospective customer, other broker or dealer, or information repository. By providing this information to others under this paragraph (g), you do not represent that the information is accurate; rather, you represent that, as of the date recorded under paragraph (b)(3)(iii) of this section, you had a reasonable basis under the circumstances for believing that the information was accurate and current in all material respects and was obtained from reliable sources; but

(2) You do not need to comply with paragraph (g)(1) of this section to the extent that the information is reasonably available through EDGAR, any other federal or state electronic information system, or an information repository.

(h) When a broker or dealer is not required to comply with this section. You are not required to comply with this section when you publish a quotation for:

(1) A security that is listed on a national securities exchange or Nasdaq; is traded on such exchange or Nasdaq on the same day as, or on the business day immediately before, the day you publish the quotation; and is not suspended, terminated, or prohibited from trading on such exchange or Nasdaq;

(2) An exempted security, as defined in section 3(a)(12) of the Act (15 U.S.C. 78c(a)(12));

(3) A security where the quotation represents the unsolicited order of a customer (other than a person acting as or for a dealer);

(4) A non-convertible debt security or a non-participatory preferred stock;

(5) An asset-backed security that is rated by at least one nationally recognized statistical rating organization, as that term is used in § 240.15c3-1, in one of its generic rating categories that signifies investment grade;

\*41 (6) A security with a worldwide average daily trading volume value of at least $100,000 during each month of the six full calendar months immediately before the date you publish the quotation;

(7) A convertible security, if the underlying security meets the requirements of paragraph (h)(6) of this section;

(8) A security that has a bid price, as published on a national securities exchange, Nasdaq, or quotation medium, of at least $50 per share. If the security is a unit composed of one or more securities, the bid price of the unit divided by the number of shares of the unit that are not warrants, options, rights, or similar securities must be at least $50; or

(9) A security of an issuer that has net tangible assets in excess of $10,000,000.

(i) The steps to take to become an information repository.

(1) An entity seeking information repository designation must file an application with the Director of the Commission's Division of Market Regulation in Washington, D.C. The application should provide detailed information explaining how the

APP. 000544

entity satisfies the attributes set forth below in paragraph (i)(2) of this section. The entity must also file any additional information relating to the attributes set forth below in paragraph (i)(2) of this section that the Director of the Commission's Division of Market Regulation subsequently requests.

(2) In determining whether to designate an entity as an information repository, the Commission will consider whether the entity:

(i) Collects information about a substantial segment of issuers of securities subject to this section;

(ii) Maintains current and accurate information about such issuers;

(iii) Has effective acquisition, retrieval, and dissemination systems;

(iv) Places no inappropriate limits on the issuers from or about which it will accept information;

(v) Provides access to the documents deposited with it to anyone willing and able to pay the applicable fees;

(vi) Charges reasonable fees; and

(vii) In general, is so organized and has the capacity to be able to reasonably carry out the purposes of this section.

(3) An information repository must notify the Director of the Commission's Division of Market Regulation of any material changes that occur in the facts and circumstances of its application for such designation; and

(4) In the event it is determined that an information repository no longer satisfies all of the attributes set forth above in paragraph (i)(2) of this section, the Director of the Commission's Division of Market Regulation may revoke such designation.

(j) The definitions applicable to this section. For purposes of this section, the following definitions apply:

(1) Alternative trading system has the same meaning contained in § 242.300(a) of this chapter.

(2) Asset backed security has the meaning contained in General Instruction I.B.5. to Form S-3 (17 CFR 239.13).

(3) Information repository means an entity that:

**\*42** (i) Gathers and provides to brokers or dealers and others current issuer information described in paragraph (c) of this section when this information is not routinely or widely made available, electronically or otherwise; and

(ii) Is designated by the Commission as an information repository as described in paragraph (i) of this section.

(4) Issuer, in the case of quotations for American Depositary Receipts, means the issuer of the deposited shares represented by such American Depositary Receipts.

(5) NASD means the National Association of Securities Dealers, Inc., and its wholly owned subsidiaries (including, but not limited to, NASD Regulation, Inc. and The Nasdaq Stock Market, Inc.).

(6) Nasdaq means The Nasdaq National Market and The Nasdaq SmallCap Market, both operated by The Nasdaq Stock Market, Inc.

(7) Net tangible assets means total assets less intangible assets and liabilities. For purposes of this section, net tangible assets must be demonstrated by current financial statements, as described in paragraph (c)(6)(xiii) of this section, and:

(i) If the issuer is not a foreign private issuer, the financial statements must be audited and reported on by an independent

public accountant in accordance with § 210.2-02 of this chapter; or

(ii) If the issuer is a foreign private issuer, the financial statements must be prepared in accordance with a comprehensive body of accounting principles, audited in compliance with requirements of the country of incorporation, and reported on by an accountant duly registered and in good standing in accordance with the regulations of that jurisdiction.

(8) Non-participatory preferred stock means non-convertible capital stock, the holders of which are entitled to a preference in payment of dividends and in distribution of assets on liquidation, dissolution, or winding up of the issuer, but are not entitled to participate in residual earnings or assets of the issuer.

(9) Promoter has the same meaning contained in § 230.405 of this chapter.

(10) Publish means to publish a quotation for a security in a quotation medium or, directly or indirectly, to submit a quotation for a security for publication in a quotation medium.

(11) Quotation means any bid or offer at a specified price with respect to a security, or any indication of interest by a broker or dealer in receiving bids or offers from others for a security, or any indication by a broker or dealer that advertises its general interest in buying or selling a particular security.

(12) Quotation medium means any:

(i) System of general circulation to brokers or dealers that regularly disseminates quotations of identified brokers or dealers; or

(ii) Publication, alternative trading system, or other device that is used by brokers or dealers to disseminate quotations to others.

(13) Securities Act means the Securities Act of 1933 (15 U.S.C.77a et seq.).

**\*43** (k) How this section applies to securities for which a broker or dealer is publishing quotations immediately before the effective date of the amendments. If you were publishing a quotation for a security on the business day immediately before **[insert effective date of the final rule]**, you may continue to publish quotations for the security without complying with paragraph (b) of this section until you publish a quotation described in paragraphs (a)(2), (a)(3), (a)(4), (a)(5), or (a)(6) of this section.

(l) The Commission can grant exemptions from this section. This section does not prohibit the publication of any quotation for a security or a class of securities, if the Commission, on written request or its own motion, exempts such quotation, either unconditionally or on specified terms and conditions.

3. Section 240.17a-4 is amended by adding paragraph (b)(11) to read as follows:

**§ 240.17a-4 Records to be preserved by certain exchange members, brokers and dealers.**

\*\*\*\*\*

(b) \*\*\*

(11) The records required to be obtained pursuant to § 240.15c2-11.

\*\*\*\*\*

By the Commission.
Jonathan G. Katz
Secretary

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**\*44** [Note: This Appendix to the Preamble will not appear in the Code of Federal Regulations.]

### Appendix

### Guidance on the Scope of a Broker-Dealer's Review Under Current Rule 15c2-11 and the Amendments

#### I. Introduction

To assist broker-dealers in complying with Rule 15c2-11 (Rule)[1] under the Securities Exchange Act of 1934 (Exchange Act),[2] we are setting forth the factors that they should consider in carrying out their review obligations under the Rule as it currently exists and under the amendments proposed in Securities Exchange Act Release No. 34-41110.[3] We are providing this guidance because commenters on the initial proposal[4] expressed concerns about their review obligations under its provisions, particularly in light of elimination of the piggyback provision, the addition of an annual review requirement, and the obligation to obtain enhanced issuer information. This guidance applies, unless otherwise noted, to a broker-dealer's obligations under the current Rule as well as under the reproposal.

Rule 15c2-11 regulates the publication of quotations for OTC securities in a quotation medium.[5] The Rule generally prohibits broker-dealers from publishing a quotation unless they have reviewed specified information about the issuer. The kind of information depends on the nature of the issuer, e.g., whether the issuer is subject to the Exchange Act's periodic reporting requirements (reporting issuer) or is an issuer that is not subject to the Exchange Act's reporting requirements (non-reporting issuer). Broker-dealers must also have a reasonable basis for believing that the issuer information, when considered in conjunction with any supplemental information,[6] is accurate in all material respects and that it was obtained from a reliable source.

The Rule is precise about the kind of issuer and other information that the broker-dealer must obtain and review before publishing quotations and about how current that information must be. However, some commenters on the Proposing Release stated that they were unclear about the nature of the broker-dealer's obligation to determine that the broker-dealer reasonably believes that the source of the Rule 15c2-11 information is reliable and that the information is accurate in all material respects. We are giving our views on the steps a broker-dealer should take to assess the reliability of the source of the required information and the accuracy of that information.[7]

#### II. Quotation Events Triggering the Review Requirement

Under the current Rule, the first broker-dealer to publish a priced quotation must obtain and review the Rule's required information. Under the current Rule's piggyback exception, a broker-dealer does not have to satisfy these information requirements when it publishes a quotation for a security if it, or any other broker-dealer, is already publishing regular quotations for the security.[8] This means that the first market maker publishing a quotation is the only one that has to obtain the required information, and thereafter, any other market maker can publish quotations in the security indefinitely, unless there is a significant lapse in quotation activity.[9]

**\*45** The amendments will restructure Rule 15c2-11 by setting forth more clearly the quotation events that trigger the Rule, the requirements that the broker-dealer must satisfy, and the nature of the information that the broker-dealer must review. The amendments state that no broker-dealer, directly or indirectly, may publish the described kinds of quotations for a security in any quotation medium, without first complying with the Rule's provisions.[10] Under the amendments, the Rule will apply at specified points in time, namely, when a broker-dealer publishes:

• the first quotation for a security;

• its first quotation at a specified price for a security after another broker or dealer published the first quotation for the same security.

• the first quotation following the termination of a Commission trading suspension ordered pursuant to section 12(k) of the Exchange Act[11] in any security of the issuer of the suspended security;

• a quotation at a specified price for a security after a period of five or more consecutive business days when it did not publish any quotations at a specified price for that security;

• its first quotation at a specified price for a security after the date that is four months after the end of the issuer's fiscal year, unless the issuer is a foreign private issuer; or

• its first quotation at a specified price for a security of a foreign private issuer after the date that is sevent months after the end of the issuer's fiscal year.

If the Rule applies, under both the current Rule and the amendments, the broker-dealer must:
• review the Rule's specified information;

• determine that it has a reasonable basis for believing that the information is accurate in all material respects and was obtained from reliable sources;

• record the date it reviewed the specified information, the sources of the information, and the person at the firm responsible for the broker-dealer's compliance with the Rule; and

• preserve the specified information in accordance with Rule 17a-4.[12]

We set out below in more detail the review obligation required of a broker-dealer before it publishes a quotation for covered OTC securities. In general, the broker-dealer must first form a reasonable belief about the source's reliability. Then the broker-dealer should examine the materials to make sure it has obtained all of the information required by the Rule, including any supplemental information known by the broker-dealer. In reviewing this information, the Rule requires that the broker-dealer must have a reasonable basis under the circumstances for believing that the issuer information described in paragraph (a) [reproposed paragraph (c)] of the Rule,[13] when considered in conjunction with the supplemental information described in paragraph (b) [reproposed paragraph (d)] of the Rule,[14] is accurate in all material respects and was obtained from reliable sources.

**\*46** In addition, we are providing numerous examples of "red flags" often associated with Rule 15c2-11 documents. A red flag is information that under the circumstances signals that one or more of the required items of information may be materially inaccurate. We consider these red flags to be indications that should lead a broker-dealer to inquire whether it had a reasonable basis to believe that the issuer information is accurate in all material respects and that it was obtained from a reliable source.

The red flags that we discuss have been present in Commission enforcement actions, examinations conducted by our staff, and reviews of Rule 15c2-11 conducted by the National Association of Securities Dealers, Inc. (NASD) submissions, but our discussion is not meant to be exhaustive. Other information may come into the broker-dealer's knowledge or possession that would lead it to question whether the source is reliable or whether the required information is accurate in all material respects. The adequacy of a broker-dealer's review must be considered on a case-by-case basis.

The reproposed Rule would require a broker-dealer to obtain and review some issuer information not required by the current Rule, such as criminal or securities law violations and additional issuer information. Until the proposal is adopted, the Rule does not require the broker-dealer to obtain and review this information. This information, however, would be a red flag and, and, under the current Rule, could be "material information" that the broker-dealer must take into account when conducting its review obligations.

### III. The Review Process

#### A. Introduction

While the broker-dealer must obtain and review the required information, the standard of review is based on a broker-dealer's arriving at a reasonable belief, not a certainty, that the information is accurate and was obtained from a reliable source. Although broker-dealers often refer to their Rule 15c2-11 files as "due diligence" files, the Rule's standard of review does not approach the depth of inquiry generally associated with an underwriter's obligations in a registered public offering or

APP. 000548

**\*50** When red flags are present, the broker-dealer's efforts to satisfy itself with respect to the accuracy of the information will vary with the circumstances and may require the broker-dealer to obtain additional information or seek to verify existing information. If the broker-dealer is aware that the required issuer information is materially inaccurate, it may nevertheless publish quotations without violating the Rule, as long as the broker-dealer can supplement that information with additional information that the broker-dealer reasonably believes is accurate. If the immediate source of the issuer information is unreliable, however, the broker-dealer should view that source with skepticism and attempt to obtain the Rule's information from another source. For example, a broker-dealer that is aware that the required issuer information is inaccurate could produce a written record reflecting the additional, corrected information or could obtain other materials, such as a more recent Form 8-K,[33] that would permit the broker-dealer to comply with the Rule. If the broker-dealer sees that the auditor's report in an issuer's financial statements is qualified, the broker-dealer may need to contact the accountants about the basis for such qualification. If the broker-dealer learns that an issuer's control person has been convicted of securities fraud, it should contact the appropriate regulatory authority to ascertain the facts.[34]

The Rule's provisions are triggered by discrete quotation events. Once the broker-dealer has complied with the Rule's requirements with respect to a particular quotation event, there is no continuing duty to obtain and review the information. Of course, when a quotation event occurs, e.g., the broker-dealer is publishing priced quotations as of the annual review date required by the reproposed Rule, it must conduct a review of current issuer information. In this case, the review process would be the same as described above. However, the review process should be somewhat simpler because the broker-dealer would already have gained some familiarity with the issuer as a result of its prior review.

### D. Scope of review following a trading suspension

A Commission trading suspension is a material event affecting the market for an issuer's securities.[35] After the termination of a trading suspension, a broker-dealer may not enter a quotation unless and until it has strictly complied with all the provisions of the Rule. Before initiating or resuming a quotation for securities subject to Rule 15c2-11, the broker-dealer must conduct a careful review in a professional manner of the basis for the trading suspension to determine whether there is a reasonable basis for the broker-dealer to believe that the information about the issuer is accurate and current. The broker-dealer may be unable to reach a reasonable basis for relying on the questioned financial statements in the Commission's order even if the information otherwise satisfies the Rule's presumption of "current" information.[36] This presumption is obviated if the broker-dealer has information to the contrary.[37]

**\*51** The broker-dealer must also check the reliability of the source of the information, particularly when the same source is providing updated information. If the broker-dealer seeks assurances or additional information from the source (in most cases, the issuer) about the matters cited in the Commission trading suspension order, great caution should be used before relying on the statements or assurances from the issuer. The broker-dealer may have to test the accuracy of the information or the source's reliability by conducting an independent review or obtaining verification of information provided by the issuer. The broker-dealer may need to seek an opinion of an independent accountant or attorney to form a reasonable basis to believe that the Rule's information is accurate and from a reliable source. In one enforcement action, a broker-dealer unreasonably relied on pre-suspension financial statements when the Commission's trading suspension was based upon a lack of accurate financial information and the issuer's auditors indicated to the broker-dealer that they were having problems verifying the issuer's financial information.[38]

A broker-dealer may have difficulty obtaining the necessary information about an issuer after the expiration of a trading suspension. This difficulty, however, does not relieve the broker-dealer of its responsibilities under the Rule. If any broker-dealer is uncertain as to what is required by the Rule, it should refrain from entering quotations relating to the securities in question until the Rule's provisions have been met.

### IV. Examples of Red Flags

If the broker-dealer discovers at any stage of the review process any red flags in the issuer information (whether the issuer is a reporting or non-reporting company), it cannot publish a quote unless and until those red flags are reasonably addressed. Material inconsistencies in the paragraph (a) [reproposed paragraph (c)] information, or material inconsistencies between that information and the paragraph (b) [reproposed paragraph (d)] information, are red flags. We have set out below examples of red flags that we have noticed in microcap fraud cases or in Rule 15c2-11 submissions made to the NASD. These examples,

with a retail broker's obligations in recommending a security to a customer. As discussed below, the scope of review is relatively simple in the case of an issuer that has just completed a public offering or an offering under Regulation A[15] or that files periodic reports with the Commission.[16] In these cases, the broker-dealer must obtain and review information that is on file with the Commission, in addition to any supplemental information. In the case of a non-reporting issuer, where there may be no information filed with a regulatory authority, the broker-dealer must obtain the required information from sources its deems reliable and must review this information together with any supplemental information.

The Rule does not currently specify the status of the person who must conduct the review on the broker-dealer's behalf. Under the reproposed Rule, the broker-dealer must make a record of the person at the firm who is responsible for the broker-dealer's compliance with the Rule's provisions.[17] Generally, the person performing the review should have sufficient experience or authority at the firm to make sure that the Rule's requirements are fully satisfied.

**\*47** Rule 15c2-11 is intended to prevent broker-dealers from becoming involved in the fraudulent manipulation of OTC securities. However, even if a broker-dealer technically complies with the Rule's requirements, it would be subject to liability under other antifraud provisions of the securities laws, such as Rule 10b-5, if a broker-dealer publishes quotations as part of a fraudulent or manipulative scheme.[18]

### B. Source reliability

### 1. Determining whether a source is reliable

The broker-dealer must first have a reasonable basis for believing that Rule 15c2-11 information comes from a reliable source. In general, this means that the information was derived from the issuer. If the information is from the issuer or its officers and directors, attorney, or accountant, the broker-dealer generally can assume that the source is reliable, absent red flags to the contrary.[19] If the information is from EDGAR or another governmental website or an independent retrieval service[20] or standard research sources[21] or an information repository contemplated under the reproposed Rule, the broker-dealer can satisfy the Rule's requirement to have a reasonable basis for believing that the source of the information is reliable. If the broker-dealer receives the information from an independent and objective source, such as a bank that is not a market maker in the security, which represents that it has prepared the information or received the information directly from the issuer, the broker-dealer typically may rely on that representation as to the source. Because broker-dealers frequently obtain the Rule 15c2-11 information from these sources, the reliability of the information's source is not often called into question.

Occasionally, the broker-dealer may obtain the Rule 15c2-11 information from sources not associated with the issuer, such as another market maker.[22] In this case, the requesting broker-dealer should inquire about the original source of the information. The broker-dealer providing the information must make a record of the source of the issuer information and can supply this information to the requesting broker-dealer.

When a red flag regarding the source's reliability exists, the broker-dealer must inquire further to reasonably determine whether the information's source is reliable. To satisfy the Rule's requirements, the broker-dealer must ascertain the original source of the information, especially when a broker-dealer is provided information from another broker-dealer that encourages the publication of quotations rather than responds to a request for information.[23] If the broker-dealer providing the information refuses to substantiate that the information is from the issuer, this refusal is a red flag that may indicate that the source is unreliable. If the broker-dealer is told that the issuer has prepared or approved the information, the broker-dealer may need to verify that representation by directly contacting the issuer.

### 2. Examples of unreliable sources

**\*48** The Report of Investigation Regarding Transactions in the Securities of Laser Arms Corporation (Laser Arms Report) illustrates when a broker-dealer did not have a reasonable basis to believe that the information about a non-reporting issuer was from a reliable source.[24] The Laser Arms Report noted that "inherent in the requirement of paragraph (a)(5) [reproposed paragraph (c)(6)] is 'the premise that the broker-dealer must at least verify that it has received the required information and know that source of the information.'"[25]

The broker-dealer that submitted the initial application to quote Laser Arms stock did not make any attempt to verify the

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

APP. 000550