source of the issuer information contained in the Laser Arms Memorandum. In fact, it was a fictitious document prepared by a recidivist securities law violator who was the undisclosed principal of Laser Arms.[26] The broker-dealer's immediate source of the Laser Arms Memorandum was a trader at another broker-dealer whom he had known for less than one year, had seen on only a few occasions, and had dealt with primarily by telephone. The broker-dealer did not review or attempt to determine the source of any part of the information in the Laser Arms Memorandum. Any attempt to contact the issuer directly probably would have led to the discovery that Laser Arms was a shell corporation with no assets, operations, or products.[27] Under these circumstances, the Commission did not believe that this broker-dealer, or any of the broker-dealers to subsequently publish quotations, had a reasonable basis for believing that the source of the Rule 15c2-11 information was reliable.[28]

### C. Document review obligations

Once the broker-dealer has formed a reasonable belief about the source's reliability, it should examine the materials to make sure it has obtained all of the information required by the Rule. This means that a broker-dealer must not only review the information about the issuer of the security to be quoted but also consider any supplemental information.[29] The Rule requires that the broker-dealer must have a reasonable basis under the circumstances for believing that the issuer information described in paragraph (a) [reproposed paragraph (c)] of the Rule, when considered in conjunction with the supplemental information described in paragraph (b) [reproposed paragraph (d)] of the Rule, is accurate in all material respects.

Unlike the duties of an underwriter in a securities offering, Rule 15c2-11 ordinarily does not require a broker-dealer to conduct an independent inquiry about the issuer of the security to be quoted. A broker-dealer publishing quotes for a covered OTC security may have no relationship with the issuer, and the Rule does not demand that the broker-dealer develop one to obtain information. However, the broker-dealer must review the required information, together with any supplemental information that comes to its attention, and should be alert to red flags.

**\*49** Because documents filed with the Commission are subject to liability provisions, a broker-dealer generally can reach a reasonable belief as to the accuracy of information contained in these documents.[30] This also would be true for documents filed with financial institutions' regulatory authorities, which broker-dealers may obtain and review when publishing quotes for the securities of certain banks, provided for in paragraph (c)(4) of the reproposed Rule.

If a registration statement incorporates other documents by reference, the broker-dealer may be required to obtain some of the incorporated documents to satisfy the Rule's information gathering and review requirements. It should not be necessary for the broker-dealer to be familiar with all aspects of the filed documents. The broker-dealer should focus on those sections that describe the items of information set forth in Rule 15c2-11 (a)(5)[reproposed Rule 15c2-11(c)(6)], the issuer's identified "risk factors,"[31] any current material business combinations, such as the merger of a reporting shell into a non-reporting company, and current financial information.

In contrast to information from other kinds of issuers, non-reporting issuer information generally has not been filed with any regulatory authority. Thus, the broker-dealer cannot make any assumptions about the accuracy of such information. Similarly, a broker-dealer cannot make any assumptions about the accuracy of information to documents and other materials that are submitted to the Commission by foreign private issuers under Rule 12g3-2(b). Although they are submitted to the Commission, these documents are not "filed" and so are not subject to the liabilities that attach to reporting issuer information. These documents are prepared in accordance with the standards of the issuer's home jurisdiction, not the standards set forth under the U.S. federal securities laws, and broker-dealers should independently assess the accuracy of such information. Broker-dealers will also need to independently assess the accuracy of information filed with foreign securities regulatory authorities, based on considerations such as the disclosure and liability standards under foreign law. In reviewing the Rule's required information for non-reporting issuers, the kinds of significant events that require a domestic reporting issuer to file a Form 8-K under the Exchange Act[32] also should be considered red flag events.

Where no red flags appear during the review of current and complete information, the broker-dealer would have a reasonable basis for believing that the Rule's information is accurate. At this point, the broker-dealer's review ordinarily would end, i.e., the broker-dealer would not be required to question the financial statements or any other information required to be obtained and reviewed. The Rule does not require the broker-dealer to question any information unless the information contains apparent material discrepancies, or other information in the broker-dealer's knowledge or possession (i.e., paragraph (b) [reproposed paragraph (d)] information) reasonably indicates that the paragraph (a) [reproposed paragraph (c)] information is materially inaccurate.

APP. 000551

however, are not comprehensive, as red flags depend on the facts and circumstances of each case.

We are providing examples of red flags that require additional scrutiny by the broker-dealer to comply with Rule 15c2-11. These examples, however, are not exhaustive. Conversely, the presence of these or other red flags is not necessarily an indication of microcap fraud or even inaccurate issuer information. The red flag simply means that the broker-dealer should question whether the issuer information is accurate, and in certain cases, from a reliable source. The more red flags that are present, the more a broker-dealer should scrutinize the issuer information.

1. Commission Trading Suspensions. As indicated above, Commission trading suspension orders generally raise significant red flags as to whether the Rule 15c2-11 information is accurate and whether its source is reliable. Broker-dealers publishing quotes once a trading suspension terminates must satisfy the Rule's requirements, which may include seeking verification from the issuer or soliciting the views of an independent professional.

**\*52** 2. Foreign Trading Suspensions. A trading suspension by a foreign regulator may indicate that the issuer information is unreliable or inaccurate. However, a trading suspension in a foreign market may be imposed simply because the issuer failed to meet exchange listing standards. If the broker-dealer learns of a foreign trading suspension, it should attempt to determine the basis for the suspension order and assess whether the issuer information is still accurate and whether its source is still reliable.

3. Concentration of ownership of the majority of outstanding, freely tradeable stock. Concentration of ownership of freely tradeable securities is a prominent feature of microcap fraud cases. When one person or group controls the flow of freely tradeable securities, this person or persons can have a much greater ability to manipulate the stock's price than when the securities are widely held. In a "pump and dump" scheme, retail interest is stimulated, and the price of the securities is manipulated upward, at the behest or under the control of the manipulators who control much of the stock. Often, other broker-dealers that are not intentionally participating in improper activities publish quotations in response to escalating demand for the security resulting from increasing retail sales. The promoters of these companies, company insiders, and unscrupulous brokers make substantial profits when they sell their shares at inflated prices. When the scheme is over, the security's price plummets, and innocent investors who paid a premium price are left holding worthless shares.[39]

4. Large reverse stock splits. Microcap fraud schemes can involve the substantial concentration of the publicly-traded float through a reverse stock split. The subsequent issuance of large amounts of stock to insiders increases their control over both the issuer and trading of the stock.[40]

5. Companies in which assets are large and revenue is minimal without any explanation. A red flag exists when the issuer assigns a high value on its financial statements to certain assets that are often unrelated to the company's business and were recently acquired in a non-cash transaction. In this situation, the company's revenues often are minimal and there appears to be no valid explanation for such large assets and minimal revenues.[41]

Also, a red flag is present when the financial statements of a development stage issuer list as the principal component of the issuer's net worth an asset wholly unrelated to the issuer's line of business. For example, from a review of Rule 15c2-11 submissions, art collections or other collectibles, that are unrelated to the issuer's business apparently have been overvalued on the financial statements of some issuers.[42] While assets that are unrelated to the business of the issuer are not always an indication of potential microcap fraud, some unscrupulous issuers have overvalued these types of assets in an effort to inflate their balance sheets.

**\*53** 6. Shell corporation's acquisition of private company. A shell corporation is characterized by no business operations and little or no assets. In a fraud scheme, a reporting company with a large number of shares controlled by one person or a small number of persons often merges with a non-reporting company having some business operations. The new public company is then used as the vehicle for "pump and dump" and other fraudulent schemes. Broker-dealers placing quotes for these issuers' securities should be mindful of the potential for abuse.[43]

7. Offerings under Rule 504 of Regulation D where one or more of the following factors are present:
• Little capital is raised in the Rule 504 offering and there appears to be no business purpose except to provide some shareholders with free-trading shares;

• The Rule 504 offering is preceded by an unregistered offering to insiders or others for services rendered at prices well below the price in the subsequent offering;

• Sales immediately following the Rule 504 offering are at substantially higher prices than those paid in the Rule 504 offering; or

• A shell company and an operating company merge, which results in the operating entity becoming the surviving entity. The surviving entity goes "public" by issuing shares pursuant to Rule 504.[44]

Rule 504 of Regulation D allows non-reporting companies to raise up to $1 million per year in "seed capital" without complying with Securities Act registration requirements. The freely tradable nature of securities issued in Rule 504 offerings has facilitated a number of fraudulent schemes through the OTC Bulletin Board Display Service (OTC Bulletin Board) or the Pink Sheets published by the National Quotation Bureau, Inc. (NQB).[45] Broker-dealers should be alert to information in the Rule 15c2-11 materials where an active trading market is being promoted for securities issued solely in a Rule 504 transaction.

8. <u>A registered or unregistered offering raises proceeds that are used to repay a bridge loan made or arranged by the underwriter where</u>:
• The bridge loan was made at a high interest rate for a short period;

• The underwriter received securities at below-market rates prior to the offering; and

• The issuer has no apparent business purpose for the bridge loan.

Broker-dealers have given small issuers bridge loans at a high interest rate for a short time period.[46] In exchange for this bridge loan, the broker-dealer receives a significant number of shares of the issuer's common stock at a price that is substantially below market rates. The broker-dealer then engages in a scheme to manipulate the stock's price and ultimately benefits when it dumps the stock at an artificially high price.[47]

9. <u>Significant write-up of assets upon a company obtaining a patent or trademark for a product</u>. The significant write-up of assets upon the issuer's obtaining a patent or trademark for a product is a technique used by issuers engaged in microcap fraud to inflate their balance sheets.[48]

**\*54** 10. <u>Significant asset consists of OTC Bulletin Board or Pink Sheet companies</u>. We have noticed that some microcap fraud schemes involve issuers whose major assets are substantial amounts of shares in other OTC Bulletin Board or Pink Sheet companies.

11. <u>Assets acquired for shares of stock when the stock has no market value</u>. In microcap fraud cases, the issuer's financial statements often indicate that the issuer acquired assets to which it assigned substantial value in exchange for its essentially worthless stock.[49]

12. <u>Significant write-up of assets in a business combination of entities under common control</u>.

Those persons engaged in microcap fraud often use a business combination such as a merger as an opportunity to falsify financial statements.[50] We have seen microcap fraud schemes in which unscrupulous issuers use purchase method accounting[51] to write up the historical value of an asset to an artificially high value in situations when the entities involved in the business combination are under common control or otherwise have a high degree of common ownership. For example, Generally Accepted Accounting Principles (GAAP) requires that the acquisition of one entity by another entity be accounted for at historical cost in a manner similar to that in "pooling of interests" accounting when these entities are under common control.[52]

13. Unusual auditing issues.
• Auditors refuse to certify financial statements or they issue a qualified opinion; or

• There has been a change of accountants.[53]

Rule 15c2-11 does not contemplate that the broker-dealer scrutinize the issuer's financial statements with the expertise of an accountant. The above red flags, however, do not require an expertise in accounting matters and have appeared in several microcap fraud schemes. In one case, the respondents stated in the Form 211 submissions to the NASD that they relied on audited financial statements. However, the auditors orally advised the associated persons of the broker-dealer before they submitted the Form 211 that the auditor's opinion attached to the pro forma financial statement was qualified because of the auditor's inability to verify the issuer's financial information.[54]

An accountant's resignation or dismissal is a characteristic found in some microcap fraud cases. If a broker-dealer sees any of these red flags, it should confirm the auditor's credentials with the appropriate state licensing authority, question the circumstances of the change in accountants, and carefully scrutinize the Rule's required information.

14. Extraordinary items in notes to the financial statements, e.g., unusual related party transactions. Unusual related party transactions are sometimes found in microcap fraud schemes. For example, an issuer's financial statements may show a related party transaction between two companies, which later merge and inflate the worth of their assets by using purchase method accounting.[55]

**\*55** 15. Suspicious documents.
• Inconsistent financial statements;

• Altered financial statements; or

• Altered certificates of incorporation.

Altered or facially inconsistent issuer documents have been present in various microcap fraud schemes. For example, Polaris Mining Co. was a shell corporation with no meaningful assets and no trading market for its stock.[56] Douglass and Co., Inc., a broker-dealer, published quotations for Polaris in the Pink Sheets in violation of Rule 15c2-11 because the Polaris financial information upon which Douglass and Co., Inc. relied was deficient and contradictory on its face: two balance sheets for the same years contained blatant disparities. Both balance sheets valued certain mined but unprocessed ores at the estimated eventual selling price even though significant processing work remained to be done. One statement did not list property location. One statement had an item for capitalized expenses and the other statement for the same year did not. The former statement showed no retained earnings or accumulated deficit, suggesting that the figure for capitalized expenses was an arbitrary one designed to make assets and liabilities balance out.[57]

In addition, issuer information that is altered on its face raises red flags that, at a minimum, require the broker-dealer to contact the issuer.[58]

16. Broker-dealer receives substantially similar offering documents from different issuers with the following characteristics:
• The same attorney is involved;

• The same officers and directors are listed; and/or

• The same shareholders are listed.

It is not uncommon for the same individuals to be involved in multiple microcap frauds. If a broker-dealer realizes after reviewing the information for several issuers that the same individuals are involved with these entities, the broker-dealer should make further inquiries to determine whether it has a reasonable basis to believe that the issuer information is accurate.

17. Extraordinary gains in year-to-year operations. In microcap fraud cases, the issuer may show extraordinary gains in its year-to-year operations. This may be accomplished through assigning an artificially high value to certain assets or through other manipulative devices that are red flags, such as the significant write-up of assets upon merger or acquisition.[59]

18. Reporting company fails to file an annual report. The fact that a reporting company has not filed an annual report suggests that there is a potential problem with the company.[60]

19. Disciplinary actions against an issuer's officers, directors, general partners, promoters, or control persons.

The following types of disciplinary actions should trigger further investigation by a broker-dealer:
• Indictment or conviction in a criminal proceeding;[61]

• Order permanently or temporarily enjoining, barring, suspending or otherwise limiting an officer, director, general partner, promoter, or control person's involvement in any type of business, securities, commodities, or banking activities;

**\*56** • Adjudication by civil court of competent jurisdiction, the Commission, the Commodity Futures Trading Commission or a state securities regulator to have violated federal or state securities or commodities law; or

• Order by a self-regulatory organization permanently or temporarily barring, suspending or otherwise limiting involvement in any type of business or securities activities.[62]

Many microcap fraud cases involve recidivist securities law violators.[63] If a broker-dealer has information or could reasonably discover information about the above types of violations, it should question whether it has a reasonable basis to believe that the issuer's information is accurate and complete in these circumstances.

20. Significant events involving an issuer or its predecessor, or any of its majority owned subsidiaries.

The following types of significant events should prompt further investigation by a broker-dealer:
• Change in control of the issuer;[64]

• Substantial increase in equity securities;

• Merger, acquisition, or business combination;

• Acquisition or disposition of significant assets;[65]

• Bankruptcy proceedings;[66] or

• Delisting from any securities exchange or the Nasdaq Stock Market.[67]

While not necessarily problematic, these are material events involving the issuer. The change in control of the issuer, merger, acquisition, or business combination, acquisition or disposition of significant assets can provide unscrupulous issuers an opportunity to artificially overvalue the issuer's assets to support an upward manipulation of the issuer's worthless stock.[68] An increase in the issuer's equity securities provides the securities necessary for such manipulation. Bankruptcy proceedings or a delisting from an exchange or the Nasdaq Stock Market may also indicate problems with an issuer that could lead the broker-dealer to conclude that it does not have a reasonable basis to believe that the issuer's financial information is accurate.[69]

21. Request to publish both bid and ask quotes on behalf of a customer for the same stock. The highly unusual request from a customer for the broker-dealer to publish both bid and ask quotes is a red flag "that calls for appropriate inquiry on [the broker-dealer's] part."[70]

22. Issuer or promoter offers to pay a "due diligence" fee. If a market maker receives an offer from an issuer to pay a "due diligence" fee in connection with making a market in the issuer's security, this is not solely a red flag.[71] It is a violation of NASD Rule 2460 for the broker-dealer to accept this offer.[72] If the broker-dealer receives any consideration in connection with publishing a quotation, the reproposed Rule requires the broker-dealer to disclose any such compensation, as well as any other significant relationship information between the issuer and the broker-dealer publishing the quotation or any of its associated persons.[73] In Douglass and Co., Inc., a registered representative said he would try to get the broker-dealer to initiate a market in the stock of Polaris Mining Co., but that it would cost the issuer about $1,500 to cover "expenses." The registered representative later agreed to accept Polaris stock (some of which he kept himself) instead of the $1,500.[74]

**\*57** 23. Regulation S transactions of domestic issuers. Regulation S[75] provides a safe harbor from the registration requirements of the Securities Act of 1933 for offers and sales of securities by both foreign and domestic issuers that are made outside the United States. We recently adopted amendments to Regulation S that are designed to prevent the abuses that relate to offshore offerings of equity securities of domestic issuers.[76] Prior to the recent amendments, Regulation S transactions involving large amounts of the securities of U.S. issuers were particularly vulnerable to fraud and manipulation.[77] The perpetrators of the fraud sold the securities to U.S. investors after the 40-day holding period expired, and little information was available to investors about the issuers.

Under the amendments, equity securities of U. S. issuers that are sold offshore under Regulation S are classified as "restricted securities" within the meaning of Rule 144 under the Securities Act, and the period during which these securities cannot be distributed in the United States is lengthened from 40 days to one year. These amendments make Regulation S abuses less likely, but broker-dealers should be alert to any questionable activities once the one-year holding period expires.

24. Form S-8 stock. Form S-8 is the short-form registration statement for offers and sales of a company's securities to its employees, including consultants and advisors.[78] The form has been abused by unscrupulous issuers to register on Form S-8 securities nominally offered and sold to employees or, more commonly, to so-called consultants and advisors. These persons then resell the securities in the public markets, at the direction of the issuer or a promoter.[79] In a typical pattern, an issuer registers on Form S-8 securities underlying options issued to so-called consultants where, by prearrangement, the issuer directs the consultants' exercise of the options and resale of the underlying securities in the public market. The consultants then either remit to the issuer the proceeds from the sale of the underlying shares, or apply the proceeds to pay debts of the issuer that are not related to any services provided by the consultants.[80] In some cases, these consultants perform little or no other service for the issuer. In other microcap frauds, the issuer uses Form S-8 to sell securities to "employees" who act as conduits by selling the securities to the public and remitting the proceeds (or their economic benefit) to the issuer.[81] This public sale of securities by the issuer has not been registered, although the Securities Act requires registration. The failure to register this sale of securities deprives public investors of the protections afforded by the Securities Act.

To prevent these abuses, Form S-8 and related rules impose certain restrictions on the use of the form for the sale of securities to certain consultants and advisors.[82] We are also proposing additional amendments to Form S-8.[83] Although these amendments should deter microcap abuses, broker-dealers nevertheless should be aware of the prior abuses of Form S-8 in microcap fraud cases.

**\*58** 25. "Hot industry" microcap stocks. Another characteristic of microcap fraud cases is that they often involve stocks that are in vogue.[84] In the past, oil and gas ventures and mining operations, as well as stocks of issuers with purportedly innovative products, have been popular in frauds involving low-priced stocks.

26. Unusual activity in brokerage accounts of issuer affiliates, especially involving "related" shareholders. Many microcap frauds begin with the deposit and sale of large blocks of an obscure stock by a new and unfamiliar customer who often is affiliated with an issuer.[85] At the same time, the broker-dealer is encouraged to make a market in the stock by the issuer.

27. Companies that frequently change names. Frequent name changes are another characteristic that we have seen in microcap fraud cases. For example, Twenty First Century Health(TFCH) was originally a company called Big Valley Energy, Inc. Big Valley then changed its name to Biotronic Energy Engineering, Inc., then to The Sonoron Group, then to Zorro International, Inc., then to Health & Wealth, Inc., and finally became TFCH in 1995. At the promoter's request, TFCH issued false audited financial statements that recorded material, nonexistent assets.[86]

**APP. 000556**

28. Companies that frequently change their line of business. Besides companies that frequently change their names, we also see companies that frequently change their line of business in microcap fraud cases. For example, New Allied Development started out as a uranium mining company that was a dormant public shell with no assets.[97] New Allied then acquired the rights to medical products in exchange for its overvalued stock. Next, New Allied became a vehicle to enter the gaming business purportedly to build a casino.

## Footnotes

[1]  The term "microcap securities" is not defined under the federal securities laws or regulations. The use of the term "microcap securities" in this release, however, should be distinguished from its use in the mutual fund context. For example, Lipper Analytical Services, a mutual fund rating organization, generally categorizes microcap companies as companies with market capitalization of less than $300 million. Lipper-Directors' Analytical Data, Investment Objective Key, 2d ed. 1997.

[2]  Microcap securities can also be listed on securities exchanges or Nasdaq or quoted in alternative trading systems.

[3]  For a summary of these cases, see Fight Against Microcap Fraud "Paying Dividends", Press Release No. 98-92 (September 24, 1998), available through our Internet website at <http://www.sec.gov/news/micronew.htm>.

[4]  For a summary of these cases, see Purveyors of Fraudulent Spam, Online Newsletters, Message Board Postings, and Websites Caught, Press Release No. 98-117 (October 28, 1998), available through our Internet website at < http://www.sec.gov/news/netfraud.htm>.

[5]  See, e.g., "Microcap Stock: A Guide for Investors" (providing a variety of tips on how to detect and avoid microcap fraud); "Cold Calling Alert" (describing the cold calling rules and instructing investors how to avoid telephone scams); "Internet Fraud" (describing common frauds including on-line newsletter and bulletin board posting scams); and "Ask Questions" (listing questions that investors should ask about their investments and their investment professionals). All of these publications are available for free from our toll-free publications line at (800) 732-0330 and can be downloaded through our Internet website at <http://www.sec.gov>.

[6]  Securities Exchange Act Release No. 40878 (January 4, 1999), 64 FR 1255 (OTC Bulletin Board Release).

[7]  Securities Act Release No. 33-7646 (February 19, 1999). The amendments to Form S-8 restrict the use of Form S-8 for the sale of securities to consultants and advisors, among other things.

[8]  15 U.S.C. 77a et seq.

[9]  Securities Act Release No.33-7644 (February 19, 1999). The amendments limit the circumstances where freely tradable securities may be issued in reliance on, and general solicitation is permitted under, Rule 504 of Regulation D.

[10]  17 CFR 240.15c2-11.

[11]  15 U.S.C. 78a et seq.

[12]  In this release, "OTC stocks" or "OTC securities" refers to securities that are not listed on a national securities exchange or Nasdaq. "Covered OTC securities" refers to those OTC securities that are subject to Rule 15c2-11. The Rule applies to securities quoted on the OTC Bulletin Board operated by the NASD, the Pink Sheets operated by the NQB, and similar quotation mediums. For further discussion of quotation mediums, see Part III.F. below.

[13]  17 CFR 240.10b-5.

[14]  Rule 15c2-11 defines "quotation" as any bid or offer at a specified price with respect to a security, or any indication of interest by a broker or dealer in receiving bids or offers from others for a security, or any indication by a broker or dealer that advertises its general interest in buying or selling a particular security. For the purposes of this lease, a "priced quotation" is a bid or offer at a specified price.

[15]  See Part III.C. below for a description of the required issuer and supplemental information.

16   An "interdealer quotation system" is a quotation medium of general circulation to brokers or dealers which regularly disseminates quotations of identified brokers or dealers. 17 CFR 240.15c2-1*l*(e)(2). Under the proposed amendments, the definition of "interdealer quotation system" would be incorporated into the definition of "quotation medium." See Part III.F. below for a discussion of the term "quotation medium."

17   Securities Exchange Act Release No. 39670 (February 17, 1998), 63 FR 9661 (Proposing Release).

18   This total includes virtually identical comment letters from 68 issuers. All comment letters are available in File No. S7-3-98 at our Public Reference Room, 450 Fifth Street, N.W., Washington, D.C. 20549. Comment letters that were submitted electronically are available through our Internet website at <http:// www.sec.gov/rules/s7398.htm>.

19   The amendments, however, will prohibit the first broker-dealer from publishing a priced or unpriced quotation for a covered OTC security unless it complies with the Rule. For a discussion of the requirements concerning the initial quotation for a covered OTC security, see Part III.B.1. below.

20   15 U.S.C. 78*l*(k).

21   However, we are narrowing the scope of the requirement contained in the Proposing Release that broker-dealers provide the Rule 15c2-11 information to others upon their request. See Part III.D. below.

22   17 CFR 240.17a-4.

23   See, e.g., Letter from Securities Industry Association (April 28, 1998) (SIA Comment Letter).

24   Of course the general antifraud provisions of the federal securities laws, including Rule 10b-5 (17 CFR 240.10b-5), apply to transactions in all securities, whether or not excluded from Rule 15c2-11.

25   We estimate that at least 10% of covered OTC securities will be excluded from the Rule under these tests. We estimate that approximately 5% of the OTC securities of U.S. companies, 10% of the OTC securities of foreign issuers (excluding ADRs), and 66% of OTC American Depositary Receipts (ADRs) will satisfy any one of these three alternative tests.

26   We haveused an ADTV value of $100,000 in another, but related, context. Rules 101 and 102 of Regulation M, 17CFR 242.101 and 102, provide for a one business day restricted period for securities with an ADTV value of at least $100,000 (as measured over a 60 day period), if the issuer has a public float value of at least $25 million. These rules are intended to prevent manipulative activities during a distribution.

27   A broker-dealer will be able to rely on trading volume as reported by SROs or comparable entities, or any other source believed to be reliable. Electronic information systems that provide information regarding securities in markets around the world could provide an easy means to determine worldwide trading volume in a particular security. Worldwide trading volume includes all markets, domestic or foreign, where an OTC security is traded.

28   This is comparable to the calculation of value of ADTV under Regulation M. SeeSecurities Exchange Act Release No. 38067 (December 20, 1996), 62 FR 520, 537.

29   See id.

30   Most of the Commission's recent trading suspension orders issued under Section 12(k) of the Exchange Act, 15 U.S.C. 78*l*(k), have involved securities quoted on the OTC Bulletin Board or the Pink Sheets. Our staff's analysis of these trading suspension orders, issued between April 1, 1994 and January 1, 1998, showed that the suspended OTC securities had an average bid price of approximately $5, with a median bid price of approximately $3. These securities had bid prices that ranged from a low of approximately $0.50 to a high of approximately $18.

31   This is comparable to the provisions excluding equity securities priced at $5 or more from the definition of "penny stock" contained in 17 CFR 240.3a51-1(d)(2).

32   An analysis of OTC securities that were the subject of recent Commission-ordered trading suspensions showed that the issuers on average had approximately $3,500,000 in net tangible assets, with a median of approximately $225,000 in such assets.

APP. 000558

33    17 CFR 210.2-02.

34    These financial statements may be found in filings with the Commission on Forms 20-F or 6-K, or in submissions under Rule 12g3-2(b) under the Exchange Act (17 CFR 240.12g3-2(b)), or elsewhere.

35    17 CFR 240.3a51-1.

36    See proposed NASD Rule 2315, which the Commission recently issued for public comment. Securities Exchange Act Release No. 41075 (February 19, 1999). The proposed rule will be available through the NASD Regulation Internet website at <http://www.nasdr. com> and our Internet website at <http:// www.sec.gov>.

37    IASC's accounting standards are summarized on, and may be ordered through, the IASC's Internet website at <http://www.iasc.org.uk>.

38    Non-participatory preferred stock means non-convertible capital stock, the holders of which are entitled to a preference in payment of dividends and in distribution of assets on liquidation, dissolution, or winding up of the issuer, but are not entitled to participate in residual earnings or assets of the issuer. See paragraph (j)(8) of the Rule proposal, which is based upon a definition contained in Rule 902(a)(1) of Regulation S (17 CFR 230.902(a)(1)).

39    17 CFR 240.15c3-1 (net capital requirements for broker-dealers).

40    The Commission's staff is engaged in a project to consider the development of disclosure and registration requirements specifically related to asset-backed securities. As part of that project, the staff intends to examine further the role of ratings with respect to asset-backed securities. Therefore, we consider it appropriate to limit the proposed exclusion to investment grade asset-backed securities at this time.

41    Proposing Release, 63 FR at 9669. Also, we are combining into a single provision the current exceptions for exchange-listed and Nasdaq securities.

42    For a discussion of the requirements under the reproposed amendments concerning the submission of information to the NASD, see Part III.I. below.

43    15 U.S.C. 78*l*(k).

44    The initial proposal would have permitted a broker-dealer to conduct the annual review as of the anniversary date of the initial quotation.

45    See Letter from A.G. Edwards & Sons, Inc., (April 27, 1998) (A.G. Edwards Comment Letter); and Letter from National Quotation Bureau, LLC, (April 27, 1998) (NQB Comment Letter).

46    See e.g., A.G. Edwards Comment Letter.

47    See, e.g., NQB Comment Letter.

48    See Letter from NASD Regulation, Inc., (July 17, 1998) (NASD Comment Letter); Letter from North American Securities Administrators Association, Inc., (April 27, 1998) (NASAA Comment Letter); and SIA Comment Letter.

49    15 U.S.C. 78m and 78*o*(d).

50    15 U.S.C. 78*l*(g)(2)(G).

51    In response to the 78 comment letters that we received from issuers of securities quoted on the OTC Bulletin Board who were concerned about continued liquidity for their securities, we note that 33 of these issuers are reporting companies. Also, under recently approved amendments to NASD Rules 6530 and 6540, all of these issuers ultimately will need to be reporting companies current in their reporting obligations in order for their securities to remain on the OTC Bulletin Board. See note 6 above and accompanying text. There should be no burdens on reporting issuers to provide information to broker-dealers wishing to publish quotations because the issuer information should be available on EDGAR, as long as the issuers are current in their reporting obligations.

PUBLICATION OR SUBMISSION OF QUOTATIONS..., Release No. 41110...

52    <u>See</u> Part II.A.4. of the Proposing Release at 63 FR 9661, 9664-9669.

53    <u>See, e.g.,</u> NASAA Comment Letter.

54    <u>See, e.g.,</u> Letter from Daniel J. Demers (March 27, 1998) (Demers Comment Letter); Letter from Robotti & Company, Inc., (April 27, 1998) (Robotti Comment Letter); and NQB Comment Letter. In 1989, we sought comment on whether there were situations, such as bankruptcy, that should be addressed if the piggyback provision were revised. <u>See</u>Securities Exchange Act Release No. 27247 (September 14, 1989), 54 FR 39194 (1989 Release). Commenters on the 1989 Release argued that it was appropriate to permit broker-dealers to continue quoting the securities of issuers that had filed for bankruptcy because it provided liquidity for these securities and suggested that issuers in bankruptcy be identified in the quotation system by using a special indicator.

55    11 U.S.C. 1101 <u>et seq.</u>

56    Demers Comment Letter, <u>see also</u>11 U.S.C. 1125. The disclosure statement includes, among other things, description of the issuer's business plan, a description of any securities to be issued, and financial information.

57    Broker-dealers would be able to continue to publish unpriced quotations.

58    <u>See</u>Federal Rule of Bankruptcy Procedure 2015 (Rule 2015 bankruptcy reports).

59    <u>See</u> Staff Legal Bulletin No. 2 (April 15, 1997)(CF)(Staff Legal Bulletin No. 2), which is available through our Internet website at &lt;http:// www.sec.gov/rules/othern/slbcf2.txt&gt;. Under Staff Legal Bulletin No. 2, our Division of Corporation Finance has granted no-action relief permitting an issuer in Chapter 11 reorganization to satisfy its Exchange Act reporting obligations by filing the Rule 2015 bankruptcy reports on Exchange Act Form 8-K. <u>See</u>17 CFR 249.308. Under Staff Legal Bulletin No. 2, the staff has allowed a company to substitute its Rule 2015 bankruptcy reports for its Exchange Act periodic reports when there is little or no trading in the debtor's securities.

60    <u>See</u> Staff Legal Bulletin No. 2.

61    <u>See</u>11 U.S.C. 1125. The disclosure statement includes, among other things, a description of the issuer's business plan, a description of any securities to be issued, and financial information.

62    <u>See</u> Letter from Florida Division of Securities (April 27, 1998) (Florida Comment Letter); NQB Comment Letter; Demers Comment Letter; and Robotti Comment Letter. Mr. Demers suggested that the required financial information for non-reporting issuers emerging from bankruptcy be from the "effective date" of the plan, instead of the "confirmation date" of the plan. We are retaining this amendment from the confirmation date because adequate information is available about the non-reporting issuer at this point for Rule 15c2-11 purposes.

63    15 U.S.C. 78l(g).

64    17 CFR § 240.12g3-2(b).

65    Some of the paragraph (c)(6) information that broker-dealers will have to obtain and review may be present in the foreign issuer's Rule 12g3-2(b) materials.

66    <u>See</u> Part III.C.4. below.

67    For example, some commenters stated that we should delete the reference to Rule 12g3-2(b) and require broker-dealers to review the same information as required for all other foreign non-reporting issuers whose securities are subject to Rule 15c2-11. <u>See, e.g.,</u> Florida Comment Letter. Other commenters, however, indicated that we should continue to require broker-dealers to review only the home country information that certain foreign issuers submit to the Commission under Rule 12g3-2(b). <u>See, e.g.,</u> SIA Comment Letter.

68    <u>See</u> NASAA Comment Letter.

69    <u>See, e.g.,</u> Letter from David B. Schneider (April 21, 1998).

70    This provision is a presumption that financial information that is less than 15 months old is current. However, if the broker-dealer

has other information that indicates that the issuer's financial condition has materially changed from that shown in the financial statements, this presumption may not apply, and the broker-dealer should determine whether more recent financial information is available. Financial information older than 15 months is not current and does not satisfy the Rule's requirements. The presumption for non-financial information is that this information is considered current if it is as of a date within 12 months of publication of the quotation.

71    This presumption will operate in the same manner as for domestic issuers. See footnote 70 above.

72    See, e.g., Letter from Security Traders Association (April 28, 1998) (STA Comment Letter). We originally proposed that the information be made available to anyone upon request.

73    See, e.g., Letter from Richard P. Ryder, Esq. (May 12, 1998).

74    See, e.g., Letter from The Bond Market Association Comment Letter (April 27, 1998); NQB Comment Letter; and Florida Comment Letter.

75    A broker-dealer may charge for the reasonable expenses it incurs in producing and forwarding copies of the Rule 15c2-11 information.

76    We note that, for reporting issuers, information repositories already exist. Broker-dealers are able to access and review the required information on our EDGAR system, available through our Internet website at <http:// www.sec.gov>. In addition, broker-dealers may consult federal or state electronic information systems for information about issuers of covered OTC securities.

77    See, e.g., Letter from Singer Frumento Sichenzia, LLP, (April 13, 1998).

78    This authority will be delegated to the Director of the Commission's Division of Market Regulation. We propose to amend Rule 200.30-3, which provides for delegation of authority to the Director, to include the designation of information repositories. See 17 CFR 200.30-3.

79    See, e.g., STA Comment Letter.

80    Under the current Rule, "interdealer quotation system" is defined as any system of general circulation to brokers or dealers which regularly disseminates quotations of identified brokers or dealers. A separate definition of "interdealer quotation system" is no longer necessary because of the proposed elimination of the piggyback provision and the revision that the information be furnished to the NASD in accordance with NASD rules, rather than to interdealer quotation systems.

81    We are using the term "alternative trading system," which encompasses the term "electronic communications network." See Securities Exchange Act Release No. 40760 (December 8, 1998), 63 FR 70844.

82    See, e.g., Letter from Instinet (April 22, 1998).

83    For example, some broker-dealers have claimed to submit customer "orders" in quotation mediums following the termination of a Commission trading suspension issued under Exchange Act Section 12(k).

84    To rely on the exception for an unsolicited customer order, the order must represent an unsolicited indication of interest of a customer (other than a person acting as or for a dealer) of the broker-dealer submitting the order to the ATS.

85    We have previously interpreted the Rule to require a broker-dealer that was publishing quotations in a particular interdealer quotation system to review issuer information before publishing quotations in another interdealer quotation system unless it relied upon an exemption. See Letter re: OTC Bulletin Board Display Service (December 20, 1993) (conditional exemption permitting broker-dealers that are currently publishing quotations in an interdealer quotation system to publish quotations in the OTC Bulletin Board without reviewing issuer information under the Rule); and Letter re: OTC Bulletin Board; Modification of Exemption (December 1, 1998) (modifying the exemption granted in 1993). Upon adoption of the reproposed amendments, we will rescind this interpretation and related exemptions.

86    17 CFR 240.17a-4. We will add new paragraph (b)(11).

87    This proposed recordkeeping requirement was discussed by few commenters and generally was viewed favorably. See, e.g., NASAA Comment Letter.

88     Broker-dealers publishing quotes for securities of exempt financial institutions may obtain the regulatory reports from the financial institution by contacting their primary bank regulatory agency. Broker-dealers can access the Federal Reserve System's National Information Center of Banking Information Internet website at <http://www.ffiec.gov/NIC>, the Office of the Comptroller of the Currency's Internet website at <http://www.occ.treas.gov>, which has information about individual nationally chartered banks, or the Federal Deposit Insurance Corporation's (FDIC) Internet website at <http://www.fdic.gov>, which provides the most recent Call Reports for all FDIC insured banks. Broker-dealers that access exempt financial institution information through these websites would be able to satisfy the Rule's requirements by recording their review and preserving the information in the same manner as for EDGAR information discussed above.

89     The reproposal would provide the Commission with the authority to grant an exemption from the Rule for any quotation for a security or any class of security.

90     See, e.g., Florida Comment Letter.

91     15 U.S.C. 78w(a)(2).

92     15 U.S.C. 78c.

93     See, e.g., SEC v. Global Financial Traders, Ltd., Litigation Release Nos. 15291 (March 14, 1997), and 15338 (April 17, 1997).

94     NASD Manual, Marketplace Rules, Rule 6740.

95     We computed these cost estimates after reviewing, among other sources, responses to a survey of broker-dealers conducted by the NQB about issues raised in the Proposing Release. The results of the NQB's survey are available in File No. S7-3-98 at the Commission's Public Reference Room, 450 Fifth Street N.W., Washington, D.C. 20549.

96     The cost estimate assumes that clerical staff are paid at an average rate of $15 per hour and supervisory compliance staff are paid at an average rate of $100 per hour. The blended compensation rate assumes that 70% of the time is clerical and 30% is supervisory compliance $[(0.7 \times \$15) + (0.3 \times \$100) = \$40]$.

97     See OTC Bulletin Board Release.

98     See 5 U.S.C. 603.

99     For purposes of the regulatory flexibility analysis, a broker-dealer is considered "small" if its total capital is less than $500,000, and it is not affiliated with a broker-dealer that has $500,000 or more in total capital.

100     See Securities Exchange Act Release No. 40122 (June 24, 1998), 63 FR 35508 (adopting amendments to the definitions of "small business" or "small organization" under the Investment Company Act of 1940, the Investment Advisers Act of 1940, the Securities Exchange Act of 1934, and the Securities Act of 1933).

101     44 U.S.C. 3501 et seq.

102     The Commission notes that a separate PRA filing was not prepared to reflect the proposed companion changes to Rule 17a-4. The burden hours and costs described for the Rule include and account for the anticipated burdens that may arise as a result of the proposed change to Rule 17a-4.

103     The NASD has a rule requiring broker-dealers that initiate or resume quotations for covered equity securities to submit verification that they have collected the information necessary to comply with NASD requirements, as well as Rule 15c2-11. See NASD Manual, Marketplace Rules, Rule 6740.

104     We recognize that there may be covered OTC securities quoted in other quotation mediums, but at this time we do not have the empirical data to include them in our estimations.

105     This estimate is based on the assumption that the NASD will, in the first year after the reproposal becomes effective, approve 10% fewer Form 211 filings than the 1,400 applications approved in 1998.

106     Some securities have priced quotations published in both of these quotation systems. To avoid double counting, such securities are

counted as OTC Bulletin Board securities.

1    17 CFR 240.15c2-11.

2    15 U.S.C. 78a et seq.

3    This appendix sets forth guidance on a broker-dealer's review obligations under the Rule as it currently exists and under the proposed amendments. If the Commission takes final action on the proposed amendments, the Appendix will be revised to delete references to the proposal and to reflect the final rule. We expect that the Appendix will provide useful guidance to broker-dealers in conducting the document review required by the Rule.

4    Securities Exchange Act Release No. 39670 (February 17, 1998), 63 FR 9661 (Proposing Release).

5    A quotation is broadly defined as any indication that a broker-dealer is willing to buy or sell a particular security. The reproposed Rule, however, applies most directly to priced quotations. Rule 15c2-11 applies to broker-dealers that publish quotations for securities traded in the OTC markets. In this appendix, "OTC stocks" or "OTC securities" refers to securities that are not listed on a national securities exchange or Nasdaq. "Covered OTC securities" refers to those OTC securities that are subject to Rule 15c2-11. Rule 15c2-11 applies to securities quoted on the OTC Bulletin Board, operated by the National Association of Securities Dealers, Inc. (NASD); the Pink Sheets operated by the National Quotation Bureau, Inc. (NQB); and similar quotation systems.

6    See footnote 14 below for a description of "supplemental information."

7    This discussion confirms and supplements earlier guidance on Rule 15c2-11 issues. SeeSecurities Exchange Act Release No. 29094 (April 17, 1991), 56 FR 19148 (1991 Adopting Release); Securities Exchange Act Release No. 27247 (September 14, 1989), 54 FR 39194 (1989 Proposing Release).

8    17 CFR 240.15c2-11(f)(3). The security must have been the subject of quotations on at least 12 business days during the previous 30 calendar days, with no more than 4 consecutive business days elapsing without a quotation. Effectively, the Rule applies only to those market makers publishing quotations during the first 30 days of a security's trading. The ability to piggyback on one's own quotations is referred to as "self-piggybacking."

9    The piggyback exception would be eliminated under the proposed amendments.

10   The current Rule applies to an "interdealer quotation system," which is a quotation medium of general circulation to brokers or dealers which regularly disseminates quotations of identified brokers or dealers. 17 CFR 240.15c2-11(e)(2). Under the proposed amendments, the definition of interdealer quotation system" would be incorporated into the definition of "quotation medium." Under the amendments, a "quotation medium" will be a system of general circulation to brokers or dealers that regularly disseminates quotations of identified brokers or dealers; or publication, alternative trading system, or other device that is used by brokers or dealers to disseminate quotations to others.

11   15 U.S.C. 78l(k).

12   17 CFR 240.17a-4.

13   Currently, a broker-dealer must review and maintain in its records certain issuer information, which, depending on the issuer, may include prospectuses or offering circulars; certain Exchange Act reports; other regulatory filings; information furnished to the Commission pursuant to Section 12(g)(2)(G)(i) of the Exchange Act; or certain financial information for non-reporting issuers. The amendments expand the information required for issuers that do not file periodic reports with the Commission (e.g., non-reporting issuers). In addition, broker-dealers would be required to make the issuer information available to anyone who requested it.

14   In addition to a copy of any trading suspension order issued by the Commission pursuant to Exchange Act Section 12(k), the broker-dealer must record and consider any other material information (including adverse information) regarding the issuer that comes to its knowledge or possession before publishing a quotation under the Rule. Paragraph (b) [reproposed paragraph (d)] does not require a broker-dealer to maintain trivial information or information from an uncertain source. Also, the broker-dealer is not required to affirmatively seek out information about the issuer beyond that specifically required by the Rule. However, if material information about the issuer comes to its knowledge or possession (orally or in writing), the broker-dealer must take that information into account in assessing whether the issuer information is accurate and is from a reliable source. See footnote 35 below regarding how to obtain information about Commission trading suspensions.

15      17 CFR 230.251-230.263.

16      Under the reproposal, the broker-dealer can look to filings made with other federal or state regulatory authorities for certain types of issuers, e.g., financial institutions.

17      See text of reproposed Rule 15c2-11(b)(3)(iv).

18      17 CFR 240.10b-5.

19      Because of recent microcap fraud cases involving promoters, a broker-dealer should not presume a promoter is a reliable source of issuer information. See SEC Charges 44 Stock Promoters in First Internet Securities Fraud Sweep, Press Release 98-117 (October 28, 1998) available at <http:// www.sec.gov/news/press/98117.txt>.

20      Examples of an "independent retrieval service" would be the SEC's Public Reference Room or a document retrieval service.

21      Examples of "standard research sources" include publications such as Standard & Poor's Standard Corporation Manual and Moody's Investors Service Manuals.

22      The proposed Rule will require a broker-dealer to provide the information to another broker-dealer upon request.

23      See Bunker Securities, Inc., 48 S.E.C. 859 (1987), aff'd without opinion, 833 F.2d 303 (3d Cir. 1987).

24      50 S.E.C. 489 (1991). The Laser Arms Report was issued pursuant to the investigative authority granted to the Commission under Section 21(a) of the Exchange Act (15 U.S.C. 78u(a)).

25      Laser Arms Report at 501, citingSecurities Exchange Act Release No. 34-29095 (April 17, 1991), 56 FR 19158 (1991 Proposing Release).

26      The Laser Arms Memorandum misrepresented Laser Arms as a high technology weapons manufacturer and the developer of a self-chilling beverage can. The memorandum also included forged certificates of incorporation, fictitious balance sheets, and auditor's report on which the signature of the accountant had been forged.

27      Another broker-dealer who attempted to call Laser Arms learned there was no telephone listing for the company. This broker-dealer nevertheless initiated a market in Laser Arms' securities.

28      See also Bunker Securities, Inc., 48 S.E.C. 859 (1987), aff'd without opinion, 833 F.2d 303 (3d Cir. 1987).

29      See footnote 14 above for a definition of supplemental information.

30      See Sections 11 and 27 of the Securities Act, 15 U.S.C. 77k and 77x, and Sections 18 and 32 of the Exchange Act, 15 U.S.C. 78r and 78ff. See 1991 Adopting Release, 56 FR 19148, 19150 (1991).

31      If the issuer's registration statement, pursuant to Item 401 of Regulation S-K, describes criminal or other disciplinary proceedings involving a reporting issuer's officer, director, general partner, promoter, or control person, this would be a red flag. Reproposed Rule 15c2-11(c)(6)(xi) will require broker-dealers to inquire about these types of criminal or other disciplinary proceedings involving a non-reporting issuer's officer, director, general partner, promoter, or control person. Under the current Rule, however, a broker-dealer's knowledge of criminal or other disciplinary proceedings involving a reporting or non-reporting issuer's officer, director, general partner, promoter, or control person would be a red flag.

32      17 CFR 249.308.

33      17 CFR 249.308.

34      Even though the criminal and securities law violations specified in reproposed paragraph (c)(6)(xi) are not specified in paragraph (a)(5) of the current Rule, a broker-dealer's knowledge of such information would be material adverse information under the current Rule, and such violations would be a red flag.

35      See Section 12(k) of the Exchange Act. Information regarding recent trading suspension orders can be obtained by calling

APP. 000564

800-SEC-0330. The broker-dealer must obtain a copy of the trading suspension order or a copy of the Commission release announcing the trading suspension. Copies of Commission releases may be obtained through our Internet website at <http://www.sec.gov/enforce/tsuspend.htm> or from the Commission's Public Reference Room in Washington, D.C. and in regional Commission offices. Also, Commission releases are available from information databases (e.g., LEXIS), and also are published in the SEC Docket, which is available from publication services (e.g., Commerce Clearing House, Inc.).

36    The reproposal contains a presumption that the financial information of both reporting issuers and domestic and foreign non-reporting issuers is current if it is less than 15 months old. However, if the broker-dealer has other information that indicates that the issuer's financial condition has materially changed from that shown in the financial statements, this presumption may not apply, and the broker-dealer should determine whether more recent financial information is available. Financial information older than 15 months is not current and does not satisfy the Rule's requirements.

37    General Bond & Share Co., 51 S.E.C. 411 (1993)(Commission opinion), rev'd on other grounds, General Bond & Share Co. v. SEC, 39 F.3d 1451 (10th Cir. 1994); see also Robin Rushing and Harold Gallison, Jr., Securities Exchange Act Release No. 36910 (February 29, 1996).

38    Robin Rushing and Harold Gallison, Jr., Securities Exchange Act Release No. 36910 (February 29, 1996); see also Bagley Securities, Inc., Securities Exchange Act Release No. 27673 (February 5, 1990); William V. Frankel &Company, Securities Exchange Act Release No. 27649 (January 26, 1990); Richfield Securities, Inc., Securities Exchange Act Release No. 26129 (September 29, 1988).

39    See New Allied Development Corporation, Securities Exchange Act Release No. 37990 (November 26, 1996)(New Allied's control persons had substantial stock interest in nominee accounts); Douglas and Co., Inc., 46 S.E.C. 1189 (1978); Gotham Securities Corporation, 46 S.E.C. 723 (1976). Paragraph (c)(6)(x) of the reproposed Rule will require disclosure of the beneficial ownership of the issuer's stock by its executive officers, directors, general partners, promoters, or control persons.

40    Emshwiller, "Reverse Stock Splits At Many Firms Spark Outcry," The Wall Street Journal, November 20, 1998, at C1; SEC v. Magna Technologies, Inc., Litigation Release No. 12227 (August 21, 1989)(insiders of Magna effected a 4-for-1 reverse stock split, concentrated ownership in themselves, and then manipulated the price of Magna's stock by disseminating false and misleading information).

41    New Allied Development Corporation, Securities Exchange Act Release No. 37990 (November 26, 1996).

42    See In the Matter of Rom N. De Guzman, Securities Exchange Act Release No. 37747 (September 30, 1996).

43    See New Allied Development Corporation, Securities Exchange Act Release No. 37990 (November 26, 1996); Stylex Homes, Inc., Securities Exchange Act Release No. 36299 (September 29, 1995); Bunker Securities, Inc., 48 S.E.C. 859 (1987), aff'd without opinion, 833 F.2d 303 (3d Cir. 1987); Butcher & Singer, Inc., 48 S.E.C. 640,aff'd without opinion, 833 F.2d 303 (3d Cir. 1987); Douglass and Co., Inc., 46 S.E.C. 1189 (1978); A. J. Carno Co., 1976 SEC LEXIS 2764 (February 23, 1976)(initial decision), order dismissing proceeding and withdrawing broker-dealer registration, Securities Exchange Act Release No. 14647 (April 10, 1978); Gotham Securities Corporation, 46 S.E.C. 723 (1976).

44    See example #6, above.

45    See Securities Act Release No. 33-7644 (February 19, 1999) in which we adopted amendments to Rule 504 of Regulation D that limit the circumstances where general solicitation is permitted and "freely tradable" securities may be issued in reliance on Rule 504 to transactions (1) registered under state law requiring public filing and delivery of a disclosure document to investors before sale, or (2) exempted under state law permitting general solicitation and general advertising so long as sales are made only to "accredited investors."

46    Emshwiller, "NASD Quietly Takes Aim At IPO Bridge-Loan Trend," The Wall Street Journal, January 20, 1998, at C1.

47    See Memory Metals, Inc., Securities Act Release No. 6820 (February 22, 1989).

48    New Allied Development Corporation, Securities Exchange Act Release No. 37990 (November 26, 1996); see also Frederick R. Grant, Securities Exchange Release No. 38239 (February 5, 1997); Atlantis Group, Inc., Securities Exchange Act Release No. 37932 (November 8, 1996); Eli Buchalter, Securities Exchange Act Release No. 37702 (September 19, 1996); Milton Mermelstein, Securities Exchange Act Release No. 37222 (May 16, 1996).

APP. 000565

PUBLICATION OR SUBMISSION OF QUOTATIONS..., Release No. 41110...

49    See New Allied Development Corporation, Securities Exchange Act Release No. 37990 (November 26, 1996)(the respondents obtained New Allied, a public shell, which was a dormant uranium mining company with no assets, in a transaction which resulted in insiders controlling 52.4% of New Allied's stock; New Allied then acquired an interest in real estate associated with worthless gambling concerns in exchange for New Allied stock); Douglass and Co., Inc., 46 S.E.C. 1189 (1978).

50    See New Allied Development Corporation, Securities Exchange Act Release No. 37990 (November 26, 1996)(the respondents disseminated materially false documents to market makers, including unaudited financial statements, that valued New Allied's medical and consumer products at $2,150,000, although their historical costs were approximately $17,000); A. J. Carno Co., 1976 SEC LEXIS 2764 (February 23, 1976)(Initial Decision), order dismissing proceeding and withdrawing broker-dealer registration, Securities Exchange Act Release No. 14647 (April 10, 1978)( Management Dynamics, Inc.'s (MD) founding officer and director wrote MD shareholders to recommend the acquisition of the assets of a real estate developer. Press releases and shareholder letters reinforced the misleading impression that the transaction was certain to generate substantial income for MD).

51    When two companies merge, compliance with Generally Accepted Accounting Principles requires that the combination be accounted for as either the "pooling method" or "purchase method." With the pooling method, the historical costs of the two companies are added together. With purchase method accounting, the company being acquired writes up its assets to fair market value, which generally are greater than the historical costs.

52    Ronald Effren, Securities Act Release No. 7256, Securities Exchange Act Release No. 36713 (January 16, 1996); see also Martin Halpern, Securities Exchange Act Release No. 34727 (September 27, 1994).

53    See Securities Exchange Act Form 8-K, Item 4; Merle S. Finkel, Securities Act Release No. 7401 (March 12, 1997)(original auditors notified Systems of Excellence that purported registration statement on Form S-8 had not been filed and that other irregularities exist in connection with issuance of this stock; thereafter, Systems of Excellence retained new auditor who issued materially false or inaccurate audit reports).

54    See Robin Rushing and Harold Gallison, Jr., Securities Exchange Act Release No. 36910 (February 29, 1996). In this case, the SEC also had entered a trading suspension for lack of accurate financial information.

55    See Ronald Effren, Securities Exchange Act Release No. 36713 (January 16, 1996).

56    Douglass and Co., Inc., 46 S.E.C. 1189 (1978).

57    See also Butcher & Singer, Inc., 48 S.E.C. 640,aff'd without opinion, 833 F.2d 303 (3d Cir. 1987)(a salesman and later an officer of Butcher & Singer apparently obtained some blank stock certificates and forged former officers' signatures as well as the certificates' amounts and purported dates of issuance to himself and his family members; the broker-dealer, Butcher & Singer, failed to review the Rule's required information; Butcher & Singer might have noticed red flags that would have led to the discovery of the underlying fraud if it had reviewed the Rule's required information).

58    See United States v. Marshall Zolp, Litigation Release Nos. 11494 (July 23, 1987) and 11236 (October 2, 1986)(fictitious certificates of incorporation and fictitious financial statements on which the name of another company had been whited out and the name of Laser Arms filled in).

59    See, e.g., A. J. Carno Co., 1976 SEC LEXIS 2764 (February 23, 1976) (Initial Decision), order dismissing proceedings and withdrawing broker-dealer registration, Securities Exchange Act Release No. 14647 (April 10, 1978).

60    See Combined Companies International Corp., Securities Exchange Act Release No. 38653 (May 19, 1997); Robin Rushing and Harold Gallison, Jr., Securities Exchange Act Release No. 36910 (February 29, 1996).

61    Stylex Homes, Inc., Securities Exchange Act Release No. 36299 (September 29, 1995).

62    The reproposed text of Rule 15c2-11 (c)(6)(xi)(A)(2) requires the broker-dealer to review these factors for non-reporting issuers. Otherwise, under the reproposed text of Rule 15c2-11(c)(6)(xi)(B) or (C), the broker-dealer must obtain a statement from the issuer that none of these events has occurred or must record the steps taken to obtain this information and that the issuer refused or failed to provide it. Even though the current Rule does not require the broker-dealer to obtain and review this information, we consider such information to be red flags under the Rule if it comes to the broker-dealer's attention.

63    See SEC v. I-Net Providers, Litigation Release No. 15219 (January 17, 1997); New Allied Development Corporation, Securities Exchange Act Release No. 37990 (November 26, 1996).

64    See Exchange Act Form 8-K, Item 1.

65    See Exchange Act Form 8-K, Item 2.

66    See Exchange Act Form 8-K, Item 3.

67    The proposed text of Rule 15c2-1l(c)(6)(xii)(A) requires the broker-dealer to review these factors. Otherwise, under the proposed text of Rule 15c2-11(c)(6)(xii)(B) or (C), the broker-dealer must obtain a statement from the issuer that none of these events has occurred or must record the steps taken to obtain this information and that the issuer refused or failed to provide it. Even though the current Rule does not require the broker-dealer to obtain and review this information, we consider such information to be red flags under the Rule if it comes to the broker-dealer's attention.

68    See New Allied Development Corporation, Securities Exchange Act Release No. 37990 (November 26, 1996); A. J. Carno Co., 1976 SEC LEXIS 2764 (February 23, 1976)(Initial Decision), order dismissing proceedings and (footnote continued) withdrawing broker-dealer registration.Securities Exchange Act Release No. 14647 (April 10, 1978); see also Bion Environmental Technologies, Inc., Securities Exchange Act Release No. 36111 (August 16, 1995).

69    See B.J. Thomas, Securities Exchange Act Release No. 38727 (June 10, 1997); SEC v. Magna Technologies, Inc., Litigation Release No. 12227 (August 21, 1989); see e.g., Milton Mermelstein, Securities Exchange Act Release No. 37222 (May 16, 1996).

70    Alessandrini & Co., Inc., 45 S.E.C. 399 (1971), citing D.H. Blair & Co., 44 S.E.C. 320 (1970).

71    Butcher & Singer, Inc., 48 SEC 640,aff'd without opinion, 833 F.2d 303 (3d Cir. 1987)(a salesman received 400,000 shares of an obscure penny stock for helping to develop and maintain a market in the stock); see Brent Duane Green, Securities Exchange Act Release No. 39210 (October 7, 1997); Steven Ira Wertman, Securities Exchange Act Release No. 38751 (June 20, 1997); Christopher D. Jennings, Securities Exchange Act Release No. 38696 (May 30, 1997).

72    NASD Rule 2460, Payments for Market Making, prohibits any payment by an issuer or the issuer's affiliates and promoters, directly or indirectly, to a member for publishing a quotation, acting as a market maker, or submitting an application.

73    See reproposed Rule 15c2-11(e); see also current Rule 15c2-11(a)(5)(xvi).

74    Douglass and Co., Inc., 46 S.E.C. 1189 (1978); see also See Robin Rushing and Harold Gallison, Jr., Securities Exchange Act Release No. 36910 (February 29, 1996); General Bond & Share Co., 51 S.E.C. 411 (1993)(Commission opinion), rev'd on other grounds, General Bond & Share Co. v. SEC, 39 F.3d 1451 (10th Cir. 1994).

75    17 CFR 230.901-230.905 and Preliminary Notes.

76    Securities Act Release No. 7505 (February 17, 1998), 63 FR 9632. We also adopted amendments that would affect applicable reporting requirements along with other amendments intended to prevent abuses of Regulation S. Since January 1, 1999, Regulation S transactions are required to be reported quarterly on Forms 10-Q and 10-K.

77    See Frederick R. Grant, Securities Exchange Release No. 38239 (February 5, 1997); S.E.C.v. Enviromint Holdings, Inc., Litigation Release No. 14683 (October 6, 1995).

78    Form S-8 under the Securities Act of 1933 (15 U.S.C. 77a et seq.).

79    See S.E.C. v. Enviromint Holdings, Inc., Litigation Release No. 14683 (October 6, 1995).

80    See, e.g., Spectrum Information Technologies, Inc., Securities Act Release No. 7426 (June 25, 1997); SEC v. Hollywood Trenz, Inc., Litigation Release No. 15730.

81    See S.E.C. v. Charles O. Huttoe, Litigation Release Nos. 15153 (November 7, 1996); 15185 (December 12, 1996)(unregistered public offering purporting to use Form S-8).

82    Securities Act Release No. 33-7646 (February 19, 1999).

83    Securities Act Release No. 33-7647 (February 19, 1999).

84    See Douglass and Co., Inc., 46 S.E.C. 1189 (1978) (November 26, 1996) (mining operation); see also S.E.C. v. Bradley J. Simmons and American Energy Group, Ltd, Litigation Release No. 15353 (April 29, 1997)(oil and gas company).

85    Laser Arms Report, 50 S.E.C. 489, 503;see also Butcher & Singer, Inc., 48 S.E.C. 640,aff'd without opinion, 833 F.2d 303 (3d Cir. 1987); Gotham Securities Corporation, 46 S.E.C. 723 (1976) (the family of the broker-dealer's principal owned a significant amount of the stock of Marcon Electronics Corp., which was a shell corporation with no assets; the family benefited when the broker-dealer manipulated upward the price of the Marcon stock).

86    Merle S. Finkel, Securities Act Release No. 7401 (March 12, 1997).

87    New Allied Development Corporation, Securities Exchange Act Release No. 37990 (November 26, 1996).

Release No. 41110 (S.E.C. Release No.), Release No. 34-41110, 69 S.E.C. Docket 475, 1999 WL 95487

End of Document                                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

APP. 000568

# Appendix

# Exhibit AA



63 FR 9661-01
PROPOSED RULES
SECURITIES AND EXCHANGE COMMISSION
17 CFR Part 240
[Release No. 34-39670; File No. S7-3-98]
RIN 3235-AH40

Publication or Submission of Quotations Without Specified Information

Wednesday, February 25, 1998

**\*9661** AGENCY: Securities and Exchange Commission.

ACTION: Proposed rule.

SUMMARY: The Securities and Exchange Commission ("Commission") is publishing for public comment proposed amendments to Rule 15c2-11 ("Rule") under the Securities Exchange Act of 1934 ("Exchange Act"). The Commission is publishing these proposals in response to increasing incidents of fraud and manipulation in the over-the-counter securities market involving thinly traded securities of thinly-capitalized issuers (i.e., "microcap securities"). Rule 15c2-11 governs the publication of quotations for securities that are traded in a quotation medium other than a national securities exchange or Nasdaq. The proposals would require all broker-dealers to review information about the issuer when they first publish or resume publishing a quotation for a security subject to the Rule, document that review, annually update the information if they publish priced quotations, and make the information available to other persons upon request. In addition, the proposals would enhance the Rule's information requirements for quotations for the securities of non-reporting issuers and ease the Rule's recordkeeping requirements when broker-dealers have electronic access to information about reporting issuers. The Commission also is proposing a number of textual and structural changes in an effort to simplify and streamline the Rule. Finally, the Commission is proposing an amendment to Rule 17a-4 under the Exchange Act that would incorporate the record retention requirements currently contained in Rule 15c2-11.

DATES: Comments must be received on or before April 27, 1998.

ADDRESSES: Persons wishing to submit written comments should send three copies to Jonathan G. Katz, Secretary, Securities and Exchange Commission, Mail Stop 6-9, 450 Fifth Street, N.W., Washington, D.C. 20549. Comments also may be submitted electronically at the following E-mail address: rule-comments @sec.gov. All comment letters should refer to File No. S7-3-98; this file number should be included on the subject line if E-mail is used. Comment letters received will be available for public inspection and copying in the Commission's Public Reference Room, 450 Fifth Street, N.W., Washington, D.C. 20549. Electronically submitted comment letters will be posted on the Commission's Internet web site (http://www.sec.gov).

FOR FURTHER INFORMATION CONTACT: Any of the following attorneys in the Office of Risk Management and Control, Division of Market Regulation, Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549, at (202) 942-0772: Nancy J. Sanow, Alan Reed, Irene Halpin, Florence Harmon, Denise Landers, or Chester McPherson.

SUPPLEMENTARY INFORMATION: The Commission is proposing for comment amendments to Rule 15c2-11[FN1] and Rule 17a-4[FN2] under the Securities Exchange Act of 1934 ("Exchange Act").[FN3]

### I. Executive Summary and Background

#### *A. Executive Summary*
Incidents involving fraud and manipulation of microcap securities that trade in the over-the-counter ("OTC") securities market appear to be rising.[FN4] This trend has been the subject of Congressional hearings,[FN5] state hearings[FN6] and

APP. 000570

numerous media reports.[FN7] These developments have caused the Commission to reexamine Exchange Act Rule 15c2-11, its rule governing the publication of quotations in the non-Nasdaq OTC market. As a result, the Commission is proposing comprehensive amendments to Rule 15c2-11 that address abuses involving microcap securities and more generally would enhance the integrity of quotations for securities in this market sector. The proposed amendments also would reorganize and simplify the Rule's provisions.

Microcap securities[FN8] generally are characterized by low share prices and little or no analyst coverage. The issuers of microcap securities typically are thinly capitalized and often are not required to file periodic reports with the Commission. Securities of microcap companies usually are quoted on the OTC Bulletin Board ("Bulletin Board") operated by the National Association of Securities Dealers, Inc. ("NASD") or in the Pink Sheets published by the National Quotation Bureau ("NQB"), but they are not exclusive to these **\*9662** mediums.[FN9] The Commission recognizes, however, that not all securities traded in this market sector are tainted by fraud.

Microcap fraud frequently involves issuers for which public information is limited, especially when issuers are not subject to reporting requirements.[FN10] Without information, it is difficult for investors, securities professionals, and others to evaluate the risks presented by microcap securities. Investors consequently can fall prey to persons who make false representations and unrealistic predictions about these securities.

As part of their manipulative schemes, unscrupulous retail brokers, operating out of "boiler rooms," frequently use high pressure sales tactics to stimulate investors to buy these securities. These brokers often publicly disseminate false press releases or make false statements about issuers (including through the Internet) to promote sales. To further the manipulative scheme, retail broker-dealers often also act as market makers or, either on their own or through the issuers' promoters, induce other firms to act as market makers in the securities.

Market makers' quotations are important to the success of microcap fraud schemes. By publishing quotations in the Bulletin Board, in the Pink Sheets, or in similar quotation mediums, broker-dealers give the market for the securities an aura of credibility. This can occur even if the market maker is not intentionally participating in improper activities, but is publishing quotes in response to escalating demand for the securities resulting from increasing retail sales. Trading volume for the security skyrockets and quotations and sales prices escalate (often at prices artificially set by the manipulators).

Eventually, broker-dealers and promoters stop stimulating interest in the security and its price drops. Too often the result is the same: innocent investors lose money. To address this microcap fraud problem, the Commission is pursuing a strategy of investor education, focused broker-dealer inspections, increased enforcement, and regulatory initiatives.[FN11]

The proposed amendments to Rule 15c2-11 would place greater information review and recording requirements, and thus greater accountability, on broker-dealers publishing quotations for securities in a quotation medium other than a national securities exchange or Nasdaq ("covered OTC securities"). These proposed amendments also would provide greater investor access to information about these securities. In particular, the proposed amendments would:

- Eliminate the Rule's "piggyback" provision, which currently permits broker-dealers (other than the initial broker-dealer) to quote the security without having current issuer information;

- Require broker-dealers that publish priced quotations for a security to obtain and review updated information about the issuer at least annually;

- Expand the information required about issuers that do not file periodic reports with the Commission;

- Require documentation of the broker-dealer's compliance with Rule 15c2-11; and

- Enhance investor access to the information required by Rule 15c2-11.

The proposed amendments apply to all securities covered by Rule 15c2-11, not just microcap securities. The Commission believes that the scope of the amendments is appropriate to preserve the general integrity of quotations in the OTC market and to foster greater information transparency in a marketplace where issuers often are relatively unknown and their

APP. 000571

securities are traded infrequently.

### B. Operation of Current Rule 15c2-11

Rule 15c2-11 regulates the initiation and resumption of quotations in a quotation medium by a broker-dealer for certain OTC securities. The Commission adopted Rule 15c2-11 in 1971 to prevent fraudulent and manipulative trading schemes that had arisen in connection with the distribution and trading of unregistered securities issued by "shell" companies, or other issuers of infrequently-traded securities (about which there was little public information).[FN12] The Rule prevents broker-dealers from publishing quotations for covered OTC securities without reviewing basic information about the issuer.[FN13] Specifically, the Rule applies to broker-dealers publishing quotations in a "quotation medium,"[FN14] but it does not apply to broker-dealers publishing quotations for securities listed and traded on an exchange or quoted on Nasdaq.

Subject to certain exceptions, the Rule prohibits a broker-dealer from publishing a quotation for a security (or submitting a quotation for publication) in a quotation medium unless it has obtained and reviewed specified information about the issuer and the security. The broker-dealer also must have a reasonable basis for believing that the issuer information is accurate and that it was obtained from a reliable source.

Currently, a broker-dealer must review and maintain in its records the following issuer information:

- For an issuer that has conducted a recent public offering either registered under the Securities Act of 1933 ("Securities Act")[FN15] or effected pursuant to Regulation A under the Securities Act, a copy of the prospectus or offering circular;

- For an issuer that files reports with the Commission pursuant to Sections 13 or 15(d) of the Exchange Act ("reporting issuer") or is an insurance company of the kind specified in Section 12(g)(2)(G) of the Exchange Act, the issuer's most recent annual report and any quarterly or current reports filed thereafter;

- For foreign issuers that claim the registration exemption under Exchange Act Rule 12g3-2(b), the information furnished to the Commission pursuant to that rule; or

- For any other issuer, the information, including certain financial information, specified in paragraph (a)(5) of the Rule, which must be reasonably current in relation to the day a quotation is submitted.

In addition, paragraph (c) of the Rule requires a broker-dealer to review any other information about the issuer that comes to its knowledge or possession before the publication or submission for publication of a quotation.
Under the Rule's "piggyback" exception, the information requirements do not apply when a broker-dealer publishes, in an interdealer quotation system,[FN16] a quotation for a covered OTC **\*9663** security that already has been the subject of regular and frequent quotations.[FN17] A broker-dealer can "piggyback" on either its own or other broker-dealers' previously published quotations. The exception is grounded on the assumption that regular and frequent quotations for a security generally reflect market supply and demand forces based on independent, informed pricing decisions.

### C. 1991 Proposing Release

In 1991, the Commission proposed amendments to Rule 15c2-11 that would have eliminated the piggyback provision. At the time, the Commission believed that the underlying assumption of the piggyback provision (i.e., that regular and frequent quotations for a security generally reflect supply and demand forces based on independent pricing decisions) were no longer valid in the non-Nasdaq OTC market.[FN18]

The Commission observed that the Rule's coverage is limited to non-Nasdaq OTC securities, which usually are low-priced, speculative stocks of relatively unknown issuers, and that the market for these securities is characterized by an absence of both market making and retail competition. As a result, the Commission proposed amendments that would have required every broker-dealer to review issuer information prior to initiating or resuming quotations in a covered OTC security. These amendments would have retained a "self-piggybacking" provision for broker-dealers that quoted these securities with the required frequency.[FN19]

The Commission received 75 comment letters from 74 commenters in response to the 1991 Proposing Release. The vast