majority of commenters opposed the Commission's proposal. These commenters believed that the proposal would discourage, or even eliminate, market making for many non-Nasdaq OTC securities. They claimed that the proposed amendments would have impaired liquidity, reduced market value, and harmed the capital-raising process. Several commenters believed that the proposed changes would have hurt the market for the securities of many substantial and legitimate companies, but would have little effect on fraud in worthless stocks. For several reasons, including the adoption of other measures aimed at curbing then-existing abuses in low-priced stocks,[FN20] the Commission did not take further action on this initiative.[FN21]

## II. Proposed Amendments

*A. Proposed Revisions to Rule 15c2-11*

### 1. Activities Prohibited by the Rule

The proposed amendments restructure Rule 15c2-11 to set forth more clearly the activities prohibited by the Rule and the requirements of the Rule. The Rule would state that it is unlawful for a broker-dealer, directly or indirectly, to publish or to submit for publication any quotation for a security in any quotation medium unless the broker-dealer complies with the Rule's provisions.[FN22]

The Rule further would provide that, prior to publishing or submitting for publication an initial quotation for a security in a quotation medium, or upon the occurrence of enumerated events, a broker-dealer must:

- Obtain and review the Rule's information;

- Determine that it has a reasonable basis for believing that the information is accurate and current in all material respects and is obtained from reliable sources; and

- Record the date it reviewed the specified information, the sources of the information, and the person at the firm responsible for the broker-dealer's compliance with the Rule.[FN23]

By restructuring the Rule in this manner, the Commission believes that the obligations of broker-dealers under the Rule are more clearly set out. Moreover, by imposing a recordation requirement, broker-dealers' accountability for compliance with the Rule should be enhanced.

Q1. Do the Rule's core requirements remain appropriate or should they be amended?

Q2. Are there other compliance items that should be recorded?

Q3. Should the Rule expressly require the firm's compliance officer to review the Rule 15c2-11 information before the quote is submitted?

Q4. What type of review do broker-dealers currently undertake? What is the appropriate scope of review by a broker-dealer to comply with the Rule, as proposed to be amended? Commenters should consider the duties of a broker-dealer under Rule 15c2-11 as discussed in the 1991 Adopting Release.[FN24]

### 2. Elimination of the Piggyback Provision

The Commission proposes to eliminate the piggyback provision. As discussed above, the piggyback provision currently permits broker-dealers to publish quotations for a security without complying with the Rule's requirements if any other broker-dealer has published regular and frequent quotations for that security. In the Commission's view, microcap fraud is facilitated by broker-dealers that publish quotations for a security without reviewing any issuer information.[FN25] Even if they are not participating in the fraud, these other broker-dealers give the security a measure of credibility through their quotations. Some broker-dealers claim that they "trade by the numbers" (i.e., they trade solely on the basis of supply and demand factors and without regard to fundamental information about the issuer).[FN26] The Commission believes that eliminating the piggyback provision is an essential step to preventing microcap fraud. In the Commission's view, *9664

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.    4

responsible broker-dealers would be deterred from publishing quotations if they were aware of basic information about the issuer that suggested a possible fraud.

Under the proposal, each broker-dealer that publishes a quotation for a covered OTC security for the first time in a particular quotation medium[FN27] other than the exchanges or Nasdaq would be required to review fundamental information about the issuer and have a reasonable basis for believing that the information is accurate, current, and from reliable sources. The Commission recognizes that many commenters on the 1991 Proposing Release raised issues about the perceived costs of compliance and the possible resulting loss of liquidity for some securities if the piggyback provision were eliminated and annual information updating were required. As discussed below, the availability of the EDGAR system should reduce the information gathering and recordkeeping costs for those broker-dealers that publish quotes for the securities of reporting issuers. Also, the Commission encourages the development of central repositories of information about issuers that are not participating in its public disclosure system.[FN28]

Q5. Are there any circumstances in which it would be appropriate to retain a piggyback provision? If so, how should such a provision be structured?

### 3. The Occurrence of Events Requiring Actions under the Rule

After a broker-dealer publishes its first quotation[FN29] in compliance with the Rule for a security in a particular quotation medium it can continue to publish quotations (either priced or unpriced) for the security in that medium without reviewing updated information until the occurrence of either of the following events:

- A period of five or more consecutive business days in which the broker-dealer does not publish quotations for the security; or

- The Commission has ordered a trading suspension pursuant to Section 12(k)[FN30] of the Exchange Act for any of the issuer's securities.

Following one of these events, a broker-dealer must gather and review the information required by the Rule before publishing quotations. In the Commission's view, if a broker-dealer has not quoted the security for five or more consecutive business days, that fact may reflect the broker-dealer's nominal interest in publishing quotations for the security, and thus the broker-dealer may not be aware of significant events involving the issuer.

The Rule also would require a broker-dealer to gather and review the specified information annually if the broker-dealer publishes priced quotations for the security. The purpose of this requirement is to make sure that a broker-dealer publishing priced quotations periodically reviews fundamental information about the issuer. A broker-dealer should know if there is no current information about the issuer or if the current information reflects a significant change in the issuer's ownership, operations, or financial condition.

The annual update requirement would apply only to broker-dealers publishing priced quotations. The Commission believes that priced quotations have been used in microcap fraud and manipulation schemes, (e.g., when a broker-dealer publishes quotations at increasing prices to obtain bank loans or to value customer securities' positions). In addition, priced quotations are used as indicia of value for a variety of purposes (e.g., pledges of securities). The Commission will reconsider its position, however, if it discovers that unpriced entries are also used to facilitate unlawful schemes.

The broker-dealer would have two optional dates as measuring points for conducting the annual review: the anniversary date of its initial quotation for the security; or the date that is four months after the end of the issuer's fiscal year (or, for a foreign private issuer, the date that is seven months after the end of the issuer's fiscal year). The annual review must be conducted before the broker-dealer publishes a priced quotation following the review date option that it selects. The Commission believes that four months (or seven months for foreign private issuers) would give a broker-dealer sufficient time to obtain and review updated issuer information about reporting and non-reporting issuers.

Q6. Should the annual update requirement apply to unpriced quotations?

Q7. Should the annual update requirement be eased or eliminated when a reporting issuer is current in its Exchange Act

reporting obligations?

Q8. Should the provision triggering the review of updated information following a break in quotations provide for a period of more or less than five consecutive business days?

Q9. In addition to a trading suspension, should any other significant events involving the issuer (e.g., a merger or acquisition, significant offering, name change, change of business, resignation of accountants, or bankruptcy proceeding) trigger the Rule's obligations to obtain, review, and document updated information?

Q10. Should the Rule include other optional dates triggering the annual review requirement for priced quotations (e.g., by January 1 of each year)?

Q11. For domestic issuers, should the period within which a broker-dealer must conduct an annual review be longer than four months after an issuer's fiscal year end (for example, five or six months) or shorter than four months (for example, three months, or 14 weeks)?

Q12. For foreign issuers, should the period within which a broker-dealer must conduct an annual review be longer than seven months after an issuer's fiscal year end (for example, as long as nine months) or shorter than seven months (for example, four or six months)?

Q13. For foreign issuers, should the annual updating requirement apply if trading is suspended on any exchange or organized market on which its securities trade?

Q14. Would either the requirement to review updated information after a five-day lapse or the annual update requirement adversely affect the liquidity of covered OTC securities? Commenters responding to this question are urged to provide data and analysis.

**4. Information Required by the Rule**
a. Issuer Information. Current Rule 15c2-11 specifies the information that a broker-dealer must review before publishing quotations for five categories of issuers: (1) Issuers that had a recent registered offering; (2) issuers that had a recent offering under Regulation A under the Securities Act;[FN31] (3) reporting issuers and insurance companies *9665 exempted from Section 12(g) of the Exchange Act[FN32] by reason of Section 12(g)(2)(G) ("exempt insurance companies");[FN33] (4) foreign private issuers that are exempt from Section 12(g) of the Exchange Act by reason of compliance with Rule 12g3-2(b) thereunder;[FN34] and (5) other issuers. The proposals would revise the Rule's information requirements with respect to reporting issuers and would enhance the requirements for non-reporting issuers. In addition, the proposals would add an information provision that covers certain non-reporting financial institutions.

i. Reporting issuers and exempt insurance companies. Currently, a broker-dealer publishing quotations for the securities of a reporting issuer (or exempt insurance company) must review the issuer's most recent annual report, together with any subsequently filed quarterly or current reports. The proposed amendments retain this requirement and clarify that the issuer must be current in its reporting obligations. Therefore, broker-dealers publishing quotations for the securities of any issuer delinquent in its reporting obligations ("delinquent issuer") no longer would be able to rely on the Rule's provision containing the information requirements designed for non-reporting issuers.[FN35]

For reporting issuers, broker-dealers would be able to access and review the required information on the Commission's EDGAR system, available through the Commission's Internet website (http://www.sec.gov). Broker-dealers using this method would have to document the date of their review and satisfy the Rule's information retention requirements, discussed later in this release.

Under the proposals, a broker-dealer could not publish its initial quote without reviewing the Rule's required information, nor could it continue to publish priced quotations without updating that information annually. This means that, in the case of a delinquent issuer, a broker-dealer would not be permitted to publish an initial quotation or continue to publish priced quotations after the annual review date because it would not be able to obtain current reports. Broker-dealers that initiated a quotation in compliance with the Rule prior to the issuer's delinquency could continue to publish unpriced quotations after

the annual review date.

While the market for a delinquent issuer's securities may be somewhat constrained by this proposal, this requirement furthers the Rule's purpose of limiting the fraudulent and manipulative potential of priced quotations in the absence of accurate and current information about the issuer. The Commission recently brought several enforcement actions against issuers for failure to file timely reports.[FN36] In many of these actions, an active trading market for the issuer's securities existed even though adequate and current issuer information was not available to broker-dealers or investors. In these circumstances, priced quotations have a substantial potential to facilitate improper retail sales practices where broker-dealers recommend securities to investors, without adequate information to support the recommendation, and refer investors to the market price (i.e., priced quotes) as an indication of value.

In the past, commenters have suggested marking the quotation with a designator to indicate that issuer information was not available.[FN37] The Commission does not view this alternative as responding adequately to the problem of active trading facilitated by priced quotations without current information. Moreover, that approach would remove an incentive that delinquent issuers may have to provide current information to their shareholders and the marketplace.

Q15. Under what circumstances, if any, should broker-dealers be able to initiate quotations, or continue publishing priced quotations, for the securities of delinquent issuers?

ii. Other issuers. Rule 15c2-11(a)(5)[FN38] specifies the information that broker-dealers must obtain and review for issuers other than those covered by paragraphs (a)(1) through (a)(4). For the most part, this provision covers the securities of U.S. non-reporting issuers. Currently, a broker-dealer is required to review basic information about these issuers, including: the issuer's most recent balance sheet, profit and loss, and retained earnings statements; a description of the issuer's business, products or services offered, and facilities; and a description of any relationship between the broker-dealer and the issuer's insiders.

Based on recent experience, broker-dealer review of additional items of information should reduce the potential for fraud in this segment of the capital market.

Therefore, the Commission proposes to expand the information that broker-dealers must review before publishing a quotation for a non-reporting issuer's securities and to make that information more readily available to the marketplace.

The proposed amendments would require broker-dealers to review more information about the issuer's outstanding securities, its officers and directors, its financial condition, and certain significant events, among other items. This enhanced information would give a broker-dealer that is considering whether to publish quotations a greater understanding of the issuer's operations and a better indication of whether potential or actual fraud or manipulation may be present.

Securities Information. The Rule would require a broker-dealer to obtain and review information regarding each class of the non-reporting issuer's outstanding securities, including the number of securities outstanding, the number of securities issuable upon exercise or conversion of outstanding derivative securities of the issuer, and the total number of securityholders of record as of the end of the issuer's most recent fiscal year (or a more recent date if the data is available). The Commission believes that this information is relevant because it provides broker-dealers with a greater awareness of the issuer's equity structure, particularly as recent incidents of fraud have involved transactions in derivative securities, *9666 such as warrants.[FN39] This enhanced information requirement would indicate to the broker-dealer whether any persons had access to large quantities of securities that could dilute the value of the public float.

Q16. Are there other items of information regarding the issuer's outstanding securities that would be helpful to broker-dealers publishing quotations of covered OTC securities?

Control Person Information. For non-reporting issuers, the Rule would require broker-dealers to obtain the names, addresses, and holdings in the issuer's securities of the issuer's insiders (including promoters and control persons), and information about the disciplinary histories of the issuer's insiders (including promoters and control persons). Specifically, the broker-dealer must review information about the following events involving persons related to the issuer in: Any criminal charges or convictions; any court-issued injunctions, bars or other limitations involving any type of business, securities,

commodities, or banking activities; any violation of federal or state securities or commodities law; or any bars or suspensions by a self-regulatory organization ("SRO"). This information must be provided if the events occurred during the five-year period preceding the publication of the quotation. Reviewing these items of information should help broker-dealers evaluate the degree of control over the issuer exerted by insiders and alert the broker-dealer to possible "red flags" regarding the issuer's insiders and control persons.

Two alternative options for the broker-dealer to satisfy this requirement are proposed. The broker-dealer could obtain a statement from the issuer that none of the specified actions had occurred; or the broker-dealer could document the steps taken to obtain the required information and the issuer's response, including whether the issuer refused to cooperate. The second alternative would allow the broker-dealer to publish quotations when it has difficulty obtaining the information. However, the broker-dealer should consider the issuer's refusal to supply this information when the broker-dealer ascertains whether it has a reasonable basis for believing that the other Rule 15c2-11 information it obtained and reviewed is accurate and the sources are reliable.

Q17. Is it appropriate to allow a broker-dealer to publish quotations if the issuer refuses to supply disciplinary history information regarding its insiders, control persons, or promoters?

Q18. Should any other disciplinary history or other background information about the issuer's insiders, control persons, or promoters be required? Would this information be helpful to broker-dealers in determining whether to publish quotations?

Financial Information. The Commission is proposing to expand the financial information that a broker-dealer must gather and review about a non-reporting issuer. The proposal includes different requirements with respect to domestic and foreign private issuers. Currently, paragraph (a)(5)(xii) requires a broker-dealer to obtain and review an issuer's most recent balance sheet and profit and loss and retained earnings statements. The Rule does not require this financial information to be audited or presented in a particular format.

Domestic non-reporting issuers. The proposed amendments would require a broker-dealer to obtain and review the issuer's most recent balance sheet, statement of operations (income), statement of cash flows, statement of shareholders' equity, and statement of comprehensive income. It also would require these items to be prepared in accordance with U.S. generally accepted accounting principles ("U.S. GAAP"). This requirement for the financial statements to be prepared in accordance with a comprehensive body of generally accepting accounting principles would create greater uniformity for these financial statements. This uniformity would assist the review by broker-dealers and surveillance by regulators.

The Commission understands that in the case of non-reporting U.S. issuers, the financial statements submitted on NASD Form 211 to the NASD pursuant to NASD Marketplace Rule 6740 typically are prepared in accordance with U.S. GAAP and some, but not all, are audited.[FN40] Accordingly, the Commission's preliminary view is that the proposed U.S. GAAP standard would not impose substantial costs on issuers.

Q19. Do most domestic non-reporting issuers already prepare their financial statements in accordance with U.S. GAAP?

Q20. Should the Rule require that these financial statements be audited?

Foreign non-reporting issuers. The proposals would require a broker-dealer to obtain and review the following information for a foreign private issuer (other than an issuer furnishing information to the Commission pursuant to Rule 12g3-2(b)): the issuer's most recent balance sheet and statement of operations (income) and, to the extent prepared by the issuer, statements of cash flows, comprehensive income and changes in shareholders' equity. These statements must be prepared in accordance with a comprehensive body of accounting principles. This proposal would provide broker-dealers with financial information about issuers that do not participate in the Exchange Act reporting programs. Preparation of U.S. GAAP financial statements would be permitted but not required.

The proposal would permit broker-dealers to obtain information prepared using a number of different comprehensive bodies of accounting which will limit the uniformity of the information reviewed. Although the Commission has not included specific amendments to address this concern, the Commission is seeking comments on possible alternative measures that could be adopted to improve the level of financial information relied upon by broker-dealers when submitting priced

quotations for foreign non-reporting issuers' securities.

Q21. The proposal requires a broker-dealer to obtain and review statements of cash flows, comprehensive income and changes in shareholders' equity only to the extent prepared by the issuer. Should broker-dealers be prohibited from publishing quotations if certain of those financial statements are not available? If so, which ones should be required?

Q22. Do most foreign non-reporting issuers already prepare their financial statements in accordance with a comprehensive body of accounting principles?

Q23. Should broker-dealers be required to obtain and review financial statements for foreign non-reporting issuers prepared in accordance with or that are reconciled to U.S. GAAP?[FN41]

Q24. Should broker-dealers be required to obtain and review financial statements for foreign non-reporting issuers prepared in accordance with or reconciled to U.S. GAAP[FN42] only when the principal market for their securities is the United States?

Q25. Should the Rule require that these financial statements be audited? If so, should they be required to be audited in accordance with U.S. generally accepted auditing standards?

Significant Events. In addition, the proposals would require a description of significant events regarding the issuer during the last two years, including: A change in control; a 10% or more increase in an outstanding class of equity securities; a merger or acquisition; an acquisition or disposition of significant assets; bankruptcy proceedings; or delistings by a securities exchange or Nasdaq. This information seems relevant because broker-dealers would be made aware of information about significant events involving the issuer. The Commission is also proposing to add a provision, similar to the disciplinary history requirement, that would give broker-dealers the alternative of either obtaining a statement from the issuer that none of these events had occurred or providing its own statement of the steps it took to obtain the significant event information in cases where the issuer failed or refused to provide it.

Q26. Are there other significant events involving the issuer that a broker-dealer should review before publishing a quotation?

Q27. Is it appropriate to allow a broker-dealer to publish quotations if the issuer refuses to provide information regarding a significant event?

iii. Certain foreign issuers. Rule 15c2-11[FN43] currently permits a broker-dealer to obtain and review the information submitted to the Commission by a foreign private issuer pursuant to Rule 12g3-2(b) under the Exchange Act.[FN44] Rule 12g3-2(b) exempts securities of any foreign private issuer from registration pursuant to Section 12(g) of the Exchange Act if the issuer furnishes to the Commission information that the issuer has: Made or is required to make public pursuant to the law of the country in which the foreign private issuer is domiciled or incorporated; filed or is required to file with a stock exchange on which the securities are traded and which the exchange made public; or distributed or is required to distribute to its securityholders.[FN45]

The Commission has not included a specific proposal to change the Rule's requirements for Rule 12g3-2(b) issuers.[FN46] This is consistent with the general incorporation of Section 12 issuer information requirements and exemptions into the Rule. The Commission notes, however, that Rule 12g3-2(b) has no specific information requirements. As a result, there is no assurance that broker-dealers will have the same types of information for foreign private issuers that claim the Rule 12g3-2(b) exemption as broker-dealers will be required to have with respect to other issuers. In addition, many of the companies that claim the Rule 12g3-2(b) exemption are foreign microcap companies that can be subject to the same type of abusive practices as U.S. microcap companies.[FN47] Accordingly, the Commission is considering whether to limit a broker-dealer's reliance under Rule 15c2-11 on an issuer's 12g3-2(b) exempt status at least with respect to priced quotations.

Q28. Should the reference to Rule 12g3-2(b) be deleted from Rule 15c2-11? This would mean that broker-dealers publishing quotations for Rule 12g3-2(b) issuers' securities would be required to obtain and review the same information as required for all other foreign non-reporting issuers whose securities are subject to Rule 15c2-11. Comment is specifically requested with respect to Question 23 in the context of the requirements of Rule 15c2-11 as applied to Rule 12g3-2(b) issuers. Should a

APP. 000578

distinction in this respect be made depending upon whether the quotation is priced or unpriced?

Q29. Should reliance under Rule 15c2-11 on the Rule 12g3-2(b) exception not be permitted for those issuers whose principal market is the United States? If so, how should the principal market be determined?[FN48]

Q30. What difficulty, if any, would broker-dealers encounter in obtaining the information specified in proposed paragraph (d)(6) for a Rule 12g3-2(b) issuer?

Q31. Should the exception for Rule 12g3-2(b) issuers apply only to larger foreign private issuers, so that quotations for smaller issuers would require the information specified in proposed paragraph (d)(6)? If so, how should such distinction be measured? For example, if market value of public float is used, what would be the appropriate threshold (e.g., $25 million, $75 million, $150 million, or some other amount)? If dollar value of average daily trading volume is used, what would be the appropriate threshold (e.g., $100,000, $1 million, $5 million, or some other amount)?

Q32. Should the Rule 12g3-2(b) exception be available only for foreign private issuers that satisfy Nasdaq SmallCap quantitative listing standards (i.e., at least $4 million in net tangible assets, or a market capitalization of at least $50 million, or net income in two of the last three fiscal years of at least $750,000, and a market value of public float of at least $5 million)?

Q33. Should there be a separate Commission rule requiring broker-dealers, whether or not they recommend a transaction in a security, to inform customers about available information regarding the issuer of the foreign security?

Q34. Should there be a separate Commission rule requiring broker-dealers, before recommending a transaction in a foreign security, to review financial information about the foreign issuer that is the basis of the recommendation and to document that review?

iv. Exempt financial institutions. Proposed paragraph (d)(4) would apply to financial institutions that are exempt from Exchange Act reporting requirements,[FN49] but file reports with other governmental agencies ("exempt financial institutions").[FN50] The Commission has determined that, *9668 because the reports filed with federal or state bank supervisory agencies are readily available and contain information analogous to Exchange Act reports, broker-dealers should be required to obtain and review that information rather than the information required under proposed paragraph (d)(6) for other non-reporting issuers. Broker-dealers that quote the securities of financial institutions that file periodic reports with the Commission would have to obtain and review the information specified in proposed paragraph (c)(3) of the Rule.[FN51]

Q35. Should the Rule contain a separate provision relating to exempt financial institutions?

Q36. Would broker-dealers face any difficulties in obtaining information about exempt financial institutions that is filed with the appropriate regulatory authority?

v. Bankruptcy situations. Issuers in Bankruptcy. When the Commission issued a release in 1989 seeking comment on the piggyback provision (among other things), it inquired whether there were situations, such as issuer bankruptcies, that should be addressed if the piggyback provision were eliminated.[FN52] Many commenters on the 1989 Release argued that it was appropriate to permit broker-dealers to continue quoting the securities of issuers that had filed for bankruptcy because it provided liquidity for these securities. Commenters, including the NASD,[FN53] suggested that issuers in bankruptcy be designated as such in the quotation system by affixing a special indicator to the security's symbol. The NASD also recommended that this indicator be required on all confirmations of transactions involving the bankrupt issuer's securities and that broker-dealers publishing quotations for these securities be required to obtain, at a minimum, the most recent financial statements on file with the bankruptcy court.

The Commission disagreed with these views and stated that the initiation of any quotations, or indefinite continuation of priced quotations, for securities where the basic information required by the Rule is not available to the marketplace would undercut the prophylactic purposes of the Rule and might even encourage the abuses sought to be prevented.[FN54]

Commenters also suggested that broker-dealers could satisfy the Rule's requirements by reviewing court filings for an issuer

in reorganization pursuant to Chapter 11 of the Bankruptcy Code.[FN55] However, these Chapter 11 filings generally are periodic reports that ordinarily contain only receipts and disbursements.[FN56] These periodic reports do not provide the type of issuer financial information contemplated by the Rule. In particular, where a bankrupt issuer meets the criteria for Exchange Act reporting, it would be inconsistent with the public interest and protection of investors to permit broker-dealers to facilitate trading by publishing quotations without reviewing Exchange Act information. Therefore, under the proposals, broker-dealers would not be able to initiate or resume quotations for the securities of issuers in bankruptcy and could not publish priced quotations for those securities as of the annual update requirement, unless they have obtained and reviewed the Rule's required information.

Q37. What difficulties does this position present for broker-dealers quoting securities of issuers that file for bankruptcy?

Issuers Emerging from Bankruptcy. The Commission recently received a petition for rulemaking seeking a revision of the financial statement requirements for non-reporting issuers emerging from bankruptcy.[FN57] In addition to the issuer's most recent financial statements, the Rule currently requires that a broker-dealer review similar financial information for the two preceding years. This requirement could result in a review of pre-bankruptcy financial information that has little bearing on the financial condition of the issuer emerging from a Chapter 11 reorganization. The Commission agrees with the suggestion made in the petition and proposes to amend Rule 15c2-11 to limit a broker-dealer's review to the court-approved disclosure statement[FN58] for the issuer's plan of reorganization and the issuer's financial information from the date the bankruptcy court confirms the reorganization plan.

Q38. Does the proposed amendment deal appropriately with issuers emerging from bankruptcy?

b. Supplemental Information. Rule 15c2-11(b)(2) currently requires a broker-dealer to maintain in its records a copy of any trading suspension order issued in the 12 months preceding the publication or submission of the quotation.[FN59] In addition, Rule 15c2-11(b)(3) requires a broker-dealer to preserve material information regarding the issuer which comes to the broker-dealer's attention before publishing the quotation or submitting the quotation for publication.[FN60] The Commission is proposing to retain these provisions. As under the current Rule, a broker-dealer would be required to consider this supplemental information, along with the issuer information, when it determines whether it has a reasonable basis for believing that both the issuer information and supplemental information are accurate, current, and from reliable sources.[FN61]

c. Significant Relationship Information. Currently, Rule 15c2-11 requires a broker-dealer to record information regarding the broker-dealer's relationship with those non-reporting issuers whose securities are being quoted. Specifically, broker-dealers must document whether:

- The broker-dealer or any associated person is affiliated with the issuer;

- The quotation is being entered on behalf of another broker-dealer and, if so, its name; and

- Whether the quote is being submitted on behalf of an insider or control person of the issuer, the name of the person, and the basis for any exemption from the federal securities laws for sales by such person.

The purpose of this information is to alert regulators and others of possible "red flags," such as potential violations of the registration provisions of the Securities Act.
The proposed amendments would retain these requirements and apply *9669 them to all covered OTC securities, not just those of non-reporting issuers. In addition, the proposals would require the broker-dealer to record whether it had any arrangement to receive any compensation for publishing the quotation and, if so, a description of the compensation and the name of the person providing it.

Microcap fraud often involves payments by the issuer (or insiders or promoters of the issuer) or other broker-dealers to the broker-dealer to create a market in the issuer's stock.[FN62] The Commission believes that the records created by the broker-dealer under the proposals would help expose improper arrangements, which can mislead market participants as to the quality of a broker-dealer's quotations.[FN63] Moreover, this information also would assist regulators in identifying broker-dealers that may be acting as "fronts" for other broker-dealers or the issuer by publishing ostensibly independent

quotes.

Q39. Is there a better way to identify when compensation has been paid to broker-dealers for publishing quotations?

### 5. Exceptions to the Rule

Under the proposed amendments, the current exceptions relating to quotations representing a customer's indication of interest and not involving the solicitation of a customer's interest, quotations for municipal securities, and quotations representing a security listed and traded on a national securities exchange or authorized for quotation on Nasdaq remain substantively the same.

Q40. Is there any reason to continue the requirement in the exception regarding exchange-listed securities that the security be traded on the exchange in proximity to the day the OTC quotation is published?

The Commission is concerned that the proposed changes may result in misuse of the exception covering unsolicited customer orders, particularly if a broker-dealer wants to publish quotations for a security but cannot obtain the requisite issuer information. The unsolicited status of the underlying customer orders would be called into question if a broker-dealer repeatedly publishes quotations on the basis of this exception.[FN64] In that circumstance, the broker-dealer's activities would suggest that it is acting as a market maker, rather than a broker or dealer attempting to fill unsolicited customer orders.

Q41. How frequently and under what circumstances do broker-dealers rely on the unsolicited customer order exception?

Q42. Is it appropriate for the Rule to retain an exception for unsolicited customer orders?

Q43. Should unsolicited customer orders be required to be identified as such in the quotation medium?[FN65]

Q44. Should there be a limited exception for a quotation reflecting isolated proprietary transactions by the broker-dealer? What should be the parameters of any such exception?

Debt Securities. Rule 15c2-11 covers debt securities, although the Commission recognizes that broker-dealers publishing quotations for debt securities may not have focused on this aspect of the Rule. Debt securities frequently are held by institutional investors, and it does not appear that they have been the subject of the abuses that the Rule is intended to address.

Q45. In light of these considerations, should the Rule continue to apply to debt securities? Should the Rule except all non-convertible debt securities or just non-convertible investment grade debt securities?

### 6. Information Available upon Request

Rule 15c2-11(a)(5) currently provides that the information described in that paragraph must be made available upon request to any person expressing an interest in a transaction in that security with the broker-dealer.[FN66] This requirement may have little practical effect because only the first broker-dealer to publish quotations must have the information, and an investor might find it difficult to identify that broker-dealer.[FN67] In fact, that broker-dealer may no longer be publishing quotations. The proposed amendments would require every broker-dealer that publishes quotations for covered OTC securities to obtain, review, and preserve the specified information. The Commission believes that some microcap fraud could be prevented if there were greater investor access to information about these securities and their issuers. Accordingly, the Commission is proposing to enhance the accessibility of this information by requiring a broker-dealer publishing quotations for any covered OTC security to make the information promptly available upon request by any person.

The Commission believes that the cost of requiring broker-dealers to make the information available (including to other broker-dealers) upon request is minimal. Also, the requirement to provide the requested information would prevent a broker-dealer from arranging with the issuer to have exclusive access to the issuer's information and thereby have sole access to Rule 15c2-11 information. This result would be anti-competitive and detrimental to the marketplace.

The proposed amendments would retain in substantial form the current clause that providing information to others does not

constitute a representation by the broker-dealer that the information is accurate. Providing the information to others instead would constitute a representation that the information is current in relation to the date the information was reviewed, and that the broker-dealer has a reasonable basis for believing that the information is accurate and from reliable sources.

Q46. Under what circumstances do broker-dealers currently provide Rule 15c2-11 information to others?

Q47. Should the proposed rule specifically permit broker-dealers to charge a reasonable fee to offset their costs of providing the information?

Q48. Should the scope of this provision be limited to non-reporting issuers because information about reporting issuers is available to investors, such as on EDGAR through the Internet? If this requirement should be limited to non-reporting issuer information, should broker-dealers be required to furnish the supplemental and significant relationship information about reporting issuers?

**7. Preservation of Documents and Information**

To facilitate compliance with the Rule's recordkeeping requirements, the Commission believes that it is appropriate to codify the Rule's record preservation requirements in Rule 17a-4,[FN68] rather than in Rule 15c2-11.

Rule 17a-4 obligates broker-dealers to preserve documents and information that they must compile pursuant to Commission rules for the time period and in the manner specified in the **\*9670** various provisions of Rule 17a-4. The Commission therefore is proposing to amend Rule 17a-4 to add the information specified in proposed paragraphs (d), (e), and (f) of Rule 15c2-11 to the other information that broker-dealers are already required to preserve under Rule 17a-4. Rule 15c2-11, as proposed to be amended, also would cross reference this proposed requirement.

With regard to issuer information that is accessible to broker-dealers through the Commission's EDGAR system, the proposed revisions would provide that if broker-dealers satisfied the Rule's requirements by obtaining and reviewing the information contained on EDGAR, they would not need to preserve such information independently, as long as they document the review and the information is accessible on EDGAR for the same period of time that the broker-dealers are obligated to preserve such information pursuant to Rule 17a-4. For example, if a broker-dealer is required by Rule 15c2-11 to obtain and review an issuer's Annual Report on Form 10-K and to preserve that information for three years, then as long as the broker-dealer can electronically access the Form 10-K for that three-year period, it does not have to preserve the document independently in a separate location. Broker-dealers still would need to preserve information about reporting issuers that is not available on EDGAR, e.g., other information that comes to their attention before entering a quotation.

Q49. Are there other ways to ease the Rule's recordkeeping requirements for broker-dealers?

8. Information Provided to the NASD

Rule 15c2-11 currently requires any broker-dealer covered by the Rule to submit the information required under paragraph (a)(5) (i.e., for non-reporting issuers) to the interdealer quotation system, in the form prescribed by the system, at least three business days before submitting a quotation for publication. The Commission is proposing to amend this obligation by requiring broker-dealers to submit the information that they must obtain and review pursuant to Rule 15c2-11 to the NASD only, in accordance with the NASD's rules. Previously, this information was not obtained by an SRO (a substantial proportion of the documents were submitted to the National Quotation Bureau, Inc., the publisher of the Pink Sheets). Presently, NASD Marketplace Rule 6740 requires broker-dealers to submit the Rule 15c2-11 information to the NASD before they can publish a quotation for a covered OTC equity security in any quotation medium. The proposed amendment would recognize broker-dealers' obligation under NASD rules and avoid any possible need to make multiple submissions of the same information (e.g., to the NASD and to one or more interdealer quotation systems). The NASD uses this information for surveillance and enforcement purposes and routinely provides copies of this information to the Commission.

Q50. Does there continue to be any need for the Rule to require that the information be supplied to the operator of each interdealer quotation system?

### B. Central Information Repository

The elimination of the piggyback provision and the increased costs of compliance that may result suggest the desirability of having a central data base of information, particularly for the securities of non-reporting issuers. Such a data base also would enhance the availability of information about little known issuers to investors, other professionals, and regulators. For these reasons, the Commission encourages the development of one or more repositories for Rule 15c2-11 information.

In the 1991 Proposing Release, the Commission contemplated that a Rule 15c2-11 repository would:

(1) collect information about a substantial segment of issuers of securities subject to the Rule;

(2) maintain current and accurate information about such issuers;

(3) use effective acquisition, retrieval, and dissemination systems;

(4) charge reasonable fees; and

(5) operate in a manner that would permit it reasonably to carry out the purposes of the Rule.[FN69] The Commission seeks comments concerning the features and the feasibility of a central information repository.

Q51. Should the Rule incorporate the standards above? Are there other standards that should be included?[FN70]

Q52. Should the Commission promote the development of central information repositories through other means?

### C. Definitions

The proposals would revise or eliminate several definitions now contained in Rule 15c2-11 and add a few new definitions. The current definitions of "issuer" and "quotation" would be retained.

Q53. Are the proposed definitions appropriate in light of the Rule's purposes?

Quotation Medium. The definition of "interdealer quotation system" would be incorporated into the definition of "quotation medium."[FN71] This definition is quite inclusive: it covers any publication or electronic communications network, or other device that is used by brokers or dealers to make known to others their interest in transactions in any security, including offers to buy or sell at a stated price or otherwise, or invitations of offers to buy or sell. The Commission has been advised by the NASD that almost all Forms 211 that it receives are filed for quotations to be published in the OTC Bulletin Board or the Pink Sheets. Transaction data indicates, however, that there is significant trading in OTC securities that are not quoted in these quotation mediums. While there can be many explanations for this phenomenon, it is possible that broker-dealers view Rule 15c2-11 as applying only to quotations published in the Bulletin Board or the Pink Sheets. In fact, the Rule applies to quotations published in any quotation medium.

Q54. What is the experience of broker-dealers under the Rule when publishing quotations in quotation mediums other than the Bulletin Board or the Pink Sheets?

Q55. Is the scope of the definition of quotation medium too broad?

Q56. Should the Rule except mediums that do not identify broker-dealers publishing quotations (i.e., where quotations are anonymous) and/or that do not provide automatic execution facilities? Why would this be appropriate or inappropriate?

Q57. Should the definition draw any distinction between "quotations" and "orders"?

Q58. Should the Rule apply to quotation systems devoted exclusively to a single issuer's securities? If so, would an aggregation of such systems be a quotation medium?

Q59. Should the Rule apply to quotation systems devoted exclusively to a single broker-dealer's quotations? If so, would an aggregation of such systems be a quotation medium?

**APP. 000583**

Publication or Submission of Quotations Without Specified Information, 63 FR 9661-01

Q60. Should the definition of "interdealer quotation system" be retained? *9671

### D. Transition Provision

The Commission is proposing a transition provision covering quotations by broker-dealers that were initiated prior to the effective date of the proposed amendments. Broker-dealers could continue their market-making activities until the occurrence of one of the events set forth in the Rule, as proposed to be amended. The Commission believes that this proposed transition provision would be necessary to maintain liquidity in covered OTC securities while broker-dealers adjust to the amended requirements. Broker-dealers initiating quotations for these securities, however, would need to obtain and review the requisite information.

Q61. Does the proposed transition provision adequately address securities that broker-dealers may have been quoting for significant periods of time, and for which they may be unable to obtain current information from the issuer?

Q62. Under what circumstances should the Rule accommodate those broker-dealers that would like to initiate quotations for securities covered by the transition paragraph but for which they cannot obtain the requisite issuer information?

### III. General Request for Comments

The Commission solicits comment on all aspects of its proposed amendments to Rule 15c2-11, as well as on any other matter that might have an impact on the proposals discussed above. In particular, the Commission seeks comment on whether the proposals would help promote information transparency in the OTC market and help curb abuses in the trading of microcap securities. Commenters are asked to consider whether the proposed revisions would have any adverse impact on the liquidity of covered OTC securities and should provide data and analysis to support their views. Commenters are invited to address whether the Rule's text is sufficiently clear and understandable. In addition, commenters are asked to discuss whether the Rule and/or proposed amendments should apply to quotations for all securities covered by Rule 15c2-11, or whether certain amendments (e.g., disciplinary histories of an issuer's insiders and promoters) should be limited to quotations for microcap securities.

Persons submitting written comments should send three copies of their comments to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549, and should refer to File No. S7-3-98. Comments also may be sent electronically to the following e-mail address: rule-comments@sec.gov and should include the file number on the subject line of the e-mail.

### IV. Costs and Benefits of the Proposed Amendments

The Commission requests commenters to evaluate the costs and benefits associated with the proposed amendments to Rule 15c2-11. The Commission has identified certain costs and benefits relating to the proposals, which are discussed below, and encourages commenters to discuss any additional costs or benefits.[FN72] In particular, the Commission requests comment on the potential costs for any necessary modifications to information gathering, management, and recordkeeping systems or procedures that would be necessary to implement the proposals, as well as any potential benefits resulting from the proposals for issuers, investors, broker-dealers, securities industry professionals, regulators or others. Commenters should provide analysis and data to support their views on the costs and benefits associated with the proposals.

### A. Benefits

The Commission believes that the proposed amendments generally would help improve the quality of the markets for securities subject to Rule 15c2-11 and would help protect investors from fraudulent schemes involving these securities. Traders of the securities of legitimate microcap issuers also would benefit if the integrity of this market sector is improved. The Commission believes that the specific benefits set forth below would flow from the proposed amendments.

The Commission does not routinely collect, as part of its examinations or investigations, data for the dollar value of fraudulent activity and therefore cannot quantify investor losses due to recent microcap frauds. However, from its enforcement investigations and interactions with other regulators, and review of investor complaints, the Commission

believes microcap trading abuses are on the rise and overall involve significant dollar amounts.

Microcap fraud frequently involves issuers for which public information is limited.[FN73] Without information, it is difficult for investors, securities professionals, and others to evaluate the risks presented by these securities. Many investors consequently fall prey to persons who make false representations and unrealistic predictions about these securities. The publication of quotations by broker-dealers can facilitate the fraudulent promotion of microcap securities. Currently, not all broker-dealers are required to review certain basic information about an issuer before initiating quotations.

To reduce the potential for fraud in the OTC market, the proposed amendments require every broker-dealer, before initiating a quotation for a covered OTC security in a quotation medium, to gather and review the issuer information and to update that information annually when it publishes priced quotations. The proposed amendments would require more information than the Rule currently requires about the issuer's outstanding securities, its officers and directors, and its financial condition. In particular, by requiring that all broker-dealers obtain and review issuer information and update it annually, the proposed amendments should substantially assist a broker-dealer in its consideration of whether to publish quotations for an issuer's securities. Provided with this additional information, the broker-dealer would gain a greater understanding of the issuer's business and a better indication of whether potential or actual fraud or manipulation may be present.

After reviewing the information, responsible broker-dealers should refrain from publishing quotations for questionable securities. This will prevent responsible broker-dealers from becoming unwitting participants in manipulative or fraudulent schemes of unscrupulous broker-dealers and/or promoters. Because all broker-dealers must have issuer information before initiating quotations for covered OTC securities, issuer information would be more widely available to market professionals. Additionally, broker-dealers must provide this information to any person upon request.

The proposals, if adopted, would serve an important surveillance function. Currently, only the first broker-dealer quoting a security must gather, review, and preserve the information. The proposed amendments would require all broker-dealers *9672 initiating quotations to satisfy the Rule's current requirements and would add a recordation requirement. Moreover, under NASD Marketplace Rule 6740, the broker-dealer demonstrates its compliance with that rule by filing the Rule 15c2-11 information with the NASD. Recently, the review of Forms 211 filed with the NASD has resulted in a number of Commission trading suspensions and other enforcement actions.

The proposed amendments would ease significantly the Rule's recordkeeping requirement when broker-dealers have access to reporting issuer information on the Commission's EDGAR system. Access to EDGAR is free on the Internet. Given that approximately 42% of securities on the OTC Bulletin Board ("OTCBB") and Pink Sheets are issued by reporting companies, whose reports are included on EDGAR, a significant recordkeeping cost savings to broker-dealers should result.

The Commission does not have data to quantify the value of the benefits described above. The Commission seeks comments on the value of these benefits and on any benefits, not already identified, that may result from the adoption of these proposed amendments.

*B. Costs*

The Commission has identified various costs that may result if the proposals are adopted. The proposals would eliminate the piggyback provision, which now effectively limits the Rule's application to those broker-dealers that publish quotations during the first 30 days of the security's trading. Under the proposals, each broker-dealer would need to obtain and review the Rule's required information when it initiates quotations for the security or initiates or resumes quotations following specified events. Moreover, an annual update requirement would apply to all broker-dealers that publish priced quotations. As a result of these proposals, each broker-dealer publishing quotations for a security would have to obtain issuer information and possibly incur costs when it first publishes a quotation and when it conducts the required update. To the extent a broker-dealer does not already have this information, it would incur costs for the collection and review of this information. Moreover, a broker-dealer also would incur costs associated with creating the records required by the Rule and retaining the Rule's required information for the specified period of time pursuant to the proposed amendment to Rule 17a-4.

The Commission estimates that it would cost a broker-dealer $35 per hour to comply with the requirements of the Rule based on a blended compensation rate of $35 per hour for clerical and supervisory compliance staff. As identified in the Paperwork Reduction Act section of this release, the Commission estimates that the additional annual burden hours to broker-dealers in

the aggregate would be approximately 127,000 hours. The Commission, therefore, estimates that the cost to broker-dealers in the aggregate to obtain and review the required information if the proposed amendments are adopted would be approximately $4,445,000. The Commission seeks comments on the reasonableness of its estimates for the additional annual hourly and dollar costs to broker-dealers.

The Commission believes that any additional costs to broker-dealers should be offset, however, by the fact that those broker-dealers conducting a retail business already may have the information required to satisfy their obligations under the federal securities laws and the rules of the SROs when they recommend a security to an investor.

Although Rule 15c2-11 does not regulate issuers, there may be some indirect costs imposed on issuers, particularly non-reporting issuers, because they may be contacted by broker-dealers to provide the information specified in the Rule. Non-reporting issuers would incur the cost of having to collect and provide the requested information to each requesting broker-dealer. In addition, the proposals would expand the scope of the information required for quotations of non-reporting issuers' securities. However, the Commission is assuming that non-reporting issuers maintain their financial information in compliance with prevailing accounting standards and, in most instances, would have available updated financial information prepared in accordance with GAAP. The NASD has informed us that the financial statements filed with the Form 211 generally are prepared in accordance with GAAP, and many are audited.

The Commission assumes that for non-reporting issuers, it will cost approximately $15 per hour for clerical staff to obtain and provide the information required if the proposed amendments are adopted.[FN74] As identified in the PRA section of this release, the Commission estimates that the additional annual reporting burden hours to non-reporting issuers in the aggregate would be approximately 50,000 hours, or approximately $750,000 per year. The Commission seeks comments on the reasonableness of its estimates for the additional annual hourly and dollar costs to issuers.

Regarding start-up, operating, and maintenance costs, the Commission believes that broker-dealers that now collect, review, and retain the information required by the current Rule would incur only marginal start-up, operating, and maintenance costs (i.e., to expand systems already in place). Further, some broker-dealers may be collecting the information required by the proposals for other purposes. However, the Commission believes some broker-dealers may not have adequate systems in place to retain issuer information and would, therefore, incur start-up, operating, and maintenance costs in order to comply with the requirements of the proposed amendments.

As discussed in the PRA section of this release, the Commission estimates that an average of 4.3 broker-dealers provide quotations for each of the 7,038 covered OTC securities that would be affected if the proposed amendments are adopted. The Commission estimates that broker-dealers would incur start-up, operating, and maintenance costs of approximately $17,736 associated with reporting issuer information, and approximately $97,968 associated with non-reporting issuer information. The total start-up, operating and maintenance cost burden for broker-dealers is estimated to be $115,704 ($17,736+$97,968). The Commission seeks comments on the reasonableness of its estimates for the total start-up, operating and maintenance cost burdens to broker-dealers.

Finally, the Rule could affect the liquidity of some securities. If broker-dealers are unable to obtain the required issuer information, they would have to refrain from publishing priced quotations in that security. This could make it more difficult for investors to determine what prices other market participants are willing to bid or offer for the security. However, broker-dealers may still publish unpriced quotes and publish priced quotes representing unsolicited customer interest in buying or selling securities. It should also be possible for some broker-dealers to continue to make *9673 markets without publishing quotations in a quotation medium. Thus, while investors are still able to obtain price information, the cost of obtaining this information may increase. Any effect on liquidity must be weighed against the benefit of stopping potential fraud or manipulation. Greater investor access to information should result in more informed investor decisions and potentially could result in additional trading and thus liquidity for covered OTC securities. The Commission's preliminary view is that the benefits of the proposed rule changes should justify any adverse impact on liquidity.

The Commission seeks comments on the cost estimates identified in this section and comments on any cost, not already identified, should the amendments be adopted as proposed. Commenters are requested to supply specific data and analysis.

**V. Effects on Efficiency, Competition, and Capital Formation**

In adopting rules under the Exchange Act, Section 23(a)(2) requires the Commission to consider the impact any rule would have on competition and to not adopt any rule that would impose a burden on competition not necessary or appropriate in the public interest. Section 3(f) of the Exchange Act requires the Commission, when engaged in rulemaking, to consider or determine whether an action is necessary or appropriate in the public interest, and whether the action would promote efficiency, competition, and capital formation.[FN75] The proposed amendments are intended to protect investors by requiring broker-dealers that initiate or resume quotations for a covered OTC security in a quotation medium, and that are publishing priced quotations as of the annual update requirement, to have fundamental information about the issuer.

When reports of fraud and manipulation in a particular market sector are common, legitimate participants in that marketplace are adversely affected. For example, legitimate small issuers seeking capital in the public markets may find that their costs of raising capital are increased because of underwriters' and, ultimately, investors' reluctance to participate in these transactions. Measures to reduce microcap fraud should result in enhanced capital formation by legitimate small issuers.

The Commission believes that the requirement to obtain and review issuer information should improve the level of competition among broker-dealers because all broker-dealers would be affected equally. With the elimination of the piggyback provision, every broker-dealer must obtain and review the information in connection with a decision to publish quotations. Absent these requirements, the Commission believes that some broker-dealers would submit quotations without regard to basic information about relatively unknown issuers, and therefore, would be more likely to cause investors to fall prey to fraudulent and manipulative pricing schemes. Because all broker-dealers would now be subjected to the same requirements to gather and review the information before publishing quotations, fairness and competition in this segment of the industry should improve.

The Commission's preliminary view is that the proposed amendments to the Rule would not have any anticompetitive effects that are not necessary or appropriate in the public interest. There may be isolated cases where some broker-dealers can continue to publish unpriced quotations for a security because issuer information was available when they initiated quotations or the security qualifies for the transition provision covering quotations occurring prior to the amendment's effective date, yet other broker-dealers later cannot initiate or resume quotations because current issuer information is no longer available. Because of the proposed annual updating requirement, the broker-dealer would only be able to publish unpriced quotations after the updating period (if current issuer information was not available). Although in such cases some broker-dealers may be precluded from publishing quotations in a quotation medium, the Commission preliminarily considers this possible burden on competition to be justified by the benefits to investors of broker-dealers having accurate and current issuer information before they initiate or resume publication of quotations in a quotation medium.

The Commission requests comments on the competitive benefits that may result to broker-dealers under the proposed amendments to the Rule and also is requesting comments on any anticompetitive effects that may result if the Rule is adopted as proposed. The Commission is aware that requiring broker-dealers to collect information more regularly may cause some broker-dealers to stop publishing quotations, thus reducing the liquidity of some securities. The Commission requests data and analysis on what effect the proposed changes may have on the liquidity of this market. Finally, the Commission seeks comment on what impact the proposals, if adopted, would have on efficiency and capital formation.

### VI. Initial Regulatory Flexibility Act

The Commission has prepared an Initial Regulatory Flexibility Analysis ("IRFA")[FN76] regarding the proposed amendments to Rule 15c2-11 and the companion amendment to Rule 17a-4 under the Exchange Act. The following summarizes the IRFA.

As discussed in the IRFA, the Rule specifies the information that a broker-dealer must gather and review before publishing quotations for covered OTC securities. The Rule is intended to prevent broker-dealers from publishing quotations for covered OTC securities in a quotation medium without obtaining, reviewing, and retaining current information about the issuer. The Commission is proposing these amendments because of increased incidence of fraud and manipulation in securities subject to Rule.

The amendments to the Rule would affect all broker-dealers, including a number of small broker-dealers, seeking to publish quotations for covered OTC securities. The Commission's Office of Economic Analysis ("OEA") estimated that as of December 31, 1996, there were 3,444 small public broker-dealers. Based on Exchange Act Rule 0-10(c)(1), OEA considered

APP. 000587

a small broker-dealer as a broker-dealer reporting total capital of less than $500,000 at year-end 1996. The number of these small broker-dealers that submit quotations for covered OTC securities to quotation mediums is unknown. However, the Commission believes that, at any given time, there are approximately 400 broker-dealers, including small broker-dealers, that submit quotations for covered OTC securities. The Commission seeks comments on the number of small broker-dealers that quote covered OTC securities in quotation mediums.

The proposed amendments would indirectly affect those small issuers that may be requested to provide the information required by the proposed amendments to broker-dealers publishing quotations in those issuers' securities. Based on Exchange Act Rule 0-10(a), a small issuer is one that on the last day of its most recent fiscal year had total assets of $5,000,000 or less. The total number of small issuers of covered OTC securities is not known at this time. The Commission seeks comment on the total number of issuers of covered OTC securities; the number (or *9674 percentage) of these issuers that are small issuers; and the total number (or percentage) of small issuers of covered OTC securities that are reporting and non-reporting issuers, respectively.

As discussed above in this release, the proposed amendments would eliminate the piggyback provision and would specify that every broker-dealer must gather and review the required information when it initiates or resumes publishing quotations for a covered OTC security. At least once a year thereafter in the case of priced quotations, or following a break in quotations of five or more business days or upon the termination of a Commission trading suspension order, a broker-dealer would have to gather and review the information required by the Rule.

In addition, a broker-dealer would be required to maintain information concerning its compliance with the Rule, including whether: the broker-dealer is affiliated with the issuer; a quotation is being submitted on behalf of another broker-dealer or associated person (including the name of such broker-dealer); the quotation is being submitted on behalf of the issuer or persons affiliated with the issuer; and the broker-dealer has received any monetary or other compensation to publish the quotation.

The Commission is also proposing to require broker-dealers to acquire and review the annual and other periodic reports that financial institutions file with their respective regulatory agencies other than the Commission. The Commission believes that because non-reporting financial institutions file periodic reports containing information similar or identical to information that reporting financial institutions file with the Commission, a broker-dealer quoting such financial institutions' securities should obtain these reports in order to achieve the informational goals of the Rule.

The possible addition of recordkeeping costs for broker-dealers as a result of eliminating the piggyback provision and enhancing the required issuer information further highlights the desirability of creating a central data base for information on covered issuers and their securities. In that regard, the Commission encourages the development in the private sector of one or more central repositories for Rule 15c2-11 information. Such repositories may provide a more efficient vehicle for meeting the record-assembly needs of brokers and dealers, including firms seeking to comply not only with the Rule, but also with other applicable investor protection requirements, such as general anti-fraud and suitability rules of the Commission and SROs.

The IRFA notes that the availability of the Commission's EDGAR system for broker-dealers to collect and review the reports required by the Rule should lessen the costs and burdens associated with compliance with any expanded information gathering, review, and updating requirements. In addition, the prevalent use of computers and the Internet, on which access to EDGAR is free, should also reduce the recordkeeping and compliance costs for all broker-dealers by automating the information collection and retention process.

The IRFA recognizes that the proposed amendments indirectly affect certain issuers, particularly non-reporting issuers. The proposed amendments would require all broker-dealers, before initiating or resuming publication of a quotation, to obtain, review, and retain more issuer information than is currently required under Rule 15c2-11 and, when publishing priced quotations, to update that information annually. Consequently, non-reporting issuers must collect and provide the required information for each requesting broker-dealer. The Commission assumes that non-reporting issuers maintain their financial information in compliance with prevailing accounting standards and that the cost incurred by non-reporting issuers to prepare the necessary information in response to broker-dealers' requests would be minimal.

Publication or Submission of Quotations Without Specified Information, 63 FR 9661-01

The IRFA discusses the kinds of possible alternative proposals that the Commission has considered. These include, among others, creating differing compliance or reporting requirements or timetables that take into account the resources available to small entities, and whether such entities could be exempted from any of the proposed rules, or any part thereof. Therefore, having considered the foregoing alternatives in the context of the proposed amendments, the Commission does not believe they would accomplish the stated objectives of the proposal.

The Commission encourages the submission of written comments regarding any aspect of the IRFA. In particular, the Commission seeks comments on: (i) The number of small entities that would be affected by the amended Rule, including the number of small broker-dealers and issuers; (ii) the number of small entities that are issuers of covered OTC securities; and (iii) the number of small entities that are reporting and non-reporting issuers of covered OTC securities, respectively. Comments should also specify the costs of compliance with the proposed amendments, and suggest alternatives that would provide the OTC market with more information about the issuers of these securities. In describing the nature of any impact that the proposals would have, empirical data supporting these views should be provided.

For purposes of the Small Business Regulatory Enforcement Fairness Act of 1996, the Commission is also requesting information regarding the potential impact of the proposed amendments on the economy on an annual basis. In particular, comments should address whether the proposed changes, if adopted, would have a $100,000,000 annual effect on the economy, cause a major increase in costs or prices, or have a significant adverse effect on competition, investment, or innovations. Commenters should provide empirical data to support their views.

Comments should be submitted in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549. Comments also may be submitted electronically at the following E-mail address: rule-comments@sec.gov. All comment letters should refer to File No. S7-3-98; this file number should be included on the subject line if E-mail is used. Comment letters will be available for public inspection and copying in the Commission's Public Reference Room, 450 Fifth Street, N.W., Washington, D.C. 20549. Electronically submitted comment letters will also be posted on the Commission's Internet web site (httpp:// www.sec.gov).

A copy of the Initial Regulatory Flexibility Analysis may be obtained by contacting Chester A. McPherson, Office of Risk Management and Control, Division of Market Regulation, Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549, at (202) 942-0772.

## VII. Paperwork Reduction Act

Certain provisions of the proposed amendments contain "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995 ("PRA");[FN77] the Commission has submitted them to the Office of Management and Budget for review in accordance with 44 U.S.C. 3507(d) and 5 CFR 1320.11. The title for the collection of information is: "Publication or submission of quotations without specified information." This collection of *9675 information has previously been assigned OMB Control No. 3235-0202.

### A. Collection of Information Under the Proposed Amendments

Rule 15c2-11 under the Exchange Act currently requires the very first broker-dealer publishing a quotation for certain over-the-counter ("OTC") securities in a quotation medium to obtain and review the information specified in the Rule. Generally, the Rule applies to securities that are not listed and traded on a national securities exchange or quoted on Nasdaq ("covered OTC securities"). Most covered OTC securities are quoted in the OTC Bulletin Board ("OTCBB"), which is operated by the National Association of Securities Dealers, Inc. ("NASD"), or in the Pink Sheets (containing quotations for equity securities) or Yellow Sheets (containing quotations for debt securities), which are published by the National Quotation Bureau, Inc. ("NQB").

The proposed amendments to Rule 15c2-11 would require every broker-dealer to collect, review, and retain specific information about the security's issuer before initiating or resuming a quotation for a covered OTC security. Broker-dealers submitting priced quotations for the security would be required to collect, review, and retain the Rule's specified information annually. Broker-dealers would also have to record the sources of their information, the date their review occurred, and the person responsible for the review. Also, the proposals would require broker-dealers publishing quotations for a covered OTC security to collect, review, and retain more information than is required currently.