## Part 4 – (Complete for OTC Bulletin Board quotation requests only)

Fiscal Year End Date (MM/DD) _08/31_

Date of Incorporation (MM/DD/YYYY) _8/5/11_

Standard Industrial Classification (SIC) Code _5084_

(a) Complete if the Issuer files periodic reports through the SEC's EDGAR system.

• Provide the 10-digit Central Index Key (CIK) number. (The CIK is a unique identifier assigned by the SEC to all companies and people who file disclosure documents through EDGAR with the SEC.)

_0001532796_

(b) Complete if the Issuer does not file periodic reports through the SEC's EDGAR system.

• Name of regulatory authority where the Issuer files periodic financial reports:

_____

• Telephone number of the regulatory authority:

_____

• The Issuer's filing cycle. (Check one)

☑ Quarterly

☐ Semi-Annually

☐ Annually

☐ Other (Describe the filing cycle)

• List the required reports filed by the Issuer for the current fiscal year.

| Name of Report or Statement | Report or Statement Date | EDGAR Filed Date |
|---|---|---|
| S-1/A | 12.05.11 | 12.05.11 |
| 10-Q | 11.30.11 | 1-13.12 |

6

SEC-PC-P-0000095

## Part 5 – Certification

The undersigned must have a reasonable basis for believing that the information accompanying this form is accurate in all material respects and that the sources of the information are reliable.

By signing this document, I acknowledge and certify that my firm has a reasonable basis for believing that the information accompanying this form (including required EDGAR filed documents not provided) is accurate in all material respects and that the sources of the information are reliable ("affirmative review obligation") as required by Rule 15c2-11 under the 1934 Act and NASD Rule 6640. I understand and acknowledge that this affirmative review obligation applies to all subsequent submissions made in connection with this Form 211 application. Further, I certify that I have examined this form and, to the best of my knowledge and belief, it is true, correct, and complete. I understand and acknowledge that copies of this form, accompanying documents, and subsequent submissions made in connection with this Form 211 application may be provided to the Securities and Exchange Commission, or other regulatory agencies, Pink OTC Markets Inc., and to the public upon request through the Pink OTC Markets Inc.

Name, title and signature of firm employee to contact regarding information contained in this Form 211 application.

| | | | |
|---|---|---|---|
| Name | Mark Dillon | Title | Trader |
| Signature | Mark Dillon | Date | 5.29.12 |
| Phone | 800-654-9929 | Fax | 208-664-2283 |

Name, title, and signature of the registered principal of the firm responsible for this Form 211 application, and all subsequent submissions made in connection with this application.

| | | | |
|---|---|---|---|
| Name | John Worrell | Title | Head Trader |
| Signature | | Date | 5.29.12 |
| Firm Name | Pennaluna & Company | | |

(Firm must be a Pink OTC Markets Inc. subscriber if application is for the Pink Quote.)

| | | | | | |
|---|---|---|---|---|---|
| Address | 421 Sherman Ave, Suite 203 | | | | |
| City | Coeur d'Alene | State | ID | Zip | 83814 |
| Firm CRD# | 0226 | Market Participant Identifier | PENA | | |

Investor protection. Market integrity

1735 K Street, NW
Washington, DC 20006-1506
www.finra.org
© 2008 FINRA. All rights reserved.
09_0040-05-00

7

SEC-PC-P-0000096

# Appendix

# Exhibit JJ



Financial Industry Regulatory Authority

**FACSIMILE ONLY**

February 1, 2012

Mr. Mark Dillon
Pennaluna & Company
421 Sherman Avenue, Suite 203
Coeur D'alene, ID 83814

Re: Chimera Energy Corporation (FINRA Matter No. 20120311899)

Dear Mr. Dillon:

The staff has received and reviewed the Form 211 Application for the above-referenced
security. This will confirm that Pennaluna & Company's ("Pennaluna") Form 211
Application is deficient. As a reminder, SEC Rule 15c2-11 requires that a broker dealer
"... based upon a review of the paragraph (a) information together with any other
documents and information required by paragraph (b) of this section, has a reasonable
basis under the circumstances for believing that the paragraph (a) information is
accurate in all material respects, and that the sources of the paragraph (a) information
are reliable." Therefore, pursuant to FINRA Rule 6432, the staff requests the following
information in order to continue the review process:

1. A detailed explanation of the relationship between Andrew Farmer and the
   Issuer.

2. The date the certificates will be delivered.

3. Details surrounding the Issuer's offering. Your answer should include, but not
   be limited to, who solicited investors, how the solicitor knew them, and how
   many individuals were solicited including those that did not purchase.

4. Inform the staff as to whether any FINRA member firms participated in the
   offering.

5. Details related to how, when, and from whom the control persons of the
   Issuer gained control of the Issuer. In your response, indicate all parties
   involved, how they were introduced, the nature of their involvement, and any
   consideration paid.

6. Describe **all** relationships and affiliations among and between the
   shareholders and the Issuer, its predecessors, its present and prior officers
   and directors, and other shareholders.

Investor protection. Market Integrity.

9509 Key West Avenue
Rockville, MD
20850-3329

t 240 386 4000
www.finra.org

**APP. 000648**

SEC-PC-P-0000086

7. The Issuer's November 30, 2011 Form 10-Q shows that the issuer has minimal revenue, $70,851 in assets and limited operations. Additionally, the Issuer's registration statement states that the issuer has no full or part-time employees and its sole officer and director will devote 10 to 25 hours per week "from time to time" to its business affairs. Given this, it appears to the staff that Issuer's operations assets are nominal as described in SEC Release No. 33-8587, and, therefore, the Issuer's SEC filings should be amended to indicate the Issuer is a shell company.

8. A written statement from the Issuer confirming that shares of the Issuer not included in the Registration Statement are restricted and cannot be resold pursuant to Rule 144 until the conditions of Rule144(i)(2) have been met.

9. The officer of the company does not appear to have a technical background. Explain what steps they will take to further the Issuer's business objectives.

10. Has your firm entered into any agreements with the Issuer, its shareholders, affiliates or any entity representing the Issuer? If so, provide a copy of such agreements.

The staff will reexamine Pennaluna's submission following receipt of the requested information and any related documents. Pursuant to NASD Notice to Members 99-26, if Pennaluna does not materially respond to the staff's questions and provide the required information in 180 calendar days from the date of this deficiency letter Pennaluna's Application will be considered abandoned and the file will be closed.

Submit a copy of this letter with any additional documents. If you have any questions regarding the above, contact the undersigned at (240) 386-6937.

Very truly yours,

Eric Mayes
Compliance Examiner
OTC Compliance Unit

SEC-PC-P-0000087

# Appendix

# Exhibit KK

| | |
|---|---|
| **From:** | cgrob@chimeraenergyusa.com |
| **Sent:** | Friday, February 3, 2012 7:35 PM |
| **To:** | Ashley Dillon <ashley@pennaluna.com> |
| **Subject:** | RE: Chimera deficiency |
| **Attach:** | FINRA Response-signed.pdf; Investor Introductions-signed.pdf; Chimera - Investor Relationships - 1.13.12.pdf; Chimera No Shell Cert Signed.pdf; Chimera-144 Cert Signed.pdf |

Hi Ashley,

Here are the documents pertaining to the deficiency. Please review and notify me if there should be any changes.

Regards,

**Charles Grob**
**Chimera Energy Corporation**
**President and CEO**
**2800 Post Oak Boulevard Ste 4100**
**Houston, TX 77056**
**Phone: (832) 390-2334**
**Fax: (832) 390-2350**



-------- Original Message --------
Subject: Chimera deficiency
From: Ashley Dillon <ashley@pennaluna.com>
Date: Thu, February 02, 2012 11:54 am
To: "cgrob@chimeraenergyusa.com" <cgrob@chimeraenergyusa.com>

Hi Charles,

Attached is the deficiency for Chimera.

Please let me know if you have any questions and I would be happy to answer them for you.

Best,

Ashley Dillon
http://www.markjdillon.com/
Pennaluna and Company
421 Sherman ave
Coeur d 'Alene Id 83814

SEC-PC-E-0000299

800 654 9929 or 1 208 667 7472
fax 1 208 664 2283

Attn; Mark Dillon

-----Original Message-----
From: Pennaluna & Co.
Sent: Thursday, February 02, 2012 9:38 AM
To: Ashley Dillon
Subject: New Scan

Here is a your freshly scanned document.
--------------------------------------------------------------

Sent by the Kyocera FS-1128MFP printer/fax/scanner

--------------------------------------------------------------

**APP. 000652**                    SEC-PC-E-0000300



February 3, 2012

Pennaluna and Company
421 Sherman Avenue
Coeur d'Alene, ID 83814
Attn: Mark Dillon

> Re:    **Chimera Energy Corporation**
>        **Form 211 Application**
>        **FINRA Matter No. 20120311899**

Dear Mr. Dillon:

By letter dated February 1, 2012, FINRA provided to you its comments on the Chimera Energy Corp. (the "Company," "we," "us" or "our") Form 211 Application. We are in receipt of these comments and set forth below are the Company's responses to FINRA's comments. For your convenience, the comments are listed below, followed by the Company's response.

1.  A detailed explanation of the relationship between Andrew Farmer and the Issuer.

**RESPONSE:** Mr. Farmer is a long-term friend of the Issuer's CEO, Charles Grob. Mr. Grob sought advice from Mr. Farmer on firms with which to discuss a Form 211 Application. Among others, Mr. Farmer recommended Pennaluna & Company to the Issuer and made the initial introduction. Mr. Farmer is not an officer, director, consultant, affiliate, or shareholder of the Issuer.

2.  The date the certificates will be delivered.

**RESPONSE:** The Issuer has closed its offering and has delivered all resulting certificates to its shareholders.

3.  Details surrounding the Issuer's offering. Your answer should include, but not be limited to, who solicited investors, how the solicitor knew them, and how many individuals were solicited including those that did not purchase.

**RESPONSE:** The Issuer raised $75,000 from 29 investors pursuant to a Registration Statement on Form S-1 filed with the Securities and Exchange Commission that was approved for effectiveness on December 21, 2011. The subscription period was opened on December 22, 2011 and closed on January 11, 2012.

Each of the individuals who subscribed to the offering was either personally known to the Issuer's CEO, Charles Grob, or introduced to the Issuer by another shareholder. Mr. Grob was the sole individual authorized by the Issuer to solicit investments. In addition to the 29 investors who subscribed to the offering, 4 individuals who initially expressed interest in the offering chose not to subscribe.

4.  Inform the staff as to whether any FINRA member firms participated in the offering.

**RESPONSE:** No FINRA member firms were involved in the offering.

5.  Details related to how, when, and from whom the control persons of the Issuer gained control of the Issuer. In your response, indicate all parties involved, how they were introduced, the nature of their involvement, and any consideration paid.

**RESPONSE:** On August 5, 2011 Charles Grob formed Chimera Energy Corp. in the State of Nevada. On August 22, 2011 Mr. Grob purchased 10,000,000 shares of the Issuer's common stock in for $10,000. No other parties were involved in the purchase of the shares.

**APP. 000653**

SEC-PC-E-0000301

6.   Describe **all** relationships and affiliations among and between the shareholders and the Issuer, its predecessors, its present and prior officers and directors, and other shareholders.

**RESPONSE:** See attached breakdown of the interrelationships between shareholders as well as each shareholder's connection to the issuer and its CEO.  Other than those indicated there are no relationships or affiliations among and between shareholders and the Issuer or its officer and director.  There are no predecessors or prior officers and directors.

7.   The Issuer's November 20, 2011 Form 10-Q shows that the Issuer has minimal revenue, $70,851 in assets and limited operations.  Additionally, the Issuer's registration statements states that the Issuer has no full or part time employees and its sole officer and director will devote 10 to 25 hours per week "from time to time" to its business efforts.  Given this, it appears to the staff that the Issuer's operations assets are nominal as described in SEC release No. 33-8587, and, therefore the Issuer's SEC filings should be amended to indicate the Issuer is a shell company.

**RESPONSE:** See attached description of the Company's assets and operations.  In the Company's opinion, neither its assets nor operations qualify as nominal.  As such, the Company believes it does not fall within the scope of a "shell company" as described in SEC release No. 33-8587.

8.   A written statement from the Issuer confirming that shares of the Issuer not included in the Registration Statements are restricted and cannot be resold pursuant to Rule 144 until the conditions of Rule 144(i)(2) have been met.

**RESPONSE:** Attached is a statement from the Issuer confirming that shares of the Issuer not included in the Registration Statements are restricted and cannot be resold pursuant to Rule 144 until the conditions of Rule 144(i)(2) have been met

9.   The officer of the company does not appear to have a technical background.  Explain what steps they will take to further the Issuer's business objectives.

**RESPONSE:** The Issuer's primary business business model is the sale of polycrystalline diamond cutters (PDC) to the manufacturers of PDC drill bits used in the oil and gas industry.  The sale of PDC's to drill bit manufacturers does not require a highly technical background.  The business and sales experience of the Issuer's officer will be instrumental in the furtherance of its business objectives.  Specifically, the Issuer plans to further its business objectives by implementing Phase I and Phase II of its anticipated milestones as set forth in the MD&A section of the Issuer's S-1.

10.   Has your firm entered into any agreements with the Issuer, its shareholders, affiliates or any entity representing the Issuer?  If so, provide a copy of such agreements.

**RESPONSE:** The Issuer has not, nor has any entity representing the Issuer, entered into an agreement of any kind with Pennaluna & Co. or any affiliate thereof.

Please let me know if you have any additional questions.

Sincerely,

Charles Grob
Chairman & CEO

SEC-PC-E-0000302



January 13, 2012

Pennaluna & Company
421 Sherman Avenue
Coeur d'Alene, ID 83814

Dear Sirs:

Chimera Energy Corp. raised $75,000 from 29 investors pursuant to a Registration Statement on Form S-1 filed with the Securities and Exchange Commission that was approved for effectiveness on December 21, 2011. The subscription period was opened on December 22, 2011 and closed on January 11, 2012.

Each of the individuals who subscribed to the offering was either personally known to our CEO, Charles Grob, or introduced to our CEO by another shareholder. Mr. Grob was the sole individual authorized by the company to solicit investments from individuals who indicated interest in the offering. In addition to the 29 investors who subscribed to the offering, 4 individuals who initially expressed interest in the offering chose not to subscribe.

Attached is a spreadsheet detailing the inter-relationships between the investors as well as the individual who introduced them to our CEO.

Sincerely,

Charles Grob
President and CEO

SEC-PC-E-0000303



# RELATIONSHIPS BETWEEN SHAREHOLDERS

| SHAREHOLDER NAME | RELATIONSHIP |
|---|---|
| AUSTIN, ANDREW | CLOSE FRIEND OF BRIAN BARRILLEAUX, BROTHER OF ROBBIE AUSTIN, BROTHER-IN-LAW OF NICOLE MILLER |
| AUSTIN, ROBBIE | CLOSE FRIEND OF BRIAN BARRILLEAUX, HUSBAND OF NICOLE MILLER, BROTHER-IN-LAW OF ANDREW AUSTIN |
| BARRILLEAUX, BRIAN | LONGTIME FRIEND OF CEO CHARLES GROB, FIANCÉE OF NATALIE MOORE, BROTHER OF MATTHEW BRYANT |
| BEALL, ROBERT | LONGTIME FRIEND OF CEO CHARLES GROB |
| BRYANT, MATTHEW | BROTHER OF BRIAN BARRILLEAUX |
| COTTON, LYDIA | LONGTIME FRIEND OF CEO CHARLES GROB |
| COX, MAIRI | LONGTIME FRIEND OF CEO CHARLES GROB, WIFE OF PAUL COX |
| COX, PAUL | LONGTIME FRIEND OF CEO CHARLES GROB, HUSBAND OF MAIRI COX |
| DEMANDANTE, ARCHIE | CLOSE FRIEND OF ANNA TIKHONOVA, HUSBAND OF JANA ROBINSON-DEMANDANTE |
| EAGLETON, BRENDAN | LONGTIME FRIEND OF CEO CHARLES GROB |
| FARMER, LINWOOD | FATHER-IN-LAW OF ANNA TIKHONOVA, HUSBAND OF PATRICIA FARMER |
| FARMER, PATRICIA | MOTHER-IN-LAW OF ANNA TIKHONOVA, WIFE OF LINWOOD FARMER |
| FERTITTA, NICOLE | LONGTIME FRIEND OF CEO CHARLES GROB |
| FLEMING, MATT | LONGTIME FRIEND OF CEO CHARLES GROB |
| GARCIA, BRITTANY | CLOSE FRIEND OF JANA ROBINSON-DEMANDANTE, WIFE OF ALEJANDRO GARCIA-HERRERA |
| GARCIA-HERRERA, ALEJANDRO | HUSBAND OF BRITTANY GARCIA |
| HUFF, H. DOUG | PARTNER OF DAVID PARISI |
| LEAL, BRANDI | CLOSE FRIEND OF JANA ROBINSON-DEMANDANTE |
| MEGA, BENJAMIN | LONGTIME FRIEND OF CEO CHARLES GROB |
| MILLER, NICOLE | CLOSE FRIEND OF BRIAN BARRILLEAUX, WIFE OF ROBBIE AUSTIN, SISTER-IN-LAW OF ANDREW AUSTIN |
| MOORE, NATALIE | FIANCÉE OF BRIAN BARRILLEAUX |
| MOSS, JAMES | CLOSE FRIEND OF BRIAN BARRILLEAUX, HUSBAND OF KELLIE MOSS |
| MOSS, KELLIE | CLOSE FRIEND OF BRIAN BARRILLEAUX, WIFE OF JAMES MOSS |
| PARISI, DAVID | BUSINESS ACQUAINTANCE OF CEO CHARLES GROB |
| ROBINSON-DEMANDANTE, JANA | CLOSE FRIEND OF ANNA TIKHONOVA, WIFE OF ARCHIE DEMANDANTE |
| SAMIUDDIN, SHARA | LONGTIME FRIEND OF CEO CHARLES GROB |
| SORELLE, DANIEL | LONGTIME FRIEND OF CEO CHARLES GROB |
| STRESSAU, M. ASHTON | LONGTIME FRIEND OF CEO CHARLES GROB |
| TIKHONOVA, ANNA | LONGTIME FRIEND OF CEO CHARLES GROB |

2800 POST OAK BLVD, SUITE 4100 • HOUSTON, TX • 77056 • (832) 390-2334

SEC-PC-E-0000304



January 20, 2012

Pennaluna and Company
421 Sherman Avenue
Coeur d'Alene, ID 83814
Attn: Compliance Department

To Whom It May Concern:

Through Rule 405 of the Securities Act of 1933 and Rule 12b-2 of the Securities and Exchange Act of 1934, the Securities and Exchange Commission defines a "shell company" as a company (other than an asset backed issuer), which has "no operations; and either no or nominal assets; assets consisting of solely cash and cash equivalents; or assets consisting of any amount of cash and cash equivalents and nominal other assets." For the purposes of the Commission's definition, the determination of the company's assets is based on those assets that would be reflected on the company's balance sheet, prepared in connection with U.S. generally accepted accounting principles.

While Chimera Energy Corp. is a development-stage enterprise; the Company does not fall under the Commission's definition of a "shell company" for the following reasons:

1. Operations – The Company has a very specific business plan and bona fide operations. To date, the Company has taken substantive steps towards implementing its business plan, including:

   a. Arranged $100,000 in debt financing to implement the business plan;
   b. Entered into a supplier agreement for the manufacture of the Company's introductory product line;
   c. Generated revenues from the delivery of products to multiple customers; and
   d. Devoted significant resources to locating and engaging potential customers for the Company's products.

2. Assets – The Company's has significant assets that fall outside the generally accepted definition of nominal. As of November 30, 2011 the Company's assets consisted of:

   a. Cash and cash equivalents   $70,851
   b. Accounts receivable - $9,700
   c. Inventory - $15,970

It is the opinion of the Company that it does not fall into the Commission's definition of a "shell company" as set forth above. The Company's operations alone prevent its classification as a "shell," while at the same time its assets cannot be considered to be nominal.

Sincerely,

Charles Grob
Chairman & CEO
Chimera Energy Corp.

SEC-PC-E-0000305



February 3, 2012

Pennaluna and Company
421 Sherman Avenue
Coeur d'Alene, ID 83814

Ladies and Gentlemen:

I, the undersigned, Charles Grob, Chairman and CEO of Chimera Energy Corp., hereby represent and certify that:

1. On August 5, 2011 Chimera Energy Corp. (the "Company") was formed in Nevada by Charles Grob as its sole officer and director. On August 22, 2011 Mr. Grob purchased 10,000,000 shares of the Company's common stock for $10,000; becoming the Company's sole shareholder.

2. The Company filed a Registration Statement with the Securities and Exchange Commission ("SEC") to register 5,000,000 shares of its common stock for sale to the public under a Direct Public Offering. Such Registration Statement was approved for effectiveness by the SEC on December 21, 2011.

3. On January 12, 2012 the Company closed its stock offering after selling 5,000,000 shares to 29 individual non-affiliated investors.

4. As of February 3, 2012 there are 15,000,000 shares of the Company's common stock issued and outstanding. There are 5,000,000 shares of free-trading stock issued pursuant to subscriptions to the S 1 offering and the 10,000,000 restricted shares purchased by Mr. Grob.

5. The Company confirms that the shares issued to Mr. Grob were not included in the Registration Statement and therefor remain restricted. The shares cannot be resold pursuant to Rule 144 until the conditions of Rule 144(i)(2) have been met.

Pennaluna & Company is permitted to rely on the above representations in filing a Form 211 Application on behalf of the Company.

Sincerely,

Charles Grob
Chairman & CEO
Chimera Energy Corp.

2800 Post Oak Blvd. Suite 4100 • Houston, TX • 77056 • (832) 390-2334

APP. 000658                    SEC-PC-E-0000306

# Appendix

# Exhibit LL

APP. 000659

# PENNALUNA & COMPANY
~ *Stockbrokers since 1926* ~

February 6, 2012

Mr. Eric Mayes
Compliance Examiner   *240 38C 5100*
FINRA
OTC Compliance Unit
9513 Key West Avenue
Rockville  MD  20850-3389

**Re:  Chimera Energy Corporation Common Stock
(FINRA Matter No. 20120311899)**

Dear Mr. Mayes:

This responds to your letter of February 1, 2012, concerning the above submission.  A copy of that correspondence is enclosed as requested.

With respect to many of the issues you raised, please see the enclosed letter and related documents that we have recently received from the Issuer's CEO.

If you have further questions or comments, please contact me by fax at 208-664-2283 ... by telephone at 208-667-7472 ... or by mail at Pennaluna & Company, 421 Sherman Ave -- Ste 203, Coeur d'Alene ID 83814.

Thank you for your help.

Sincerely,

Mark Dillon

421 Sherman Avenue • Coeur d'Alene, Idaho 83814 • (208) 667-7472 • (800) 535-5329
413 6th Street • Wallace, Idaho 83873 • (208) 752-1242
e-mail: pennaluna@pennaluna.com • web site: http://www.pennaluna.com

APP. 000660

SEC-PC-P-0000078


Financial Industry Regulatory Authority

FACSIMILE ONLY

February 1, 2012

Mr. Mark Dillon
Pennaluna & Company
421 Sherman Avenue, Suite 203
Coeur D'alene, ID 83814

Re: Chimera Energy Corporation (FINRA Matter No. 20120311899)

Dear Mr. Dillon:

The staff has received and reviewed the Form 211 Application for the above-referenced
security. This will confirm that Pennaluna & Company's ("Pennaluna") Form 211
Application is deficient. As a reminder, SEC Rule 15c2-11 requires that a broker dealer
"... based upon a review of the paragraph (a) information together with any other
documents and information required by paragraph (b) of this section, has a reasonable
basis under the circumstances for believing that the paragraph (a) information is
accurate in all material respects, and that the sources of the paragraph (a) information
are reliable." Therefore, pursuant to FINRA Rule 6432, the staff requests the following
information in order to continue the review process:

1. A detailed explanation of the relationship between Andrew Farmer and the
   Issuer.

2. The date the certificates will be delivered.

3. Details surrounding the Issuer's offering. Your answer should include, but not
   be limited to, who solicited investors, how the solicitor knew them, and how
   many individuals were solicited including those that did not purchase.

4. Inform the staff as to whether any FINRA member firms participated in the
   offering.

5. Details related to how, when, and from whom the control persons of the
   Issuer gained control of the Issuer. In your response, indicate all parties
   involved, how they were introduced, the nature of their involvement, and any
   consideration paid.

6. Describe **all** relationships and affiliations among and between the
   shareholders and the Issuer, its predecessors, its present and prior officers
   and directors, and other shareholders.

7. The Issuer's November 30, 2011 Form 10-Q shows that the Issuer has minimal revenue, $70,851 in assets and limited operations. Additionally, the Issuer's registration statement states that the Issuer has no full or part-time employees and its sole officer and director will devote 10 to 25 hours per week "from time to time" to its business affairs. Given this, it appears to the staff that Issuer's operations assets are nominal as described in SEC Release No. 33-8587, and, therefore, the Issuer's SEC filings should be amended to indicate the Issuer is a shell company.

8. A written statement from the Issuer confirming that shares of the Issuer not included in the Registration Statement are restricted and cannot be resold pursuant to Rule 144 until the conditions of Rule 144(i)(2) have been met.

9. The officer of the company does not appear to have a technical background. Explain what steps they will take to further the Issuer's business objectives.

10. Has your firm entered into any agreements with the Issuer, its shareholders, affiliates or any entity representing the Issuer? If so, provide a copy of such agreements.

The staff will reexamine Pennaluna's submission following receipt of the requested information and any related documents. Pursuant to NASD Notice to Members 99-26, if Pennaluna does not materially respond to the staff's questions and provide the required information in 180 calendar days from the date of this deficiency letter Pennaluna's Application will be considered abandoned and the file will be closed.

Submit a copy of this letter with any additional documents. If you have any questions regarding the above, contact the undersigned at (240) 386-6937.

Very truly yours,

Eric Mayes
Compliance Examiner
OTC Compliance Unit

SEC-PC-P-0000080



February 3, 2012

Pennaluna and Company
421 Sherman Avenue
Coeur d'Alene, ID 83814
Attn: Mark Dillon

        Re:     Chimera Energy Corporation
                Form 211 Application
                FINRA Matter No. 20120311899

Dear Mr. Dillon:

By letter dated February 1, 2012, FINRA provided to you its comments on the Chimera Energy Corp. (the "Company," "we," "us" or "our") Form 211 Application. We are in receipt of these comments and set forth below are the Company's responses to FINRA's comments. For your convenience, the comments are listed below, followed by the Company's response.

    1.  A detailed explanation of the relationship between Andrew Farmer and the Issuer.

RESPONSE: Mr. Farmer is a long-term friend of the Issuer's CEO, Charles Grob. Mr. Grob sought advice from Mr. Farmer on firms with which to discuss a Form 211 Application. Among others, Mr. Farmer recommended Pennaluna & Company to the Issuer and made the initial introduction. Mr. Farmer is not an officer, director, consultant, affiliate, or shareholder of the Issuer.

    2.  The date the certificates will be delivered.

RESPONSE: The Issuer has closed its offering and has delivered all resulting certificates to its shareholders.

    3.  Details surrounding the Issuer's offering. Your answer should include, but not be limited to, who solicited investors, how the solicitor knew them, and how many individuals were solicited including those that did not purchase.

RESPONSE: The Issuer raised $75,000 from 29 investors pursuant to a Registration Statement on Form S-1 filed with the Securities and Exchange Commission that was approved for effectiveness on December 21, 2011. The subscription period was opened on December 22, 2011 and closed on January 11, 2012.

Each of the individuals who subscribed to the offering was either personally known to the Issuer's CEO, Charles Grob, or introduced to the Issuer by another shareholder. Mr. Grob was the sole individual authorized by the Issuer to solicit investments. In addition to the 29 investors who subscribed to the offering, 4 individuals who initially expressed interest in the offering chose not to subscribe.

    4.  Inform the staff as to whether any FINRA member firms participated in the offering.

RESPONSE: No FINRA member firms were involved in the offering.

    5.  Details related to how, when, and from whom the control persons of the Issuer gained control of the Issuer. In your response, indicate all parties involved, how they were introduced, the nature of their involvement, and any consideration paid.
RESPONSE: On August 5, 2011 Charles Grob formed Chimera Energy Corp. in the State of Nevada. On August 22, 2011 Mr. Grob purchased 10,000,000 shares of the Issuer's common stock in for $10,000. No other parties were involved in the purchase of the shares.

2800 POST OAK BLVD. SUITE 4100 • HOUSTON, TX • 77056 • (832) 390-2334

SEC-PC-P-0000081

6.   Describe **all** relationships and affiliations among and between the shareholders and the Issuer, its predecessors, its present and prior officers and directors, and other shareholders.

**RESPONSE:** See attached breakdown of the interrelationships between shareholders as well as each shareholder's connection to the issuer and its CEO. Other than those indicated there are no relationships or affiliations among and between shareholders and the Issuer or its officer and director. There are no predecessors or prior officers and directors.

7.   The Issuer's November 20, 2011 Form 10-Q shows that the Issuer has minimal revenue, $70,851 in assets and limited operations. Additionally, the Issuer's registration statements states that the Issuer has no full or part time employees and its sole officer and director will devote 10 to 25 hours per week "from time to time" to its business efforts. Given this, it appears to the staff that the Issuer's operations assets are nominal as described in SEC release No. 33-8587, and, therefore the Issuer's SEC filings should be amended to indicate the Issuer is a shell company.

**RESPONSE:** See attached description of the Company's assets and operations. In the Company's opinion, neither its assets nor operations qualify as minimal. As such, the Company believes it does not fall within the scope of a "shell company" as described in SEC release No. 33-8587.

8.   A written statement from the Issuer confirming that shares of the Issuer not included in the Registration Statements are restricted and cannot be resold pursuant to Rule 144 until the conditions of Rule 144(i)(2) have been met.

**RESPONSE:** Attached is a statement from the Issuer confirming that shares of the Issuer not included in the Registration Statements are restricted and cannot be resold pursuant to Rule 144 until the conditions of Rule 144(i)(2) have been met

9.   The officer of the company does not appear to have a technical background. Explain what steps they will take to further the Issuer's business objectives.

**RESPONSE:** The Issuer's primary business model is the sale of polycrystalline diamond cutters (PDC) to the manufacturers of PDC drill bits used in the oil and gas industry. The sale of PDC's to drill bit manufacturers does not require a highly technical background. The business and sales experience of the Issuer's officer will be instrumental in the furtherance of its business objectives. Specifically, the Issuer plans to further its business objectives by implementing Phase I and Phase II of its anticipated milestones as set forth in the MD&A section of the Issuer's S-1.

10.   Has your firm entered into any agreements with the Issuer, its shareholders, affiliates or any entity representing the Issuer? If so, provide a copy of such agreements.

**RESPONSE:** The Issuer has not, nor has any entity representing the Issuer, entered into an agreement of any kind with Pennaluna & Co. or any affiliate thereof.

Please let me know if you have any additional questions.

Sincerely,

Charles Groh
Chairman & CEO



SEC-PC-P-0000082



January 13, 2012

Pennaluna & Company
421 Sherman Avenue
Coeur d'Alene, ID 83814

Dear Sirs:

Chimera Energy Corp. raised $75,000 from 29 investors pursuant to a Registration Statement on Form S-1 filed with the Securities and Exchange Commission that was approved for effectiveness on December 21, 2011. The subscription period was opened on December 22, 2011 and closed on January 11, 2012.

Each of the individuals who subscribed to the offering was either personally known to our CEO, Charles Grob, or introduced to our CEO by another shareholder. Mr. Grob was the sole individual authorized by the company to solicit investments from individuals who indicated interest in the offering. In addition to the 29 investors who subscribed to the offering, 4 individuals who initially expressed interest in the offering chose not to subscribe.

Attached is a spreadsheet detailing the inter-relationships between the investors as well as the individual who introduced them to our CEO.

Sincerely,

Charles Grob
President and CEO

SEC-PC-P-0000083



# RELATIONSHIPS BETWEEN SHAREHOLDERS

| SHAREHOLDER NAME | RELATIONSHIP |
|---|---|
| AUSTIN, ANDREW | CLOSE FRIEND OF BRIAN BARRILLEAUX, BROTHER OF ROBBIE AUSTIN, BROTHER-IN-LAW OF NICOLE MILLER |
| AUSTIN, ROBBIE | CLOSE FRIEND OF BRIAN BARRILLEAUX, HUSBAND OF NICOLE MILLER, BROTHER-IN-LAW OF ANDREW AUSTIN |
| BARRILLEAUX, BRIAN | LONGTIME FRIEND OF CEO CHARLES GROB, FIANCÉE OF NATALIE MOORE, BROTHER OF MATTHEW BRYANT |
| BEALL, ROBERT | LONGTIME FRIEND OF CEO CHARLES GROB |
| BRYANT, MATTHEW | BROTHER OF BRIAN BARRILLEAUX |
| COTTON, LYDIA | LONGTIME FRIEND OF CEO CHARLES GROB |
| COX, MAIRI | LONGTIME FRIEND OF CEO CHARLES GROB, WIFE OF PAUL COX |
| COX, PAUL | LONGTIME FRIEND OF CEO CHARLES GROB, HUSBAND OF MAIRI COX |
| DEMANDANTE, ARCHIE | CLOSE FRIEND OF ANNA TIKHONOVA, HUSBAND OF JANA ROBINSON-DEMANDANTE |
| EAGLETON, BRENDAN | LONGTIME FRIEND OF CEO CHARLES GROB |
| FARMER, LINWOOD | FATHER-IN-LAW OF ANNA TIKHONOVA, HUSBAND OF PATRICIA FARMER |
| FARMER, PATRICIA | MOTHER-IN-LAW OF ANNA TIKHONOVA, WIFE OF LINWOOD FARMER |
| FERTITTA, NICOLE | LONGTIME FRIEND OF CEO CHARLES GROB |
| FLEMING, MATT | LONGTIME FRIEND OF CEO CHARLES GROB |
| GARCIA, BRITTANY | CLOSE FRIEND OF JANA ROBINSON-DEMANDANTE, WIFE OF ALEJANDRO GARCIA-HERRERA |
| GARCIA-HERRERA, ALEJANDRO | HUSBAND OF BRITTANY GARCIA |
| HUFF, H. DOUG | PARTNER OF DAVID PARISI |
| LEAL, BRANDI | CLOSE FRIEND OF JANA ROBINSON-DEMANDANTE |
| MEGA, BENJAMIN | LONGTIME FRIEND OF CEO CHARLES GROB |
| MILLER, NICOLE | CLOSE FRIEND OF BRIAN BARRILLEAUX, WIFE OF ROBBIE AUSTIN, SISTER-IN-LAW OF ANDREW AUSTIN |
| MOORE, NATALIE | FIANCÉE OF BRIAN BARRILLEAUX |
| MOSS, JAMES | CLOSE FRIEND OF BRIAN BARRILLEAUX, HUSBAND OF KELLIE MOSS |
| MOSS, KELLIE | CLOSE FRIEND OF BRIAN BARRILLEAUX, WIFE OF JAMES MOSS |
| PARISI, DAVID | BUSINESS ACQUAINTANCE OF CEO CHARLES GROB |
| ROBINSON-DEMANDANTE, JANA | CLOSE FRIEND OF ANNA TIKHONOVA, WIFE OF ARCHIE DEMANDANTE |
| SAMIUDDIN, SHARA | LONGTIME FRIEND OF CEO CHARLES GROB |
| SORELLE, DANIEL | LONGTIME FRIEND OF CEO CHARLES GROB |
| STRESSAU, M. ASHTON | LONGTIME FRIEND OF CEO CHARLES GROB |
| TIKHONOVA, ANNA | LONGTIME FRIEND OF CEO CHARLES GROB |

SEC-PC-P-0000084

# Appendix

# Exhibit MM



FINRA

Financial Industry Regulatory Authority

**FACSIMILE ONLY**

March 12, 2012

Mr. Mark Dillon
Pennaluna & Company
421 Sherman Avenue, Suite 203
Coeur D'alene, ID 83814

Re: Chimera Energy Corporation (FINRA Matter No. 20120311899)

Dear Mr. Dillon:

The staff has received and reviewed the February 6, 2012 response of Pennaluna & Company ("Pennaluna") to our letter of February 1, 2012 regarding the pending Form 211 Application for the above-referenced security(ies). This will confirm that Pennaluna's Form 211 Application remains deficient. As a reminder, SEC Rule 15c2-11 requires that a broker dealer "... based upon a review of the paragraph (a) information together with any other documents and information required by paragraph (b) of this section, has a reasonable basis under the circumstances for believing that the paragraph (a) information is accurate in all material respects, and that the sources of the paragraph (a) information are reliable." Therefore, pursuant to FINRA Rule 6432, the staff requests the following information in order to continue the review process:

1. We reviewed your response to comment 2 of our February 1, 2012 letter. As previously requested, provide the <u>date</u> the certificates were delivered.

2. We reviewed your response to comment 7 of our February 1, 2012 letter. The staff is still under the opinion that the issuer is a shell company. If Pennaluna disagrees with the staff's view that the issuer is a shell company, Pennaluna should provide any and all documentation detailing why the issuer is not a shell.

3. We reviewed your response to comment 8 of our February 1, 2012 letter. As previously requested, provide a written statement <u>from the issuer</u> confirming that shares of the issuer not included in the Registration Statement are restricted and cannot be resold pursuant to Rule 144 until the conditions of Rule 144(i)(2) have been met.

Investor protection. Market Integrity.

9509 Key West Avenue        t 240 386 4000
Rockville, MD               www.finra.org
20850-3329

SEC-PC-P-0000075

4.   A statement indicating whether any person or entity has control, written or otherwise, of the sale, transfer, disposition, voting or any other aspect of the shares listed on the shareholder list other than the person or entity identified as the shareholder.  This statement should include any past, present or future arrangements.

The staff will reexamine Pennaluna's submission following receipt of the requested information and any related documents.  Pursuant to NASD Notice to Members 99-26, if Pennaluna does not materially respond to the staff's questions and provide the required information in 180 calendar days from the date of this deficiency letter, Pennaluna's Application will be considered abandoned and the file will be closed.

Please submit a copy of this letter with any additional documents. If you have any questions regarding the above, please call the undersigned at (240) 386-6837.

Very truly yours,

Eric Mayes
Compliance Examiner
OTC Compliance Unit

SEC-PC-P-0000076

# Appendix

# Exhibit NN

**To:**        David M. Loev[dloev@loevlaw.com]
**Cc:**        Alyssa Vasquez[alyssa@loevlaw.com]
**From:**      Andrew Farmer
**Sent:**      Tue 3/13/2012 12:11:45 PM
**Importance:**          **Normal**
**Subject:**   Chimera Amendment
Chimera - 10Q112 - Amend No.1.docx

David,

Please review the language of the Explanatory Note on page 2.  If you're good with the language please have the updates made to the edgar file and have it prepared for filing ASAP.

Thanks,

Andrew Farmer

**Iridium Capital Limited**

(832) 364-6317

(832) 553-3080 Fax

(619) 247-2680 Cell

---

No virus found in this message.
Checked by AVG – www.avg.com
Version: 2015.0.5856 / Virus Database: 4306/9322 - Release Date: 03/17/15

SEC-LoevD-E-0001708

## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

**Form 10-Q**

☑   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended November 30, 2011**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

Commission File Number 333-177406

**Chimera Energy Corporation**

(Exact name of small business issuer as specified in its charter)

| | |
|---|---|
| **Nevada** | **45-2941876** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2800 Post Oak Blvd., Suite 4100** **Houston, TX** | **77056** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:  (832) 390-2334

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☑     No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act:

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☑ |

There were 15,000,000 shares of the registrant's common stock issued and outstanding as of January 13, 2012.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☑     No ☐

SEC-LoevD-E-0001709

## EXPLANATORY NOTE

The purpose of this Amendment No. 1 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended November 30, 2011, filed with the Securities and Exchange Commission on January 13, 2012 (the "Form 10-Q"), is solely to update the indication of the Company's "Shell" status.   During the process of applying for a trading symbol, the Company was notified by FINRA that it was considered to be a "Shell" and therefore must amend its Form 10-Q to disclose its status as a "shell company."

No other changes have been made to the Form 10-Q. This Amendment No. 1 to the Form 10-Q continues to speak as of the original filing date of the Form 10-Q, does not reflect events that may have occurred subsequent to the original filing date, and does not modify or update in any way disclosures made in the original Form 10-Q.

SEC-LoevD-E-0001710

# Information about Chimera - 10Q112 - Amend No

C:\Users\VydashenkoN\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.IE5\S...





**Save As**

**Read-Only Document**
This document has been opened in read-only mode. Changes cannot be made to the original document. To save changes, create a new copy of the document.



**Protect Document**

**Permissions**
Anyone can open, copy, and change any part of this document.



**Check for Issues**

**Prepare for Sharing**
Before sharing this file, be aware that it contains:
- Revisions
- Document properties and author's name
- Custom XML data
- Content that people with disabilities find difficult to read

**Manage Versions**

**Versions**
There are no previous versions of this file.

**Properties** ▾

| | |
|---|---|
| Size | 95.3KB |
| Pages | 28 |
| Words | 11780 |
| Total Editing Time | 1 Minute |
| Title | Go Solar USA, Inc. (Form: 10-Q/A, Received: 12/23/... |
| Tags | Add a tag |
| Comments | Source: EDGAR Online, Inc. © Copyright 2010. All r... |

**Related Dates**

| | |
|---|---|
| Last Modified | 3/13/2012 11:10 AM |
| Created | 3/13/2012 11:10 AM |
| Last Printed | Never |

**Related People**

| | |
|---|---|
| Author | EDGAR Online HTML to RTF Converter. Version 3.0 |
| | Add an author |
| Last Modified By | Andrew Farmer |

**Related Documents**

Open File Location

Show All Properties

# Appendix

# Exhibit OO



March 14, 2012

Pennaluna and Company
421 Sherman Avenue
Coeur d'Alene, ID 83814
Attn: Mark Dillon

> **Re:**   **Chimera Energy Corporation**
> **Form 211 Application**
> **FINRA Matter No. 20120311899**

Dear Mr. Dillon:

By letter dated March 12, 2012, FINRA provided to you its updated comments on the Chimera Energy Corp. (the "Company," "we," "us" or "our") Form 211 Application. We are in receipt of these comments and set forth below are the Company's responses to FINRA's comments. For your convenience, the comments are listed below, followed by the Company's response.

  1.  We reviewed your response to comment 2 of our February 1, 2012 letter.  As previously requested, provide the <u>date</u> the certificates were delivered.

**RESPONSE:** The Company commenced delivery of the certificates to shareholders on January 25, 2012 via overnight courier.  As of January 31, 2012 the Company had verification that all certificates had been delivered.

  2.  We reviewed your response to comment 7 of our February 1, 2012 letter. The staff is still under the opinion that the Issuer is a shell company.  If Pennaluna disagrees with staff's view that the Issuer us a shell company, Pennaluna should provide any and all documentation detailing why the Issuer is not a shell.

**RESPONSE:** The Company has amended its Form 10-Q for the period ended November 30, 2011, as filed with the Securities and Exchange Commission on January 13, 2012, to update its shell status.

  3.  We reviewed your response to comment 8 of our February 1, 2012 letter.  As previously requested, provide a written statement **from the Issuer** confirming that shares of the Issuer not included in the Registration Statements are restricted and cannot be resold pursuant to Rule 144 until the conditions of Rule 144(i)(2) have been met.

**RESPONSE:** Attached is a statement from the Company confirming that shares of the Company not included in the Registration Statements are restricted and cannot be resold pursuant to Rule 144 until the conditions of Rule 144(i)(2) have been met

4. A statement indicating whether any person or entity has control, written or otherwise, of the sale, transfer, disposition, voting or any other aspect of the shares listed on the shareholder list other than the person or entity identified as the shareholder. This statement should include any past, present or future arrangements.

**RESPONSE:** Attached is a statement from the Company attesting that there is no such arrangement known to the Company.

Please let me know if you have any additional questions.

Sincerely,

Charles Grob
Chairman & CEO



SEC-PC-P-0000074

# Appendix

# Exhibit PP



*CHMR*

**Financial Industry Regulatory Authority**

FACSIMILE ONLY

April 10, 2012

Mr. Mark Dillon
Pennaluna & Company
421 Sherman Avenue, Suite 203
Coeur D'alene, ID 83814

Re: Chimera Energy Corporation Common Stock ("CHMR") (FINRA Matter No. 20120311899)

Dear Mr. Dillon:

The staff has reviewed the information submitted by Pennaluna & Company ("Pennaluna") pursuant to FINRA Rule 6432 and Rule 15c2-11 under the Securities Exchange Act of 1934 in connection with the above-referenced security(ies).

This letter will confirm that on April 10, 2012, acting in reliance upon the information contained in the filing, we have cleared Pennaluna's request for an unpriced quotation on the OTC Bulletin Board and OTC Link for CHMR. If Pennaluna decides to enter a priced quotation (bid or offer) in this security in any quotation medium, Pennaluna must supplement its filing with the Form 211. This supplemental filing must include the basis and factors for Pennaluna's priced quotation and be received by the FINRA three days before the priced entry appears in a quotations medium (See Notice to Members 90-40).

Be advised that in clearing Pennaluna's filing it should not be assumed that any federal, state, or self-regulatory requirements other than Rule 6432 and Rule 15c2-11 have been considered. Furthermore, this clearance should not be construed as indicating that the FINRA has passed upon the accuracy or adequacy of the documents contained in your Rule 15c2-11 submission. For members who receive clearance to enter quotations on the OTC Bulletin Board, FINRA Operations will effect their clearance for quotation the next business day. If you have any questions regarding this matter, contact the undersigned at (240) 386-6937.

Very truly yours,

Eric Mayes
Compliance Examiner
OTC Compliance Unit

cc: OTC Link LLC

Investor protection. Market integrity.

9509 Key West Avenue
Rockville, MD
20850-3329

t 240 386 4000
www.finra.org

SEC-PC-P-0000040

# Appendix

# Exhibit QQ

# IRIDIUM CAPITAL LIMITED

May 30, 2012

Island Stock Transfer
100 2nd Ave South, Suite 705S
St Petersburg, FL 33701

To whom it may concern:

Our client, Clarent Services Corp., has purchased the certificates of Chimera Energy Corp. listed below.

| Name | Cert # | # of Shares | Cost Basis per share |
|------|--------|-------------|----------------------|
| Andrew Austin | 1002 | 400,000 | $0.0225 |
| Alejandro Garcia-Herrera | 1017 | 200,000 | $0.0225 |
| David Parisi | 1025 | 50,000 | $0.0225 |
| M. Ashton Stressau | 1029 | 50,000 | $0.0225 |

Please cancel these certificates and issue (1) certificate representing 700,000 shares in the name of:

**Clarent Services Corp.**
Frankfurter Welle
An der Welle 4
60322 FrankfurtGermany
NON-US ENTITY

A bank check in the amount of $137 to cover the transfer fees is attached.

| | |
|---|---|
| Certificate Cancellation ($3 X 4) | $ 12.00 |
| Certificate Issuance | $ 25.00 |
| Rush Fee (Same Day Processing) | $100.00 |
| Total | $137.00 |

Please use the enclosed FedEx return label.

Should you have any questions please feel free to call me at (832) 364-6317.

Sincerely,

Andrew Farmer
Iridium Capital Limited

ICL-0001

APP. 000681

# IRIDIUM CAPITAL LIMITED

May 30, 2012

Island Stock Transfer
100 2nd Ave South, Suite 705S
St Petersburg, FL 33701

To whom it may concern:

Our client, Levantera SA, has purchased the certificates of Chimera Energy Corp. listed below.

| Name | Cert # | # of Shares | Cost Basis per share |
|------|--------|-------------|----------------------|
| Brian Barrilleaux | 1004 | 200,000 | $0.0225 |
| Maiti Cox | 1009 | 50,000 | $0.0225 |
| Brendan Eagleton | 1011 | 50,000 | $0.0225 |
| Brittany Garcia | 1016 | 200,000 | $0.0225 |
| Natalie Moore | 1022 | 200,000 | $0.0225 |

Please cancel these certificates and issue (1) certificate representing 700,000 shares in the name of:

**Levantera SA**
Athens Tower 21st Floor
2-4 Messegion
Athens 11527 Greece
NON-US ENTITY

A bank check in the amount of $140 to cover the transfer fees is attached.

| | |
|---|---|
| Certificate Cancellation ($3 X 5) | $ 15.00 |
| Certificate Issuance | $ 25.00 |
| Rush Fee (Same Day Processing) | $100.00 |
| Total | $140.00 |

Please use the enclosed FedEx return label.

Should you have any questions please feel free to call me at (832) 364-6317.

Sincerely,


Andrew Farmer
Iridium Capital Limited

ICL-0030

APP. 000682

# IRIDIUM CAPITAL LIMITED

May 30, 2012

Island Stock Transfer
100 2nd Ave South, Suite 705S
St Petersburg, FL 33701

To whom it may concern:

Our client, Hillsmere SA, has purchased the certificates of Chimera Energy Corp. listed below.

| Name | Cert # | # of Shares | Cost Basis per share |
|------|--------|-------------|----------------------|
| Robbie Austin | 1003 | 200,000 | $0.0225 |
| Matthew Bryant | 1006 | 400,000 | $0.0225 |
| Nicole Fertitta | 1014 | 100,000 | $0.0225 |

Please cancel these certificates and issue (1) certificate representing 700,000 shares in the name of:

**Hillsmere SA**
Via San Francesco D'Assisi 22
Torino 10121
Italy
NON-US ENTITY

A bank check in the amount of $134 to cover the transfer fees is attached.

| | |
|---|---|
| Certificate Cancellation ($3 X 3) | $   9.00 |
| Certificate Issuance | $ 25.00 |
| Rush Fee (Same Day Processing) | $100.00 |
| Total | $134.00 |

Please use the enclosed FedEx return label.

Should you have any questions please feel free to call me at (832) 364-6317.

Sincerely,

Andrew Farmer
Iridium Capital Limited

ICL-0066

APP. 000683

# IRIDIUM CAPITAL LIMITED

May 31, 2012

Island Stock Transfer
100 2ⁿᵈ Ave South, Suite 705S
St Petersburg, FL 33701

To whom it may concern:

Our client, Kylemore Corp., has purchased the certificates of Chimera Energy Corp. listed below.

| Name | Cert # | # of Shares | Cost Basis per share |
|------|--------|-------------|----------------------|
| Linwood Farmer | 1012 | 200,000 | $0.0225 |
| Patricia Farmer | 1013 | 200,000 | $0.0225 |
| Nicole Miller | 1021 | 200,000 | $0.0225 |
| H. Doug Huff | 1018 | 100,000 | $0.0225 |

Please cancel these certificates and issue (1) certificate representing 700,000 shares in the name of:

**Kylemore Corp.**
Edificio Brasilia
Praca Mouzinho de Albuquerque
113 - 5 Andar
Porto 4100-359 Portugal
ID # 639563295

A bank check in the amount of $137 to cover the transfer fees is attached.

| | |
|---|---|
| Certificate Cancellation ($3 X 4) | $ 12.00 |
| Certificate Issuance | $ 25.00 |
| Rush Fee (Same Day Processing) | $100.00 |
| Total | $137.00 |

Please use the enclosed FedEx return label.

Should you have any questions please feel free to call me at (832) 364-6317.

Sincerely,

Andrew Farmer
Iridium Capital Limited

ICL-0096

APP. 000684

# Appendix

# Exhibit RR

# Chartered Investments, Inc.

May 10, 2012

Island Stock Transfer
100 2nd Ave South, Suite 705S
St Petersburg, FL 33701

To whom it may concern:

Chartered Investments Inc. has purchased the certificates of Chimera Energy Corp. listed below.

| Name | Cert # | # of Shares | Cost Basis per share |
|------|--------|-------------|----------------------|
| Paul Cox | 1008 | 100,000 | $0.0225 |
| Brandi Leal | 1019 | 200,000 | $0.0225 |
| Shara Samiuddin | 1027 | 200,000 | $0.0225 |
| Daniel Sorelle | 1028 | 100,000 | $0.0225 |

Please cancel these certificates and issue a new certificate for 600,000 shares in the name of:

**Chartered Investments Inc.**
2500 CityWest Blvd, Suite 302
Houston, Texas 77042
Tax ID: 45-2412797

A company check in the amount of $137 to cover the transfer fees is attached.

| | |
|---|---|
| Certificate Cancellation ($3 X 4) | $ 12.00 |
| Certificate Issuance | $ 25.00 |
| Rush Fee (Same Day Processing) | $100.00 |
| Total | $137.00 |

Please use the enclosed FedEx return label.

Should you have any questions please feel free to call me at (832) 364-6317.

Sincerely,

Andrew Farmer
President
Chartered Investments, Inc.

CI-000015

# Appendix

# Exhibit SS

# Oak Resources Inc.

May 11, 2012

Island Stock Transfer
100 2nd Ave South, Suite 705S
St Petersburg, FL 33701

To whom it may concern:

We have purchased the below certificates of Chimera Energy Corp.

| Name | Cert # | # of Shares | Cost Basis per share |
|------|--------|-------------|----------------------|
| Kellie Moss | 1023 | 200,000 | $0.0225 |
| James Moss | 1024 | 200,000 | $0.0225 |
| Benjamin Mega | 1020 | 100,000 | $0.0225 |

Please cancel these certificates, and issue a new certificate in the name of:

**Oak Resources Inc.**
5201 Memorial Blvd, Suite 443
Houston, Texas 77007
Tax ID: 90-0730166

The reissued certificate should be delivered to Oak Resources at the address listed above.

A bank check in the amount of $134 to cover the transfer fees is attached.

| | |
|---|---|
| Certificate Cancellation ($3 x 3) | $  9.00 |
| Certificate Issuance | $ 25.00 |
| Rush Fee (Same Day Processing) | $100.00 |
| Total | $134.00 |

Please use the enclosed FedEx return label.

Should you have any questions please feel free to call me at (713) 842-0284.

Sincerely,

Lydia Cotton
CEO

OAK000069

# Appendix

# Exhibit TT

# TransAmerica Trading Inc.

May 10, 2012

Island Stock Transfer
100 2nd Ave South, Suite 705S
St Petersburg, FL 33701

To whom it may concern:

We have purchased the below certificates of Chimera Energy Corp.

| Name | Cert # | # of Shares | Cost Basis per share |
|------|--------|-------------|----------------------|
| Robert Beall | 1005 | 100,000 | $0.0225 |
| Archie Demandante | 1010 | 200,000 | $0.0225 |
| Matt Fleming | 1015 | 200,000 | $0.0225 |
| Jana Robinson-Demandante | 1026 | 200,000 | $0.0225 |

Please cancel these certificates and issue a new certificate for 700,000 shares in the name of:

**TransAmerica Trading, Inc.**
297 Kingsbury Grade, Suite 233
Lake Tahoe, NV 89449
Tax ID: 20-4689574

A company check in the amount of $137 to cover the transfer fees is attached.

| | |
|---|---|
| Certificate Cancellation ($3 X 4) | $ 12.00 |
| Certificate Issuance | $ 25.00 |
| Rush Fee (Same Day Processing) | $100.00 |
| Total | $137.00 |

Please use the enclosed FedEx return label.

Should you have any questions please feel free to call me at (337) 802-1220.

Sincerely,

Carolyn P Austin
CEO

297 Kingsbury Grade, Suite 233 – Lake Tahoe, Nevada – 89449

SEC-ACA-E-0000426

# Appendix

# Exhibit UU

ACT OF SALE OF COMMON STOCK

THIS AGREEMENT made as of the 6th day of April 2012, by and between Paul Cox (hereinafter referred to as the "Seller") and Chartered Investments, Inc. (hereinafter referred to as the "Purchaser").

Recitals:

1. The Seller is the owner of 100,000 shares of the issued and outstanding common stock of Chimera Energy Corp. (the "Company").

2. The Seller purchased the shares from the Company in a direct public offering.   The shares were registered with the Securities and Exchange Commission through an S-1 Registration Statement which became effective on December 21, 2011.

3. At no time has the Seller been considered to be a "Control Person" or "Affiliate" of the Company as defined by relevant SEC and/or FINRA regulations.

4. The Seller desires to sell to Purchaser, and the Purchaser desires to purchase 100,000 issued and outstanding shares (the "Shares") of the common stock of the Company.

Agreements:

In consideration of the covenants, warranties, and mutual agreements herein set forth, and in reliance upon the representation and warranties contained herein, the parties do hereby agree as follows:

1.    Sale of Shares; Consideration.

1.1. Sale. Subject to all the terms and conditions of this Agreement, the Seller hereby sells, assigns, transfers, and delivers to Purchaser, and the Purchaser hereby purchases the Shares.   These shares are evidenced by stock certificate number 1008 which has been delivered to Purchaser along with a duly endorsed stock power signed by Seller, receipt of which is hereby acknowledged.

1.2. Purchase Price. In consideration of the sale of Shares, and subject to the conditions hereinafter set forth, Purchaser pays to Seller, receipt of which is hereby acknowledged by Seller, $0.0225USD for each of the Shares sold hereunder, for an aggregate of $2,250USD.

2. Arbitration. Any and all claims or controversies arising out of this Agreement shall be submitted to and settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association then in effect, and judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction over the claim or controversy.

3. Benefit. This Agreement shall be binding upon, and inure to the benefit of the respective successors and assigns of the Purchaser and Seller.

4. Construction. The Parties hereto agree that this Agreement shall be construes and enforced in accordance with the laws of the state of Texas.

5. Counterparts. A copy or facsimile of this Agreement shall be deemed an original.

IN WITNESS WHEREOF, the parties have duly executed this Agreement.

"Seller"                                             "Purchaser"

By: Paul Cox                                         By: ANDREW FARMER

SEC-ACA-E-0000362

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER AND ORIGINAL DOCUMENT SECURITY SCREEN ON BACK WITH PADLOCK SECURITY ICON.

**Chartered Investments Inc.**
Corporate Office
5005 Hidalgo Street Suite 619
Houston Texas 77056

JP Morgan Chase Bank NA
Dallas, Texas 75201

**1238**

32-61/1110

5/5/2012

PAY TO THE
ORDER OF _____ Paul Cox                                    $ **2,250.00

Two Thousand Two Hundred Fifty and 00/100********************************************************************** **DOLLARS**

Paul Cox
226 West 19th Strret
Houston TX 77008

MEMO   Purchase 100,000 Shares of Chimera Energy Corp.          AUTHORIZED SIGNATURE

⑈001238⑈ ⑆111000614⑆     897988374⑈

Chartered Investments Inc.                                        **1238**

Paul Cox

5/5/2012
Purchase 100,000 Shares of Chimera Energy Corp.          2,250.00

Chase Checking      Purchase 100,000 Shares of Chimera Energy C          2,250.00

SEC-ACA-E-0000363

# Exhibit UU.1

APP. 000694-A

ACT OF SALE OF COMMON STOCK

THIS AGREEMENT made as of the 6th day of April 2012, by and between Brandi Leal (hereinafter referred to as the "Seller") and Chartered Investments, Inc. (hereinafter referred to as the "Purchaser").

Recitals:

1. The Seller is the owner of 200,000 shares of the issued and outstanding common stock of Chimera Energy Corp. (the "Company").

2. The Seller purchased the shares from the Company in a direct public offering.  The shares were registered with the Securities and Exchange Commission through an S-1 Registration Statement which became effective on December 21, 2011.

3. At no time has the Seller been considered to be a "Control Person" or "Affiliate" of the Company as defined by relevant SEC and/or FINRA regulations.

4. The Seller desires to sell to Purchaser, and the Purchaser desires to purchase 200,000 issued and outstanding shares (the "Shares") of the common stock of the Company.

Agreements:

In consideration of the covenants, warranties, and mutual agreements herein set forth, and in reliance upon the representation and warranties contained herein, the parties do hereby agree as follows:

1.    Sale of Shares; Consideration.

1.1. Sale. Subject to all the terms and conditions of this Agreement, the Seller hereby sells, assigns, transfers, and delivers to Purchaser, and the Purchaser hereby purchases the Shares.   These shares are evidenced by stock certificate number 1019 which has been delivered to Purchaser along with a duly endorsed stock power signed by Seller, receipt of which is hereby acknowledged.

1.2. Purchase Price. In consideration of the sale of Shares, and subject to the conditions hereinafter set forth, Purchaser pays to Seller, receipt of which is hereby acknowledged by Seller, $0.0225USD for each of the Shares sold hereunder, for an aggregate of $4,500USD.

2. Arbitration. Any and all claims or controversies arising out of this Agreement shall be submitted to and settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association then in effect, and judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction over the claim or controversy.

SEC-ACA-E-0000370

3. Benefit. This Agreement shall be binding upon, and inure to the benefit of the respective successors and assigns of the Purchaser and Seller.

4. Construction. The Parties hereto agree that this Agreement shall be construes and enforced in accordance with the laws of the state of Texas.

5. Counterparts. A copy or facsimile of this Agreement shall be deemed an original.

IN WITNESS WHEREOF, the parties have duly executed this Agreement.

"Seller"                                            "Purchaser"

By: Brandi Leal                                    By: ANDREW FARMER

SEC-ACA-E-0000371

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER AND ORIGINAL DOCUMENT SECURITY SCREEN ON BACK WITH PADLOCK SECURITY ICON.

**Chartered Investments Inc.**
*Corporate Office*
5005 Hidalgo Street Suite 619
Houston Texas 77056

JP Morgan Chase Bank NA
Dallas, Texas 75201

32-61/1110

**1241**

5/5/2012

PAY TO THE
ORDER OF ___ Brandi Leal                                                    $ **4,500.00

Four Thousand Five Hundred and 00/100************************************************************************ DOLLARS

Brandi Leal
10302 Wayward Wind Lane
Houston, TX  77064

MEMO   Purchase 200,000 Shares of Chimera Energy Corp                AUTHORIZED SIGNATURE

⑆001241⑆ ⑆111000614⑆       897988374⑆

---

Chartered Investments Inc.                                                          1241

Brandi Leal
                                                    5/5/2012
                        Purchase 200,000 Shares of Chimera Energy Corp.        4,500.00

Chase Checking        Purchase 200,000 Shares of Chimera Energy C              4,500.00

SEC-ACA-E-0000372

## ACT OF SALE OF COMMON STOCK

THIS AGREEMENT made as of the 6th day of April 2012, by and between Shara Samiuddin (hereinafter referred to as the "Seller") and Chartered Investments, Inc. (hereinafter referred to as the "Purchaser").

Recitals:

1. The Seller is the owner of 200,000 shares of the issued and outstanding common stock of Chimera Energy Corp. (the "Company").

2. The Seller purchased the shares from the Company in a direct public offering.   The shares were registered with the Securities and Exchange Commission through an S-1 Registration Statement which became effective on December 21, 2011.

3. At no time has the Seller been considered to be a "Control Person" or "Affiliate" of the Company as defined by relevant SEC and/or FINRA regulations.

4. The Seller desires to sell to Purchaser, and the Purchaser desires to purchase 200,000 issued and outstanding shares (the "Shares") of the common stock of the Company.

Agreements:

In consideration of the covenants, warranties, and mutual agreements herein set forth, and in reliance upon the representation and warranties contained herein, the parties do hereby agree as follows:

1.      Sale of Shares; Consideration.

   1.1. Sale. Subject to all the terms and conditions of this Agreement, the Seller hereby sells, assigns, transfers, and delivers to Purchaser, and the Purchaser hereby purchases the Shares.   These shares are evidenced by stock certificate number 1027 which has been delivered to Purchaser along with a duly endorsed stock power signed by Seller, receipt of which is hereby acknowledged.

   1.2. Purchase Price. In consideration of the sale of Shares, and subject to the conditions hereinafter set forth, Purchaser pays to Seller, receipt of which is hereby acknowledged by Seller, $0.0225USD for each of the Shares sold hereunder, for an aggregate of $4,500USD.

2. Arbitration. Any and all claims or controversies arising out of this Agreement shall be submitted to and settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association then in effect, and judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction over the claim or controversy.

3. **Benefit.** This Agreement shall be binding upon, and inure to the benefit of the respective successors and assigns of the Purchaser and Seller.

4. **Construction.** The Parties hereto agree that this Agreement shall be construes and enforced in accordance with the laws of the state of Texas.

5. **Counterparts.** A copy or facsimile of this Agreement shall be deemed an original.

IN WITNESS WHEREOF, the parties have duly executed this Agreement.

"Seller"                                    "Purchaser"

By: Shara Samiuddin                         By: ANDREW FARMER

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER AND ORIGINAL DOCUMENT SECURITY SCREEN ON BACK WITH PADLOCK SECURITY ICON.

**Chartered Investments Inc.**
*Corporate Office*
5005 Hidalgo Street Suite 619
Houston Texas 77056

JP Morgan Chase Bank NA
Dallas, Texas 75201

**1240**

32-61/1110

5/5/2012

PAY TO THE
ORDER OF    Shara Samiuddin                                              $ **4,500.00

Four Thousand Five Hundred and 00/100************************************************   DOLLARS

Shara Samiuddin
5616 Jackson Street #2116
Houston TX 77004

MEMO    Purchase 200,000 Shares of Chimera Energy Corp.          AUTHORIZED SIGNATURE

⑆001240⑆ ⑆111000614⑆   897988374⑈

---

Chartered Investments Inc.                                              1240

Shara Samiuddin                                    5/5/2012
                 Purchase 200,000 Shares of Chimera Energy Corp.          4,500.00

Chase Checking        Purchase 200,000 Shares of Chimera Energy C          4,500.00

ACT OF SALE OF COMMON STOCK

THIS AGREEMENT made as of the 6th day of April 2012, by and between Daniel Sorelle (hereinafter referred to as the "Seller") and Chartered Investments, Inc. (hereinafter referred to as the "Purchaser").

Recitals:

1. The Seller is the owner of 100,000 shares of the issued and outstanding common stock of Chimera Energy Corp. (the "Company").

2. The Seller purchased the shares from the Company in a direct public offering.   The shares were registered with the Securities and Exchange Commission through an S-1 Registration Statement which became effective on December 21, 2011.

3. At no time has the Seller been considered to be a "Control Person" or "Affiliate" of the Company as defined by relevant SEC and/or FINRA regulations.

4. The Seller desires to sell to Purchaser, and the Purchaser desires to purchase 100,000 issued and outstanding shares (the "Shares") of the common stock of the Company.

Agreements:

In consideration of the covenants, warranties, and mutual agreements herein set forth, and in reliance upon the representation and warranties contained herein, the parties do hereby agree as follows:

1.    Sale of Shares; Consideration.

1.1. Sale. Subject to all the terms and conditions of this Agreement, the Seller hereby sells, assigns, transfers, and delivers to Purchaser, and the Purchaser hereby purchases the Shares.   These shares are evidenced by stock certificate number 1028 which has been delivered to Purchaser along with a duly endorsed stock power signed by Seller, receipt of which is hereby acknowledged.

1.2. Purchase Price. In consideration of the sale of Shares, and subject to the conditions hereinafter set forth, Purchaser pays to Seller, receipt of which is hereby acknowledged by Seller, $0.0225USD for each of the Shares sold hereunder, for an aggregate of $2,250USD.

2. Arbitration. Any and all claims or controversies arising out of this Agreement shall be submitted to and settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association then in effect, and judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction over the claim or controversy.

SEC-ACA-E-0000388

3. Benefit. This Agreement shall be binding upon, and inure to the benefit of the respective successors and assigns of the Purchaser and Seller.

4. Construction. The Parties hereto agree that this Agreement shall be construes and enforced in accordance with the laws of the state of Texas.

5. Counterparts. A copy or facsimile of this Agreement shall be deemed an original.

IN WITNESS WHEREOF, the parties have duly executed this Agreement.

"Seller"                                    "Purchaser"

By: Daniel Sorelle                          By: ANDREW FARMER

SEC-ACA-E-0000389

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER AND ORIGINAL DOCUMENT SECURITY SCREEN ON BACK WITH PADLOCK SECURITY ICON.

**Chartered Investments Inc.**
*Corporate Office*
5005 Hidalgo Street Suite 619
Houston Texas 77056

JP Morgan Chase Bank NA
Dallas, Texas 75201

1253

32-61/1110

5/5/2012

PAY TO THE
ORDER OF ___ Daniel Sorelle

$ **2,250.00

Two Thousand Two Hundred Fifty and 00/100************************************************************

DOLLARS

Daniel Sorelle
2159 Pelham Drive
Houston TX 77019

MEMO   Purchase 100,000 Shares of Chimera Energy Corp.

AUTHORIZED SIGNATURE

⑈001253⑈ ⑆111000614⑆   897988374⑈

---

Chartered Investments Inc.                                                    1253

Daniel Sorelle                                    5/5/2012
                        Purchase 100,000 Shares of Chimera Energy Corp. -          2,250.00

Chase Checking        Purchase 100,000 Shares of Chimera Energy C                  2,250.00

SEC-ACA-E-0000390

# Exhibit UU.2

## ACT OF SALE OF COMMON STOCK

THIS AGREEMENT made as of the 20th day of March 2012, by and between Lydia Cotton (hereinafter referred to as the "Seller") and Oak Resources, Inc. (hereinafter referred to as the "Purchaser").

Recitals:

1. The Seller is the owner of 200,000 shares of the issued and outstanding common stock of Chimera Energy Corp. (the "Company").

2. The Seller purchased the shares from the Company in a direct public offering.   The shares were registered with the Securities and Exchange Commission through an S-1 Registration Statement which became effective on December 22, 2011.

3. At no time has the Seller been considered to be a "Control Person" or "Affiliate" of the Company as defined by relevant SEC and/or FINRA regulations.

4. The Seller desires to sell to Purchaser, and the Purchaser desires to purchase 200,000 issued and outstanding shares (the "Shares") of the common stock of the Company.

Agreements:

In consideration of the covenants, warranties, and mutual agreements herein set forth, and in reliance upon the representation and warranties contained herein, the parties do hereby agree as follows:

1.    Sale of Shares; Consideration.

1.1. Sale. Subject to all the terms and conditions of this Agreement, the Seller hereby sells, assigns, transfers, and delivers to Purchaser, and the Purchaser hereby purchases the Shares.   These shares are evidenced by stock certificate number 1007 which has been delivered to Purchaser along with a duly endorsed stock power signed by Seller, receipt of which is hereby acknowledged.

1.2. Purchase Price. In consideration of the sale of Shares, and subject to the conditions hereinafter set forth, Purchaser pays to Seller, receipt of which is hereby acknowledged by Seller, $0.015USD for each of the Shares sold hereunder, for an aggregate of $3,000USD.

2. Arbitration. Any and all claims or controversies arising out of this Agreement shall be submitted to and settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association then in effect, and judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction over the claim or controversy.

FW-03772

LC000007

3. **Benefit.** This Agreement shall be binding upon, and inure to the benefit of the respective successors and assigns of the Purchaser and Seller.

4. **Construction.** The Parties hereto agree that this Agreement shall be construes and enforced in accordance with the laws of the state of Texas.

5. **Counterparts.** A copy or facsimile of this Agreement shall be deemed an original.

IN WITNESS WHEREOF, the parties have duly executed this Agreement.

"Seller"                                    "Purchaser"

By: Lydia Cotton                            By: Lydia Cotton, President

FW-03772

LC000008

ACT OF SALE OF COMMON STOCK

THIS AGREEMENT made as of the 20th day of March 2012, by and between Lydia Cotton (hereinafter referred to as the "Seller") and Oak Resources, Inc. (hereinafter referred to as the "Purchaser").

Recitals:

1. The Seller is the owner of 200,000 shares of the issued and outstanding common stock of Chimera Energy Corp. (the "Company").

2. The Seller purchased the shares from the Company in a direct public offering.   The shares were registered with the Securities and Exchange Commission through an S-1 Registration Statement which became effective on December 22, 2011.

3. At no time has the Seller been considered to be a "Control Person" or "Affiliate" of the Company as defined by relevant SEC and/or FINRA regulations.

4. The Seller desires to sell to Purchaser, and the Purchaser desires to purchase 200,000 issued and outstanding shares (the "Shares") of the common stock of the Company.

Agreements:

In consideration of the covenants, warranties, and mutual agreements herein set forth, and in reliance upon the representation and warranties contained herein, the parties do hereby agree as follows:

1.      Sale of Shares; Consideration.

1.1. Sale. Subject to all the terms and conditions of this Agreement, the Seller hereby sells, assigns, transfers, and delivers to Purchaser, and the Purchaser hereby purchases the Shares.   These shares are evidenced by stock certificate number 1007 which has been delivered to Purchaser along with a duly endorsed stock power signed by Seller, receipt of which is hereby acknowledged.

1.2. Purchase Price. In consideration of the sale of Shares, and subject to the conditions hereinafter set forth, Purchaser pays to Seller, receipt of which is hereby acknowledged by Seller, $0.015USD for each of the Shares sold hereunder, for an aggregate of $3,000USD.

2. Arbitration. Any and all claims or controversies arising out of this Agreement shall be submitted to and settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association then in effect, and judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction over the claim or controversy.

3. **Benefit.** This Agreement shall be binding upon, and inure to the benefit of the respective successors and assigns of the Purchaser and Seller.

4. **Construction.** The Parties hereto agree that this Agreement shall be construes and enforced in accordance with the laws of the state of Texas.

5. **Counterparts.** A copy or facsimile of this Agreement shall be deemed an original.

IN WITNESS WHEREOF, the parties have duly executed this Agreement.

"Seller"                                    "Purchaser"

By: Lydia Cotton                            By: Lydia Cotton, President

ACT OF SALE OF COMMON STOCK

THIS AGREEMENT made as of the 1st day of May 2012, by and between James Moss (hereinafter referred to as the "Seller") and Oak Resources, Inc. (hereinafter referred to as the "Purchaser").

Recitals:

1. The Seller is the owner of 200,000 shares of the issued and outstanding common stock of Chimera Energy Corp. (the "Company").

2. The Seller purchased the shares from the Company in a direct public offering.   The shares were registered with the Securities and Exchange Commission through an S-1 Registration Statement which became effective on December 21, 2011.

3. At no time has the Seller been considered to be a "Control Person" or "Affiliate" of the Company as defined by relevant SEC and/or FINRA regulations.

4. The Seller desires to sell to Purchaser, and the Purchaser desires to purchase 200,000 issued and outstanding shares (the "Shares") of the common stock of the Company.

Agreements:

In consideration of the covenants, warranties, and mutual agreements herein set forth, and in reliance upon the representation and warranties contained herein, the parties do hereby agree as follows:

1.    Sale of Shares; Consideration.

1.1. Sale. Subject to all the terms and conditions of this Agreement, the Seller hereby sells, assigns, transfers, and delivers to Purchaser, and the Purchaser hereby purchases the Shares.   These shares are evidenced by stock certificate number 1024 which has been delivered to Purchaser along with a duly endorsed stock power signed by Seller, receipt of which is hereby acknowledged.

1.2. Purchase Price. In consideration of the sale of Shares, and subject to the conditions hereinafter set forth, Purchaser pays to Seller, receipt of which is hereby acknowledged by Seller, $0.0225USD for each of the Shares sold hereunder, for an aggregate of $4,500USD.

2. Arbitration. Any and all claims or controversies arising out of this Agreement shall be submitted to and settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association then in effect, and judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction over the claim or controversy.

3. Benefit. This Agreement shall be binding upon, and inure to the benefit of the respective successors and assigns of the Purchaser and Seller.

4. Construction. The Parties hereto agree that this Agreement shall be construes and enforced in accordance with the laws of the state of Texas.

5. Counterparts. A copy or facsimile of this Agreement shall be deemed an original.

IN WITNESS WHEREOF, the parties have duly executed this Agreement.

"Seller"                                    "Purchaser"

By/ James Moss                              By:

ACT OF SALE OF COMMON STOCK

THIS AGREEMENT made as of the 1st day of May 2012, by and between Kellie Moss (hereinafter referred to as the "Seller") and Oak Resources, Inc. (hereinafter referred to as the "Purchaser").

Recitals:

1. The Seller is the owner of 200,000 shares of the issued and outstanding common stock of Chimera Energy Corp. (the "Company").

2. The Seller purchased the shares from the Company in a direct public offering. The shares were registered with the Securities and Exchange Commission through an S-1 Registration Statement which became effective on December 21, 2011.

3. At no time has the Seller been considered to be a "Control Person" or "Affiliate" of the Company as defined by relevant SEC and/or FINRA regulations.

4. The Seller desires to sell to Purchaser, and the Purchaser desires to purchase 200,000 issued and outstanding shares (the "Shares") of the common stock of the Company.

Agreements:

In consideration of the covenants, warranties, and mutual agreements herein set forth, and in reliance upon the representation and warranties contained herein, the parties do hereby agree as follows:

1. Sale of Shares; Consideration.

1.1. Sale. Subject to all the terms and conditions of this Agreement, the Seller hereby sells, assigns, transfers, and delivers to Purchaser, and the Purchaser hereby purchases the Shares. These shares are evidenced by stock certificate number 1023 which has been delivered to Purchaser along with a duly endorsed stock power signed by Seller, receipt of which is hereby acknowledged.

1.2. Purchase Price. In consideration of the sale of Shares, and subject to the conditions hereinafter set forth, Purchaser pays to Seller, receipt of which is hereby acknowledged by Seller, $0.0225USD for each of the Shares sold hereunder, for an aggregate of $4,500USD.

2. Arbitration. Any and all claims or controversies arising out of this Agreement shall be submitted to and settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association then in effect, and judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction over the claim or controversy.

3.  Benefit. This Agreement shall be binding upon, and inure to the benefit of the respective successors and assigns of the Purchaser and Seller.

4.  Construction. The Parties hereto agree that this Agreement shall be construes and enforced in accordance with the laws of the state of Texas.

5.  Counterparts. A copy or facsimile of this Agreement shall be deemed an original.

IN WITNESS WHEREOF, the parties have duly executed this Agreement.

"Seller"                                         "Purchaser"

By: Kellie Moss                                  By:

ACT OF SALE OF COMMON STOCK

THIS AGREEMENT made as of the 1st day of May 2012, by and between Benjamin Mega (hereinafter referred to as the "Seller") and Oak Resources, Inc. (hereinafter referred to as the "Purchaser").

Recitals:

1. The Seller is the owner of 100,000 shares of the issued and outstanding common stock of Chimera Energy Corp. (the "Company").

2. The Seller purchased the shares from the Company in a direct public offering. The shares were registered with the Securities and Exchange Commission through an S-1 Registration Statement which became effective on December 21, 2011.

3. At no time has the Seller been considered to be a "Control Person" or "Affiliate" of the Company as defined by relevant SEC and/or FINRA regulations.

4. The Seller desires to sell to Purchaser, and the Purchaser desires to purchase 100,000 issued and outstanding shares (the "Shares") of the common stock of the Company.

Agreements:

In consideration of the covenants, warranties, and mutual agreements herein set forth, and in reliance upon the representation and warranties contained herein, the parties do hereby agree as follows:

1. Sale of Shares; Consideration.

   1.1. Sale. Subject to all the terms and conditions of this Agreement, the Seller hereby sells, assigns, transfers, and delivers to Purchaser, and the Purchaser hereby purchases the Shares. These shares are evidenced by stock certificate number 1020 which has been delivered to Purchaser along with a duly endorsed stock power signed by Seller, receipt of which is hereby acknowledged.

   1.2. Purchase Price. In consideration of the sale of Shares, and subject to the conditions hereinafter set forth, Purchaser pays to Seller, receipt of which is hereby acknowledged by Seller, $0.0225USD for each of the Shares sold hereunder, for an aggregate of $2,250USD.

2. Arbitration. Any and all claims or controversies arising out of this Agreement shall be submitted to and settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association then in effect, and judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction over the claim or controversy.

3. Benefit. This Agreement shall be binding upon, and inure to the benefit of the respective successors and assigns of the Purchaser and Seller.

4. Construction. The Parties hereto agree that this Agreement shall be construes and enforced in accordance with the laws of the state of Texas.

5. Counterparts. A copy or facsimile of this Agreement shall be deemed an original.

IN WITNESS WHEREOF, the parties have duly executed this Agreement.

"Seller"                                    "Purchaser"

By: Benjamin Mega                           By:

FW no. 03772                                                        OAK000073

# Exhibit UU.3

**Page 1**

1 UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3 In the Matter of:          )

4                            ) File No. FW-03772-A

5 CHIMERA ENERGY CORPORATION )

6

7 WITNESS: Lydia Danell Cotton

8 PAGES:   1 through 23

9 PLACE:   Securities and Exchange Commission

10        Ft. Worth Regional Office

11        801 Cherry Street, 19th Floor

12        Fort Worth, TX 76102

13 DATE:    Tuesday, August 20, 2013

14

15      The above-entitled matter came on for hearing,

16 pursuant to notice, at 1:19 p.m.

17

18

19

20

21

22

23

24        Diversified Reporting Services, Inc.

25           (202) 467-9200

**Page 2**

1 APPEARANCES:

2

3 On behalf of the Securities and Exchange Commission:

4     NIKOLAY VYDASHENKO, ESQ.

5     Securities & Exchange Commission

6     Division of Enforcement

7     801 North Cherry Street, Suite 1900

8     Fort Worth, Texas 76102-6882

9     vydashenkon@sec.gov

10

11 On behalf of the Witness:

12     GERALD J. CASEY, ESQ.

13     Law Office of Gerald J. Casey

14     613 Alamo Street

15     Lake Charles, Louisiana 70601

16

17

18

19

20

21

22

23

24

25

**Page 3**

1           C O N T E N T S

2

3 WITNESS                      EXAMINATION

4 Lydia Danell Cotton               4

5

6 EXHIBITS:

7 None

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 4**

1           P R O C E E D I N G S

2     MR. VYDASHENKO:  We're on the record at

3 1:19 p.m. on August 20th, 2013.

4     Please raise your right hand.

5     Do you swear or affirm to tell the truth, the

6 whole truth and nothing but the truth?

7     MS. COTTON: I do.

8 Whereupon,

9           LYDIA DANELL COTTON

10 was called as a witness and, been duly sworn, was

11 examined and testified as follows:

12           EXAMINATION

13     BY MR. VYDASHENKO:

14   Q   Please state your full name and spell your

15 name for the record.

16   A   Lydia Danell Cotton, L-y-d-i-a, D-a-n-e-l-l,

17 Cotton, C-o-t-t-o-n.

18   Q   Could you spell your middle name again,

19 please?

20   A   Danell, D-a-n-e-l-l.

21   Q   I'm Nikolay Vydashenko, and I'm an officer of

22 the Commission for purposes of this proceeding.  Before

23 we start I'm going to need to provide you some

24 information that I'm going to read and I'm also going to

25 ask you a few preliminary questions.

**Page 13**

1    Q    Were any documents called for by Exhibit 40
2  not produced for any reason other than privilege?
3    A    I decline to answer.
4    Q    Do you know of any documents responsive to
5  Subpoena marked as Exhibit 40 that were not produced
6  because they were lost, destroyed or otherwise disposed
7  of?
8    A    I decline to answer.
9    Q    Are you familiar with an entity called Oak
10 Resources, Inc.?
11   A    I decline to answer.
12   Q    Do you have an ownership interest in
13 Oak Resources, Inc.?
14   A    I decline to answer.
15   Q    Did anyone other than you have an ownership
16 interest in Oak Resources, Inc., in 2011 and 2012?
17   A    I decline to answer.
18   Q    What is can the nature of the business in
19 which Oak Resources is engaged?
20   A    I decline to answer.
21   Q    Is there anyone who exercises control over
22 Oak Resources, Inc., besides you?
23   A    I decline to answer.
24   Q    Did Andrew Farmer exercise control over
25 trading in the stock of Chimera Energy Corp. in the

**Page 14**

1  brokerage accounts of Oak Resources, Inc.?
2    A    I decline to answer.
3    Q    Did Andrew Farmer exercise control over the
4  proceeds from the sales of Chimera Energy Corp. stock by
5  Oak Resources, Inc.?
6    A    I decline to answer.
7    Q    At any time did David Parisi exercise control
8  over trading in the brokerage account of Oak Resources,
9  Inc.?
10   A    I decline to answer.
11   Q    Do you assert the Fifth Amendment privilege
12 against civil-incrimination concerning all questions of
13 Oak Resources, Inc.?
14   A    Yes.
15   Q    Are you familiar with an entity called Parisi
16 Accounting?
17   A    I decline to answer.
18   Q    Why are brokerage statements from
19 Oak Resources, Inc.'s, account at Merrimac Corporate
20 Securities, Inc., mailed to the care of Parisi
21 Accounting?
22   A    I decline to answer.
23   Q    Do you know a person by the name of
24 Andrew Farmer?
25   A    I decline to answer.

**Page 15**

1    Q    Do you now have or did you ever have a
2  relationship with a person named Andrew Farmer?
3    A    I decline to answer.
4    Q    Do you assert the Fifth Amendment privilege
5  against self-incrimination with respect to all questions
6  related to Andrew Farmer?
7    A    I decline to answer.
8    Q    Do you know a person by name of Thomas Massey?
9    A    I decline to answer.
10   Q    Do you assert the Fifth Amendment privilege
11 against self-incrimination with respect to all questions
12 concerning Thomas Massey?
13   A    I decline to answer.
14   Q    Do you know a person by the name of
15 David Parisi?
16   A    I decline to answer.
17   Q    Do you assert the Fifth Amendment privilege
18 against self-incrimination with respect to all questions
19 concerning David Parisi?
20   A    I decline to answer.
21   Q    Do you know a person by the name of
22 Tyson Rohde?
23   A    I decline to answer.
24   Q    Do you assert the Fifth Amendment privilege
25 with respect to self-incrimination with respect to all

**Page 16**

1  questions concerning Tyson Rohde?
2    A    I decline to answer.
3    Q    Do you know a person by the name of Charles Grob?
4    A    I decline to answer.
5    Q    Do you assert the Fifth Amendment privilege
6  against self-incrimination with respect to all questions
7  concerning Charles Grob?
8    A    I decline to answer.
9    Q    Do you know a person by the name of
10 Baldemar Rios?
11   A    I decline to answer.
12   Q    Do you assert the Fifth Amendment privilege
13 concerning self-incrimination with respect to all
14 questions concerning Baldemar Rios?
15   A    I decline to answer.
16   Q    Did you personally buy stock from Chimera in
17 its initial public offering that was effectuated in
18 December of 2011?
19   A    I decline to answer.
20   Q    Did any person give money to you or to
21 entities you control for the purpose of funding your
22 purchase of Chimera stock in Chimera's initial public
23 offering?
24   A    I decline to answer.
25   Q    Did you sell stock you bought in Chimera's

1 public offering?
2    A   I decline to answer.
3    Q   Did you have any role in finding investors to
4 invest in Chimera's initial public offering?
5    A   I decline to answer.
6    Q   Do you assert the Fifth Amendment privilege
7 against civil incrimination with regard to all questions
8 concerning your purchase of stock in Chimera's initial
9 public offering?
10   A   I decline to answer.
11   Q   Did you or entities you control purchase the
12 stock of Chimera from persons who bought that stock in
13 Chimera's initial public offering?
14   A   I decline to answer.
15   Q   Did any person give money to you or to
16 Oak Resources or any other entities you control for the
17 purpose of funding Oak Resources, Inc.'s, purchase of
18 Chimera stock from investors who bought the stock in
19 Chimera's official public offering?
20   A   I decline to answer.
21   Q   Do you assert the Fifth Amendment privilege
22 against self-incrimination with respect to all questions
23 concerning the purchase of Chimera's stock from
24 investors who bought the stock in Chimera's initial
25 public offering?

1    A   I decline to answer.
2    Q   Did you personally purchase any Chimera shares
3 on the public market?
4    A   I decline to answer.
5    Q   Did you personally sell any Chimera shares on
6 the public market?
7    A   I decline to answer.
8    Q   Did you direct any entities or individuals to
9 sell Chimera securities in the market?
10   A   I decline to answer.
11   Q   Did you or entities you control receive
12 proceeds from the sale of Chimera shares on the public
13 market?
14   A   I decline to answer.
15   Q   Do you assert the Fifth Amendment privilege
16 concerning self-incrimination with respect to all
17 questions concerning the purchase and sale of Chimera
18 securities by you or entities you control?
19   A   I decline to answer.
20   Q   In 2012 did you have any knowledge of
21 Chimera's operations or its business?
22   A   I decline to answer.
23   Q   Do you assert the Fifth Amendment privilege do
24 you assert the Fifth Amendment privilege against
25 self-incrimination with respect to all questions

1 concerning your knowledge of Chimera's business?
2    A   I decline to answer.
3    Q   Did you review Chimera's public statements in
4 2012?
5    A   I decline to answer.
6    Q   Did you know that some of Chimera's public
7 statements in 2012 contained false or misleading
8 information and omitted information such that these
9 statements were misleading to Chimera's investors?
10   A   I decline to answer.
11   Q   Do you assert the Fifth Amendment privilege
12 against self-incrimination with respect to all questions
13 concerning Chimera's public statements.
14   A   I decline to answer.
15   Q   Were you involved in any marketing or
16 advertising activities designed to raise investor
17 awareness of Chimera?
18   A   I decline to answer.
19   Q   Did you or entities you control pay for
20 marketing and advertising activities designed to raise
21 investor awareness of Chimera?
22   A   I decline to answer.
23   Q   Were you involved in the response of any
24 person or entity, other than yourself and Oak Resources
25 to subpoenas issued by the SEC in this investigation?

1    A   I decline to answer.
2    Q   Did you direct any person or entity other than
3 Oak Resources, Inc., in responding to the SEC subpoenas
4 or requests for information?
5    A   I decline to answer.
6    Q   Did you direct any person or entity other than
7 Oak Resources, Inc., to take any action or to refrain
8 from taking any action relating to responding to the
9 SEC's investigation in this matter?
10   A   I decline to answer.
11   Q   Did any person or entity direct you personally
12 in responding to the SEC Subpoena issued to you in this
13 matter?
14   A   I decline to answer.
15   Q   Did any person or entity other than yourself
16 direct Oak Resources in responding to the SEC Subpoena
17 issued to it in this matter?
18   A   I decline to answer.
19   Q   Did any person or entity direct you to take
20 any action or refrain from taking any action related to
21 responding to the SEC's investigation in this matter?
22   A   I decline to answer.
23   Q   In 2012 were you aware of any articles, blog
24 entries or other publicly-available materials that were
25 critical of Chimera's business or that questioned the

APP. 000718

Page 21

1 accuracy of public statements made by Chimera?
2    A   I decline to answer.
3    Q   In 2012 were you aware of anyone taking short
4 positions in Chimera stock?
5    A   I decline to answer.
6    Q   Were you aware of the reasons why anybody took
7 short positions in Chimera stock in 2012?
8    A   I decline to answer.
9    Q   Have you spoken to anyone other than your
10 counsel regarding this investigation?
11    A   I decline to answer.
12    Q   Ms. Cotton, we have no further questions at
13 this time. We may, however, call you again to testify
14 in this investigation. Should this be necessary, we
15 will contact your counsel.
16       At this time do you wish to clarify anything
17 or add anything to the statements you have made today?
18    A   No.
19       MR. VYDASHENKO:  Counsel do you wish to ask
20 any clarifying questions?
21       MR. CASEY:  No.
22       MR. VYDASHENKO:  We are off the record at 1:37
23 p.m.
24       (Whereupon, at 1:37 p.m., the examination
25 was concluded.)

Page 22

1          PROOFREADER'S CERTIFICATE
2
3 In the Matter of:  CHIMERA ENERGY CORPORATION
4 Witness:       Lydia Danell Cotton
5 File Number:   FW-03772-A
6 Date:          Tuesday, August 20, 2013
7 Location:      Fort Worth, TX
8
9
10      This is to certify that I, Susan Watkins,
11 (the undersigned), do hereby swear and affirm
12 that the attached proceedings before the U.S.
13 Securities and Exchange Commission were held
14 according to the record and that this is the
15 original, complete, true and accurate transcript
16 that has been compared to the reporting or recording
17 accomplished at the hearing.
18
19
20
21 _____   _____
22 (Proofreader's Name)        (Date)
23
24
25

Page 23

1 THE STATE OF TEXAS:
2 COUNTY OF HARRIS:
3      I, David S. Smith, a Certified Shorthand Reporter,
4 hereby certify that the foregoing testimony of
5 LYDIA DANELL COTTON was given before me after the
6 Witness had been first duly sworn.
7      I further certify that this transcript was
8 transcribed under my direction and is a complete and
9 correct transcript of the proceedings.
10      I further certify that I am neither counsel for,
11 related to, nor employed by any of the parties or
12 attorneys in the action in which this proceeding was
13 taken, and further that I am not financially or
14 otherwise interested in the outcome of the action.
15      Certified to by me this 3rd of September, 2013.
16
17          _____
17          David S. Smith
18          Texas CSR No. 41662
19          Expiration Date: 12/31/14
20          Charlotte Smith Reporting, Inc.
21          Firm I.D. 361
22          2203 Timberloch Place, Suite 249
23          The Woodlands, Texas 77380
24          DSMITH@SIMPLECHARLOTTE.COM
25          713.523.5400

Page 24

# Exhibit UU.4

APP. 000720

ACT OF SALE OF COMMON STOCK

THIS AGREEMENT made as of the 1st day of May 2012, by and between Jana Robinson-Demandante (hereinafter referred to as the "Seller") and TransAmerica Trading Inc. (hereinafter referred to as the "Purchaser").

Recitals:

1. The Seller is the owner of 200,000 shares of the issued and outstanding common stock of Chimera Energy Corp. (the "Company").

2. The Seller purchased the shares from the Company in a direct public offering.   The shares were registered with the Securities and Exchange Commission through an S-1 Registration Statement which became effective on December 21, 2011.

3. At no time has the Seller been considered to be a "Control Person" or "Affiliate" of the Company as defined by relevant SEC and/or FINRA regulations.

4. The Seller desires to sell to Purchaser, and the Purchaser desires to purchase 200,000 issued and outstanding shares (the "Shares") of the common stock of the Company.

Agreements:

In consideration of the covenants, warranties, and mutual agreements herein set forth, and in reliance upon the representation and warranties contained herein, the parties do hereby agree as follows:

1. Sale of Shares; Consideration.

   1.1. Sale. Subject to all the terms and conditions of this Agreement, the Seller hereby sells, assigns, transfers, and delivers to Purchaser, and the Purchaser hereby purchases the Shares.   These shares are evidenced by stock certificate number 1026 which has been delivered to Purchaser along with a duly endorsed stock power signed by Seller, receipt of which is hereby acknowledged.

   1.2. Purchase Price. In consideration of the sale of Shares, and subject to the conditions hereinafter set forth, Purchaser pays to Seller, receipt of which is hereby acknowledged by Seller, $0.0225USD for each of the Shares sold hereunder, for an aggregate of $4,500USD.

2. Arbitration. Any and all claims or controversies arising out of this Agreement shall be submitted to and settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association then in effect, and judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction over the claim or controversy.

SEC-ACA-E-0000452

3. Benefit. This Agreement shall be binding upon, and inure to the benefit of the respective successors and assigns of the Purchaser and Seller.

4. Construction. The Parties hereto agree that this Agreement shall be construes and enforced in accordance with the laws of the state of Texas.

5. Counterparts. A copy or facsimile of this Agreement shall be deemed an original.

   IN WITNESS WHEREOF, the parties have duly executed this Agreement.

"Seller"                                          "Purchaser"


By: Jana Robinson-Demandante                      By:

Wells Fargo View Check Copy

5/23/12 11:38 AM



## View Check Copy

| Check Number | Date Posted | Check Amount | Ac |
|---|---|---|---|
| 1018 | 05/16/12 | $4,500.00 | ADVANTAGE BUSINESS PACKAGE CHECK |

TRANSAMERICA TRADING INC
287 KINGSE, RT GRADE STE 225
MAIL BOX #226
STATELINE, NV 05439

1018

Date MAY 5 2012

Pay to the Order of JANA ROBINSON - DEMANDANTE $ 4,500 ⁰⁰/₁₀₀

FOUR THOUSAND FIVE HUNDRED EXACTLY ——— Dollars

WELLS FARGO

FOR PURCHASE 200,000 CHIMERA ENERGY

⑈000000101⑈ ⑆321270742⑆ 201840328⑆

https://image.wellsfargo.com/imageman/di...68BHAIR28GHPwTpW3tr9yjDEx&st=1337791118    Page 1 of 4

🏠 Equal Housing Lender

ACT OF SALE OF COMMON STOCK

THIS AGREEMENT made as of the 1st day of May 2012, by and between Archie Demandante (hereinafter referred to as the "Seller") and TransAmerica Trading Inc. (hereinafter referred to as the "Purchaser").

Recitals:

1. The Seller is the owner of 200,000 shares of the issued and outstanding common stock of Chimera Energy Corp. (the "Company").

2. The Seller purchased the shares from the Company in a direct public offering.   The shares were registered with the Securities and Exchange Commission through an S-1 Registration Statement which became effective on December 21, 2011.

3. At no time has the Seller been considered to be a "Control Person" or "Affiliate" of the Company as defined by relevant SEC and/or FINRA regulations.

4. The Seller desires to sell to Purchaser, and the Purchaser desires to purchase 200,000 issued and outstanding shares (the "Shares") of the common stock of the Company.

Agreements:

In consideration of the covenants, warranties, and mutual agreements herein set forth, and in reliance upon the representation and warranties contained herein, the parties do hereby agree as follows:

1. Sale of Shares; Consideration.

    1.1. Sale. Subject to all the terms and conditions of this Agreement, the Seller hereby sells, assigns, transfers, and delivers to Purchaser, and the Purchaser hereby purchases the Shares.   These shares are evidenced by stock certificate number 1010 which has been delivered to Purchaser along with a duly endorsed stock power signed by Seller, receipt of which is hereby acknowledged.

    1.2. Purchase Price. In consideration of the sale of Shares, and subject to the conditions hereinafter set forth, Purchaser pays to Seller, receipt of which is hereby acknowledged by Seller, $0.0225USD for each of the Shares sold hereunder, for an aggregate of $4,500USD.

2. Arbitration. Any and all claims or controversies arising out of this Agreement shall be submitted to and settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association then in effect, and judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction over the claim or controversy.

SEC-ACA-E-0000436

3. Benefit. This Agreement shall be binding upon, and inure to the benefit of the respective successors and assigns of the Purchaser and Seller.

4. Construction. The Parties hereto agree that this Agreement shall be construes and enforced in accordance with the laws of the state of Texas.

5. Counterparts. A copy or facsimile of this Agreement shall be deemed an original.

   IN WITNESS WHEREOF, the parties have duly executed this Agreement.

"Seller"                                          "Purchaser"


By: Archie Demandante                             By:

SEC-ACA-E-0000437

Wells Fargo View Check Copy

5/23/12 11:37 AM



## View Check Copy

| Check Number | Date Posted | Check Amount | Ac |
|---|---|---|---|
| 1019 | 05/16/12 | $4,500.00 | ADVANTAGE BUSINESS PACKAGE CHECK |

TRANSAMERICA TRADING INC
297 KINGSBURY GRADE STE 233
MAIL BOX 4470
STATELINE, NV 89449

1019

Date MAY 5 2012

Pay to the Order of ARCHIE DEMANDANTE   $ 4,500 00

FOUR THOUSAND FIVE HUNDRED EXACTLY   Dollars

WELLS FARGO

FOR PURCHASE 200,000 CHIMERA ENERGY   Carolyn Castro

⑈000000 10 19⑈ ⑊3 2 12 70 74 2⑊ 20 16 40 3 2 83⑈

For Deposit Only Archie Demandante 8140652283

☖ Equal Housing Lender

https://image.wellsfargo.com/imageman/d...vHiq%2Bu6ZtYyHw1CJ2AKMDEx&st=1337791049   Page 1 of 4

**APP. 000726**

SEC-ACA-E-0000438

ACT OF SALE OF COMMON STOCK

THIS AGREEMENT made as of the 1st day of May 2012, by and between Matt Fleming (hereinafter referred to as the "Seller") and TransAmerica Trading Inc. (hereinafter referred to as the "Purchaser").

Recitals:

1.  The Seller is the owner of 200,000 shares of the issued and outstanding common stock of Chimera Energy Corp. (the "Company").

2.  The Seller purchased the shares from the Company in a direct public offering.   The shares were registered with the Securities and Exchange Commission through an S-1 Registration Statement which became effective on December 21, 2011.

3.  At no time has the Seller been considered to be a "Control Person" or "Affiliate" of the Company as defined by relevant SEC and/or FINRA regulations.

4.  The Seller desires to sell to Purchaser, and the Purchaser desires to purchase 200,000 issued and outstanding shares (the "Shares") of the common stock of the Company.

Agreements:

In consideration of the covenants, warranties, and mutual agreements herein set forth, and in reliance upon the representation and warranties contained herein, the parties do hereby agree as follows:

1.      Sale of Shares; Consideration.

    1.1. Sale. Subject to all the terms and conditions of this Agreement, the Seller hereby sells, assigns, transfers, and delivers to Purchaser, and the Purchaser hereby purchases the Shares.   These shares are evidenced by stock certificate number 1015 which has been delivered to Purchaser along with a duly endorsed stock power signed by Seller, receipt of which is hereby acknowledged.

    1.2. Purchase Price. In consideration of the sale of Shares, and subject to the conditions hereinafter set forth, Purchaser pays to Seller, receipt of which is hereby acknowledged by Seller, $0.0225USD for each of the Shares sold hereunder, for an aggregate of $4,500USD.

2.  Arbitration. Any and all claims or controversies arising out of this Agreement shall be submitted to and settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association then in effect, and judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction over the claim or controversy.

SEC-ACA-E-0000444

3. Benefit. This Agreement shall be binding upon, and inure to the benefit of the respective successors and assigns of the Purchaser and Seller.

4. Construction. The Parties hereto agree that this Agreement shall be construes and enforced in accordance with the laws of the state of Texas.

5. Counterparts. A copy or facsimile of this Agreement shall be deemed an original.

IN WITNESS WHEREOF, the parties have duly executed this Agreement.

"Seller"                                                    "Purchaser"

By: Matt Fleming                                           By:

SEC-ACA-E-0000445

Wells Fargo View Check Copy

5/23/12 11:38 AM


WELLS FARGO

## View Check Copy

| Check Number | Date Posted | Check Amount | Ac |
|---|---|---|---|
| 1017 | 05/14/12 | $4,500.00 | ADVANTAGE BUSINESS PACKAGE CHECK |

TRANSAMERICA TRADING INC
297 KINGSOLVY CITAXE STE 235
MAIL BOX 4470
STATELINE, NV 89449

1017

Date MAY 5 2012

Pay to the order of MATT FLEMING        $ 4,500 ∞

FOUR THOUSAND FIVE HUNDRED EXACTLY        Dollars

WELLS FARGO

FOR PURCHASE 200,000 CHIMERA ENERGY,        Carolyn Austin

⑆000000 1017⑆ ⑈3212 7074 2⑈ 20164036630⑈

⌂ **Equal Housing Lender**

**APP. 000729**        SEC-ACA-E-0000446

## ACT OF SALE OF COMMON STOCK

THIS AGREEMENT made as of the 1st day of May 2012, by and between Robert Beall (hereinafter referred to as the "Seller") and TransAmerica Trading Inc. (hereinafter referred to as the "Purchaser").

Recitals:

1. The Seller is the owner of 100,000 shares of the issued and outstanding common stock of Chimera Energy Corp. (the "Company").

2. The Seller purchased the shares from the Company in a direct public offering. The shares were registered with the Securities and Exchange Commission through an S-1 Registration Statement which became effective on December 21, 2011.

3. At no time has the Seller been considered to be a "Control Person" or "Affiliate" of the Company as defined by relevant SEC and/or FINRA regulations.

4. The Seller desires to sell to Purchaser, and the Purchaser desires to purchase 100,000 issued and outstanding shares (the "Shares") of the common stock of the Company.

Agreements:

In consideration of the covenants, warranties, and mutual agreements herein set forth, and in reliance upon the representation and warranties contained herein, the parties do hereby agree as follows:

1. Sale of Shares; Consideration.

   1.1. Sale. Subject to all the terms and conditions of this Agreement, the Seller hereby sells, assigns, transfers, and delivers to Purchaser, and the Purchaser hereby purchases the Shares. These shares are evidenced by stock certificate number 1005 which has been delivered to Purchaser along with a duly endorsed stock power signed by Seller, receipt of which is hereby acknowledged.

   1.2. Purchase Price. In consideration of the sale of Shares, and subject to the conditions hereinafter set forth, Purchaser pays to Seller, receipt of which is hereby acknowledged by Seller, $0.0225USD for each of the Shares sold hereunder, for an aggregate of $2,250USD.

2. Arbitration. Any and all claims or controversies arising out of this Agreement shall be submitted to and settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association then in effect, and judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction over the claim or controversy.

SEC-ACA-E-0000428

3. Benefit. This Agreement shall be binding upon, and inure to the benefit of the respective successors and assigns of the Purchaser and Seller.

4. Construction. The Parties hereto agree that this Agreement shall be construes and enforced in accordance with the laws of the state of Texas.

5. Counterparts. A copy or facsimile of this Agreement shall be deemed an original.

IN WITNESS WHEREOF, the parties have duly executed this Agreement.

"Seller"                                              "Purchaser"


By: Robert Beall                                      By:

Wells Fargo View Check Copy

5/23/12 11:38 AM



## View Check Copy

| Check Number | Date Posted | Check Amount | Ac |
|---|---|---|---|
| 1015 | 05/18/12 | $2,250.00 | ADVANTAGE BUSINESS PACKAGE CHECK |



TRANSAMERICA TRADING INC
2917 KINGSBURY GRADE STE 235
MAIL BOX 4470
STATELNE, NV 29448

1015

Date MAY 5 2012

Pay to the Order of ROBERT BEALL    $2,250.00

TWO THOUSAND TWO HUNDRED FIFTY d⁰⁰/100 —    Dollars

FOR PURCHASE 109,000 CHIMERA ENERGY

⑈000000 1015⑈ ⑆3 2 1 2 70 74 2⑈ 2018403 28 3⑈

🏠 Equal Housing Lender

https://image.wellsfargo.com/imageman/di...mUVaH7jJ%2B1fCVuKd%2FjzEx&st=1337791070        Page 1 of 4

**APP. 000732**        SEC-ACA-E-0000430

# Exhibit UU.5

# SCOTTSDALE CAPITAL ADVISORS

7170 E. McDonald Road, Suite 6
Scottsdale, AZ 85253
P (480)603-4900 F (480) 603-4901 Toll Free (866)404-9051
www.ScottsdaleCapital.com

## Account Statement - Period 11/1/2010 to 10/31/2012

ANNA TIKHONOVA
5005 HIDALGO STREET
HOUSTON TX 77056

Account Name: ANNA TIKHONOVA

Account Number: 4620

Account Executive: SCA HOUSE ACCOUNT

| Portfolio Summary | Opening Balances | Closing Balances |
|---|---|---|
| Equities | $ -- | $ 253936.01 |
| Mutual Funds | $ -- | $ -- |
| Corporate Bonds | $ -- | $ -- |
| **Priced Portfolio Value** | $ -- | $ 253936.01 |
| Cash | $ -- | $ -- |
| **Dreyfus** | $ -- | $ 10284.98 |
| **Total Account Equity** | $ -- | $ 264220.99 |

| Income Summary | Year To Date |
|---|---|
| Taxable Interest | $ -- |
| Non-Tax Interest | $ -- |
| Credit Interest | $ -- |
| Non-Qual Div | $ -- |
| Dividends | $ -- |
| Money Mkt Div | $ 0.35 |



### Asset Allocation

- Equities (96.1%)
- Mutual Funds (0%)
- Corporate Bonds (0%)
- Cash (0%)
- Dreyfus (3.89%)

Clearing Through Alpine Securities
440 East 400 South • Salt Lake City, UT 84111
p (801) 355-5588 • f (801) 355-5742 • toll free (800) 274-5588 • alpine-securities.com
Member FINRA & SIPC

Page 1

**APP. 000734**

SEC-ACA-E-0000030

**EXPLANATION OF YOUR ALPINE SECURITIES CORPORATION BROKERAGE STATEMENT**

Alpine Securities Corporation ("Alpine or the "Broker/Dealer") requests that you promptly advise Alpine in writing of any material change in you financial situation and/or investment objectives. Also, promptly report any discrepancies between Alpine's records as provided in this account statement and your records to Alpine at (801) 355-5588. To further protect your rights under the Securities Investor Protection Act (SIPC), reconfirm your oral communication to Alpine in writing at 440 East 400 South, Salt Lake City, UT 84111.

As required under SEC rules, upon written request, the Broker/Dealer will provide to you, for orders placed during the six months prior to your request: a) the venue to which your orders for listed securities or NASDAQ stocks were routed for execution; b) whether or not you directed the Broker/Dealer to use that venue, and c) the time of the related transaction's execution(s).

Alpine is a member of the Securities Investor Protection Corporation ("SIPC"). SIPC provides up to $500,000 of net equity protection, including $100,000 for claims for cash awaiting reinvestment ("SIPC coverage"). This coverage applies to accounts you hold in a separate account capacity (for instance as custodian, joint tenant, or sole owner). Investor information, including a brochure regarding SIPC may be obtained by contacting SIPC at (202) 371-8300 and from their web-site at www.sipc.org.

Alpine is a member of the Financial Industry Regulatory Authority (FINRA) and we are required to inform you of the availability of the FINRA Investor Brochure, which contains information on the FINRA Public Disclosure Program. You may contact FINRA at (800) 289-9999 or visit www.finra.org.

The net free credit balance, if any, is payable on demand in the normal course of business operations. These funds may be used in the operation of our business in accordance with 17C.F.R. 240, 15c3-2 under the Securities Exchange Act of 1934. Any securities held as collateral against any indebtedness to us will be delivered to you in the normal course of business operations upon full payment of such indebtedness. Free credit balances invested in money market funds, managed by The Dreyfus Corporation ("Dreyfus") are not under Alpine's control. Dreyfus money market funds are not FDIC or SIPC insured. Information regarding the Dreyfus money market funds, dividend rates and a prospectus may be obtained from the Dreyfus website at www.dreyfus.com. Alpine may receive a fee for services it performs with respect to the Dreyfus money market funds.

It is understood and agreed that all securities carried in this account may be loaned by us or pledged, hypothecated or rehypothecated by us, and may be sold or bought at public or private sales without notice, when such sale or purchase is deemed necessary by us for our protection. Securities carried in this account may be commingled with securities carried for the account of other clients.

On all securities which we have held or at any time may hold or carry for you in any account of yours (either individually or jointly with others), or which may be deposited with us for any purpose, including safekeeping, we may pledge as a general lien for the discharge of all your obligations to us, however arising and irrespective of the number of accounts you have with us. We may require you to deposit additional collateral in accordance with the rules and regulations of FINRA, the SEC, and any other regulatory agency to whose jurisdiction we are subject, and we may also, but shall have no obligation to, require you to deposit such additional collateral as we, in our sole discretion, determine is needed as security for your obligation to us.

We are required to report to the Internal Revenue Service all cash dividends and registered bond interest credited to your account on securities held for you in our name. All dividends and interest credits should be included in your income tax return.

It is agreed that all transactions are subject, in addition to federal law and the rules and regulations of the regulatory agencies, to the rules and customs of the exchange, market or clearing house where effected and to the constitution, laws and regulations of the country and its political subdivisions wherein the transactions are executed.

The pie chart located on the statement is an estimate for illustrative purposes only.

Alpine's consolidated statement of financial condition for the previous six months ended March 31, and for the year ended September 30, is available without charge at www.alpine-securities.com or you may also receive a copy by calling Alpine at (801) 355-5588. Alpine's most recently filed audited consolidated statement of financial condition is available at Alpine's office located at 440 East 400 South, Salt Lake City, Utah and at the Denver Regional Office of the Securities and Exchange Commission.

Any account transferred to another brokerage will be charged $100.00 to cover our costs.

Prices shown on your statement represent estimated values that may be based on a limited number of trades or quotations and may not be current as of the statement date. You may not be able to sell this security at a price equal or near the estimated value and the actual amount you receive will be reduced by any commissions or similar charges. The Broker/Dealer will not refuse to accept your order to sell a security at the estimated value. If an estimated value is not shown, the value could not be determined based on available information.

PLEASE RETAIN THIS STATEMENT AS IT WILL BE HELPFUL IN PREPARING YOUR INCOME TAX RETURNS AND MAY BE NEEDED ALONG WITH SUBSEQUENT STATEMENTS TO VERIFY INTEREST CHARGES IN YOUR ACCOUNT.

**IMPORTANT NOTICE REGARDING GOOD 'TIL CANCELLED ORDERS**

Should you desire to make any change, or if the list of open orders is incorrect, please advise us immediately. The responsibility for failure to cancel any open order, even though a substitute order has been entered, rest upon the customer. Transactions resulting from execution of any such order which you have failed to cancel will be entered in your account. Good 'Till Canceled buy orders and sell orders which specify stop or stop limit are reduced for cash dividends. All orders are reduced proportionately in the event of a stock dividend or stock split.

**\*\*WE MUST BE ADVISED IMMEDIATELY OF ANY ERRORS OR OMISSIONS\*\***

SEC-ACA-E-0000031

**Account Statement - Period 11/1/2010 to 10/31/2012**                          Account Number: ████4620

Account Name: ANNA TIKHONOVA                          Account Executive: SCA HOUSE ACCOUNT

# Daily Account Activity - Cash Account

Beginning Balance: 0.00

| Settlement Date | Activity Date | Activity | Quantity | Description | Price | Subtracted | Added | Balance |
|---|---|---|---|---|---|---|---|---|
| 10/3/2011 | – | RECEIVED | 1000000.00 | ONYX SERVICE & SOLUTIONS | – | – | – | 0.00 |
| 10/4/2011 | – | JOURNAL | – | DTC FEE 77664620 ONYX | – | 500.00 | – | -500.00 |
| 10/4/2011 | – | JOURNAL | – | RUSH FEE 77664620 ONYX | – | 250.00 | – | -750.00 |
| 10/11/2011 | 10/5/2011 | SOLD | 20000.00 | ONYX SERVICE & SOLUTIONS | 3.5800 | – | 68336.87 | 67586.87 |
| 10/11/2011 | 10/5/2011 | SOLD | 8940.00 | ONYX SERVICE & SOLUTIONS | 3.6300 | – | 30951.48 | 98538.35 |
| 10/11/2011 | 10/5/2011 | SOLD | 5000.00 | ONYX SERVICE & SOLUTIONS | 3.5300 | – | 16815.66 | 115354.01 |
| 10/11/2011 | 10/5/2011 | SOLD | 5000.00 | ONYX SERVICE & SOLUTIONS | 3.5500 | – | 16911.15 | 132265.16 |
| 10/11/2011 | 10/5/2011 | SOLD | 2900.00 | ONYX SERVICE & SOLUTIONS | 3.5500 | – | 9791.77 | 142056.93 |
| 10/11/2011 | 10/5/2011 | SOLD | 2100.00 | ONYX SERVICE & SOLUTIONS | 3.5500 | – | 7079.62 | 149136.55 |
| 10/12/2011 | 10/6/2011 | SOLD | 5000.00 | ONYX SERVICE & SOLUTIONS | 3.5800 | – | 17054.40 | 166190.95 |
| 10/12/2011 | 10/6/2011 | SOLD | 1500.00 | ONYX SERVICE & SOLUTIONS | 3.5000 | – | 4973.89 | 171164.84 |
| 10/12/2011 | 10/6/2011 | SOLD | 1000.00 | ONYX SERVICE & SOLUTIONS | 3.5000 | – | 3302.68 | 174467.52 |
| 10/12/2011 | – | SWEEP | – | SWEPT TO DREYFUS GENERAL MNY M | – | 140820.22 | – | 33647.30 |
| 10/13/2011 | – | SWEEP | – | SWEPT TO DREYFUS GENERAL MNY M | – | 33847.30 | – | 0.00 |
| 10/14/2011 | 10/11/2011 | SOLD | 4000.00 | ONYX SERVICE & SOLUTIONS | 2.0525 | – | 7800.64 | 7800.64 |
| 10/14/2011 | 10/11/2011 | SOLD | 2500.00 | ONYX SERVICE & SOLUTIONS | 2.0600 | – | 4878.40 | 12679.04 |
| 10/14/2011 | 10/11/2011 | SOLD | 2500.00 | ONYX SERVICE & SOLUTIONS | 2.0550 | – | 4866.47 | 17545.51 |
| 10/14/2011 | 10/11/2011 | SOLD | 1140.00 | ONYX SERVICE & SOLUTIONS | 2.1300 | – | 2279.14 | 19824.65 |
| 10/17/2011 | 10/12/2011 | SOLD | 796.00 | ONYX SERVICE & SOLUTIONS | 2.1000 | – | 1556.59 | 21381.24 |
| 10/17/2011 | 10/12/2011 | SOLD | 2000.00 | ONYX SERVICE & SOLUTIONS | 2.0900 | – | 3952.06 | 25333.30 |
| 10/17/2011 | 10/12/2011 | SOLD | 20000.00 | ONYX SERVICE & SOLUTIONS | 2.2250 | – | 42456.89 | 67790.19 |
| 10/17/2011 | 10/12/2011 | SOLD | 385.00 | ONYX SERVICE & SOLUTIONS | 2.2500 | – | 706.48 | 68496.67 |
| 10/17/2011 | 10/12/2011 | SOLD | 24218.00 | ONYX SERVICE & SOLUTIONS | 2.2400 | – | 51766.35 | 120263.02 |
| 10/17/2011 | 10/12/2011 | SOLD | 1500.00 | ONYX SERVICE & SOLUTIONS | 2.2300 | – | 3192.69 | 123455.71 |
| 10/17/2011 | 10/12/2011 | SOLD | 1000.00 | ONYX SERVICE & SOLUTIONS | 2.2300 | – | 2089.85 | 125545.56 |
| 10/17/2011 | – | SWEEP | – | SWEPT TO DREYFUS GENERAL MNY M | – | 14540.38 | – | 111005.18 |
| 10/18/2011 | 10/13/2011 | SOLD | 600.00 | ONYX SERVICE & SOLUTIONS | 2.4000 | – | 1325.22 | 112330.40 |
| 10/18/2011 | 10/13/2011 | SOLD | 2500.00 | ONYX SERVICE & SOLUTIONS | 2.3300 | – | 5523.01 | 117853.41 |
| 10/18/2011 | – | SWEEP | – | SWEPT TO DREYFUS GENERAL MNY M | – | 111005.18 | – | 6848.23 |
| 10/19/2011 | – | SWEEP | – | SWEPT TO DREYFUS GENERAL MNY M | – | 6848.23 | – | 0.00 |
| 10/20/2011 | – | JOURNAL | – | O INSUFFICIENT CREDIT | – | 50.00 | – | -50.00 |
| 10/20/2011 | – | JOURNAL | – | SCA WIRE FEE | – | 25.00 | – | -75.00 |
| 10/20/2011 | – | JOURNAL | – | WIRE | – | 300000.00 | – | -300075.00 |
| 10/21/2011 | – | SWEEP | – | SWEPT FR DREYFUS GENERAL MNY M | – | – | 300075.00 | 0.00 |
| 10/24/2011 | 10/19/2011 | SOLD | 1100.00 | ONYX SERVICE & SOLUTIONS | 2.0800 | – | 2145.24 | 2145.24 |
| 10/25/2011 | – | SWEEP | – | SWEPT TO DREYFUS GENERAL MNY M | – | 2145.24 | – | 0.00 |
| 11/17/2011 | 11/14/2011 | SOLD | 8400.00 | ONYX SERVICE & SOLUTIONS | 1.6800 | – | 13436.93 | 13436.93 |
| 11/18/2011 | 11/15/2011 | SOLD | 5500.00 | ONYX SERVICE & SOLUTIONS | 1.8000 | – | 9414.55 | 22851.48 |

Page 3

SEC-ACA-E-0000032

**Account Statement - Period 11/1/2010 to 10/31/2012**     Account Number:█████4620

Account Name: ANNA TIKHONOVA     Account Executive: SCA HOUSE ACCOUNT

## Daily Account Activity - Cash Account (continued)

| Settlement Date | Activity Date | Activity | Quantity | Description | Price | Subtracted | Added | Balance |
|---|---|---|---|---|---|---|---|---|
| 11/18/2011 | -- | SWEEP | -- | SWEPT TO DREYFUS GENERAL MNY M | -- | 13438.93 | -- | 9414.55 |
| 11/21/2011 | 11/16/2011 | SOLD | 9500.00 | ONYX SERVICE & SOLUTIONS | 1.7400 | -- | 15746.08 | 25160.63 |
| 11/21/2011 | -- | SWEEP | -- | SWEPT TO DREYFUS GENERAL MNY M | -- | -- | 9414.55 | 15746.08 |
| 11/22/2011 | 11/17/2011 | SOLD | 5072.00 | ONYX SERVICE & SOLUTIONS | 1.8400 | -- | 8872.59 | 24818.67 |
| 11/22/2011 | -- | SWEEP | -- | SWEPT TO DREYFUS GENERAL MNY M | -- | 15746.08 | -- | 8872.59 |
| 11/23/2011 | 11/18/2011 | SOLD | 1700.00 | ONYX SERVICE & SOLUTIONS | 1.7100 | -- | 2736.38 | 11608.97 |
| 11/23/2011 | -- | SWEEP | -- | SWEPT TO DREYFUS GENERAL MNY M | -- | 8872.59 | -- | 2736.38 |
| 11/25/2011 | -- | JOURNAL | -- | WIRE FEE | -- | 50.00 | -- | 2686.38 |
| 11/25/2011 | -- | JOURNAL | -- | SCA WIRE FEE | -- | 25.00 | -- | 2661.38 |
| 11/25/2011 | -- | JOURNAL | -- | WIRE | -- | 59063.82 | -- | -56402.24 |
| 11/25/2011 | -- | SWEEP | -- | SWEPT TO DREYFUS GENERAL MNY M | -- | 2736.38 | -- | -59138.62 |
| 11/28/2011 | 11/22/2011 | SOLD | 2500.00 | ONYX SERVICE & SOLUTIONS | 1.6100 | -- | 3804.05 | -55334.57 |
| 11/28/2011 | -- | SWEEP | -- | SWEPT FR DREYFUS GENERAL MNY M | -- | -- | 55334.57 | 0.00 |
| 12/15/2011 | -- | JOURNAL | -- | SCA CERT DEPO FEE ONYX | -- | 500.00 | -- | -500.00 |
| 12/16/2011 | -- | SWEEP | -- | SWEPT FR DREYFUS GENERAL MNY M | -- | -- | 500.00 | 0.00 |
| 12/19/2011 | -- | JOURNAL | -- | SCA REV CERT DEPO FEE SWRI | -- | -- | 500.00 | 500.00 |
| 12/20/2011 | -- | SWEEP | -- | SWEPT TO DREYFUS GENERAL MNY M | -- | 500.00 | -- | 0.00 |
| 1/27/2012 | 1/24/2012 | SOLD | 4000.00 | ONYX SERVICE & SOLUTIONS | 1.4850 | -- | 5632.83 | 5632.83 |
| 1/30/2012 | -- | SWEEP | -- | SWEPT TO DREYFUS GENERAL MNY M | -- | 5632.83 | -- | 0.00 |
| 2/3/2012 | -- | JOURNAL | -- | SCA BLUE SHEET FEES ONYX | -- | 150.00 | -- | -150.00 |
| 2/6/2012 | -- | SWEEP | -- | SWEPT FR DREYFUS GENERAL MNY M | -- | -- | 150.00 | 0.00 |
| 3/21/2012 | -- | RECEIVED | 1695338.00 | ONYX SERVICE & SOLUTIONS | -- | -- | -- | 0.00 |
| 4/13/2012 | -- | RECEIVED | 200000.00 | CHIMERA ENERGY CORP | -- | -- | -- | 0.00 |
| 4/13/2012 | -- | JOURNAL | -- | SCA STK REC FEE CHMR | -- | 300.00 | -- | -300.00 |
| 4/16/2012 | -- | SWEEP | -- | SWEPT FR DREYFUS GENERAL MNY M | -- | -- | 300.00 | 0.00 |
| 4/19/2012 | -- | JOURNAL | -- | NON DTC FEE 77684620 CHMR | -- | 1000.00 | -- | -1000.00 |
| 4/20/2012 | -- | SWEEP | -- | SWEPT FR DREYFUS GENERAL MNY M | -- | -- | 1000.00 | 0.00 |
| 6/5/2012 | 5/31/2012 | SOLD | 2500.00 | CHIMERA ENERGY CORP | 0.9875 | -- | 2317.61 | 2317.61 |
| 6/8/2012 | -- | SWEEP | -- | SWEPT TO DREYFUS GENERAL MNY M | -- | 2317.61 | -- | 0.00 |
| 7/13/2012 | -- | RECEIVED | 592500.00 | CHIMERA ENERGY CORP | -- | -- | -- | 0.00 |
| 7/13/2012 | -- | JOURNAL | -- | CORP ACTION FEE CHMR | -- | 20.00 | -- | -20.00 |
| 7/16/2012 | -- | SWEEP | -- | SWEPT FR DREYFUS GENERAL MNY M | -- | -- | 20.00 | 0.00 |

## Daily Account Activity - Dreyfus General Money Market Fund

Beginning Balance: 0.00

| Settlement Date | Activity Date | Activity | Quantity | Description | Price | Subtracted | Added | Balance |
|---|---|---|---|---|---|---|---|---|
| 10/12/2011 | -- | SWEEP | -- | PURCHASE FR(1) CASH  ACCT | -- | -- | 140820.22 | 140820.22 |

Page 4

SEC-ACA-E-0000033

**Account Statement - Period 11/1/2010 to 10/31/2012**                    Account Number: ⬛⬛4620

Account Name: ANNA TIKHONOVA                                    Account Executive: SCA HOUSE ACCOUNT

## Daily Account Activity - Dreyfus General Money Market Fund (continued)

| Settlement Date | Activity Date | Activity | Quantity | Description | Price | Subtracted | Added | Balance |
|---|---|---|---|---|---|---|---|---|
| 10/13/2011 | – | SWEEP | – | PURCHASE FR(1) CASH  ACCT | – | – | 33647.30 | 174467.52 |
| 10/17/2011 | – | SWEEP | – | PURCHASE FR(1) CASH  ACCT | – | – | 14540.38 | 189007.90 |
| 10/18/2011 | – | SWEEP | – | PURCHASE FR(1) CASH  ACCT | – | – | 111005.18 | 300013.08 |
| 10/19/2011 | – | SWEEP | – | PURCHASE FR(1) CASH  ACCT | – | – | 6848.23 | 306861.31 |
| 10/21/2011 | – | SWEEP | – | DREYFUS GENERAL MNY MKT FUND | – | 300075.00 | – | 6786.31 |
| 10/25/2011 | – | SWEEP | – | PURCHASE FR(1) CASH  ACCT | – | – | 2145.24 | 8931.55 |
| 10/31/2011 | – | DIVIDEND | – | DREYFUS GENERAL MNY MKT FUND | – | – | 0.54 | 8932.09 |
| 11/18/2011 | – | SWEEP | – | PURCHASE FR(1) CASH  ACCT | – | – | 13436.93 | 22369.02 |
| 11/21/2011 | – | SWEEP | – | PURCHASE FR(1) CASH  ACCT | – | – | 9414.55 | 31783.57 |
| 11/22/2011 | – | SWEEP | – | PURCHASE FR(1) CASH  ACCT | – | – | 15746.08 | 47529.65 |
| 11/23/2011 | – | SWEEP | – | PURCHASE FR(1) CASH  ACCT | – | – | 8872.59 | 56402.24 |
| 11/25/2011 | – | SWEEP | – | PURCHASE FR(1) CASH  ACCT | – | – | 2736.38 | 59138.62 |
| 11/28/2011 | – | SWEEP | – | DREYFUS GENERAL MNY MKT FUND | – | 55334.57 | – | 3804.05 |
| 11/30/2011 | – | DIVIDEND | – | DREYFUS GENERAL MNY MKT FUND | – | – | 0.14 | 3804.19 |
| 12/16/2011 | – | SWEEP | – | DREYFUS GENERAL MNY MKT FUND | – | 500.00 | – | 3304.19 |
| 12/20/2011 | – | SWEEP | – | PURCHASE FR(1) CASH  ACCT | – | – | 500.00 | 3804.19 |
| 1/30/2012 | – | SWEEP | – | PURCHASE FR(1) CASH  ACCT | – | – | 5632.83 | 9437.02 |
| 2/6/2012 | – | SWEEP | – | DREYFUS GENERAL MNY MKT FUND | – | 150.00 | – | 9287.02 |
| 2/29/2012 | – | DIVIDEND | – | DREYFUS GENERAL MNY MKT FUND | – | – | 0.04 | 9287.06 |
| 3/30/2012 | – | DIVIDEND | – | DREYFUS GENERAL MNY MKT FUND | – | – | 0.05 | 9287.11 |
| 4/16/2012 | – | SWEEP | – | DREYFUS GENERAL MNY MKT FUND | – | 300.00 | – | 8987.11 |
| 4/20/2012 | – | SWEEP | – | DREYFUS GENERAL MNY MKT FUND | – | 1000.00 | – | 7987.11 |
| 4/30/2012 | – | DIVIDEND | – | DREYFUS GENERAL MNY MKT FUND | – | – | 0.04 | 7987.15 |
| 5/31/2012 | – | DIVIDEND | – | DREYFUS GENERAL MNY MKT FUND | – | – | 0.04 | 7987.19 |
| 6/6/2012 | – | SWEEP | – | PURCHASE FR(1) CASH  ACCT | – | – | 2317.61 | 10304.80 |
| 6/29/2012 | – | DIVIDEND | – | DREYFUS GENERAL MNY MKT FUND | – | – | 0.04 | 10304.84 |
| 7/16/2012 | – | SWEEP | – | DREYFUS GENERAL MNY MKT FUND | – | 20.00 | – | 10284.84 |
| 7/31/2012 | – | DIVIDEND | – | DREYFUS GENERAL MNY MKT FUND | – | – | 0.05 | 10284.89 |
| 8/31/2012 | – | DIVIDEND | – | DREYFUS GENERAL MNY MKT FUND | – | – | 0.04 | 10284.93 |
| 9/28/2012 | – | DIVIDEND | – | DREYFUS GENERAL MNY MKT FUND | – | – | 0.05 | 10284.98 |

## Portfolio Positions

| Security Description | Symbol | Quantity | Current Share Price | Current Mkt. Value | Percent of Port. | Est. Div. Yield | Est. Annual Income |
|---|---|---|---|---|---|---|---|
| CHIMERA ENERGY CORP | CHMR | 790000.00 | 0.3150 | 248850.00 | 0.98 | – | – |
| ONYX SERVICE & SOLUTIONS | ONYX | 2543007.00 | 0.0020 | 5086.01 | 0.02 | – | – |

Page 5

SEC-ACA-E-0000034

# Appendix

# Exhibit VV

APP. 000739



**Financial Industry Regulatory Authority**

# Transfer Agent Verification Form

Completion of this form certifies to FINRA™ notification of a corporate action (e.g., a name change, stock split, and/or spin-off) for an OTC issuer. This form is required to be filled out and submitted by the transfer agent only.

## Transfer Agency: *Required Field

AGENCY NAME:* Island Stock Transfer

IS TRANSFER AGENCY A SEC REGISTERED AGENT?* ☒ Yes   ☐ No, please confirm where registered:

AGENCY ADDRESS:* 15500 Roosevelt Boulevard Suite 301 Clearwater, FL 33760

AGENCY REPRESENTATIVE:*Kimberly Hood     TITLE:* Corporate Actions Associate

TELEPHONE:*   +1 (727) 289-0010     FACSIMILE:    +1 (727) 289-0069     EMAIL:* khood@islandstocktransfer.com

WEBSITE:*  www.islandstocktransfer.com

WHERE DID THE AGENT RECEIVE NOTIFICATION FROM? *   ☒ ISSUER   ☐ LEGAL COUNSEL   ☐ OTHER

## OTC Issue Requiring Change: *Required Field

COMPANY NAME :*Chimera Energy Corporation

ADDRESS: *2800 Post Oak Blvd, Suite 4100

CITY:* Houston     STATE/PROVINCE:* Texas     ZIP/POSTAL CODE:* 77056

COUNTRY OF INCORPORATION:*  United States     IF US, STATE OF INCORPORATION:  Nevada

DATE OF INCORPORATION OR RE-INCORPORATION:*:  Aug 5, 2011

CONTACT NAME:* Charles Grob     TITLE:* CEO

TELEPHONE:*   +1 (832) 390-2334     FACSIMILE:    +1 (832) 390-2350     EMAIL:*  cgrob@chimeraenergyusa.com

## Appointment Verification: *Required Field

DATE OF APPOINTMENT AS TRANSFER AGENT:* Dec 20, 2011

*If date of appointment is within last six months, please provide the following information:*

PRIOR TRANSFER AGENT:  N/A

DATE RECORDS WERE TRANSFERRED AND RECEIVED FROM PRIOR AGENT:  N/A

Investor protection. Market Integrity.

9509 Key West Avenue     t 240 386 4000
Rockville, MD     www.finra.org
20850-3329

TRANSFER AGENT VERIFICATION FORM  REV. (03/09)

Page 1 of 3

SEC-IST-E-0000317

## Transaction Options (please fill out all that apply):

### ☐ Name Change:

NEW COMPANY NAME: _____

CUSIP/CINS NUMBER(S):   CURRENT: _____   NEW: _____

ANTICIPATED EFFECTIVE DATE FOR CORPORATE ACTION: ** _____

### ☒ Stock Split:

☐ FORWARD SPLIT PAYABLE UPON SURRENDER OF OLD CERTIFICATES

    CUSIP/CINS NUMBER(S):   CURRENT: _____   NEW: _____

    STOCK SPLIT RATIO: _____

☒ FORWARD SPLIT - NEW SHARES ALLOCATED/MAILED DIRECTLY TO SHAREHOLDERS

    CUSIP/CINS NUMBER(S):   CURRENT: 16934U100   NEW: N/A

    RECORD DATE: Jul 6, 2012   PAYABLE DATE: Jul 6, 2012

    STOCK SPLIT RATIO: 4:1

☐ REVERSE SPLIT

    CUSIP/CINS NUMBER(S):   CURRENT: _____   NEW: _____

    RECORD DATE: _____   PAYABLE DATE: _____

    STOCK SPLIT RATIO: _____

*The following information is required for all stock splits:*

PRE-SPLIT TOTAL SHARES OUTSTANDING: 16,500,000   AS OF DATE: Jul 3, 2012

POST-SPLIT TOTAL SHARES OUTSTANDING: ~~66,000,000~~ ~~40,500,000~~   AS OF DATE: Jul 6, 2012

METHOD OF SETTLING FRACTIONAL SHARES: fractional shares will be rounded down to the next whole share

ANTICIPATED EFFECTIVE DATE FOR CORPORATE ACTION: ** Jul 6, 2012

Any conditions which must be met for the transaction to become effective: _____

### ☐ Spin-Off:

SPIN-OFF COMPANY NAME: _____

PARENT ENTITY: _____

CUSIP/CINS NUMBER(S):   Spin-Off Company: _____   Parent Entity: _____

RELATIONSHIP BETWEEN SPIN-OFF AND PARENT ENTITY: _____

ANTICIPATED EFFECTIVE DATE FOR CORPORATE ACTION: ** _____

** NOTE: Processing of Corporate Action prior to announcement on the OTCBB or OTC Daily List may result in subsequent clearance and settlement issues.

Investor protection. Market integrity.

9509 Key West Avenue    t 240 386 4000
Rockville, MD            www.finra.org
20850 3329

TRANSFER AGENT VERIFICATION FORM  REV. (03/09)

SEC-IST-E-0000318

☐ **Other** (please specify):

## Stock Certificate Verification: *Required Field

ARE THE EXISTING SHARES DEPOSITORY ELIGIBLE AND HELD AT DTC?*    ☒ Yes    ☐ No

CAN DTC HOLD THE NEW CERTIFICATES IN NOMINEE NAME?*    ☒ Yes    ☐ No

IS THE SURRENDER OF CERTIFICATES MANDATORY?*    ☐ Yes, please specify effective date: _____    ☒ No

WHEN WILL NEW INVENTORY BE AVAILABLE?*   Jul 3, 2012 _____

ARE THERE ANY RESTRICTIONS ON THE NEW SHARES?*

   ☐ Yes, please specify (i.e., 144, legend, etc.):   Previous restricted shares remain restricted, free trading shares remain free trading

   ☐ No

## Authorization by Transfer Agent Representative: *Required Field

I*, Kimberly Hood _____, hereby certify that all requirements by the Transfer Agent have been

satisfied to process the transaction and that all the information disclosed in this request is accurate and true.

SIGNATURE:*   **Kimberly Hood**      DATE:* Jul 3, 2012

## Submission of Transfer Agent Notification:

**FINRA**
Operations, 5th Floor
9509 Key West Avenue
Rockville, MD 20850
Telephone: 1.866.776.0800
Fax: 202.689.3533
Email: OTCcorpactions@finra.org

 

Investor protection. Market integrity.

9509 Key West Avenue    t 240 386 4000
Rockville, MD    www.finra.org
20850-3329

TRANSFER AGENT VERIFICATION FORM REV. (03/09)

Page 3 of 3

APP. 000742

SEC-IST-E-0000319

# Appendix

# Exhibit WW

424B3 1 chimera424b3.htm

Filed Pursuant to Rule 424(b)(3)
Registration No. 333-177406

**PROSPECTUS**

**CHIMERA ENERGY CORPORATION**

**5,000,000 SHARES OF COMMON STOCK**

**Initial Public Offering**

Prior to this registration, there has been no public trading market for the common Stock of CHIMERA ENERGY CORPORATION ("CEC", the "Company", "us", "we", and "our") and it is not presently traded on any market or securities exchange.  A total of 5,000,000 shares of common stock are being offered for sale by the Company to the public.

The offering of the 5,000,000 shares is being conducted on a self-underwritten, "best efforts" basis, which means that our director and officer, Charles Grob, will use his best efforts to sell the common stock and there is no commitment by any person to purchase any shares. This prospectus will permit our president to sell the shares directly to the public, with no commission or other remuneration payable to him for any shares he may sell. In offering the securities on our behalf, he will rely on the safe harbor from broker-dealer registration set out in Rule 3a4-1 under the Securities and Exchange Act of 1934. The shares will be offered at a fixed price of $0.015 per share for the duration of the offering. There is no minimum number of shares required to be sold to close the offering. This offering will continue until the earlier of: (i) 90 days after this registration statement becomes effective with the Securities and Exchange Commission, or (ii) the date on which all 5,000,000 shares registered hereunder have been sold; provided that we may at our discretion extend the offering for an additional 90 days. Proceeds from the sale of the shares will be used to fund the initial stages of our business development. The Company will deliver stock certificates attributable to shares of common stock purchased directly to the purchasers within ninety (90) days of the close of the offering.  The offering date is the date by which this registration statement becomes effective. This is a direct participation offering since we, and not an underwriter, are offering the stock.

| SHARES OFFERED BY COMPANY | PRICE TO PUBLIC | | SELLING AGENT COMMISSIONS | PROCEEDS TO THE COMPANY | |
|---|---|---|---|---|---|
| Per Share | $ | 0.015 | Not applicable | $ | 0.015 |
| Minimum Purchase | | None | Not applicable | | Not applicable |
| Total (5,000,000 shares) | $ | 75,000 | Not applicable | $ | 75,000 |

The Company currently has a limited operating history.  Any investment in the shares offered herein involves a high degree of risk.  You should only purchase shares if you can afford a loss of your investment.  Our independent registered public accountant has issued an audit opinion for the Company which includes a statement expressing substantial doubt as to our ability to continue as a going concern.

There has been no market for our securities and a public market may never develop, or, if any market does develop, it may not be sustained. Our common stock is not traded on any exchange or on the over-the-counter market. After the effective date of the registration statement relating to this prospectus, we hope to have a market maker file an application with the Financial Industry Regulatory Authority ("FINRA") for our common stock to be eligible for trading on the Over-the-Counter Bulletin Board or OTCQB Market.  We do not yet have a market maker who has agreed to file such application. There can be no assurance that our common stock will ever be quoted on a stock exchange or a quotation service or that any market for our stock will develop.

Neither the Securities and Exchange Commission nor any state regulatory authority has approved or disapproved of these securities, endorsed the merits of this offering, or determined that this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

AN INVESTMENT IN OUR SECURITIES IS SPECULATIVE. INVESTORS SHOULD BE ABLE TO AFFORD THE LOSS OF THEIR ENTIRE INVESTMENT. SEE THE SECTION ENTITLED "RISK FACTORS" BEGINNING ON PAGE 5 OF THIS PROSPECTUS.

THIS PROSPECTUS SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY THESE SECURITIES AND WE SHALL NOT SELL ANY OF THESE SECURITIES IN ANY STATE WHERE SUCH AN OFFER OR SOLICITATION WOULD BE UNLAWFUL BEFORE REGISTRATION OR QUALIFICATION UNDER SUCH STATE'S SECURITIES LAWS.

You should rely only on the information contained in this prospectus. We have not authorized anyone to provide you with information different from that contained in this prospectus.

**DATED DECEMBER 21, 2011**

APP. 000744

The following table of contents has been designed to help you find important information contained in this prospectus. We encourage you to read the entire prospectus.

## TABLE OF CONTENTS

|  | PAGE NO. |
|---|---|
| SUMMARY INFORMATION | 1 |
| OUR OFFERING | 1 |
| BUSINESS SUMMARY | 3 |
| SUMMARY OF OUR FINANCIAL INFORMATION | 4 |
| RISK FACTORS | 5 |
| DIVIDEND POLICY | 17 |
| USE OF PROCEEDS | 17 |
| DETERMINATION OF OFFERING PRICE | 19 |
| DILUTION OF THE PRICE YOU PAY FOR YOUR SHARES | 19 |
| THE OFFERING | 20 |
| PLAN OF DISTRIBUTION | 21 |
| DESCRIPTION OF SECURITIES | 23 |
| INTEREST OF NAMED EXPERTS AND COUNSEL | 23 |
| EXPERTS | 23 |
| LEGAL MATTERS | 23 |
| BUSINESS DESCRIPTION | 24 |
| DESCRIPTION OF PROPERTY | 29 |
| LEGAL PROCEEDINGS | 29 |
| MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS | 29 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 30 |
| CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 36 |
| CODE OF BUSINESS CONDUCT AND ETHICS | 36 |
| MANAGEMENT | 37 |
| CONFLICTS OF INTEREST | 38 |
| COMMITTEES OF THE BOARD OF DIRECTORS | 38 |
| EXECUTIVE COMPENSATION | 39 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS | 42 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 43 |
| INDEMNIFICATION OF OFFICERS AND DIRECTORS | 43 |
| REPORTS TO SECURITY HOLDERS | 43 |
| WHERE YOU CAN FIND MORE INFORMATION | 44 |
| STOCK TRANSFER AGENT | 44 |
| FINANCIAL STATEMENTS | F-1 |

APP. 000745

## SUMMARY INFORMATION

This prospectus, and any supplement to this prospectus include "forward-looking statements". To the extent that the information presented in this prospectus discusses financial projections, information or expectations about our business plans, results of operations, products or markets, or otherwise makes statements about future events, such statements are forward-looking. These forward-looking statements which include words such as "anticipates", "believes", "expects", "intends", "forecasts", "plans", "future", "strategy" or words of similar meaning, are subject to risks and uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from the results, performance or achievements expressed or implied by the forward-looking statements. You should not unduly rely on these statements. Forward-looking statements involve assumptions and describe our plans, strategies, and expectations. You can generally identify a forward-looking statement by words such as may, will, should, expect, anticipate, estimate, believe, intend, contemplate or project. Factors, risks, and uncertainties that could cause actual results to differ materially from those in the forward-looking statements include those risks set forth under "Risk Factors."

With respect to any forward-looking statement that includes a statement of its underlying assumptions or basis, we caution that, while we believe such assumptions or basis to be reasonable and have formed them in good faith, assumed facts or basis almost always vary from actual results, and the differences between assumed facts or basis and actual results can be material depending on the circumstances. When, in any forward-looking statement, we or our management express an expectation or belief as to future results, that expectation or belief is expressed in good faith and is believed to have a reasonable basis, but there can be no assurance that the stated expectation or belief will result or be achieved or accomplished. All subsequent written and oral forward-looking statements attributable to us, or anyone acting on our behalf, are expressly qualified in their entirety by the cautionary statements. Except as required by applicable law, including the securities laws of the United States and/or if the existing disclosure fundamentally or materially changes, we do not undertake any obligation to publicly release any revisions to any forward-looking statements to reflect events or circumstances after the date of this prospectus or to reflect unanticipated events that may occur.

This summary only highlights selected information contained in greater detail elsewhere in this prospectus. This summary may not contain all of the information that you should consider before investing in our common stock. You should carefully read the entire prospectus, including "Risk Factors" beginning on Page 5, and the financial statements, before making an investment decision

All dollar amounts refer to US dollars unless otherwise indicated.

## OUR OFFERING

We have 10,000,000 shares of common stock issued and outstanding. Through this offering we will register 5,000,000 shares of common stock for offering to the public. These shares represent additional common stock to be issued by us. We may endeavor to sell all 5,000,000 shares of common stock after this registration becomes effective. The price at which we offer these shares is fixed at $0.015 per share for the duration of the offering. There is no arrangement to address the possible effect of the offering on the price of the stock. We will receive all proceeds from the sale of the common stock.

| Securities being offered by the Company | 5,000,000 shares of common stock, par value $0.001 offered by us in a direct offering. |
| Offering price per share | We are offering the 5,000,000 shares of our common stock at $0.015 per share. |
| Total offering proceeds | $75,000 |

-1-

APP. 000746

| | |
|---|---|
| **Number of shares outstanding before the offering of common shares** | 10,000,000 common shares are currently issued and outstanding. |
| **Number of shares outstanding after the offering of common shares** | 15,000,000 common shares will be issued and outstanding if we sell all of the shares that we are offering. |
| **The minimum number of shares to be sold in this offering** | None. |
| **Market for the common shares** | There is no public market for the common shares. The price per share is $0.015. |
| | We may not be able to meet the requirement for a public listing or quotation of our common stock. Further, even if our common stock is quoted or granted listing, a market for the common shares may not develop. |
| | The offering price for the shares will remain $0.015 per share for the duration of the offering. |
| **Use of Proceeds** | We will receive all proceeds from the sale of the common stock and intend to use the proceeds from this offering to begin implementing the business and marketing plan. The expenses of this offering, including the preparation of this prospectus and the filing of this registration statement, estimated at $11,000 are being paid for by us. |
| **Termination of the Offering** | This offering will terminate upon the earlier to occur of (i) 90 days after this registration statement becomes effective with the Securities and Exchange Commission, and (ii) the date on which all 5,000,000 shares registered hereunder have been sold; provided that we may, at our discretion, extend the offering for an additional 90 days. The Company will deliver stock certificates attributable to shares of common stock purchased directly to the purchasers within ninety (90) days of the close of the offering.. |
| **Terms of the Offering** | Our sole officer and director will sell the common stock upon effectiveness of this registration statement on a "best efforts" basis. |
| **Risk Factors** | See "Risk Factors" on pages 5 through 16 and the other information in this prospectus for a discussion of the factors you should consider before deciding to invest in shares of our common stock. |

You should rely only upon the information contained in this prospectus. We have not authorized anyone to provide you with information different from that which is contained in this prospectus. We are offering to sell shares of common stock and seeking offers to buy shares of common stock only in jurisdictions where offers and sales are permitted.

APP. 000747

## BUSINESS SUMMARY

We are a Houston based energy company, incorporated in the State of Nevada on August 5, 2011, with a fiscal year end of August 31. Our business and registered office is located at 2800 Post Oak Blvd., Suite 4100, Houston, Texas 77056. Our telephone number is 832-390-2334. Our Internet address is http://www.chimeraenergyusa.com. The information on, or that may be accessed through, our website is not incorporated by reference into this prospectus and should not be considered a part of this prospectus. Our current business supplies equipment and components that are used in the exploration and production of oil and gas. In August 2011, we capitalized our business operations with a $100,000 note that bears interest at an annual rate of 15% per annum and is due and payable on August 21, 2013, and commenced our operations with the purchase of $30,000 of inventory. On August 22, 2011, our founder, sole officer and director, Charles Grob, purchased 10,000,000 shares of our common stock for $10,000 at a price per share of $0.001.

In addition to our present business line, we intend to develop additional product lines to become a diversified equipment company. We are endeavoring to raise growth capital to further develop our business plan. The proceeds from this offering will be used to provide working capital for our polycrystalline diamond compact (PDC) products and provide cash for additional development. We will not have the necessary capital to fully execute our business plan until we are able to secure additional debt and equity financing. There can be no assurance that such financing will be available on suitable terms, if at all. Even if we sell all of the shares offered in this offering, we will require additional capital to fund the future growth and development of the business.

We need to raise $500,000 (including the $75,000 of capital which will be raised from this offering, assuming it is fully subscribed) to fully implement our business plan over the next 24 months. The funds raised in this offering, even assuming we sell all the shares being offered herein, will serve as intermediate financing to fund operations and growth until we can raise additional funds. We anticipate a cash burn rate for overhead of approximately $3,000 per month. If we sell 25% of the shares offered herein, we anticipate being able to continue our operations for approximately six months without raising additional funding. If we sell 50% of such offered shares, we estimate that we will be able to continue our operations for approximately 12 months. If we sell 75% of such offered shares, we estimated that we will be able to continue our operations for approximately 18 months and in the event we sell 100% of the shares offered herein, we estimate that we will be able to continue our operations, without any additional funding for approximately 24 months.

Our management believes that at the current level of development, the Company can only justify a limited financing. We believe that with the money raised through this offering we will be able to advance our business sufficiently to attract more financing, which in turn will provide us with the lower cost of capital required to develop our business.

If we sell less than 25% of the number of shares offered through this offering and we are unable to secure additional financing, we will not be able to effectively conduct the business development activities necessary to move the Company forward. Under those circumstances, investors will likely lose their entire investment in the Company.

We intend to develop a wholesale oilfield equipment business that offers multiple lines of products to both oilfield equipment manufacturers and oil and gas companies. We expect our business plan to require at least three years of development before we have fully diversified product lines. Until that time, and as we are developing business segments, we will have concentrations in certain areas. For instance, as of the date of this offering, 100% of our operations reside in the distribution of PDC cutters. Provided that our business obtains additional financing, we intend to diversify our product mix.

-3-

APP. 000748

Major oil and gas companies are spending significant amounts of money investing in oilfield equipment. While alternative energy businesses continue to become more competitive as investment in those sectors increases, we believe that the predominance of energy will continue to be supplied by oil and gas companies. We intend to build a diversified oilfield equipment business that is scalable enough to provide high-growth opportunities to our investors.

We intend to take an opportunistic approach to investments in future projects. We will endeavor to identify and fund the most economically viable projects that have the potential to provide the highest returns to our stakeholders for a given level of risk. We need to raise an additional $500,000 (including the proposed $75,000 capital raise which is being undertaken through the offering of the shares included herein) to implement our business plan over the next 24 months. The funds raised in this offering, even assuming we sell all the shares offered, will be insufficient to develop a diversified energy business.

### SUMMARY OF OUR FINANCIAL INFORMATION

The following table sets forth selected financial information, which should be read in conjunction with the information set forth in the "Management's Discussion and Analysis of Financial Position and Results of Operations" section and the accompanying financial statements and related notes included elsewhere in this prospectus.

| | Summary Statement of Operations For The Period From Inception On (August 5, 2011) Through August 31, 2011 |
|---|---|
| Revenues | $ 17,000 |
| Cost of goods sold | $ 15,000 |
| Expenses | $ 1,080 |
| Net Profit (Loss) | $ 550 |
| Net Profit (Loss) per share | $ 0.00 |

**Summary Balance Sheet**
**As of August 31, 2011**

| | |
|---|---|
| Cash and cash equivalents | $ 78,989 |
| Total assets | $ 110,989 |
| Total liabilities | $ 100,439 |

As indicated in the financial statements accompanying this prospectus, our revenue to date is $17,000 and we have incurred limited profits since inception. We have had early-stage operations and have been issued a "going concern" opinion by our auditor, based upon our reliance on the sale of our common stock as the sole source of funds for our future operations.

-4-

APP. 000749

**RISK FACTORS**

Please consider the following risk factors and other information in this prospectus relating to our business and prospects before deciding to invest in our common stock.

This offering and any investment in our common stock involves a high degree of risk. You should carefully consider the risks described below and all of the information contained in this prospectus before deciding whether to purchase our common stock. If any of the following risks actually occur, our business, financial condition and results of operations could be harmed. The trading price of our common stock could decline due to any of these risks, and you may lose all or part of your investment.

We consider the following to be the material risks for an investor regarding this offering. Our company should be viewed as a high-risk investment and speculative in nature. An investment in our common stock may result in a complete loss of the invested amount. Please consider the following risk factors before deciding to invest in our common stock.

Risks related to Our Business

*We Are An Early Stage Company, Our Business Is Evolving And Our Business Prospects Are Difficult To Evaluate.*

We are an early stage company with very limited operating history. We have a limited operating history that you can rely on in connection with an investment decision. Our prospects must be carefully considered in light of our history, our high capital costs, our exposure to operating losses and the other risks, uncertainties and difficulties that are typically encountered by companies that are implementing new business models. Some of the principal risks and difficulties we expect to encounter include our ability to:

- Raise substantial capital to finance our planned expansion, together with the losses we may incur in our early stage of development;

- Develop new products at the cost and on the time-table we project. We may encounter unexpected technical and legal challenges that may delay our implementation time line and/or increase our costs;

- Develop, implement and maintain systems to ensure compliance with a variety of governmental and quasi-governmental rules, regulations and policies;

- Adapt and successfully execute our rapidly evolving and inherently unpredictable business plan and respond to competitive developments and changing market conditions;

- Attract, retain and motivate qualified personnel; and

Because of our lack of operating history and our early stage of development, we have limited insight into trends and conditions that may exist or might emerge and affect our business. There is no assurance that our business strategy will be successful or that we can or will successfully address these risks.

*We May Need To Raise Additional Capital To Continue Our Business Operations In Addition To The Funds We Hope To Raise Through This Offering.*

We believe that we may need to raise additional capital in the future in addition to the $75,000 we hope to raise through this offering. We believe that the proceeds from this offering in addition to our existing cash on hand will satisfy our cash requirements for up to 24 months. If we are unable to raise additional monies, we only have enough capital to cover the costs of this offering and to begin implementing the business and marketing plan. The expenses of this offering include the preparation of this prospectus, the filing of this registration statement and transfer agent fees. As of August 31, 2011, we had $78,989 cash on hand. If we are unable to raise additional monies, we only have enough capital to cover the costs of this offering and to begin implementing the business and marketing plan. Additionally, if we fail to significantly grow our operations in the future, additional financing may be required. If we are unable to obtain additional financing, our future growth, if any, could be impaired. If we fail to raise additional funding in the future, we may not have enough money to pay our legal and accounting expenses and we could be forced to curtail or abandon our business plan, causing any investment in us to become worthless. Additionally, even if we do raise additional funding, there can be no assurance that additional capital from outside sources will be available for our marketing and future growth, if any, or if such financing is available, that it will not involve issuing securities senior to our common stock or equity financings which are dilutive to holders of our common stock. In addition, in the event we do not raise additional capital, we may be limited in our ability to grow our Company.

-5-

APP. 000750

*The Repayment Of Our $100,000 Notes Payable Is Secured By A Security Interest In Substantially All Of Our Assets.*

On or around August 22, 2011, Kylemore Corp., loaned us $100,000 which was evidenced by a Promissory Note. The note is due on August 21, 2013 and accrues interest at the rate of 15% per annum. In the event an event of default occurs under the note the interest rate increases to 25% per annum (subject to applicable law). The note is secured by a security interest in substantially all of our assets and we do not currently have sufficient funds to repay the note. If we default on the repayment of the note, the holder thereof may enforce its security interest over the assets of the Company, which if enforced could leave us without any assets, and as a result, we could be forced to curtail or abandon our current business plans and operations. If that were to happen, any investment in the Company could become worthless.

*We Do Not Know The Exact Development And Operating Costs Of Our Potential Additional Product Lines.*

We only have one product line and have not developed additional product lines and therefore, we do not know the exact costs involved with the organic development and operation of the products in which we intend to pursue. These products include, but are not limited to, equipment used for oil and gas exploration, production, transportation, and refining. In the case of higher than expected costs to acquire and/or develop these products, we may not be able to operate profitably in the market place. If we are unable to successfully build profitable product lines, we will have to cease our operations, which may result in the complete loss of your investment.

*Our Lack Of An Operating History Gives No Assurance That Our Future Operations Will Result In Profitable Revenues, Which Could Result In The Suspension Or End Of Our Operations.*

We were incorporated on August 5, 2011, and although we have realized operating revenues to date, we have very little operating history upon which an evaluation of our future success or failure can be made. Our ability to achieve and maintain profitability and positive cash flow is dependent upon the completion of this offering and our ability to generate revenues in excess of our expenses.

Based upon current plans, we expect to incur operating losses in future periods because we will likely incur expenses that exceed our revenues. We cannot guarantee that we will be successful in generating a profit in the future. Failure to generate a profit may cause us to go out of business.

*We Are A New Company With A Limited Operating History And We Face A High Risk Of Business Failure Which Would Result In The Loss Of Your Investment.*

We are an early stage company formed recently to carry out the activities described in this prospectus and thus have only a limited operating history upon which an evaluation of its prospectus can be made. We were incorporated on August 5, 2011, and to date have been involved primarily in the development of our business plan and early-stage operations. Because we have a limited operating history there is little internal or industry-based historical financial data upon which to estimate our planned operating expenses.

-6-

APP. 000751

We expect that our results of operations may also fluctuate significantly in the future as a result of a variety of market factors including, among others, the entry of new competitors; the availability of motivated and qualified personnel; the initiation, renewal or expiration of our customer base; pricing changes by the Company or its competitors, specific economic conditions in the energy markets and general economic conditions. Accordingly, our future sales and operating results are difficult to forecast.

*Adverse Developments In The Global Economy Restricting The Credit Markets May Materially And Negatively Impact Our Business.*

The recent downturn in the world's major economies and the constraints in the credit markets have heightened or could continue to heighten a number of material risks to our business, cash flows and financial condition, as well as our future prospects. Continued issues involving liquidity and capital adequacy affecting lenders could affect our ability to access credit facilities or obtain debt financing and could affect the ability of lenders to meet their funding requirements when we need to borrow. Further, in the uncertain event that a public market for our stock develops, the volatility in the equity markets may make it difficult in the future for us to access the equity markets for additional capital at attractive prices, if at all. The current credit crisis in other countries, for example, and concerns over debt levels of certain other European Union member states, has increased volatility in global credit and equity markets. If we are unable to obtain credit or access capital markets, our business could be negatively impacted. For example, we may be unable to raise all or a portion the $500,000 that we estimate we will require to execute Phases I and II of our business plan (including the $75,000 we hope to raise in this offering).

*Because We Are Small And Do Not Have Much Capital, We Must Limit Our Marketing Activities. As A Result, Our Sales May Not Be Enough To Operate Profitably. If We Do Not Make A Profit, We May Have To Suspend Or Cease Operations.*

Due to the fact we are small and do not have much capital, we must limit our marketing activities to potential customers having the likelihood of purchasing our products. We intend to increase our sales efforts to increase revenues from the sale of our inventory of PDC cutters. Because we will be limiting the scope of our marketing activities to regional PDC drill bit manufacturers, we may not be able to generate enough sales to operate profitably. If we cannot operate profitably, we may have to suspend or cease operations.

*We Have Been Focused On The Development Of Our PDC Cutter Distribution Business Segment, And As Such, Have Not Commenced Operations Or Generated Revenues From Other Product Lines. Investing In The Company Before It Has Diversified Product Lines Involves Substantial Risk To Any Investor.*

An investment in our Company is characterized by a high degree of risk. Investors should take caution when considering our revenue, minimal earnings, and lengthy development cycle. Our current operations reside entirely in the wholesale distribution of PDC cutters, a primary component used in oil and gas drill bits. We intend to diversify our product lines to provide more stability to our operations. Although we believe that future capital investments in other product lines will ultimately generate additional revenues and earnings for the Company, there can be no assurance that we will be able to effectively acquire or develop these products or that they will be profitable.

There is no assurance that investments in other product lines will be beneficial to us in the future. In order for us to benefit from our investments, product lines in which we invest must generate revenues and earnings. The success of these investments depends on the ability of management to successfully develop, market, and sell new products; and generate revenues and earnings therefrom. The inability of new products in which we invest to generate net income may adversely affect our financial performance and stock price.

-7-

APP. 000752

*We Have Limited Assets That May Be Used To Develop Execute Our Business Plan. Our Lack Of Assets May Have An Adverse Impact On Our Ability To Grow Our Business And Generate Revenues And Earnings.*

We have limited financial and operational assets as well as limited long-term assets such as property, facilities and equipment to fully develop our business plan. We will need to raise additional capital to provide for a facility, purchase equipment and inventory, and fund the labor required to appropriately develop new product lines. Our lack of financial and operational assets may impair our ability to generate future revenues and earnings which may result in a loss of your investment.

*We May Incur Substantial Losses In The Future As We Expand Our Operations And Invest In The Development Of New Product Lines.*

We will incur costs related to investing or developing new product lines. When developing new products organically, it is likely that we will incur costs for a prolonged period prior to generating revenues, if any. The foregoing costs and expenses will likely give rise to substantial near-term operating losses and may prevent the Company from achieving profitability for an extended period of time. We expect to rely on equity and debt financing to fund potential operating losses and other cash requirements until we are able to generate larger profits from operations. We may experience negative cash flow, which will hamper current operations and prevent the Company from expanding. We may be unable to attain, sustain or increase profitability on a quarterly or annual basis in the future, which could require us to scale back or terminate our operations.

*Introducing New Product Lines Is Time Consuming And Expensive And May Not Ultimately Result In An Operating Profit.*

The cost associated with the introduction of new product lines can be very high and new product lines often generate substantial losses for an extended period of time before making a meaningful contribution to administrative overhead. There is no assurance that any potential products from which we may generate revenue will be successfully developed, or that our marketing activities will be successful or profitable. Even if we are ultimately successful, delays, additional expenses and other factors may significantly impair our potential profitability and there is no assurance that the Company will ever generate an operating profit.

*We Will Be A Small Player In An Intensely Competitive Industry And May Be Unable To Compete.*

The oilfield equipment distribution industry in the United States is large and intensely competitive. Although we operate in a niche market with very esoteric components, many of our competitors have substantially more financial and operational resources than us. As a result of this competition, our efforts to commercialize any products under development in the future may be preempted, rendered obsolete, or priced out of the market by our competitors. Competition in oil and gas exploration and production, conventional power generation, and alternative power generation is also robust and there are substantial barriers to entry. Some of the barriers to entry include capital requirements, operational staff, technical expertise, and access to high quality assets.

-8-

APP. 000753

*Oil And Gas Equipment And Other Products That We May Develop And/Or Distribute May Be Subject To Certification And Approval From Regulatory Agencies.*

Products that we may distribute may be subject to oversight and/or approval from certain regulatory agencies including the International Organization for Standardization (ISO), American Petroleum Institute (API), Environmental Protection Agency (EPA), and the Texas Railroad Commission. Should we fail to meet regulatory standards and attain such approvals our ability to operate may be impaired. Attainment of permits and certifications can be costly and may lead to substantially longer development timelines. Should we fail to attain regulatory certifications, our financial and operational performance could be adversely affected and you could lose your investment.

*If The Company Is Dissolved, It Is Unlikely That There Will Be Sufficient Assets Remaining To Distribute To Our Shareholders.*

In the event of the dissolution of the Company, the proceeds realized from the liquidation of our assets, if any, will be used primarily to pay the claims of our creditors, if any, before there can be any distribution to the shareholders. In that case, the ability of equity investors to recover all or any portion of their investment will depend on the amount of funds realized and the claims to be satisfied therefrom.

*If We Are Forced To Incur Unanticipated Costs Or Expenses, We May Have To Suspend Or Cease Our Activities Entirely Which Could Result In A Total Loss Of Your Investment.*

Because we are a small business, with limited assets, we are not in a position to bear unanticipated costs and expenses. If we have to make changes in our structure or are faced with circumstances that are beyond our ability to afford, we may have to suspend or cease our activities entirely which could result in a total loss of your investment.

*Key Management Personnel May Leave The Company Which Could Adversely Affect The Ability Of The Company To Continue Its Development.*

Because we are almost entirely dependent on the efforts of our sole officer and director, Charles Grob, his departure or the loss of other key personnel in the future, could have a material adverse effect on our business. We do not maintain key man life insurance on any of our officers or directors.

*Because Our Current Sole Officer And Director Does Not Have Significant Experience In Operating An Energy Equipment Company, Our Business Has A Higher Risk Of Failure.*

Although our Chief Executive Officer and Director has extensive academic business knowledge, he does not have experience in developing an energy equipment company. Therefore, without this experience, our management's business experience may not be enough to effectively develop and maintain our company. As a result, the implementation of our business plan may be delayed, or eventually, unsuccessful.

*Our Sole Officer And Director May Face Conflicts Of Interest Associated With His Commitment To The Company And His Other Activities Outside Of The Company.*

As of the date of this prospectus, we have no employees, other than Mr. Grob, our founder, Chief Executive Officer and sole director, who currently devotes 10 to 25 hours per week to our business as required from time to time without compensation. We have not entered into any formal agreement with Mr. Grob regarding the provision of his services to the Company. Mr. Grob is not obligated to commit his full time and attention to our business and accordingly, he may encounter a conflict of interest in allocating his time between our operations and those of other businesses. Although Mr. Grob is presently able to devote 10 to 25 hours per week to our business, this may change. Also, if we require Mr. Grob to devote more than 10 to 25 hours per week to our business on a regular basis for an extended period, it is uncertain that he will be able to satisfy our requirements unless we have sufficient resources to compensate him for any lost income from his private business.  Due to the above, Mr. Grob may face a conflict of interest between the Company and his other business interests.

-9-

APP. 000754

*Since Our Sole Officer And Director Currently Owns 100% Of The Outstanding Shares of Common Stock, And Controls The Company, Investors May Find That His Decisions Are Contrary To Their Interests And You Should Not Purchase Shares Unless You Are Willing To Entrust All Aspects Of Management To Our Sole Officer And Director, Or His Successors.*

Our sole officer and director, Charles Grob, owns 10,000,000 shares of common stock representing 100% of our outstanding stock. Mr. Grob will continue to own 10,000,000 shares of our common stock after this offering is completed representing 66% of our outstanding shares, assuming all securities offered herein are sold. As a result, he will have control of us even if the full offering is subscribed and will be able to choose all of our directors. His interests may differ from the interests of other stockholders. Factors that could cause his interests to differ from the other stockholders include the impact of corporate transactions on the timing of business operations and his ability to continue to manage the business given the amount of time he is able to devote to us.

All decisions regarding the management of our affairs will be made exclusively by him along with the outcome of all corporate transactions and other matters, including the election of Directors, mergers, consolidations, the sale of all or substantially all of our assets, and he will also have the power to prevent or cause a change in control. Purchasers of the offered shares may not participate in our management and, therefore, are dependent upon his management abilities. The only assurance that our shareholders, including purchasers of the offered shares, have that our sole officer and director will not abuse his discretion in executing our business affairs, is his fiduciary obligation and business integrity. Such discretionary powers include, but are not limited to, decisions regarding all aspects of business operations, corporate transactions and financing. Mr. Grob also has the ability to accomplish or ratify actions at the shareholder level which would otherwise implicate his fiduciary duties if done as one of the members of our board of directors.

Accordingly, no person should purchase the offered shares unless willing to entrust all aspects of management to the sole officer and director, or his successors. Potential purchasers of the offered shares must carefully evaluate the personal experience and business performance of our management.

*Because We Only Have One Supplier Of Our PDC Cutters, We Have A Concentration In Our Supply Chain. In The Event That We Are Not Able To Continue To Purchase Inventory From Our Supplier With Favorable Prices And Terms, It Could Adversely Affect Our Operations And Your Investment.*

In the event that our sole supplier increases prices, presents unfavorable trade terms, experiences problems with quality control, becomes insolvent, or simply decides to no longer sell its products to us, our financial and operational results will be materially, adversely affected. As a result, this could cause you to lose a portion or all of your investment in our business.

*Because We Only Have One Purchaser Of Our PDC Cutters, We Have A Concentration In Our Distribution Chain. In The Event That We Are Not Able To Continue To Make Sales To Our One Customer It Could Adversely Affect Our Operations And Your Investment.*

In the event that our sole customer decides not to purchase our products, determines that they are not willing to pay the previous prices they have historically paid for our products or ceases to purchase our products for any reason, our financial and operational results will be materially, adversely affected. As a result, this could cause you to lose a portion or all of your investment in our business.

-10-

APP. 000755

*We May Be Unable To Collect Our Accounts Receivable.*

For the period from August 5, 2011 (inception) through August 31, 2011, the Company recorded one sale in the amount of $17,000 of which $8,500 remains uncollected as of the date of this filing. In the event the Company is unable to collect the amount currently due or on amounts due in the future, it could have a material adverse effect on the Company's operations and/or force the Company to curtail its planned business operations.

*A Significant Or Prolonged Economic Downturn Could Have A Material Adverse Effect On Our Results Of Operations.*

Our results of operations will be affected by the level of business activity of our customers and future customers, which in turn will be affected by the level of economic activity in the customer segments, industries and markets that they serve. A decline in the level of business activity of our customers could have a material adverse effect on our revenues and profit margin. Future economic conditions could cause customers to reduce or defer their expenditures for our products, which could cause a material adverse effect on our revenues and results of operations.

*A Reduction In Spending Due To The Economic Downturn Could Result In A Decrease In Demand For Our Products.*

If spending on capital expenditures in the oil and gas industry decreases, the demand for products like those provided by us would likely decline. This decrease could reduce our opportunity for growth, increase our marketing and sales costs, and reduce the prices we can charge for products, which could reduce our revenue and operating results, if any.

*We Face Corporate Governance Risks And Negative Perceptions Of Investors Associated With The Fact That We Currently Have Only One Officer And Director.*

Charles Grob is our sole officer and director. As such, he has significant control over our business direction. Additionally, as he is our only director, there are no other members of the Board of Directors available to second and/or approve related party transactions involving Mr. Grob, including the compensation Mr. Grob may be paid and the employment agreements we may enter into with Mr. Grob. Additionally, there is no segregation of duties between officers because Mr. Grob is our sole officer, and as such, he is solely responsible for the oversight of our accounting functions. Therefore, investors may perceive that because no other directors are approving related party transactions involving Mr. Grob and no other officers are approving our financial statements that such transactions are not fair to the Company and/or that such financial statements may contain errors. The price of our common stock may be adversely affected and/or devalued compared to similarly sized companies with multiple officers and directors due to the investing public's perception of limitations facing our company due to the fact that we only have one officer and director.

*If We Are Unable To Adequately Protect Our Intellectual Property Rights Our Business Is Likely To Be Adversely Affected.*

We plan to rely on a combination of patents, trademarks, non-disclosure agreements and other security measures to establish and protect our proprietary rights. The measures we have taken or may take in the future may not prevent misappropriation of our proprietary information or prevent others from independently developing similar products or services, designing around our proprietary or patented technology or duplicating our products or services.

-11-

APP. 000756

Risks Related To Our Industry

*Volatility Or Decline In Oil And Natural Gas Prices May Result In Reduced Demand For Our Products And Services Which May Adversely Affect Our Business, Financial Condition And Results Of Operation.*

The markets for oil and natural gas have historically been extremely volatile. We anticipate that these markets will continue to be volatile in the future. Although oil and gas prices have increased significantly in recent years, there can be no guarantees that these prices will remain at current levels. Such volatility in oil and gas prices, or the perception by our customers of unpredictability in oil and natural gas prices, affects the spending patterns in our industry. The demand for our products and services is, in large part, driven by current and anticipated oil and gas prices and the related general levels of production spending and drilling activity. In particular, volatility or a decline in oil and gas prices may cause a decline in exploration and drilling activities. This, in turn, could result in lower demand for our products and services and may cause lower prices for our products and services. As a result, volatility or a prolonged decline in oil or natural gas prices may adversely affect our business, financial condition and results of operations.

*Competition From New And Existing Competitors Within Our Industry Could Have An Adverse Effect On Our Results Of Operations.*

The oil and gas industry is highly competitive and fragmented. Our principal competitors include companies capable of competing effectively in our markets on a local basis as well as a number of large companies that possess substantially greater financial and other resources than we do. Furthermore, we face competition from companies working to develop oil and gas products which would compete with us. Additionally, our larger competitors may be able to devote greater resources to developing, promoting and selling their products and services. We may also face increased competition due to the entry of new competitors. As a result of this competition, we may experience lower sales if our prices are undercut or advanced technology is brought to market, which would likely have an adverse effect on our results of operations and force us to curtail or abandon our current business plan.

*Our Results Of Operations May Be Negatively Affected By Sustained Downturns Or Sluggishness In The Economy, Including Reductions In Demand Or Low Levels In The Market Prices Of Commodities, All Of Which Are Beyond Our Control.*

Sustained downturns in the economy generally affect the markets in which we operate and negatively influence our operations. Declines in demand for oil and gas as a result of economic downturns may reduce our cash flows, especially if our customers reduce exploration and production activities and, therefore, use of our products.

Lower demand for oil and gas and lower prices for oil and gas result from multiple factors that affect the markets which consume our products and services:

•    supply of and demand for energy commodities, including any decreases in the production of oil and gas which could negatively affect the demand for oil and gas in general, and as a result the need for our products;

•    general economic conditions, including downturns in the United States, Canada or other economies which affect energy consumption particularly in which sales to industrial or large commercial customers which could negatively affect the demand for oil and gas in general, and as a result the need for our products;  and

•    federal, state and foreign energy and environmental regulations and legislation, which could make oil and gas exploration more costly, which could in turn drive down demand for oil and gas, and which could in turn reduce the demand for our products and cause our revenues to decrease.

-12-

APP. 000757

*The Long-Term Financial Condition Of Our Businesses Is Dependent On The Continued Availability Of Oil And Gas Reserves.*

Our business is dependent upon the continued availability of oil production and reserves.  Low prices for oil and gas, regulatory limitations, or the lack of available capital for these projects could adversely affect the development of additional reserves and production, and, therefore, demand for our products and services.

Risks Related to Our Financial Condition

*There Is Substantial Uncertainty About Our Ability To Continue As A Going Concern.*

In their audit report, our auditors have expressed an opinion that substantial doubt exists as to whether we can continue as an ongoing business. Although we have revenues, we have had limited profits and continue to require substantial capital to develop our business. Because our activities have been financed with a loan from a single investor, we have a concentration of sources of funding. Failure to receive future capital from this investor, or to replace that funding with new investment capital, may require us to suspend or cease our activities altogether which could result in the loss of your investment.

*We Have Significant Weaknesses In Our System Of Internal Controls That Could Subject Us To Regulatory Scrutiny Or Impair Investor Confidence, Which Could Adversely Affect Our Business.*

Section 404 of the Sarbanes-Oxley Act of 2002 requires companies to perform a comprehensive evaluation of their internal controls. At present, our system of internal controls does not satisfy all applicable regulatory requirements. Future efforts to bring our system of internal controls into compliance with Section 404 and related regulations will likely require the commitment of significant financial and managerial resources. If we fail in that effort, we could be subject to regulatory scrutiny or suffer a loss of investor confidence, which could adversely affect our business.

Risks Related to This Offering

*Because There Is No Public Trading Market For Our Common Stock, You May Not Be Able To Resell Your Stock.*

We intend to apply to have our common stock quoted on the OTC markets. This process takes some time and the application must be made on our behalf by a market maker. Our stock may be quoted or traded only to the extent that there is interest by broker-dealers in acting as a market maker. Despite our best efforts, we may not be able to convince any broker/dealers to act as market-makers and make quotations on the OTC Bulletin Board or OTCQB market.

If our common stock becomes quoted and a market for the stock develops, the actual price of our shares will be determined by prevailing market prices at the time of the sale.

We cannot assure you that there will be a market in the future for our common stock. The trading of securities on the OTC markets is often sporadic and investors may have difficulty buying and selling our shares or obtaining market quotations for them, which may have a negative effect on the market price of our common stock. You may not be able to sell your shares at their purchase price or at any price at all. Accordingly, you may have difficulty reselling any shares you purchase from the selling security holders.

*Investing In Our Company Is Highly Speculative And Could Result In The Entire Loss Of Your Investment.*

Purchasing the offered shares is highly speculative and involves significant risk. The offered shares should not be purchased by any person who cannot afford to lose their entire investment. Our business objectives are also speculative, and it is possible that we would be unable to accomplish them. Our shareholders may be unable to realize a substantial or any return on their purchase of the offered shares and may lose their entire investment. For this reason, each prospective purchaser of the offered shares should read this prospectus and all of its exhibits carefully and consult with their attorney, business and/or investment advisor.

-13-

*Investing In Our Company May Result In An Immediate Loss Because Buyers Will Pay More For Our Common Stock Than The Pro Rata Portion Of The Assets Are Worth.*

We have only been recently formed and have only a limited operating history, therefore, the price of the offered shares is not based on any data. The offering price and other terms and conditions regarding our shares have been arbitrarily determined and do not bear any relationship to assets, earnings, book value or any other objective criteria of value. No investment banker, appraiser or other independent third party has been consulted concerning the offering price for the shares or the fairness of the offering price used for the shares. Our net tangible book value per share of common stock is $0.001 as of August 31, 2011, our most recent financial statement date.

The arbitrary offering price of $0.015 per common share as determined herein is substantially higher than the net tangible book value per share of our common stock. Our assets do not substantiate a share price of $0.015. This premium in share price applies to the terms of this offering. The offering price will not change for the duration of the offering even if we obtain a listing on any exchange or become quoted on the OTC Bulletin Board or OTCQB market.

*We May Issue Additional Shares Of Common Stock Or Derivative Securities That Will Dilute The Percentage Ownership Interest Of Our Existing Shareholders And May Dilute The Book Value Per Share Of Our Common Stock And Adversely Affect The Terms On Which The Company May Obtain Additional Capital.*

Our authorized capital consists of 100,000,000 shares of common stock. The Board of Directors has the authority, without action by or vote of our shareholders, to issue all or part of the authorized shares of common and preferred stock for any corporate purpose, including for the conversion or retirement of debt. We are likely to seek additional equity capital in the future as we develop our business and expand our operations. Any issuance of additional shares of common stock or derivative securities, such as convertible promissory notes, will dilute the percentage ownership interest of our shareholders and may dilute the book value per share of our common stock. Additionally, the exercise or conversion of derivative securities could adversely affect the terms on which the Company can obtain additional capital. Holders of derivative securities are most likely to voluntarily exercise or convert their derivative securities when the exercise or conversion price is less than the market price for the underlying common stock. Holders of derivative securities will have the opportunity to profit from any rise in the market value of our common stock or any increase in our net worth without assuming the risks of ownership of the underlying shares of our common stock. It is possible that, due to additional share issuance, you could lose a substantial amount, or all, of your investment.

Our Board of Directors may attempt to use non-cash consideration to satisfy obligations, which would likely consist of restricted shares of our common stock. Our Board of Directors has authority, without action or vote of the shareholders, to issue all or part of the authorized but unissued shares of common stock. In addition, if a trading market develops for our common stock, we may attempt to raise capital by selling shares of our common stock, possibly at a discount to market. These actions will result in dilution of the ownership interests of existing shareholders, may further dilute common stock book value, and that dilution may be material. Such issuances may also serve to enhance existing management's ability to maintain control of the Company because the shares may be issued to parties or entities committed to supporting existing management.

-14-

*As We Do Not Have An Escrow Or Trust Account With Subscriptions For Investors, If We File For Or Are Forced Into Bankruptcy Protection, Investors Will Lose The Entire Investment.*

Invested funds for this offering will not be placed in an escrow or trust account and if we file for bankruptcy protection or a petition for involuntary bankruptcy is filed by creditors against us, your funds will become part of the bankruptcy estate and administered according to the bankruptcy laws. As such, you will lose your investment and your funds will be used to pay creditors.

*We Do Not Anticipate Paying Dividends In The Foreseeable Future, So There Will Be Less Ways In Which You Can Make A Gain On Any Investment In Us.*

We have never paid dividends and do not intend to pay any dividends for the foreseeable future. To the extent that we may require additional funding currently not provided for in our financing plan, our funding sources may prohibit the declaration of dividends. Because we do not intend to pay dividends, any gain on your investment will need to result from an appreciation in the price of our common stock. There will therefore be fewer ways in which you are able to make a gain on your investment.

*In The Event That Our Shares Are Traded, They May Trade Under $5.00 Per Share And Thus Will Be A Penny Stock. Trading In Penny Stocks Has Many Restrictions And These Restrictions Could Severely Affect The Price And Liquidity Of Our Shares.*

In the event that our shares are traded, and our stock trades below $5.00 per share, our stock would be known as a "penny stock", which is subject to various regulations involving disclosures to be given to you prior to the purchase of any penny stock. The U.S. Securities and Exchange Commission (the "SEC") has adopted regulations which generally define a "penny stock" to be any equity security that has a market price of less than $5.00 per share, subject to certain exceptions. Depending on market fluctuations, our common stock could be considered to be a "penny stock". A penny stock is subject to rules that impose additional sales practice requirements on broker/dealers who sell these securities to persons other than established customers and accredited investors. For transactions covered by these rules, the broker/dealer must make a special suitability determination for the purchase of these securities. In addition, he must receive the purchaser's written consent to the transaction prior to the purchase. He must also provide certain written disclosures to the purchaser. Consequently, the "penny stock" rules may restrict the ability of broker/dealers to sell our securities, and may negatively affect the ability of holders of shares of our common stock to resell them. These disclosures require you to acknowledge that you understand the risks associated with buying penny stocks and that you can absorb the loss of your entire investment. Penny stocks are low priced securities that do not have a very high trading volume. Consequently, the price of the stock is often volatile and you may not be able to buy or sell the stock when you want to.

*Financial Industry Regulatory Authority ("FINRA") Sales Practice Requirements May Also Limit Your Ability To Buy And Sell Our Common Stock, Which Could Depress The Price Of Our Shares.*

FINRA rules require broker-dealers to have reasonable grounds for believing that an investment is suitable for a customer before recommending that investment to the customer. Prior to recommending speculative low-priced securities to their non-institutional customers, broker-dealers must make reasonable efforts to obtain information about the customer's financial status, tax status and investment objectives, among other things. Under interpretations of these rules, FINRA believes that there is a high probability such speculative low-priced securities will not be suitable for at least some customers. Thus, FINRA requirements make it more difficult for broker-dealers to recommend that their customers buy our common stock, which may limit your ability to buy and sell our shares, have an adverse effect on the market for our shares, and thereby depress our share price.

-15-

APP. 000760

*You May Face Significant Restrictions On The Resale Of Your Shares Due To State "Blue Sky" Laws.*

Each state has its own securities laws, often called "blue sky" laws, which (1) limit sales of securities to a state's residents unless the securities are registered in that state or qualify for an exemption from registration, and (2) govern the reporting requirements for broker-dealers doing business directly or indirectly in the state. Before a security is sold in a state, there must be a registration in place to cover the transaction, or it must be exempt from registration. The applicable broker-dealer must also be registered in that state.

We do not know whether our securities will be registered or exempt from registration under the laws of any state. A determination regarding registration will be made by those broker-dealers, if any, who agree to serve as market makers for our common stock. We have not yet applied to have our securities registered in any state and will not do so until we receive expressions of interest from investors resident in specific states after they have viewed this prospectus. We will initially focus our offering in the state of Texas and will rely on exemptions found in the Texas Securities Act. There may be significant state blue sky law restrictions on the ability of investors to sell, and on purchasers to buy, our securities. You should therefore consider the resale market for our common stock to be limited, as you may be unable to resell your shares without the significant expense of state registration or qualification.

*We Will Incur Significant Increased Costs As A Result Of Operating As A Fully Reporting Company As Well As In Connection With Section 404 Of The Sarbanes Oxley Act.*

We will incur legal, accounting and other expenses in connection with our future status as a fully reporting public company. The Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") and rules subsequently implemented by the SEC have imposed various requirements on public companies, including requiring changes in corporate governance practices. As such, our management and other personnel will need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations will increase our legal and financial compliance costs and make some activities more time-consuming and costly. The Sarbanes-Oxley Act requires, among other things, that we maintain effective internal controls for financial reporting and disclosure of controls and procedures. In particular, we must perform system and process evaluation and testing of our internal controls over financial reporting to allow management to report on the effectiveness of our internal controls over financial reporting. Our testing may reveal deficiencies in our internal controls over financial reporting that are deemed to be material weaknesses. Our compliance with Section 404 and our future status as a publicly reporting company will require that we incur substantial accounting, legal and filing expenses and expend significant management efforts. We currently do not have an internal audit group, and we may need to hire additional accounting and financial staff with appropriate public company experience and technical accounting knowledge. Moreover, if we are not able to comply with the requirements of Section 404 in a timely manner, the market price of our stock, if any, could decline, and we could be subject to sanctions or investigations by the SEC or other regulatory authorities, which would require additional financial and management resources.

*If Our Common Stock Is Not Approved For Quotation On The Over-The-Counter Bulletin Board or OTCQB Market, Our Common Stock May Not Be Publicly-Traded, Which Could Make It Difficult To Sell Shares Of Our Common Stock And/Or Cause The Value Of Our Common Stock To Decline In Value.*

In order to have our common stock quoted on the Over-The-Counter Bulletin Board ("OTCBB") or OTCQB market, which is our current plan, we will need to first have our Registration Statement, of which this prospectus is apart, declared effective by the SEC; then engage a market maker, who will file a Form 15c2-11 with FINRA; and clear FINRA comments to obtain a trading symbol. Assuming we clear SEC comments and assuming we clear FINRA comments, we anticipate receiving a trading symbol and having our shares of common stock quoted on the OTCBB in approximately one (1) to two (2) months after the effectiveness of our Registration Statement. In the event we are unable to have our Registration Statement declared effective by the SEC or our Form 15c2-11 is not approved by FINRA for the OTCBB, we plan to file a 15c2-11 to quote our shares of common stock on the OTC Pink Sheets. If we are not cleared to have our securities quoted on the OTCBB, OTCQB and/or in the event we fail to obtain effectiveness of our Registration Statement, and are not cleared for trading on the OTC Pink Sheets, there will be no public market for our common stock and it could be difficult for our then shareholders to sell shares of common stock which they own. As a result, the value of our common stock will likely be less than it would otherwise due to the difficulty shareholders will have in selling their shares. If we are unable to obtain clearance to quote our securities on the OTCBB, OTCQB and/or the Pink Sheets, it will be difficult for us to raise capital and we could be forced to curtail or abandon our business operations, and as a result, the value of our common stock could become worthless.

-16-

APP. 000761

## DIVIDEND POLICY

To date, we have not declared or paid any dividends on our outstanding shares. We currently do not anticipate paying any cash dividends in the foreseeable future on our common stock. Although we intend to retain our earnings to finance our operations and future growth, our Board of Directors will have discretion to declare and pay dividends in the future. Payment of dividends in the future will depend upon our earnings, capital requirements and other factors, which our Board of Directors may deem relevant.

## USE OF PROCEEDS

Our offering is being made on a self-underwritten basis: no minimum number of shares must be sold in order for the offering to proceed. The offering price per share is $0.015. The following table sets forth the uses of proceeds assuming the sale of 25%, 50%, 75% and 100%, respectively, of the securities offered for sale by us.

| | IF 25% OF SHARES (1,250,000 SHARES) ARE SOLD | IF 50% OF SHARES (2,500,000 SHARES) ARE SOLD | IF 75% OF SHARES (3,750,000 SHARES) ARE SOLD | IF 100% OF SHARES (5,000,000 SHARES) ARE SOLD |
|---|---|---|---|---|
| GROSS PROCEEDS FROM THIS OFFERING | $  18,750 | $  37,500 | $  56,250 | $  75,000 |
| OFFERING EXPENSES | | | | |
| Accounting fees | 4,000 | 4,000 | 4,000 | 4,000 |
| Legal fees | 5,000 | 5,000 | 5,000 | 5,000 |
| Printing | 500 | 500 | 500 | 500 |
| Transfer Agent | 1,500 | 1,500 | 1,500 | 1,500 |
| TOTAL OPERATING EXPENSES EXPECTED | 11,000 | 11,000 | 11,000 | 11,000 |
| BUSINESS DEVELOPMENT | 750 | 19,500 | 38,250 | 57,000 |
| MARKETING | 4,000 | 4,000 | 4,000 | 4,000 |
| ADMINISTRATION EXPENSES | 3,000 | 3,000 | 3,000 | 3,000 |
| TOTAL EXPECTED | $  18,750 | $  37,500 | $  56,250 | $  75,000 |

The use of proceeds from this offering is anticipated to be utilized as follows:

Offering Expenses

The accounting, legal, printing (Edgarizing) and Transfer Agent fees are the estimated costs associated with conducting this offering.

-17-

APP. 000762

Business Development

We intend to conduct an investigation to identify potential development opportunities that have the potential to add the most value to our shareholders. The level of effort in this investigation increases as the offering proceeds increase. For proceeds raised up to 50% of the total offering amount, we would focus on developing our PDC distribution segment. If we raise more than 50% of the total offering amount, we would begin preliminary investigations into other additional product lines.

Initially, new products will include various sizes of PDC cutters. Currently we are supplying 19 millimeter (mm) cutters. We plan to offer 13mm and 16mm cutters within the next six months. In addition to PDC cutters, we will be identifying other potentially profitable business segments related to oilfield equipment in which we can invest. We currently do not have definitive product lines that we wish to pursue; however, we do intend to create a business with diversified lines to spread operational risk inherent with selling only one product.

Marketing

Our marketing will include contacting PDC drill bit manufacturers that require PDC cutters as a primary component for fabricating a PDC drill bit.

Administration

Administration expenses include costs associated with activities to obtain additional financing as discussed in the "Plan of Operations" in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section elsewhere in this prospectus. Administration expenses also include the legal, accounting and edgarizing expenses associated with the continuing disclosure and filing requirements as required by the SEC. The SEC disclosure requirements are our highest priority.

---------------------------

We believe that the maximum proceeds from this offering (i.e., $75,000) in addition to our cash on hand will satisfy our basic, subsistence level, cash requirements for up to 24 months, including legal and accounting costs associated with this offering ($11,000), incidental expenses, and the cost of implementing the investigative aspects of our business plan including identifying and securing additional sources of financing, employees/consultants, suppliers, and customers.

We believe that seventy-five percent (75%) of the possible proceeds from this offering (i.e., $56,250) plus existing cash on hand will satisfy our basic, subsistence level, cash requirements for up to 18 months, while 50% of the proceeds (i.e., $37,500) plus existing cash on hand will sustain us for up to 12 months, and 25% of the proceeds (i.e., $18,750) plus cash on hand will sustain us for up to 6 months. Our budgetary allocations may vary however, depending upon the percentage of proceeds that we obtain from the offering. For example, we may determine that it is more beneficial to allocate funds toward securing potential financing and business opportunities in the short term rather than to conserve funds to satisfy continuous disclosure requirements for a longer period.

If we are unable to raise additional monies other than the proceeds of this offering, we will only have enough capital to cover the above described expenses. As of August 31, 2011 we had $78,989 cash on hand. We believe that this cash will cover the expenses of this offering and should meet our working capital requirements for the next approximately six months.

Even if we are able to sell all of the securities being offered in this prospectus, we will still require approximately $500,000 (this includes the anticipated $75,000 we hope to raise through the sale of securities in this offering) to meet our development milestones over the next 24 months. Please review our disclosure titled "Plan of Operations" in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" elsewhere in this prospectus. Please note that there can be no assurance that we will be able to raise such funds.

-18-

Continuous Disclosure Obligations

Separate from the proceeds of this offering, we estimate that auditing, legal, printing (edgarizing) and transfer agent expenses (i.e., costs associated with continuous disclosure obligations of the SEC reporting requirements (e.g., quarterly reports on Form 10-Q, annual reports on Form 10-K, and current reports on Form 8-K) will total approximately $20,000 to $25,000 per year. We anticipate paying these expenses out of our cash on hand and revenues generated through the sale of our products, and not through proceeds from the offering.

## DETERMINATION OF OFFERING PRICE

The offering price for the shares in this offering was arbitrarily determined by our management. In determining the initial public offering price of the shares we considered several factors including the following:

- our status of business development;

- our new business structure and operations as well as lack of a significant client base;

- prevailing market conditions, including the history and prospects for our industry;

- our future prospects and the experience of our management; and

- our capital structure.

Therefore, the public offering price of the shares does not necessarily bear any relationship to established valuation criteria and may not be indicative of prices that may prevail at any time or from time to time in the public market for the common stock. You cannot be sure that a public market for any of our securities will develop and continue or that the securities will ever trade at a price at or higher than the offering price in this offering.

## DILUTION OF THE PRICE YOU PAY FOR YOUR SHARES

The price of the current offering is fixed at $0.015 per share. This price is significantly greater than the price paid by our sole officer and director for common equity on August 22, 2011. Our sole officer and director, Charles Grob, paid $0.001 per share, a difference of $0.014 per share lower than the share price in this offering.

Dilution represents the difference between the offering price and the net tangible book value per share immediately after completion of this offering. Net tangible book value is the amount that results from subtracting total liabilities and intangible assets from total assets. Dilution arises mainly as a result of our arbitrary determination of the offering price of the shares being offered. Dilution of the value of the shares you purchase is also a result of the lower book value of the shares held by our existing stockholders. The following tables compare the differences of your investment in our shares with the investment of our existing stockholders.

-19-

APP. 000764

### EXISTING STOCKHOLDERS IF ALL OF THE SHARES ARE SOLD

| | | |
|---|---|---|
| Price per share | $ | 0.0150 |
| Net tangible book value per share before offering | $ | 0.0011 |
| Potential gain to existing shareholders | $ | 0.0139 |
| Net tangible book value per share after offering | $ | 0.0057 |
| Increase to present stockholders in net tangible book value per share after offering | $ | 0.0046 |
| Capital contributions | $ | 10,000 |
| Capital contribution by officer and director in August 2011 | $ | 10,000 |
| Number of shares outstanding before the offering | | 10,000,000 |
| Number of shares after offering held by existing stockholders | | 10,000,000 |
| Percentage of ownership after offering | | 66% |

| DILUTION TO NEW SHAREHOLDERS | PERCENTAGE OF SHARES SOLD | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 25% | | 50% | | 75% | | 100% | |
| Per share offering price | $ | 0.0150 | $ | 0.0150 | $ | 0.0150 | $ | 0.0150 |
| Net tangible book value per share before offering | $ | 0.0011 | $ | 0.0011 | $ | 0.0011 | $ | 0.0011 |
| Net tangible book value per share after offering | $ | 0.0026 | $ | 0.0039 | $ | 0.0049 | $ | 0.0057 |
| Increase in book value attributable to new shareholders | $ | 0.0015 | $ | 0.0028 | $ | 0.0038 | $ | 0.0046 |
| Dilution to new shareholders | $ | 0.0135 | $ | 0.0122 | $ | 0.0112 | $ | 0.0104 |

### THE OFFERING

We are registering 5,000,000 shares of our common stock for offer and sale at $0.015 per share.

There is currently no active trading market for our common stock, and such a market may not develop or be sustained. We currently plan to have our common stock listing on the OTC markets, subject to the effectiveness of this Registration Statement. In addition, a market maker will be required to file a Form 211 with FINRA before the market maker will be able to make a market in our shares of common stock. At the date hereof, we are not aware that any market maker has any such intention.

We may not sell the shares registered herein until the registration statement filed with the Securities and Exchange Commission is effective. Further, we will not offer the shares through a broker-dealer or anyone affiliated with a broker-dealer. Upon effectiveness, all of the shares being registered herein may become tradable. The stock may be traded or listed only to the extent that there is interest by broker-dealers in acting as a market maker in our stock. Despite our best efforts, it may not be able to convince any broker/dealers to act as market-makers and make quotations on the OTC markets. We may consider pursuing a quotation on the OTCBB or OTCQB after this registration becomes effective and we have completed our offering.

The price per share will remain at $0.015 even if we obtain a listing on any exchange or are quoted on the Over-The-Counter (OTCBB or OTCQB), the offering price of $0.015 will not change for the duration of the offering.

We will receive all of the proceeds from such sales of securities and are bearing all expenses in connection with the registration of our shares.

-20-

APP. 000765

## PLAN OF DISTRIBUTION

We have 10,000,000 shares of common stock issued and outstanding as of the date of this prospectus. The Company is registering an additional of 5,000,000 shares of its common stock for sale at the price of $0.015 per share. There is no arrangement to address the possible effect of the offering on the price of the stock.

We are offering the shares on a "self-underwritten" basis directly through Charles Grob, our sole officer and director, named herein. Mr. Grob will not receive any commissions or other remuneration of any kind in connection with his participation in this offering based either directly or indirectly on transactions in securities. In connection with the Company's selling efforts in the offering, Mr. Grob will not register as a broker-dealer pursuant to Section 15 of the Exchange Act of 1934, as amended (the "Exchange Act"), but rather will rely upon the "safe harbor" provisions of SEC Rule 3a4-1, promulgated under the Exchange Act. Generally speaking, Rule 3a4-1 provides an exemption from the broker-dealer registration requirements of the Exchange Act for persons associated with an issuer that participate in an offering of the issuer's securities. Mr. Grob is not subject to any statutory disqualification, as that term is defined in Section 3(a)(39) of the Exchange Act. Mr. Grob will not be compensated in connection with his participation in the offering by the payment of commissions or other remuneration based either directly or indirectly on transactions in our securities. Mr. Grob is not, nor has he been within the past 12 months, a broker or dealer, and he is not, nor has he been within the past 12 months, an associated person of a broker or dealer. At the end of the offering, Mr. Grob will continue to primarily perform substantial duties for the Company or on its behalf otherwise than in connection with transactions in securities. Mr. Grob will not participate in selling an offering of securities for any issuer more than once every 12 months other than in reliance on Exchange Act Rule 3a4-1(a)(4)(i) or (iii).

The Company will receive all proceeds from the sale of the 5,000,000 shares being offered. The price per share is fixed at $0.015 for the duration of this offering. Although our common stock is not listed on a public exchange or quoted over-the-counter, we intend to seek to have our shares of common stock quoted on the Over-the Counter Bulletin Board. In order to be quoted on the OTC Bulletin Board, a market maker must file an application on our behalf in order to make a market for our common stock. There can be no assurance that a market maker will agree to file the necessary documents with FINRA, nor can there be any assurance that such an application for quotation will be approved.

The Company's shares may be sold to purchasers from time to time directly by and subject to the discretion of the Company. Further, the Company will not offer its shares for sale through underwriters, dealers, agents or anyone who may receive compensation in the form of underwriting discounts, concessions or commissions from the Company and/or the purchasers of the shares for whom they may act as agents. The shares of common stock sold by the Company may be occasionally sold in one or more transactions; all shares sold under this prospectus will be sold at a fixed price of $0.015 per share.

In order to comply with the applicable securities laws of certain states, the securities will be offered or sold in those only if they have been registered or qualified for sale; an exemption from such registration or if qualification requirement is available and with which the Company has complied.

In addition and without limiting the foregoing, the Company will be subject to applicable provisions, rules and regulations under the Exchange Act with regard to security transactions during the period of time when this Registration Statement is effective.

The Company will pay all expenses incidental to the registration of the shares (including registration pursuant to the securities laws of certain states) which we expect to be $11,000.

This offering is a self-underwritten offering, which means that it does not involve the participation of an underwriter to market, distribute or sell the shares offered under this prospectus. This offering will terminate upon the earlier to occur of (i) 90 days after this registration statement becomes effective with the Securities and Exchange Commission, and (ii) the date on which all 5,000,000 shares registered hereunder have been sold; provided, however, that we may, at our discretion, extend the offering for an additional 90 days.

-21-

We anticipate that we will be initially offering our securities in the State of Texas. Once this Registration Statement is effective, and if Mr. Grob believes that there is sufficient interest in our company to offer our securities in the state of Texas, we will register with the state of Texas under 'blue sky' laws. However, we have not yet applied for 'blue sky' registration in the state of Texas, or any other state, and there can be no assurance that we will be able to apply, or that our application will be approved and our securities will be registered, in Texas or any other state in the US. For further discussion regarding 'blue sky' registration please see 'Risk Factors' elsewhere in this prospectus.

Our officer, director, control persons and affiliates do not intend to purchase any shares in this offering.

If applicable, the shares may not be offered or sold in certain jurisdictions unless they are registered or otherwise comply with the applicable securities laws of such jurisdictions by exemption, qualification or otherwise. We intend to sell the shares only in the states in which this offering has been qualified or an exemption from the registration requirements is available, and purchases of shares may be made only in those states.

We will not use public solicitation or general advertising in connection with the offering. The shares will be offered at a fixed price of $0.015 per share for the duration of the offering.

This is a direct participation offering since we, and not an underwriter, are offering the stock. We will receive all of the proceeds from such sales of securities and are bearing all expenses in connection with the registration of our shares.

**Procedures for Subscribing**

If you decide to subscribe for any shares in this offering, you must:

- execute and deliver a subscription agreement; and
- deliver a check or certified funds to us for acceptance or rejection.

All checks for subscriptions must be made payable to "Chimera Energy Corporation". No subscription may be executed nor funds delivered prior to effectiveness of the registration statement.

**Right to Reject Subscriptions**

We have the right to accept or reject subscriptions in whole or in part, for any reason or for no reason. All monies from rejected subscriptions will be returned immediately by us to the subscriber, without interest or deductions. Subscriptions for securities will be accepted or rejected within 48 hours after we receive them.

-22-

APP. 000767

## DESCRIPTION OF SECURITIES

**COMMON STOCK**

Our authorized number of shares common stock is one hundred million (100,000,000) shares with a par value of $0.001. Shares of our common stock:

- have equal ratable rights to dividends from funds legally available if and when declared by our Board of Directors;

- are entitled to share ratably in all of our assets available for distribution to holders of common stock upon liquidation, dissolution or winding up of our affairs;

- do not have preemptive, subscription or conversion rights and there are no redemption or sinking fund provisions or rights; and

- are entitled to one non-cumulative vote per share on all matters on which stockholders may vote.

We refer you to the Bylaws of our Articles of Incorporation and the applicable statutes of the State of Nevada for a more complete description of the rights and liabilities of holders of our securities.

<u>Non-Cumulative Voting</u>

Holders of shares of our common stock do not have cumulative voting rights, which means that the holders of more than 50% of the outstanding shares, voting for the election of directors, can elect all of the directors to be elected, if they so choose, and, in that event, the holders of the remaining shares will not be able to elect any of our directors. After this offering is completed, assuming it is fully subscribed, the present stockholder will own approximately 67% of our outstanding shares.

<u>Cash Dividends</u>

As of the date of this prospectus, we have not declared or paid any cash dividends to stockholders. The declaration of any future cash dividend will be at the discretion of our Board of Directors and will depend upon our earnings, if any, our capital requirements and financial position, our general economic conditions, and other pertinent conditions. It is our present intention not to pay any cash dividends in the foreseeable future, but rather to reinvest earnings, if any, in our business operations.

## INTEREST OF NAMED EXPERTS AND COUNSEL

No expert or counsel named in this prospectus as having prepared or certified any part thereof or having given an opinion upon the validity of the securities being registered or upon other legal matters in connection with the registration or offering of our common stock was employed on a contingency basis or had or is to receive, in connection with the offering, a substantial interest, directly or indirectly, in us. Additionally, no such expert or counsel was connected with us as a promoter, managing or principal underwriter, voting trustee, director, officer or employee.

## EXPERTS

LBB & Associates Ltd., LLP, 10260 Westheimer Road, Suite 310, Houston, Texas 77042,has audited our Financial Statements for the period August 5, 2011 (date of inception) through August 31, 2011 and to the extent set forth in its report, which are included herein in reliance upon the authority of said firm as experts in accounting and auditing. There were no disagreements related to accounting principles or practices, financial statement disclosure, internal controls or auditing scope or procedure from date of appointment as our independent registered accountant through the period of audit (inception August 5, 2011 through August 31, 2011).

## LEGAL MATTERS

The Loev Law Firm, PC, 6300 West Loop South, Suite 280, Bellaire, Texas 77401, has passed upon certain legal matters in connection with the validity of the issuance of the shares of common stock.

-23-

## BUSINESS DESCRIPTION

**OVERVIEW**

We are a Houston based energy company, incorporated in the State of Nevada on August 5, 2011, with a fiscal year end of August 31. Our business and registered office is located at 2800 Post Oak Blvd., Suite 4100, Houston, Texas 77056. Our telephone number is (832) 390-2334. Our Internet address is http://www.chimeraenergyusa.com. The information on, or that may be accessed through, our website is not incorporated by reference into this prospectus and should not be considered a part of this prospectus. Our current business consists of supplying equipment and components that are used in the exploration and production of oil and gas. In August 2011, we capitalized the business with a $100,000 note that bears interest at an annual rate of 15% and is due and payable on August 21, 2013, and commenced operations with the purchase of $30,000 of inventory. On August 22, 2011, our founder, sole officer and director purchased 10,000,000 shares of common stock for $10,000 at the par value of the Company's common stock, $0.001 per share.

In addition to our present business line, we intend to develop new product lines to become a diversified equipment company. We plan to build a portfolio of oilfield equipment to sell to oilfield manufacturers and oil and gas operators. Our focus will be primarily on developing technologies developed in the United States.

We are endeavoring to raise growth capital to further develop our business plan. The proceeds from this offering will be used to provide working capital for our oilfield equipment supply business segment and provide cash for additional development, as described in greater detail herein under "Use of Proceeds". We will not have the necessary capital to fully execute our business plan until we are able to secure additional debt and equity financing. There can be no assurance that such financing will be available on suitable terms, if at all. Even if we raise 100% of the funds we hope to raise through the offering, we will require additional capital to fund the future growth and development of the Company.

We need to raise $500,000 (including the $75,000 we hope to raise through this offering) to fully implement our business plan over the next 24 months. The funds raised in this offering, even assuming we sell all the shares being offered, will serve as intermediate financing to fund operations and growth until we can raise additional funds. We anticipate a cash burn rate of approximately $3,000 per month. If we sell 25% of the shares offered herein, we anticipate being able to continue our operations for approximately six months without raising additional funding. If we sell 50% of such offered shares, we estimate that we will be able to continue our operations for approximately 12 months. If we sell 75% of such offered shares, we estimated that we will be able to continue our operations for approximately 18 months and in the event we sell 100% of the shares offered herein, we estimate that we will be able to continue our operations, without any additional funding for approximately 24 months.

Our management believes that at the current level of development, the Company can only justify a limited financing. We believe that with the money raised through this offering we will be able to advance our business sufficiently to attract more financing, which in turn will provide us with the lower cost of capital required to develop our business.

If we sell less than 25% of the number of shares offered through this offering and we are unable to secure additional financing, we will not be able to effectively conduct the business development activities necessary to move the Company forward. Under those circumstances, investors will likely lose their entire investment in the Company.

We intend to develop additional products to sell to oilfield manufacturers and oil and gas companies. We expect our business plan to require at least three years of development before we have fully developed multiple product lines. Until that time, and as we are developing business segments, we will have concentrations in certain areas. For instance, as of the date of this offering, 100% of our operations reside in PDC cutter distribution. Provided that our business obtains additional financing, we intend to diversify our business segments.

-24-

APP. 000769

Major oil and gas companies are spending significant amounts of money purchasing oilfield equipment. While alternative energy solutions continue to become more competitive as investment in alternative energy increases, we expect the primary sources of energy will continue to be provided by oil and gas. We intend to build an oilfield equipment wholesale business that is scalable and has the potential to provide high-growth opportunities to our investors.

We intend to take an opportunistic approach to investments in future projects. We will endeavor to identify and fund the most economically viable projects that have the potential to provide the highest returns to our stakeholders for a given level of risk. We need to raise an additional $500,000 (including the proposed $75,000 capital raise which is being undertaken through the offering of the shares included herein) to implement our business plan over the next 24 months. The funds raised in this offering, even assuming we sell all the shares offered, will be insufficient to develop a diversified energy business.

OUR PRODUCTS

We currently market and sell polycrystalline diamond compact cutters (PDC cutters) for use in coal mining, geological exploration and oil and gas drilling. PDC cutters are composite material made by sintering diamond powder on a tungsten carbide substrate under high temperature and pressure. They are widely used to make oilfield and geological exploration PDC drill bits that are suitable for drilling medium to hard geological formations. We purchase all of our cutter inventory from HJSM Co. Ltd., located in Henan Province, China ("HJSM"), and act as a wholesale distributor of PDC cutters.  HJSM maintains readily available inventory that we can purchase and receive within two weeks. For large orders of more than 2,000 pieces, we can provide them with advance notice and typically have the products manufactured and delivered within thirty days of notification. Although we only have one supplier of PDC cutters, we intend to develop additional relationships with other manufacturers to mitigate our supply chain concentration moving forward.

Our current inventory consists of PDC cutters.

Below are pictures of our products, available sizes and applications:



-25-

APP. 000770

**Available Sizes**

| Product Code | Diameter | Height | Thickness of Diamond Layer | Chamfer of Diamond Layer | Chamfer of Tungsten Carbide |
|---|---|---|---|---|---|
| C1308DT | 13.44 mm | 8.00 mm | 2.0 mm | 0.25 mm x 45o | 0.50 mm x 45o |
| C1313DT | 13.44 mm | 13.20 mm | 2.0 mm | 0.25 mm x 45o | 0.50 mm x 45o |
| C1608DT | 16.00 mm | 8.00 mm | 2.0 mm | 0.25 mm x 45o | 0.50 mm x 45o |
| C1610DT | 16.00 mm | 10.00 mm | 2.0 mm | 0.25 mm x 45o | 0.50 mm x 45o |
| C1613DT | 16.00 mm | 13.20 mm | 2.0 mm | 0.25 mm x 45o | 0.50 mm x 45o |
| C1908DT | 19.05 mm | 8.00 mm | 2.0 mm | 0.25 mm x 45o | 0.50 mm x 45o |
| C1913DT | 19.05 mm | 13.20 mm | 2.0 mm | 0.25 mm x 45o | 0.50 mm x 45o |

**Pictures of oil and gas drill bits with PDC cutters**



OUR OPERATIONS

We currently lease office space and do not require a warehouse to store our inventory. Our PDC cutters are small and large quantities could easily be stored in our current office space. The average sales price of our products ranges from $75 - $200 per unit. We currently purchase our entire inventory from one supplier which creates a risk to our business in the event that they implement price increases, lower the quality of our products, or decide not to sell to us.

We do not currently have any agreements in place with our customers or supplier providing assurances that they will continue to purchase and sell products to us, respectively. There can be no guarantee that we will be able to secure such agreements or that we will be able to do so on terms favorable to us.

We have conducted limited operations to date and anticipate expanding our business using the proceeds from this offering. We will not have the necessary capital to implement our complete business plan until we are able to secure adequate financing. We anticipate that we will require total financing of $500,000; $425,000 of which we will be seeking to raise subsequent to this $75,000 offering, in order to execute our business plan over a 24 month period. There can be no assurance that such financing will be available or available on suitable terms. Please see "Risk Factors" elsewhere in this prospectus for a full discussion on this potential business risk.

We have no plans to change our business activities or to combine with another business and are not aware of any events or circumstances that might cause us to change our plans. Although we have been conducting limited operations and have realized a profit since inception, we have been issued a going concern opinion from our auditors. We have limited liquidity and capital resources and will likely rely upon future equity and debt transactions to fund our operations and growth plans.

Business Plan Implementation Schedule

We have generated revenues and cash flow from our operations; however we will be unable to establish the remainder of our business plan until we are able to secure total financing of approximately $500,000 (including this $75,000 capital raise). However, there can be no assurance that sufficient financing will be available or available on suitable terms. Please refer to page 31 herein for a detailed description of our anticipated milestones. With the exception of the costs associated with this offering (which we estimate will total approximately $11,000) virtually all aspects of our business plan are scalable in terms of size, quality, and effectiveness, and the timing of their execution must be concurrent or near concurrent and progressive over a eighteen month period. We anticipate that we will require a total of $500,000 in order to begin to grow our business into a diversified energy company within a 24 month period.

-26-

**APP. 000771**

## BUSINESS STRATEGY

Our strategy is to continue to operate and grow our PDC cutter distribution business while we determine what additional equipment offerings would best complement our existing product line for oil and gas exploration and production. Although the order in which we diversify our product lines is dependent upon available funding, prevailing market conditions and specific business opportunities, our ultimate goal remains consistent in the creation an equipment business that provides diversified products and growth opportunities to our stakeholders.

We intend to grow our PDC cutter business segment by focusing on our regional sales and marketing efforts. We plan to hire additional sales professionals to assist in market penetration through warm and cold sales calls to potential buyers of our products. In addition, we anticipate developing additional business segments to vertically integrate the supply chain to include the manufacture and sales of and of other oilfield equipment. In doing so, we hope to reduce the cost and/or increase our profit margins on our products to the end consumer by managing each phase of value added to our products.

We do not anticipate all of these business segments to be operational until at least three years from the date of this offering, funding permitting. There is also no guarantee that we will ever be able to effectively execute our business plan of operating a diversified oilfield equipment business. Therefore, potential investors should focus their investment analysis and decision upon the current PDC cutter operations.

## SALES AND MARKETING STRATEGY

We plan to increase our revenues from sales from regional business-to-business sales and marketing efforts. We plan to visit all of the primary, regional PDC drill bit manufacturers and provide literature and empirical evidence that supports our value proposition. We also intend to advertise in industry trade journals and at industry events. Finally, should we raise the maximum amount in this offering, we intend to setup booths at industry trade shows to display our products and explain their benefits.

We intend to market, sell and distribute our PDC cutters through attendance at industry trade shows, advertising in trade publications, direct sales to PDC drill bit manufacturers (via sales representatives), and a planned future website. We have developed our website http://chimeraenergyusa.com and intend to add e-commerce features such that PDC drill bit manufacturers will be able to place online orders for our products. The information on, or that may be accessed through, our website is not incorporated by reference into this prospectus and should not be considered a part of this prospectus.

## CHARACTERISTICS AND MAKE UP OF TARGET MARKET

The initial market area targeted is the Southwest United States. However, we intend to obtain more national exposure through our planned Internet website, trade magazines and advertising, and attending National/Regional Shows. Our marketing will be highly directed to PDC drill bit manufacturers.

Although the focus of our target market will be in Texas, Oklahoma and Louisiana, we have the ability to sell our products to anyone that is interested in buying them. Our products are compact, durable and can easily be repackaged and shipped to any location in the world. Over the past 20 years, PDC drill bits have steadily increased in use throughout oil and gas drilling operations in the United States. PDC drill bits are also the preferred technology in many of the new domestic shale discoveries such as the Marcellus Shale, Fayetteville Shale, Bakken Shale, Eagle Ford Shale, and the Barnett Shale. We plan to specifically target drill bit manufacturers who are located in our region, but who are poised for growth in these new areas. As the long term demand for oil and gas increases, the demand for drilling equipment, such as our products, is also expected to increase.

-27-

APP. 000772

## BRAND RECOGNITION AND CHARACTERISTICS

The PDC cutter market is characterized by many participants that offer very similar products. Most PDC cutter manufacturers focus on research and development in efforts to create a superior product. However, despite these efforts, the industry remains highly commoditized. Therefore, our strategy is to brand our products as a low-cost alternative to our competitors while maintaining technological integrity. We have developed a logo that we anticipate will assist with advertising and recognition branding for our future products.

## COMPETITION

This industry operates in a highly specialized niche, therefore there are not many PDC cutter manufacturers or distributors . A list of the primary companies include:

- Newcut Industries, an Indian Company;
- Zhengzhou LD Diamond Products CO. Ltd., a Chinese company;
- 3B Diamond, a Chinese company; and
- Element Six, a US company.

In addition to the above, there are other small regional companies that we will compete with.

Some of the competitive business conditions relating to PDC cutter distribution include: economies of scale, access to capital, proprietary technology, exclusive vendor relationships, cost basis of inventory, shipping and inventory costs, and customer relationships.

Most of our competitors, some of which are also PDC manufacturers, have substantial competitive advantages over us in all of the aforementioned categories of competitive business conditions.

## EMPLOYEES AND EMPLOYMENT AGREEMENTS

As of the date of this offering, we have no employees other than Mr. Grob, our sole officer and director. Mr. Grob has the flexibility to work on our business up to 10 to 25 hours per week. He is prepared to devote more time to our operations as may be required and we do not have any employment agreements with him.

We do not presently have pension, health, annuity, insurance, stock options, profit sharing, or similar benefit plans; however, we may adopt plans in the future. There are presently no personal benefits available to our sole director and officer.

During the initial implementation of our business plan, we intend to hire independent consultants to assist in its development and execution.

## GOVERNMENT REGULATIONS

We are unaware of and do not anticipate having to expend significant resources to comply with any governmental regulations in the PDC cutter market. We are subject to the laws and regulations of those jurisdictions in which we plan to sell or farm our product, which are generally applicable to business operations, such as business licensing requirements, income taxes and payroll taxes. In general, the development and operation of our business is not subject to special regulatory and/or supervisory requirements.

-28-

APP. 000773

<u>Intellectual Property</u>

We do not currently hold rights to any intellectual property and have not filed for copyright or trademark protection for our name or intended website.

<u>Research and Development</u>

Since our inception to the date of this prospectus, we have not spent any money on research and development activities.

<u>Reports to Security Holders</u>

Any member of the public may read and copy any materials filed by us with the Securities and Exchange Commission at the Securities and Exchange Commission's Public Reference Room at 100 F Street, N.E. Washington, D.C. 20549. Information on the operation of the Public Reference Room may be obtained by calling the Securities and Exchange Commission at 1-800-732-0330. The Securities and Exchange Commission maintains an internet website (http://www.sec.gov) that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the Securities and Exchange Commission.

## DESCRIPTION OF PROPERTY

We maintain our business office at 2800 Post Oak Blvd., Suite 4100, Houston, Texas 77056. Our telephone number is (832) 390-2334. We entered into a Part-Time Rental Agreement for our business office with ServCorp on August 4, 2011, with an effective date of September 1, 2011. The material terms of the lease agreement are as follows:

1)   The agreement with ServCorp commenced effective on August 4, 2011, and continues thereafter on a month-to-month basis.

2)   We paid a $175 setup fee to start the lease agreement.

3)   Monthly rent of $200 is due in advance on the first day of each month.

4)   ServCorp services provided to the Company include secretarial services, use of conference rooms, email, internet, copying and printing, mail forwarding, and are subject to change at ServCorp's discretion.

5)   The lease may be terminated at any time by either party with one month's written notice.

6)   We agreed to indemnify ServCorp against any loss or damage of information or data.

The Company is currently in the process of upgrading its lease agreement with ServCorp to include a full-time, dedicated office space. The Company anticipates that its monthly lease rate will increase to approximately $1,000 per month under the upgraded agreement. It is anticipated that the new space will be available for the Company's use within 60 days of the date of this prospectus.

## LEGAL PROCEEDINGS

We know of no material, active or pending legal proceedings against us, nor are we involved as a plaintiff in any material proceedings or pending litigation. There are no proceedings in which any of our director, officer or affiliate, or any registered beneficial shareholder are an adverse party or has a material interest adverse to us.

## MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

Our common stock is not traded on any market or exchange. We intend to apply to have our common stock quoted on the Over-The-Counter Bulletin Board ("OTCBB") or OTCQB market once this prospectus has been declared effective by the SEC; however, there is no guarantee that we will obtain a listing.

-29-

APP. 000774

There is currently no trading market for our common stock and there is no assurance that a regular trading market will ever develop. Over-the-counter securities are not listed and traded on the floor of an organized national or regional stock exchange. Instead, over-the-counter securities transactions are conducted through a telephone and computer network connecting dealers. Over-the-counter issuers are traditionally smaller companies that do not meet the financial and other listing requirements of a regional or national stock exchange.

To have our common stock listed on any of the public trading markets, including the OTCBB or OTCQB, we will require a market maker to sponsor our securities. We have not yet engaged any market maker to sponsor our securities, and there is no guarantee that our securities will meet the requirements for quotation or that our securities will be accepted for quotation on the OTCBB or OTCQB. This could prevent us from developing a trading market for our common stock.

HOLDERS

As of the date of this prospectus there was one holder of record of our common stock.

DIVIDENDS

To date, we have not paid dividends on shares of our common stock and we do not expect to declare or pay dividends on shares of our common stock in the foreseeable future. The payment of any dividends will depend upon our future earnings, if any, our financial condition, and other factors deemed relevant by our Board of Directors.

EQUITY COMPENSATION PLANS

As of the date of this prospectus we did not have any equity compensation plans.

### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

This section of the prospectus includes a number of forward-looking statements that reflect our current views with respect to future events and financial performance. Forward-looking statements are often identified by words like: "believe", "expect", "estimate", "anticipate", "intend", "project" and similar expressions, or words that, by their nature, refer to future events. You should not place undue certainty on these forward-looking statements, which apply only as of the date of this prospectus. These forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from historical results or our predictions.

Our financial statements are stated in United States Dollars (USD or US$) and are prepared in accordance with United States Generally Accepted Accounting Principles. All references to "common shares" refer to the common shares in our capital stock.

Overview

We are an early stage company, incorporated in the State of Nevada on August 5, 2011, as a for-profit company, and an established fiscal year of August 31. Although we have generated revenues from business operations, our auditor has issued a going concerned opinion. This means there is substantial doubt that we can continue as an on-going business for the next twelve (12) months unless we obtain additional capital to pay our bills.

-30-

APP. 000775

Accordingly, we must raise cash from sources other than loans we undertake. From inception through the date of this offering, our business operations have primarily been focused on distributing PDC cutters. While we have generated revenue from business operations, most of the cash currently held by us is the result of the issuance of common stock to our sole director and officer and debt issued to a private investor.

We believe that the proceeds from this offering in addition to our existing cash on hand will satisfy our cash requirements for up to 24 months. If we are unable to raise additional monies, we only have enough capital to cover the costs of this offering and to begin implementing the business and marketing plan. The expenses of this offering include the preparation of this prospectus, the filing of this registration statement and transfer agent fees. As of August 31, 2011 we had $78,989 cash on hand.

Plan of Operations

We will need to raise additional capital to fully develop our business plan. During the 24 months following the completion of this offering, we intend to implement our business development and marketing plan. We believe we must raise an additional $500,000 (this includes the anticipated $75,000 capital raise) to pay for expenses associated with our development over the next 24 months. $150,000 will be used to finance anticipated activities during Phase One of our development plan as described below, and $350,000 will be used to finance anticipated activities during Phase Two of our development plan as described below.

PHASE ONE

| ANTICIPATED MILESTONES | PROJECTED DATE OF COMPLETION | ESTIMATED BUDGET $ |
|---|---|---|
| | 0-12 MONTHS | |
| Purchase additional inventory | | 65,000 |
| Initiate sales and marketing efforts | | 20,000 |
| Hire sales representatives | | 30,000 |
| Complete e-commerce website | | 20,000 |
| Additional working capital | | 15,000 |
| TOTAL PHASE ONE | | $ 150,000 |

-31-

APP. 000776

PHASE TWO

| MILESTONES | PROJECTED TIME TO COMPLETION 12-24 MONTHS | ESTIMATED BUDGET $ |
|---|---|---|
| INVENTORY Purchase additional inventory | | 210,000 |
| MARKETING & SALES Complete Sales Literature, Displays, Advertising | | 40,000 |
| MANAGEMENT & ADMINISTRATION Consultants, Operational CFO, and Sales Employees | | 70,000 |
| ADDITIONAL WORKING CAPITAL | | 30,000 |
| | TOTAL PHASE TWO | 350,000 |
| | TOTAL PHASE ONE & TWO | 500,000* |

* This includes the anticipated $75,000 capital raise undertaken by this offering.

Many of the developments enumerated in Phase 2 are dependent on the completion of objectives in Phase 1 and both Phases are dependent on us securing additional financing even if we are able to sell all of the securities offered by this prospectus. There can be no assurance that we will be able to sell any of the securities offered by this prospectus or secure additional financing. If we are able to raise some, but not all funds required to undertake the developments in Phase 1 and Phase 2, our management will re-examine our proposed business activities to use our resources most efficiently. In this event, our focus will likely be on spending available funds on assuring that we retain our reporting status with the SEC and developing our product designs to attract investors.

 If we are unable to raise additional funds we will not be able to complete any of the milestones in either Phase 1 or Phase 2. Due to the fact that many of the milestones are dependent on each other, if we do not raise any capital in this offering, we will not be able to implement any facets of our business plan as described above, however we believe that the current funds available to us will be sufficient to continue maintaining a reporting status and limited operations for up to 24 months.

We intend to conduct an investigation to identify potential development opportunities relating to our business plan that have the potential to add the most value to our shareholders as determined by our management. The level of effort in this investigation increases as the offering proceeds increase. For proceeds raised up to 50% of the total offering amount, we would focus on developing our PDC distribution segment. If we raise more than 50% of the total offering amount we plan to continue developing our PDC business segment, and plan to also begin preliminary investigations into other additional product lines.

-32-

APP. 000777

We intend to pursue capital through public or private financing as well as borrowings and other sources, such as our officer and director in order to finance our businesses activities. We cannot guarantee that additional funding will be available on favorable terms, if at all. If adequate funds are not available, then our ability to continue our operations may be significantly hindered.

**RESULTS OF OPERATIONS**

There is little historical financial information about us upon which to base an evaluation of our performance. We generated revenues of $17,000 from operations during the period from August 5, 2011 (inception) to August 31, 2011. In that same period, we incurred total costs and expenses of $16,450, which included $15,000 of cost of goods sold, $1,080 of general and administrative expenses and $370 of interest expense.  The $17,000 of revenues from operations were solely due to one sale consisting of 200 units at $85.00 per unit ($17,000 total).

Although we have generated revenues from our operations, we cannot guarantee we will be successful in our business operations. Our business is subject to risks inherent in the establishment of a new business enterprise, including the financial risks associated with the limited capital resources currently available to us for the implementation of our business strategies. (See "Risk Factors"). To become profitable and competitive over the long run, we must develop the business and marketing plan and execute the plan. Our management will attempt to secure financing through various means including borrowing and investment from institutions and private individuals.

Our results of operations are summarized below:

|  | August 5, 2011 (Inception) to August 31, 2011 |
| --- | --- |
| Revenue | $ 17,000 |
| Cost of Revenue | $ 15,000 |
| Expenses | $ 1,450 |
| Net Income | $ 550 |
| Net Income per Share - Basic and Diluted | $ 0.00 |
| Weighted Average Number Shares Outstanding - Basic and Diluted | 10,000,000 |

**LIQUIDITY AND CAPITAL RESOURCES**

As of August 31, 2011, we had generated $17,000 in revenues from our business operations. For the period ended August 31, 2011, we issued 10,000,000 shares of common stock to our sole officer and director for cash proceeds of $10,000; and issued a two year note in the amount of $100,000, described in greater detail below.

We anticipate needing a minimum of $150,000 for Phase One and an additional $350,000 for Phase Two of our planned development plan, as described above, totaling $500,000 (this includes the anticipated $75,000 raise) in order to effectively execute our business plan over the next twenty-four months. Currently available cash is not sufficient to allow us to commence full execution of our business plan. Our business expansion will require significant capital resources that may be funded through the issuance of common stock or of notes payable or other debt arrangements that may affect our debt structure.  However , there can be no assurance that we will be able to raise money in this fashion and have not entered into any agreements that would obligate a third party to provide us with capital.

-33-

APP. 000778

As of August 31, 2011 we had total assets, consisting solely of current assets of $110,989, including of $78,989 of cash on hand, $17,000 of accounts receivable, net, and $15,000 of inventory.

We had total liabilities of $100,439 as of August 31, 2011, which consisted of $439 of current liabilities, which were solely due to accounts payable and accrued expenses and $100,000 of long-term liabilities relating to our $100,000 note payable (described below).

We had total working capital of $110,550 as of August 31, 2011.

We had net cash used by operating activities of $31,011 for the period from August 5, 2011 (inception) through August 31, 2011, consisting of an increase of $17,000 in accounts receivable and an increase of $15,000 in inventory, offset by $550 of net income and an increase of $439 of accounts payable and accrued expenses.

We had $110,000 of net cash provided by financing activities for the period from August 5, 2011 (inception) through August 31, 2011, which included $10,000 from the sale of stock in connection with the August 22, 2011, sale of 10,000,000 shares of our restricted common stock to Charles Grob, the Company's founder, sole officer and director, and $100,000 in connection with the sale of the note, described below.

On or around August 22, 2011, Kylemore Corp., loaned us $100,000 which was evidenced by a Promissory Note. The note is due on August 21, 2013 and accrues interest at the rate of 15% per annum. In the event an event of default occurs under the note, the interest rate increases to 25% per annum (subject to applicable law). The note is secured by a security interest in substantially all of our assets and we do not currently have sufficient funds to repay the note.

To date, the Company has managed to keep our monthly cash flow requirement low for two reasons. First, our sole officer does not draw a salary at this time. Second, the Company has been able to keep our fixed operating expenses to a minimum and will generally only incur variable expenses when we have an order to sell product.

As of the date of this registration statement, we believe that the current funds available to us will be sufficient to continue maintaining a reporting status and limited operations for up to 24 months. However, in order to be successful in fully implementing our business plan as described above , we will require additional capital as set forth in Milestones I & II.

The Company currently has no external sources of liquidity such as arrangements with credit institutions or off-balance sheet arrangements that will have or are reasonably likely to have a current or future effect on our financial condition or immediate access to capital. The sole Director and Officer has made no commitments written or oral, with respect to providing a source of liquidity in the form of cash advances, loans and/or financial guarantees.

If the Company is unable to raise the funds partially through this offering the Company will seek alternative financing through means such as borrowings from institutions or private individuals. There can be no assurance that the Company will be able to keep costs from being more than these estimated amounts or that the Company will be able to raise such funds. Even if we sell all shares offered through this registration statement, we expect that the Company will seek additional financing in the future. However, the Company may not be able to obtain additional capital or generate sufficient revenues to fund our operations. If we are unsuccessful at raising sufficient funds, for whatever reason, to fund our operations, the Company may be forced to seek a buyer for our business or another entity with which we could create a joint venture. If all of these alternatives fail, we expect that the Company will be required to seek protection from creditors under applicable bankruptcy laws.

-34-

Our independent auditor has expressed substantial doubt about our ability to continue as a going concern and believes that our ability is dependent on our ability to implement our business plan, raise capital and generate revenues. See Note 2 of our financial statements.

Recent Federal legislation, including the Sarbanes-Oxley Act of 2002, has resulted in the adoption of various corporate governance measures designed to promote the integrity of the corporate management and the securities markets. Some of these measures have been adopted in response to legal requirements. Others have been adopted by companies in response to the requirements of national securities exchanges, such as the NYSE or The NASDAQ Stock Market, on which their securities are listed. Among the corporate governance measures that are required under the rules of national securities exchanges are those that address board of directors' independence, audit committee oversight, and the adoption of a code of ethics. Our Board of Directors is comprised of one individual who is also our executive officer. Our executive officer makes decisions on all significant corporate matters such as the approval of terms of the compensation of our executive officer and the oversight of the accounting functions.

Although the Company has adopted a Code of Ethics and Business Conduct the Company has not yet adopted any of these other corporate governance measures and, since our securities are not yet listed on a national securities exchange, the Company is not required to do so. The Company has not adopted corporate governance measures such as an audit or other independent committees of our board of directors as we presently do not have any independent directors. If we expand our board membership in future periods to include additional independent directors, the Company may seek to establish an audit and other committees of our board of directors. It is possible that if our Board of Directors included independent directors and if we were to adopt some or all of these corporate governance measures, stockholders would benefit from somewhat greater assurances that internal corporate decisions were being made by disinterested directors and that policies had been implemented to define responsible conduct. For example, in the absence of audit, nominating and compensation committees comprised of at least a majority of independent directors, decisions concerning matters such as compensation packages to our senior officer and recommendations for director nominees may be made by a majority of directors who have an interest in the outcome of the matters being decided. Prospective investors should bear in mind our current lack of corporate governance measures in formulating their investment decisions.

OFF-BALANCE SHEET ARRANGEMENTS

We have no significant off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in our financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that are material to our stockholders.

INFLATION

The effect of inflation on our revenues and operating results has not been significant.

CRITICAL ACCOUNTING POLICIES

Our financial statements are affected by the accounting policies used and the estimates and assumptions made by management during their preparation. A complete listing of these policies is included in Note 3 of the notes to our financial statements for the year ended August 31, 2011. We have identified below the accounting policies that are of particular importance in the presentation of our financial position, results of operations and cash flows, and which require the application of significant judgment by management.

USE OF ESTIMATES - The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

-35-

RESEARCH AND DEVELOPMENT EXPENSES - Expenditures for research, development, and engineering of products will be expensed as incurred.

EARNINGS (LOSS) PER SHARE - Basic earnings or loss per share is computed by dividing net income/(loss) attributable to common stockholders by the weighted average common shares outstanding for the period. Diluted earnings per share is computed giving effect to all potentially dilutive common shares. Potentially dilutive common shares may consist of incremental shares issuable upon the exercise of stock options and warrants and the conversion of notes payable to common stock. In periods in which a net loss has been incurred, all potentially dilutive common shares are considered antidilutive and thus are excluded from the calculation. At August 31, 2011 the Company did not have any potentially dilutive common shares.

## CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## CODE OF BUSINESS CONDUCT AND ETHICS

In August 2011 we adopted a Code of Ethics and Business Conduct which is applicable to our employees and which also includes a Code of Ethics for our CEO and principal financial officer and persons performing similar functions. A code of ethics is a written standard designed to deter wrongdoing and to promote

- honest and ethical conduct,

- full, fair, accurate, timely and understandable disclosure in regulatory filings and public statements,

- compliance with applicable laws, rules and regulations,

- the prompt reporting violation of the code, and

- accountability for adherence to the code.

A copy of our Code of Business Conduct and Ethics has been filed with the Securities and Exchange Commission as an exhibit to this S-1 filing. Any person desiring a copy of the Code of Business Conduct and Ethics, can obtain one by going to Edgar and looking at the attachments to our this S-1 filing.

-36-

APP. 000781

## MANAGEMENT

**Sole Officer and Director**

Our sole director will serve until his successor is elected and qualified. Our sole officer is elected by the sole director and serves until his successor is duly elected and qualified, or until he is removed from office. The board of directors has no nominating, auditing or compensation committees.

The name, age and position of our president, secretary/treasurer, and director is set forth below:

| NAME AND ADDRESS | AGE | POSITION(S) |
|---|---|---|
| **Charles Grob** | 31 | President, Secretary/ Treasurer |
| | | Principal Executive Officer |
| | | Principal Financial Officer and sole member of the Board of Directors |

The person named above has held his offices/positions since the inception of our company and is expected to hold his offices/positions until the next annual meeting of our stockholders and until his successor is elected and qualified.

BUSINESS EXPERIENCE & EDUCATION

CHARLES GROB, SOLE OFFICER AND DIRECTOR

Since August 2011, Mr. Grob has served as the sole officer and Director of the Company. From July 2009 to August 2011, Mr. Grob focused his efforts on continuing to operate his private Insurance and Financial Consulting business (which he operated as a sole proprietorship under his own name), while simultaneously completing his MBA from the University of Houston as described below.   From October 2005 to June 2009, Mr. Grob was self employed as a Finance and Insurance Consultant with Consolidated Underwriters in Dunn, North Carolina, where he managed over 100 customer accounts and used demand management and forecasting models to identify trends and derive statistically optimized coverage levels for insurance clients.  From June 2003 to June 2005, Mr. Grob was employed as a Financial Advisor with Waddell & Reed Financial Services in Austin, Texas, where he provided financial presentation and sales plan development services and focused on industrial organization psychology.  Mr. Grob obtained his Bachelors Degree in Psychology from the University of Texas in 2003 and his M.B.A from the University of Houston, C. T. Bauer College of Business, with a focus on Strategic Management and Operations in 2010.

*Qualifications as Director:*

With over five years of experience in managing the development and growth of his private Insurance and Financial Consulting business, Mr. Grob offers data analysis and decision making tools to drive organizational goals. Mr. Grob's experience in customer acquisition and retention, combined with his strategic management and operations planning education, provide the Company with a result oriented professional with unique business skills to facilitate the growth of our business.

**Involvement in Certain Legal Proceedings**

Our sole director and executive officer has not been involved in any of the following events during the past ten years:

1.   any bankruptcy petition filed by or against any business of which such person was a general partner or executive officer either at the time of the bankruptcy or within two years prior to that time;

-37-

2.  any conviction in a criminal proceeding or being subject to a pending criminal proceeding (excluding traffic violations and other minor offenses*);

3.  being subject to any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining, barring, suspending or otherwise limiting his involvement in any type of business, securities or banking activities; or

4.  being found by a court of competent jurisdiction (in a civil action), the Commission or the Commodity Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended, or vacated.

## CONFLICTS OF INTEREST

As of the date of this prospectus, we have no employees, other than Mr. Grob, our founder, Chief Executive Officer and sole director, who currently devotes 10 to 25 hours per week to our business as required from time to time without compensation. We have not entered into any formal agreement with Mr. Grob regarding the provision of his services to the Company.

Mr. Grob is not obligated to commit his full time and attention to our business and accordingly, he may encounter a conflict of interest in allocating his time between our operations and those of other businesses.

Although Mr. Grob is presently able to devote 10 to 25 hours per week to our business, this may change. Also, if we require Mr. Grob to devote more than 10 to 25 hours per week to our business on a regular basis for an extended period, it is uncertain that he will be able to satisfy our requirements unless we have sufficient resources to compensate him for any lost income from his private business.

In general, officers and directors of a corporation are required to present business opportunities to the corporation if:

- the corporation could financially undertake the opportunity;
- the opportunity is within the corporation's line of business; and
- it would be unfair to the corporation and its stockholders not to bring the opportunity to the attention of the corporation.

## COMMITTEES OF THE BOARD OF DIRECTORS

Our sole director has not established any committees, including an Audit Committee, a Compensation Committee or a Nominating Committee, or any committee performing similar functions. The functions of those committees are being undertaken by our sole director. Because we do not have any independent directors, our sole director believes that the establishment of committees of the Board would not provide any benefits to our company and could be considered more form than substance.

We do not have a policy regarding the consideration of any director candidates that may be recommended by our stockholders, including the minimum qualifications for director candidates, nor has our sole director established a process for identifying and evaluating director nominees. We have not adopted a policy regarding the handling of any potential recommendation of director candidates by our stockholders, including the procedures to be followed. Our sole director has not considered or adopted any of these policies as we have never received a recommendation from any stockholder for any candidate to serve on our Board of Directors.

-38-

APP. 000783

Given our relative size and lack of directors and officers insurance coverage, we do not anticipate that any of our stockholders will make such a recommendation in the near future. While there have been no nominations of additional directors proposed, in the event such a proposal is made, all current members of our Board will participate in the consideration of director nominees.

Our sole director is not an "audit committee financial expert" within the meaning of Item 407(d) of Regulation S-K. In general, an "audit committee financial expert" is an individual member of the audit committee or Board of Directors who:

- understands generally accepted accounting principles and financial statements;

- is able to assess the general application of such principles in connection with accounting for estimates, accruals and reserves;

- has experience preparing, auditing, analyzing or evaluating financial statements comparable to the breadth and complexity to our financial statements;

- understands internal controls over financial reporting; and

- understands audit committee functions.

Our Board of Directors is comprised solely of Mr. Grob who was integral to our formation and who is involved in our day to day operations. While we would prefer to have an audit committee financial expert on our board of directors, Mr. Grob does not have a professional background in finance or accounting. He does however have considerable education in finance. As with most small, early stage companies, until such time our Company further develops its business, achieves a stronger revenue base and has sufficient working capital to purchase directors and officers insurance, the Company does not have any immediate prospects to attract independent directors. When the Company is able to expand our Board of Directors to include one or more independent directors, the Company intends to establish an Audit Committee of our Board of Directors. It is our intention that one or more of these independent directors will also qualify as an audit committee financial expert. Our securities are not quoted on an exchange that has requirements that a majority of our Board members be independent and the Company is not currently otherwise subject to any law, rule or regulation requiring that all or any portion of our Board of Directors include "independent" directors, nor are we required to establish or maintain an Audit Committee or other committee of our Board of Directors.

WE DO NOT HAVE ANY INDEPENDENT DIRECTORS AND THE COMPANY HAS NOT VOLUNTARILY IMPLEMENTED VARIOUS CORPORATE GOVERNANCE MEASURES, IN THE ABSENCE OF WHICH, STOCKHOLDERS MAY HAVE MORE LIMITED PROTECTIONS AGAINST INTERESTED DIRECTOR TRANSACTIONS, CONFLICTS OF INTEREST AND SIMILAR MATTERS.

## EXECUTIVE COMPENSATION

We have made no provisions for paying cash or non-cash compensation to our sole officer and director. No salaries are being paid or accrued at the present time, no salaries or other compensation were paid in cash, or otherwise, or accrued for services performed prior to August 5, 2011, our date of inception, and no compensation will be paid or accrued unless and until our operations generate sufficient cash flows.

The table below summarizes all compensation awarded to, earned by, or paid to our named executive officer for all services rendered in all capacities to us for the period from inception August 5, 2011 through August 31, 2011.

-39-

APP. 000784

Summary Compensation Table

| Name and principal position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Nonqualified Deferred Compensation Earnings ($) | All Other Compensation | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Charles Grob President | 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

There are no other stock option plans, retirement, pension, or profit sharing plans for the benefit of our officer and director other than as described herein. During the periods indicated, the Company had no directors who did not also serve as executive officers of the Company, whose total compensation is as provided above, included compensation for services as directors of the Company (if any). There have been no changes in the Company's compensation policies since August 31, 2011.

There were no grants of stock options since inception to the date of this prospectus.

We do not have any long-term incentive plans that provide compensation intended to serve as incentive for performance.

Our sole director has not adopted a stock option plan. We have no plans to adopt a stock option plan, but may choose to do so in the future. If such a plan is adopted, this may be administered by the board or a committee appointed by the board. The committee would have the power to modify, extend or renew outstanding options and to authorize the grant of new options in substitution therefore, provided that any such action may not impair any rights under any option previously granted. We may develop an incentive based stock option plan for our officer and director and may reserve up to 10% of our outstanding shares of common stock for that purpose.

OPTIONS GRANTS DURING THE LAST FISCAL YEAR / STOCK OPTION PLANS

We do not currently have a stock option plan in favor of any director, officer, consultant or employee of our company. No individual grants of stock options, whether or not in tandem with stock appreciation rights known as SARs or freestanding SARs have been made to our sole director and officer since our inception; accordingly, no stock options have been granted or exercised by our sole director and officer since we were founded.

AGGREGATED OPTIONS EXERCISES IN LAST FISCAL YEAR

No individual grants of stock options, whether or not in tandem with stock appreciation rights known as SARs or freestanding SARs have been made to our sole director and officer since our inception; accordingly, no stock options have been granted or exercised by our sole director and officer since we were founded.

LONG-TERM INCENTIVE PLANS AND AWARDS

We do not have any long-term incentive plans that provide compensation intended to serve as incentive for performance. No individual grants or agreements regarding future payouts under non-stock price-based plans have been made to our sole director and officer or any employee or consultant since our inception; accordingly, no future payouts under non-stock price-based plans or agreements have been granted or entered into or exercised by our sole director and officer or employees or consultants since we were founded.

-40-

APP. 000785

COMPENSATION OF DIRECTORS

Our sole director is not compensated by us for acting as such. He is reimbursed for reasonable out-of-pocket expenses incurred. There are no arrangements pursuant to which our sole director is or will be compensated in the future for any services provided as a director.

We do not have any agreements for compensating our directors for their services in their capacity as directors, although such directors are expected in the future to receive stock options to purchase shares of our common stock as awarded by our board of directors.

EMPLOYMENT CONTRACTS, TERMINATION OF EMPLOYMENT, CHANGE-IN-CONTROL ARRANGEMENTS

There are no employment contracts or other contracts or arrangements with our officer or director other than those disclosed in this report. There are no compensation plans or arrangements, including payments to be made by us, with respect to Mr. Grob that would result from his resignation, retirement or any other termination. There are no arrangements for directors, officers or employees that would result from a change-in-control.

INDEBTEDNESS OF DIRECTORS, SENIOR OFFICERS, EXECUTIVE OFFICERS AND OTHER MANAGEMENT

Neither our sole director and officer nor any associate or affiliate of our company during the last two fiscal years is or has been indebted to our company by way of guarantee, support agreement, letter of credit or other similar agreement or understanding currently outstanding.

-41-

### SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS

The following table sets forth, as of the date of this prospectus, the total number of shares owned beneficially by our sole officer and director, and the present owners of 5% or more of our total outstanding shares. The table also reflects what his ownership will be assuming completion of the sale of all shares in this offering. The stockholder listed below has direct ownership of his shares and possesses sole voting and dispositive power with respect to the shares.

Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and includes voting and/or investing power with respect to securities. We believe that, except as otherwise noted and subject to applicable community property laws, each person named in the following table has sole investment and voting power with respect to the shares of common stock shown as beneficially owned by such person. Additionally, shares of common stock subject to options, warrants or other convertible securities that are currently exercisable or convertible, or exercisable or convertible within 60 days of the date of this prospectus, are deemed to be outstanding and to be beneficially owned by the person or group holding such options, warrants or other convertible securities for the purpose of computing the percentage ownership of such person or group, but are not treated as outstanding for the purpose of computing the percentage ownership of any other person or group.

| Title of Class | Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class [1] |
|---|---|---|---|
| Common Stock | Charles Grob 2800 Post Oak Blvd., Suite 4100, Houston, Texas 77056 | 10,000,000 | 100% |
| | All Officers and Directors as a Group (1 person) | 10,000,000 | 100% |

The following table sets forth the beneficial ownership table after the anticipated 100% completion of the offering.

| Title of Class | Name and Address of Shareholders | Amount and Nature of Shareholders Ownership | Percent of Class [2] |
|---|---|---|---|
| Common Stock | Charles Grob 2800 Post Oak Blvd., Suite 4100 Houston, Texas 77056 | 10,000,000 | 66.66% |
| | All other Shareholders | 5,000,000 | 33.33% |

[1] Based on 10,000,000 shares issued and outstanding as of the date of this prospectus
[2] Assuming the sale of all shares offered herein.

-42-

## CHANGE IN CONTROL

We are not aware of any arrangement that might result in a change in control of our company in the future.

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

On August 22, 2011, we issued 10,000,000 shares of our common stock to our sole director and officer at $0.001 per share for aggregate proceeds of $10,000.

There have been no other transactions since our audit date, August 31, 2011, or any currently proposed transactions in which we are, or plan to be, a participant and in which any related person had or will have a direct or indirect material interest.

Given our small size and limited financial resources, we have not adopted formal policies and procedures for the review, approval or ratification of transactions, such as those described above, with our executive officer, director and significant stockholder. However, all of the transactions described above were approved and ratified by our sole director. In connection with the approval of the transactions described above, our director took into account various factors, including his fiduciary duty to the Company; the relationships of the related parties described above to the Company; the material facts underlying each transaction; the anticipated benefits to the Company and related costs associated with such benefits; whether comparable products or services were available; and the terms the Company could receive from an unrelated third party.

We intend to establish formal policies and procedures for the approval of related party transaction in the future, once we have sufficient resources and have appointed additional directors, so that such transactions will be subject to the review, approval or ratification of our Board of Directors, or an appropriate committee thereof. On a moving forward basis, our sole director will continue to approve any related party transaction based on the criteria set forth above.

## INDEMNIFICATION OF OFFICERS AND DIRECTORS

Our Bylaws provide that we will indemnify our directors and officers to the fullest extent provided by Nevada law.

The general effect of the foregoing is to indemnify a control person, officer or director from liability, thereby making us responsible for any expenses or damages incurred by such control person, officer or director in any action brought against them based on their conduct in such capacity, provided they did not engage in fraud or criminal activity.

Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended (the "Securities Act") may be permitted to our directors, officers or control persons pursuant to the foregoing provisions, we have been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

## REPORTS TO SECURITY HOLDERS

We plan to file annual, quarterly, and current reports, and other information with the SEC, where applicable. You may read and copy any reports, statements, or other information we file at the SEC's public reference room at 100 F. Street, N.E., Washington D.C. 20549. You can request copies of these documents, upon payment of a duplicating fee by writing to the SEC. Please call the SEC at 1-800-SEC-0330 for further information on the operation of the public reference rooms. Our SEC filings are also available to the public on the SEC's Internet site at http:\\www.sec.gov.

-43-

APP. 000788

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the Securities and Exchange Commission, 100 F Street NE, Washington, D.C. 20549, under the Securities Act of 1933 a registration statement on Form S-1 of which this prospectus is a part, with respect to the common shares offered hereby. We have not included in this prospectus all the information contained in the registration statement, and you should refer to the registration statement and our exhibits for further information.

In the Registration Statement, certain items of which are contained in exhibits and schedules as permitted by the rules and regulations of the Securities and Exchange Commission. You should read this prospectus and any prospectus supplement together with the Registration Statement and the exhibits filed with or incorporated by reference into the Registration Statement. The information contained in this prospectus speaks only as of its date unless the information specifically indicates that another date applies.

You should rely only on the information contained in this prospectus. No finder, dealer, sales person or other person has been authorized to give any information or to make any representation in connection with this offering other than those contained in this prospectus and, if given or made, such information or representation must not be relied upon as having been authorized by Chimera Energy Corporation. This prospectus does not constitute an offer to sell or a solicitation of an offer to buy any of the securities offered hereby by anyone in any jurisdiction in which such offer or solicitation is not authorized or in which the person making such offer or solicitation is not qualified to do so or to any person to whom it is unlawful to make such offer or solicitation.

## STOCK TRANSFER AGENT

We have not engaged the services of a transfer agent at this time. However, within the next twelve months we anticipate doing so. Until such a time a transfer agent is retained, we will act as our own transfer agent.

-44-

APP. 000789

**Chimera Energy Corporation**
**(A Development Stage Corporation)**
**Financial Statements**
**For the Period August 5, 2011 (date of inception) through August 31, 2011**

|  | Page |
|---|---|
| **Financial Statements:** | |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Balance Sheet | F-3 |
| Statement of Operations | F-4 |
| Statement of Changes in Stockholder's Equity | F-5 |
| Statement of Cash Flows | F-6 |
| Notes to Financial Statements | F-7 |

F-1

**LBB & ASSOCIATES LTD., LLP**
10260 Westheimer Road, Suite 310
Houston, TX 77042
Phone (713) 800-4343 Fax: (713) 456-2408

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Shareholders:
Chimera Energy Corporation
(A Development Stage Corporation)
Houston, Texas

We have audited the balance sheet of Chimera Energy Corporation as of August 31, 2011 and the related statements of operations, stockholder's equity and cash flows for the period August 5, 2011 (date of inception) through August 31, 2011. These financial statements were the responsibility of the Company's management. Our responsibility was to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements were free of material misstatement. The Company was not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that were appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements, referred to above, present fairly, in all material respects, the financial position of Chimera Energy Corporation as of August 31, 2011, and the results of its operations and its cash flows for the period August 5, 2011 (date of inception) through August 31, 2011, in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the financial statements, the Company's limited operations and profitability raise substantial doubt about its ability to continue as a going concern. Management's plans regarding those matters also are described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ LBB & Associates Ltd., LLP
Houston, Texas
October 12, 2011

F-2

APP. 000791

**Chimera Energy Corporation**
**(A Development Stage Corporation)**
**BALANCE SHEET**

**August 31, 2011**

| | | |
|---|---:|---:|
| **Assets** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ | 78,989 |
| Accounts receivable, net | | 17,000 |
| Inventory | | 15,000 |
| Total current assets | | 110,989 |
| | | |
| Total assets | $ | 110,989 |
| | | |
| **Liabilities and stockholder's equity** | | |
| **Current liabilities** | | |
| Accounts payable and accrued expenses | $ | 439 |
| Total current liabilities | | 439 |
| | | |
| Note payable | | 100,000 |
| Total liabilities | | 100,439 |
| | | |
| **Stockholder's equity** | | |
| Common stock: 100,000,000 authorized; $0.001 par value | | |
| 10,000,000 shares issued and outstanding | | 10,000 |
| Retained earnings during the development stage | | 550 |
| Total stockholder's equity | | 10,550 |
| | | |
| Total liabilities and stockholder's equity | $ | 110,989 |

**The accompanying notes are an integral part of these financial statements.**

F-3

APP. 000792

**Chimera Energy Corporation**
**(A Development Stage Corporation)**
**STATEMENT OF OPERATIONS**

|  | August 5, 2011 (Inception) through August 31, 2011 |
|---|---|
| Revenues | $ 17,000 |
| Cost of goods sold | 15,000 |
|   Gross profit | 2,000 |
|  |  |
| Operating expenses: |  |
| General and administrative | 1,080 |
|     Total operating expenses | 1,080 |
|  |  |
| Income from operations | 920 |
|  |  |
| Interest expense | (370) |
|  |  |
|   Net income | $ 550 |
|  |  |
|  |  |
| Basic and diluted income per share | $ 0.00 |
|  |  |
| Weighted average number of shares outstanding | 10,000,000 |

**The accompanying notes are an integral part of these financial statements.**

F-4

APP. 000793

Chimera Energy Corporation
(A Development Stage Corporation)
STATEMENT OF STOCKHOLDER'S EQUITY

| | Common Stock | | Retained earnings during the development stage | Total |
|---|---|---|---|---|
| | Shares | Amount | | |
| Issuance of common stock for cash, August 22, 2011, $.001 per share | 10,000,000 | $ 10,000 | $ - | $ 10,000 |
| Net Income | - | - | 550 | 550 |
| Balance, August 31, 2011 | 10,000,000 | $ 10,000 | $ 550 | $ 10,550 |

The accompanying notes are an integral part of these financial statements.

F-5

APP. 000794

**Chimera Energy Corporation**
**(A Development Stage Corporation)**
**STATEMENT OF CASH FLOWS**

|  | August 5, 2011 (Inception) through August 31, 2011 |
|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | |
| Net income | $ 550 |
| Adjustment to reconcile Net Income to net cash provided by operations: | |
| Changes in assets and liabilities: | |
| Accounts payable and accrued expenses | 439 |
| Accounts receivable | (17,000) |
| Inventory | (15,000) |
| Net Cash Used by Operating Activities | (31,011) |
| | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | |
| Proceeds from the issuance of common stock | 10,000 |
| Proceeds from note payable | 100,000 |
| Net Cash Provided by Financing Activities | 110,000 |
| | |
| Net change in cash and cash equivalents | 78,989 |
| Cash and cash equivalents, beginning of period | - |
| Cash and cash equivalents, end of period | $ 78,989 |

**The accompanying notes are an integral part of these financial statements.**

F-6

APP. 000795

**Chimera Energy Corporation**
**(A Development Stage Corporation)**
**Notes to Financial Statements**
**For the Period August 5, 2011 (date of inception) through August 31, 2011**

**1. Background Information**

Chimera Energy Corporation, a Nevada corporation (the "Company"), supplies equipment and components that are used in the exploration and production of oil and gas. The Company is a development stage corporation and is seeking to implement its business plan. The Company was incorporated on August 5, 2011 (Date of Inception) with its corporate headquarters located in Houston, Texas and its year-end is August 31. In addition to our present product line, we intend to develop and commercialize additional products and technologies for the oil and gas industry.

**2. Going Concern**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. For the period ended August 31, 2011, the Company had net income of $550 and has limited operations and profitability. In view of these matters, the Company's ability to continue as a going concern is dependent upon its ability to achieve a higher level of operations and profitability. The Company intends on financing its future development activities and its working capital needs largely from the sale of public equity securities with some additional funding from other traditional financing sources, including term notes until such time that funds provided by operations are sufficient to fund working capital requirements. The financial statements of the Company do not include any adjustments relating to the recoverability and classification of recorded assets, or the amounts and classifications of liabilities that might be necessary should the Company be unable to continue as a going concern.

**3. Significant Accounting Policies**

The significant accounting policies followed are:

BASIS OF PRESENTATION – The financial statements of the Company have been prepared in accordance with generally accepted accounting principles in the United States of America.

DEVELOPMENT STAGE CORPORATION – The Company is a "development stage corporation" and is devoting its resources to establishing its new business although our planned operations have commenced; we have only earned minimal revenues during the period from August 5, 2011 (Inception) to August 31, 2011.

USE OF ESTIMATES - The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

F-7

APP. 000796

chimera424b3.htm

CASH AND CASH EQUIVALENTS - All cash, other than held in escrow, is maintained with a major financial institution in the United States. Deposits with this bank may exceed the amount of insurance provided on such deposits. Temporary cash investments with an original maturity of three months or less are considered to be cash equivalents.

RESEARCH AND DEVELOPMENT EXPENSES - Expenditures for research, development, and engineering of products are expensed as incurred.

INVENTORY – Inventories will be valued at the lower of cost or market. The cost will be determined by the first –in, first-out (FIFO) method and inventories are reviewed for excess quantities and obsolescence.

REVENUE AND COST RECOGNITION - The Company recognizes revenue and costs in the period which the economic event occurred. Revenues are recognized upon delivery of goods or services and with reasonable assurance that the cash will be collected. The Company has recorded one sale, consisting of 200 units at $85.00 per unit ($17,000 total), for the period ended August 31, 2011 in which $8,500 remains uncollected as of the date of the audit report.

The Company establishes an allowance for doubtful accounts to ensure accounts receivable are not overstated due to accounts that are not collectible. The Company maintains a bad debt reserve based on a variety of factors, including the age of the receivable, trends and financial condition of customers, macroeconomic conditions, and significant one-time events. Management believes no allowance is necessary as of August 31, 2011.

ADVERTISING COSTS - The Company's policy regarding advertising is to expense advertising when incurred.

SHIPPING AND HANDLING FEES – All amounts billed to a customer in a sales transaction related to shipping and handling are reported as revenues. Costs incurred by the Company for shipping and handling are reported as cost of sales.

INCOME TAXES - Income taxes are provided for the tax effects of transactions reported in the financial statements and consist of taxes currently due plus deferred taxes resulting from temporary differences. Such temporary differences result from differences in the carrying value of assets and liabilities for tax and financial reporting purposes. The deferred tax assets and liabilities represent the future tax consequences of those differences, which will either be taxable or deductible when the assets and liabilities are recovered or settled. Valuation allowances are established when necessary to reduce deferred tax assets to the amount expected to be realized.

F-8

APP. 000797

The Company has adopted the provisions of FASB ASC 740-10 "Uncertainty in Income Taxes" (ASC 740-10). The Company has not recognized a liability as a result of the implementation of ASC 740-10. A reconciliation of the beginning and ending amount of unrecognized tax benefits has not been provided since there is no unrecognized benefit since the date of adoption. The Company has not recognized interest expense or penalties as a result of the implementation of ASC 740-10. If there were an unrecognized tax benefit, the Company would recognize interest accrued related to unrecognized tax benefits in interest expense and penalties in operating expenses.

EARNINGS (LOSS) PER SHARE - Basic loss per share is computed by dividing net loss attributable to common stockholders by the weighted average common shares outstanding for the period. Diluted loss per share is computed giving effect to all potentially dilutive common shares. Potentially dilutive common shares may consist of incremental shares issuable upon the exercise of stock options and warrants and the conversion of notes payable to common stock. In periods in which a net loss has been incurred, all potentially dilutive common shares are considered anti-dilutive and thus are excluded from the calculation. On August 31, 2011, the Company did not have any potentially dilutive securities that could result in the issuance of additional shares of common stock.

FINANCIAL INSTRUMENTS - We account for assets and liabilities at fair value in accordance with FASB Accounting Standards Codification (ASC) 820 "Fair Value Measurements and Disclosures" (ASC 820) defines fair value as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. ASC 820 also establishes a fair value hierarchy that distinguishes between (1) market participant assumptions developed based on market data obtained from independent sources (observable inputs), and (2) an entity's own assumptions about market participant assumptions developed based on the best information available in the circumstances (unobservable inputs). The fair value hierarchy consists of three broad levels, which gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3). The three levels of the fair value hierarchy are described below:

- Level 1 - Unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities.

- Level 2 - Inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly, including quoted prices for similar assets or liabilities in active markets; quoted prices for identical or similar assets or liabilities in markets that are not active; inputs other than quoted prices that are observable for the asset or liability (e.g., interest rates); and inputs that are derived principally from or corroborated by observable market data by correlation or other means.

- Level 3 - Inputs that are both significant to the fair value measurement and unobservable.

F-9

APP. 000798

Fair value estimates discussed herein are based upon certain market assumptions and pertinent information available to management as of August 31, 2011. The respective carrying value of certain on-balance-sheet financial instruments approximated their fair values due to the short-term nature of these instruments. These financial instruments include accounts receivable, other current assets, accounts payable, accrued compensation and accrued expenses. The fair value of the Company's notes payable is estimated based on current rates that would be available for debt of similar terms which is not significantly different from its stated value.

RECENT ACCOUNTING PRONOUNCEMENTS

The Company accounting policies contemplate all affected pronouncements issued by the Financial Accounting Standards Board ("FASB"). There are no issued, but not yet affected pronouncements which are expected by management to have a material impact on the Company's present or future financial statements.

**4. Note Payable**

On August 22, 2011, the Company borrowed $100,000 through a promissory note, for the purpose of raising operating capital. Under the terms of the note, interest shall accrue at 15% per annum; and principal and accrued interest shall become due on August 21, 2013, unless extended by mutual consent of the parties.

The note is secured by all the assets, properties, goods, inventory, equipment, furniture, fixtures, leases, supplies, records, money, documents, instruments, chattel paper, accounts, intellectual property rights (including but not limited to, copyrights, moral rights, patents, patent applications, trademarks, service marks, trade names, trade secrets) and other general intangibles, whether owned by the Company on August 22, 2011 or acquired thereafter.

**5. Related Party Transactions**

The Company's sole Officer and Director is involved in other business activities and may, in the future, become involved in other business opportunities that become available. He may face a conflict in selecting between the Company and other business interests. The Company has not formulated a policy for the resolution of such conflicts.

**6. Income Taxes**

The Company follows ASC 740. Deferred income taxes reflect the net effect of (a) temporary difference between carrying amounts of assets and liabilities for financial purposes and the amounts used for income tax reporting purposes and (b) net operating costs carry-forwards.

F-10

APP. 000799

As of August 31, 2011, the Company had net operating loss carry forwards of approximately $31,000 that may be available to reduce future years' taxable income through to Year 2031. Future tax benefits which may arise as a result of these losses have not been recognized in these financial statements, as their realization is determined not likely to occur and accordingly, the Company has recorded a valuation allowance for the deferred tax asset relating to these tax loss carry-forwards.

The components of the deferred tax asset, the statutory tax rate, the effective tax rate and the elected amount of the valuation allowance are indicated below:

|  | From August 5, 2011 (Inception) to August 31, 2011 |
|---|---|
| Net operating loss | $ 31,000 |
| Statutory tax rate | 34?% |
| Refundable federal income tax attributable to current operations | 10,500 |
| Change in valuation allowance | (10,500) |
| Net refundable amount | $ - |

The cumulative tax effect at the expected rate of 34% of significant items comprising the net deferred tax amount is as follows:

|  | August 31, 2011 |
|---|---|
| Deferred tax asset attributed to: | |
| Net operating loss | $ 31,000 |
| Less, valuation allowance | (31,000) |
| Net deferred tax assets | $ - |

F-11

APP. 000800

**DEALER PROSPECTUS DELIVERY OBLIGATION**

Until a date, which is 90 days after the date of this prospectus, all dealers that effect transactions in these securities whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

**PROSPECTUS**

**CHIMERA ENERGY CORPORATION**

**SALE OF**
**5,000,000 SHARES OF COMMON STOCK**

**DECEMBER 21, 2011**

You should rely only on the information contained in this Prospectus. No dealer, salesperson or other person is authorized to give information that is not contained in this Prospectus. This Prospectus is not an offer to sell nor is it seeking an offer to buy these securities in any jurisdiction where the offer or sale is not permitted. The information contained in this Prospectus is correct only as of the date of this Prospectus, regardless of the time of the delivery of this Prospectus or the sale of these securities.

-45-

APP. 000801

# Appendix

# Exhibit XX

10-Q 1 chimera10q053112.htm

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

### Form 10-Q

☑   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

#### For the quarterly period ended May 31, 2012

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number 333-177406

**Chimera Energy Corporation**

(Exact name of small business issuer as specified in its charter)

| | |
|---|---|
| **Nevada** | **45-2941876** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2800 Post Oak Blvd., Suite 4100 Houston, TX** | **77056** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (832) 390-2334

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act:

Large accelerated filer ☐                                Accelerated filer ☐

Non-accelerated filer ☐                                Smaller reporting company ☑

There were 66,000,000 shares of the registrant's common stock issued and outstanding as of July 12, 2012.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐   No ☑

**APP. 000803**

## IMPORTANT INFORMATION REGARDING THIS FORM 10-Q

Unless otherwise indicated, references to "we," "us," and "our" in this Quarterly Report on Form 10-Q refer to Chimera Energy Corporation.

Readers should consider the following information as they review this Quarterly Report:

### Forward-Looking Statements

The statements contained or incorporated by reference in this Quarterly Report on Form 10-Q that are not historical facts are "forward-looking statements" (as such term is defined in the Private Securities Litigation Reform Act of 1995), within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). All statements other than statements of historical fact are, or may be deemed to be, forward-looking statements. Forward-looking statements include any statement that may project, indicate or imply future results, events, performance or achievements. The forward-looking statements contained herein are based on current expectations that involve a number of risks and uncertainties. These statements can be identified by the use of forward-looking terminology such as "believes," "expect," "may," "will," "should," "intend," "plan," "could," "estimate" or "anticipate" or the negative thereof or other variations thereon or comparable terminology, or by discussions of strategy that involve risks and uncertainties.

Given the risks and uncertainties relating to forward-looking statements, investors should not place undue reliance on such statements. Forward-looking statements included in this Quarterly Report on Form 10-Q speak only as of the date of this Quarterly Report on Form 10-Q and are not guarantees of future performance. Although we believe that the expectations reflected in the forward-looking statements are reasonable, such expectations may prove to have been incorrect. All subsequent written and oral forward-looking statements attributable to us, or persons acting on our behalf, are expressly qualified in their entirety by these cautionary statements.

Except to the extent required by applicable securities laws, we expressly disclaim any obligation or undertakings to release publicly any updates or revisions to any statement or information contained in this Quarterly Report on Form 10-Q, including the forward-looking statements discussed above, to reflect any change in our expectations with regard thereto or any change in events, conditions or circumstances on which any statement or information is based.

APP. 000804

# CHIMERA ENERGY CORPORATION

**CONTENTS**

PART I – FINANCIAL INFORMATION

ITEM 1 – FINANCIAL STATEMENTS

Balance Sheets as of May 31, 2012 (Unaudited) and August 31, 2011                                                F-2

Statements of Operations for the three and nine months ended May 31, 2012 and for the period from August
5, 2011 (date of inception) through May 31, 2012 (Unaudited)                                                      F-3

Statements of Cash Flows for the nine months ended May 31, 2012 and for the period from August 5, 2011
(date of inception) through May 31, 2012 (Unaudited)                                                             F-4

Notes to Financial Statements                                                                                    F-5

ITEM 2 – MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
RESULTS OF OPERATIONS                                                                                            4

ITEM 3 – QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISKS                                             5

ITEM 4T – CONTROLS AND PROCEDURES                                                                                5

PART 2 – OTHER INFORMATION                                                                                       6

ITEM 1A – RISK FACTORS                                                                                           6

ITEM 6 – EXHIBITS                                                                                                6

**APP. 000805**

# CHIMERA ENERGY CORP
## (Development Stage Company)

### BALANCE SHEETS

ASSETS

|  | May 31, 2012 (UNAUDITED) | August 31, 2011 |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash and Cash Equivalents | $ 97,708 | $ 78,989 |
| Accounts Receivable, Net | 2,800 | 17,000 |
| Inventory | 15,970 | 15,000 |
| Total Current Assets | 116,478 | 110,989 |
| | | |
| **TOTAL ASSETS** | $ 116,478 | $ 110,989 |

LIABILITIES AND STOCKHOLDERS' DEFICIT

|  |  |  |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Accounts Payable and Accrued Expenses | $ 309 | $ 69 |
| Accrued Interest on Notes Payable | 11,620 | 370 |
| Total Current Liabilities | 11,929 | 439 |
| | | |
| Notes Payable | 100,000 | 100,000 |
| | | |
| **TOTAL LIABILITIES** | 111,929 | 100,439 |
| | | |
| **STOCKHOLDERS' DEFICIT** | | |
| Common stock, $0.01 par value, 100,000,000 shares authorized; 16,500,000 and 10,000,000 shares outstanding, respectively | 16,500 | 10,000 |
| Additional Paid In Captial | 91,000 | - |
| Retained Earnings (Deficit Accumulated) During Development Stage | (102,951) | 550 |
| | | |
| **TOTAL STOCKHOLDERS' EQUITY** | 4,549 | 10,550 |
| | | |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 116,478 | $ 110,989 |

The accompanying notes are an integral part of these financial statements.

F-1

APP. 000806

# CHIMERA ENERGY CORP
(Development Stage Company)

## STATEMENTS OF OPERATIONS (UNAUDITED)

| | For the Three Months Ended May 31, 2012 | For the Nine Months Ended May 31, 2012 | Period from Inception (August 5, 2011) to May 31, 2012 |
|---|---|---|---|
| REVENUES | $ 2,880 | $ 8,000 | $ 25,000 |
| COST OF REVENUES | 2,000 | 5,870 | 20,870 |
| GROSS PROFIT | 880 | 2,130 | 4,130 |
| OPERATING EXPENSES | | | |
| Selling, General and Administrative | 13,630 | 43,548 | 44,628 |
| Professional Fees | 50,833 | 50,833 | 50,833 |
| Total Operating Expenses | 64,463 | 94,381 | 95,461 |
| OPERATING INCOME | (63,583) | (92,251) | (91,331) |
| OTHER EXPENSES | | | |
| Interest expense | (3,750) | (11,250) | (11,620) |
| Total Other Expenses | (3,750) | (11,250) | (11,620) |
| NET LOSS | $ (67,333) | $ (103,501) | $ (102,951) |
| NET LOSS PER SHARE: | | | |
| Common Stock: | | | |
| Basic and Diluted Net Loss Per Share | $ (0.00) | $ (0.01) | |
| Denominator for Basic and Diluted Net Loss Per Share Weighted Average Number of Common Shares Outstanding | 15,098,901 | 12,505,494 | |

The accompanying notes are an integral part of these financial statements.

F-2

APP. 000807

# CHIMERA ENERGY CORP
## (Development Stage Company)

### STATEMENTS OF CASH FLOWS (UNAUDITED)

|  | For the Nine Months Ended May 31, 2012 | Period from Inception (August 5, 2011) to May 31, 2012 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net Income | $ (103,501) | $ (102,951) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Compensatory Element of Stock Issuance | 22,500 | 22,500 |
| Changes in Operating Assets and Liabilities: | | |
| Accounts Receivable | 14,200 | (2,800) |
| Inventory | (970) | (15,970) |
| Accrued Interest on Notes Payable | 11,250 | 11,250 |
| Accounts Payable and Accrued Expenses | 240 | 679 |
| NET CASH USED IN OPERATING ACTIVITIES | (56,281) | (87,292) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from Notes Payable | - | 100,000 |
| Proceeds from the Sale of Common Stock | 75,000 | 85,000 |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | 75,000 | 185,000 |
| NET CHANGE IN CASH AND CASH EQUIVALENTS | 18,719 | 97,708 |
| CASH AND CASH EQUVALENTS, Beginning of Period | 78,989 | - |
| CASH AND CASH EQUIVALENTS, End of Period | $ 97,708 | $ 97,708 |
| **SUPPLEMENTAL CASH FLOW INFORMATION** | | |
| Interest Paid | $ - | $ - |
| Income Taxes Paid | $ - | $ - |

The accompanying notes are an integral part of these financial statements.

F-3

APP. 000808

Chimera Energy Corporation
(A Development Stage Corporation)
Notes to Financial Statements
May 31, 2012 (Unaudited)

**1. Background Information**

Chimera Energy Corporation, a Nevada corporation (the "Company"), supplies equipment and components that are used in the exploration and production of oil and gas. The Company is a development stage corporation and is seeking to implement its business plan. The Company was incorporated on August 5, 2011 (Date of Inception) with its corporate headquarters located in Houston, Texas and its year-end is August 31. In addition to our present product line, we intend to develop and commercialize additional products and technologies for the oil and gas industry. The results of operations for our interim periods are not necessarily indicative of the results to be expected for the full year. Notes to the financial statements that would substantially duplicate the disclosure contained in the audited financial statements for fiscal 2011, as reported in the Form S-1 of the Company, have been omitted.

**2. Going Concern**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. For the period from August 5, 2011 through May 31, 2012, the Company incurred a net loss of $102,951 and had limited operations. In view of these matters, the Company's ability to continue as a going concern is dependent upon its ability to achieve a higher level of operations and profitability. The Company intends on financing its future development activities and its working capital needs largely from the sale of public equity securities with some additional funding from other traditional financing sources, including term notes until such time that funds provided by operations are sufficient to fund working capital requirements. These factors, among others, raise substantial doubt about our company's ability to continue as a going concern. The financial statements of the Company do not include any adjustments relating to the recoverability and classification of recorded assets, or the amounts and classifications of liabilities that might be necessary should the Company be unable to continue as a going concern.

**3. Note Payable**

On August 22, 2011, the Company borrowed $100,000 through a promissory note, for the purpose of raising operating capital. Under the terms of the note, interest shall accrue at 15% per annum; and principal and accrued interest shall become due on August 21, 2013, unless extended by mutual consent of the parties.

The note is secured by all the assets, properties, goods, inventory, equipment, furniture, fixtures, leases, supplies, records, money, documents, instruments, chattel paper, accounts, intellectual property rights (including but not limited to, copyrights, moral rights, patents, patent applications, trademarks, service marks, trade names, trade secrets) and other general intangibles, whether owned by the Company on August 22, 2011 or acquired thereafter.

**4. Common Stock**

In January 2012, the Company sold five million shares of its common stock pursuant in conjunction with a registration statement filed with the Securities and Exchange Commission on Form S-1, effective December 21, 2011. The total proceeds raised in the offering were $75,000 and the offering price per share was $0.015.

On May 25, 2012 the Company's Board of Directors authorized the issuance of 1,500,000 shares of the Company's common stock to its Chairman and CEO, Charles Grob. The shares were issued for compensation. The issuance was value at $22,500 based solely on the per share price of $0.015 paid by the subscribers to the Company's recent public offering.

**5. Subsequent Event**

On June 26, 2012 the Company's Board of Directors approved a 4:1 forward split of the Company's issued and outstanding shares of common stock. The forward split will be effectuated through the issuance of 4 new additional shares for each share held as of the records date, July 6, 2012. After giving effect to the forward split, the Company will have 66,000,000 shares of common stock issued and outstanding. The increase in authorized shares and forward stock split have not been retroactively applied.

F-4

**APP. 000809**

## ITEM 2: MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### FORWARD LOOKING STATEMENTS

This document contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," "will" or words of similar meaning and include, but are not limited to, statements about the expected future business and financial performance of the Company. Forward-looking statements are based on management's current expectations and assumptions, which are inherently subject to uncertainties, risks and changes in circumstances that are difficult to predict. Actual outcomes and results may differ materially from these expectations and assumptions due to changes in global political, economic, business, competitive, market, regulatory and other factors. We undertake no obligation to publicly update or review any forward-looking information, whether as a result of new information, future developments or otherwise.

**The following discussion and analysis should be read in connection with the Company's financial statements and related notes thereto, as included in this report, as well as the Company's effective Registration Statement filed on form S-1/A on December 5, 2011.**

### Organization and Basis of Presentation

We are a Houston based energy company, incorporated in the State of Nevada on August 5, 2011, with a fiscal year end of August 31. Our business and registered office is located at 2800 Post Oak Blvd., Suite 4100, Houston, Texas 77056. Our telephone number is 832-390-2334. Our Internet address is http://www.chimeraenergyusa.com. The information on, or that may be accessed through, our website is not incorporated by reference into this quarterly filing and should not be considered a part of this disclosure.

Our current business supplies equipment and components that are used in the exploration and production of oil and gas. In August 2011, we capitalized our business operations with a $100,000 note that bears interest at an annual rate of 15% per annum and is due and payable on August 21, 2013, and commenced our operations with the purchase of $30,000 of inventory. On August 22, 2011, our founder, sole officer and director, Charles Grob, purchased 10,000,000 shares of our common stock for $10,000 at a price per share of $0.001.

In January 2012, the Company sold five million shares of its common stock pursuant to a registration statement filed with the Securities and Exchange Commission on Form S-1, effective December 21, 2011. The total proceeds raised in the offering were $75,000 and the offering price per share was $0.015. As of the date of this filing the offering is closed. The company intends to use the proceeds from the offering as described in its prospectus filed with the SEC. For additional information concerning this offering please refer to our EDGAR filings which can be found at http://edgar.sec.gov.

### Results of Operations

### For the three and nine months ended May 31, 2012.

For the three and nine months ended May 31, 2012, we realized revenues of $2,880 and $8,000, respectively; and cost of goods sold of $2,000 and $5,870, respectively. Our operating expenses associated with the operations of the Company for the same periods were $64,463 and $94,381, respectively. Interest expense totaled $3,750 for the three months ended May 31, 2012 and totaled $11,250 for the nine months ended May 31, 2012. Interest expense for the periods ended May 31, 2012 was the interest that was accrued on our $100,000 note. For the three and nine months ended May 31, 2012, we recognized a net loss of $67,333 and $103,501, respectively. The primary reason for the net loss was due to early stage revenues from operations and an increase in operating expenses associated with going public.

-4-

APP. 000810

**For the Period from August 5, 2011 (Inception) through May 31, 2012**

For the period from August 5, 2011 (inception) through May 31, 2012, we realized revenues of $25,000 and cost of goods sold of $20,870. Our operating expenses associated with the operations of the Company for the same period were $95,461. Interest expense totaled $11,620. For the period ended May 31, 2012, we recognized a net loss of $102,951. The primary reason for the net loss was due to early stage revenues from operations and an increase in general and administrative expenses associated with going public.

**Liquidity and Capital Resources**

We incurred a net loss of $103,501 and $102,951 for the nine months ended May 31, 2012, and for the period from inception through May 31, 2012, respectively. As of May 31, 2012, we had a working capital surplus of $4,549. We anticipate that we will require approximately $500,000 to fund our operations and fully execute our business plan. We continue to rely on loans from third parties to fund operating shortfalls and do not foresee a change in this situation in the immediate future. There can be no assurance that we will continue to have such funding available. We will not be able to continue operations without additional financings. These conditions create substantial doubt as to the Company's ability to continue as a going concern.

**COMMON STOCK**

We are authorized to issue 100,000,000 shares of Common Stock, with a par value of $0.001. There were 16,500,000 shares of Common Stock issued and outstanding as of July 13, 2012 and May 31, 2012  All shares of common stock have one vote per share on all matters including election of directors, without provision for cumulative voting. The common stock is not redeemable and has no conversion or preemptive rights. The common stock currently outstanding is validly issued, fully paid and non- assessable. In the event of liquidation of the company, the holders of common stock will share equally in any balance of the company's assets available for distribution to them after satisfaction of creditors and preferred shareholders, if any. The holders of common stock of the company are entitled to equal dividends and distributions per share with respect to the common stock when, as and if, declared by the board of directors from funds legally available.

**PREFERRED STOCK**

We have not authorized or issued any preferred stock as of the date of this filing.

**ITEM 3: QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISKS**

As a smaller reporting company, we are not required to provide the information required by this Item.

**ITEM 4T: CONTROLS AND PROCEDURES**

Our principal executive have evaluated the effectiveness of our disclosure controls and procedures, as defined in Rules 13a – 15(e) and 15d – 15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") that are designed to ensure that information required to be disclosed in our reports under the Exchange Act, is recorded, processed, summarized and reported within the time periods required under the SEC's rules and forms and that the information is gathered and communicated to our management, including our principal executive officer as appropriate, to allow for timely decisions regarding required disclosure.

Our principal executive officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e)) as of the end of the period covered by this report. Based on this evaluation, our principal executive officer concluded that our disclosure controls and procedures were not effective as of the end of the period covered by this report due to a lack of segregation of duties and an absence of written policies and procedures for accounting and financial reporting, which are identified in our Annual Report on Form S-1 for the period ended August 31, 2011 as a material weakness in our internal controls over financial reporting.

-5-

**APP. 000811**

**Change In Internal Control Over Financial Reporting**
There were no changes in our internal control over financial reporting that occurred during the three months ended May 31, 2012 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## PART II. OTHER INFORMATION

### ITEM 1A: RISK FACTORS

A smaller reporting company is not required to provide the information required by this item.

### ITEM 2: Unregistered Sales of Equity Securities and Use of Proceeds

There were no unregistered sales of equity securities during the 9 month period ended May 31, 2012.

### ITEM 3: Legal Proceedings

None

### ITEM 4: EXHIBITS AND REPORTS ON FORM 8-K

| (a) | Exhibits: |
| Exhibit No. | Description |
| 31.1 | Section 302 Certification * |
| 32.1 | Section 906 Certification * |

\* filed
herewith

(b)   Reports on Form 8-K:

None.

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

                                        Chimera Energy Corporation

                              By:   /s/ Charles Grob
                                        Charles Grob
                                        Chairman of the Board and CEO
                                        (Principal Executive Officer and
                                        Principal Accounting Officer)

Date:  July 16, 2012

-6-

APP. 000812

# Appendix

# Exhibit YY

APP. 000813

8-K 1 chimera8k072612.htm CHIMERA ENERGY CORP. FORM 8-K FOR JULY 26, 2012

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# Form 8-K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): July 26, 2012**

Commission File Number 333-177406

## Chimera Energy Corp.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Nevada**<br>(State or other jurisdiction of<br>incorporation or organization) | **45-2941876**<br>(I.R.S. Employer<br>Identification No.) |
| **2800 Post Oak Blvd Suite 4100**<br>**Houston, Texas**<br>(Address of principal<br>executive offices) | **77056**<br>(Zip Code) |

Registrant's telephone number, including area code: (832) 390-2334

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

APP. 000814

**ITEM 1.01:**       **ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT**

On July 26, 2012 Chimera Energy Corp. (the "Company" or "Chimera") entered into a License Agreement (the "License") with a non-related entity, China Inland Oil Exploration Company of Chencunzhen, China("CIOEC"), related to certain technologies developed by CIOEC.

Pursuant to the terms of the License, Chimera is granted an exclusive license to develop and commercialize CIOEC's cutting edge technologies related to Non-Hydraulic Extraction. Chimera will to CIOEC a monthly license fee of $5,000USD for the term of the agreement. In addition, CIOEC will be due a royalty payment equal to 20% of the net proceeds generated from the Non-Hydraulic Extraction technologies.

The License is filed as Exhibit 10.1 hereto and should be referred to in its entirety for comprehensive information relating to the terms and conditions thereof.

**ITEM 9.01:**       **FINANCIAL STATEMENTS AND EXHIBITS**

| Exhibit Number | Description |
| --- | --- |
| 10.01 | License Agreement between Chimera Energy Corp. and China Inland Oil Exploration Company dated July 26, 2012 |

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Chimera Energy Corp.

By: /s/ Charles Grob
Charles Grob
Chairman and CEO

Date:  July 27, 2012

EX-10.01 2 ex10-01.htm LICENSE AGREEMENT BETWEEN CHIMERA ENERGY CORP. AND CHINA INLAND OIL EXPLORATION COMPANY DATED JULY 26, 2012

Exhibit 10.01

## LICENSE AGREEMENT
## 许可证协议

Agreement made, effective as of July 26, 2012, by and between Chimera Energy Corp of the USA, here referred to as licensee, and China Inland Oil Exploration Company of Chencunzhen, Guangdong Province, China, here referred to as licensor.

该协议由美国Chimera能源公司（这里称为被许可方）与中国广东省陈村镇中国大陆石油勘探公司（这里称为许可方）签署，生效日期为2012年7月26号。

In consideration of the mutual promises contained in this agreement, the parties agree as follows:

考虑到该协议中彼此间的承诺，双方达成以下协议：

## SECTION ONE.
## 第一部分

### GRANT OF LICENSE; DESCRIPTION OF PROCEDURE
### 颁发许可证；流程描述

Licensor grants to licensee a license, subject to all of the terms and conditions of this agreement, the right to institute the development and use of materials, ideas, directions and all associated Intellectual Property associated with: *The exclusive use, development rights, modifications and branding of the environmentally friendly oil & gas extraction procedure for shale to replace hydraulic fracturing that is known as Non Hydraulic Extraction.*

以协议中所有的条款和条件为依据，许可方授权被许可方许可证，被许可方有权制定材料的开发和使用，思路，方向以及所有相关的知识产权的使用，包括：*独家使用，发展权利，修改以及为了取代水力压裂而从页岩中提取油和天然气的绿色环保过程的商标标志，这种被称为非液压萃取。*

## SECTION TWO.
## 第二部分

### LIMITATION TO DESCRIBED PURPOSE
### 所描述目的的限制

"Non Hydraulic Fracturing" shall be used by licensee solely for development and marketing **for the purpose of profit** during the period beginning July 26, 2012, and continuing until this agreement is terminated as provided in this agreement.

自协议生效日，2012年7月26日起直至该协议中提供的终止时间，许可方应仅在以盈利为目的的发展及市场营销方面使用"非水力压裂"。

1

APP. 000816

### SECTION THREE.
### 第三部分

### PERIODIC PAYMENTS
### 分期付款

Licensee shall pay licensor for this license at the rate of $ 5,000.00 USD per month, payable in advance. The first payment shall be made on the date of the beginning of the period specified above. Subsequent payments shall be made in advance promptly on the last day of each month thereafter during the continuation of this agreement.

被许可人应每月向许可人支付$ 5,000.00美元用于使用许可证，需提前付款。首付款应在上述规定的期限开始之日起支付。随后的款项应及时在本协议延续期内每月的最后一天提前支付。

### SECTION FOUR.

### 第四部分

### VARIABLE PAYMENTS
### 可变支付

In addition to making the payments provided for in Section Three of this agreement, licensee shall make payments based on the profits generated from Non Hydraulic Extraction. Such payments shall be at the rate of 20% of net profits generated from Non Hydraulic Extraction and any technology developed from the procedure for a period of ten years after the first revenues are generated from utilization of the Procedure. Such payments will be made on a quarterly schedule, due 30 days after the close of each quarter. Payments will be calculated under GAAP. All payments shall be supported by appropriate statements certified by licensee.

除了在本协议第三条规定的款项支付，被许可方须支付基于非液压萃取而产生利润的款项。这些款项应是从非液压萃取以及使用该流程产生的第一笔收入后10年内关于流程的任何技术的发展所产生的净利润的20%。款项应以季度支付，每季度结束后的30天内到期。款项应以公认的会计准则计算。所有的款项应由被许可方适当的声明证实。

2

APP. 000817

## SECTION FIVE.
### 第五部分

## TERMINATION
### 协议终止

A. Either party may terminate this agreement at any time in the first 12 months, without regard to payment periods by giving written notice to the other, specifying the date of termination, such notice to be given not less than 30 days prior to the date specified in such notice for the date of termination.

任何一方在协议开始12个月内随时均可终止本协议，不考虑向对方发出书面通知的付款期限，该通知应详细说明终止本协议日期，并在指定终止日期前不超过30天发出。

B. Beginning on the 13th month, Licensor may not cancel this contract if Licensee is current on all terms and in good standing regarding the terms of this agreement. Licensee's right to terminate this agreement at any time without regard to payment periods by giving written notice to the other shall not be affected and is extended throughout the term of this agreement. such notice to be given not less than 30 days prior to the date specified in such notice for the date of termination.

从第13个月开始，如果被许可方目前遵守所有条款并有良好的信誉，许可方不得取消本协议。不考虑向对方发出书面通知的付款期限，被许可方随时终止本协议的权利不会受到影响其延长整个协议期限。该通知应详细说明终止本协议日期，并在指定终止日期前不超过30天发出。

C. If licensee shall make an assignment for the benefit of creditors, or be placed in receivership or adjudicated a bankrupt, or take advantage of any bankruptcy or insolvency law, licensor may terminate this agreement by giving written notice to the licensee, specifying the date of termination, such notice to be given not less than 30 days prior to the date specified in such notice for the date of termination.

如果被许可方分配债权人的利益，或被接管，或被裁定破产，或利用任何破产或破产法，许可方应向被许可方发出书面通知终止本协议，该通知应详细说明终止本协议日期，并在指定终止日期前不超过30天发出。

3

APP. 000818

## SECTION SIX.
### 第六部分

### GOVERNING LAW
### 基本法

It is agreed that this agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Texas, USA.

经双方同意，本协议应受美国得克萨斯州的法律规定进行解释和执行，

## SECTION SEVEN.
### 第七部分

### ENTIRE AGREEMENT
### 全部协议

This agreement constitutes the entire agreement between the parties and any prior understanding or representation of any kind preceding the date of this agreement shall not be binding on either party except to the extent incorporated in this agreement.

本协议构成双方之间的全部协议，任何事先了解或本协议的日期前的任何表现形式，除纳入本协议的范围内，不得对任何一方当事人具有约束力。

## SECTION EIGHT.

### 第八部分

### MODIFICATION OF AGREEMENT
### 协议的修改

Any modification of this agreement or additional obligation assumed by either party in connection with this agreement shall be binding only if evidenced in writing signed by each party or an authorized representative of each party.

本协议的任何修改或任一方承担的与本协议有关的额外义务，在双方或各方授权代表签署的书面证明的情况下方才具有约束力。

4

APP. 000819

http://www.sec.gov/Archives/edgar/data/1532796/000121478212000052/ex10-01.htm          5/29/2013

## SECTION NINE.

第九部分

NOTICES

通知

Any notice provided for or concerning this agreement shall be in writing and shall be deemed sufficiently given when sent by certified or registered mail if sent to the respective address of each party as set forth at the beginning of this agreement.

任何为本协议做准备或涉及本协议的通知应以书面形式，如发送到双方各自的地址，

须使用已认证或注册的邮件，如在本协议开始所述。

In witness, each party to this agreement has caused it to be executed on the date indicated below.

此证，本协议的双方在以下注明日期之日起执行。

/s/ Zeng Zong
Zeng Zong, Director                    Date: July 26, 2012
China Inland Oil Exploration
Company

/s/ Charles Grob
Charles Grob, President                Date: July 26, 2012
Chimera Energy Corp.

5

APP. 000820

APP. 000821

# Appendix

# Exhibit ZZ

GFX Message Print - Message Inquiry Display Dialog Box

User: jcarden      Bank: Square 1 Bank      Date: 08/02/13 14:06:08

Message Status: PNRM
Seq Num: 20122370014100      Related Seq Num:
Pay Method: FED Input      Message ID: FTR811
Date Recvd: 08/24/2012 05:37:46      Value Date: 08/24/2012

Sender: 021000021,      Receiver: 053112615
Amount: $25,000.00
Debit info --
    ABA:       021000021
    Name:      JPMORGAN CHASE BANK, NA
    Addr1:
    Addr2:
    Addr3:
    Addr4:

Credit info --
    Account: 106685
    Name:      Crisp Media, Inc.
    Addr1:     545 EIGHTH AVE
    Addr2:     STE 2000
    Addr3:     NEW YORK NY 10018
    Addr4:

Advice:               Dept:    DEPT1      Trancode:
Category:             Linesheet:           Create Template:

Message Text:
              XFT811
    Msg Disp    {1100}30P N
    Acc Time    {1110}0824C836FT03
    OMAD        {1120}20120824L1LFBP4C00006508240837FT03
    Msg Type    {1510}1000
    IMAD        {1520}20120824B1QGC02C001313
    Amount      {2000}000002500000
    Sender DI   {3100}021000021JPMORGAN CHASE*
    Sndr Ref    {3320}3139200237ES*
    Rcvr DI     {3400}053112615SQUARE 1 BANK*
    Bus Func    {3600}CTR
    BNP         {4200}D106685*
                CRISP MEDIA INC.*
                545 EIGHTH AVE SUITE 2000*
                NEW YORK NY 10018 US*
    RFB         {4320}BPI: OF 12/08/24*
    ORG         {5000}D897988374*
                CHARTERED INVESTMENTS INC*
                5005 HIDALGO ST UNIT 619*
                HOUSTON, TX 770566425*
    OBI         {6000}OMEGA CYBER /CHIMERA ENERGY*

CONFIDENTIAL                                    CRISP000005

GFX Message Print - Message Inquiry Display Dialog Box

User: jcarden      Bank: Square 1 Bank      Date: 08/02/13 14:05:48

Message Status: PNRM
Seq Num: 20122080085500      Related Seq Num:
Pay Method: FED Input:      Message ID: FTR811
Date Recvd: 07/26/2012 13:47:02      Value Date: 07/26/2012

Sender:  021000021,      Receiver:  053112615
Amount:  $25,000.00
Debit info --
     ABA:     021000021
     Name:    JPMORGAN CHASE BANK, NA
     Addr1:
     Addr2:
     Addr3:
     Addr4:

Credit info --
     Account: 106685
     Name:    Crisp Media, Inc.
     Addr1:   545 EIGHTH AVE
     Addr2:   STE 2000
     Addr3:   NEW YORK NY 10018
     Addr4:

Advice:             Dept:    DEPT1      Trancode:
Category:           Linesheet:          Create Template:

Message Text:
               XFT811
     Msg Disp    {1100}30P N
     Acc Time    {1110}07261647FT03
     OMAD        {1120}20120726L1LFBP4C00020107261647FT03
     Msg Type    {1510}1000
     IMAD        {1520}20120726B1QGC08C006414
     Amount      {2000}000002500000
     Sender DI   {3100}021000021JPMORGAN CHASE*
     Sndr Ref    {3320}4312700208ES*
     Rcvr DI     {3400}053112615SQUARE 1 BANK*
     Bus Func    {3600}CTR
     BNF         {4200}D106685*
                 CRISP MEDIA INC.*
                 545 EIGHTH AVE SUITE 2000*
                 NEW YORK NY 10018 US*
     RFB         {4320}BPL OF 12/07/26*
     ORG         {5000}D897988374*
                 CHARTERED INVESTMENTS INC*
                 5005 HIDALGO ST UNIT 619*
                 HOUSTON, TX 770566425*
     OBI         {6000}OMEGA CYBER /CHIMERA ENERGY*

CONFIDENTIAL                                          CRISP000006