

Dear Fellow Shareholders,

The last few weeks have been simultaneously the most rewarding and the most challenging during my tenure as the Chairman and CEO of Chimera Energy Corp. The highs, and lows, are both noteworthy and deserve more discussion than can be achieved through a Press Release. I hope this letter will help bring you some clarity as to the current status of our company as well as our plans and goals for the future.

The past twelve months of our development efforts have culminated in a phenomenal opportunity for our Non-Hydraulic Fracturing technology to debut with PEMEX, one of the largest oil and gas producers in Latin America. Just getting an opportunity to work with such an established industry player is a major win for us. During our recent visit to PEMEX we discussed engineering plans to utilize our technology on 3 wells chosen by PEMEX. Once the final engineering plans are approved we will execute a definite agreement with PEMEX for the services to be provided. In the industry this is known as a Master Service Agreement. The Agreement will specify all of the operational and financial details of the services to be provided. Once this Agreement is reached will file the executed version with the SEC as part of a Current Report on Form 8-K.

Unfortunately, all is not roses. Over the past 3 weeks Chimera has become the target of what can only be described as a blatant misinformation campaign. These self-described "shorters" are running a highly coordinated campaign against our company consisting of falsehoods, slander and innuendo. This campaign has consisted of misleading and libelous articles posted on the trading website Seeking Alpha, attempts to extort information from our employees and attorneys, hundreds of repetitive postings clogging company message boards, not to mention the highly illegal practice of naked shorting.

For those of you who have read the "articles" and message board postings I thought it would be worthwhile to discuss a few of the blatant lies that have been told:

1. I am the majority stockholder of Chimera Energy Corp. I hold 67.54% of the issued and outstanding stock of the company. Per SEC rules and guidelines my stock holdings are included in the company's filing with the SEC. I have never sold or transferred a single share of Chimera stock.

2. We have an executed Memorandum of Understanding with PEMEX related to our Non-Hydraulic Fracturing technology.

3. We have received a formal proposal request from PEMEX relating to the use of our technology on three wells identified and designated by PEMEX.

4. Simultaneous to the our work the engineering plans for the PEMEX wells we are negotiating the terms of the definitive Master Service Agreement that will spell out the terms and conditions of the services to be provided to PEMEX.

I had hoped that these "shorters" would make their money and find another company to denigrate, however it appears as though they have chosen to double down. This campaign became highly

SEC-LoevD-E-0003432

personal to me when a video posted by this group to the YouTube service attacked my family and included their contact information. This escalation leaves me no choice but to go on the offensive.

Over the next several days I will be working with our attorneys to devise a litigation strategy for getting to the bottom of this campaign. It will not be easy to find the perpetrators. They are well hidden behind anonymous email accounts and fake names. Our efforts may not lead to the ultimate perpetrators, but they will certainly expose the truth behind this attack campaign.

I ask each and every shareholder to carefully consider all of the information about the company when making your investment decisions. I believe that Chimera and our technology both have bright futures.

While I may not be able to speak directly to each and every shareholder, I ask that if you have an comments or concerns that you email us at ir@chimeraenergyusa.com.

Sincerely,


Charles Grob
Chairman & CEO



SEC-LoevD-E-0003433

# Appendix

# Exhibit HHHH

**To:** Andrew Farmer
(andrew.farmer@iridiumcapitallimited.com)[andrew.farmer@iridiumcapitallimited.com]
**From:** David M. Loev
**Sent:** Tue 8/28/2012 7:14:30 PM
**Importance:** Normal
**Subject:** FW: Chimera 8-K
submissionpdf.pdf

Pls confirm approval to file

David M. Loev
The Loev Law Firm, PC
6300 West Loop South
Suite 280
Bellaire, Texas 77401
(713) 524-4110 - phone
(713) 524-4122 - fax
(713) 920-9372 - efax
dloev@loevlaw.com
http://www.loevlaw.com


-----Original Message-----
From: Alyssa Vasquez [mailto:alyssa@loevlaw.com]
Sent: Tuesday, August 28, 2012 6:14 PM
To: David Loev; John Gillies
Subject: Chimera 8-K


--
Alyssa Vasquez
The Loev Law Firm, PC
6300 W. Loop South
Suite 280
Bellaire, TX 77401
713-524-4110
alyssa@loevlaw.com

SEC-LoevD-E-0002270

**Loev Corporate Filings, Inc. Electronic EDGAR Proof**

| | |
|---|---|
| **Job Number:** | **8-K** |
| **Filer:** | **Chimera** |
| **Form Type:** | **8-K** |
| **Reporting Period / Event Date:** | **08/28/12** |
| **Customer Service Representative:** | **Alyssa Vasquez** |
| **Revision Number:** | **1** |

This proof may not fit on letter-sized (8.5 x 11 inch) paper. If copy is cut off, please print to a larger format, e.g., legal-sized (8.5 x 14 inch) paper or oversized (11 x 17 inch) paper.

Accuracy of proof is guaranteed ONLY if printed to a PostScript printer using the correct PostScript driver for that printer make and model.

(this header is not part of the document)

SEC-LoevD-E-0002271

**EDGAR Submission Header Summary**

| | |
|---|---|
| Submission Type | 8-K |
| Live File | on |
| Return Copy | on |
| Submission Contact | Alyssa Vasquez |
| Submission Contact Phone Number | 713-524-4110 |
| Exchange | NONE |
| Confirming Copy | off |
| Filer CIK | 0001532796 |
| Filer CCC | xxxxxxxx |
| Period of Report | 08/28/12 |
| Item IDs | 8.01 |
| | 9.01 |
| Notify via Filing website Only | off |

**Documents**

| | |
|---|---|
| 8-K | chimera8k082812.htm |
| EX-99.1 | ex99-1.htm |
| GRAPHIC | ex99-1.jpg |

**Module and Segment References**

SEC-LoevD-E-0002272

# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

## Form 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): August 28, 2012**

Commission File Number 333-177406

### Chimera Energy Corp.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Nevada** | **45-2941876** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2800 Post Oak Blvd Suite 4100** | |
| **Houston, Texas** | **77056** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (832) 390-2334

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

SEC-LoevD-E-0002273

ITEM 8.01:        OTHER EVENTS

On August 28, 2012 Chimera Energy Corp. (the "Company" or "Chimera") posted to the Company's website a shareholder letter from the CEO, Charles Grob.

This shareholder letter is attached as Exhibit 99.1 hereto and is incorporated herein by reference.

ITEM 9.01:        FINANCIAL STATEMENTS AND EXHIBITS

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Shareholder Letter from Charles Grob, dated August 28, 2012 |

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Chimera Energy Corp.

By: /s/ Charles Grob
Charles Grob
Chairman and CEO

Date:  August 28, 2012

-2-

SEC-LoevD-E-0002274

Exhibit 99.1



Dear Fellow Shareholders,        .

The last few weeks have been simultaneously the most rewarding and the most challenging during my tenure as the Chairman and CEO of Chimera Energy Corp. The highs, and lows, are both noteworthy and deserve more discussion than can be achieved through a Press Release. I hope this letter will help bring you some clarity as to the current status of our company as well as our plans and goals for the future

The past twelve months of our development efforts have culminated in a phenomenal opportunity for our Non-Hydraulic Fracturing technology to debut with PEMEX, one of the largest oil and gas producers in Latin America. Just getting an opportunity to work with such an established industry player is a major win for us. During our recent visit to PEMEX we discussed engineering plans to utilize our technology on 3 wells chosen by PEMEX. Once the final engineering plans are approved we will execute a definite agreement with PEMEX for the services to be provided. In the industry this is known as a Master Service Agreement. The Agreement will specify all of the operational and financial details of the services to be provided. Once this Agreement is reached will file the executed version with the SEC as part of a Current Report on Form 8-K.

Unfortunately, all is not roses. Over the past 3 weeks Chimera has become the target of what can only be described as a blatant misinformation campaign. These self-described "shorters" are running a highly coordinated campaign against our company consisting of falsehoods, slander and innuendo. This campaign has consisted of misleading and libelous articles posted on the trading website Seeking Alpha, attempts to extort information from our employees and attorneys, hundreds of repetitive postings clogging company message boards, not to mention the highly illegal practice of naked shorting.

For those of you who have read the "articles" and message board postings I thought it would be worthwhile to discuss a few of the blatant lies that have been told:

1. I am the majority stockholder of Chimera Energy Corp. I hold 67.54% of the issued and outstanding stock of the company. Per SEC rules and guidelines my stock holdings are included in the company's filing with the SEC. I have never sold or transferred a single share of Chimera stock.

2. We have an executed Memorandum of Understanding with PEMEX related to our Non-Hydraulic Fracturing technology.

3. We have received a formal proposal request from PEMEX relating to the use of our technology on three wells identified and designated by PEMEX.

4. Simultaneous to the our work the engineering plans for the PEMEX wells we are negotiating the terms of the definitive Master Service Agreement that will spell out the terms and conditions of the services to be provided to PEMEX.

I had hoped that these "shorters" would make their money and find another company to denigrate, however it appears as though they have chosen to double down. This campaign became highly personal to me when a video posted by this group to the YouTube service attacked my family and included their contact information. This escalation leaves me no choice but to go on the offensive.

Over the next several days I will be working with our attorneys to devise a litigation strategy for getting to the bottom of this campaign. It will not be easy to find the perpetrators. They are well hidden behind anonymous email accounts and fake names. Our efforts may not lead to the ultimate perpetrators, but they will certainly expose the truth behind this attack campaign

I ask each and every shareholder to carefully consider all of the information about the company when making your investment decisions. I believe that Chimera and our technology both have bright futures.

While I may not be able to speak directly to each and every shareholder, I ask that if you have any comments or concerns that you email us at ir@chimeraenergyusa.com

Sincerely,

/s/ Charles Grob
Charles Grob
Chairman & CEO

SEC-LoevD-E-0002276

# Appendix

# Exhibit IIII

| | |
|---|---|
| Subject: | Fwd: ChEC_Foollow up Negotiations with Pemex |
| From: | Thomas Massey (thomas.massey@yahoo.com) |
| To: | apfarmer@yahoo.com; |
| Bcc: | thomas.massey@yahoo.com; |
| Date: | Monday, September 17, 2012 12:34 PM |

Need you to approve 5k for Baldamer, for expenses and other things if we do not see anything positive news from this 5k I will address it a different way....

Thomas Massey
409-658-1970 Cell

Begin forwarded message:

> **From:** Baldemar Rios <baldemar.rios@gmail.com>
> **Date:** September 17, 2012 11:31:25 AM CDT
> **To:** Thomas Massey <thomas.massey@yahoo.com>
> **Subject: ChEC_Foollow up Negotiations with Pemex**
>
> **My Friend,**
>
> As I said, I started doing the approach at the Pemex/PEP headquarters for the meeting/introduction of the technology, we need to do this with the IMP (Mexican Petroleum Institute) they provide and asist Pemex on technologies. with them
>
> As you can see this is the way Pemex works;  however, we can open the way we need it to be. The only way we can make thing the way we need  is through the top management, this is why is important to set up the meeting now because the lower level people will be crush because they are doing things without the top management authorization, especially with  new technology.
>
> As I said to you; for example in the case of the reactors, we are about to get the PO/contract and down payment and all we have is a RFQ and we submitted our proposal, they do not like too much exchange of communication with papers, they always think, we can you it in the future if things do not go the way the company (contractor) wants, a lot of the tight agreements happen verbally, these are just to comments not excuses.
>
> The important thing is that we can make things happen, they way we need. Ok I will set up the two or three meetings for next week, I will send you the names of the persons to meet in the next two days.

http://us-mg4.mail.yahoo.com/neo/launch?.rand=2pe0mguei1h7g                          4/6/2013

As you know to do all this lobbying and entertaining, I have to take people out for lunch or diner, I know you and Chimera have been supporting this, I hope, I can count with 5K because I might need to go to Villahermosa and Poza Rica by mid of this week, things will happen, I understand to make things happen we need to spend money, you know if I had money available, I will invest on this; however, I hope to have it very soon.

I will call you later.

Thank you very much.

Baldemar Perez-Rios

FW-03772                          APP. 000991                          TM000393

# Appendix

# Exhibit JJJJ

Subject:    [FWD: Chimera Expenses]

From:    cgrob@chimeraenergyusa.com (cgrob@chimeraenergyusa.com)

To:    thomas.massey@yahoo.com;

Date:    Wednesday, September 26, 2012 8:58 PM

**Charles Grob**
**Chimera Energy Corporation**
**President and CEO**
**2800 Post Oak Boulevard Ste 4100**
**Houston, TX 77056**
**Phone: (832) 390-2334**
**Fax: (832) 390-2350**



-------- Original Message --------
Subject: Chimera Expenses
From: <cgrob@chimeraenergyusa.com>
Date: Wed, September 26, 2012 6:26 pm
To: "Andrew Farmer" <andrew.farmer@iridiumcapitallimited.com>

Andrew,

Please see the attached expense report. I can and will provide receipts or bank statements
for every line item.

Thanks,

**Charles Grob**
**Chimera Energy Corporation**
**President and CEO**
**2800 Post Oak Boulevard Ste 4100**
**Houston, TX 77056**
**Phone: (832) 390-2334**
**Fax: (832) 390-2350**

http://us-mg4.mail.yahoo.com/neo/launch?.rand=2pe0mguei1h7g      4/6/2013



FW-03772 APP. 000994 TM000542

| | |
|---|---|
| Subject: | Chimera Expenses |
| From: | cgrob@chimeraenergyusa.com (cgrob@chimeraenergyusa.com) |
| To: | andrew.farmer@iridiumcapitallimited.com; |
| Cc: | thomas.massey@yahoo.com; |
| Date: | Wednesday, September 26, 2012 9:35 PM |

The previous version had an error with payment to Baldemar. Please see the corrected version of the expenses.

**Charles Grob**
**Chimera Energy Corporation**
**President and CEO**
**2800 Post Oak Boulevard Ste 4100**
**Houston, TX 77056**
**Phone: (832) 390-2334**
**Fax: (832) 390-2350**

FW-03772                    APP. 000995                    TM000543

| Date | Ammount | Company |
|------|---------|---------|
| 08/12/11 | 102.66 | Deluxe for Business |
| 08/18/11 | 12.00 | Whitney Bank |
| 08/24/11 | 238.14 | Reprint |
| 08/25/11 | 12.00 | Whitney Bank |
| 08/25/11 | 30,000.00 | Henan Jingrui |
| 08/26/11 | 35.00 | Whitney Bank |
| 09/02/11 | 129.90 | Label Artech |
| 09/02/11 | 72.37 | Office Depot |
| 09/06/11 | 177.39 | Servcorp |
| 09/12/11 | 1.38 | FedEx |
| 09/12/11 | 13.36 | FedEx |
| 09/17/11 | 97.48 | GoDaddy |
| 09/19/11 | 484.40 | GoDaddy |
| 09/20/11 | 12.90 | Office Depot |
| 09/20/11 | 31.52 | Carabba's |
| 09/23/11 | 44.97 | Houston's |
| 09/23/11 | 5,000.00 | Loev Law Firm |
| 09/23/11 | 2,500.00 | LBB & Associates |
| 09/28/11 | 27.05 | Office Depot |
| 09/28/11 | 8.21 | Office Depot |
| 10/03/11 | 69.00 | FedEx |
| 10/03/11 | 136.00 | Pre-Press Services |
| 10/05/11 | 203.02 | Servcorp |
| 10/13/11 | (8,500.00) | Encore/Tercel |
| 10/17/11 | 2,200.00 | Henan Jingrui |
| 10/17/11 | 35.00 | Whitney Bank |
| 10/17/11 | 100.00 | SEC |
| 10/17/11 | 20.00 | Whitney Bank |
| 10/17/11 | 37.65 | ULINE |
| 10/18/11 | 54.20 | Grand Lux Cafe |
| 10/24/11 | 4.30 | HEB |
| 10/24/11 | 22.70 | USPS |
| 10/24/11 | 53.72 | Piatto Ristorante |
| 10/26/11 | 5.90 | USPS |
| 11/01/11 | 5.90 | USPS |
| 11/04/11 | 214.48 | Servcorp |
| 11/07/11 | 4,000.00 | LBB & Associates |
| 11/08/11 | 919.00 | Loev Corporate Filings |
| 11/17/11 | 43.30 | Pre-Press Services |
| 11/18/11 | 9.60 | USPS |
| 12/05/11 | 200.00 | Servcorp |
| 12/09/11 | (8,500.00) | Encore/Tercel |
| 12/09/11 | (1,200.00) | Viper Bit |
| 12/12/11 | 1,050.00 | LBB & Associates |
| 12/23/11 | 3.29 | USPS |
| 12/23/11 | 651.00 | Island Stock Transfer |

| Date | Amount | Description |
|---|---:|---|
| 12/25/11 | 757.00 | Loev Corporate Filings |
| 12/25/11 | 772.00 | Loev Corporate Filings |
| 12/25/11 | 2,295.00 | Love Law Firm |
| 12/30/11 | (8,000.00) | Investor deposit |
| 01/05/12 | (18,000.00) | Investor deposit |
| 01/05/12 | 203.38 | Servcorp |
| 01/05/12 | 500.00 | Joel Felix |
| 01/06/12 | 31.00 | FedEx |
| 01/09/12 | 1,195.00 | LBB & Associates |
| 01/09/12 | 1,992.00 | Loev Law Firm |
| 01/09/12 | 1.15 | FedEx |
| 01/09/12 | 3.29 | USPS |
| 01/09/12 | 96.94 | Office Depot |
| 01/10/12 | (7,500.00) | Investor deposit |
| 01/10/12 | 65.34 | Office Depot |
| 01/11/12 | 1,500.00 | P3XBRL |
| 01/11/12 | (10,500.00) | Investor deposit |
| 01/13/12 | (32,250.00) | Investor deposit |
| 01/13/12 | 6.00 | Whitney Bank |
| 01/13/12 | 27.10 | USPS |
| 01/14/12 | 1,500.00 | David Parisi |
| 01/17/12 | (3,000.00) | Investor deposit |
| 01/19/12 | 3,000.00 | Matt Fleming |
| 01/20/12 | 6.00 | Whitney Bank |
| 02/03/12 | 223.74 | Servcorp |
| 02/03/12 | 606.00 | Island Stock Transfer |
| 02/06/12 | 1,185.00 | Loev Corporate Filings |
| 02/07/12 | 147.50 | Loev Law Firm |
| 02/08/12 | 1,012.00 | Island Stock Transfer |
| 02/08/12 | 167.00 | BizFilings |
| 02/14/12 | 2,000.00 | Henan Jingrui |
| 02/14/12 | 35.00 | Whitney Bank |
| 02/21/12 | 770.00 | Henan Jingrui |
| 02/21/12 | 35.00 | Whitney Bank |
| 02/22/12 | 11.30 | USPS |
| 02/23/12 | 102.84 | Jason's Deli |
| 02/23/12 | 20.00 | Star Stop (Exxon) |
| 02/27/12 | 19.15 | USPS |
| 03/05/12 | 201.60 | Servcorp |
| 03/06/12 | 200.00 | Island Stock Transfer |
| 03/06/12 | 2,500.00 | Charles Grob |
| 03/30/12 | (880.00) | Bit Brokers |
| 03/30/12 | (3,120.00) | Blast Hole Bit |
| 04/04/12 | 200.00 | Island Stock Transfer |
| 04/04/12 | 202.91 | Servcorp |
| 04/04/12 | 2,500.00 | Charles Grob |
| 04/05/12 | (750.00) | Nicole Fertitta |

**APP. 000997**

| Date | Amount | Payee |
|---|---|---|
| 04/10/12 | 57.44 | Office Depot |
| 04/10/12 | 457.00 | Loev Corporate Filings |
| 04/10/12 | 154.25 | Loev Law Firm |
| 04/12/12 | 7,500.00 | Scottsdale Capital Advisors |
| 04/12/12 | 20.00 | Whitney Bank |
| 04/13/12 | 900.00 | P3XBRL |
| 04/17/12 | 31.90 | USPS |
| 04/19/12 | 508.00 | FINRA |
| 04/19/12 | 20.00 | Whitney Bank |
| 04/30/12 | 2,220.00 | LBB & Associates |
| 04/30/12 | 200.00 | Island Stock Transfer |
| 04/30/12 | 214.00 | Loev Corporate Filings |
| 05/03/12 | 2,000.00 | Henan Jingrui |
| 05/03/12 | 45.00 | Whitney Bank |
| 05/03/12 | 23,333.33 | Charles Grob |
| 05/03/12 | 298.52 | Servcorp |
| 05/09/12 | 62.36 | Goode Company BBQ |
| 05/15/12 | 3.02 | Walgreens |
| 05/15/12 | 23.85 | USPS |
| 05/26/12 | (2,800.00) | Blast Hole Bit |
| 06/05/12 | 200.00 | Island Stock Transfer |
| 06/05/12 | 1,666.66 | Charles Grob |
| 06/06/12 | 109.50 | Loev Law Firm |
| 06/11/12 | 298.59 | Servcorp |
| 06/27/12 | 200.00 | FINRA |
| 07/05/12 | 299.48 | Servcorp |
| 07/09/12 | 228.00 | Island Stock Transfer |
| 07/09/12 | 5,000.00 | Charles Grob |
| 07/11/12 | 375.00 | Nevada Secretary of State |
| 07/20/12 | 5,000.00 | China Inland Oil |
| 07/20/12 | 45.00 | Whitney Bank |
| 07/24/12 | 900.00 | P3XBRL |
| 07/27/12 | 6.81 | Home Depot |
| 07/31/12 | 2,150.00 | Hulsey Intellectual Propert Lawy |
| 08/02/12 | 1,950.00 | LBB & Associates |
| 08/02/12 | 941.00 | Island Stock Transfer |
| 08/02/12 | 7,500.00 | Charles Grob |
| 08/03/12 | 303.01 | Servcorp |
| 08/06/12 | 7,101.95 | America West Drilling Supply |
| 08/07/12 | 421.00 | Loev Corporate Filings |
| 08/08/12 | 1,949.37 | United Airlines |
| 08/08/12 | 988.69 | El Camino Real Airport Hotel |
| 08/09/12 | 625.00 | NAPE |
| 08/10/12 | 178.64 | Reprint |
| 08/10/12 | 1,169.28 | Expedia |
| 08/10/12 | 35.88 | GoDaddy |
| 08/12/12 | 20.56 | Office Depot |

**APP. 000998**

| | | |
|---|---|---|
| 08/12/12 | 1,220.00 | Business Wire, inc. |
| 08/12/12 | 1,220.00 | Business Wire, inc. |
| 08/13/12 | 36.00 | United Airlines |
| 08/13/12 | 145.17 | Hotel Camino Real Aeropuerto |
| 08/13/12 | 4,000.00 | Valdemar Rios |
| 08/14/12 | 45.00 | Whitney Bank |
| 08/13/12 | 535.37 | Hotel Camino Real Polanco |
| 08/14/12 | 45.00 | Whitney Bank |
| 08/15/12 | 602.66 | Hotel Camino Real Polanco |
| 08/15/12 | 523.80 | Zhen Shanghai |
| 08/15/12 | 34.55 | The Parking Spot |
| 08/15/12 | 34.99 | FedEx |
| 08/16/12 | 4,000.00 | Valdemar Rios |
| 08/16/12 | 45.00 | Whitney Bank |
| 08/16/12 | 43.56 | FedEx |
| 08/17/12 | 1,645.00 | Business Wire, inc. |
| 08/17/12 | 1,220.00 | Business Wire, inc. |
| 08/17/12 | 1,645.00 | Business Wire, inc. |
| 08/17/12 | 1,645.00 | Business Wire, inc. |
| 08/17/12 | 1,645.00 | Business Wire, inc. |
| 08/17/12 | 1,645.00 | Business Wire, inc. |
| 08/24/12 | 1,000.00 | Valdemar Rios |
| 08/24/12 | 5,000.00 | Valdemar Rios |
| 08/27/12 | 488.10 | United Airlines |
| 08/28/12 | 24.00 | United Airlines |
| 08/28/12 | 15.00 | Royal Coach Towne Car Service |
| 08/28/12 | 17.00 | Bush International Airport |
| 08/30/12 | 338.00 | Loev Corporate Filings |
| 09/01/12 | 7,500.00 | Charles Grob |
| 09/01/12 | 800.00 | Island Stock Transfer |
| 09/07/12 | 5,000.00 | Valdemar Rios |
| 09/07/12 | 45.00 | Whitney Bank |
| 09/07/12 | 348.25 | Loev Law Firm |
| 09/11/12 | 32.48 | T-Mobile |
| 09/19/12 | 19.95 | National Student Clearing House |
| 09/19/12 | 5,000.00 | Valdemar Rios |
| 09/19/12 | 45.00 | Whitney Bank |
| 09/21/12 | 264.00 | Hulsey Intellectual Propert Lawy |
| 09/23/12 | 2,000.00 | Business Wire, inc. |
| 09/23/12 | 3,645.00 | Business Wire, inc. |
| 09/23/12 | 3,945.00 | Business Wire, inc. |
| 09/23/12 | 1,895.00 | Business Wire, inc. |

#########

# Appendix

# Exhibit KKKK

**To:**      cgrob@chimeraenergyusa.com[cgrob@chimeraenergyusa.com]
**Cc:**      Andrew Farmer
(andrew.farmer@iridiumcapitallimited.com)[andrew.farmer@iridiumcapitallimited.com]; Tyson Rohde
(tysonrohde@hotmail.com)[tysonrohde@hotmail.com]
**From:**    David M. Loev
**Sent:**    Tue 10/2/2012 6:35:44 PM
**Importance:**        Normal
**Subject:**  FW: Air Liquide/Chimera

Charles,


See correspondence below and let me know if the terms are acceptable.  I have copied
language from below which they discussed with me and I told them that we had not
discussed.


Further, Chimera agrees to remove the September 21, 2012 press release and any
reference to Air Liquide from its website and use its best efforts to contact Yahoo and
other websites that continue to publish the press release to remove same from their
websites.


Let me know if this is acceptable.


Regards,


David M. Loev

The Loev Law Firm, PC

6300 West Loop South

Suite 280

Bellaire, Texas 77401

(713) 524-4110 - phone

(713) 524-4122 - fax

SEC-LoevD-E-0002602

(713) 920-9372 - efax

dloev@loevlaw.com

http://www.loevlaw.com


**From:** Milligan, Sean [mailto:smilligan@winstead.com]
**Sent:** Tuesday, October 02, 2012 5:29 PM
**To:** dloev@loevlaw.com
**Cc:** Guthrie, Mark
**Subject:** Air Liquide/Chimera


David,


This confirms our discussion today in which you represented that Chimera
Energy Corporation agrees to the relief requested in Air Liquide USA LLC's
Application for Temporary Restraining Order.  Specifically, Chimera agrees to:
(1) Refrain from referring to Air Liquide in any public statement or press release,
including, but not limited to, on its website, or in any publications, advertising or
marketing materials, and other communications without the express written
consent of an authorized officer of Air Liquide on behalf of Air Liquide; and (2)
Refrain from claiming any sort of business relationship or agreement with Air
Liquide in any dissemination of information to the public. Further, Chimera
agrees to remove the September 21, 2012 press release and any reference to
Air Liquide from its website and use its best efforts to contact Yahoo and other
websites that continue to publish the press release to remove same from their
websites.


Please confirm we have an agreement as to the foregoing injunctive relief
requested by Air Liquide.


In return for a signed Settlement Agreement and Final Judgment entering
Permanent Injunctive relief as set forth above, Air Liquide agrees to dismiss the
lawsuit against Chimera and release its claims as set forth in the Petition against
Chimera. Air Liquide's agreement is conditioned on the understanding that

SEC-LoevD-E-0002603

`

between now and the execution of a Settlement and Final Judgment, Chimera will not (1) make or cause to be made any reference to Air Liquide in a press release, on its website, or in any publications, advertising or marketing materials, and other communications without the express written consent of an authorized officer of Air Liquide on behalf of Air Liquide; (2) claim any sort of business relationship or agreement with Air Liquide in any dissemination of information to the public.

Procedurally, we will need Chimera to file an Answer in the lawsuit, which can just be a general denial of Air Liquide's claims. This is necessary for the Court to obtain jurisdiction over Chimera and enter an Agreed Final Judgment and Permanent Injunction. Once that is done, we can execute a final Settlement Agreement and Final Judgment granting Permanent Injunction. I will begin preparing the Settlement and Final Judgment. Please confirm that you will prepare an Answer to the lawsuit on Chimera's behalf.

We would like to resolve this quickly and plan to send the Settlement Agreement and Agreed Final Judgment to you this week. Please have Chimera execute these documents within 7 days of receipt.

If you have any questions or comments regarding the foregoing, please feel free to call me if you have any questions.

Thanks,

Sean

**Sean P. Milligan**

**Winstead PC**  |  JPMorgan Chase Tower  |  600 Travis Street  |  Suite 1100 |  Houston, Texas 77002

713.650.2660 *direct*  |  713.650.2400 *fax*

smilligan@winstead.com  |  www.winstead.com

SEC-LoevD-E-0002604

IRS Circular 230 Required Notice--IRS regulations require that we inform you as follows: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended to be used and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter[s].

Information contained in this transmission is attorney privileged and confidential. It is intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone.

SEC-LoevD-E-0002605

# Appendix

# Exhibit LLLL

Filed 12 October 1 P12:20
Chris Daniel - District Clerk
Harris County
ED101J017105953
By: Nelson  Cuero

> 2012-57434 / Court: 281

CAUSE NO. _____

| | | |
|---|---|---|
| **AIR LIQUIDE USA LLC,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **CHIMERA ENERGY CORPORATION,** | § | |
| **AND CHARLES GROB** | § | |
| | § | _____ **JUDICIAL DISTRICT** |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S ORIGINAL VERIFIED PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION

Plaintiff, Air Liquide USA LLC, files this Original Petition and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction complaining of Defendants Chimera Energy Corporation and Charles Grob and shows the Court the following:

### I.
### DISCOVERY CONTROL PLAN

1.      Plaintiff intends that discovery in this matter be conducted under Level 3 of Rule 190.3 of the Texas Rules of Civil Procedure, and respectfully moves the Court to enter an Order designating this matter as Level 3.

### II.
### PARTIES

2.      Plaintiff Air Liquide USA LLC ("Air Liquide") is a Delaware limited liability company with its principal place of business in Houston, Texas.

3.      Defendant Chimera Energy Corporation ("Chimera") is a Nevada corporation that conducts business in Texas and has its principal place of business in Texas at 2800 Post Oak Boulevard, Suite 4100, Houston, Texas 77056.  Defendant does not maintain a registered agent

1238945v.1

for service of process.   Therefore, pursuant to Texas Business Organizations Code § 5.255, service may be made on Chimera's President and CEO, Charles Grob, at 17 South Cheska, Houston, Texas, 77024, or wherever he may be found.

4.      Defendant Charles Grob ("Grob"), the President and CEO of Chimera, is a Texas resident who may be served at 17 South Cheska, Houston, Texas 77024, or wherever he may be found.

## III.
## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction because the amount in controversy exceeds the minimum jurisdictional limits.   This Court also has personal jurisdiction over all Defendants.

6.      Venue is proper pursuant to Texas Civil Practice & Remedies Code § 15.002(a)(1) because a substantial part of the events or omissions giving rise to the claim occurred in Harris County.   Venue is also proper pursuant to Texas Civil Practices and Remedies Code §15.002(a)(3) because Chimera and Grob are residents of Harris County.

## IV.
## NATURE OF SUIT

7.      This suit involves the misleading use of Air Liquide's name in a press release by Chimera and Grob, who is a substantial shareholder in Chimera.   The press release is attached as **Exhibit A-1**.  Chimera's press release, issued and disseminated on the internet at the direction of Grob on September 21, 2012, improperly suggests that Air Liquide and Chimera had entered into a business relationship in which Air Liquide agreed to provide helium to a purported Non-Hydraulic Extraction system operated by Chimera for an oil services project in Mexico.   No such business relationship between Air Liquide and Chimera exists.   Air Liquide seeks a temporary

**Plaintiff's Original Petition and Application for Temporary**
**Restraining Order, Temporary Injunction, and Permanent Injunction**                    **Page 2**

APP. 001007                    SEC-Air Liquide-E-0000006

restraining order, temporary injunction and permanent injunction restraining Chimera and Grob

from using Air Liquide's name in future press releases or corporate communications without its

express consent, and to recover damages arising from such unauthorized use.   Grob's and

Chimera's actions constitute violations of Section 43(a) of the federal Lanham Act, violations of

Section 16.29 of the Texas Business and Commerce Code, and Texas common law.

**V.**
**FACTUAL BACKGROUND**

8.     Air Liquide[1] offers industrial gases and related services to a variety of customers,

including those in the industrial manufacturing, electronics and healthcare marketplaces.   Air

Liquide relies on its reputation and good name in offering quality products and services in these

industries worldwide.

9.     Chimera is a relatively new company, which trades penny stock on the Over-the-

Counter Bulletin Board exchange.   Chimera appears to be controlled exclusively by its President

and CEO, Grob.   In its Registration Statement filed with the Securities and Exchange

Commission, Chimera's business involves the marketing and wholesale distribution of

polycrystalline diamond compact cutters (PDC cutters) for use in coal mining, geological

exploration and oil and gas drilling.   *See* **Exhibit B**.

10.     On its website Chimera claims to have licensed a breakthrough method and

technology to extract shale oil without the use of water known as Non-Hydraulic Extraction.

This method is designed to neutralize dangers to groundwater and other potentially toxic

byproducts.   Chimera touts this new technology as a breakthrough alternative to the traditional

---

[1] As used herein, Air Liquide shall refer to Air Liquide USA LLC and its affiliates, as applicable.

                    SEC-Air Liquide-E-0000007

method of hydraulic fracturing. *See* **Exhibit B-1**, Chimera's website, http://www.chimeraenergyusa.com/non-hydraulic-extraction.html.

11. On August 9, 2012, Robert Legler, Director of Business Development for Air Liquide, after having read or heard about the Non-Hydraulic Extraction method in a press release Chimera had issued, sent an email to Grob, as President and CEO of Chimera, stating that Air Liquide was interested in investigating a fit with the technology set forth the recent press release by Chimera. *See* **Exhibit A, Affidavit of Robert Legler** and **Exhibit A-2**, Email chain between Legler to Grob. Mr. Grob responded that he would be interested in discussing a technology fit with Air Liquide, but no further inquiries were made with respect to Air Liquide's manufacture and supply of nitrogen gas. *See* **Exhibit A, Affidavit of Robert Legler** and **Exhibit A-2**, Email chain between Legler to Grob. On September 18, 2012, Grob sent an email to Mr. Legler inquiring about whether Air Liquide supplies helium. *See* **Exhibit A, Affidavit of Robert Legler** and **Exhibit A-2**. Mr. Legler responded on September 19, 2012, with some questions to Mr. Grob including the volume needed, the location and application for use of the helium, and when Chimera needed the helium. *See* **Exhibit A-2**. Grob never responded to Mr. Legler's September 19th email, and Air Liquide never supplied pricing information or indicated whether it was in a position to supply Chimera with helium. *See* **Exhibit A, Affidavit of Robert Legler**.

12. Subsequently, on September 21, 2012, Grob sent a web inquiry to Air Liquide expressing interest in purchasing 1000 cubic meters of helium. *See* **Exhibit A, Affidavit of Robert Legler**. Air Liquide did not respond to the inquiry. *See* **Exhibit A, Affidavit of Robert Legler**. Shortly thereafter, and without authorization of Air Liquide, Chimera issued a press release through Marketwire stating that it "has selected Air Liquide as its supplier of helium for use in Non-Hydraulic Extraction on Pemex wells in the Chicontepic Basin of Mexico. Articles

---

**Plaintiff's Original Petition and Application for Temporary**
**Restraining Order, Temporary Injunction, and Permanent Injunction**                    **Page 4**

   SEC-Air Liquide-E-0000008

have circulated recently that report a temporary tightening in the worldwide helium supply.  As such, Chimera Energy Corp management acted quickly to identify the supplier for the project in order to eliminate any potential impact." *See* **Exhibit A, Affidavit of Robert Legler** and **Exhibit A-1**. The press release claims that Chimera's Non-Hydraulic Extraction system is an unprecedented technology designed to replace hydraulic fracking without negative environmental impacts.

13.     The press release uses Air Liquide's name in a significantly misleading way.  The press release implies that Air Liquide and Chimera reached a significant business arrangement for Air Liquide to supply helium to Chimera's extraction system in Mexico.  This is simply not true. *See* **Exhibit A, Affidavit of Robert Legler**.

14.     The extent of Air Liquide's communications with Chimera prior to the press release were limited to the brief exchange in August, and subsequent exchange on September 18, 19 and 21, in which Chimera inquired as to whether Air Liquide supplied helium.  There was no prior discussion of Chimera's intended use for the helium, the quantity needed, the location of the project, and the timing of Chimera's request. *See* **Exhibit A, Affidavit of Robert Legler**.  Indeed, when Air Liquide requested such details from Chimera, it received no response. *See* **Exhibit A, Affidavit of Robert Legler**.

15.     Immediately after learning of Chimera's press release, Air Liquide took proactive steps to protect its good name and refute the misleading statements in the press release.  Robert Legler of Air Liquide emailed Grob on September 24, 2012 -- the day Air Liquide learned of the press release -- requesting that Chimera immediately meet with Air Liquide to discuss the press release. *See* **Exhibit A, Affidavit of Robert Legler and Exhibit A-2**.  In a telephone meeting later that day with Grob, Mr. Legler requested Chimera immediately retract the press release.

APP. 001010                        SEC-Air Liquide-E-0000009

*See* **Exhibit A, Affidavit of Robert Legler**.  Mr. Grob said that he would mention Mr. Legler's request to his press department and get back to Air Liquide.  *See* **Exhibit A, Affidavit of Robert Legler**.

16.     Having not heard anything from Grob, Mr. Legler emailed Grob on September 25, 2012 to get an update from Chimera's press department regarding the retraction of the press release. *See* **Exhibit A, Affidavit of Robert Legler** and **Exhibit A-2.**  A few minutes after that message, Grob and a Mr. Thomas, an individual claiming to be from Chimera's press department, called Mr. Legler, and advised Mr. Legler that any retraction of the press release might hurt Chimera's stock price. *See* **Exhibit A, Affidavit of Robert Legler**.  Mr. Thomas proposed in that conversation to issue a press release stating that Air Liquide is unable to supply the helium, but not to fully retract or clarify the prior press release with respect to the lack of any relationship or agreement between Air Liquide and Chimera.  *See* **Exhibit A, Affidavit of Robert Legler**.  In a subsequent email to Grob at 4:32 p.m. on September 25, 2012, Mr. Legler once again reiterated Air Liquide's demand that Chimera retract its press release and provided suggested wording for Chimera's retraction.  *See* **Exhibit A, Affidavit of Robert Legler and Exhibit A-2.**  Chimera called Mr. Legler in response to my email and said the words may require a few changes that will require attorney review and such review will not happen tonight but may happen in the morning.  Thereafter, at 5:43 p.m. on September 25, 2012, Mr. Legler advised Grob by email that Air Liquide would issue its own press release that evening. *See* **Exhibit A, Affidavit of Robert Legler and Exhibit A-2.**

17.     In further effort to protect its good name and reputation, Air Liquide issued its own press release on September 25, 2012, clarifying that Air Liquide has no business

---

relationship or affiliation with Chimera. *See* **Exhibit A, Affidavit of Robert Legler** and **Exhibit A-3**.

18.   Even after Air Liquide's repeated requests and Air Liquide's own press release, Chimera did not agree to issue a subsequent press release retracting its prior press release and clarifying that Chimera and Air Liquide have no business relationship. On September 26, 2012, Air Liquide, through counsel, sent Chimera a cease and desist letter. *See* **Exhibit A-4**. In the letter, counsel for Air Liquide pointed out that Chimera used Air Liquide's name in a misleading way and demanded that Chimera immediately issue a retraction of its September 21st press release, and refrain from referring to Air Liquide in any future press releases or other communications. *See* **Exhibit A-4**. The letter further demanded that Chimera confirm within 24 hours that it intended to comply with the demands set forth by Air Liquide. *See id*. Chimera failed to respond.

19.   Despite being given numerous attempts to do so, Chimera has not retracted or clarified the misleading statements in its press release despite being given many chances to do so. Chimera's failure to take corrective action or cooperate with Air Liquide in any way forces Air Liquide to seek immediate injunctive relief.

20.   The misleading use of Air Liquide's name has the potential to irreparably injure Air Liquide's good name and its business. *See* **Exhibit A, Affidavit of Robert Legler**. Based on Air Liquide's limited investigation, Chimera appears to be a very new company. *See* **Exhibit A, Affidavit of Robert Legler**. There have been others who have questioned whether Chimera does in fact have a contract to provide services to the Pemex wells in Mexico. *See* **Exhibit A-6**, August 27, 2012, *available at* http://seekingalpha.com/article/829951-chimera-energy-part-ii-pemex-denies-contract-as-fabrications-and-lies-continue-deceiving-investors.

APP. 001012                    SEC-Air Liquide-E-0000011

21.     In addition, Chimera is a penny stock company that appears to be highly volatile. Chimera does not have a significant presence in the industry and has been heavily criticized as a fraudulent company.     *See* **Exhibit A-5**, August 15, 2012 article, *available at* http://seekingalpha.com/article/808601-pay-per-click-ads-help-this-houston-promoter-run-2-simultaneous-scams-part-1-chmr.     Chimera also been criticized for misleading the public regarding its association with Pemex.     *See* **Exhibit A-6**, August 27, 2012, *available at* http://seekingalpha.com/article/829951-chimera-energy-part-ii-pemex-denies-contract-as-fabrications-and-lies-continue-deceiving-investors.     While Air Liquide does not have enough information to determine the validity of Chimera's business operations or these allegations for fraud, should injunctive relief not be granted against Chimera ordering it to refrain from misleading the public, Air Liquide is concerned that Air Liquide's name could be associated with, and face claims it was complicit in, the dissemination of misleading information to the public by Chimera.

22.     In addition, Air Liquide has an extensive customer base all over the United States and internationally.     *See* **Exhibit A, Affidavit of Robert Legler**.     Air Liquide supplies helium for industrial purposes to customers throughout the world.     *See* **Exhibit A, Affidavit of Robert Legler**.     Helium is limited in source and availability.     *See* **Exhibit A, Affidavit of Robert Legler**.     Due to factors outside of Air Liquide's control, helium is in short supply and Air Liquide has been unable to supply many of its long-time customers with the helium needed and requested for their operations.     *See* **Exhibit A, Affidavit of Robert Legler**.     Yet, Chimera's press release conveys the impression that Air Liquide has agreed to provide Chimera with helium.     If Air Liquide's customers who are not receiving the helium they need learn of this

APP. 001013                    SEC-Air Liquide-E-0000012

press release, this could impact Air Liquide's relationship with its customers.  *See* **Exhibit A, Affidavit of Robert Legler**.

23.     As discussed in paragraphs 40 through 51 below, there is no adequate remedy at law for the injuries referenced in paragraphs 8 through 22.  It appears that Chimera would have questionable ability to respond to monetary damages.  In addition, Chimera's financial status, as set forth in its S-1 Registration Statement filed with the SEC, indicates that it has assets worth just over $110,000 and liabilities at around $100,000.  *See* **Exhibit B**, Chimera's Registration Statement, p. 3.  Further, it is not even clear if Chimera has physical office space, or merely a virtual office in the Williams Tower.  *See* **Exhibit B**.

24.     Air Liquide will suffer immediate irreparable harm, damage and injury if Chimera and Grob are not enjoined from using Air Liquide's name in further communications to the public and if Chimera fails to retract its prior misleading statements in the September 21st press release.  Chimera and Grob refused to take any corrective action, claiming that such action may hurt Chimera's stock value.  Therefore, Air Liquide reasonably believes that if immediate injunctive relief is not issued preventing Chimera and Grob from using Air Liquide's name in future marketing or public communications, Chimera and Grob may once again use Air Liquide's name in a misleading way solely for Chimera's own benefit. *See* **Exhibit A, Affidavit of Robert Legler**.

## VI.
## CAUSES OF ACTION

### COUNT 1
### FEDERAL UNFAIR COMPETITION UNDER THE LANHAM ACT

25.     All preceding paragraphs are hereby incorporated by reference as if set forth fully herein.

Plaintiff's Original Petition and Application for Temporary
Restraining Order, Temporary Injunction, and Permanent Injunction

Page 9

APP. 001014                    SEC-Air Liquide-E-0000013

26.     This claim is for a violation of §43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a) *et seq.*

27.     Air Liquide has established goodwill and rights in the trademarks and trade names of "Air Liquide" through various federal trademark registrations and years of continuous use.

28.     Chimera's press release uses Air Liquide's name in a manner that is deceptively misleading and is likely to cause confusion and deceive the public as to the affiliation, connection, or association of Air Liquide with Chimera, in violation of Section 43(a) of the Lanham Act.

29.     The foregoing conduct by Chimera and Grob constitutes a misleading description of fact, and a misleading representation of fact as to Chimera's business relationship or affiliation with Air Liquide and Chimera's claimed Non-Hydraulic Extraction system, in violation of Section 43(a) of the Lanham Act. The foregoing acts and conduct by Chimera have proximately caused damages to Air Liquide in an amount in excess of the jurisdictional limits of this.

30.     Air Liquide seeks recovery of its attorneys' fees against Chimera and Grob pursuant to 15 U.S.C. §1117 of the Lanham Act.

## COUNT II
## INJURY TO BUSINESS REPUTATION/DILUTION OF TRADE NAME UNDER §16.29 OF THE TEXAS BUSINESS AND COMMERCE CODE

31.     All preceding paragraphs are hereby incorporated by reference as if set forth fully herein.

32.     This is a claim for violation of § 16.29 of the Texas Business and Commerce Code.

---

**Plaintiff's Original Petition and Application for Temporary**
**Restraining Order, Temporary Injunction, and Permanent Injunction**                    **Page 10**

SEC-Air Liquide-E-0000014

33.     Air Liquide has established goodwill and rights in the trademarks and trade names of "Air Liquide" through various federal trademark registrations and years of continuous use.

34.     Chimera's press release uses Air Liquide's name in a manner that is deceptively misleading and is likely to cause confusion and deceive the public in violation of § 16.29 of the Texas Business and Commerce Code.

35.     The foregoing acts and conduct by Chimera are likely to injure Air Liquide's business reputation and/or dilute the trademarks and trade names of Air Liquide.  Therefore, Air Liquide seeks an injunction under § 16.29 of the Texas Business and Commerce Code enjoining the use of these trademarks and trade names by Chimera.

## COUNT III
## APPROPRIATION OF AIR LIQUIDE'S NAME OR LIKENESS

36.     All preceding paragraphs are hereby incorporated by reference as if set forth fully herein.

37.     By its statements in the press release, on information and belief, Chimera and Grob appropriated Air Liquide's name and likeness for the value associated with Air Liquide's name.  Such use of Air Liquide's name and likeness is solely for Chimera's and Grob's own benefit.

38.     The foregoing acts and conduct by Chimera and Grob are likely to injure Air Liquide's business reputation and proximately cause damages to Air Liquide.

39.     Air Liquide seeks recovery of all monetary damages associated with the damages caused to Air Liquide's name and business reputation as a result of Chimera's misleading use of its name.

Plaintiff's Original Petition and Application for Temporary
Restraining Order, Temporary Injunction, and Permanent Injunction                    Page 11

APP. 001016                          SEC-Air Liquide-E-0000015

## VII.
## APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
## TEMPORARY AND PERMANENT INJUNCTION

40.    Unless a temporary restraining order is entered prohibiting Chimera from using and appropriating Air Liquide's name and/or likeness in a misleading way in future communications and press releases, Air Liquide will suffer immediate and irreparable harm to its name, and loss and damages in the form of lost good-will.

41.    The immediate and irreparable harm caused to Air Liquide for which there is no adequate remedy at law is further demonstrated as follows:

42.    First, Chimera is a new corporation that does not appear to have a significant presence in the industry.  Its principal and promoter Grob, also does not appear to have experience in the fracturing industry.  Chimera has been criticized as a fraudulent company and has misled the public as to its business relationship with Air Liquide.  Associating Air Liquide's good name with Chimera and the misleading information set forth in the press release likely will cause irreparable harm to Air Liquide's name.   Though requested, Chimera and Grob have failed to retract the press release or to provide oral or written assurance that they will retract the press release and that they will make no further unauthorized use of Air Liquide's name.   In addition, Chimera's press release is still retrievable from the internet on the Chimera Yahoo Finance page, and Air Liquide's page is not visible on that page.  *See* **Exhibit A-7**.  Therefore, Air Liquide's press release clarifying Chimera's misleading statements do not cure the immediate and irreparable harm to Air Liquide.

43.    Second, Air Liquide supplies helium for industrial and medical purposes to customers throughout the world.  Due to factors outside of Air Liquide's control, Air Liquide is unable to supply many of its long-time customers with the helium needed for their operations.

**APP. 001017**                    SEC-Air Liquide-E-0000016

Should Air Liquide's customers become aware of Chimera's unretracted press release, which implies a significant business arrangement for Air Liquide to provide helium, or if Chimera and Grob continue to use Air Liquide's name as a source of helium, this could impact Air Liquide's relationship with its customers.

44.     Immediate injunctive relief is warranted to prevent Chimera and Grob from continuing to use Air Liquide's name in a misleading way.  Based on Chimera's and Grob's own representation that any retraction of its press release could hurt its stock value, Air Liquide has reason to believe that, if not enjoined from doing so, Chimera and Grob may continue to use Air Liquide's name and association for their own benefit.

45.     There is a strong probability that Air Liquide will succeed on the merits of its case, given the facts outlined above and considering the acts of Chimera and Grob.  Although the facts are not fully developed, the risk to Air Liquide is substantial enough to warrant seeking the Court's immediate relief.  Due to the difficulty of measuring damages incurred, injunctive relief is required to adequately limit Air Liquide's damage and to prevent future injury.

46.     Air Liquide does not have an adequate remedy at law because damages cannot be calculated at this time and it is believed Chimera, a relatively new corporation without substantial assets who trades penny stock on the OTCBB exchange, and its sole officer and director and major shareholder, Grob, are unable to pay damages.  In addition, Chimera's financial situation and lack of physical presence in the Houston area or anywhere else casts doubt on Chimera's ability to pay a judgment.  Further, there is no adequate remedy at law because damage to Air Liquide's name and reputation cannot be calculated in dollars, and it may be difficult to prove that customer dissatisfaction due to the unauthorized and misleading use of Air Liquide's name caused a specific amount of damages.

APP. 001018                    SEC-Air Liquide-E-0000017

47.     Accordingly, pursuant to Texas Civil Practice & Remedies Code Section 65.001 *et seq.*, Texas Rules of Civil Procedure 680, 681 and 683, Air Liquide seeks a temporary restraining order, and following notice and a hearing, temporary injunction enjoining Chimera and Grob and those in active concert or participation with them from:

      a.    Referring to Air Liquide in any public statement or press release, including, but not limited to, on its website, or in any publications, advertising or marketing materials, and other communications without the express written consent of an authorized officer of Air Liquide on behalf of Air Liquide; and

      b.    Claiming any sort of business relationship or agreement with Air Liquide in any dissemination of information to the public.

48.     In addition to the relief set forth above, Air Liquide further seeks a mandatory temporary injunction requiring Chimera and/or Grob to remove the September 21, 2012 press release from Chimera's website and use its best efforts to contact Yahoo and other websites that continue to publish the press release to remove same from their websites.

49.     Air Liquide would further show that, unless this Court grants a permanent injunction, Air Liquide will continue to be irreparably damaged and harmed. Moreover, it is believed that Chimera may not have the ability to respond to Air Liquide's claims in damages. Accordingly, Air Liquide requests the Court to enter a permanent injunction against Chimera, as set forth herein.

50.     Air Liquide is willing to post bond if so required by the Court.

APP. 001019                    SEC-Air Liquide-E-0000018

## VIII.
## REQUEST FOR DISCLOSURE

51.    Pursuant to Texas Rule of Civil Procedure 194, Chimera is requested to disclose, within 50 days of service of this Request with Plaintiff's Original Petition, the information or material described in Rule 194.2 of the Texas Rules of Civil Procedure.

## IX.
## JURY DEMAND

52.    Pursuant to Rule 216 of the Texas Rules of Civil Procedure, Air Liquide hereby demands a jury trial in this matter. The requisite jury fee is being tendered contemporaneously.

## X.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Air Liquide respectfully prays for the following:

a.    That a temporary restraining order be issued restraining Chimera and Grob and all others acting in concert or active participation with them from:

- Referring to Air Liquide in any public statement or press release, including, but not limited to, on its website, or in any publications, advertising or marketing materials, and other communications without the express written consent of an authorized officer of Air Liquide on behalf of Air Liquide; and

- Claiming any sort of business relationship or agreement with Air Liquide in any dissemination of information to the public.

b.    That Chimera and Mr. Grob be cited to appear and show cause why a temporary, and thereafter a permanent, injunction should not be issued enjoining Defendants from the above-described acts.

c.    That after a hearing on Plaintiff's Application for Temporary Injunction, the Court enter a temporary injunction enjoining Chimera and Mr. Grob from the above-described acts and requiring Chimera and/or Mr. Grob In addition to the relief set forth above, Air Liquide further seeks a mandatory temporary injunction requiring Chimera and/or Grob to remove the September 21, 2012 press release from Chimera's website and use its

APP. 001020                         SEC-Air Liquide-E-0000019

best efforts to contact Yahoo and other websites that continue to public the press release to remove same from their websites.

d.      That on final trial on the merits, Air Liquide receive, in addition to a permanent injunction, actual damages against Defendants as a result of their wrongful actions as set forth above.

e.      That Air Liquide recover all reasonable and necessary attorneys' fees and costs.

f.      That Air Liquide be awarded, in addition to all damages outlined above, pre-judgment interest and post-judgment interest on all such sums.

g.      That Air Liquide be awarded all other and further relief, at law or in equity, to which it may be justly entitled.

Respectfully submitted,

WINSTEAD PC

By:   /s/ Jay W. Brown               .
      **Jay W. Brown**
      State Bar No. 03138830
      **Mark C. Guthrie**
      State Bar No. 08636600
      **Sean P. Milligan**
      State Bar No. 24055978
      1100 JPMorgan Chase Tower
      600 Travis Street
      Houston, Texas 77002
      Telephone: (713) 650-8400
      Facsimile: (713) 650-2400

      **ATTORNEYS FOR AIR LIQUIDE USA LLC**

---

**Plaintiff's Original Petition and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction**

Unofficial Copy Office of Chris Daniel District Clerk

     SEC-Air Liquide-E-0000020

# Appendix

# Exhibit MMMM

**To:**       David M. Loev[dloev@loevlaw.com]
**From:**     Andrew Farmer
**Sent:**     Wed 10/3/2012 8:39:32 PM
**Importance:**        Normal
**Subject:**  Re: Chimera

Sorry, thought Charles had let you know. I think that is a reasonable arrangement.

Sent from my iPhone

On Oct 3, 2012, at 6:04 PM, "David M. Loev" <dloev@loevlaw.com> wrote:


Andrew,


Let me know thoughts so I can communicate with other attorney.


David M. Loev

The Loev Law Firm, PC

6300 West Loop South

Suite 280

Bellaire, Texas 77401

(713) 524-4110 - phone

(713) 524-4122 - fax

(713) 920-9372 - efax

dloev@loevlaw.com

http://www.loevlaw.com


**From:** Chimera Energy [mailto:cgrob@chimeraenergyusa.com]
**Sent:** Wednesday, October 03, 2012 2:46 PM
**To:** David M. Loev
**Cc:** Andrew Farmer; Tyson Rohde

SEC-LoevD-E-0002609

**Subject:** Re: Chimera

David,

The terms look fine to me pending Andrew's approval.

Thanks,

Charles

Sent from my iPhone

On Oct 3, 2012, at 12:15 PM, "David M. Loev" <dloev@loevlaw.com> wrote:

Charles,

Following-up on my email from yesterday.

David M. Loev

The Loev Law Firm, PC

6300 West Loop South

Suite 280

Bellaire, Texas 77401

(713) 524-4110 - phone

(713) 524-4122 - fax

SEC-LoevD-E-0002610

(713) 920-9372 – efax

dloev@loevlaw.com

http://www.loevlaw.com

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2015.0.5856 / Virus Database: 4306/9322 - Release Date: 03/17/15

SEC-LoevD-E-0002611

# Appendix

# Exhibit NNNN

| | |
|---|---|
| Subject: | Fwd: Shareholder Letter |
| From: | Thomas Massey (thomas.massey@yahoo.com) |
| To: | baldemar.rios@gmail.com; |
| Bcc: | thomas.massey@yahoo.com; |
| Date: | Tuesday, October 9, 2012 7:41 PM |

Please review and approve I need this tonight, thanks

Thomas Massey
409-658-1970 Cell

Begin forwarded message:

> **From:** Andrew Farmer <andrew.farmer@iridiumcapitallimited.com>
> **Date:** October 9, 2012, 7:32:11 PM CDT
> **To:** John Brotherton <john.david.brotherton@gmail.com>, Tom Massey <thomas.massey@yahoo.com>
> **Subject: Shareholder Letter**
>
> Here is the first draft of the shareholder letter.
>
> Tom, please run this by Baldemar tonight.  I'd like to have his sign-off tonight.
>
> The plan would be to put this out was part of an 8-k around 10am our time.
>
> Thanks,
>
> Andrew Farmer
> **Iridium Capital Limited**
> (832) 364-6317
> (832) 553-3080 Fax
> (619) 247-2680 Cell



Dear Fellow Shareholders,

I would like to take this opportunity to introduce myself. My name is Baldemar Rios. On October 8th I was appointed by the Board of Directors and Majority Shareholder of Chimera Energy Corp. to be the new Chief Executive Officer. I have been a consultant to Chimera for the past several months working directly with PEMEX to further our exclusive Non-Hydraulic Extraction technology. I have more than 30 years of experience in a diverse range of energy related industries, including several years as a chemical engineer with PEMEX.

Over the past several months we have worked tirelessly with our contacts at PEMEX to finalize the Master Service Agreement and get our technology into the field for testing. While the process has, at times, been exasperating, we are confident that we have made the right connections and are positioned to move forward with real-world testing of the technology on several wells selected by PEMEX.

I thought it would be worthwhile to give everyone a summary of what we have accomplished to date:

1. We have executed Memorandum of Understanding with PEMEX related to our Non-Hydraulic Fracturing technology.

2. We have received a formal proposal request from PEMEX relating to the use of our technology on three wells identified and designated by PEMEX.

3. We have had extensive discussions with the PEMEX technology department related to our technology and how it can be deployed in the selected wells.

4. We have commissioned a Mexican fabrication shop to engineer and develop the prototype device for field-testing.

5. We anticipate a further set of meetings with the production engineering and technology departments of PEMEX as we move closer to the final engineering plans for the demonstration of the technology.

6. In addition to our developing relationship with PEMEX we have been contacted by several independent production companies in the United States asking about a demonstration of our technology. While we do not currently have plans to run multiple demonstration programs simultaneously, we may in the future setup a domestic demonstration for those interested parties.

With the good also comes the bad. Despite countless hours in discussions with a variety of securities attorneys and broker/dealers we continue to be mystified by the unabashed short campaign being carried out against our stock. While it seems obvious that a very aggressive short campaign exists against the stock, nobody we've contacted seems to be able to identify the individuals responsible for the campaign nor the methodology being utilized to continue the short indefinitely.

The end result of these conversations is that there is no guaranteed method for forcing a short position to cover, or settle the short position by buying the shares from the open market. While legally the position must be covered within three trading days, anecdotal evidence indicates that the market makers involved in this campaign just keep moving the position between themselves every few days, negating the obligation to cover the position.

To demonstrate the size of the "short" we need to look no further than the company's Share Volume Report from OTCBB.com. As of September 30, 2012 there were 66m shares of Chimera issued and outstanding. Charles Grob, the Majority Shareholder, held 46m shares of restricted stock in certificate form and individual investors held an additional 16m shares through brokerage accounts.

Considering those numbers, how is it possible that the Share Volume Report shows more than 17m shares traded hands in the month of September? It seems highly unlikely that more than 100% of the company's free trading stock changed hands during the month. Obviously there is no way for the company to know exactly how many shares are represented in the "short," however several expert opinions put the short at more than 10m shares.

During our discussions with counsel is was brought to our attention that a change of the company's CUSIP[1] number might force the short position to be settled prior to the change. Unfortunately, we can't just change our CUSIP number at will. The company must enact a corporate action that fundamentally changes its equity structure in order to force the change in CUSIP. After extensive discussions over the past week, I have recommended to the Board of Directors and Majority Shareholder that the company effectuate a reverse stock split of our issued an outstanding shares of common stock at a ratio of one post split share for each two shares held prior to the split. While this reverse stock split would immediately double the price of our stock, the sole purpose for taking this action would be to force the "shorters" to cover their positions.

There is no guarantee that FINRA will approve our request for the reverse split, or that the split will have the desired effect on the "shorters". What I do know is that we can't stand by and let the "shorters" take advantage of average shareholders who are just trying to make a decent return from something we all acknowledge to be a speculative investment.

Please forward your inquiries or questions to ir@chimeraenergyusa.com.

Sincerely,

Baldemar Rios
Chairman & CEO

---

[1] CUSIP numbers are unique identifiers issued by the CUSIP Service Bureau, a division of Standard & Poors. The CUSIP Service Bureau assigns a unique CUSIP number to each class of debt or equity security issued by a public company.



# Appendix

# Exhibit OOOO

# SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549

# Form 8-K

## CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): October 10, 2012

Commission File Number 333-177406

## Chimera Energy Corp.

(Exact name of registrant as specified in its charter)

| Nevada | 45-2941876 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| 2800 Post Oak Blvd Suite 4100 Houston, Texas | 77056 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area
code: (832) 390-2334

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

EXHIBIT   22                    PLTF.
                               DEFT.
WITNESS   F Avila
CONSISTING OF   8   PAGES
DATE   6-18-15
BEHMKE REPORTING AND VIDEO SERVICES, INC

chimera8k100912.htm

APP. 001032

### ITEM 5.02: DEPARTURE OF DIRECTORS OR CERTAIN OFFICERS; ELECTION OF DIRECTORS, APPOINTMENT OF CERTAIN OFFICERS

Effective October 10, 2012, Charles Grob resigned from all positions held with the Chimera Energy Corp. (the "Company" or "Chimera"), including resigning as Chairman of the Board of Directors. There was no disagreement between the Company and Mr. Grob at the time of his resignation from the Board of Directors.

Also on October 10, 2012, the Company's Shareholders appointed Baldemar Rios as sole Director, CEO and Corporate Secretary. Mr. Rios will serve as a director until his successor has been elected at the next annual meeting of the Company's shareholders or until his earlier resignation, removal, or death. Mr. Rios has not been appointed to any committees of the Board, as the Board does not presently have any committees.

Baldemar Rios, age 54, has held various positions in in a diverse range of energy related industries and operated his own businesses for more than 30 years.

Most recently, from 1993 to late 2010, Mr. Rios served as the President and CEO of Projects & Industrial Products, LP, a Houston based enterprise focused on engineering services related to petrochemical and refining facilities.

Prior to 1993, Mr. Rios was involved in a variety of companies, generally in the capacity of a chemical engineer.

Mr. Rios does not currently have any employment agreement in place with the Company.

Mr. Rios was not appointed pursuant to any arrangement or understanding between Mr. Rios and any other person.

### ITEM 8.01: OTHER EVENTS

On October 10, 2012, Chimera posted to the Company's website a shareholder letter from the CEO, Baldemar Rios.

This shareholder letter is attached as Exhibit 99.1 hereto and is incorporated herein by reference.

### ITEM 9.01: FINANCIAL STATEMENTS AND EXHIBITS

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Shareholder Letter from Baldemar Rios, dated October 10, 2012 |

APP. 001033

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Energy Corp.

Chimera

By:    /s/

Baldemar Rios

Rios

Baldemar

and CEO

Chairman

Date: October 10, 2012

APP. 001034

chimera8k100912.htm

APP. 001035

**Exhibit 99.1**



Dear Chimera Shareholders,

On behalf of Chimera Energy Corp, I would like to take this opportunity to introduce myself. My name is Baldemar Rios. On October 10, 2012, I was appointed by the Board of Directors and Majority Shareholder of Chimera Energy Corp. to be the new Chief Executive Officer. I have been a consultant to Chimera for the past several months working directly with Petróleos Mexicanos (also known as PEMEX), one of the largest producers of oil and gas in the Americas, to further our exclusive Non-Hydraulic Extraction technology. I have more than 30 years of experience in a diverse range of energy related industries, including several years as a chemical engineer with PEMEX.

Over the past several months we have worked tirelessly with our contacts at PEMEX to finalize the Master Service Agreement and get our technology into the field for testing. While the process has, at times, been exasperating, we are confident that we have made the right connections and are positioned to move forward with real-world testing of the technology on several wells selected by PEMEX.

I thought it would be worthwhile to give everyone a summary of what we have accomplished to date:

1. We have executed Memorandum of Understanding with PEMEX related to our Non-Hydraulic Fracturing technology.

2. We have received a formal proposal request from PEMEX relating to the use of our technology on three wells identified and designated by PEMEX.

3. We have had extensive discussions with the PEMEX technology department related to our technology and how it can be deployed in the selected wells.

4. We have commissioned a Mexican fabrication shop to engineer and develop the prototype device for field-testing.

5. We anticipate a further set of meetings with the production engineering and technology departments of PEMEX as we move closer to the final engineering plans for the demonstration of the technology.

6. In addition to our developing relationship with PEMEX we have been contacted by several independent production companies in the United States asking about a demonstration of our technology. While we do not currently have plans to run multiple demonstration programs simultaneously, we may in the future setup a domestic demonstration for those interested parties.

With the good also comes the bad. Despite countless hours in discussions with a variety of securities attorneys and broker/dealers we continue to be mystified by the unabashed short campaign being carried out against our stock. While it seems obvious that a very aggressive short campaign exists against the stock, nobody we've contacted seems to be able to identify the individual(s) responsible for the campaign nor the methodology being utilized to continue the short indefinitely. The methodology has been described as "naked shorting," an activity that is manipulative and generally illegal.

6/15/2015                                                          ex99-1.htm

The end result of these conversations is that there is no guaranteed method for forcing a short position to cover, or settle the short position by buying the shares from the open market. While legally the sale of a security must be settled within three trading days, anecdotal evidence indicates that the market makers involved in this campaign just keep moving the position between themselves every few days, negating the obligation to cover or deliver the position. This activity violates SEC Reg SHO as it relates to short sale activities. More information can be found at: http://www.sec.gov/spotlight/keyregshoissues.htm.

To demonstrate the size of the "short" we need to look no further than the company's Share Volume Report from OTCBB.com. As of September 30, 2012 there were 66m shares of Chimera issued and outstanding. Charles Grob, the Majority Shareholder, held 46m shares of restricted stock in certificate form and individual investors held an additional 16m shares through brokerage accounts. There were also 4m free trading shares being held in certificate form. Therefore, as of September 30, 2012 there were only 16m shares of free trading stock available in the market.

Considering those numbers, how is it possible that the Share Volume Report shows more than 17m shares traded hands in the month of September? It seems highly unlikely that more than 100% of the company's free trading stock changed hands during the month. Obviously there is no way for the company to know exactly how many shares are represented in the "short," however several expert opinions put the short at more than 10m shares.

During our discussions with counsel is was brought to our attention that a change of the company's CUSIP[1] number might force the short position to be settled prior to the change. Unfortunately, we can't just change our CUSIP number at will. The company must enact a corporate action that fundamentally changes its equity structure in order to force the change in CUSIP. After extensive discussions over the past week, I have recommended to the Board of Directors and Majority Shareholder that the company consider taking a corporate action that would necessitate a change in the CUSIP number. To that end, I have instructed the company's securities counsel to provide the Board of Directors with a recommendation as to the most efficient method of accomplishing the goal of changing the CUSIP number.

There is no guarantee that FINRA will approve our request for the corporate action, or that the change of CUSIP number will have the desired effect on the "shorters". What I do know is that we can't stand by and let these bottom feeders take advantage of legitimate shareholders.

Our commitment to the shareholders of Chimera and the continued advancement of our technology is unwavering. We sincerely appreciate your patience and support as we navigate through these trying times.

Please forward your inquiries or questions to ir@chimeraenergyusa.com.


Sincerely,

/s/ Baldemar Rios
Baldemar Rios
Chairman & CEO


[1] CUSIP numbers are unique identifiers issued by the CUSIP Service Bureau, a division of Standard & Poors. The CUSIP Service Bureau assigns a unique CUSIP number to each class of debt or equity security issued by a public company.

APP. 001037

ex99-1.htm

APP 001038

# Appendix

# Exhibit PPPP



Financial Industry Regulatory Authority

October 2, 2012

Mr. Charles Grob
Chief Executive Officer
Chimera Energy Corp.
2800 Post Oak Boulevard
Suite 4100
Houston, Texas 77056

**Re:    Chimera Energy Corp. ("CHMR")**

Dear Mr. Grob:

The staff of FINRA's Office of Fraud Detection and Market Intelligence ("the staff") is conducting a review of trading in the common shares of **Chimera Energy Corp. ("CHMR")**. Pursuant to our earlier conversation and in connection with this review, the staff requests that CHMR provide the following information:

1. Describe the events surrounding the license agreement with China Inland Oil Exploration Company of Chencunzhen China ("CIOEC"). How was CHMR introduced to CIOEC? When was this introduction made? Who is CHMR's main contact at CIOEC?

2. The Company's website states that CHMR is currently patenting the Exothermic Fracturing deployment system. Can you please provide the patent number or patent application number? Please provide the patent number or patent application number for any patents owned or licensed by the Company.

3. On August 6, 2012, the Company announced it had executed a purchase order with America West Drilling Supply. Please provide a copy of this purchase order.

4. Can you please describe how the Company was introduced to Petroleos Mexicanos ("PEMEX")? Who is your main contact at PEMEX? Can you please give an overview of the current relationship between CHMR and PEMEX?

5. On August 24, 2012, CHMR announced the Company had received receipt of the official signed document from PEMEX to utilize the Company's new Non-Hydraulic Shale Oil Extraction System on Central Tajin Area wells number 4, 5, and 6 in the Chicontepic Basin of Mexico. Please provide a copy of this signed document.

6. Has the Company conducted any private placements in 2012? If so, please provide the following information: the date the private placement commenced, the date it was completed, how much was raised in each offering, the name of any

Investor protection. Market integrity.     9509 Key West Avenue    t  240 386 4000

FW-03772    **APP. 001040**    TM000572

FINRA-member broker dealer involved in the offerings, and the Company's planned use of the funds.  If a FINRA-member broker dealer was involved, please describe how CHMR was introduced to the firm.

7.  For each of the following individuals and entities, please state whether any executive of CHMR is aware of the individual or entity.  If they are, please describe how they know the individual or entity, and any business CHMR or the executive officer has done with these individuals or entities, either for business or personal purposes.

   a.  Andrew Farmer
   b.  Chartered Investments
   c.  TransAmerica Trading Inc.
   d.  Carolyn P. Austin
   e.  Scott Sieck
   f.  Oak Resources Inc.
   g.  Lydia Danell Cotton
   h.  CBH Compagnie
   i.  Compagnie Bancaire Helvetique

If any documents requested are not submitted, identify each document, indicate its location and explain the reason that it could not be submitted.  In the event that the document does not exist, acknowledge the non-existence in writing.

This inquiry should not be construed as an indication that the staff has determined that any violations of the rules of the FINRA or federal securities laws have occurred, or as a reflection upon the merits of the securities involved or upon any person who effected transactions in such securities.

Please respond as soon as possible but no later than **October 16, 2012**, and submit your response by e-mail to melinda.park@finra.org, by fax to (301) 407-4554, or by mail.  If you have any questions regarding this request, please e-mail or call me at (240) 386-6895.

Sincerely,


Melinda Park
Regulatory Analyst
The Office of Fraud Detection and Market Intelligence
FINRA
9509 Key West Avenue
Rockville, MD 20850

# Appendix

# Exhibit QQQQ

**To:** David M. Loev[dloev@loevlaw.com];
cgrob@chimeraenergyusa.com[cgrob@chimeraenergyusa.com]
**From:** baldemar@chimeraenergyusa.com
**Sent:** Thur 10/11/2012 11:20:22 PM
**Importance:** Normal
**Subject:** FINRA Response
Chimera - FINRA Response - 10.15.12.docx

Gentlemen,

Attached is my draft reposnse to the FINRA inquiry.  I would like this to go out Monday morning.

Thanks,
Baldemar Rios
Chimera Energy Corp.

SEC-LoevD-E-0003316



October 15, 2012

Melinda Park
FINRA
Fraud Detection and Market Intelligence
9509 Key West Avenue
Rockville, MD 20850

      **Re:   Chimera Energy Corporation**

Dear Ms. Park:

By letter dated October 2, 2012, FINRA requested certain documents and explanations from Chimera Energy Corp. (the "Company," "we," "us" or "our"). We are in receipt of these requests and set forth below are the Company's responses. For your convenience, the questions are listed below, followed by the Company's response.

1. Describe the events surrounding the license agreement with China Inland Oil Exploration Company of Chencuzhen China ("CIOEC"). How was CHMR introduced to CIOEC? When was this introduction made? Who is CHMR's main contact at CIOEC?

**RESPONSE:** The Company was introduced to CIOEC through a mutual vendor, Henan Jingrui Superhard Materials Co. ("Henan") in March of 2012. Henan provides polycrystalline diamond cutters to both the Company and CIOEC. The Company's main contact at CIOEC is Mr. Zeng Jian Jun.

2. The Company's website states that CHMR is currently patenting the Exothermic Fracturing deployment system. Can you please provide the patent number or patent application number? Please provide the patent number or patent application number for any patents owned or licensed by the Company.

**RESPONSE:** The Company has engaged William Hulsey III of Hulsey Intellectual Property Lawyers to prepare and file a patent application related to the Company's Exothermic Fracturing deployment system. As of the date of this letter the patent application has not yet been filed. A copy of the engagement agreement is attached hereto.

3. On August 6, 2012, the Company announced it had executed a purchase order with America West Drilling Supply. Please provide a copy of this purchase order.

**RESPONSE:** Attached is a copy of the invoice from America West Drilling Supply Inc.

**APP. 001044**

SEC-LoevD-E-0003317

4. Can you please describe how the Company was introduced to Petoleos Mexicanos ("PEMEX")? Who is your main contact at PEMEX? Can you please give us an overview of the current relationship between CHMR and PEMEX?

**RESPONSE:** Mr. Baldemar Rios introduced the Company to PEMEX while he was engaged as a consultant to the Company. The Company's current contact at PEMEX is Dr. Fernando Flores Avila, PEMEX's Manager of New Technologies for the North Region.

5. On August 24, 2012 CHMR announced the Company had received receipt of the official signed document from PEMEX to utilize the Company's new Non-Hydraulic Shale Oil Extraction System on Central Tajin Area wells number 4, 5, and 6 in the Chicontepic Basin of Mexico. Please provide a copy of this signed document.

**RESPONSE:** Attached is a copy of the signed document requesting a formal proposal from the Company related to the Central Tajin Area wells number 4, 5, and 6 in the Chicontepic Basin of Mexico

6. Has the Company conducted any private placements in 2012? If so, please provide the following information: the date the private placement commenced, the date it was completed, how much was raised in each offering, the name of any FINRA-member broker dealer involved in the offerings, and the Company's planned use of the funds. If a FINRA-member broker dealer was involved, please describe how CHMR was introduced to the firm.

**RESPONSE:** The Company has not engaged in any private placements in 2012. The only funds raised from the public were the result of the Company's Direct Public Offering. The Securities and Exchange Commission declared the Company's Registration Statement on Form S-1 effective on December 21, 2011.

7. For each of the following individuals and entities, please state whether any executive of CHMR is aware of the individual or entity. If they are, please describe how the know the individual or entity, and any business CHMR or the executive officer has done with these individuals or entities, either for business or personal purposes.

    a. Andrew Farmer
    b. Chartered Investments Inc.
    c. TransAmerica Trading Inc.
    d. Carolyn P Austin
    e. Scott Sieck
    f. Oak Resources Inc.
    g. Lydia Danell Cotton
    h. CBH Compagnie
    i. Compagnie Bancaire Helvetique



SEC-LoevD-E-0003318

**RESPONSE:**

a. Andrew Farmer – Mr. Farmer is a long-term friend of our former CEO, Charles Grob. The Company does not have now, nor has it ever had, a business relationship with Mr. Farmer. While Mr. Grob and Mr. Farmer are friends, they have never had a business relationship.

b. Chartered Investments Inc. – The Company believes that Chartered Investments is an entity owned and operated by Mr. Farmer. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Chartered Investments Inc.

c. TransAmerica Trading Inc. – The Company believes that TransAmerica Trading is an entity owned and operated by Ms. Carolyn Austin. Neither the Company, nor any executive officer, has ever had a business or personal relationship with TransAmerica Trading.

d. Carolyn P Austin – Ms. Austin is known to the Company and its executive officers through Company stock held by TransAmerica Trading. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Ms. Austin.

e. Scott Sieck – The Company and its executive officers are unaware of Mr. Sieck. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Mr. Sieck.

f. Oak Resources Inc. – The Company and its executive officers are unaware of Oak Resources. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Oak Resources.

g. Lydia Danell Cotton – Ms. Cotton is an acquaintance of Mr. Grob. Ms. Cotton was an original investor in the Company's Direct Public Offering ("DPO"). Other than her investment in the DPO, neither the Company, nor any executive officer, has ever had a business or personal relationship with Ms. Cotton.

h. CBH Compagnie – The Company and its executive officers are unaware of CBH Compagnie. Neither the Company, nor any executive officer, has ever had a business or personal relationship with CBH Compagnie.

j. Compagnie Bancaire Helvetique – The Company and its executive officers are unaware of Compagnie Bancaire Helvetique. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Compagnie Bancaire Helvetique.

Please let me know if you have any additional questions.

Sincerely,

Baldemar Rios
Chairman & CEO



SEC-LoevD-E-0003319

# Information about Chimera - FINRA Response - 10.15

C:\Users\VydashenkoN\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.IE5\...



### Read-Only Document

**Save As**

This document has been opened in read-only mode. Changes cannot be made to the original document. To save changes, create a new copy of the document.

### Permissions

**Protect Document ▾**

Anyone can open, copy, and change any part of this document.

### Prepare for Sharing

**Check for Issues ▾**

Before sharing this file, be aware that it contains:
- ◻ Document properties, author's name and related dates
- ◻ Headers and footers
- ◻ Custom XML data
- ◻ Content that people with disabilities are unable to read

### Versions

**Manage Versions ▾**

There are no previous versions of this file.

**Properties ▾**

| | |
|---|---|
| Size | 49.5KB |
| Pages | 3 |
| Words | 1020 |
| Total Editing Time | 59 Minutes |
| Title | September 15, 2004 |
| Tags | Add a tag |
| Comments | Add comments |

**Related Dates**

| | |
|---|---|
| Last Modified | 10/11/2012 11:17 PM |
| Created | 10/11/2012 3:28 PM |
| Last Printed | 2/2/2012 8:34 PM |

**Related People**

| | |
|---|---|
| Author | Andrew Farmer |
| | Add an author |
| Last Modified By | Andrew Farmer |

**Related Documents**

Open File Location

Show All Properties

# Appendix

# Exhibit RRRR

**To:**       David Loev[dloev@loevlaw.com]
**Cc:**       cgrob@chimeraenergyusa.com[cgrob@chimeraenergyusa.com]; John
Gillies[john@loevlaw.com]
**From:**     baldemar@chimeraenergyusa.com
**Sent:**     Mon 10/15/2012 2:09:38 PM
**Importance:**       **Normal**
**Subject:**  RE: FINRA Response
Chimera - FINRA Response Exhibits - 10.15.12.pdf
Chimera - FINRA Response - 10.15.12.pdf
Chimera - FINRA Response - 10.15.12.docx

Mr. Loev,

Attached please find the updated FINRA response letter.  I have included the word file
along with an executed PDF.

Also attached are the exhibit to be submitted with the letter.

Will you be sending to FINRA or should I?

Thanks,
Baldemar Rios

-------- Original Message --------
Subject: Re: FINRA Response
From: David Loev <dloev@loevlaw.com>
Date: Sun, October 14, 2012 3:04 pm
To: baldemar@chimeraenergyusa.com
Cc: cgrob@chimeraenergyusa.com, John Gillies <john@loevlaw.com>


Baldemar,

We have attached the response to FINRa with our suggested revisions and
comments.  Let us know if you have further questions or would like our input in
connection with revisions based on our comments or documents to be attached.

Charles, you do not need to execute the letter as Baldemar is the current CEO of the
company.

regards,


--
David M. Loev
The Loev Law Firm, PC
6300 West Loop South
Suite 280
Bellaire, Texas 77401
(713) 524-4110 - phone

SEC-LoevD-E-0003351

(713) 524-4122 - fax
(713) 920-9372 - efax
dloev@loevlaw.com
http://www.loevlaw.com

On Thu, Oct 11, 2012 at 11:20 PM, <baldemar@chimeraenergyusa.com>
wrote:

Gentlemen,

Attached is my draft reposnse to the FINRA inquiry.  I would like this to go
out Monday morning.

Thanks,
Baldemar Rios
Chimera Energy Corp.

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2015.0.5856 / Virus Database: 4311/9331 - Release Date: 03/18/15

SEC-LoevD-E-0003352



October 15, 2012

Melinda Park
FINRA
Fraud Detection and Market Intelligence
9509 Key West Avenue
Rockville, MD 20850

      **Re:   Chimera Energy Corporation**

Dear Ms. Park:

By letter dated October 2, 2012, FINRA requested certain documents and explanations from Chimera Energy Corp. (the "Company," "we," "us" or "our"). We are in receipt of these requests and set forth below are the Company's responses. For your convenience, the questions are listed below, followed by the Company's response.

1. Describe the events surrounding the license agreement with China Inland Oil Exploration Company of Chencuzhen China ("CIOEC"). How was CHMR introduced to CIOEC? When was this introduction made? Who is CHMR's main contact at CIOEC?

**RESPONSE:** The Company was introduced to CIOEC through a mutual vendor, Henan Jingrui Superhard Materials Co. ("Henan") in March of 2012. Henan provides polycrystalline diamond cutters to both the Company and CIOEC. The Company's main contact at CIOEC is Mr. Zeng Jian Jun.

2. The Company's website states that CHMR is currently patenting the Exothermic Fracturing deployment system. Can you please provide the patent number or patent application number? Please provide the patent number or patent application number for any patents owned or licensed by the Company.

**RESPONSE:** The Company has engaged William Hulsey III of Hulsey Intellectual Property Lawyers to prepare and file a patent application related to the Company's Exothermic Fracturing deployment system. As of the date of this letter the patent application has not yet been filed. A copy of the engagement agreement is attached hereto.

3. On August 6, 2012, the Company announced it had executed a purchase order with America West Drilling Supply. Please provide a copy of this purchase order.

**RESPONSE:** Attached is a copy of the invoice from America West Drilling Supply Inc.

**APP. 001051**

SEC-LoevD-E-0003353

4. Can you please describe how the Company was introduced to Petoleos Mexicanos ("PEMEX")?  Who is your main contact at PEMEX?  Can you please give us an overview of the current relationship between CHMR and PEMEX?

**RESPONSE:** Mr. Baldemar Rios introduced the Company to PEMEX while he was engaged as a consultant to the Company.  The Company's current contact at PEMEX is Dr. Fernando Flores Avila, PEMEX's Manager of New Technologies for the North Region.  As of the date of this letter the Company and its consultants are working diligently with Dr. Flores Avila and his engineering team towards the common goal of an onsite demonstration program at one of the well locations identified by PEMEX.  The Company is still in the process of negotiating the Master Service Agreement with PEMEX relating to the technology.  The Company anticipates the Master Service Agreement will be finalized upon the completion of laboratory testing by PEMEX as well as the approval of the final down hole engineering plan.

5. On August 24, 2012 CHMR announced the Company had received receipt of the official signed document from PEMEX to utilize the Company's new Non-Hydraulic Shale Oil Extraction System on Central Tajin Area wells number 4, 5, and 6 in the Chicontepic Basin of Mexico. Please provide a copy of this signed document.

**RESPONSE:** Attached is a copy of the signed document requesting a formal proposal from the Company related to the Central Tajin Area wells number 4, 5, and 6 in the Chicontepic Basin of Mexico.

6. Has the Company conducted any private placements in 2012?  If so, please provide the following information: the date the private placement commenced, the date it was completed, how much was raised in each offering, the name of any FINRA-member broker dealer involved in the offerings, and the Company's planned use of the funds. If a FINRA-member broker dealer was involved, please describe how CHMR was introduced to the firm.

**RESPONSE:** The Company has not engaged in any private placements in 2012.  The only funds raised from the public were the result of the Company's Direct Public Offering.  The Securities and Exchange Commission declared the Company's Registration Statement on Form S-1 effective on December 21, 2011.

7. For each of the following individuals and entities, please state whether any executive of CHMR is aware of the individual or entity.  If they are, please describe how they know the individual or entity, and any business CHMR or the executive officer has done with these individuals or entities, either for business or personal purposes.

   a. Andrew Farmer
   b. Chartered Investments Inc.
   c. TransAmerica Trading Inc.
   d. Carolyn P Austin
   e. Scott Sieck



SEC-LoevD-E-0003354

    f.  Oak Resources Inc.
    g.  Lydia Danell Cotton
    h.  CBH Compagnie
    i.  Compagnie Bancaire Helvetique

**RESPONSE:**

a. Andrew Farmer – Mr. Farmer is a long-term friend of our former CEO, Charles Grob. During the formation of the Company, Mr. Grob sought advice from Mr. Farmer regarding the process of filing the Company's Registration Statement with the SEC. At no time was Mr. Farmer an officer, director or affiliate of the Company. Mr. Farmer was never compensated for his advice. The Company does not have now, nor has it ever had, a business relationship with Mr. Farmer. While Mr. Grob and Mr. Farmer are friends, they have never had a business relationship.

b. Chartered Investments Inc. – The Company believes that Chartered Investments is an entity owned and operated by Mr. Farmer. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Chartered Investments Inc.

c. TransAmerica Trading Inc. – The Company believes that TransAmerica Trading is an entity owned and operated by Ms. Carolyn Austin. Neither the Company, nor any executive officer, has ever had a business or personal relationship with TransAmerica Trading.

d. Carolyn P Austin – Ms. Austin is known to the Company and its executive officers through Company stock held by TransAmerica Trading. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Ms. Austin.

e. Scott Sieck – The Company and its executive officers are unaware of Mr. Sieck. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Mr. Sieck.

f. Oak Resources Inc. – The Company and its executive officers are unaware of Oak Resources. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Oak Resources.

g. Lydia Danell Cotton – Ms. Cotton is a social acquaintance of Mr. Grob. Ms. Cotton was an original investor in the Company's Direct Public Offering ("DPO"). Other than her investment in the DPO, neither the Company, nor any executive officer, has ever had a business or personal relationship with Ms. Cotton.

h. CBH Compagnie – The Company and its executive officers are unaware of CBH Compagnie. Neither the Company, nor any executive officer, has ever had a business or personal relationship with CBH Compagnie.

j. Compagnie Bancaire Helvetique – The Company and its executive officers are unaware of Compagnie Bancaire Helvetique. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Compagnie Bancaire Helvetique.



SEC-LoevD-E-0003355

**HULSEY$^{IP}$**

**Intellectual Property
Lawyers**

William N. Hulsey III
(512) 478-9190
Bill.Hulsey@HULSEYIPlaw.com

July 30, 2012

Chimera Energy Corporation
Mr. Charles Grob
2800 Post Oak Blvd., Ste. 4100
Houston, TX 77056
cgrob@chimeraenergyusa.com
O: (832) 390-2334
C: (512) 350-7694

     Re:    Engagement letter for Legal Services

Dear Mr. Grob:

     Thank you for engaging us to represent Chimera Energy Corporation in connection with intellectual property matters. We appreciate the confidence you have shown in HULSEY, P.C., Intellectual Property Lawyers and we look forward to representing you in this engagement.

     It is our practice to specify our engagement arrangements with Chimera Energy Corporation, which is the purpose of this letter and the attached *Additional Terms of Engagement*. If you have any questions about this letter, the *Additional Terms of Engagement*, or any aspect of the engagement or our relationship, please contact me immediately.

     We will begin the representation by drafting a US Provisional Patent Application for Chimera Energy Corporation's Non-Hydraulic Extraction invention. Our representation may further include other aspects of patent, trade secret, trademark, and copyright law that concern you. Upon expansion of our role, we may seek to modify this letter of engagement to our mutual satisfaction.

     I will be the attorney accountable to Chimera Energy Corporation and will work with you to ensure that we perform the highest quality work at fair, reasonable fees. We look forward to an active, collaborative working relationship with you, and we will, of course, keep Chimera Energy Corporation informed of significant events in all matters as they progress.

     We generally charge for our services based upon the time and effort devoted to the matter and the hourly rates of the lawyers and legal assistants that work on the representation. Presently, my hourly rate is $450.00, and the attorney and staff

HULSEY PROFESSIONAL'S LAW FIRM PARTNERSHIP'S NEW GOLDEN AGE® 919 CONGRESS AVENUE, SUITE 919 AUSTIN, TEXAS 78701 P| (512) 478-9190 F| (512) 410-9192 WWW.HULSEYIPLAW.COM

SEC-LoevD-E-0003357

Mr. Charles Grob
Page 2

resources of our firm have hourly rates that range from $125.00 to $450.00. For patent, trademark, and other intellectual property preparation and prosecution matters that may go beyond the outside fee schedule, we refer you to the table entitled *Typical IP Charges in Texas as Reported by the Biennial 2011 American Intellectual Property Law Association Economic Survey*, which accompanies this engagement letter.

You should know that we typically are well within the amounts arising from the costs appearing in this survey of Texas' intellectual property law practices. Moreover, prior to initiating any new matter for you, we will work with you to set and achieve specific fee targets. This will help to assure that not only through excellent service, but also with reasonable fees that our firm meets and exceeds your expectations. I trust that you will feel free to call me with any billing or service questions.

It is our policy to collect half of the estimated legal fees and all of any associated filing fees (e.g. U.S. Patent and Trademark Office filing fees) up front as a fee deposit. We estimate our legal fees to be $4,000 and the USPTO filing fees to be $150. It is important to understand that the above estimates only cover up to the initial filing of the application. There will be additional incidental costs throughout the pendency of the application including reporting letters, docketing, and other similar items that are critical to keeping you informed and protecting your intellectual property rights.

If you have any questions about any of the above or the *Additional Terms of Engagement*, please call me. If this letter and the *Additional Terms of Engagement* accurately reflect our agreement, please sign the enclosed copy of this letter and return it to me with a check for $2,150. Thank you again for the opportunity to represent you in these matters.

Very truly yours,

William N. Hulsey III
Hulsey, P.C.
Intellectual Property Lawyers

AGREED AND ACCEPTED:

Chimera Energy Corporation

By: _____          Dated: _7.31.12_____
Mr. Charles Grob, CEO

SEC-LoevD-E-0003358

Question #3

**AMERICA WEST DRILLING SUPPLY INC**
1350 E GLENDALE AVE
Sparks, NV  89431

# Invoice

Customer No.:  **CHIMERA**

Invoice No.:    20074

Bill To: **Chimera Energy Corporation**
2800 Post Oak Blvd
Houston, TX  77056

Ship To: **Chimera Energy Corporation**
1301 1/2 North Gordon Street
Alvin, TX  77511

| Date | Ship Via | F.O.B. | Terms |
|------|----------|--------|-------|
| 08/06/12 | TRUCK PREPAID | Origin | Credit Card |

| Purchase Order Number | Order Date | Sales Person | Our Order Number |
|-----------------------|-----------|--------------|------------------|
| Charles Grob | 08/06/12 | Toby Hodgson | 11665 |

| Quantity Required | Quantity Shipped | B.O. | Item Number | Description | Unit Price | Amount |
|-------------------|------------------|------|-------------|-------------|------------|--------|
| 1 | 1 | | PF6000 | 6" PERFORATOR COMPLETE w/ 3 1/2" Reg Pin | 6897.00 | 6897.00 |
| | | | | Paid by credit card | | |

|  |  |
|--|--|
| Invoice subtotal | 6897.00 |
| Freight charges | 204.95 |
| Invoice total | 7101.95 |

THANK YOU FOR YOUR BUSINESS

**Thank You**

SEC-LoevD-E-0003359

Question #5

 **PEMEX**
**EXPLORACIÓN Y PRODUCCIÓN**

**SUBDIRECCIÓN DE INGENIERÍA Y DESARROLLO DE OBRAS ESTRATÉGICAS**
Gerencia de Proyectos División Norte

Poza Rica de Hgo., Ver., a 6 de agosto del 2012

**CHIMERA ENERGY CORP**

ASUNTO: SOLICITUD DE PROPUESTA PARA EFECTUAR PRUEBAS DE
RECUPERACIÓN EN POZOS.

A quien corresponda:

Por medio de la presente hacemos de su conocimiento que estamos interesados en realizar las pruebas correspondientes aplicando la tecnología de su empresa, para mantener y/o recuperar la producción de crudo en el campo de Chicontepec, Ver. específicamente en el campo maduro del Tajin, área central pozos 4,5, y 6.

Por lo cual les solicitamos una propuesta para poder llevar a cabo dicho objetivo.

Si mas por el momento y en espera de su pronta respuesta.

Atentamente

Ing. José Quiroga H.
Superintendencia de Contratos. R.N.

*JAAM*

Subdirección de Ingeniería y Desarrollo de Obras Estratégicas. Gerencia de Proyectos División Norte
Edificio Administrativo Planta Baja, Col. Herradura, Interior del Campo PEMEX, C.P. 93370. Poza Rica de Hgo., Ver.

SEC-LoevD-E-0003360



October 15, 2012

Melinda Park
FINRA
Fraud Detection and Market Intelligence
9509 Key West Avenue
Rockville, MD 20850

> **Re:   Chimera Energy Corporation**

Dear Ms. Park:

By letter dated October 2, 2012, FINRA requested certain documents and explanations from Chimera Energy Corp. (the "Company," "we," "us" or "our"). We are in receipt of these requests and set forth below are the Company's responses. For your convenience, the questions are listed below, followed by the Company's response.

1. Describe the events surrounding the license agreement with China Inland Oil Exploration Company of Chencuzhen China ("CIOEC"). How was CHMR introduced to CIOEC? When was this introduction made? Who is CHMR's main contact at CIOEC?

**RESPONSE:** The Company was introduced to CIOEC through a mutual vendor, Henan Jingrui Superhard Materials Co. ("Henan") in March of 2012. Henan provides polycrystalline diamond cutters to both the Company and CIOEC. The Company's main contact at CIOEC is Mr. Zeng Jian Jun.

2. The Company's website states that CHMR is currently patenting the Exothermic Fracturing deployment system. Can you please provide the patent number or patent application number? Please provide the patent number or patent application number for any patents owned or licensed by the Company.

**RESPONSE:** The Company has engaged William Hulsey III of Hulsey Intellectual Property Lawyers to prepare and file a patent application related to the Company's Exothermic Fracturing deployment system. As of the date of this letter the patent application has not yet been filed. A copy of the engagement agreement is attached hereto.

3. On August 6, 2012, the Company announced it had executed a purchase order with America West Drilling Supply. Please provide a copy of this purchase order.

**RESPONSE:** Attached is a copy of the invoice from America West Drilling Supply Inc.

**APP. 001058**                                                     SEC-LoevD-E-0003361

4. Can you please describe how the Company was introduced to Petoleos Mexicanos ("PEMEX")? Who is your main contact at PEMEX? Can you please give us an overview of the current relationship between CHMR and PEMEX?

**RESPONSE:** Mr. Baldemar Rios introduced the Company to PEMEX while he was engaged as a consultant to the Company. The Company's current contact at PEMEX is Dr. Fernando Flores Avila, PEMEX's Manager of New Technologies for the North Region. As of the date of this letter the Company and its consultants are working diligently with Dr. Flores Avila and his engineering team towards the common goal of an onsite demonstration program at one of the well locations identified by PEMEX. The Company is still in the process of negotiating the Master Service Agreement with PEMEX relating to the technology. The Company anticipates the Master Service Agreement will be finalized upon the completion of laboratory testing by PEMEX as well as the approval of the final down hole engineering plan.

5. On August 24, 2012 CHMR announced the Company had received receipt of the official signed document from PEMEX to utilize the Company's new Non-Hydraulic Shale Oil Extraction System on Central Tajin Area wells number 4, 5, and 6 in the Chicontepic Basin of Mexico. Please provide a copy of this signed document.

**RESPONSE:** Attached is a copy of the signed document requesting a formal proposal from the Company related to the Central Tajin Area wells number 4, 5, and 6 in the Chicontepic Basin of Mexico.

6. Has the Company conducted any private placements in 2012? If so, please provide the following information: the date the private placement commenced, the date it was completed, how much was raised in each offering, the name of any FINRA-member broker dealer involved in the offerings, and the Company's planned use of the funds. If a FINRA-member broker dealer was involved, please describe how CHMR was introduced to the firm.

**RESPONSE:** The Company has not engaged in any private placements in 2012. The only funds raised from the public were the result of the Company's Direct Public Offering. The Securities and Exchange Commission declared the Company's Registration Statement on Form S-1 effective on December 21, 2011.

7. For each of the following individuals and entities, please state whether any executive of CHMR is aware of the individual or entity. If they are, please describe how they know the individual or entity, and any business CHMR or the executive officer has done with these individuals or entities, either for business or personal purposes.

   a. Andrew Farmer
   b. Chartered Investments Inc.
   c. TransAmerica Trading Inc.
   d. Carolyn P Austin
   e. Scott Sieck



SEC-LoevD-E-0003362

     f. Oak Resources Inc.
     g. Lydia Danell Cotton
     h. CBH Compagnie
     i. Compagnie Bancaire Helvetique

**RESPONSE:**

     a. Andrew Farmer – Mr. Farmer is a long-term friend of our former CEO, Charles Grob. During the formation of the Company, Mr. Grob sought advice from Mr. Farmer regarding the process of filing the Company's Registration Statement with the SEC. At no time was Mr. Farmer an officer, director or affiliate of the Company. Mr. Farmer was never compensated for his advice. The Company does not have now, nor has it ever had, a business relationship with Mr. Farmer. While Mr. Grob and Mr. Farmer are friends, they have never had a business relationship.

     b. Chartered Investments Inc. – The Company believes that Chartered Investments is an entity owned and operated by Mr. Farmer. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Chartered Investments Inc.

     c. TransAmerica Trading Inc. – The Company believes that TransAmerica Trading is an entity owned and operated by Ms. Carolyn Austin. Neither the Company, nor any executive officer, has ever had a business or personal relationship with TransAmerica Trading.

     d. Carolyn P Austin – Ms. Austin is known to the Company and its executive officers through Company stock held by TransAmerica Trading. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Ms. Austin.

     e. Scott Sieck – The Company and its executive officers are unaware of Mr. Sieck. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Mr. Sieck.

     f. Oak Resources Inc. – The Company and its executive officers are unaware of Oak Resources. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Oak Resources.

     g. Lydia Danell Cotton – Ms. Cotton is a social acquaintance of Mr. Grob. Ms. Cotton was an original investor in the Company's Direct Public Offering ("DPO"). Other than her investment in the DPO, neither the Company, nor any executive officer, has ever had a business or personal relationship with Ms. Cotton.

     h. CBH Compagnie – The Company and its executive officers are unaware of CBH Compagnie. Neither the Company, nor any executive officer, has ever had a business or personal relationship with CBH Compagnie.

     j. Compagnie Bancaire Helvetique – The Company and its executive officers are unaware of Compagnie Bancaire Helvetique. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Compagnie Bancaire Helvetique.



SEC-LoevD-E-0003363

Please let me know if you have any additional questions.

Sincerely,


Baldemar Rios
Chairman & CEO



SEC-LoevD-E-0003364

Information about Chimera - FINRA Response - 10.15
C:\Users\Vydashenko\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.IE5\...



**Read-Only Document**
This document has been opened in read-only mode. Changes cannot be made to the original document. To save changes, create a new copy of the document.

Save As



Protect Document

**Permissions**
Anyone can open, copy, and change any part of this document.



Check for Issues

**Prepare for Sharing**
Before sharing this file, be aware that it contains:
- Comments and revisions
- Document properties, author's name and related dates
- Headers and footers
- Custom XML data
- Content that people with disabilities are unable to read



Manage Versions

**Versions**
There are no previous versions of this file.



**Properties** ▾

| | |
|---|---|
| Size | 51.9KB |
| Pages | 4 |
| Words | 1153 |
| Total Editing Time | 4 Minutes |
| Title | September 15, 2004 |
| Tags | Add a tag |
| Comments | Add comments |

**Related Dates**

| | |
|---|---|
| Last Modified | 10/15/2012 1:04 PM |
| Created | 10/15/2012 1:01 PM |
| Last Printed | 2/2/2012 8:34 PM |

**Related People**

| | |
|---|---|
| Author | Andrew Farmer |
| | Add an author |
| Last Modified By | Andrew Farmer |

**Related Documents**

Open File Location

Show All Properties

# Appendix

# Exhibit SSSS

Subject: [FWD: RE: Questions regarding CHMR]
From: cgrob@chimeraenergyusa.com (cgrob@chimeraenergyusa.com)
To: thomas.massey@yahoo.com; andrew.farnor@viridiumcapitallimited.com;
Date: Monday, October 15, 2012 7:25 PM

What I sent to FINRA...

**Charles Grob**
**Chimera Energy Corporation**
**2800 Post Oak Boulevard Ste 4100**
**Houston, TX 77056**
**Phone: (832) 390-2334**
**Fax: (832) 390-2350**



-------- Original Message --------
**Subject: RE: Questions regarding CHMR**
**From:** <cgrob@chimeraenergyusa.com>
**Date: Mon, October 15, 2012 4:55 pm**
**To: "Park, Melinda"** <Melinda.Park@finra.org>
**Cc: "Baldemar Rios"** <baldemar.rios@gmail.com>

Hi Melinda,

I hope you are well. Please see the attached questions with answers, and supporting documents. Since we last spoke, Baldemar Rios has assumed the postion of CEO.

Thank You,

**Charles Grob**
**Chimera Energy Corporation**
**2800 Post Oak Boulevard Ste 4100**
**Houston, TX 77056**
**Phone: (832) 390-2334**
**Fax: (832) 390-2350**



-------- Original Message --------
**Subject: Questions regarding CHMR**
**From: "Park, Melinda"** <Melinda.Park@finra.org>
**Date: Tue, October 02, 2012 11:53 am**
**To: "cgrob@chimeraenergyusa.com"** <cgrob@chimeraenergyusa.com>

Mr. Grob –

Pursuant to our phone conversation, attached please find a copy of questions regarding Chimera Energy Corp. ("CHMR").

Please let me know if you have any questions.

Thank you,

**Melinda Park**
**Regulatory Analyst**
**Office of Fraud Detection and Market Intelligence**
**FINRA**
**9509 Key West Avenue**
**Rockville, MD 20850**
**tel: 240-386-6895**
**fax: 301-407-4554**
www.finra.org

Confidentiality Notice: This email, including attachments, may include non-public, proprietary, confidential or legally privileged info

http://us-mg4.mail.yahoo.com/neo/launch?.rand=2pe0mguei1h7g          4/6/2013

#2

**HULSEY**<sup>*IP*</sup>

**Intellectual Property
Lawyers**

William N. Hulsey III
(512) 478-9190
Bill Hulsey@ HULSEY*IP*law.com

July 30, 2012

Chimera Energy Corporation
Mr. Charles Grob
2800 Post Oak Blvd., Ste. 4100
Houston, TX 77056
cgrob@chimeraenergyusa.com
O: (832) 390-2334
C: (512) 350-7694

    Re:    Engagement letter for Legal Services

Dear Mr. Grob:

    Thank you for engaging us to represent Chimera Energy Corporation in connection with intellectual property matters. We appreciate the confidence you have shown in HULSEY, P.C., Intellectual Property Lawyers and we look forward to representing you in this engagement.

    It is our practice to specify our engagement arrangements with Chimera Energy Corporation, which is the purpose of this letter and the attached *Additional Terms of Engagement*. If you have any questions about this letter, the *Additional Terms of Engagement*, or any aspect of the engagement or our relationship, please contact me immediately.

    We will begin the representation by drafting a US Provisional Patent Application for Chimera Energy Corporation's Non-Hydraulic Extraction invention. Our representation may further include other aspects of patent, trade secret, trademark, and copyright law that concern you. Upon expansion of our role, we may seek to modify this letter of engagement to our mutual satisfaction.

    I will be the attorney accountable to Chimera Energy Corporation and will work with you to ensure that we perform the highest quality work at fair, reasonable fees. We look forward to an active, collaborative working relationship with you, and we will, of course, keep Chimera Energy Corporation informed of significant events in all matters as they progress.

    We generally charge for our services based upon the time and effort devoted to the matter and the hourly rates of the lawyers and legal assistants that work on the representation. Presently, my hourly rate is $450.00, and the attorney and staff

Mr. Charles Grob
Page 2

resources of our firm have hourly rates that range from $125.00 to $450.00. For patent, trademark, and other intellectual property preparation and prosecution matters that may go beyond the outside fee schedule, we refer you to the table entitled *Typical IP Charges in Texas as Reported by the Biennial 2011 American Intellectual Property Law Association Economic Survey*, which accompanies this engagement letter.

You should know that we typically are well within the amounts arising from the costs appearing in this survey of Texas' intellectual property law practices. Moreover, prior to initiating any new matter for you, we will work with you to set and achieve specific fee targets. This will help to assure that not only through excellent service, but also with reasonable fees that our firm meets and exceeds your expectations. I trust that you will feel free to call me with any billing or service questions.

It is our policy to collect half of the estimated legal fees and all of any associated filing fees (e.g. U.S. Patent and Trademark Office filing fees) up front as a fee deposit. We estimate our legal fees to be $4,000 and the USPTO filing fees to be $150. It is important to understand that the above estimates only cover up to the initial filing of the application. There will be additional incidental costs throughout the pendency of the application including reporting letters, docketing, and other similar items that are critical to keeping you informed and protecting your intellectual property rights.

If you have any questions about any of the above or the *Additional Terms of Engagement*, please call me. If this letter and the *Additional Terms of Engagement* accurately reflect our agreement, please sign the enclosed copy of this letter and return it to me with a check for $2,150. Thank you again for the opportunity to represent you in these matters.

Very truly yours,

William N. Hulsey III
Hulsey, P.C.
Intellectual Property Lawyers


AGREED AND ACCEPTED:

Chimera Energy Corporation

By: _____          Dated: __7.31.12_____

Mr. Charles Grob, CEO

Question #3

**AMERICA WEST DRILLING SUPPLY INC**
1350 E GLENDALE AVE
Sparks, NV 89431

# Invoice

| | |
|---|---|
| Customer No.: | CHIMERA |
| Invoice No.: | 20074 |

Bill To:   **Chimera Energy Corporation**
2800 Post Oak Blvd
Houston, TX 77056

Ship To:   **Chimera Energy Corporation**
1301 1/2 North Gordon Street
Alvin, TX 77511

| Date | Ship Via | F.O.B. | Terms |
|---|---|---|---|
| 08/06/12 | TRUCK PREPAID | Origin | Credit Card |

| Purchase Order Number | Order Date | Sales Person | Our Order Number |
|---|---|---|---|
| Charles Grob | 08/06/12 | Toby Hodgson | 11665 |

| Required | Quantity Shipped | B.O. | Item Number | Description | Unit Price | Amount |
|---|---|---|---|---|---|---|
| 1 | 1 | | PF6000 | 6" PERFORATOR COMPLETE w/ 3 1/2" Reg Pin Paid by credit card | 6897.00 | 6897.00 |

| | |
|---|---|
| Invoice subtotal | 6897.00 |
| Freight charges | 204.95 |
| Invoice total | 7101.95 |

THANK YOU FOR YOUR BUSINESS

Thank You

*Question #5*

 **PEMEX**
**EXPLORACIÓN Y PRODUCCIÓN** ——— **SUBDIRECCIÓN DE INGENIERÍA Y DESARROLLO DE OBRAS ESTRATÉGICAS**
Gerencia de Proyectos División Norte

Poza Rica de Hgo., Ver., a 6 de agosto del 2012

***CHIMERA ENERGY CORP***

ASUNTO: SOLICITUD DE PROPUESTA PARA EFECTUAR PRUEBAS DE
RECUPERACIÓN EN POZOS.

A quien corresponda:

Por medio de la presente hacemos de su conocimiento que estamos interesados
en realizar las pruebas correspondientes aplicando la tecnología de su empresa,
para mantener y/o recuperar la producción de crudo en el campo de Chicontepec,
Ver. específicamente en el campo maduro del Tajin, área central pozos 4,5, y 6.

Por lo cual les solicitamos una propuesta para poder llevar a cabo dicho objetivo.

Si mas por el momento y en espera de su pronta respuesta.

Atentamente

Ing. José Quiroga H.
Superintendencia de Contratos. R.N.

*JAAM*

Subdirección de Ingeniería y Desarrollo de Obras Estratégicas. Gerencia de Proyectos División Norte
Edificio Administrativo Planta Baja, Col. Herradura, Interior del Campo PEMEX, C.P. 93370. Poza Rica de Hgo., Ver.



October 15, 2012

Melinda Park
FINRA
Fraud Detection and Market Intelligence
9509 Key West Avenue
Rockville, MD 20850

      **Re:**   **Chimera Energy Corporation**

Dear Ms. Park:

By letter dated October 2, 2012, FINRA requested certain documents and explanations from Chimera Energy Corp. (the "Company," "we," "us" or "our"). We are in receipt of these requests and set forth below are the Company's responses. For your convenience, the questions are listed below, followed by the Company's response.

1. Describe the events surrounding the license agreement with China Inland Oil Exploration Company of Chencuzhen China ("CIOEC"). How was CHMR introduced to CIOEC? When was this introduction made? Who is CHMR's main contact at CIOEC?

**RESPONSE:** The Company was introduced to CIOEC through a mutual vendor, Henan Jingrui Superhard Materials Co. ("Henan") in March of 2012. Henan provides polycrystalline diamond cutters to both the Company and CIOEC. The Company's main contact at CIOEC is Mr. Zeng Jian Jun.

2. The Company's website states that CHMR is currently patenting the Exothermic Fracturing deployment system. Can you please provide the patent number or patent application number? Please provide the patent number or patent application number for any patents owned or licensed by the Company.

**RESPONSE:** The Company has engaged William Hulsey III of Hulsey Intellectual Property Lawyers to prepare and file a patent application related to the Company's Exothermic Fracturing deployment system. As of the date of this letter the patent application has not yet been filed. A copy of the engagement agreement is attached hereto.

3. On August 6, 2012, the Company announced it had executed a purchase order with America West Drilling Supply. Please provide a copy of this purchase order.

**RESPONSE:** Attached is a copy of the invoice from America West Drilling Supply Inc.

2800 POST OAK BLVD, SUITE 4100 • HOUSTON, TX • 77056 • (832) 390-2334

4. Can you please describe how the Company was introduced to Petoleos Mexicanos ("PEMEX")? Who is your main contact at PEMEX? Can you please give us an overview of the current relationship between CHMR and PEMEX?

**RESPONSE:** Mr. Baldemar Rios introduced the Company to PEMEX while he was engaged as a consultant to the Company. The Company's current contact at PEMEX is Dr. Fernando Flores Avila, PEMEX's Manager of New Technologies for the North Region. As of the date of this letter the Company and its consultants are working diligently with Dr. Flores Avila and his engineering team towards the common goal of an onsite demonstration program at one of the well locations identified by PEMEX. The Company is still in the process of negotiating the Master Service Agreement with PEMEX relating to the technology. The Company anticipates the Master Service Agreement will be finalized upon the completion of laboratory testing by PEMEX as well as the approval of the final down hole engineering plan.

5. On August 24, 2012 CHMR announced the Company had received receipt of the official signed document from PEMEX to utilize the Company's new Non-Hydraulic Shale Oil Extraction System on Central Tajin Area wells number 4, 5, and 6 in the Chicontepic Basin of Mexico. Please provide a copy of this signed document.

**RESPONSE:** Attached is a copy of the signed document requesting a formal proposal from the Company related to the Central Tajin Area wells number 4, 5, and 6 in the Chicontepic Basin of Mexico.

6. Has the Company conducted any private placements in 2012? If so, please provide the following information: the date the private placement commenced, the date it was completed, how much was raised in each offering, the name of any FINRA-member broker dealer involved in the offerings, and the Company's planned use of the funds. If a FINRA-member broker dealer was involved, please describe how CHMR was introduced to the firm.

**RESPONSE:** The Company has not engaged in any private placements in 2012. The only funds raised from the public were the result of the Company's Direct Public Offering. The Securities and Exchange Commission declared the Company's Registration Statement on Form S-1 effective on December 21, 2011.

7. For each of the following individuals and entities, please state whether any executive of CHMR is aware of the individual or entity. If they are, please describe how they know the individual or entity, and any business CHMR or the executive officer has done with these individuals or entities, either for business or personal purposes.

   a. Andrew Farmer
   b. Chartered Investments Inc.
   c. TransAmerica Trading Inc.
   d. Carolyn P Austin
   e. Scott Sieck



     f.  Oak Resources Inc.
     g.  Lydia Danell Cotton
     h.  CBH Compagnie
     i.  Compagnie Bancaire Helvetique

**RESPONSE:**

a. Andrew Farmer – Mr. Farmer is a long-term friend of our former CEO, Charles Grob. During the formation of the Company, Mr. Grob sought advice from Mr. Farmer regarding the process of filing the Company's Registration Statement with the SEC. At no time was Mr. Farmer an officer, director or affiliate of the Company. Mr. Farmer was never compensated for his advice. The Company does not have now, nor has it ever had, a business relationship with Mr. Farmer. While Mr. Grob and Mr. Farmer are friends, they have never had a business relationship.

b. Chartered Investments Inc. – The Company believes that Chartered Investments is an entity owned and operated by Mr. Farmer. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Chartered Investments Inc.

c. TransAmerica Trading Inc. – The Company believes that TransAmerica Trading is an entity owned and operated by Ms. Carolyn Austin. Neither the Company, nor any executive officer, has ever had a business or personal relationship with TransAmerica Trading.

d. Carolyn P Austin – Ms. Austin is known to the Company and its executive officers through Company stock held by TransAmerica Trading. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Ms. Austin.

e. Scott Sieck – The Company and its executive officers are unaware of Mr. Sieck. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Mr. Sieck.

f. Oak Resources Inc. – The Company and its executive officers are unaware of Oak Resources. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Oak Resources.

g. Lydia Danell Cotton – Ms. Cotton is a social acquaintance of Mr. Grob. Ms. Cotton was an original investor in the Company's Direct Public Offering ("DPO"). Other than her investment in the DPO, neither the Company, nor any executive officer, has ever had a business or personal relationship with Ms. Cotton.

h. CBH Compagnie – The Company and its executive officers are unaware of CBH Compagnie. Neither the Company, nor any executive officer, has ever had a business or personal relationship with CBH Compagnie.

j. Compagnie Bancaire Helvetique – The Company and its executive officers are unaware of Compagnie Bancaire Helvetique. Neither the Company, nor any executive officer, has ever had a business or personal relationship with Compagnie Bancaire Helvetique.



Please let me know if you have any additional questions.

Sincerely,

Baldemar Rios
Chairman & CEO



# Exhibit TTTT

**To:**       cgrob@chimeraenergyusa.com[cgrob@chimeraenergyusa.com]
**Cc:**       Andrew Farmer
(andrew.farmer@iridiumcapitallimited.com)[andrew.farmer@iridiumcapitallimited.com]; Tyson Rohde
(tysonrohde@hotmail.com)[tysonrohde@hotmail.com]
**From:**     David M. Loev
**Sent:**     Tue 10/2/2012 6:35:44 PM
**Importance:**          **Normal**
**Subject:**  FW: Air Liquide/Chimera

Charles,


See correspondence below and let me know if the terms are acceptable.  I have copied
language from below which they discussed with me and I told them that we had not
discussed.


Further, Chimera agrees to remove the September 21, 2012 press release and any
reference to Air Liquide from its website and use its best efforts to contact Yahoo and
other websites that continue to publish the press release to remove same from their
websites.


Let me know if this is acceptable.


Regards,


David M. Loev

The Loev Law Firm, PC

6300 West Loop South

Suite 280

Bellaire, Texas 77401

(713) 524-4110 – phone

(713) 524-4122 – fax

SEC-LoevD-E-0002602

(713) 920-9372 – efax

dloev@loevlaw.com

http://www.loevlaw.com

**From:** Milligan, Sean [mailto:smilligan@winstead.com]
**Sent:** Tuesday, October 02, 2012 5:29 PM
**To:** dloev@loevlaw.com
**Cc:** Guthrie, Mark
**Subject:** Air Liquide/Chimera

David,

This confirms our discussion today in which you represented that Chimera Energy Corporation agrees to the relief requested in Air Liquide USA LLC's Application for Temporary Restraining Order.  Specifically, Chimera agrees to: (1) Refrain from referring to Air Liquide in any public statement or press release, including, but not limited to, on its website, or in any publications, advertising or marketing materials, and other communications without the express written consent of an authorized officer of Air Liquide on behalf of Air Liquide; and (2) Refrain from claiming any sort of business relationship or agreement with Air Liquide in any dissemination of information to the public. Further, Chimera agrees to remove the September 21, 2012 press release and any reference to Air Liquide from its website and use its best efforts to contact Yahoo and other websites that continue to publish the press release to remove same from their websites.

Please confirm we have an agreement as to the foregoing injunctive relief requested by Air Liquide.

In return for a signed Settlement Agreement and Final Judgment entering Permanent Injunctive relief as set forth above, Air Liquide agrees to dismiss the lawsuit against Chimera and release its claims as set forth in the Petition against Chimera. Air Liquide's agreement is conditioned on the understanding that

SEC-LoevD-E-0002603

between now and the execution of a Settlement and Final Judgment, Chimera will not (1) make or cause to be made any reference to Air Liquide in a press release, on its website, or in any publications, advertising or marketing materials, and other communications without the express written consent of an authorized officer of Air Liquide on behalf of Air Liquide; (2) claim any sort of business relationship or agreement with Air Liquide in any dissemination of information to the public.

Procedurally, we will need Chimera to file an Answer in the lawsuit, which can just be a general denial of Air Liquide's claims. This is necessary for the Court to obtain jurisdiction over Chimera and enter an Agreed Final Judgment and Permanent Injunction. Once that is done, we can execute a final Settlement Agreement and Final Judgment granting Permanent Injunction. I will begin preparing the Settlement and Final Judgment. Please confirm that you will prepare an Answer to the lawsuit on Chimera's behalf.

We would like to resolve this quickly and plan to send the Settlement Agreement and Agreed Final Judgment to you this week. Please have Chimera execute these documents within 7 days of receipt.

If you have any questions or comments regarding the foregoing, please feel free to call me if you have any questions.

Thanks,

Sean

**Sean P. Milligan**

**Winstead PC**  |  JPMorgan Chase Tower  |  600 Travis Street  |  Suite 1100  |  Houston, Texas 77002

713.650.2660 *direct*  |  713.650.2400 *fax*

smilligan@winstead.com   |  www.winstead.com

SEC-LoevD-E-0002604

IRS Circular 230 Required Notice--IRS regulations require that we inform you as follows: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended to be used and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter[s].

Information contained in this transmission is attorney privileged and confidential. It is intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone.

SEC-LoevD-E-0002605

# Exhibit UUUU

10-Q 1 chimera10q113011.htm

## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

### Form 10-Q

☑   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended November 30, 2011**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____to _____**

Commission File Number 333-177406

**Chimera Energy Corporation**

(Exact name of small business issuer as specified in its charter)

| | |
|---|---|
| **Nevada** | **45-2941876** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2800 Post Oak Blvd., Suite 4100 Houston, TX** | **77056** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:  (832) 390-2334

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act:

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☑ |

There were 15,000,000 shares of the registrant's common stock issued and outstanding as of January 13, 2012.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

APP. 001078

## IMPORTANT INFORMATION REGARDING THIS FORM 10-Q

Unless otherwise indicated, references to "we," "us," and "our" in this Quarterly Report on Form 10-Q refer to Chimera Energy Corporation.

Readers should consider the following information as they review this Quarterly Report:

### Forward-Looking Statements

The statements contained or incorporated by reference in this Quarterly Report on Form 10-Q that are not historical facts are "forward-looking statements" (as such term is defined in the Private Securities Litigation Reform Act of 1995), within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). All statements other than statements of historical fact are, or may be deemed to be, forward-looking statements. Forward-looking statements include any statement that may project, indicate or imply future results, events, performance or achievements. The forward-looking statements contained herein are based on current expectations that involve a number of risks and uncertainties. These statements can be identified by the use of forward-looking terminology such as "believes," "expect," "may," "will," "should," "intend," "plan," "could," "estimate" or "anticipate" or the negative thereof or other variations thereon or comparable terminology, or by discussions of strategy that involve risks and uncertainties.

Given the risks and uncertainties relating to forward-looking statements, investors should not place undue reliance on such statements. Forward-looking statements included in this Quarterly Report on Form 10-Q speak only as of the date of this Quarterly Report on Form 10-Q and are not guarantees of future performance. Although we believe that the expectations reflected in the forward-looking statements are reasonable, such expectations may prove to have been incorrect. All subsequent written and oral forward-looking statements attributable to us, or persons acting on our behalf, are expressly qualified in their entirety by these cautionary statements.

Except to the extent required by applicable securities laws, we expressly disclaim any obligation or undertakings to release publicly any updates or revisions to any statement or information contained in this Quarterly Report on Form 10-Q, including the forward-looking statements discussed above, to reflect any change in our expectations with regard thereto or any change in events, conditions or circumstances on which any statement or information is based.

# CHIMERA ENERGY CORPORATION

### CONTENTS

PART 1 – FINANCIAL INFORMATION

ITEM 1 – UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS

    Balance Sheets as of August 31, 2011 and November 30, 2011  (Unaudited)    F-1

    Statements of Operations for the three months ended November 30, 2011 and for the period from August 5, 2011
    (date of inception) through November 30, 2011 (Unaudited)    F-2

    Statements of Cash Flows for the three months ended November 30, 2011 and for the period from August 5, 2011
    (date of inception) through November 30, 2011 (Unaudited)    F-3

NOTES TO FINANCIAL STATEMENTS (UNAUDITED)    F-4

ITEM 2 – MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF
OPERATIONS    2

ITEM 3 – QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISKS    4

ITEM 4T – CONTROLS AND PROCEDURES    4

PART 2 – OTHER INFORMATION    5

ITEM 1A – RISK FACTORS    5

ITEM 6 – EXHIBITS    17

# CHIMERA ENERGY CORPORATION

(A DEVELOPMENT STAGE COMPANY)
BALANCE SHEETS

| | November 30, 2011 | August 31, 2011 |
|---|---|---|
| | ( Unaudited) | |
| **ASSETS** | | |
| Current Assets | | |
| Cash and cash equivalents | $ 70,851 | $ 78,989 |
| Accounts receivable, net | 9,700 | 17,000 |
| Inventory | 15,970 | 15,000 |
| Total current assets | 96,521 | 110,989 |
| | | |
| Total assets | $ 96,521 | $ 110,989 |
| | | |
| Liabilities and stockholder's equity | | |
| Current Liabilities | | |
| Accounts payable and accrued expenses | $ 6,606 | $ 439 |
| Total current liabilities | 6,606 | 439 |
| | | |
| Note payable | 100,000 | 100,000 |
| | | |
| Total liabilities | 106,606 | 100,439 |
| | | |
| Stockholders' equity (deficit) | | |
| Common stock: 100,000,000 authorized; $0.001 par value 10,000,000 shares issued and outstanding | 10,000 | 10,000 |
| Retained earnings (accumulated deficit) during the development stage | (20,085) | 550 |
| Total stockholders' equity (deficit) | (10,085) | 10,550 |
| Total liabilities and stockholders' equity (deficit) | $ 96,521 | $ 110,989 |

**The accompanying notes are an integral part of these financial statements.**

F-1

APP. 001081

# CHIMERA ENERGY CORPORATION

## (A DEVELOPMENT STAGE COMPANY)
## STATEMENTS OF OPERATIONS (UNAUDITED)

| | For the Three Months Ended November 30, 2011 | August 5, 2011 (Inception) through November 30, 2011 |
|---|---|---|
| Revenues | $ 1,200 | $ 18,200 |
| Cost of goods sold | 1,100 | 16,100 |
| Gross Profit | 100 | 2,100 |
| | | |
| Operating expenses: | | |
| General and administrative | 16,985 | 18,065 |
| Total operating expenses | 16,985 | 18,065 |
| | | |
| (Loss) from operations | (16,885) | (15,965) |
| | | |
| Interest expense | (3,750) | (4,120) |
| | | |
| Net loss | $ (20,635) | $ (20,085) |
| | | |
| Basic and diluted loss per share | $ (0.00) | |
| | | |
| Weighted average number of shares outstanding | 10,000,000 | |

**The accompanying notes are an integral part of these financial statements.**

F-2

APP. 001082

# CHIMERA ENERGY CORPORATION

(A DEVELOPMENT STAGE COMPANY)
STATEMENTS OF CASH FLOWS (UNAUDITED)

|  | For the Three Months Ended November 30, 2011 | August 5, 2011 (Inception) through November 30, 2011 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** |  |  |
| Net loss | $ (20,635) | $ (20,085) |
| Adjustment to net loss to net cash used by operations: |  |  |
| Changes in assets and liabilities: |  |  |
| Accounts payable and accrued expenses | 6,167 | 6,606 |
| Accounts receivable | 7,300 | (9,700) |
| Inventory | (970) | (15,970) |
| Net cash used by operating activities | (8,138) | (39,149) |
|  |  |  |
| **CASH FLOWS FROM FINANCING ACTIVITIES** |  |  |
| Proceeds from the issuance of common stock | - | 10,000 |
| Proceeds from note payable | - | 100,000 |
| Net cash provided by financing activities | - | 110,000 |
|  |  |  |
| Net change in cash and cash equivalents | (8,138) | 70,851 |
| Cash and cash equivalents, beginning of period | 78,989 | - |
| Cash and cash equivalents, end of period | $ 70,851 | $ 70,851 |
|  |  |  |
| Supplemental disclosures of cash flow information: |  |  |
| Cash payments for: |  |  |
| Taxes | $ - | $ - |
| Interest | $ - | $ - |

**The accompanying notes are an integral part of these financial statements.**

F-3

# CHIMERA ENERGY CORPORATION

(A DEVELOPMENT STAGE COMPANY)
NOTES TO UNAUDITED FINANCIAL STATEMENTS
November 30, 2011(Unaudited)

## 1. Background Information

Chimera Energy Corporation, a Nevada corporation (the "Company"), supplies equipment and components that are used in the exploration and production of oil and gas. The Company is a development stage corporation and is seeking to implement its business plan. The Company was incorporated on August 5, 2011 (Date of Inception) with its corporate headquarters located in Houston, Texas and its year-end is August 31. In addition to our present product line, we intend to develop and commercialize additional products and technologies for the oil and gas industry. The results of operations for our interim periods are not necessary indicative of the result to be expected for the full year.

Notes to the financial statements that would substantially duplicate the disclosure contained in the audited financial statement for fiscal 2011 as reported, have been omitted.

## 2. Going Concern

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. For the period from August 5, 2011 through November 30, 2011, the Company incurred a net loss of $20,085 and had limited operations. In view of these matters, there is substantial doubt about the Company's ability to continue as a going concern which is dependent upon its ability to achieve a higher level of operations and profitability. The Company intends on financing its future development activities and its working capital needs largely from the sale of public equity securities with some additional funding from other traditional financing sources, including term notes until such time that funds provided by operations are sufficient to fund working capital requirements. The financial statements of the Company do not include any adjustments relating to the recoverability and classification of recorded assets, or the amounts and classifications of liabilities that might be necessary should the Company be unable to continue as a going concern.

## 3. Note Payable

On August 22, 2011, the Company borrowed $100,000 through a promissory note, for the purpose of raising operating capital.  Under the terms of the note, interest shall accrue at 15% per annum; and principal and accrued interest shall become due on August 21, 2013, unless extended by mutual consent of the parties.

The note is secured by all the assets, properties, goods, inventory, equipment, furniture, fixtures, leases, supplies, records, money, documents, instruments, chattel paper, accounts, intellectual property rights (including but not limited to, copyrights, moral rights, patents, patent applications, trademarks, service marks, trade names, trade secrets) and other general intangibles, whether owned by the Company on August 22, 2011 or acquired thereafter.

## 4. Subsequent Events

Subsequent to November 30, 2011, the Company sold five million shares of its common stock pursuant to a registration statement filed with the Securities and Exchange Commission on Form S-1, effective December 21, 2011. The total proceeds raised in the offering was $75,000 and the offering price per share was $0.015. As of the date of this filing the offering is closed. The company intends to use the proceeds from the offering as described in its prospectus filed with the SEC. For additional information concerning this offering please refer to our EDGAR filings which can be found at www.sec.gov.

F-4

## ITEM 2: MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### FORWARD LOOKING STATEMENTS

This document contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," "will" or words of similar meaning and include, but are not limited to, statements about the expected future business and financial performance of the Company. Forward-looking statements are based on management's current expectations and assumptions, which are inherently subject to uncertainties, risks and changes in circumstances that are difficult to predict. Actual outcomes and results may differ materially from these expectations and assumptions due to changes in global political, economic, business, competitive, market, regulatory and other factors. We undertake no obligation to publicly update or review any forward-looking information, whether as a result of new information, future developments or otherwise.

**The following discussion and analysis should be read in connection with the Company's financial statements and related notes thereto, as included in this report, as well as the Company's effective Registration Statement filed on form S-1/A on December 5, 2011.**

### Organization and Basis of Presentation

We are a Houston based energy company, incorporated in the State of Nevada on August 5, 2011, with a fiscal year end of August 31. Our business and registered office is located at 2800 Post Oak Blvd., Suite 4100, Houston, Texas 77056. Our telephone number is 832-390-2334. Our Internet address is http://www.chimeraenergyusa.com. The information on, or that may be accessed through, our website is not incorporated by reference into this quarterly filing and should not be considered a part of this disclosure.

Our current business supplies equipment and components that are used in the exploration and production of oil and gas. In August 2011, we capitalized our business operations with a $100,000 note that bears interest at an annual rate of 15% per annum and is due and payable on August 21, 2013, and commenced our operations with the purchase of $30,000 of inventory. On August 22, 2011, our founder, sole officer and director, Charles Grob, purchased 10,000,000 shares of our common stock for $10,000 at a price per share of $0.001.

### Critical Accounting Policies

The preparation of financial statements and related disclosures in conformity with accounting principles generally accepted in the United States of America requires management to make judgments, assumptions and estimates that affect the amounts reported in our consolidated financial statements and accompanying notes. We base our estimates and judgments on historical experience and on various other assumptions that we believe are reasonable under the circumstances. However, future events are subject to change, and the best estimates and judgments routinely require adjustment. The amounts of assets and liabilities reported in our consolidated balance sheet, and the amounts of revenues and expenses reported for each of our fiscal periods, are affected by estimates and assumptions which are used for, but not limited to, the accounting for allowance for doubtful accounts, goodwill and intangible asset impairments, restructurings, inventory and income taxes. Actual results could differ from these estimates. The following critical accounting policies are significantly affected by judgments, assumptions and estimates used in the preparation of our consolidated financial statements.

*Intangible Assets* – Intangible assets consist of a patent. The cost of intangible assets is amortized on a straight-line basis over the estimated useful life of the patent.

-2-

**APP. 001085**

*Valuation of Intangible Assets* – In accordance with authoritative guidance issued by the Financial Accounting Standards Board ("FASB"), related to accounting for the impairment or disposal of long-lived assets, the carrying value of intangible assets is reviewed on a regular basis for the existence of facts or circumstances, both internally and externally, that may suggest impairment. Some factors considered important, which could trigger an impairment review, include a significant decrease in the market value of an asset, a significant change in the extent or manner in which an asset could be used, a significant adverse change in the business climate that could affect the value of an asset, an accumulation of costs for an asset in excess of the amount originally expected, and a current expectation that, it is more likely than not, a long-lived asset will be disposed of at a loss before the end of its estimated useful life.

If any such facts or circumstances exist, the carrying value of long-lived assets are evaluated to determine if impairment exists based upon estimated undiscounted future cash flows over the remaining useful life of the assets and comparing that value to the carrying value of the assets. If the carrying value of the assets is greater than the estimated future cash flows, the assets are written down to the estimated fair value. The estimated fair value of the assets is based on a current market value of the assets. If a current market value is not readily available, a projected discounted cash flow method is applied using a discount rate determined by management to be commensurate with the risk inherent in the current business model. As of the date of this filing, we do not have any intangible assets.

**Results of Operations**

**For the three months ended November 30, 2011.**

For the three months ended November 30, 2011, we realized revenues of $1,200 and cost of goods sold of $1,100. Our general and administrative expenses associated with the operations of the Company for the same period were $16,985. Interest expense totaled $3,750 for the three months ended November 30, 2011. Interest expense for the three months ended November 30, 2011 was the interest that was accrued on our $100,000 note. For the three months ended November 30, 2011, we recognized a net loss of $20,635. The primary reason for the net loss was due to early stage revenues from operations and an increase in general and administrative expenses associated with going public.

**For the Period from August 5, 2011 (Inception) through November 30, 2011**

For the period from August 5, 2011 (inception) through November 30, 2011, we realized revenues of $18,200 and cost of goods sold of $16,100. Our general and administrative expenses associated with the operations of the Company for the same period were $18,065. Interest expense totaled $4,120 for the three period ended November 30, 2011. Interest expense for the period from inception through November 30, 2011 was the interest that was accrued on our $100,000 note. For the period ended November 30, 2011, we recognized a net loss of $20,085. The primary reason for the net loss was due to early stage revenues from operations and an increase in general and administrative expenses associated with going public.

**Liquidity and Capital Resources**

We incurred a net loss of $20,635 and 20,085 for the three months ended November 30, 3011, and for the period from inception through November 30, 2011, respectively. For the three months ended November 30, 2011, we had a working capital surplus of $89,915. We anticipate that we will require approximately $500,000 to fund our operations and fully execute our business plan. We continue to rely on loans from third parties to fund operating shortfalls and do not foresee a change in this situation in the immediate future. There can be no assurance that we will continue to have such funding available. We will not be able to continue operations without additional financings. These conditions create uncertainty as to the Company's ability to continue as a going concern.

-3-

**APP. 001086**

**COMMON STOCK**

We are authorized to issue 100,000,000 shares of Common Stock, with a par value of $0.001. There were 10,000,000 shares of Common Stock issued and outstanding as of November 30, 2011 and 15,000,000 shares issued and outstanding as of January 1, 2012. All shares of common stock have one vote per share on all matters including election of directors, without provision for cumulative voting. The common stock is not redeemable and has no conversion or preemptive rights. The common stock currently outstanding is validly issued, fully paid and non- assessable. In the event of liquidation of the company, the holders of common stock will share equally in any balance of the company's assets available for distribution to them after satisfaction of creditors and preferred shareholders, if any. The holders of common stock of the company are entitled to equal dividends and distributions per share with respect to the common stock when, as and if, declared by the board of directors from funds legally available.

**PREFERRED STOCK**

We have not authorized or issued any preferred stock as of the date of this filing.

**ITEM 3: QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISKS**

As a smaller reporting company, we are not required to provide the information required by this Item.

**ITEM 4T: CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)). Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered in this report, our disclosure controls and procedures were not effective to ensure that information required to be disclosed in reports filed under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the required time periods and is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

Our management, including our principal executive officer and principal financial officer, does not expect that our disclosure controls and procedures or our internal controls will prevent all error or fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints and the benefits of controls must be considered relative to their costs. Due to the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected. To address the material weaknesses, we performed additional analysis and other post-closing procedures in an effort to ensure our consolidated financial statements included in this annual report have been prepared in accordance with generally accepted accounting principles. Accordingly, management believes that the financial statements included in this report fairly present in all material respects our financial condition, results of operations and cash flows for the periods presented.

Our management assessed the effectiveness of our internal control over financial reporting as of November 30, 2011. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. We have identified the following material weaknesses;

1. As of November 30, 2011, we did not maintain effective controls over the control environment. Specifically we have not developed and effectively communicated to our employees its accounting policies and procedures. This has resulted in inconsistent practices. Further, the Board of Directors does not currently have any independent members and no director qualifies as an audit committee financial expert as defined in Item 407(d)(5)(ii) of Regulation S-B. Since these entity level programs have a pervasive effect across the organization, management has determined that these circumstances constitute a material weakness.

-4-

**APP. 001087**

2. As of November 30, 2011, we did not maintain effective controls over financial statement disclosure. Specifically, controls were not designed and in place to ensure that all disclosures required were originally addressed in our financial statements.   Accordingly, management has determined that this control deficiency constitutes a material weakness.

Because of these material weaknesses, management has concluded that the Company did not maintain effective internal control over financial reporting as of November 30, 2011, based on the criteria established in "Internal Control-Integrated Framework" issued by the COSO.

**Change In Internal Control Over Financial Reporting**
There were no changes in our internal control over financial reporting that occurred during the three months ended November 30, 2011 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## PART II. OTHER INFORMATION

## ITEM 1A: RISK FACTORS

Our business involves a high degree of risk. The following risk factors should be considered carefully in addition to the other information contained in this Form 10-Q.

Risks related to Our Business

> ### We Are An Early Stage Company, Our Business Is Evolving And Our Business Prospects Are Difficult To Evaluate.

We are an early stage company with very limited operating history. We have a limited operating history that you can rely on in connection with an investment decision. Our prospects must be carefully considered in light of our history, our high capital costs, our exposure to operating losses and the other risks, uncertainties and difficulties that are typically encountered by companies that are implementing new business models. Some of the principal risks and difficulties we expect to encounter include our ability to:

- Raise substantial capital to finance our planned expansion, together with the losses we may incur in our early stage of development;

- Develop new products at the cost and on the time-table we project. We may encounter unexpected technical and legal challenges that may delay our implementation time line and/or increase our costs;

- Develop, implement and maintain systems to ensure compliance with a variety of governmental and quasi-governmental rules, regulations and policies;

- Adapt and successfully execute our rapidly evolving and inherently unpredictable business plan and respond to competitive developments and changing market conditions;

- Attract, retain and motivate qualified personnel; and

-5-

Because of our lack of operating history and our early stage of development, we have limited insight into trends and conditions that may exist or might emerge and affect our business. There is no assurance that our business strategy will be successful or that we can or will successfully address these risks.

### *We May Need To Raise Additional Capital To Continue Our Business Operations.*

We believe that we may need to raise additional capital in the future. We believe our existing cash on hand will satisfy our cash requirements for up to 24 months. However, if we are unable to obtain additional financing, our future growth, if any, could be impaired. If we fail to raise additional funding in the future, we may not have enough money to pay our legal and accounting expenses and we could be forced to curtail or abandon our business plan, causing any investment in us to become worthless. Additionally, even if we do raise additional funding, there can be no assurance that additional capital from outside sources will be available for our marketing and future growth, if any, or if such financing is available, that it will not involve issuing securities senior to our common stock or equity financings which are dilutive to holders of our common stock. In addition, in the event we do not raise additional capital, we may be limited in our ability to grow our Company.

### *The Repayment Of Our $100,000 Notes Payable Is Secured By A Security Interest In Substantially All Of Our Assets.*

On or around August 22, 2011, Kylemore Corp., loaned us $100,000 which was evidenced by a Promissory Note. The note is due on August 21, 2013 and accrues interest at the rate of 15% per annum. In the event an event of default occurs under the note the interest rate increases to 25% per annum (subject to applicable law). The note is secured by a security interest in substantially all of our assets and we do not currently have sufficient funds to repay the note. If we default on the repayment of the note, the holder thereof may enforce its security interest over the assets of the Company, which if enforced could leave us without any assets, and as a result, we could be forced to curtail or abandon our current business plans and operations. If that were to happen, any investment in the Company could become worthless.

### *We Do Not Know The Exact Development And Operating Costs Of Our Potential Additional Product Lines.*

We only have one product line and have not developed additional product lines and therefore, we do not know the exact costs involved with the organic development and operation of the products in which we intend to pursue. These products include, but are not limited to, equipment used for oil and gas exploration, production, transportation, and refining. In the case of higher than expected costs to acquire and/or develop these products, we may not be able to operate profitably in the market place. If we are unable to successfully build profitable product lines, we will have to cease our operations, which may result in the complete loss of your investment.

### *Our Lack Of An Operating History Gives No Assurance That Our Future Operations Will Result In Profitable Revenues, Which Could Result In The Suspension Or End Of Our Operations.*

We were incorporated on August 5, 2011, and although we have realized operating revenues to date, we have very little operating history upon which an evaluation of our future success or failure can be made. Our ability to achieve and maintain profitability and positive cash flow is dependent upon our ability to generate revenues in excess of our expenses.

Based upon current plans, we expect to incur operating losses in future periods because we will likely incur expenses that exceed our revenues. We cannot guarantee that we will be successful in generating a profit in the future. Failure to generate a profit may cause us to go out of business.

-6-

APP. 001089

*We Are A New Company With A Limited Operating History And We Face A High Risk Of Business Failure Which Would Result In The Loss Of Your Investment.*

We are an early stage company incorporated on August 5, 2011, and to date have been involved primarily in the development of our business plan and early-stage operations. Because we have a limited operating history there is little internal or industry-based historical financial data upon which to estimate our planned operating expenses.

We expect that our results of operations may also fluctuate significantly in the future as a result of a variety of market factors including, among others, the entry of new competitors; the availability of motivated and qualified personnel; the initiation, renewal or expiration of our customer base; pricing changes by the Company or its competitors, specific economic conditions in the energy markets and general economic conditions. Accordingly, our future sales and operating results are difficult to forecast.

*Adverse Developments In The Global Economy Restricting The Credit Markets May Materially And Negatively Impact Our Business.*

The recent downturn in the world's major economies and the constraints in the credit markets have heightened or could continue to heighten a number of material risks to our business, cash flows and financial condition, as well as our future prospects. Continued issues involving liquidity and capital adequacy affecting lenders could affect our ability to access credit facilities or obtain debt financing and could affect the ability of lenders to meet their funding requirements when we need to borrow. Further, in the uncertain event that a public market for our stock develops, the volatility in the equity markets may make it difficult in the future for us to access the equity markets for additional capital at attractive prices, if at all. The current credit crisis in other countries, for example, and concerns over debt levels of certain other European Union member states, has increased volatility in global credit and equity markets. If we are unable to obtain credit or access capital markets, our business could be negatively impacted.

*Because We Are Small And Do Not Have Much Capital, We Must Limit Our Marketing Activities. As A Result, Our Sales May Not Be Enough To Operate Profitably. If We Do Not Make A Profit, We May Have To Suspend Or Cease Operations.*

Due to the fact we are small and do not have much capital, we must limit our marketing activities to potential customers having the likelihood of purchasing our products. We intend to increase our sales efforts to increase revenues from the sale of our inventory of PDC cutters. Because we will be limiting the scope of our marketing activities to regional PDC drill bit manufacturers, we may not be able to generate enough sales to operate profitably. If we cannot operate profitably, we may have to suspend or cease operations.

*We Have Been Focused On The Development Of Our PDC Cutter Distribution Business Segment, And As Such, Have Not Commenced Operations Or Generated Revenues From Other Product Lines. Investing In The Company Before It Has Diversified Product Lines Involves Substantial Risk To Any Investor.*

An investment in our Company is characterized by a high degree of risk. Investors should take caution when considering our revenue, minimal earnings, and lengthy development cycle. Our current operations reside entirely in the wholesale distribution of PDC cutters, a primary component used in oil and gas drill bits. We intend to diversify our product lines to provide more stability to our operations. Although we believe that future capital investments in other product lines will ultimately generate additional revenues and earnings for the Company, there can be no assurance that we will be able to effectively acquire or develop these products or that they will be profitable.

There is no assurance that investments in other product lines will be beneficial to us in the future. In order for us to benefit from our investments, product lines in which we invest must generate revenues and earnings. The success of these investments depends on the ability of management to successfully develop, market, and sell new products; and generate revenues and earnings therefrom. The inability of new products in which we invest to generate net income may adversely affect our financial performance and stock price.

-7-

**APP. 001090**

*We Have Limited Assets That May Be Used To Develop Execute Our Business Plan. Our Lack Of Assets May Have An Adverse Impact On Our Ability To Grow Our Business And Generate Revenues And Earnings.*

We have limited financial and operational assets as well as limited long-term assets such as property, facilities and equipment to fully develop our business plan. We will need to raise additional capital to provide for a facility, purchase equipment and inventory, and fund the labor required to appropriately develop new product lines. Our lack of financial and operational assets may impair our ability to generate future revenues and earnings which may result in a loss of your investment.

*We May Incur Substantial Losses In The Future As We Expand Our Operations And Invest In The Development Of New Product Lines.*

We will incur costs related to investing or developing new product lines. When developing new products organically, it is likely that we will incur costs for a prolonged period prior to generating revenues, if any. The foregoing costs and expenses will likely give rise to substantial near-term operating losses and may prevent the Company from achieving profitability for an extended period of time. We expect to rely on equity and debt financing to fund potential operating losses and other cash requirements until we are able to generate larger profits from operations. We may experience negative cash flow, which will hamper current operations and prevent the Company from expanding. We may be unable to attain, sustain or increase profitability on a quarterly or annual basis in the future, which could require us to scale back or terminate our operations.

*Introducing New Product Lines Is Time Consuming And Expensive And May Not Ultimately Result In An Operating Profit.*

The cost associated with the introduction of new product lines can be very high and new product lines often generate substantial losses for an extended period of time before making a meaningful contribution to administrative overhead. There is no assurance that any potential products from which we may generate revenue will be successfully developed, or that our marketing activities will be successful or profitable. Even if we are ultimately successful, delays, additional expenses and other factors may significantly impair our potential profitability and there is no assurance that the Company will ever generate an operating profit.

*We Will Be A Small Player In An Intensely Competitive Industry And May Be Unable To Compete.*

The oilfield equipment distribution industry in the United States is large and intensely competitive. Although we operate in a niche market with very esoteric components, many of our competitors have substantially more financial and operational resources than us. As a result of this competition, our efforts to commercialize any products under development in the future may be preempted, rendered obsolete, or priced out of the market by our competitors. Competition in oil and gas exploration and production, conventional power generation, and alternative power generation is also robust and there are substantial barriers to entry. Some of the barriers to entry include capital requirements, operational staff, technical expertise, and access to high quality assets.

*Oil And Gas Equipment And Other Products That We May Develop And/Or Distribute May Be Subject To Certification And Approval From Regulatory Agencies.*

Products that we may distribute may be subject to oversight and/or approval from certain regulatory agencies including the International Organization for Standardization (ISO), American Petroleum Institute (API), Environmental Protection Agency (EPA), and the Texas Railroad Commission. Should we fail to meet regulatory standards and attain such approvals our ability to operate may be impaired. Attainment of permits and certifications can be costly and may lead to substantially longer development timelines. Should we fail to attain regulatory certifications, our financial and operational performance could be adversely affected and you could lose your investment.

-8-

APP. 001091

***If The Company Is Dissolved, It Is Unlikely That There Will Be Sufficient Assets Remaining To Distribute To Our Shareholders.***

In the event of the dissolution of the Company, the proceeds realized from the liquidation of our assets, if any, will be used primarily to pay the claims of our creditors, if any, before there can be any distribution to the shareholders. In that case, the ability of equity investors to recover all or any portion of their investment will depend on the amount of funds realized and the claims to be satisfied therefrom.

***If We Are Forced To Incur Unanticipated Costs Or Expenses, We May Have To Suspend Or Cease Our Activities Entirely Which Could Result In A Total Loss Of Your Investment.***

Because we are a small business, with limited assets, we are not in a position to bear unanticipated costs and expenses. If we have to make changes in our structure or are faced with circumstances that are beyond our ability to afford, we may have to suspend or cease our activities entirely which could result in a total loss of your investment.

***Key Management Personnel May Leave The Company Which Could Adversely Affect The Ability Of The Company To Continue Its Development.***

Because we are almost entirely dependent on the efforts of our sole officer and director, Charles Grob, his departure or the loss of other key personnel in the future, could have a material adverse effect on our business. We do not maintain key man life insurance on any of our officers or directors.

***Because Our Current Sole Officer And Director Does Not Have Significant Experience In Operating An Energy Equipment Company, Our Business Has A Higher Risk Of Failure.***

Although our Chief Executive Officer and Director has extensive academic business knowledge, he does not have experience in developing an energy equipment company. Therefore, without this experience, our management's business experience may not be enough to effectively develop and maintain our company. As a result, the implementation of our business plan may be delayed, or eventually, unsuccessful.

***Our Sole Officer And Director May Face Conflicts Of Interest Associated With His Commitment To The Company And His Other Activities Outside Of The Company.***

As of the date of this filing, we have no employees, other than Mr. Grob, our founder, Chief Executive Officer and sole director, who currently devotes 10 to 25 hours per week to our business as required from time to time without compensation. We have not entered into any formal agreement with Mr. Grob regarding the provision of his services to the Company. Mr. Grob is not obligated to commit his full time and attention to our business and accordingly, he may encounter a conflict of interest in allocating his time between our operations and those of other businesses. Although Mr. Grob is presently able to devote 10 to 25 hours per week to our business, this may change. Also, if we require Mr. Grob to devote more than 10 to 25 hours per week to our business on a regular basis for an extended period, it is uncertain that he will be able to satisfy our requirements unless we have sufficient resources to compensate him for any lost income from his private business.  Due to the above, Mr. Grob may face a conflict of interest between the Company and his other business interests.

-9-

APP. 001092

*Since Our Sole Officer And Director Currently Owns 66% Of The Outstanding Shares of Common Stock, And Controls The Company, Investors May Find That His Decisions Are Contrary To Their Interests And You Should Not Purchase Shares Unless You Are Willing To Entrust All Aspects Of Management To Our Sole Officer And Director, Or His Successors.*

As of January 13, 2012 our sole officer and director, Charles Grob, owns 10,000,000 shares of common stock representing 66% of our outstanding stock. As a result, he has control of and will be able to choose all of our directors. His interests may differ from the interests of other stockholders. Factors that could cause his interests to differ from the other stockholders include the impact of corporate transactions on the timing of business operations and his ability to continue to manage the business given the amount of time he is able to devote to us.

All decisions regarding the management of our affairs will be made exclusively by him along with the outcome of all corporate transactions and other matters, including the election of Directors, mergers, consolidations, the sale of all or substantially all of our assets, and he will also have the power to prevent or cause a change in control. Purchasers of our common stock may not participate in our management and, therefore, are dependent upon his management abilities. The only assurance that our shareholders have that our sole officer and director will not abuse his discretion in executing our business affairs, is his fiduciary obligation and business integrity. Such discretionary powers include, but are not limited to, decisions regarding all aspects of business operations, corporate transactions and financing. Mr. Grob also has the ability to accomplish or ratify actions at the shareholder level which would otherwise implicate his fiduciary duties if done as one of the members of our board of directors.

Accordingly, no person should purchase our common stock unless willing to entrust all aspects of management to the sole officer and director, or his successors. Potential purchasers of our common stock must carefully evaluate the personal experience and business performance of our management.

*Because We Only Have One Supplier Of Our PDC Cutters, We Have A Concentration In Our Supply Chain. In The Event That We Are Not Able To Continue To Purchase Inventory From Our Supplier With Favorable Prices And Terms, It Could Adversely Affect Our Operations And Your Investment.*

In the event that our sole supplier increases prices, presents unfavorable trade terms, experiences problems with quality control, becomes insolvent, or simply decides to no longer sell its products to us, our financial and operational results will be materially, adversely affected. As a result, this could cause you to lose a portion or all of your investment in our business.

*Because We Only Have One Primary Purchaser Of Our PDC Cutters, We Have A Concentration In Our Distribution Chain. In The Event That We Are Not Able To Make Sales To New Customers It Could Adversely Affect Our Operations And Your Investment.*

In the event that our primary customer decides not to purchase our products, determines that they are not willing to pay the previous prices they have historically paid for our products or ceases to purchase our products for any reason, our financial and operational results will be materially, adversely affected. As a result, this could cause you to lose a portion or all of your investment in our business.

*We May Be Unable To Collect Our Accounts Receivable.*

In the event the Company is unable to collect the amount currently due or on amounts due in the future, it could have a material adverse effect on the Company's operations and/or force the Company to curtail its planned business operations.

*A Significant Or Prolonged Economic Downturn Could Have A Material Adverse Effect On Our Results Of Operations.*

Our results of operations will be affected by the level of business activity of our customers and future customers, which in turn will be affected by the level of economic activity in the customer segments, industries and markets that they serve. A decline in the level of business activity of our customers could have a material adverse effect on our revenues and profit margin. Future economic conditions could cause customers to reduce or defer their expenditures for our products, which could cause a material adverse effect on our revenues and results of operations.

-10-

APP. 001093

*A Reduction In Spending Due To The Economic Downturn Could Result In A Decrease In Demand For Our Products.*

If spending on capital expenditures in the oil and gas industry decreases, the demand for products like those provided by us would likely decline. This decrease could reduce our opportunity for growth, increase our marketing and sales costs, and reduce the prices we can charge for products, which could reduce our revenue and operating results, if any.

*We Face Corporate Governance Risks And Negative Perceptions Of Investors Associated With The Fact That We Currently Have Only One Officer And Director.*

Charles Grob is our sole officer and director. As such, he has significant control over our business direction. Additionally, as he is our only director, there are no other members of the Board of Directors available to second and/or approve related party transactions involving Mr. Grob, including the compensation Mr. Grob may be paid and the employment agreements we may enter into with Mr. Grob. Additionally, there is no segregation of duties between officers because Mr. Grob is our sole officer, and as such, he is solely responsible for the oversight of our accounting functions. Therefore, investors may perceive that because no other directors are approving related party transactions involving Mr. Grob and no other officers are approving our financial statements that such transactions are not fair to the Company and/or that such financial statements may contain errors. The price of our common stock may be adversely affected and/or devalued compared to similarly sized companies with multiple officers and directors due to the investing public's perception of limitations facing our company due to the fact that we only have one officer and director.

*If We Are Unable To Adequately Protect Our Intellectual Property Rights Our Business Is Likely To Be Adversely Affected.*

We plan to rely on a combination of patents, trademarks, non-disclosure agreements and other security measures to establish and protect our proprietary rights. The measures we have taken or may take in the future may not prevent misappropriation of our proprietary information or prevent others from independently developing similar products or services, designing around our proprietary or patented technology or duplicating our products or services.

Risks Related To Our Industry

*Volatility Or Decline In Oil And Natural Gas Prices May Result In Reduced Demand For Our Products And Services Which May Adversely Affect Our Business, Financial Condition And Results Of Operation.*

The markets for oil and natural gas have historically been extremely volatile. We anticipate that these markets will continue to be volatile in the future. Although oil and gas prices have increased significantly in recent years, there can be no guarantees that these prices will remain at current levels. Such volatility in oil and gas prices, or the perception by our customers of unpredictability in oil and natural gas prices, affects the spending patterns in our industry. The demand for our products and services is, in large part, driven by current and anticipated oil and gas prices and the related general levels of production spending and drilling activity. In particular, volatility or a decline in oil and gas prices may cause a decline in exploration and drilling activities. This, in turn, could result in lower demand for our products and services and may cause lower prices for our products and services. As a result, volatility or a prolonged decline in oil or natural gas prices may adversely affect our business, financial condition and results of operations.

-11-

APP. 001094

*Competition From New And Existing Competitors Within Our Industry Could Have An Adverse Effect On Our Results Of Operations.*

The oil and gas industry is highly competitive and fragmented. Our principal competitors include companies capable of competing effectively in our markets on a local basis as well as a number of large companies that possess substantially greater financial and other resources than we do. Furthermore, we face competition from companies working to develop oil and gas products which would compete with us. Additionally, our larger competitors may be able to devote greater resources to developing, promoting and selling their products and services. We may also face increased competition due to the entry of new competitors. As a result of this competition, we may experience lower sales if our prices are undercut or advanced technology is brought to market, which would likely have an adverse effect on our results of operations and force us to curtail or abandon our current business plan.

*Our Results Of Operations May Be Negatively Affected By Sustained Downturns Or Sluggishness In The Economy, Including Reductions In Demand Or Low Levels In The Market Prices Of Commodities, All Of Which Are Beyond Our Control.*

Sustained downturns in the economy generally affect the markets in which we operate and negatively influence our operations. Declines in demand for oil and gas as a result of economic downturns may reduce our cash flows, especially if our customers reduce exploration and production activities and, therefore, use of our products.

Lower demand for oil and gas and lower prices for oil and gas result from multiple factors that affect the markets which consume our products and services:

- supply of and demand for energy commodities, including any decreases in the production of oil and gas which could negatively affect the demand for oil and gas in general, and as a result the need for our products;

- general economic conditions, including downturns in the United States, Canada or other economies which affect energy consumption particularly in which sales to industrial or large commercial customers which could negatively affect the demand for oil and gas in general, and as a result the need for our products; and

- federal, state and foreign energy and environmental regulations and legislation, which could make oil and gas exploration more costly, which could in turn drive down demand for oil and gas, and which could in turn reduce the demand for our products and cause our revenues to decrease.

*The Long-Term Financial Condition Of Our Businesses Is Dependent On The Continued Availability Of Oil And Gas Reserves.*

Our business is dependent upon the continued availability of oil production and reserves. Low prices for oil and gas, regulatory limitations, or the lack of available capital for these projects could adversely affect the development of additional reserves and production, and, therefore, demand for our products and services.

Risks Related to Our Financial Condition

*There Is Substantial Uncertainty About Our Ability To Continue As A Going Concern.*

In their audit report, our auditors have expressed an opinion that substantial doubt exists as to whether we can continue as an ongoing business. Although we have revenues, we had limited profits and continue to require substantial capital to develop our business. Because our activities have been financed with a loan from a single investor, we have a concentration of sources of funding. Failure to receive future capital from this investor, or to replace that funding with new investment capital, may require us to suspend or cease our activities altogether which could result in the loss of your investment.

*We Have Significant Weaknesses In Our System Of Internal Controls That Could Subject Us To Regulatory Scrutiny Or Impair Investor Confidence, Which Could Adversely Affect Our Business.*

Section 404 of the Sarbanes-Oxley Act of 2002 requires companies to perform a comprehensive evaluation of their internal controls. At present, our system of internal controls does not satisfy all applicable regulatory requirements. Future efforts to bring our system of internal controls into compliance with Section 404 and related regulations will likely require the commitment of significant financial and managerial resources. If we fail in that effort, we could be subject to regulatory scrutiny or suffer a loss of investor confidence, which could adversely affect our business.

-12-

APP. 001096

Risks Related to Investing in Our Company

**_Because There Is No Public Trading Market For Our Common Stock, You May Not Be Able To Resell Your Stock._**

We intend to apply to have our common stock quoted on the OTC markets. This process takes some time and the application must be made on our behalf by a market maker. Our stock may be quoted or traded only to the extent that there is interest by broker-dealers in acting as a market maker. Despite our best efforts, we may not be able to convince any broker/dealers to act as market-makers and make quotations on the OTC Bulletin Board or OTCQB market.

If our common stock becomes quoted and a market for the stock develops, the actual price of our shares will be determined by prevailing market prices at the time of the sale.

We cannot assure you that there will be a market in the future for our common stock. The trading of securities on the OTC markets is often sporadic and investors may have difficulty buying and selling our shares or obtaining market quotations for them, which may have a negative effect on the market price of our common stock. You may not be able to sell your shares at their purchase price or at any price at all. Accordingly, you may have difficulty reselling any shares you purchase from the selling security holders.

**_Investing In Our Company Is Highly Speculative And Could Result In The Entire Loss Of Your Investment._**

Purchasing our common stock is highly speculative and involves significant risk. Our common stock should not be purchased by any person who cannot afford to lose their entire investment. Our business objectives are also speculative, and it is possible that we would be unable to accomplish them. Our shareholders may be unable to realize a substantial or any return on their purchase of our common stock and may lose their entire investment. For this reason, each prospective purchaser of our common stock should read this disclosure and all of its exhibits carefully and consult with their attorney, business and/or investment advisor.

**_Investing In Our Company May Result In An Immediate Loss Because Buyers Will Pay More For Our Common Stock Than The Pro Rata Portion Of The Assets Are Worth._**

We have only been recently formed and have only a limited operating history, therefore, the price of our common stock is not based on long-term data. No investment banker, appraiser or other independent third party has been consulted concerning the quotation price of our common stock or the fairness of its market price. Our net tangible book value per share of common stock is negative as of November 30, 2011, our most recent financial statement date.

**_We May Issue Additional Shares Of Common Stock Or Derivative Securities That Will Dilute The Percentage Ownership Interest Of Our Existing Shareholders And May Dilute The Book Value Per Share Of Our Common Stock And Adversely Affect The Terms On Which The Company May Obtain Additional Capital._**

Our authorized capital consists of 100,000,000 shares of common stock. The Board of Directors has the authority, without action by or vote of our shareholders, to issue all or part of the authorized shares of common and preferred stock for any corporate purpose, including for the conversion or retirement of debt. We are likely to seek additional equity capital in the future as we develop our business and expand our operations. Any issuance of additional shares of common stock or derivative securities, such as convertible promissory notes, will dilute the percentage ownership interest of our shareholders and may dilute the book value per share of our common stock. Additionally, the exercise or conversion of derivative securities could adversely affect the terms on which the Company can obtain additional capital. Holders of derivative securities are most likely to voluntarily exercise or convert their derivative securities when the exercise or conversion price is less than the market price for the underlying common stock. Holders of derivative securities will have the opportunity to profit from any rise in the market value of our common stock or any increase in our net worth without assuming the risks of ownership of the underlying shares of our common stock. It is possible that, due to additional share issuance, you could lose a substantial amount, or all, of your investment.

-13-

Our Board of Directors may attempt to use non-cash consideration to satisfy obligations, which would likely consist of restricted shares of our common stock. Our Board of Directors has authority, without action or vote of the shareholders, to issue all or part of the authorized but unissued shares of common stock. In addition, if a trading market develops for our common stock, we may attempt to raise capital by selling shares of our common stock, possibly at a discount to market. These actions will result in dilution of the ownership interests of existing shareholders, may further dilute common stock book value, and that dilution may be material. Such issuances may also serve to enhance existing management's ability to maintain control of the Company because the shares may be issued to parties or entities committed to supporting existing management.

*We Do Not Anticipate Paying Dividends In The Foreseeable Future, So There Will Be Less Ways In Which You Can Make A Gain On Any Investment In Us.*

We have never paid dividends and do not intend to pay any dividends for the foreseeable future. To the extent that we may require additional funding currently not provided for in our financing plan, our funding sources may prohibit the declaration of dividends. Because we do not intend to pay dividends, any gain on your investment will need to result from an appreciation in the price of our common stock. There will therefore be fewer ways in which you are able to make a gain on your investment.

*In The Event That Our Shares Are Traded, They May Trade Under $5.00 Per Share And Thus Will Be A Penny Stock. Trading In Penny Stocks Has Many Restrictions And These Restrictions Could Severely Affect The Price And Liquidity Of Our Shares.*

In the event that our shares are traded, and our stock trades below $5.00 per share, our stock would be known as a "penny stock", which is subject to various regulations involving disclosures to be given to you prior to the purchase of any penny stock. The U.S. Securities and Exchange Commission (the "SEC") has adopted regulations which generally define a "penny stock" to be any equity security that has a market price of less than $5.00 per share, subject to certain exceptions. Depending on market fluctuations, our common stock could be considered to be a "penny stock". A penny stock is subject to rules that impose additional sales practice requirements on broker/dealers who sell these securities to persons other than established customers and accredited investors. For transactions covered by these rules, the broker/dealer must make a special suitability determination for the purchase of these securities. In addition, he must receive the purchaser's written consent to the transaction prior to the purchase. He must also provide certain written disclosures to the purchaser. Consequently, the "penny stock" rules may restrict the ability of broker/dealers to sell our securities, and may negatively affect the ability of holders of shares of our common stock to resell them. These disclosures require you to acknowledge that you understand the risks associated with buying penny stocks and that you can absorb the loss of your entire investment. Penny stocks are low priced securities that do not have a very high trading volume. Consequently, the price of the stock is often volatile and you may not be able to buy or sell the stock when you want to.

*Financial Industry Regulatory Authority ("FINRA") Sales Practice Requirements May Also Limit Your Ability To Buy And Sell Our Common Stock, Which Could Depress The Price Of Our Shares.*

FINRA rules require broker-dealers to have reasonable grounds for believing that an investment is suitable for a customer before recommending that investment to the customer. Prior to recommending speculative low-priced securities to their non-institutional customers, broker-dealers must make reasonable efforts to obtain information about the customer's financial status, tax status and investment objectives, among other things. Under interpretations of these rules, FINRA believes that there is a high probability such speculative low-priced securities will not be suitable for at least some customers. Thus, FINRA requirements make it more difficult for broker-dealers to recommend that their customers buy our common stock, which may limit your ability to buy and sell our shares, have an adverse effect on the market for our shares, and thereby depress our share price.

-14-

APP. 001098

*You May Face Significant Restrictions On The Resale Of Your Shares Due To State "Blue Sky" Laws.*

Each state has its own securities laws, often called "blue sky" laws, which (1) limit sales of securities to a state's residents unless the securities are registered in that state or qualify for an exemption from registration, and (2) govern the reporting requirements for broker-dealers doing business directly or indirectly in the state. Before a security is sold in a state, there must be a registration in place to cover the transaction, or it must be exempt from registration. The applicable broker-dealer must also be registered in that state.

We do not know whether our securities will be registered or exempt from registration under the laws of any state. A determination regarding registration will be made by those broker-dealers, if any, who agree to serve as market makers for our common stock. There may be significant state blue sky law restrictions on the ability of investors to sell, and on purchasers to buy, our securities. You should therefore consider the resale market for our common stock to be limited, as you may be unable to resell your shares without the significant expense of state registration or qualification.

*We Will Incur Significant Increased Costs As A Result Of Operating As A Fully Reporting Company As Well As In Connection With Section 404 Of The Sarbanes Oxley Act.*

We will incur legal, accounting and other expenses in connection with our future status as a fully reporting public company. The Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") and rules subsequently implemented by the SEC have imposed various requirements on public companies, including requiring changes in corporate governance practices. As such, our management and other personnel will need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations will increase our legal and financial compliance costs and make some activities more time-consuming and costly. The Sarbanes-Oxley Act requires, among other things, that we maintain effective internal controls for financial reporting and disclosure of controls and procedures. In particular, we must perform system and process evaluation and testing of our internal controls over financial reporting to allow management to report on the effectiveness of our internal controls over financial reporting. Our testing may reveal deficiencies in our internal controls over financial reporting that are deemed to be material weaknesses. Our compliance with Section 404 and our future status as a publicly reporting company will require that we incur substantial accounting, legal and filing expenses and expend significant management efforts. We currently do not have an internal audit group, and we may need to hire additional accounting and financial staff with appropriate public company experience and technical accounting knowledge. Moreover, if we are not able to comply with the requirements of Section 404 in a timely manner, the market price of our stock, if any, could decline, and we could be subject to sanctions or investigations by the SEC or other regulatory authorities, which would require additional financial and management resources.

-15-

***If Our Common Stock Is Not Approved For Quotation On The Over-The-Counter Bulletin Board or OTCQB Market, Our Common Stock May Not Be Publicly-Traded, Which Could Make It Difficult To Sell Shares Of Our Common Stock And/Or Cause The Value Of Our Common Stock To Decline In Value.***

In order to have our common stock quoted on the Over-The-Counter Bulletin Board ("OTCBB") or OTCQB market, which is our current plan, we will need to engage a market maker, who will file a Form 15c2-11 with FINRA; and clear FINRA comments to obtain a trading symbol. Assuming we clear FINRA comments, we anticipate receiving a trading symbol and having our shares of common stock quoted on the OTCBB in approximately one (1) to two (2) months after the effectiveness of our Registration Statement. In the event our Form 15c2-11 is not approved by FINRA for the OTCBB, we plan to file a 15c2-11 to quote our shares of common stock on the OTC Pink Sheets. If we are not cleared to have our securities quoted on the OTCBB, OTCQB and/or in the event we fail to be cleared for trading on the OTC Pink Sheets, there will be no public market for our common stock and it could be difficult for our then shareholders to sell shares of common stock which they own. As a result, the value of our common stock will likely be less than it would otherwise due to the difficulty shareholders will have in selling their shares. If we are unable to obtain clearance to quote our securities on the OTCBB, OTCQB and/or the Pink Sheets, it will be difficult for us to raise capital and we could be forced to curtail or abandon our business operations, and as a result, the value of our common stock could become worthless.

-16-

**ITEM 6: EXHIBITS AND REPORTS ON FORM 8-K**

(a)        Exhibits:
Exhibit    Description
No.
31.1       Section 302 Certification
32.1       Section 906 Certification

(b)        Reports on Form 8-K:

None.

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Chimera Energy Corporation

By:    /s/  Charles Grob
       Charles Grob
       Chairman of the Board and CEO
       (Principal Executive Officer and
       Principal Accounting Officer)

Date:  January 13, 2012

-17-

**APP. 001101**



APP. 001102

# Exhibit VVVV

10-Q 1 chimera10q022912.htm

## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

**Form 10-Q**

☑   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended February 29, 2012**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____to _____

Commission File Number 333-177406

**Chimera Energy Corporation**
(Exact name of small business issuer as specified in its charter)

| **Nevada** | **45-2941876** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| **2800 Post Oak Blvd., Suite 4100** | |
| **Houston, TX** | **77056** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:  (832) 390-2334

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act:

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☑ |

There were 15,000,000 shares of the registrant's common stock issued and outstanding as of April 1, 2012.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐   No ☑

**APP. 001104**

## IMPORTANT INFORMATION REGARDING THIS FORM 10-Q

Unless otherwise indicated, references to "we," "us," and "our" in this Quarterly Report on Form 10-Q refer to Chimera Energy Corporation.

Readers should consider the following information as they review this Quarterly Report:

**Forward-Looking Statements**

The statements contained or incorporated by reference in this Quarterly Report on Form 10-Q that are not historical facts are "forward-looking statements" (as such term is defined in the Private Securities Litigation Reform Act of 1995), within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). All statements other than statements of historical fact are, or may be deemed to be, forward-looking statements. Forward-looking statements include any statement that may project, indicate or imply future results, events, performance or achievements. The forward-looking statements contained herein are based on current expectations that involve a number of risks and uncertainties. These statements can be identified by the use of forward-looking terminology such as "believes," "expect," "may," "will," "should," "intend," "plan," "could," "estimate" or "anticipate" or the negative thereof or other variations thereon or comparable terminology, or by discussions of strategy that involve risks and uncertainties.

Given the risks and uncertainties relating to forward-looking statements, investors should not place undue reliance on such statements. Forward-looking statements included in this Quarterly Report on Form 10-Q speak only as of the date of this Quarterly Report on Form 10-Q and are not guarantees of future performance. Although we believe that the expectations reflected in the forward-looking statements are reasonable, such expectations may prove to have been incorrect. All subsequent written and oral forward-looking statements attributable to us, or persons acting on our behalf, are expressly qualified in their entirety by these cautionary statements.

Except to the extent required by applicable securities laws, we expressly disclaim any obligation or undertakings to release publicly any updates or revisions to any statement or information contained in this Quarterly Report on Form 10-Q, including the forward-looking statements discussed above, to reflect any change in our expectations with regard thereto or any change in events, conditions or circumstances on which any statement or information is based.

**APP. 001105**

# CHIMERA ENERGY CORPORATION

## CONTENTS

PART I – FINANCIAL INFORMATION

ITEM 1 –FINANCIAL STATEMENTS

| | |
|---|---|
| Balance Sheets as of February 29, 2012 (Unaudited) and August 31, 2011 | F-1 |
| Statements of Operations for the three and six months ended February 29, 2012 and for the period from August 5, 2011 (date of inception) through February 29, 2012 (Unaudited) | F-2 |
| Statements of Cash Flows for the six months ended February 29, 2012 and for the period from August 5, 2011 (date of inception) through February 29, 2012 (Unaudited) | F-3 |
| Notes to Unaudited Financial Statements | F-4 |
| ITEM 2 – MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 4 |
| ITEM 3 – QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISKS | 5 |
| ITEM 4T – CONTROLS AND PROCEDURES | 5 |
| PART 2 – OTHER INFORMATION | 6 |
| ITEM 1A – RISK FACTORS | 6 |
| ITEM 6 – EXHIBITS | 6 |

**APP. 001106**

# CHIMERA ENERGY CORP
(Development Stage Company)

## BALANCE SHEETS

|  | February 29, 2012 | August 31, 2011 |
|---|---|---|
|  | (UNAUDITED) |  |
| **ASSETS** |  |  |
| **CURRENT ASSETS** |  |  |
| Cash and Cash Equivalents | $ 136,811 | $ 78,989 |
| Accounts Receivable, Net | 3,920 | 17,000 |
| Inventory | 15,970 | 15,000 |
| Total Current Assets | 156,701 | 110,989 |
| **TOTAL ASSETS** | $ 156,701 | $ 110,989 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** |  |  |
| **CURRENT LIABILITIES** |  |  |
| Accounts Payable and Accrued Expenses | $ 8,070 | $ 439 |
| Total Current Liabilities | 8,070 | 439 |
| Note Payable | 100,000 | 100,000 |
| **TOTAL LIABILITIES** | 108,070 | 100,439 |
| **COMMITMENTS** |  |  |
| **STOCKHOLDERS' EQUITY** |  |  |
| Common stock, $0.001 par value, 100,000,000 shares authorized; |  |  |
| 15,000,000 and 10,000,000 shares outstanding, respectively | 15,000 | 10,000 |
| Additional Paid In Capital | 70,000 | - |
| Subscription Receivable | (750) |  |
| Retained Earnings (Accumulated) During Development Stage | (35,619) | 550 |
| **TOTAL STOCKHOLDERS' EQUITY** | 48,631 | 10,550 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 156,701 | $ 110,989 |

The accompanying notes are an integral part of these financial statements.

F-1

**APP. 001107**

# CHIMERA ENERGY CORP
## (Development Stage Company)

### STATEMENTS OF OPERATIONS (UNAUDITED)

| | For the Three Months Ended February 29, 2012 | For the Six Months Ended February 29, 2012 | Period from Inception (August 5, 2011) to February 29, 2012 |
|---|---|---|---|
| REVENUES | $ 3,920 | $ 5,120 | $ 22,120 |
| COST OF REVENUES | (2,770) | (3,870) | (18,870) |
| GROSS PROFIT | 1,150 | 1,250 | 3,250 |
| OPERATING EXPENSES | | | |
| General and Administrative | 12,934 | 29,919 | 30,999 |
| Total Operating Expenses | 12,934 | 29,919 | 30,999 |
| OPERATING LOSS | (11,784) | (28,669) | (27,749) |
| OTHER EXPENSES | | | |
| Interest expense | (3,750) | (7,500) | (7,870) |
| Total Other Expenses | (3,750) | (7,500) | (7,870) |
| NET LOSS | $ (15,534) | $ (36,169) | $ (35,619) |
| NET LOSS PER SHARE: | | | |
| Common Stock: | | | |
| Basic and Diluted Net Loss Per Share | $ (0.00) | $ (0.00) | |
| Denominator for Basic and Diluted Net Loss Per Share Weighted Average Number of Common Shares Outstanding | 12,388,889 | 11,187,845 | |

The accompanying notes are an integral part of these financial statements.

F-2

**APP. 001108**

# CHIMERA ENERGY CORP

## (Development Stage Company)

### STATEMENTS OF CASH FLOWS (UNAUDITED)

|  | For the Six Months Ended February 29, 2012 | Period from Inception (August 5, 2011) to February 29, 2012 |
|---|---|---|
| CASH FLOWS USED IN OPERATING ACTIVITIES |  |  |
| Net Loss | $ (36,169) | $ (35,619) |
| Changes in Operating Assets and Liabilities: |  |  |
| Accounts Receivable | 13,080 | (3,920) |
| Inventory | (970) | (15,970) |
| Accounts Payable and Accrued Expenses | 7,631 | 8,070 |
| NET CASH USED IN OPERATING ACTIVITIES | (16,428) | (47,439) |
| CASH FLOWS FROM FINANCING ACTIVITIES |  |  |
| Proceeds from Note Payable | - | 100,000 |
| Proceeds from the Issuance of Common Stock | 74,250 | 84,250 |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | 74,250 | 184,250 |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 57,822 | 136,811 |
| CASH AND CASH EQUIVALENTS, Beginning of Period | 78,989 | - |
| CASH AND CASH EQUIVALENTS, End of Period | $ 136,811 | $ 136,811 |
| SUPPLEMENTAL CASH FLOW INFORMATION: |  |  |
| Interest Paid | $ - | $ - |
| Income Taxes Paid | $ - | $ - |

The accompanying notes are an integral part of these financial statements.

F-3

APP. 001109

Chimera Energy Corporation
(A Development Stage Corporation)
Notes to Financial Statements
For the Three and Six Months Ended February 29, 2012, and for the
Period August 5, 2011 (date of inception) through February 29, 2012 ( Unaudited)

**1. Background Information**

Chimera Energy Corporation, a Nevada corporation (the "Company"), supplies equipment and components that are used in the exploration and production of oil and gas. The Company is a development stage corporation and is seeking to implement its business plan. The Company was incorporated on August 5, 2011 (Date of Inception) with its corporate headquarters located in Houston, Texas and its year-end is August 31. In addition to our present product line, we intend to develop and commercialize additional products and technologies for the oil and gas industry. The results of operations for our interim periods are not necessarily indicative of the results to be expected for the full year. Notes to the financial statements that would substantially duplicate the disclosure contained in the audited financial statements for fiscal 2011, as reported in the Form S-1 of the Company, have been omitted.

**2. Going Concern**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. For the period from August 5, 2011 through February 29, 2012, the Company incurred a net loss of $35,619 and had limited operations. In view of these matters, the Company's ability to continue as a going concern is dependent upon its ability to achieve a higher level of operations and profitability. The Company intends on financing its future development activities and its working capital needs largely from the sale of public equity securities with some additional funding from other traditional financing sources, including term notes until such time that funds provided by operations are sufficient to fund working capital requirements. These factors, among others, raise substantial doubt about our company's ability to continue as a going concern. The financial statements of the Company do not include any adjustments relating to the recoverability and classification of recorded assets, or the amounts and classifications of liabilities that might be necessary should the Company be unable to continue as a going concern.

**3. Note Payable**

On August 22, 2011, the Company borrowed $100,000 through a promissory note, for the purpose of raising operating capital.  Under the terms of the note, interest shall accrue at 15% per annum; and principal and accrued interest shall become due on August 21, 2013, unless extended by mutual consent of the parties.

The note is secured by all the assets, properties, goods, inventory, equipment, furniture, fixtures, leases, supplies, records, money, documents, instruments, chattel paper, accounts, intellectual property rights (including but not limited to, copyrights, moral rights, patents, patent applications, trademarks, service marks, trade names, trade secrets) and other general intangibles, whether owned by the Company on August 22, 2011 or acquired thereafter.

**4. Common Stock**

In January 2012, the Company sold five million shares of its common stock pursuant in conjunction with a registration statement filed with the Securities and Exchange Commission on Form S-1, effective December 21, 2011.  The total proceeds raised in the offering were $75,000 and the offering price per share was $0.015.

**5. Subsequent Event**

On March 1, 2012, the Company entered into an Executive Employment Agreement with President Charles Grob.  The Company will pay the Charles Grob a monthly salary of $2,500 as compensation for his services on a month to month basis.

F-4

APP. 001110

## ITEM 2: MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### FORWARD LOOKING STATEMENTS

This document contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," "will" or words of similar meaning and include, but are not limited to, statements about the expected future business and financial performance of the Company. Forward-looking statements are based on management's current expectations and assumptions, which are inherently subject to uncertainties, risks and changes in circumstances that are difficult to predict. Actual outcomes and results may differ materially from these expectations and assumptions due to changes in global political, economic, business, competitive, market, regulatory and other factors. We undertake no obligation to publicly update or review any forward-looking information, whether as a result of new information, future developments or otherwise.

**The following discussion and analysis should be read in connection with the Company's financial statements and related notes thereto, as included in this report, as well as the Company's effective Registration Statement filed on form S-1/A on December 5, 2011.**

### Organization and Basis of Presentation

We are a Houston based energy company, incorporated in the State of Nevada on August 5, 2011, with a fiscal year end of August 31. Our business and registered office is located at 2800 Post Oak Blvd., Suite 4100, Houston, Texas 77056. Our telephone number is 832-390-2334. Our Internet address is http://www.chimeraenergyusa.com. The information on, or that may be accessed through, our website is not incorporated by reference into this quarterly filing and should not be considered a part of this disclosure.

Our current business supplies equipment and components that are used in the exploration and production of oil and gas. In August 2011, we capitalized our business operations with a $100,000 note that bears interest at an annual rate of 15% per annum and is due and payable on August 21, 2013, and commenced our operations with the purchase of $30,000 of inventory. On August 22, 2011, our founder, sole officer and director, Charles Grob, purchased 10,000,000 shares of our common stock for $10,000 at a price per share of $0.001.

In January 2012, the Company sold five million shares of its common stock pursuant to a registration statement filed with the Securities and Exchange Commission on Form S-1, effective December 21, 2011. The total proceeds raised in the offering were $75,000 and the offering price per share was $0.015. As of the date of this filing the offering is closed. The company intends to use the proceeds from the offering as described in its prospectus filed with the SEC. For additional information concerning this offering please refer to our EDGAR filings which can be found at http://edgar.sec.gov.

### Results of Operations

**For the three and six months ended February 29, 2012.**

For the three and six months ended February 29, 2012, we realized revenues of $3,920 and $5,120, respectively; and cost of goods sold of $2,770 and 3,870, respectively. Our general and administrative expenses associated with the operations of the Company for the same periods were $12,934 and $29,919, respectively. Interest expense totaled $3,750 for the three months ended February 29, 2012 and totaled $7,500 for the six months ended February 29, 2012. Interest expense for the periods ended February 29, 2012 was the interest that was accrued on our $100,000 note. For the three and six months ended February 29, 2012, we recognized a net loss of $15,534 and $36,169, respectively. The primary reason for the net loss was due to early stage revenues from operations and an increase in general and administrative expenses associated with going public.

-4-

**APP. 001111**

**For the Period from August 5, 2011 (Inception) through February 29, 2012**

For the period from August 5, 2011 (inception) through February 29, 2012, we realized revenues of $22,120 and cost of goods sold of $18,870. Our general and administrative expenses associated with the operations of the Company for the same period were $30,999. Interest expense totaled $7,870. For the period ended February 29, 2012, we recognized a net loss of $35,619. The primary reason for the net loss was due to early stage revenues from operations and an increase in general and administrative expenses associated with going public.

**Liquidity and Capital Resources**

We incurred a net loss of $36,169 and $35,619 for the six months ended February 29, 2012, and for the period from inception through February 29, 2012, respectively. As of February 29, 2012, we had a working capital surplus of $149,381. We anticipate that we will require approximately $500,000 to fund our operations and fully execute our business plan. We continue to rely on loans from third parties to fund operating shortfalls and do not foresee a change in this situation in the immediate future. There can be no assurance that we will continue to have such funding available. We will not be able to continue operations without additional financings. These conditions create substantial doubt as to the Company's ability to continue as a going concern.

**COMMON STOCK**

We are authorized to issue 100,000,000 shares of Common Stock, with a par value of $0.001. There were 10,000,000 shares of Common Stock issued and outstanding as of November 30, 2011 and 15,000,000 shares issued and outstanding as of April 9, 2012. All shares of common stock have one vote per share on all matters including election of directors, without provision for cumulative voting. The common stock is not redeemable and has no conversion or preemptive rights. The common stock currently outstanding is validly issued, fully paid and non- assessable. In the event of liquidation of the company, the holders of common stock will share equally in any balance of the company's assets available for distribution to them after satisfaction of creditors and preferred shareholders, if any. The holders of common stock of the company are entitled to equal dividends and distributions per share with respect to the common stock when, as and if, declared by the board of directors from funds legally available.

**PREFERRED STOCK**

We have not authorized or issued any preferred stock as of the date of this filing.

**ITEM 3: QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISKS**

As a smaller reporting company, we are not required to provide the information required by this Item.

**ITEM 4T: CONTROLS AND PROCEDURES**

Our principal executive have evaluated the effectiveness of our disclosure controls and procedures, as defined in Rules 13a – 15(e) and 15d – 15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") that are designed to ensure that information required to be disclosed in our reports under the Exchange Act, is recorded, processed, summarized and reported within the time periods required under the SEC's rules and forms and that the information is gathered and communicated to our management, including our principal executive officer as appropriate, to allow for timely decisions regarding required disclosure.

Our principal executive officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e)) as of the end of the period covered by this report. Based on this evaluation, our principal executive officer concluded that our disclosure controls and procedures were not effective as of the end of the period covered by this report due to a lack of segregation of duties and an absence of written policies and procedures for accounting and financial reporting, which are identified in our Annual Report on Form S-1 for the period ended August 31, 2011 as a material weakness in our internal controls over financial reporting.

-5-

**APP. 001112**

**Change In Internal Control Over Financial Reporting**

There were no changes in our internal control over financial reporting that occurred during the six months ended February 29, 2012 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## PART II. OTHER INFORMATION

### ITEM 1A: RISK FACTORS

A smaller reporting company is not required to provide the information required by this item

### ITEM 2: Unregistered Sales of Equity Securities and Use of Proceeds

There were no unregistered sales of equity securities during the 6 month period ended February 29, 2012.

### ITEM 3: Legal Proceedings

None

### ITEM 4: EXHIBITS AND REPORTS ON FORM 8-K

(a)          Exhibits:
Exhibit No. Description
31.1         Section 302 Certification *
32.1         Section 906 Certification *
99.1         Employment Agreement between the Company and Charles Grob, CEO,
             dated March 1, 2012 *
* filed
herewith

(b)   Reports on Form 8-K:

None.

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

                                        Chimera Energy Corporation

                                        By:   /s/  Charles Grob
                                              Charles Grob
                                              Chairman of the Board and CEO
                                              (Principal Executive Officer and
                                              Principal Accounting Officer)

Date:  April 13, 2012

-6-

**APP. 001113**



APP. 001114