UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-2345 |
| | § | |
| ANDREW I. FARMER, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM & ORDER

## I.    INTRODUCTION

The Securities and Exchange Commission ("Plaintiff" or "SEC") filed this civil enforcement action against Defendant Andrew I. Farmer ("Defendant"), alleging that he violated the antifraud and registration provisions of federal securities law in connection with the sale of Chimera Energy Corp.'s ("Chimera") stock.[1] In Count I of its Complaint, the SEC alleges that Mr. Farmer violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), by using false statements or material omissions and by committing deceptive acts, in connection with the offer or sale of Chimera stock. Count II alleges that Mr. Farmer violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b), by personally making false statements or material omissions in connection with the purchase or sale of Chimera stock. Count III alleges

---

[1] The action originally named four additional defendants, three individuals and Chimera Energy Corp. Plaintiff has reached settlement (or is in the process of doing so) with the three individual defendants. As for Chimera, a default has been entered against it after it failed to timely respond to Plaintiff's Complaint. Thus, the only defendant at issue in these cross motions for summary judgment is Andrew Farmer.

that Mr. Farmer violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), by trading unregistered securities.

Before the Court is Plaintiff's Motion for Summary Judgment (Doc. No. 53) on all claims against Defendant. Defendant has cross motioned for summary judgment on Counts I and II (Doc. No. 52). For the reasons set forth below, Plaintiff's motion is **GRANTED** and Defendant's motion is **DENIED**.

## II.    SUMMARY JUDGMENT EVIDENCE[2]

This case concerns a "pump-and-dump"[3] penny stock scheme perpetrated by Defendant and his associates between June 2011 and October 2012. In the summer of 2011, Mr. Farmer met Charles Grob.[4] *See* Farmer Dep. Tr. 70:22-25. Two months after their meeting, Grob incorporated Chimera Energy Corp. and became its first CEO and its sole officer and director. Pl.'s Mot. Summ. J. Ex. J, at 56 (Doc. No. 55-3). At the time of Chimera's incorporation, Defendant began paying Grob $2,500 per month. *Id.* Ex. F, at 31-36 (Doc. No. 55-3). Defendant also helped Chimera obtain its initial source of funding—a $100,000 loan from Kylemore Corp.

---

[2] Defendant has made several objections to Plaintiff's summary judgment evidence, *see* Doc. No. 63. In response to Defendant's objections to paragraphs 13, 26, and 29 of Plaintiff's Statement of Undisputed Facts, Plaintiff either withdraws the contested statement or modifies it accordingly. *See* Pl.'s Resp. to Def.'s Objections to Pl.'s Summ. J. Evid. (Doc. No. 66). The Defendant's remaining objections (Doc. No. 63) are **OVERRULED**. Although Plaintiff has titled the summary of its evidence "Statement of Undisputed Facts," Defendant has made clear to the Court that the parties have not conferred and agreed upon this Statement. *See* Def.'s Reply to Objections to Pl.'s Summ. J. Evid. (Doc. No. 68). Therefore, the Court will not treat a fact as undisputed simply because it is mentioned in Plaintiff's statement of purportedly undisputed facts. Rather, a fact will be deemed undisputed if Defendant has failed to provide evidence to refute the fact in question.

[3] "Pump-and-dump" is a form of stock fraud that involves artificially inflating the price of an owned stock through false and misleading positive statements, in order to sell the cheaply purchased stock at a higher price. Once the operators of the scheme "dump" their overvalued shares, the price falls and investors lose their money.

[4] Charles Grob was a defendant in this case. On August 27, 2015, the Court granted an agreed partial judgment against Grob. *See* Agreed Partial J. as to Def. Charles Grob (Doc. No. 61).

("Kylemore"), a company for which Defendant served as the "de facto agent." Farmer Dep. Tr. 77:1-13; *id.* at 82:19-25. At no point was Defendant ever named a director or officer of Chimera.

### A.  Defendant's Involvement in Chimera's IPO

By January 12, 2012, Chimera had completed its initial public offering (IPO). Defendant was heavily involved in Chimera's IPO process. Mr. Farmer had introduced Grob to David Loev, the lawyer whom Chimera retained to prepare its IPO filing. *Id.* 72:8-14. Loev testified that Defendant was his primary person of contact at Chimera whenever an issue related to the IPO arose, *see* Loev Dep. Tr. 47:25-48:7, and that he believed Defendant's role at Chimera was more important than Grob's, *id.* at 100:15-21. Defendant helped Loev prepare Chimera's Registration Statement, including emailing Loev a draft of the Registration Statement, Pl.'s Mot. Summ. J. Ex. N, at 140 (Doc. No. 55-3), and a "[f]inal clean version" of the Statement that Defendant specified was "ready" to be filed, *id.* Ex. O, at 144. Grob was not included as a recipient on any of Defendant's emails to Loev. On October 19, 2011, Chimera filed its Registration Statement on Form S-1, seeking the registration of an IPO of five million shares of Chimera stock. *See id.* Ex. L, at 63. The Registration Statement was declared effective on December 22, 2011.

Chimera's IPO resulted in the transfer of five million shares of its stock to 29 persons at the price of $0.015 per share, raising a total of $75,000. *Id.* Ex. T, at 3 (Doc. No. 55-4). Mr. Farmer personally solicited and financed IPO investments from several of his associates, friends, and family members, including his wife and his parents. More specifically, Defendant transferred money from his account to at least six IPO investors' accounts immediately before the investors bought Chimera stock. *See* Pl.'s Statement Undisputed Facts 8-11 (Doc. No. 54) (summarizing these transactions). In each instance, the amount transferred matched the purchase price that those investors then paid for shares of Chimera. *Id.* In all, Defendant directly funded the

purchase of two million of the five million shares that were offered in the IPO. *Id.*; Pl.'s Mot. Summ. J. 3 (Doc. No. 53). Neither Defendant nor Chimera ever disclosed Defendant's role in soliciting and funding the IPO purchases. *Id.*

### B. Defendant's Involvement in Chimera's Form 211 Application Process

Microcap securities such as the shares of Chimera stock generally have low share prices, no analyst coverage, and are traded "over the counter" rather than on a national stock exchange. These securities are closely regulated by the Financial Industry Regulatory Authority (FINRA).[5] In order for a broker-dealer to quote the price of, and make a market for, a microcap security, a broker-dealer must submit an application on FINRA's Form 211 to FINRA's OTC Compliance Unit. Mr. Farmer was heavily involved in Chimera's Form 211 application process.

On the day that Chimera's Registration Statement became effective, Defendant contacted a broker-dealer at Pennaluna & Co. ("Pennaluna"), named Mark Dillon. Pl.'s Mot. Summ. J. Ex. FF, at 40 (Doc. No. 55-9). In introducing Dillon to Chimera, Defendant represented that he was not "involved in the [Chimera] deal in any way." *Id.* As part of its diligence and compliance process, Pennaluna required Chimera to provide certain information, including a letter describing "who made introductions" to shareholders, "who solicited them," and how the shareholders were known to the person introducing or soliciting them. *Id.* Ex. GG, at 42 (Doc. No. 55-9). In response to this inquiry, Defendant emailed Pennaluna (without copying Grob) two documents: a letter describing Chimera's IPO shareholders, *id.* at 45, and a chart titled "Relationships Between Shareholders," which described the "inter-relationships between the investors as well as the individual who introduced them to our CEO," *id.* at 45-47. Both of these documents concealed

---

[5] FINRA is the successor of the National Association of Securities Dealers (NASD). In July 2007, NASD and the New York Stock Exchange (NYSE) consolidated their "member regulation operations" into one self-regulatory organization, FINRA. See SEC Release No. 34–56145 (July 26, 2007).

the fact that Defendant had solicited and funded forty percent of the IPO investments and also concealed that Defendant's wife, parents, former assistant, and accountant were all IPO investors. Specifically, the letter stated that each IPO subscriber "was either personally known to our CEO, Charles Grob, or introduced to our CEO by another shareholder. Mr. Grob was the sole individual authorized by the company to solicit investments from individuals who indicated interest in the offering." *Id.* at 45. The chart omitted any mention of Defendant and described the relationships between investors and Chimera in ways that obscured many of the investors' close connections to Defendant. For example, the chart describes Anna Tikhonova—Defendant's wife—as a "longtime friend" of Grob. *Id.* at 47. In fact, Tikhonova and Grob met for the first time in July 2011 when Defendant introduced them. Farmer Dep. Tr. 223:12-20.

Chimera and Defendant stood by the representations made to Pennaluna even when FINRA, seeking additional information, requested a "detailed explanation of the relationship between Andrew Farmer and the Issuer" and a description of "*all* relationships and affiliations among and between the shareholders and the Issuer." *Id.* Ex. JJ, at 4-5 (Doc. No. 55-10). In response to this inquiry, Grob stated that "Mr. Farmer is not an officer, director, consultant, affiliate, or shareholder of the Issuer." *Id.* Ex. KK, at 9 (Doc. No. 55-10).

### C. Consolidation of Chimera's Shares

In the summer of 2012, about six months after the IPO, every shareholder except for Mr. Farmer's wife sold his or her shares to one of seven entities. *See* Pl.'s Mot. Summ. J. Ex. QQ, Ex. RR, Ex. SS, Ex. TT, at 37-46 (Doc. No. 55-10). Six of the entities[6] each acquired 700,000

---

[6] These six entities were Oak Resources, Inc. ("Oak Resources"), owned by Mr. Farmer's associate and former assistant, Lydia Cotton; TransAmerica Trading, Inc. ("TransAmerica"), owned by Carolyn Austin, the mother of several IPO investors; Kylemore, putatively owned by a friend of Mr. Farmer's wife; Hillsmere SA, putatively owned by Mr. Farmer's sister-in-law; Clarent Services Corp.; and Levantera SA. *See* Pl.'s Mot. Summ. J. 6 (Doc. No. 53).

shares at $.0225 per share. *Id.* In addition, Defendant personally acquired 600,000 shares, also at $.0225 per share, through his company Chartered Investments, Inc. ("Chartered"). *Id.* None of these sales were registered with the SEC. *See* Vydashenko Decl. ¶ 4. By June 2012, these seven entities had acquired 4.6 million shares of the total 5 million shares sold in the IPO.

Four of the entities that acquired shares from the IPO investors—Hillsmere SA, Kylemore, Clarent Services Corp., and Levantera SA—are incorporated in the Republic of the Marshall Islands (collectively, the "Marshall Islands Entities"). Pl.'s Mot. Summ. J. Ex. QQ, at 37-40 (Doc. No. 55-10). The transactions for each of the Marshal Islands Entities were arranged and funded by Defendant through his company, Chartered. *Id.*

On July 6, 2012, Chimera effected a 4:1 forward stock split, quadrupling the number of shares in possession of all shareholders. *Id.* Ex. VV, at 97-99 (Doc. No. 55-10). After the split, Oak Resources, TransAmerica, and each of the Marshall Islands Entities held 2.8 million shares of Chimera stock, while Farmer owned 2.4 million shares through Chartered. *See* Pl.'s Statement Undisputed Facts 20 (Doc. No. 54).

### D. Defendant's Funding of a False Promotional Campaign

Chimera described its business as supplying equipment used in the exploration and production of oil and gas. *Id.* Ex. WW, at 126 (Doc. No. 55-10). Less than one month after the stock split, Chimera filed a Form 8-K with the SEC in which Chimera announced that it had entered into a "License Agreement" with China Inland Oil Exploration Company ("China Inland"), purportedly granting Chimera an "exclusive license to develop and commercialize [China Inland's] cutting edge technologies relating to Non-Hydraulic Extraction [(NHE)]." *Id.* Ex. YY, at 172 (Doc. No. 55-10). The summary judgment evidence establishes that Chimera's purported agreement with China Inland and the NHE technology itself are both entirely

fictitious. Defendant has been unable to produce any documents to substantiate Chimera's claim that it had an agreement with China Inland, *see* Vydashenko Decl. ¶ 4. In fact, China Inland appears to be a wholly fabricated entity, a company that never existed. *Id.* Furthermore, an expert in oil drilling technology, Dr. Fernando Sebastian Flores Avila, has testified that NHE technology is "science fiction." Flores Avila Dep. Tr. 45:6-14.

Over the next several months, Chimera issued 33 press releases and three more Forms 8-K that publicized its licensing and development of the fake NHE technology. Pl.'s Mot. Summ. J. Ex. C, at 100-16 (Doc. No. 55-1); *id.* at 1-24 (Doc. No. 55-2). Many of these public statements claimed that Chimera had a business relationship with Petroleos Mexicanos ("Pemex"), the state-owned petroleum company of Mexico. These statements were also false. The evidence shows that Chimera never had a business relationship with Pemex of any kind. *See* Flores Avila Dep. Tr. 22:6-23:25; 97:19-98:23; Sanchez Dep. Tr. 93:20-95:3; 104:16-24.

While Chimera was publishing these false statements, Defendant directed and paid an associate, John Brotherton, to conduct a "market awareness" campaign for Chimera. Farmer Dep. Tr. 118:12-18. The purpose of this campaign, according to Defendant, was to "introduce Chimera to potential investors" "with the goal of creating . . . an organized liquid market for Chimera" and increasing the price of Chimera stock. Farmer Dep. Tr. 118:12-24. As part of this "market awareness" campaign, Defendant paid $346,615 to three ad placement and publishing firms to run online ads promoting Chimera's NHE technology. *See* Pl.'s Statement Undisputed Facts 23-24 (Doc. No. 54) (summarizing these transactions). In addition, Defendant paid Brotherton over $1 million for "creat[ing] an aware market for Chimera." Farmer Dep. Tr. 118:12-16. The ads that Defendant funded described Chimera's supposed technology as a "[n]ewly licensed method" of fracking that "uses zero water and is environmentally neutral."

Pl.'s Mot. Summ. J. Ex. AAA, at 5 (Doc. No. 55-11). Other ads, also paid for by Defendant, urged viewers: "INVEST TODAY" in Chimera's "NEW SAFE FRACKING!" that "USES ZERO WATER!" *Id.* Ex. ZZ, at 3.

### E.  The Sale of Chimera's Stock to the Public for Farmer's Benefit

While Defendant was conducting this "market awareness" campaign, the seven entities that held (after the stock split) nearly 20 million shares of Chimera stock began to sell the stock to the public. *See* Pl.'s Statement Undisputed Facts 25-29 (Doc. No. 54) (summarizing the entities' sales of Chimera stock). Chimera's stock sold for as much as $1.84 per share. Pl.'s Mot. Summ. J. Ex. FFF, at 26 (Doc. No. 55-11). Between June 29 and September 27, 2012, Defendant sold to the public more than 1.1 million shares of Chimera stock for proceeds of approximately $692,554. *Id.*

The entities that owned Chimera stock, and which were not already directly controlled by or closely related to Defendant, transferred the vast majority of the proceeds obtained from their sale of Chimera stock to bank accounts controlled by Defendant. *See* Pl.'s Statement Undisputed Facts 25-29 (Doc. No. 54) (summarizing transactions and transfers to Defendant's accounts). For example, between August 10 and August 30, 2012, TransAmerica transferred $3,050,000 from its brokerage account to Chartered's bank account. Pl.'s Mot. Summ. J. Ex. GGG, at 28-31 (Doc. No. 55-11); *id.* Ex. F, at 14-21 (Doc. No. 55-3). Between August 9 and November 21, 2012, Oak Resources transferred approximately $425,000 from its bank account to Chartered's bank account. *Id.* Ex. E, at 66-69 (Doc. No. 55-2). In total, more than $4.1 million of the proceeds of the public sales of Chimera stock ended up in Defendant's possession. *See* Pl.'s Mot. Summ. J. 10 (Doc. No. 53).

### F.  Continuing Misrepresentations of Defendant's Role in Chimera

In October 2012, FINRA's Fraud Detection and Market Intelligence Unit began investigating Chimera. FINRA asked Chimera to describe how Grob knew Defendant and "any business [Chimera] or the executive officer has done" with Defendant. *Id.* Ex. PPPP, at 62 (Doc. No. 55-12). Defendant himself edited the response that Chimera sent to its securities counsel. *Id.* Ex. QQQQ, at 65-68 (Doc. No. 55-12). Chimera's formal response to FINRA's inquiry, which was substantially the same as the version Defendant reviewed and edited, denied that Defendant had any business relationship with Chimera. The letter stated, in relevant part:

> Mr. Farmer is a long-term friend of our former CEO, Charles Grob. During the formation of the Company, Mr. Grob sought advice from Mr. Farmer regarding the process of filing the Company's Registration Statement with the SEC. At no time was Mr. Farmer an officer, director or affiliate of the Company. Mr. Farmer was never compensated for his advice. The Company does not have now, nor has it ever had, a business relationship with Mr. Farmer. While Mr. Grob and Mr. Farmer are friends, they have never had a business relationship.

*Id.* Ex. RRRR, at 81 (Doc. No. 55-12).

## III.  STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(a). Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is "material" if its "resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). A genuine dispute as to a material fact exists if a reasonable jury could enter a verdict for the nonmoving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).

The movant has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has met its burden, the burden shifts to the nonmovant to show that summary judgment is not appropriate. *Id.* at 325. The nonmovant "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1071 (5th Cir. 1994) (en banc) (citing *Celotex*, 477 U.S. at 325). "This burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (internal quotation omitted). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## IV.   ANALYSIS

### A. Section 17(a) of the Securities Act

Section 17(a) of the Securities Act prohibits the offer or sale of securities by use of interstate commerce:

> (1) to employ any device, scheme, or artifice to defraud;
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a)(1)-(3). To establish liability under Section 17(a), the SEC must prove: (1) material misrepresentations or materially misleading omissions; (2) in connection with the offer or sale of securities; (3) made with the requisite mental state. *See SEC v. Seghers*, 298 F. App'x 319, 327 (5th Cir. 2008); *Aaron v. SEC*, 446 U.S. 680, 695 (1980). Violations of Section 17(a)(1)

require proof that the defendant acted with scienter. *Seghers*, 298 F. App'x at 327. However, to show that the defendant has violated Section 17(a)(2) or Section 17(a)(3), the SEC need only prove that the defendant acted with negligence. *Id. See also SEC v. Hopper*, 2006 WL 778640 at *9 (S.D. Tex. Mar.24, 2006) ("Scienter, however, is not an element of a claim under § 17(a)(2) or § 17(a)(3). Under these subsections, liability is established merely by a showing of negligence.") (citations omitted).

To determine whether a misrepresentation or omission is "material," the basic test is "whether a reasonable investor would consider the information significant." *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 862 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998). The court must ask "whether the information disclosed, understood as a whole, would mislead a reasonable potential investor. [And a] statement or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *Seghers*, 298 F. App'x at 328 (citations and internal marks omitted); *see also SEC v. Gann*, 565 F.3d 932, 937 n.17 (5th Cir. 2009). In other words, an omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic v. Levinson*, 485 U.S. 224, 232 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

### B. Liability Under Section 17(a)(2)

With regard to the Section 17(a)(2) claim, Defendant does not attempt to demonstrate that his statements were not misleading, that they were not in connection with the offer or sale of securities, or that Defendant lacked the requisite mental state. Rather, Defendant argues that he was not the "maker" of the statements within the meaning of the Supreme Court's decision in *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011), and therefore

11

that Defendant cannot be liable under Section 17(a)(2). *See* Def.'s Mot. P. Summ. J. 11-17 (Doc. No. 52); Def.'s Opp. 14-18 (Doc. No. 64). In *Janus*, the Supreme Court defined the word "make" as it relates to SEC Rule 10b-5(b)'s prohibition against "mak[ing] any untrue statement of a material fact." 17 C.F.R. § 240.10b-5(b). *Janus* held that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." 131 S. Ct. at 2302. Defendant argues that *Janus*'s definition of a false statement's "maker" extends to claims brought under Section 17(a), and, consequently, that Defendant is not liable under Section 17(a)(2) because he did not have "ultimate authority" over the misleading statements.

Defendant's argument against Section 17(a)(2) liability fails. As an initial matter, the Court finds that *Janus*'s definition of "maker" does not extend to claims under Section 17(a)(2). The vast majority of courts that have considered whether *Janus* applies to claims under Section 17(a)(2) have concluded that it does not. *See SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 795-98 (11th Cir. 2015); *SEC v. Garber*, 959 F. Supp. 2d 374, 2013 WL 1732571, at *4 (S.D.N.Y. 2013); *SEC v. Benger*, 931 F. Supp. 2d 904, 905-06 (N.D. Ill. 2013); *SEC v. Stoker*, 865 F. Supp. 2d 457, 464-66 (S.D.N.Y. 2012); *SEC v. Sells*, No. C 11-4941, 2012 WL 3242551, at *7 (N.D. Cal. Aug. 10, 2012); *SEC v. Sentinel Mgmt. Group, Inc.*, No. 07 C 4684, 2012 WL 1079961, at *14-15 (N.D. Ill. Mar. 30, 2012); *SEC v. Radius Capital Corp.*, No. 2:11-cv-116-FtM-29DNF, 2012 WL 695668, at *4 n.7 (M.D. Fla. Mar. 1, 2012); *SEC v. Daifotis*, No. C11-00137, 2011 WL 3295139, at *5 (N.D. Cal. Aug. 1, 2011); *SEC v. Mercury Interactive LLC*, No. 5:07-cv-02822, 2011 WL 5871020, at *3 (N.D. Cal. Nov. 22, 2011).[7]

---

[7] The Fifth Circuit has not yet decided this question.

In *Janus,* the Supreme Court addressed the scope of Rule 10b-5(b)—not Section 17(a)(2)—and although the provisions are similar, there is a critical textual distinction between the two. While Rule 10b-5(b) prohibits the "mak[ing]" of untrue statements, Section 17(a)(2) prohibits "obtain[ing] money or property by means of" an untrue statement. 15 U.S.C. § 77q(a)(2). Thus, the word "make"—the very term that the Supreme Court was interpreting in *Janus*—is absent from the operative text of Section 17(a)(2). *See Daifotis*, 2011 WL 3295139, at *5. Indeed, "obtain[ing] money . . . *by means of* any untrue statement" (the conduct prohibited under Section 17(a)(2)) encompasses "a *broader* range of conduct than 'mak[ing]' such a statement," as proscribed under Rule 10b-5(b). *Big Apple Consulting*, 783 F.3d at 797-98. *See also In the Matter of John P. Flannery & James D. Hopkins*, Release No. 3981, 2014 WL 7145625, at *11 (Dec. 15, 2014) (holding that the phrase "by means of" in Section 17(a)(2) imposes liability on a defendant "if he *uses* a misstatement to obtain money or property, even if he has not himself made a false statement in connection with the offer or sale of a security") (internal quotation marks omitted). Therefore, the requirement that one be the "maker" of the false statement in order to be liable under Rule 10b-5(b) does not limit one's liability under Section 17(a)(2). A defendant "may be held liable under 17(a)(2), though not under 10b-5, if he obtains money or property *by use* of a false statement, whether prepared by himself or by another." *Stoker*, 865 F. Supp. 2d at 465.

Because *Janus* is inapplicable to Section 17(a)(2) claims, the SEC need not prove that Defendant was the "maker" of the statements in order for Defendant to be liable under Section 17(a)(2). Rather, the SEC need only prove that Defendant "obtain[ed] money . . . by means of" an untrue statement or omission of material fact. 15 U.S.C. § 77q(a)(2). The SEC's summary

judgment evidence establishes, and Defendant's evidence does not seriously dispute, that Defendant obtained money by means of numerous untrue statements or material omissions.[8]

### 1. Registration Statement

First, Defendant made use of Chimera's S-1 Registration Statement to obtain money. It is clear that "a material misstatement in, or omitting requisite material information from, a . . . registration statement, or other filing with the Commission" is sufficient to violate Section 17(a)(2). *SEC v. Power*, 525 F. Supp. 2d 415, 419-20 (S.D.N.Y. 2007). *See also Softpoint*, 958 F. Supp. at 862-63 (concluding that registration statements fall within the scope of Section 17(a)(2) and (3) because they are "closely linked to the offer and sale" of stock); *SEC v. Benson*, 657 F. Supp. 1122, 1130 (S.D.N.Y. 1987) (ruling that omissions and misstatements about a corporation's income in securities registration statements violated Section 17(a)); *SEC v. Bangor Punta Corp.*, 331 F.Supp. 1154, 1160–61 (S.D.N.Y. 1971) (holding that omission of just one material fact in a securities registration statement violated Section 17(a)).

Here, the filing of Chimera's Registration Statement was the necessary initial step that enabled Defendant eventually to obtain over $4 million from the sale of Chimera stock to the public. The Registration Statement (and all other communications between Chimera and regulators during Chimera's IPO process) omitted the fact that Defendant was personally financing the purchase of two million of the total five million shares offered in the IPO. This omission was material because it helped provide the impression that there was substantial genuine interest in Chimera stock when in fact Mr. Farmer was on both sides of forty percent of

---

[8] Although the Court discusses here a number of misstatements and omissions that establish liability under Section 17(a)(2), it is important to note that "the SEC enjoys the authority to seek relief for *any* violation of the securities laws, no matter how small or inconsequential," *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1248 (11th Cir. 2012), and even a "single misstatement or omission" is sufficient for liability, *id.*

the IPO purchases. That forty percent of Chimera's IPO shares were bought by individuals who incurred no personal financial risk—and instead were essentially serving as straw purchasers for Defendant—is certainly a fact that "a reasonable investor would consider . . . important in making [the] decision to invest" in this microcap security. *Seghers*, 298 F. App'x at 328.

Defendant's only argument that he should not be liable under Section 17(a)(2) for the Registration Statement is that he did not use the Statement to obtain money. Defendant claims that "there is nothing in the registration statement that could be credibly argued was designed to artificially inflate the price of Chimera stock." Def.'s Reply 5 (Doc. No. 67). To accept this argument, the Court would need to view the Statement in isolation. Yet Plaintiff's evidence has established the existence of a complex and methodical money-making scheme of which the various statements and omissions were interlocking parts. Therefore, the Court must view each statement in the context of the many representations and actions that led to the public sale of Chimera stock. Moreover, the element of Section 17(a)(2) liability that the defendant "obtain money . . . by means of" an untrue statement or omission of material fact, 15 U.S.C. § 77q(a)(2), merely requires some "causal relationship" between the fraudulent statement or omission and the defendant's acquisition of money. *SEC v. Syron*, 934 F. Supp. 2d 609, 637 (S.D.N.Y. 2013). A defendant may be liable even "if he obtains money or property in a highly roundabout manner," *id.* at 639-40. For example, courts allow liability under Section 17(a)(2) even where the defendant obtains money only as the indirect result of the fraud, such as through increased compensation from his or her employer. *See, e.g.*, *Stoker*, 865 F. Supp. 2d at 465; *Hopper*, 2006 WL 778640, at *12 ("It is reasonable to infer that those inflated trading volumes and revenues factored into the calculation of [the defendant's] bonuses, and hence, that [the defendant] obtained all or part of those bonuses at least indirectly by means of the round-trip trading scheme

in violation of § 17(a)(2).").  Here, the causal connection between Chimera's Registration Statement and Defendant's acquisition of money is straightforward.  Without Chimera's misleading Registration Statement, Chimera could not have made an IPO, and Chimera's IPO of five million shares was among the first in the chain of events that culminated in Defendant walking away with $4.1 million after the first arm's-length sales of Chimera stock.

### 2.  Press Releases and Forms 8-K

Defendant also obtained money by means of Chimera's thirty-three press releases and four Forms 8-K that falsely claimed that Chimera was developing the NHE technology with China Inland and that Chimera had a business relationship with Pemex.  In truth, as discussed above, the NHE technology was a fiction and Chimera never had any business relationship with Pemex. These statements were thus patently false.

It is well established that liability under Section 17(a) can flow from misrepresentations and material omissions made in press releases and public filings such as Forms 8-K. *See Softpoint*, 958 F. Supp. at 862 (granting summary judgment to SEC on Section 17(a) claim where defendant, as consultant to the company, "helped prepare and disseminate an array of press releases, Form 10-K annual reports, Form 10-Q quarterly reports, and Form S-8 registration statements, containing material misrepresentations and omissions"); *SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 421 (S.D.N.Y. 2007), *aff'd sub nom. SEC v. Altomare*, 300 F. App'x 70 (2d Cir. 2008) (granting summary judgment to SEC on Section 17(a) claim where press releases "announc[ed] purported expansions and funding commitments, . . . [and] sizeable revenues from businesses with which it actually had no connection"); *SEC v. Goldsworthy*, No. CIV.A. 06-10012-JGD, 2008 WL 8901272, at *8 (D. Mass. June 11, 2008) (finding "that the jury

appropriately considered statements made in [defendant's] press release and Forms 10-Q and 8-K in determining [defendant's] liability under Section 17(a)(3)").

The false statements in Chimera's press releases and Forms 8-K were material because the statements described what Chimera purported to be the very substance—and the sole substance—of its business: the supposed development of NHE technology and the alleged arrangements with Pemex. Press releases and public statements "about a company's . . . acquisitions" are "material in the context of securities sales or purchases," *Universal Exp.*, 475 F. Supp. 2d at 426, as are those that proclaim "fictitious achievements," *SEC v. Curshen*, 888 F. Supp. 2d 1299, 1308 (S.D. Fla. 2012), or announce relationships with "businesses with which [the company] actually had no connection," *Universal Exp.*, 475 F. Supp. 2d at 421. The representations in Chimera's press releases and Forms 8-K fall squarely within this category of material statements. In addition, there is no doubt that Mr. Farmer obtained money by means of these false statements, as the descriptions of Chimera's NHE technology and its dealings with Pemex in the press releases and Forms 8-K helped to inflate the price of Chimera stock. Defendant does not contest the SEC's showing that the barrage of press statements and public filings touting Chimera's technological developments and business relationships was immediately followed by dramatic increases in Chimera's share price.

### 3.  Statement to FINRA

Third, Defendant obtained money through the statement that Chimera made to FINRA investigators, which concealed Defendant's role in Chimera and his relationship to Chimera's CEO, Charles Grob. The letter that Chimera sent to FINRA in October 2012 stated that Chimera "does not have now, nor has it ever had, a business relationship with Mr. Farmer." Pl.'s Mot. Summ. J. Ex. RRRR, at 81 (Doc. No. 55-12). This statement was blatantly false, as Defendant

was closely involved in virtually every aspect of Chimera, from helping the company secure its initial source of capital to orchestrating and funding the company's false advertising campaign. As the SEC argues, Defendant's actual relationship with Chimera was a material fact "because the persons relying on [Chimera's] statements—including brokers, regulators, and investors—consider[] such relationships important given the ease and frequency with which microcap companies like Chimera can and are manipulated by undisclosed control persons." *Id.* at 20. *See also SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) ("[M]aterial facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities."). The false statement about Defendant's relation to Chimera, made to FINRA during the critical period in which Chimera's inflated stock was being dumped on the public market, helped Defendant obtain money by delaying regulatory intervention, thereby providing more time to sell Chimera's inflated stock.

Defendant argues that a statement made to a self-regulatory organization such as FINRA cannot violate Section 17(a)(2) because such a statement is not made in "the offer or sale of securities," as Section 17(a) requires. *See* Def.'s Reply 6-7 (Doc. No. 67). However, to accept this argument would require that the Court impose too narrow a construction of Section 17(a). The Supreme Court has "instructed that the 'offer or sale' requirement should be construed broadly so as to encompass fraud in any part of the selling process." *SEC v. Brown*, 740 F. Supp. 2d 148, 163-64 (D.D.C. 2010). *See United States v. Naftalin*, 441 U.S. 768, 773 (1979) ("The statutory terms, which Congress expressly intended to define broadly, . . . are expansive enough to encompass the entire selling process."). As a result, "Section 17(a) has been broadly construed to encompass a wide range of conduct." *Softpoint*, 958 F. Supp. at 862 (collecting cases). Courts

have held that the "offer or sale" requirement of Section 17(a) is met so long as "the company's securities [were] sold and purchased throughout the period" in which the fraudulent statements were made. *Goldsworthy*, No. 06–cv–10012, at 19. *See also SEC v. Mudd*, 885 F. Supp. 2d 654, 670 (S.D.N.Y. 2012) (finding that the SEC stated a claim under Section 17(a) where the company's stock was traded on the New York Stock Exchange during the period of the alleged fraud). There is no dispute that Chimera's stock was being traded at the time Chimera falsely stated to FINRA that it had no "business relationship with Mr. Farmer." Pl.'s Mot. Summ. J. Ex. RRRR, at 81 (Doc. No. 55-12). Therefore, the Court finds that this misrepresentation was made in "the offer or sale of securities" within the meaning of Section 17(a).

### 4. Mental State

Defendant does not dispute that he acted with the requisite mental state for Section 17(a)(2) liability; nevertheless, the Court will review how Plaintiff has met its summary judgment burden with respect to the mental state element. While a mere showing of negligence is sufficient to establish a violation of Section 17(a)(2), *Seghers*, 298 F. App'x at 327, the SEC has opted to establish liability by proving that Defendant acted with scienter, *see* Pl.'s Reply 9 n.6 (Doc. No. 65).[9] There is no doubt that the SEC's evidence is sufficient on that score.

In relation to securities fraud, scienter is "the mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The scienter requirement may also be satisfied by proof that the defendant acted with severe recklessness. *See Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961 (5th Cir.1981) (en banc). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely

---

[9] By proving scienter, the SEC automatically satisfies the lower burden of showing negligence. *SEC v. Provident Royalties, LLC*, No. 3:09-CV-01238-L, 2013 WL 5314354, at *5-6 (N.D. Tex. Sept. 23, 2013).

simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Broad*, 642 F.2d at 961-62.

In each of the statements that violate Section 17(a)(2)—Chimera's Registration Statement, Chimera's Press Releases and Forms 8-K, and Chimera's statement to FINRA— Chimera made a representation that was, for the reasons discussed above, either blatantly false or grossly misleading. Moreover, because the Registration Statement and Chimera's letter to FINRA contained misrepresentations regarding Defendant's *own actions*, there is no question that Defendant was aware of the false or misleading nature of these representations. *SEC v. Ramoil Mgmt., Ltd.*, No. 01 CIV. 9057 (SC), 2007 WL 3146943, at *7 (S.D.N.Y. Oct. 25, 2007) (finding scienter where defendant's "Forms S-8 contain statements regarding his *own actions* that were false"). Defendant knew that these documents contained misrepresentations and material omissions because the unrefuted evidence shows that he personally prepared them. Although Grob or other Chimera agents ultimately authorized, filed, or published these statements—thereby insulating Defendant from *Janus* liability—the metadata on the Registration Statement, many of the press releases and Forms 8-K, and the letter to FINRA reveal that these documents were all drafted or edited by Defendant. *See* Pl.'s Mot. Summ. J. Ex. N, Ex. O, Ex. P, Ex. Q, at 140-51 (Doc. No. 55-3) (evidence showing that Defendant drafted and edited Registration Statement); *id.* Ex. YYY,  Ex. AAAA, at 95-113 (Doc. No. 55-11) (evidence showing that Defendant drafted and edited Forms 8-K); *id.* Ex. QQQQ, Ex. RRRR, at 68, 83 (Doc. No. 55-12) (evidence showing that Defendant drafted and edited letter to FINRA). Because Defendant participated in the preparation of plainly false or misleading statements, the

SEC has showed that Defendant "must have been aware of the danger of misleading the investing public"—a showing which is sufficient to establish "severe recklessness." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005); *see also Mercury Air Group, Inc. v. Mansour*, 237 F.3d 542, 546 n.3 (5th Cir. 2001) ("[Scienter] encompasses reckless indifference such that the omission or misrepresentation was 'so obvious that the defendant must have been aware of it.'" (quoting *Rubinstein v. Collins*, 20 F.3d 160, 169 (5th Cir. 1994))).

Two additional factors support a finding of scienter. First, the SEC has proven that Defendant had a motive to commit securities fraud. *See Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (a court may infer scienter from "facts that show a defendant's motive to commit securities fraud"). Plaintiff established motive because the uncontroverted evidence shows that when Chimera's shares "reached [Mr. Farmer's] victims in the public market, Farmer pocketed at least $4.1 million of the proceeds." Pl.'s Mot. Summ. J. 23 (Doc. No. 53). Second, Defendant's "culpability is confirmed by the duration of his participation" in the Chimera pump-and-dump scheme. *Softpoint*, 958 F. Supp. at 865. The record proves that Defendant was heavily involved in the scheme from its inception in June 2011 until the worthless stock was dumped on the public market over a year later. It would strain credulity to believe that Defendant remained oblivious to all that transpired around him during that period. *Id.* Consequently, the SEC has more than met its burden of proving that it is beyond any genuine dispute that Defendant acted with the requisite scienter.

Having met the mental state requirement, the Court finds that the SEC has satisfied its burden to bring forward evidence establishing each element of its Section 17(a)(2) cause of action. Defendant, for his part, has failed to produce evidence that establishes a genuine issue of

material fact as to any element of Section 17(a)(2) liability. Accordingly, the Court grants summary judgment for the SEC on its Section 17(a)(2) claim.

### C. Liability Under Rule 10b-5(b) and Section 10(b)

Rule 10b-5, promulgated by the SEC under Section 10(b) of the Securities Exchange Act of 1934, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.[10]

Like Section 17(a) of the Securities Act, Rule 10b-5 prohibits material misstatements or omissions in connection with the sale of securities. Because "the basic precepts of Sections 17(a) . . . and Rule 10b-5 are the same," claims arising under the two provisions are often "analyzed as one." *SEC v. Helms*, No. A-13-CV-01036 ML, 2015 WL 5010298, at *1 (W.D. Tex. Aug. 21, 2015). *See, e.g.*, *Id.*; *SEC v. Rose*, No. CIVA H04-2799, 2007 WL 7117887, at *2 (S.D. Tex. Mar. 23, 2007); *see also SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 903 (5th Cir. 1980)

---

[10] Rule 10b-5 reaches "only conduct already prohibited by § 10(b) [of the Exchange Act]." *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008). Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

("[T]he proscriptions of section 17(a) are substantially the same as those of section 10(b) and rule 10b-5"); *Seghers*, 298 F. App'x at 327. As discussed above, however, Rule 10b-5(b) requires that the defendant be the "maker" of the false statement, while Section 17(a)(2) imposes no such requirement. The "maker" of a statement, for purposes of Rule 10b-5(b) liability, is "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus*, 131 S. Ct. at 2302. The record contains ample evidence of false statements or material omissions that Mr. Farmer personally made and over which he had ultimate control. The undisputed evidence contained in these statements is sufficient for the SEC to prevail on its claim under Rule 10b-5(b).[11]

In directing Chimera through the Form 211 application process, through which Chimera obtained FINRA's clearance to have its securities quoted by a market maker, Defendant made a number of material misrepresentations and omissions in his communications with Chimera's broker-dealer, Pennaluna. The overall "goal of these lies and omissions was to conceal the nature and extent of Farmer's involvement with Chimera." Pl.'s Mot. Summ. J. Ex. J 20 (Doc. No. 55-3). For example, when Defendant first solicited the services of Mark Dillon, who would become Chimera's broker-dealer at Pennaluna, Defendant added "[a]s a side note" that he was not "involved in the [Chimera] deal in any way." Pl.'s Mot. Summ. J. Ex. FF, at 40 (Doc. No. 55-9). One month later, Defendant emailed Pennaluna a letter and a chart that purported to describe the connections between Chimera and its IPO investors. *See Id.* Ex. GG, at 42 (Doc. No. 55-9). Although the record establishes that Defendant was "the common link between Chimera and at least a third of IPO shareholders," *id.* at 15, both the letter and the chart entirely omitted mention

---

[11] The statements discussed here also support liability under Section 17(a)(2). But, because Section 17(a)(2), unlike Rule 10b-5(b), does not require that the defendant be the "maker" of the statements, the Court reviews the evidence of false statements made by Defendant himself as it relates to liability under Rule 10b-5(b).

of Defendant's name. In addition, the letter and chart affirmatively represented that all IPO shareholders became aware of Chimera through individuals other than Defendant. For instance, the letter stated that every IPO shareholder "was either personally known" to CEO Grob or was introduced to Grob "by another shareholder." *Id.* Ex. GG, at 45.

It is undeniable that these statements to Pennaluna were material and misleading. These communications made Mr. Farmer appear entirely irrelevant to Chimera's IPO, even though he personally solicited and financed forty percent of the IPO investments. A reasonable investor in a microcap security would surely want to know about the existence of an undisclosed control person who not only encouraged close associates and relatives to invest in the company, but also provided those associates and relatives with the cash with which they would then "buy" the company's stock. Furthermore, had Defendant not concealed from the market maker his role in Chimera, it is likely that Chimera would not have passed the Form 211 application process, and consequently Chimera's stock would not have issued in the first place. This but-for causal link is yet another fact that supports a finding of materiality. *Ramoil Mgmt.*, 2007 WL 3146943, at *7 (finding defendant liable under Rule 10b-5 where, but for defendant's false statements, "the stock would not have issued").

Other than a single, conclusory assertion that the letter and chart that Defendant sent to Pennaluna "do[] not include a false statement," Defendant makes no attempt to dispute the falsity of these communications.[12] Def.'s Opp. 20-22 (Doc. No. 64).  Instead, Defendant argues that he

---

[12] As for Defendant's statement to Pennaluna on December 22, 2011, in which Defendant stated that he was not "involved in the [Chimera] deal in any way," Defendant argues that there is nothing false about this statement because "at the time" the statement was made, Defendant had not yet transferred funds to IPO investors nor did he "plan to invest in the IPO." Def.'s Reply 4 (Doc. No. 67); Def.'s Opp. 16 (Doc. No. 64). This argument is specious. On December 23, 2011—the very next day after Defendant denied having any involvement in the Chimera deal— Defendant transferred $18,600 to three different individuals who purchased stock in Chimera's

did not "make" these statements because he "was simply forwarding a response from Grob to Dillon." *Id.* However, Plaintiff's unrefuted evidence disproves this claim. The metadata for the files containing the letter and the chart reflect that they were in fact created by Mr. Farmer in Microsoft Word and then converted, again by Mr. Farmer, into PDF format. Pl.'s Mot. Summ. J. Ex. GG, at 46, 48 (Doc. No. 55-9). Defendant then emailed the PDF files from his personal email address directly to Pennaluna. *Id.* at 42-44. Although Defendant used Chimera letterhead—including Grob's *unsigned* signature block—the evidence shows that Defendant never even allowed Grob an opportunity to edit the documents, much less relinquish Defendant's control over them. *Id.* at 45. It is clear that Defendant had "ultimate authority," *Janus*, 131 S. Ct. at 2302, over these false, material statements to Pennaluna.

It is likewise clear that Defendant acted with scienter when making the misrepresentations to Pennaluna, and Defendant has introduced no evidence to the contrary. The evidence and reasoning that support the Court's finding of scienter with respect to the Section 17(a)(2) claim, *see supra* pp. 18-20, apply with equal force to the Rule 10b-5 claim. The finding of scienter is even stronger here, however, because Defendant did not rely on an intermediary (such as Grob) to transmit the misleading statement to Pennaluna. Thus, he designed and executed the deception entirely himself. What is more, the precise purpose and effect of each misrepresentation Defendant made to Pennaluna was to conceal how Defendant's own actions relate to Chimera. Thus, Defendant's "intent to deceive, manipulate or defraud" is manifest. *Hochfelder*, 425 U.S. at 193. *See also Ramoil Mgmt.*, 2007 WL 3146943, at *7 (finding scienter

---

IPO two to five days later, each spending roughly the same amount that Defendant had given them. *See* Pl.'s Mot. Summ. J. Ex. F, at 29 (Doc. No. 55-3); *id.* at 8. The same pattern occurred with three more IPO investors between January 6, 2012 and January 12, 2012. It simply is not credible that the day before Defendant began the repeated financing of IPO purchases, Defendant had not yet formed the intention to do so. Indeed, it appears certain that Defendant's *solicitation* of IPO investors began *before* his statement that he had no involvement in Chimera's IPO.

where defendant's "Forms S-8 contain statements regarding his *own actions* that were false"). Because the SEC has satisfied its summary judgment burden on each element of its claim under Rule 10b-5(b), and because Defendant has failed to produce evidence establishing a genuine issue of fact as to any element, the Court must grant summary judgment for the SEC on the Rule 10b-5(b) claim.

### D.  "Scheme Liability" Under Section 17(a)(3) and Rule 10b-5(c)

In addition to the claims under Section 17(a)(2) and Rule 10b-5(b), which hold Defendant liable for material misstatements and omissions, the SEC also alleges a theory of "scheme liability," which arises under Section 17(a)(3) and Rule 10b-5(c). *See generally Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). Section 17(a)(3) and Rule 10b-5(c), whose provisions are substantially the same, prohibit "engag[ing] in any . . . practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c).[13]  The concept of "scheme liability" recognizes that because "[c]onduct itself can be deceptive," *Stoneridge*, 552 U.S. at 158, a defendant may incur primary liability for securities fraud without making or using an "oral or written statement," *id. See also In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 160 (S.D.N.Y. 2012); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335-36 (S.D.N.Y. 2004) ("[A] cause of action exists under [Rule 10b-5] subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant."). To establish liability under this theory, a plaintiff must prove that "the defendant . . . engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Simpson v. AOL*

---

[13] Section 17(a)(3) is slightly more limited in scope in that it proscribes fraud or deceit "upon the *purchaser*" of a security. 15 U.S.C. § 77q(a)(3) (emphasis added).

*Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds by Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008).

Defendant asserts that Plaintiff's scheme liability theory is improper because it is comprised "simply of misleading statements and omissions, . . . [which] fall entirely within the ambit of Section 17(a)(2) and Rule 10b-5(b)," and thus "no separate action for scheme liability would lie." Def.'s Mot. Summ. J. 17 (Doc. No. 52); *see also* Def.'s Opp. 20-22 (Doc. No. 64). The premise of Defendant's argument is correct: "courts must scrutinize [a scheme liability claim] to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric." *Smith Barney*, 884 F. Supp. 2d at 161. Courts have "not allowed subsections (a) and (c) of Rule 10b-5 to be used as a 'back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5.'" *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (quoting *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 503 (S.D.N.Y. 2005)). Accordingly, where "the core misconduct alleged is in fact a misstatement, it [is] improper to impose primary liability . . . by designating the alleged fraud a 'manipulative device' rather than a 'misstatement.'" *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 377-78 (S.D.N.Y. 2006). Scheme liability thus "hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." *Kelly*, 817 F. Supp. 2d at 344; *see also WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011) ("A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) and (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions."); *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012) (same).

The Court finds that Defendant's argument against scheme liability fails because Plaintiff has provided undisputed evidence that Defendant engaged in deceptive conduct distinct from Defendant's and Chimera's misstatements and omissions. The summary judgment record establishes a number of instances in which Defendant engaged in conduct that had "the principal purpose and effect of creating a false appearance of fact" about Chimera and the shares of its stock. *Simpson*, 452 F.3d at 1048.

First, Defendant financed at least seven of the IPO investors' acquisition of Chimera stock. As discussed in the review of the factual record, *supra* pp. 3-4, two million of the five million shares offered in the IPO were bought with cash that was provided to the investors by Defendant himself. Defendant's undisclosed financing of IPO investments was deceptive because it created the appearance of *bona fide* purchases of Chimera's shares, when in fact as much as forty percent of the shares were sold to straw purchasers who had no personal stake in their supposed investment. Sham transactions such as these are "deceptive devices because they created an appearance of substance where substance was lacking." *Parmalat*, 376 F. Supp. 2d at 503. *See also Softpoint*, 958 F. Supp. at 862 (holding that a "course of business that deceived purchasers as to . . . the financial stability of their investment . . . fall[s] within the scope of Section 17(a)(3), as well as Section 10(b) and Rule 10b-5"). The straw IPO purchases are "separately actionable as a fraudulent scheme" because "sham transactions . . . ha[ve] an inherent tendency to deceive," and therefore "it cannot be said that the alleged fraud or deception only occurred when the trades were misreported in the compan[y']s SEC filings." *Hopper*, 2006 WL 778640, at *11.

In addition to the IPO purchases that were secretly paid for by Defendant, the "market awareness" campaign that Defendant coordinated and funded—which disseminated false

information about Chimera's business endeavors—constitutes a deceptive practice supporting scheme liability. Although the promotional campaign consisted of false statements, Defendant's actions in hiring advertising companies and in paying for the publication of false statements amount to conduct that is distinct from the statements themselves. *See SEC v. Strebinger*, No. 1:14-CV-03533-LMM, 2015 WL 4307398, at *9 (N.D. Ga. June 11, 2015) (defendant may be liable under scheme liability theory for directing and funding a "false or otherwise misleading promotional campaign"). Defendant has admitted that the "goal" of this advertising campaign was to "creat[e] . . . an organized liquid market for Chimera" and to increase the price of Chimera stock, which indeed the campaign did. Farmer Dep. Tr. 118:12-24. In an analogous pump-and-dump case, *SEC v. Curshen*, the defendant "arrang[ed] for the posting of a false website . . . that touted" a fictitious "new solution to reduce polluting gases emitted from airplanes at high altitudes." 888 F. Supp. 2d at 1308. In *Curshen*, the court granted summary judgment for the SEC on claims under Section 17(a), Section 10(b), and Rule 10b-5. Here, Defendant's arranging for the online promotion of Chimera's fictitious waterless fracking technology was, as in *Curshen*, a "false media campaign to inflate interest in the purchase of [the company's] shares." *Id.*

Defendant argues that, although he funded Chimera's advertising efforts, he "did not control the content of the advertisements" and therefore the funding cannot be considered an inherently deceptive act. Def.'s Opp. 23 (Doc. No. 64). This conclusory assertion that Defendant did not control the advertising's content is not credible given that Defendant pursued a particular advertising strategy and spent over $1.3 million of his own funds to implement it. *See* Pl.'s Statement Undisputed Facts 23-24 (Doc. No. 54). Defendant no doubt relied on others to write the false media content and to purchase ad space for that content, but all evidence indicates that it

was Defendant who orchestrated the false advertising campaign. The law is clear that a defendant cannot escape liability by arranging for the dissemination of false or misleading statements and then "closing his eyes" to what he could see and "readily understand." *SEC v. Frank*, 388 F.2d 486, 489 (2d Cir. 1968). *See also Softpoint*, 958 F. Supp. at 862; *Ramoil Mgmt.*, 2007 WL 3146943, at *9 (finding scienter where the defendant was "egregiously refusing to see the obvious, and was therefore reckless").

Defendant's funding of sham IPO purchases and a campaign of false advertisements are discrete, inherently deceptive acts about which Defendant has failed to create a genuine issue of material fact. Yet even beyond these particular instances of conduct, the summary judgment evidence proves, more broadly, that Defendant played "a leading role in every aspect of Chimera's affairs that were pertinent to setting up and executing a pump-and-dump scheme." Pl.'s Opp. 22 (Doc. No. 62). Summary judgment against Defendant is thus proper on the SEC's scheme liability claim.

### E. Liability Under Section 5(a) and 5(c)

Under Sections 5(a) and 5(c) of the Securities Act, securities must be registered with the SEC before any person may sell or offer to sell those securities. 15 U.S.C. § 77e(a) & (c).[14] A

---

[14] Section 5(a) states:

> Unless a registration statement is in effect as to a security, it shall be unlawful for any person directly or indirectly—
> (1) to make use of any means or instruments of transportation or communication in interstate commerce or the mails
> to sell such security through the use or medium of any prospectus or otherwise; or
> (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of
> transportation, any such security for the purpose of sale or delivery after sale.

15 U.S.C. § 77e(a).
Section 5(c) states in pertinent part:

> It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce

plaintiff may initially establish a prima facie case of a violation of Sections 5(a) and 5(c) by showing the following: "(1) no registration statement was in effect as to the securities, (2) the defendant sold or offered to sell these securities, and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale." *SEC v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137, 155 (5th Cir. 1972) (citations omitted). The Securities Act expressly provides that liability extends to "any person, directly or indirectly" who sells unregistered securities in violation of the Act. 15 U.S.C. § 77e(a). If a plaintiff is able to make out a prima facie case, the defendant then bears the burden of showing that the challenged securities transactions fall within one of the exemptions from registration enumerated in Section 4 of the Act. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998).

It is undisputed that at two stages in the transaction of Chimera securities, there was no registration statement in effect: first, during the transactions which consolidated the shares distributed in the IPO into the hands of Defendant and six other entities; and, second, during Defendant's and those entities' sale of their shares to the public on the market. Def.'s Opp. 9 (Doc. No. 64); Pl.'s Mot. Summ. J. 16 (Doc. No. 53). In other words, all transactions in Chimera stock subsequent to the IPO were unregistered. It is further undisputed that Defendant sold or offered to sell Chimera stock during these periods in which the security was unregistered  and that he did so through interstate commerce. *Id.* As such, the SEC has made a prima facie case under Sections 5(a) and 5(c).

---

or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security . . . .

15 U.S.C. § 77e(c).

To avoid Section 5 liability, Defendant must therefore demonstrate that he qualifies for an exemption from the registration requirement. Defendant contends that he falls within the exemption provided in Section 4(a)(1) of the Securities Act. Section 4(a)(1) exempts from registration "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). Defendant attempts to prove that he was not an "underwriter" within the meaning of Section 4(a)(1) and therefore may claim the exemption. Defendant argues that he "did not control Chimera such that he could be deemed an underwriter." Def.'s Opp. 12 (Doc. No. 64). Defendant asserts that, despite his involvement with Chimera, "Grob was vested with complete authority" over the company "[a]t all times." *Id.* In support of this assertion, Defendant notes that Grob incorporated Chimera and named himself president and CEO; that Grob retained Chimera's securities counsel and approved the filing of the Registration Statement; that Grob executed an agreement with Kylemore, which provided Chimera with a $100,000 loan to fund its initial operations; and that Grob approved and signed all subscription agreements resulting from the IPO. *Id.* at 12-13.

Defendant may well have raised a genuine dispute as to whether Defendant fully controlled Chimera; however, "control" (or "complete authority") is not the standard for whether a person is a statutory underwriter such that he may be liable under Sections 5(a) and 5(c). An "underwriter" is defined in relevant part in Section 2(a)(11) as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking." 15 U.S.C. § 77b(a)(11). Courts have interpreted this definition broadly. *See SEC v. Kern*, 425 F.3d 143, 148 (2d Cir. 2005) ("In light of the purpose of the Act, exemptions generally are to be

interpreted to promote full disclosure of information necessary to protect the investing public."). "Underwriter," for purposes of Section 5 liability, "include[s] any person who is 'engaged in steps necessary to the distribution'" of securities. *Kern*, 425 F.3d at 152 (quoting *SEC v. Chinese Consol. Benevolent Ass'n, Inc.*, 120 F.2d 738, 741 (2d Cir. 1941)). And the "distribution" of securities includes "the entire process by which[,] in the course of a public offering[,] the block of securities is dispersed and ultimately comes to rest in the hands of the investing public." *Id.* at 153 (citing *R.A. Holman & Co., Inc. v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966)). *See also SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1086 (9th Cir. 2010) (defining "underwriter" as "[a]ny intermediary between the issuer and the investor that is an essential cog in the distribution process") (internal quotation marks omitted). In short, Section 5 is violated "if it can be shown that [the defendant] was a 'necessary participant' or a 'substantial factor' in the offering or selling" of an unregistered security. *Curshen*, 888 F. Supp. 2d at 1308 (quoting *SEC v. Holschuh*, 694 F.2d 130, 139 (7th Cir. 1982)).

In light of this broad definition of "underwriter," the summary judgment evidence makes plain that Defendant indisputably was a statutory underwriter and thus is not shielded from liability under Section 5. Indeed, as the SEC argues, "it would be difficult to come up with a better description for Farmer than one who took 'steps necessary to the distribution' of Chimera stock to the public." Pl.'s Reply 11 (Doc. No. 65) (quoting *Kern*, 425 F.3d at 152). A review of Defendant's involvement with Chimera during its lifespan demonstrates that he was a necessary participant in the distribution of Chimera stock to the public, including during the unregistered post-IPO transactions:

- At the time of Chimera's incorporation, Defendant began paying Grob, Chimera's CEO and only officer, $2,500 per month. Pl.'s Mot. Summ. J. Ex. F, at 31-36 (Doc. No. 55-3).

- Defendant helped Chimera secure its initial source of funding—a $100,000 loan from Kylemore, a company for which Defendant served as the "de facto agent." Farmer Dep. Tr. 77:1-13; *id.* at 82:19-25.
- Defendant introduced Grob to David Loev, the lawyer whom Chimera retained to prepare its IPO filing, and Defendant was Loev's primary person of contact at Chimera whenever an issue related to the IPO arose. *Id.* 72:8-14; Loev Dep. Tr. 47:25-48:7.
- Defendant provided false or misleading responses to critical inquiries from Chimera's broker-dealer, Pennaluna, providing Pennaluna with information that enabled it to make a market for Chimera's stock. Pl.'s Mot. Summ. J. Ex. FF, at 40 (Doc. No. 55-9).
- Defendant solicited several IPO investments and secretly funded at least forty percent of Chimera's IPO. Pl.'s Statement Undisputed Facts 8-11 (Doc. No. 54).
- Defendant largely funded the transfer of the shares sold in the IPO to himself and six entities, thereby consolidating ownership of Chimera stock. Pl.'s Mot. Summ. J. Ex. QQ, Ex. RR, Ex. SS, Ex. TT, at 37-46 (Doc. No. 55-10).
- Defendant directed and financed an advertising campaign that publicized Chimera's fictitious business endeavors, which inflated the price of Chimera's stock. Farmer Dep. Tr. 118:12-18; Pl.'s Mot. Summ. J. Ex. ZZ, at 3 (Doc. No. 55-11); *id.* Ex. AAA, at 5.
- Defendant sold over a million shares of Chimera stock in the first arm's-length transaction of Chimera shares, and Defendant earned over $4 million from the proceeds of his sales and the sales of the other entities that owned Chimera stock. Pl.'s Statement Undisputed Facts 25-29 (Doc. No. 54).

In *Curshen*, where the defendant "facilitate[d] [a] pump-and-dump scheme"—including by "orchestrat[ing] [a] false media campaign," as Defendant did—the court granted summary judgment for the SEC on its claim under Sections 5(a) and 5(c). 888 F. Supp. 2d at 1308. The evidence of Defendant's participation in the Chimera pump-and-dump scheme similarly establishes that Defendant was necessary to the distribution of Chimera stock. Because Defendant has offered no substantial evidence to the contrary, Defendant has failed to demonstrate that he was not an "underwriter" within the meaning of Section 4(a)(1). Consequently, Defendant is not exempt from Section 5 liability for his sale or offer of unregistered Chimera stock, and the SEC therefore prevails on its Section 5(a) and 5(c) claims.

## V.      CONCLUSION

For the reasons set forth above, the Court **GRANTS** Plaintiff's Motion for Summary Judgment (Doc. No. 53) on all claims against Defendant. Defendant's cross Motion for Summary Judgment on Counts I and II (Doc. No. 52) is **DENIED**.

     **IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on the 7th of October, 2015.

HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE