**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No.:  4:14-CV-02345** |
| | § | |
| **ANDREW I. FARMER,** | § | |
| **CHARLES E. GROB, JR.,** | § | |
| **CAROLYN AUSTIN,** | § | |
| **BALDEMAR P. RIOS, and** | § | |
| **CHIMERA ENERGY CORP.** | § | |
| | § | |
| **Defendants** | § | |
| _____ | § | |

**PLAINTIFF'S MOTION TO ENTER**
**<u>JUDGMENT AND BRIEF IN SUPPORT</u>**

Dated:  November 18, 2015

Respectfully submitted,

Matthew J. Gulde
Attorney-in-Charge
Illinois Bar No. 6272325
S.D. Texas Bar No. 1821299
Nikolay Vydashenko
New York Bar No. 4628566
United States Securities and
Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
Telephone:  (817) 978-1410 (mg)
Facsimile:  (817) 978-4927
guldem@sec.gov

*Attorneys for Plaintiff U.S.*
*Securities and Exchange Commission*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ............................................................................................. ii-v

I.     SUMMARY OF REQUESTED RELIEF ........................................................................ 1

II.    ARGUMENT AND AUTHORITY ............................................................................. 2

    A.    PERMANENT INJUNCTIONS AND BARS ................................................. 2

        1.   The Court Should Permanently Enjoin and Bar Farmer ..................................... 3
        2.   The Court Should Permanently Bar Grob From Acting as Officer or
            Director .............................................................................................................. 6
        3.   The Court Should Permanently Bar Rios From Acting as Officer or
            Director .............................................................................................................. 7

    B.    THE COURT SHOULD ORDER FARMER AND GROB TO DISGORGE THEIR ILL-GOTTEN
        GAINS WITH PREJUDGMENT INTEREST ................................................... 8

        1.   Farmer Should Disgorge $6,794,653.38 .......................................................... 10
        2.   Grob Should Disgorge $72,500 ........................................................................ 13
        3.   Prejudgment Interest ......................................................................................... 13

    C.    THE COURT SHOULD ORDER FARMER, RIOS, AND GROB TO PAY A CIVIL PENALTY
        AND SHOULD SET THE AMOUNT OF THE PENALTY ................................. 15

        1.   Each Remaining Defendant's Conduct Merits Imposition of a
            Civil Penalty .................................................................................................... 16

III.   CONCLUSION ................................................................................................... 18

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allstate Insurance Co v. Receivable Finance Co. LLC,*
501 F.3d 398 (5th Cir. 2007) ....................................................................8

*Clawson v. SEC*,
2005 WL 2174637 (9th Cir. Sept. 8, 2005) ..............................................3

*Helfat v. SEC*,
439 U.S. 953 (1978).................................................................................2

*In re Skyway Committee Holding Corp.,*
2011 WL 1380068 (Bankr. M.D. Fla. Apr. 6, 2011)..................................10

*SEC v. AMX, International, Inc.*,
7 F.3d 71 (5th Cir. 1993) .........................................................................8

*SEC v. AmeriFirst Funding, Inc.*,
2008 WL 1959843 (N.D.Tex. May 5, 2008) ..............................................9

*SEC v. AmeriFirst Funding, Inc.*,
2008 U.S. Dist. LEXIS 36782 (N.D. Tex. 2008)....................................8, 9

*SEC v. Benson*,
657 F. Supp. 1122 (S.D.N.Y. 1987)..........................................................9

*SEC v. Blackout Media Corp.*,
2012 WL 4051951 (S.D.N.Y. Sept. 14, 2012).............................................3

*SEC v. Blatt*,
583 F.2d 1325 (5th Cir. 1978) .......................................................2, 3, 13

*SEC v. Boock*,
2012 WL 3133638 (S.D.N.Y. Aug. 2, 2012)....................................3, 4, 5, 6

*SEC v. Caterinicchia*,
613 F.2d 102 (5th Cir. 1980) ....................................................................2

*SEC v. Cavanagh*,
2004 WL 1594818 (S.D.N.Y. July 16, 2004) ............................................17

*SEC v. Coates*,
137 F. Supp. 2d 413 (S.D.N.Y. 2001).......................................................17

*SEC v. Colonial Investment Management LLC*,
    659 F. Supp. 2d 467 (S.D.N.Y. 2009) ......................................................................16

*SEC v. ConnectAJet.com, Inc.*,
    2011 U.S. Dist. LEXIS 130215, 2011 WL 5509896 (N.D. Tex. Nov. 9, 2011) ............9

*SEC v. First City Finance Corp., Ltd.*,
    890 F.2d 1215 (D.D.C. 1989) ......................................................................................9

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) ....................................................................................14

*SEC v. First Pacific Bancorp*,
    142 F.3d 1186 (9th Cir. 1998) ....................................................................................3

*SEC v. Gann*,
    565 F.3d 932 (5th Cir. 2009) ......................................................................................3

*SEC v. Gunn*,
    2010 U.S. Dist. LEXIS 88164 (N.D. Tex. 2010) ......................................................13

*SEC v. Halek*,
    537 F. App'x 576 (5th Cir. 2013) ........................................................................11, 12

*SEC v. Huffman*,
    996 F.2d 800 (5th Cir. 1993) ......................................................................................8

*SEC v. Hughes Capital Corp.*,
    917 F. Supp. 1080 (D.N.J. 1996) ....................................................................9, 12, 14

*SEC v. Indigenous Global Development Corp.*,
    2008 WL 8853722 (N.D. Cal. June 30, 2008) ............................................................3

*SEC v. Kenton Capital, Ltd.*,
    69 F. Supp. 2d 1 (D.D.C.1998) ................................................................................16

*SEC v. Kern*,
    425 F.3d 143 (2d Cir. 2005) ......................................................................................16

*SEC v. Koracorp Industrial, Inc.*,
    575 F.2d 692 (9th Cir. 1978) ......................................................................................2

*SEC v. MacDonald*,
    699 F.2d 47 (1st Cir. 1983) ........................................................................................9

*SEC v. Martino*,
   255 F. Supp. 2d 268 (S.D.N.Y. 2003)........................................................10

*SEC v. Milan Capital Group, Inc.*,
   2001 WL 921169 (S.D.N.Y. Aug. 14, 2001)............................................17

*SEC v. Moran*,
   944 F. Supp. 286 (S.D.N.Y. 1996) ...........................................................16

*SEC v. Murphy*,
   626 F.2d 633 (9th Cir. 1980) ......................................................................2

*SEC v. Patel*,
   61 F.3d 137 (2d Cir.1995).............................................................................3

*SEC v. Platforms Wireless International Corp.*,
   2010 U.S. App. LEXIS 15328 (9th Cir. 2010) ..........................................14

*SEC v. Platforms Wireless International Corp.*,
   617 F.3d 1072 (9th Cir. 2010) ..............................................................9, 10

*SEC v. Razmilovic*,
   2011 U.S. Dist. LEXIS 113447 (E.D.N.Y. 2011).................................14, 16

*SEC v. Reynolds*,
   2008 U.S. Dist. LEXIS 65669 (N.D. Tex. 2008)......................................8, 9

*SEC v. Robinson*,
   2002 WL 1552049 (S.D.N.Y. 2002)..........................................................17

*SEC v. Rockwell Energy of Texas, LLC*,
   2012 WL 360191 (S.D. Tex. Feb. 1, 2012) ............................................9, 10

*SEC v. Strauss*,
   2011 U.S. Dist. LEXIS 38248 (N.D. Miss. 2011) .......................................9

*SEC v. United Energy Partners*, Inc.
   88 F. App'x 744 (5th Cir. 2004) ..........................................................10, 13

*SEC v. Universal Express, Inc.*,
   646 F. Supp. 2d 552 (S.D.N.Y. 2009)........................................................16

*SEC v. Zale Corp.*,
   650 F.2d 718 (5th Cir. 1981) ......................................................................2

*Steadman v. SEC*,
    603 F.2d 1126 (5th Cir. 1979) ...................................................................................3

## FEDERAL STATUTES

15 U.S.C. § 77t(b) ....................................................................................................2

15 U.S.C. § 77t(d) ..................................................................................................15

15 U.S.C. § 78u(d)(1) ...............................................................................................2

26 U.S.C. § 6621(a)(2) ...........................................................................................14

17 C.F.R. § 201.1004 ..............................................................................................15

**PLAINTIFF'S MOTION TO ENTER
<u>JUDGMENT AND BRIEF IN SUPPORT</u>**

Plaintiff Securities and Exchange Commission ("Commission") respectfully requests entry of a final judgment against Andrew Farmer, Charles Grob, and Baldemar Rios (collectively, the "remaining Defendants"), respectfully showing the following:

**I.
<u>SUMMARY OF REQUESTED RELIEF</u>**

In granting the Commission's Motion for Summary Judgment on October 7, 2015, the Court found that Andrew Farmer defrauded Chimera Energy Corp. ("Chimera") investors in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. The Court also found that Farmer violated Section 5 of the Securities Act by trading unregistered Chimera securities.

Unlike Farmer, defendants Grob and Rios did not contest their liability for the violations with which they were charged. They agreed to the Court's entry of partial judgments that permanently barred them from trading in penny stocks, permanently enjoined them from violating Section 10(b) of the Exchange Act and Rule 10(b)-5 thereunder, and from aiding and abetting violations of Section 15(d) of the Exchange Act. Defendant Grob was further permanently enjoined from violating Section 17(a) of the Securities Act. Under the terms of their partial judgments, the remedies beyond injunctive relief to be imposed against them were to be decided by the Court upon motion by the Commission. Both Grob and Rios agreed that, for the purpose of such motion, "the allegations of the Complaint shall be accepted as and deemed true by the Court." (Dkt. Nos. 60, p. 3 and 61, p. 3).

The Commission now respectfully moves the Court to determine the appropriate remedies against each remaining Defendant in light of their various violations of the law. Specifically, the Commission requests an order from the Court (1) permanently enjoining Farmer from future violations of the relevant securities laws; (2) permanently barring Farmer from participating in any offering of penny stocks; (3) permanently barring Defendants Farmer, Grob, and Rios from serving as officer or director of any issuer required to file reports with the SEC under Section 12(b), 12(g), or 15(d) of the Exchange Act; (4) requiring Defendants Farmer and Grob to disgorge their ill-gotten gains received as a result of wrongdoing; and (5) requiring Defendants Farmer, Grob, and Rios to pay civil penalties.

## II.
## ARGUMENT AND AUTHORITY

### A.    PERMANENT INJUNCTIONS AND BARS.

Section 21(d) of the Exchange Act contemplates entry of permanent injunctions in enforcement actions brought by the Commission when the evidence establishes a "reasonable likelihood" that a Defendant will engage in future violation of the securities laws. *See* 15 U.S.C. §77t(b); 15 U.S.C. § 78u(d)(1); *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981); *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980); *see also SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir. 1978), *cert. denied sub nom., Helfat v. SEC*, 439 U.S. 953 (1978). "[T]he Commission is entitled to prevail when the inferences flowing from the defendant's prior illegal conduct, viewed in light of present circumstances, betoken a 'reasonable likelihood' of future transgressions." *Zale Corp.*, 650 F.2d at 720; *see SEC v. Caterinicchia*, 613 F.2d 102 (5th Cir. 1980); *SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978). In predicting the likelihood of future violations, the Court should evaluate the totality of the circumstances. *Zale Corp.*, 650 F.2d at 720.

Courts consider a number of factors when imposing permanent injunctions, including the (1) egregiousness of the defendant's conduct; (2) isolated or recurrent nature of the violation; (3) degree of *scienter*; (4) sincerity of the defendant's recognition of his transgression; and (5) likelihood of the defendant's job providing opportunities for future violations. *SEC v. Gann*, 565 F.3d 932, 940 (5th Cir. 2009); *Blatt,* 583 F.2d at 1334-35.

When determining whether to impose penny stock bars and officer-and-director bars, federal courts generally consider the same factors. *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979) (*citing SEC v. Blatt*, 583 F. 2d 1325, 1334 n.29 (5th Cir. 1978); *see also SEC v. Patel*, 61 F.3d 137, 141 (2d Cir.1995) (listing same factors for office and director bar) (*citation omitted*); *SEC v. First Pacific Bancorp,* 142 F.3d 1186, 1193 (9th Cir. 1998) (same); *see also Clawson v. SEC*, 2005 WL 2174637, at *2 (9th Cir. Sept. 8, 2005) (applying *Steadman* factors and denying petition seeking review of Commission decision imposing permanent penny stock bar); *SEC v. Indigenous Global Development Corp*., 2008 WL 8853722, at *18 (N.D. Cal. June 30, 2008) (applying *Steadman* factors and imposing permanent penny stock bar); *SEC v. Blackout Media Corp*., 2012 WL 4051951, at *3 (S.D.N.Y. Sept. 14, 2012) (applying *Patel* factors and imposing permanent penny stock bar); *SEC v. Boock*, 2012 WL 3133638, at *2-3 (S.D.N.Y. Aug. 2, 2012) (applying *Patel* factors and imposing permanent penny stock bar).

## 1. The Court Should Permanently Enjoin and Bar Farmer.

These factors clearly support entry of permanent injunctions as well as penny stock and officer-and-director bars against Farmer, whose violations were multiple, continued, egregious, and undertaken with *scienter*.  The Court found that Farmer "obtained money by means of numerous untrue statements or material omissions," and that he conducted "a complex and methodical money-making scheme of which the various statements and omissions were

interlocking parts."  (October 7, 2015 Memorandum and Order, Dkt. 70 ("Oct. 7 Order"), pp. 14-15).

Farmer's violations were egregious.  He coldly executed a complicated scheme that defrauded the public to his personal benefit of well over $4.1 million.  (*Id*., at p. 8).[1]  Not only did Farmer take advantage of the company's repeated lies about its fictitious technology, but he also personally spread similar lies in order to increase interest in Chimera's stock.  (*Id*., at pp. 7-8).  He told other lies to Chimera's market maker to conceal his involvement in the deal and his plan to consolidate control over millions of shares of Chimera stock.  (*Id*., at pp. 23-24).  This egregious scheme led to Farmer and his confederates selling Chimera's worthless stock the unknowing public for as much as $1.80 per share.  (Dkt. 70, p. 8).

In addition, Farmer's violations were, by their nature, recurrent and repetitive.  Farmer, over the course of many months in 2011 and 2012, told repeated lies and engaged in many transactions in order to execute his scheme.  Making millions in a stock that trades for pennies is, by definition, a volume business.

Furthermore, Farmer displayed a high level of *scienter* as evidenced by his deep personal commitment to this scheme.  Not only was he paying Grob's salary, but he also paid over a million dollars to advertise Chimera's non-existent technology – a process he euphemistically described as "creat[ing] an aware market for Chimera" – all the while disguising his own involvement in the company and the scheme.  (*Id.*, at p. 7).  As the Commission has stated before, the clearest demonstration of Farmer's state of mind throughout the scheme and during his many misrepresentations is that he ended up with nearly all the money.

---

[1] As discussed below, this is the amount of money that available evidence confirms Farmer directly and personally received, but his total ill-gotten gains are actually higher.

As to recognition of his transgressions, Farmer has never admitted wrongdoing or acknowledged the deceit inherent in his scheme. Quite the opposite – in his summary judgment briefs and during oral argument, Farmer denied any wrongdoing and sought to hold his subordinate Charles Grob out as the real wrongdoer.[2]  When confronted with the fact that his own statement – that he was not involved in the Chimera deal in any way – was plainly false, Farmer claimed that he believed it was true at the time. While the Court has rejected this argument as "specious" and "not credible," Farmer has never retracted it. Farmer's refusal to acknowledge his transgression requires injunction and bars from the Court.

Finally, the risk of Farmer's recidivism is high. As discussed in the Commission's Motion and the Oct. 7 Order, Farmer's scheme required a significant amount of devotion and expertise. During deposition testimony, Farmer described himself as being a "business consultant" specializing in "micro cap companies." (Farmer Dep. Tr. 42:11-12). During that testimony, Farmer noted other deals he had worked that were the subject of Commission investigations and enforcement, saying "I'm sure you have [Sunrise Solar] in your files" and "Gulf Ethanol, which I'm sure is in the file somewhere. . . ." (*Id.*, at 13:19-21, 35:24). While the Commission would contend that penny stock fraud *is* Farmer's occupation, it is clear that at the very least, his work gives him ample opportunity to conduct similar schemes in the future. Accordingly, the Court should enter permanent injunctions and bars against him.

Because these factors weigh uniformly and heavily against Farmer, the Court should permanently enjoin him from violating Sections 5 and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. The Court should also permanently bar

---

[2] Farmer argued that evidence of the sham IPO investment of Daniel SoRelle, for example, "may spell trouble for Grob," but not for himself. (Farmer's Resp. to Pl.'s Mot. Summ. J., Dkt. 64, p. 6).

him from participating in penny stock offerings and acting as an officer or director of any issuer

required to file reports with the SEC under Section 12(b), 12(g), or 15(d) of the Exchange Act.

### 2. The Court Should Permanently Bar Grob From Acting as Officer or Director. [3]

Charles Grob's role in this fraud was essential, and he easily qualifies for a permanent

officer-and-director bar under the factors described above.  From August 2011 until October

2012, Grob was Chimera's CEO, sole director, and majority shareholder.  (Complaint, Dkt.1, p.

3).  Grob accepted a monthly salary from Farmer and regarded Farmer as his boss, but concealed

Farmer's involvement in Chimera from regulators and the public.  (*Id.,* pp. 6-7, 10.)  Knowing

that Chimera's waterless fracking technology was imaginary, Grob ran a sham company whose

sole practical purpose was to put money in Andrew Farmer's pockets.  (*Id. passim*).  Under the

*Gann*/*Steadman*/*Patel* factors, this is egregious conduct that merits a permanent officer-and-

director bar.  As to the recurrent nature of the violation and his scienter, Grob's conduct spanned

months and involved many repeated fraudulent acts, including the approval for publication of

dozens of false SEC filings and press releases.  This repeated pattern of knowing and intentional

misconduct was far from an isolated occurrence and shows that Grob acted with the *scienter*

required for a permanent bar.

While the Commission acknowledges that Grob has entered into an agreed partial

judgment, he has not fully recognized his transgression in that he neither admits nor denies the

allegations in the Complaint.  And when called to testify about these matters, Grob asserted his

rights under the Fifth Amendment.  As to the final factor, it is likely that Grob could play a

similar role again if not barred from acting as an officer or director.  The Chimera scheme

illustrates that anyone could play Grob's role, provided he or she is willing to follow orders

---

[3] Defendants Rios, Grob, and Austin have agreed to, and the Court has ordered, permanent injunctions against future violations of the securities laws as well as penny stock bars.

while a securities fraud expert pulls the strings.  Having thoroughly shown such willingness in connection with this sprawling fraud, Grob should be barred permanently from acting as officer or director of any issuer required to file reports with the Commission under Section 12(b), 12(g), or 15(d) of the Exchange Act.

> **3.  The Court Should Permanently Bar Rios From Acting as Officer or Director.**

Baldemar Rios succeeded Grob as CEO of Chimera, and although Chimera is functionally defunct, Rios had not resigned from this role.  Before taking over as CEO, acting as consultant to Chimera, Rios participated in communications with Pemex that were then continually misrepresented by Chimera in press releases and Forms 8-K.  Later, as CEO, Rios helped implement Farmer's fraudulent scheme by participating in drafting and approving the filing of Chimera's misleading press releases and SEC filings while operating Chimera at the minimum level necessary to maintain the appearance of a legitimate company.  Such conduct merits a permanent officer-and-director bar.

Rios's conduct was intentional and egregious.  He took over as CEO for Chimera after seeing, first hand, that the company was a sham, as it lacked the claimed technology and had not entered into the claimed agreements.  Once appointed as CEO, Rios continued Grob's work of pumping out false and misleading press releases and SEC filings.  While Rios, like Grob, has entered into an agreed partial judgment, he has not fully recognized his transgression in that he neither admits nor denies the allegations in the Complaint.  As to the final factor, it is likely that Rios could play a similar role again if not barred from acting as an officer or director.  Rios, having observed the sham operations of Chimera, was willing to stand as CEO even after Grob stepped down.  Because there will always be similar opportunities to conduct fraud, Rios should

be permanently barred from acting as officer or director of any issuer required to file reports with

the SEC under Section 12(b), 12(g), or 15(d) of the Exchange Act.

**B.    THE COURT SHOULD ORDER FARMER AND GROB TO DISGORGE THEIR ILL-GOTTEN
GAINS WITH PREJUDGMENT INTEREST.**

Farmer and Grob each benefitted from the Chimera fraud, though in vastly disparate

proportion.  Farmer personally and directly obtained more than $4.1 million from unsuspecting

investors in what the Court called the "first arms-length sales of Chimera stock."  (Oct. 7 Order at p.

16).  But that is not the extent of his ill-gotten gains.  Farmer's close associates also obtained more

than $2.2 million in similar transactions with the public.  As explained below, the Court should

order Farmer to disgorge all such amounts as ill-gotten gains of his scheme.  Grob, on the other

hand, appears to have gained only the salary that Farmer paid him and that he paid himself through

Chimera – $72,500 in total.  Grob should disgorge all of these moneys.

"The District Court has broad discretion not only in determining whether or not to order

disgorgement but also in calculating the amount to be disgorged."  *SEC v. Huffman,* 996 F.2d 800,

802 (5th Cir. 1993); *see also SEC v. AMX, Int'l, Inc.,* 7 F.3d 71, 73 (5th Cir. 1993); *SEC v.

AmeriFirst Funding, Inc.,* 2008 U.S. Dist. LEXIS 36782 (N.D. Tex. 2008); *SEC v. Reynolds*, 2008

U.S. Dist. LEXIS 65669 (N.D. Tex. 2008).  The law does not require precision in determining the

amount of disgorgement.  Rather, "disgorgement need only be a reasonable approximation of profits

causally connected to the violation."  *Id.*; *see also Allstate Ins. Co v. Receivable Fin. Co. LLC*, 501

F.3d 398, 413 (5th Cir. 2007) ("In actions brought by the SEC involving a securities violation,

'disgorgement need only be a reasonable approximation of profits causally connected to the

violation.').  As one court explained:

> If exact information were obtainable at negligible cost, we would
> not hesitate to impose upon the government a strict burden to
> produce that data to measure the precise amount of the ill-gotten

> gains.   Unfortunately, we encounter imprecision and imperfect information. . . .   Rules for calculating disgorgement must recognize that separating legal from illegal profits exactly may at times be a near-impossible task.

*SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1231 (D.D.C. 1989).

Once the Commission presents evidence reasonably approximating the amount of ill-gotten gains, the burden of proof shifts to the remaining Defendants.  *See SEC v. ConnectAJet.com, Inc.,* 2011 U.S. Dist. LEXIS 130215, 2011 WL 5509896, at *7 (N.D. Tex. Nov. 9, 2011); *AmeriFirst Funding, Inc.,* 2008 U.S. Dist. LEXIS at *4; *First City*, 890 F.2d at 1232; *see also SEC v. Hughes Capital Corp.,* 917 F. Supp. 1080, 1085 (D.N.J. 1996), *aff'd*, 124 F.3d 449 (3rd Cir. 1997). Defendants are then "obliged clearly to demonstrate that the disgorgement figure [is] not a reasonable approximation."  *First City*, 890 F.2d at 1232; *see also Reynolds*, 2008 U.S. Dist. LEXIS at *7; *SEC v. Benson*, 657 F. Supp. 1122, 1133 (S.D.N.Y. 1987).

"In the context of an offering of securities in violation of the securities laws, the proper starting point for a disgorgement award is the total proceeds received from the sale of the securities."  *SEC v. Rockwell Energy of Texas, LLC*, No. H-09-4080, 2012 WL 360191, at *3 (S.D. Tex. Feb. 1, 2012) (quoting *SEC v. AmeriFirst Funding, Inc.*, 2008 WL 1959843, at *2 (N.D.Tex. May 5, 2008)); *SEC v. Platforms Wireless International Corp.*, 617 F.3d 1072, 1081, 1096-97 (9th Cir. 2010) (holding that the SEC had reasonably approximated defendant's profits from illegal sales of unregistered Pink Sheet securities by tabulating total proceeds from those sales).  In determining an approximate amount of ill-gotten profits, "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty."  *Hughes,* 917 F. Supp. at 1085; *SEC v. Strauss*, 2011 U.S. Dist. LEXIS 38248 (N.D. Miss. 2011).  "[D]oubts are to be resolved against the defrauding party."  *SEC v. MacDonald*, 699 F.2d 47, 55 (1st Cir. 1983); *see also Hughes*, 917 F. Supp. at 1085. Further in attempting to mitigate liability, "securities law violators may not offset their

disgorgement liability with business expenses." *SEC v. Rockwell Energy*, 2012 WL 360191, at *3

(citing *SEC v. United Energy Partners*, 88 F. App'x 744, 746–47 (5th Cir. 2004)).

Disgorgement is appropriate not only in cases of fraud, but also for any violation of the

securities laws. *See, e.g., SEC v. Rockwell Energy*, 2012 WL 360191, at *6 (ordering disgorgement

against a defendant who violated only the securities registration provisions of the federal securities

laws); *see, e.g., In re Skyway Comm. Holding Corp.*, No. 8:05-bk-11953-PMG, 2011 WL 1380068,

at *2 (Bankr. M.D. Fla. Apr. 6, 2011) (awarding disgorgement against an unregistered broker for

violations of the registration provisions of federal securities laws); *SEC v. Martino*, 255 F. Supp. 2d

268, (S.D.N.Y. 2003) (same).  In this case, where Farmer and Grob misled the public as to their

sham company and its fictional technology, disgorgement is necessary and just.  In cases involving

violations of the registration requirements of Section 5, the total proceeds resulting from such

unregistered sales is the proper measurement of disgorgement.  *SEC v. Platforms Wireless*

*International Corp.*, 617 F.3d at 1096-97.

### 1.    Farmer Should Disgorge $6,794,653.38.

As the Court found in the Oct. 7 Order, Andrew Farmer funneled to his Chartered

Investments, Inc. ("Chartered") account more than $4.1 million in ill-gotten proceeds from sales

of Chimera stock to the public.  His disgorgement should be even greater, however, since he

orchestrated a scheme to defraud, through unregistered sales, which resulted in a total of at least

$6,794,653.38 in proceeds from the unsuspecting public market.

First, it is undisputed that Farmer personally sold, through his Chartered account, more

than 1.1 million shares of Chimera stock for $692,554.51 in proceeds.  (Statement of Facts

("SOF") ¶ 95, Dkt. No. 54).  Additionally, Oak Resources, Inc. sold 2,200,146 shares of Chimera

stock for proceeds of $667,557.  (SOF ¶ 91).  While Lydia Cotton was the putative owner of Oak

Resources, Inc., Farmer had trading authorization for the Oak Resources brokerage account at Pennaluna & Company, and signature authority for the Oak Resources bank account at JPMorgan Chase Bank NA.  Farmer thus controlled all $667,557 of the stock proceeds held by Oak Resources, and chose to forward $425,000 of those funds to his own Chartered account. (SOF ¶ 93).  The fact that he chose to allow the remainder of the funds to be used otherwise is irrelevant.  *SEC v. Halek*, 537 F. App'x 576, 582 (5th Cir. 2013) (holding that how ill-gotten profits were distributed and spent "has no relevance to the disgorgement calculation").

Similarly, Carolyn Austin made $3,224,630.87 through TransAmerica Trading, Inc. ("TransAmerica")'s sales of Chimera stock to the public.  (SOF ¶ 88).  Of that amount, Farmer received $3,050,000.[4]  (SOF ¶ 89).  Farmer, having enabled the unregistered sales of all sales by TransAmerica, should disgorge the full $3,224,630.87.  This amount, together with proceeds of sales by Oak Resources and by Chartered, comes to $4,584,742.38.

But that is not all.  Two of the Marshall Islands entities with extensive ties to Farmer also sold significant amounts of Chimera stock to the public. (SOF ¶ 96-106).  In August and September 2012, Kylemore Corp. ("Kylemore") made $790,876 on sales of approximately 740,000 shares of Chimera stock. (SOF ¶ 96).  Similarly, between July 31 and October 24, 2012, Hillsmere SA sold about 2,946,500 shares for proceeds of over $1.419 million. (SOF ¶ 97).  Collectively, the two Marshall Islands entities closely related to Farmer made $2,209,911 from the sales of worthless Chimera stock.

Kylemore is putatively owned by Alina Yurovskaya, a Russian citizen who is a close friend of Farmer's wife.  (SOF ¶ 99-100).  Farmer's personal connections to Kylemore are

---

[4] On November 9, 2015, Carolyn Austin remitted $139,333 to the United States Treasury.  Of that amount, $54,522 represented profits gained as a result of TransAmerica's sales of Chimera stock.  (*See* Final Judgment as to Defendant Carolyn Austin, Dkt. 74, p. 3).  If the Court orders disgorgement from Farmer on the full proceeds of TransAmerica sales, then Farmer's disgorgement should be reduced by the $54,522 received from Austin.

extensive.  He was Kylemore's "de facto agent in the United States," his wife used the email account anna@kylemorecorp.com, he registered Kylemore's internet domain name, and at least $4.36 million moved between Kylemore's and Chartered's bank accounts between October 2011 and October 2012. (SOF ¶ 10-11).  Farmer introduced Yurovskaya to David Craven, who is affiliated with EuroHelvetia TrustCo S.A.  ("EuroHelvetia"), a private wealth management firm based in Geneva, Switzerland.  (SOF ¶ 99).  Craven was the trustee of Kylemore. (*Id.*).  Farmer is listed as the "Settlor" of the Kylemore Trust, which controls Kylemore, in documents establishing Kylemore's bank account at the Geneva bank Compagnie Bancaire Helvetique ("CBH"). (SOF ¶ 99-100).

Similarly, Farmer is intimately connected to Hillsmere SA, which is putatively owned by Olga Tikhonova, his sister-in-law. (SOF ¶ 101).  EuroHelvetia's documents establishing Hillsmere SA's account also list Farmer as "Settlor" of the Hillsmere Trust (which controls Hillsmere SA), and state that the source of Hillsmere SA's funds at CBH was "[f]unds coming from A. Farmer to start in the form of a loan." (*Id.*). Olga Tikhonova and Alina Yurovskaya opened their accounts at EuroHelvetia in Geneva on the same day: April 8, 2011. (SOF ¶ 100-101).  On April 1, 2011, Farmer bought airline tickets for the two women to travel from their home in Yekaterinburg, Russia to Geneva, Switzerland. (SOF ¶ 103).

There is ample evidence for the Court to conclude that Kylemore and Hillsmere SA are merely extensions of Andrew Farmer's persona and that he personally controlled and benefitted from the wrongful sales of Chimera stock by these two entities.  Again, to the extent there is uncertainty about Farmer's control of these accounts, "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty."  *Hughes,* 917 F. Supp. at 1085. Accordingly, the Court should order Farmer to disgorge not only the $4,167,554.51 that made its

way into his own bank accounts, but the entire $6,794,653.38 made by him and his close associates from unwitting public investors.

### 2.    Grob Should Disgorge $72,500.

Charles Grob also personally benefitted from his violations of the securities laws.  Through his company Iridium Capital, Ltd., Farmer paid Grob a monthly salary of $2,500 from August 2011 through February 2012.  (SOF ¶ 13).  These payments totaled $15,000.  (*Id.*).  Grob then began writing his own paychecks, beginning with payments from Chimera to himself on March 6 and April 4, 2012 of $2,500 each.  (Ex. A - Chimera Bank Statements).  Apparently, Grob then gave himself a raise, writing a check for "executive compensation" in the amount of $23,333.33 on May 3, 2012.  (*Id.*).  Grob followed this payment with $1,666.66 on June 5; $5,000 on July 9; $7,500 on August 2; $7,500 on September 1; $7,500 on October 1, 2012.  (*Id.*).  Grob resigned as CEO and Baldemar Rios replaced him on October 11, 2012.  (SOF 125).  In total, Grob received $72,500 in payments from Farmer and Chimera.

Because Chimera's operations were a sham and because his conduct enabled massive fraud on the investing public, the Court should order Grob to disgorge all of the money he obtained in connection with Chimera and Andrew Farmer.

### 3.    Prejudgment Interest

The Court should add prejudgment interest to Farmer's and Grob's disgorgement amounts to prevent them from benefitting from the use of ill-gotten gains interest-free.  *Blatt*, 583 F.2d at 1335; *see United Energy Partners*, 88 F. App'x at 747 (noting that it is within the court's discretion to award prejudgment interest); *SEC v. Gunn*, 2010 U.S. Dist. LEXIS 88164 (N.D. Tex. 2010).

Where, as here, a wrongdoer enjoyed access to funds over a prolonged period as a result of wrongdoing, ordering the wrongdoer to pay prejudgment interest is consistent with the equitable

purpose of the remedy of disgorgement. *See Hughes*, 917 F. Supp. at 1090. By violating the securities laws, Farmer and Grob enjoyed the benefit of funds obtained in connection with fraud on the public. Farmer further enjoyed the benefit of the proceeds of unregistered sales. For Farmer and Grob to enjoy the benefit of these funds during that time period offends basic principles of justice and equity.

The IRS underpayment of federal income tax rate, as set forth in 26 U.S.C. § 6621(a)(2), is appropriate for calculating prejudgment interest in enforcement actions. That rate "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1476 (2d Cir. N.Y. 1996).

Based on a principal disgorgement amount of $6,794,653.38 as to Farmer, application of the tax underpayment rate from November 21, 2012 results in a total prejudgment interest amount of $619,193.50.[5] *See* Farmer Prejudgment Interest Report, (Ex. B).

Based on a principal disgorgement amount of $72,500 as to Grob, application of the tax underpayment rate from October 1, 2012 results in a total prejudgment interest amount of $6,606.89[6] *See* Grob Prejudgment Interest Report, (Ex. C).

---

[5] The Commission is entitled to seek prejudgment interest from the date the conduct began. *See SEC v. Platforms Wireless Int'l Corp.,* 2010 U.S. App. LEXIS 15328 (9th Cir. 2010) (district court did not abuse its discretion by imposing prejudgment interest from the date securities were sold, as "defendants plainly had the use of their unlawful profits for the entire period."); *SEC v. Razmilovic*, 2011 U.S. Dist. LEXIS 113447 (E.D.N.Y. 2011) (because he "had the use of [the] unlawful profits for the entire period," Defendant liable for prejudgment interest on entire amount of ill-gotten gains for entire period from time of his unlawful gains to entry of judgment). For simplicity, November 21, 2012 is the latest transfer of cash proceeds into Chartered accounts and is later than any sale by Farmer or related entity into the public market. (SOF 93).

[6] October 1, 2012 is the date of Grob's final payment from Chimera.

C.    **THE COURT SHOULD ORDER FARMER, RIOS, AND GROB TO PAY A CIVIL PENALTY AND SHOULD SET THE AMOUNT OF THE PENALTY.[7]**

Farmer, Grob, and Rios violated the antifraud provisions of the federal securities laws. Additionally, Farmer conducted scores of unregistered sales of Chimera's securities in further violation of the securities laws.  As discussed above, Farmer, Grob, and Rios acted with *scienter* in connection with their wrongdoing.  In light of their conduct, each remaining Defendant should be ordered to pay a maximum third-tier civil penalty.

Sections 21(d) and 21A of the Exchange Act provide three tiers of penalties applicable to those who violate the Act and its rules.[8] The first tier of penalties applicable to individuals under the Exchange Act provides that sanctions shall not exceed the greater of $7,500 for each violation, or the amount of the person's gross pecuniary gain resulting from wrongdoing.[9]  15 U.S.C. § 77t(d).  No showing of intentional or knowing wrongdoing is required in order to impose first tier penalties.  The second tier of Exchange Act penalties for individuals authorizes sanctions not to exceed the greater of $75,000 for each violation, or the amount of each person's gross pecuniary gain resulting from their wrongdoing.  *Id.*  A second-tier penalty requires that the violation "involve fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  *Id.*  Finally, the Exchange Act provides for third tier penalties against individual wrongdoers in an amount not to exceed the greater of $150,000 for each violation, or the amount of the wrongdoer's gross pecuniary gain.  *Id.*  To trigger third tier penalties, a defendant's wrongdoing must involve the same sort of fraud or disregard required by the second

---

[7] Defendant Carolyn Austin has paid, as ordered, an $80,000 civil penalty as part of the Agreed Judgment against her.

[8] Section 20(d) of the Securities Act provides the same penalty structure for violations of that statute.

[9] All remaining Defendants' conduct occurred between March 3, 2009 and March 5, 2013.  Therefore, the relevant adjustment of civil monetary penalties is the adjustment issued in 2009.  17 C.F.R. § 201.1004.

tier and must have caused substantial losses – or at least the risk of substantial losses – to others.
*Id.*

### 1.  Each Remaining Defendant's Conduct Merits Imposition of a Civil Penalty.

Civil penalties are designed to punish the individual violator and deter future violations of the securities laws. *SEC v. Kenton Capital, Ltd.*, 69 F. Supp.2d 1, 17 (D.D.C.1998); *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996).  And while the statutory tier determines the range of maximum penalties allowed per violation, the actual amount of the penalty to be imposed is left to the Court's discretion.  *See SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005); *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 567 (S.D.N.Y. 2009).

The following factors are relevant in determining whether a civil penalty is appropriate and, if so, in what amount:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's *scienter*; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; (5) whether the defendant has admitted wrongdoing; and (6) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Razmilovic*, 2011 U.S. Dist. LEXIS 113447 (E.D.N.Y. 2011); *see also SEC v. Colonial Inv. Mgmt. LLC*, 659 F. Supp. 2d 467, 503 (S.D.N.Y. 2009).  Each of these factors, with the exception of the defendant's financial condition, has been discussed above.  As has been shown, each of the discussed factors weighs heavily in favor of assessing a maximum third-tier penalty. As to the final factor, there is no basis to forego, much less reduce, civil penalties against Farmer, Grob, and Rios based on their current or foreseeable financial condition.

Consequently, the Commission asks the Court to order each remaining Defendant to pay a third-tier civil penalty in an amount it deems appropriate.  If the Court believes it appropriate to

base the penalty on pecuniary gain, that amount has been discussed above.  In the event the Court believes it more appropriate to measure the civil penalty based on the defendants' violations, the Commission has set out below the potential range of such a penalty, including for the Court's convenience, the ranges applicable for Tier 1 and Tier Two penalties.

| Defendant | 3rd Tier Low Max | 3rd Tier High Max | 2nd Tier Low Max | 2nd Tier High Max | 1st Tier Low Max | 1st Tier High Max |
|---|---|---|---|---|---|---|
| Farmer[10] | $1.95M | $6,794,653 | $975,000 | $6,794,653 | $97,500 | $6,794,653 |
| Grob[11] | $1.2M | $1.2M | $600,000 | $600,000 | $60,000 | $72,500 |
| Rios[12] | $300,000 | $300,000 | $150,000 | $150,000 | $15,000 | $15,000 |

---

[10] These figures treat Farmer's orchestration of a complex and multifaceted fraud scheme as a total of 13 violations: one for each type of misrepresentation he made or participated in (Chimera's Forms S-1, 8-K, 10-K, and 10-Q, lies to Pennaluna, lies to FINRA, lies in press releases, and lies in advertisements) and one for each entity that sold Chimera stock into the public market in unregistered transactions (Oak Resources, TransAmerica, Chartered, Hillsmere, and Kylemore).  While this results in a significant penalty amount, the Commission notes that it is a relatively conservative methodology in Farmer's favor, given that there are literally scores of violative acts from which to choose (counting each press release, each sham investor, and each trade order in the public market, for example).  Courts have significant discretion in selecting the method used to determine a penalty.  It can be measured either by the amount of pecuniary gain to the defendant or by multiplying the statutory amount by the number of violations that the court finds were committed by the defendant. *See, e.g., SEC v. Cavanagh*, 2004 WL 1594818, at *31 (S.D.N.Y. July 16, 2004) (multiplying number of fraudulent sales or offers to sell by the number of statutes violated to compute maximum penalty amount); *see also SEC v. Coates*, 137 F. Supp. 2d 413, 424, 430 (S.D.N.Y. 2001) (holding misrepresentations of separate facts in communications with investors constituted distinct Exchange Act violations); *See also SEC v. Robinson*, 2002 WL 1552049, *12 (S.D.N.Y. 2002) (noting that each sale of common stock could be deemed a separate violation, despite ultimately accepting Commission's recommendation of lesser penalty); *SEC v. Milan Capital Group, Inc.*, 2001 WL 921169, at *3 (S.D.N.Y. Aug. 14, 2001) (holding defendants who sent false offering materials to 200 investors committed "at least 200 violations of the Exchange Act" for purposes of setting a penalty under Section 21(d)).

[11] These figures treat Grob's participation in a complex and multifaceted fraud scheme as a total of 8 violations: one for each type of misrepresentation he made or participated in (Chimera's Forms S-1, 8-K, 10-K, and 10-Q, lies to Pennaluna, lies to FINRA, lies in press releases, and lies in advertisements).  As with Farmer, this is a very conservative method of assigning a number of violations in a case where there are many more violative acts from which to choose.

[12] These figures treat Rios's signing of false Forms 8-K and authorizing false press releases as two distinct violations.  Because he appears to have made only $10,000 from his participation in the Chimera venture (see Ex. A – Chimera Bank Statements), even the first-tier penalty ($15,000) is greater than the amount of his gross proceeds.

### III.
### CONCLUSION

For all of these reasons, the Court should enter judgment against Defendants Farmer, Grob, and Rios consistent with the Court's findings: the Court should enter disgorgement with prejudgment interest against Farmer and Grob; civil penalties and permanent officer-and-director bars against all remaining defendants, and permanent injunctions and a penny stock bar against Farmer.

Dated: November 18, 2015       Respectfully submitted,

           *s/ Matthew J. Gulde*
           Matthew J. Gulde
           Attorney-in-Charge
           Illinois Bar No. 6272325
           S.D. Texas Bar No. 1821299
           Nikolay Vydashenko
           New York Bar No. 4628566
           United States Securities and
           Exchange Commission
           Burnett Plaza, Suite 1900
           801 Cherry Street, Unit 18
           Fort Worth, TX  76102
           Telephone:  (817) 978-1410 (mg)
           Facsimile:  (817) 978-4927
           guldem@sec.gov
           Attorneys for Plaintiff Securities and
           Exchange Commission

## CERTIFICATE OF CONFERENCE

I hereby certify that on November 17, 2015, I conferred with counsel for defendants regarding the content of this motion and they are opposed.  Counsel for Baldemar Rios requests a hearing on these issues.

*s/ Matthew J. Gulde*
Matthew J. Gulde


## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all counsel who have registered with the Court. Additionally, I have caused a true copy thereof to be delivered by the United States Postal Service, Certified Mail, Return Receipt Requested, or as indicated, and addressed to:

Chimera Energy Corp.
c/o Nevada Secretary of State
Meyers Annex Office, Attn: Alfie Frieser
202 N. Carson Street
Carson City, Nevada 89701
*Defendant*

J. Kevin Edmundson
Edmundson PLLC
21209 Highway 71 West, Suite 3
Spicewood, Texas 78669
via email: kevin@edmundsonpllc.com
*Attorney for Defendant Andrew I. Farmer*


*s/ Matthew J. Gulde*
Matthew J. Gulde