UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. |
| V. | § | 4:14-CV-2345 |
| | § | |
| ANDREW I. FARMER, et al., | § | |
| | § | |
| Defendants. | § | |

---

ORAL DEPOSITION OF

CHARLES EARL GROB, JR.

AUGUST 15, 2016

---

        ORAL DEPOSITION OF CHARLES EARL GROB, JR., produced

as a witness at the instance of the Defendant Andrew I.

Farmer, and duly sworn, was taken in the above-styled

and numbered cause on August 15, 2016, from 9:18 a.m.

to 10:19 a.m., before Julie Brown, CSR in and for the

State of Texas, reported by machine shorthand, at the

Sovany Law Firm, Two Greenway Plaza, Suite 600, Houston,

Texas, pursuant to the Federal Rules of Civil Procedure.

EXHIBIT D

```
 1                        I N D E X
                                                      PAGE
 2   Appearances.........................................   3

 3   Stipulations........................................   -

 4   CHARLES EARL GROB, JR.

 5        EXAMINATION BY MR. EDMUNDSON...................   4
          EXAMINATION BY MR. VYDASHENKO..................  30
 6
     Reporter's Certificate.............................  42
 7


 8


 9                      EXHIBITS

10   NO.         DESCRIPTION                            PAGE

11   Exhibit 1   Appendix Exhibit C....................... 4

12   Exhibit 2   E-mails disseminated and distributed
                 during the IPO stage of Chimera.......... 4
13
     Exhibit 3   August 8, 2016, letter from Nikolay
14               Vydashenko to J. Kevin Edmundson,
                 Herrick Sovany, and Richard D. Moreno;
15               and screenshot entitled "Document
                 Properties" ............................23
16


17


18


19


20


21


22


23


24


25
```

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:
           Mr. Nikolay Vydashenko
 4         U.S. SECURITIES AND EXCHANGE COMMISSION
           801 Cherry Street, Suite 1900
 5         Fort Worth, Texas 76102
           Phone:  (817) 978-6448    Fax:  (817) 978-2700
 6         E-mail address:  Vydashenkon@sec.gov

 7

 8    FOR THE DEFENDANT ANDREW I. FARMER:
           Mr. J. Kevin Edmundson
 9         EDMUNDSON PLLC
           21209 Highway 71 West, Suite 3
10         Spicewood, Texas 78669
           Phone:  (512) 720-0782
11         E-mail address:  Kevin@edmundsonpllc.com
                - and -
12         Mr. Jeffrey J. Ansley
           BELLNUNNALLY
13         3232 McKinney Avenue, Suite 1400
           Dallas, Texas 75204
14         Phone:  (214) 740-1408    Fax:  (214) 740-5708
           E-mail address:  Jeffa@bellnunnally.com
15

16
      FOR THE DEFENDANT CHARLES EARL GROB, JR.:
17         Mr. Herrick Sovany
           SOVANY LAW FIRM
18         Two Greenway Plaza, Suite 600
           Houston, Texas 77046
19         Phone:  (713) 300-5156    Fax:  (713) 229-8545
           E-mail address:  Herrick@sovanylaw.com
20

21

22

23

24

25
```

Charles Earl Grob, Jr.                                                    4

```
 1              (Exhibits 1 and 2 marked)

 2              THE REPORTER:  Any stipulations?

 3              MR. EDMUNDSON:  No.

 4              (Witness sworn)

 5                 CHARLES EARL GROB, JR.,

 6    having been first duly sworn, testified as follows:

 7                        EXAMINATION

 8    BY MR. EDMUNDSON:

 9       Q.  Good morning, Mr. Grob.  Would you state your

10    name for the record.

11       A.  Charles Earl Grob, Jr.

12       Q.  Okay.

13              MR. EDMUNDSON:  And why don't we enter our

14    appearances for the record.

15       Q.  (BY MR. EDMUNDSON)  As you know, my name is

16    Kevin Edmundson.

17       A.  Yes.

18       Q.  And with me is Jeff Ansley, and we are both

19    counsel for Andrew Farmer.

20       A.  Okay.

21              MR. VYDASHENKO:  Nicolay Vydashenko with

22    the Securities and Exchange Commission.

23       A.  I know Nick.  Okay.

24              MR. SOVANY:  Herrick Sovany representing

25    the deponent.
```

Charles Earl Grob, Jr.                                                                5

```
 1          Q.   (BY MR. EDMUNDSON)   And, Mr. Grob, do you have
 2     any questions before we get started today?
 3          A.   No.   No, sir.
 4          Q.   Okay.   I wanted to -- you recall that you gave
 5     testimony at a hearing back in May?
 6          A.   I did.
 7          Q.   Okay.   And since that hearing, the Court has
 8     authorized us to take your deposition.   Do you
 9     understand that?
10          A.   I understand that.
11          Q.   And I wanted to pick up on a few of the points
12     that were discussed at that hearing.   I wanted to ask
13     you some questions about the press releases that Chimera
14     issued in the 2012 time period.
15          A.   Okay.
16          Q.   All right?
17               And let me show you Exhibit No. 1.
18          A.   It's quite an exhibit.
19          Q.   Quite an exhibit.   And Exhibit No. 1, I'll
20     represent to you, is an exhibit that has already been
21     entered into the record in this case.
22          A.   Yes.
23          Q.   I understand it to be a collection of all of
24     the press releases that are at issue in the complaint.
25          A.   Yes.
```

Charles Earl Grob, Jr.                                                    6

```
1        Q.  Okay.  And I don't have specific questions

2   necessarily about any of the -- any of the press

3   releases and if I do, I'll -- we can refer to them; but

4   I think we can talk about them in general groups.

5        A.  Okay.

6        Q.  All right?

7             The first group I want to talk about are

8   the press releases that related to the NHE --

9        A.  Uh-huh.

10       Q.  -- licensing arrangement.

11       A.  Correct.

12       Q.  Okay.  Who did Chimera have a licensing

13   agreement with?

14             MR. SOVANY:  Objection.  I'm going to

15   instruct you not to answer based on your Fifth Amendment

16   right.

17       Q.  (BY MR. EDMUNDSON)  And are you refusing to

18   answer the question based upon your assertion of the

19   Fifth Amendment?

20       A.  On advice of my counsel.

21       Q.  Okay.  And is it your intention to assert your

22   Fifth Amendment with respect to the alleged false and

23   misleading press releases as it related to the NHE

24   Technology?

25       A.  It is.
```

Charles Earl Grob, Jr.                                                                 7

1          Q.  Did you personally participate in the

2    negotiation of the licensing agreement for NHE

3    Technology?

4                    MR. SOVANY:  I'm instructing you not to

5    answer based on your Fifth Amendment privilege.

6          A.  As my counsel mentioned --

7          Q.  (BY MR. EDMUNDSON)  Okay.

8          A.  -- I'm going to assert my Fifth Amendment.

9                    MR. EDMUNDSON:  Okay.  And what I -- what

10   I'll do for the -- for the benefit of the Court is just

11   go through a series of questions --

12         A.  And I can say --

13                   MR. EDMUNDSON:  -- and if -- if we're all

14   in agreement, if he just asserts Five, are we -- we'll

15   accept that if that's upon advice of counsel?

16                   MR. VYDASHENKO:  I agree that if -- I'm not

17   sure what you're asking.  I'm sorry.

18                   MR. EDMUNDSON:  Well, rather than going

19   through and making the same recitation, if he just

20   asserts Five to the question, that might streamline

21   things.  I'll assume you'll have -- you would want to

22   raise the argument that he's waived previously, and we

23   can deal with that.

24                   MR. VYDASHENKO:  I reserve -- I am going to

25   raise the argument or reserve the right to raise that

Charles Earl Grob, Jr.                                                        8

```
 1    argument; but, yes, for purposes of streamlining this --
 2                 THE WITNESS:  Right.
 3                 MR. VYDASHENKO:  -- I think that's -- I
 4    wanted to make sure that I understood what I was --
 5                 MR. EDMUNDSON:  Yeah.
 6                 MR. VYDASHENKO:  -- consenting to.  Yes, he
 7    can say in shorthand that he's asserting the Fifth
 8    Amendment privilege pursuant to counsel's advice.
 9         Q.   (BY MR. EDMUNDSON)  Was the licensing agreement
10    with China Inland?
11         A.   I assert my Fifth Amendment.
12         Q.   And to the best of your knowledge, was China
13    Inland an actual business entity with which Chimera
14    negotiated the licensing agreement?
15         A.   I assert my Fifth Amendment.
16         Q.   Okay.  And did Chimera pay money to acquire the
17    licensing agreement?
18         A.   I assert my Fifth Amendment.
19         Q.   And did you have a reasonable basis to believe
20    that there was, in fact, a licensing agreement with
21    China Inland?
22         A.   I assert my Fifth Amendment.
23         Q.   While you were at Chimera, did you have in your
24    possession technical documents evidencing -- evidencing
25    the NHE Technology?
```

Charles Earl Grob, Jr.                                                                    9

```
 1        A.   I assert my Fifth Amendment.

 2                  MR. VYDASHENKO:  Let me just --

 3        Q.   (BY MR. EDMUNDSON)  And --

 4                  MR. VYDASHENKO:  Can I just interrupt to --

 5                  MR. EDMUNDSON:  Uh-huh.

 6                  MR. VYDASHENKO:  -- insert an objection?

 7                  MR. EDMUNDSON:  Uh-huh.

 8                  MR. VYDASHENKO:  I'm going to object to the

 9   witness' assertion of the Fifth Amendment privilege.  We

10   believe he has waived the privilege with respect to

11   these matters because of the declaration which Mr. Grob

12   has submitted which covered these matters and also

13   because of his testimony in court during the hearing

14   which also covered these matters.  So we believe the

15   assertion to be inappropriate at this time.

16                  MR. EDMUNDSON:  And just if we could -- is

17   there -- has there been a change since the hearing that

18   has prompted your recommendation to your client to

19   assert the Fifth?

20                  MR. SOVANY:  Absolutely.  With regard to

21   the timing and specifically the SEC's position before

22   Judge Ellison was that they were not aware of or were

23   not going to confirm or deny a criminal investigation at

24   that time -- in fact, said it was a hypothetical

25   argument at that time.
```

1              We have come to learn that based on I

2    believe it's your letter on August 8th, 2016, sent to

3    myself, Kevin Edmundson, and Richard Moreno that

4    basically says, "On August 8th, 2016, the United States

5    Attorney's Office for the Southern District of Texas

6    produced to the Securities and Exchange Commission

7    certain documents relating to this matter.  We

8    understand the USAO obtained these documents from

9    GoDaddy.com," which was produced to us on August 8th.

10             There is a criminal investigation going on

11   based on the SEC's own admission right here;

12   furthermore, the metadata on the document that was

13   produced.  I have the author as JMartin1, which I have

14   since learned is with the U.S. Attorney's Office.  And

15   this document was created August 3rd, 2016, at

16   4:39:57 p.m.; and it was modified with the same

17   timestamp.  Based on that information and the SEC's

18   prior representation to the Court which essentially

19   permitted Mr. Grob to testify before Judge Ellison,

20   things have changed.

21             Furthermore, with regard to anything that

22   Mr. Grob would have to testify would potentially be

23   self-incriminating in light of the SEC's action against

24   him, having been concluded on May 13th, 2016, with Judge

25   Ellison's order and his subsequent document order,

1   Document 109, that was entered May 17th, 2016, where he

2   increased the disgorgement amount from 57,500 to 72,500.

3   It was signed on the 16th of May, 2016.

4                    Therefore, at this point in time, any

5   testimony that Mr. Grob could speak to would be

6   irrelevant to the SEC's action against Mr. Grob and only

7   relevant to the criminal proceedings, evidenced by

8   yourself.

9                    MR. VYDASHENKO:  I'll just respond to at

10  least two points.  First, with respect to the last one,

11  Mr. Grob was never here to testify with respect to his

12  own liability; and that -- we agree that that subject

13  has been closed.  The reason he's here is because

14  Mr. Edmundson on behalf of Mr. Farmer has made a motion

15  to vacate and pursuant -- and he's seeking Mr. Grob's

16  testimony in support of that motion on behalf of

17  Defendant Farmer.  So I don't think it's -- he's not

18  here to testify about his own liability as such in this

19  case.

20                    I don't think anything has -- well, I'm not

21  aware of any changes.  What you've told me -- I think

22  you were -- you were arguing strenuously in court that

23  there is a criminal investigation going on, that there

24  are charges looming; and I have the transcript.  I can

25  go back to look at the transcript; but I think you

```
 1   were -- you were very strenuously arguing that there

 2   were charges looming -- criminal charges looming over

 3   your client's head, on May 13th.  So from that

 4   standpoint, I don't see --

 5                    MR. SOVANY:  If I may respond to that.

 6                    On Page 7 of the transcript, Mr. Gulde, who

 7   I'm sure we can all, you know, understand is with the

 8   SEC, responded, "Your Honor, it's not the SEC's policy

 9   to comment on the existence of criminal investigations.

10   I will say to the extent that Mr. Sovany is relying on

11   the Mutuals.com case he handed to me, that is precedent

12   for staying a civil proceeding because of a criminal

13   proceeding.  However, the Government brought that

14   motion" --

15                    THE REPORTER:  Slow down just a bit,

16   please.

17                    MR. SOVANY:  Sorry.

18                    "The Government brought that motion to

19   stay.  That is not the situation here.  We have a

20   hypothetical.  There is no indictment.  I don't know if

21   Mr. Sovany received a target letter.  He hasn't told me

22   if he has."

23                    That to me represented that the SEC is not

24   representing that there is a criminal investigation,

25   which they may or may not have known; but right now we
```

Charles Earl Grob, Jr.                                                          13

```
 1    do know by way of your own letter that there is an
 2    investigation and you received documents, 4,100 pages of
 3    documents that were produced.  However, there are many,
 4    many more that were not produced.  We'll, furthermore,
 5    object to any use of those documents because we don't
 6    have the complete set that the SEC obtained or requested
 7    by way of asking the U.S. Attorney's Office or working
 8    in concert with the U.S. Attorney's Office in this
 9    matter.  Therefore, matters have significantly changed;
10    and any testimony that is elicited from Mr. Grob would
11    only be necessary to self-incriminate himself.
12              Mr. -- it's my understanding that
13    Mr. Edmundson noticed the deposition of Mr. Grob in
14    conjunction with the SEC premised on the SEC's request
15    for the deposition or testimony of Mr. Grob subsequent
16    to his declaration, which was only with regard to the
17    penalty phase not the liability phase at all; and that
18    was -- that -- the liability there is a Document No. 56
19    in the record, "Unopposed Motion to Enter Agreed Partial
20    Judgment Against Charles E. Grob."  Attached to it is
21    the consent of Defendant Charles E. Grob, Jr.; and the
22    agreed judgment as to Defendant Charles E. Grob was
23    signed and entered by Judge Ellison, Document 61, on
24    August 27th, 2015.  In that consent which the SEC
25    entered into, it does specifically say that Mr. Grob
```

1    does not admit or deny anything within the complaint.

2    He stands by his consent.  Yet, nonetheless, he

3    submitted a declaration with regard to the penalty phase

4    not with regard to the judgment already entered or the

5    complaint.  Yet, the SEC requested his deposition,

6    subpoenaed him to the hearing, and put him on the stand,

7    which essentially contradicts what the SEC agreed to on

8    this consent because the questions that were asked based

9    on the declaration were not toward the penalty phase but

10   went beyond the penalty phase.  And so right now any

11   questions with regard to anything that would contradict

12   or have Mr. Grob agree to or disagree to any alleged

13   allegation in the complaint would go against his

14   consent.  And therein lies another issue that we can

15   bring up before Judge Ellison.

16            But right now, because of the criminal

17   proceedings, I'm instructing him to take the Fifth.

18            MR. EDMUNDSON:  Just so --

19            MR. VYDASHENKO:  Can I just --

20            MR. EDMUNDSON:  Go ahead.

21            MR. VYDASHENKO:  If I could respond just to

22   a few points, not all of the points.

23            On the documents that were produced, as I

24   told counsel for Mr. Farmer off the record, it was our

25   intent not to use those documents in this deposition.

```
 1              Next, we understand that the question of
 2    Mr. Grob's liability has been settled.  Nevertheless, we
 3    are here on a, pending still, motion to vacate by
 4    Mr. Farmer.  So his -- his -- the purpose of his
 5    testimony is not -- is not related to Mr. Grob's
 6    liability.  It's related to, you know, whether to --
 7    whether Mr. Farmer's motion to vacate -- vacate the
 8    summary judgment should be granted or not.
 9              MR. ANSLEY:  Let's be clear.  It's not --
10              MR. SOVANY:  If I -- if I can -- will you
11    as a representative of the United States Government
12    stipulate that this deposition -- any testimony that
13    Mr. Grob submits in this proceeding right here, this
14    deposition, will not and cannot be used by the U.S.
15    Attorney's Office for any reason whatsoever?
16              MR. VYDASHENKO:  No.  I have no authority
17    to --
18              MR. SOVANY:  Then he stands on his Fifth
19    Amendment right.
20              MR. VYDASHENKO:  Let me finish.  I
21    understand what you're saying.
22              I have no ability to stipulate on behalf of
23    the entire U.S. Government much less the U.S. Attorney's
24    Office who acts independently of the SEC.
25              THE REPORTER:  I'm sorry.  I can't hear
```

```
 1   you.
 2             MR. VYDASHENKO:  Who acts -- on behalf of
 3   the U.S. Attorney's Office, I cannot stipulate.  They
 4   act independently.  I would not presume to stipulate
 5   anything on their behalf.
 6             With respect to the consent that Mr. Grob
 7   signed, I'll just respond that the entire wording of the
 8   consent makes clear that he should not -- he cannot --
 9   while he neither admits nor denies the charges, he
10   cannot make statements anytime that contradict the
11   allegations in the complaint.  He made those statements
12   in his complaint -- in his -- in the declaration that he
13   submitted, and -- and that is why we wanted to call him
14   to the stand and challenge those statements.  I
15   understand that it was in the penalty phase; but his
16   degree of scienter, the severity of his conduct, all of
17   that -- all of those issues are relevant in the
18   determination of the penalty.
19             MR. SOVANY:  Correct.
20             MR. VYDASHENKO:  So all the questioning
21   during the penalty phase was entirely appropriate.
22             MR. EDMUNDSON:  Just so I understand, are
23   you suggesting that at this point in time since the
24   hearing and in light of the letter -- and perhaps we
25   ought to add that letter to the -- to the --
```

```
1              THE WITNESS:  Yes.
2              MR. EDMUNDSON:  -- to the exhibit.  Why
3    don't we mark this as Exhibit No. 3.
4              MR. VYDASHENKO:  And I'm sorry.  I meant to
5    make -- can I just finish my one point?
6              MR. EDMUNDSON:  Sure.
7              MR. VYDASHENKO:  During the -- and this
8    is -- this is in the transcript of the May 13th hearing;
9    but during the hearing, Herrick, you said, "It is
10   our" -- on Page 6, "It is our understanding that there's
11   an ongoing criminal proceeding.  So to have Mr. Grob
12   take the stand in the civil proceeding with regard to
13   the damages and liability herein could potentially
14   incriminate him in the criminal proceeding for which
15   there has been no indictment.
16              "THE COURT:  Is that in the Southern
17   District of Texas or somewhere else?
18              "MR. SOVANY:  Motion to stay?
19              "THE COURT:  No.  The criminal
20   investigation.
21              "MR. SOVANY:  The criminal investigation,
22   it is my understanding, is here in the Southern District
23   of Texas.
24              "THE COURT:  By the U.S. attorney here?
25              "MR. SOVANY:  Yes."
```

Charles Earl Grob, Jr.                                                                18

```
 1              So you had -- you had that on -- the reason
 2    I read that is to make -- is to reiterate my prior
 3    point, which is your understanding of the potential for
 4    Mr. Grob's criminal liability has not changed between
 5    May 13th and today.
 6              MR. SOVANY:  It actually has because that
 7    was our understanding.  We had no confirmation one way
 8    or another whether there was a criminal investigation
 9    until you actually confirmed it, saying that you
10    received stuff from the U.S. Attorney's Office; and, I
11    mean, you at least led me to believe or Mr. Gulde led me
12    to believe by here we have a hypothetical with regard to
13    a criminal investigation.  There's no indictment, no
14    target letter; and so it leads at least me to believe
15    that the SEC was -- either is representing they did not
16    know of an investigation or --
17              MR. VYDASHENKO:  He was distinguishing --
18              MR. SOVANY:  But, nonetheless, it appears
19    that the SEC did know there was an ongoing investigation
20    because how else would they know to get documents,
21    selected documents, from the U.S. Attorney's Office?
22              And, in fact, how -- can you answer how --
23    how come the SEC did not get these documents themselves?
24              MR. VYDASHENKO:  I'm not going to get into
25    how we did or didn't get certain documents.
```

Charles Earl Grob, Jr.                                                                    19

```
 1                     THE WITNESS:  Can I ask you how you got
 2      that letter?
 3                     MR. SOVANY:  No.  No, you can't.  You
 4      just --
 5                     MR. ANSLEY:  Let me follow up and ask this:
 6      Tell us --
 7                     THE REPORTER:  I'm sorry.
 8                     MR. ANSLEY:  Yeah.
 9                     MR. EDMUNDSON:  He's a former prosecutor.
10      He doesn't speak loudly.
11                     MR. ANSLEY:  I think the Court is entitled
12      to know when the SEC received the documents that you
13      sent to us on August 8th.  Can you tell us when those
14      documents were received by the SEC staff?
15                     MR. VYDASHENKO:  What's -- I think we've
16      indicated that in our letter.
17                     MR. ANSLEY:  Which is when?  I'm not clear
18      when they were received.
19                     MR. VYDASHENKO:  By us?
20                     MR. ANSLEY:  Yes.
21                     MR. VYDASHENKO:  Sometime in -- I don't
22      remember.  I don't have the letter in front of me.  We
23      received the documents sometime in early August.  Right.
24      So there was a production on August 8th.
25                     MR. ANSLEY:  Okay.  And do you know, in
```

Charles Earl Grob, Jr.                                                                                                20

```
 1  turn, when the U.S. Attorney's Office or the FBI
 2  received these documents?
 3              MR. VYDASHENKO:  No, I do not know; and I'm
 4  not going to get into questions -- I'm not going to get
 5  into questions about when the U.S. Attorney's Office did
 6  or didn't do something because I'm not the U.S.
 7  Attorney's Office.  You should not direct questions to
 8  me about the U.S. Attorney's Office.
 9              MR. ANSLEY:  Do you know whether they went
10  out there and got these documents because the SEC staff
11  asked that they get them?
12              MR. VYDASHENKO:  The SEC staff at no point
13  asked the U.S. attorney to go out and get any documents.
14  With that, I'm going to not answer additional questions
15  because they're -- they're not going to the substance of
16  why we're here today, which is for Mr. Grob's testimony.
17  To the extent you have questions about the production,
18  we can -- we can handle those separately.
19              MR. ANSLEY:  Are there other documents
20  besides those that you gave to us pursuant to this
21  letter that you received regarding the GoDaddy search
22  warrant?
23              MR. VYDASHENKO:  We can handle the
24  questions -- these questions separately.
25              MR. ANSLEY:  So you won't answer that?
```

```
1              MR. VYDASHENKO:   What is the question?

2              MR. ANSLEY:   Whether there are other

3    documents that the staff received from the Department of

4    Justice relating to the search --

5              MR. VYDASHENKO:   As I told you multiple

6    times, we handed to you all the documents that we

7    received from the U.S. Attorney's Office with respect

8    to -- as -- as I stated in that letter.

9              MR. EDMUNDSON:   The documents that were

10   produced in this case were Bates numbered, but they're

11   not sequential.   Is there -- there are gaps in the Bates

12   numbering.   Do you know whether or not the U.S.

13   Attorney's Office withheld other documents that they

14   obtained from GoDaddy when they turned them over to the

15   SEC?

16             MR. VYDASHENKO:   That's a question for the

17   U.S. Attorney's Office.

18             MR. EDMUNDSON:   Okay.   And just so I

19   understand, your position is that since liability in

20   this case is established and apparently is not contested

21   by the parties and there has been some sort of an order

22   by the Court, that Mr. -- Mr. Grob's obligations at

23   least in the civil case are functionally over and that

24   because of the letter by the -- by the U.S. Attorney's

25   Office, it would appear to you that the investigations
```

```
 1    are not parallel any longer but they have, in fact,

 2    merged and you have a right to assert the Fifth in

 3    connection with the potential use of this testimony in

 4    connection with the criminal investigation?

 5                    MR. SOVANY:  Yes.

 6                    MR. EDMUNDSON:  Okay.  All right.

 7                    MR. VYDASHENKO:  I'll just add there's no

 8    basis -- factual basis for that conclusion.

 9                    MR. EDMUNDSON:  Other than the letter --

10                    THE WITNESS:  Other than the letter.

11                    MR. EDMUNDSON:  -- and the metadata and the

12    fact that you can't answer the question of what else is

13    out there?  And we're going to have some other dialogue,

14    I think, that there are other additional questions to

15    ask.

16         Q.  (BY MR. EDMUNDSON)  So I think to be

17    complete -- and I'll be as brief as possible.  If I --

18    I'll just go through it at a high level, as the

19    commission did earlier in your deposition, just to cover

20    the waterfront.  I think I can do it quickly.  Okay?

21         A.  Okay.

22                    MR. VYDASHENKO:  I'm sorry to continue

23    interrupting.  Could we take a short break right now, or

24    do you want to --

25                    MR. EDMUNDSON:  Sure.
```

Charles Earl Grob, Jr.                                                              23

```
 1              MR. VYDASHENKO:  I want to --

 2              MR. EDMUNDSON:  Sure.  No, no, no.

 3              MR. VYDASHENKO:  -- make sure I can think

 4    this through so we don't --

 5              MR. EDMUNDSON:  For my friends at the SEC,

 6    of course.

 7              MR. VYDASHENKO:  I appreciate that.

 8              MR. EDMUNDSON:  Why don't we take a break.

 9              (Break taken from 9:41 a.m. to 9:49 a.m.)

10              (Exhibit 3 marked)

11              MR. EDMUNDSON:  We're back on the record.

12              And just a couple of pieces of

13    housekeeping.  I wanted to enter Exhibit No. 3 into the

14    record.  It -- Nikolay, it's your letter.  I mean, I can

15    show it to Mr. Grob.

16         Q.  (BY MR. EDMUNDSON)  Is that a letter that you

17    and your counsel received last week?

18         A.  I -- the first time I saw it was this morning.

19         Q.  Okay.

20              MR. EDMUNDSON:  Well, Nikolay, you don't

21    object to putting this into the record for this

22    deposition, since we've referred to it?

23              MR. VYDASHENKO:  No.

24              MR. EDMUNDSON:  Okay.  And attached to it,

25    what we believe to be the metadata for the document that
```

Charles Earl Grob, Jr.                                                    24

```
 1    was produced.  And it just --
 2                    MR. VYDASHENKO:  I have not -- I have not
 3    seen that.
 4                    MR. EDMUNDSON:  -- speaks for itself.
 5                    MR. VYDASHENKO:  Can I take a look at that?
 6                    MR. EDMUNDSON:  Yeah.
 7         Q.  (BY MR. EDMUNDSON)  Now, Mr. Grob, just a
 8    couple of more questions --
 9         A.  Uh-huh.
10         Q.  -- on NHE.  Did you have a reasonable basis in
11    fact to issue the press releases with regard to NHE
12    Technology and the licensing agreement with China Inland
13    while you were president of Chimera?
14         A.  I assert the Fifth Amendment.
15         Q.  Did you ever speak with Mr. Farmer about the
16    issuance of press releases regarding NHE Technology?
17         A.  I assert the Fifth Amendment.
18         Q.  Was Mr. Farmer involved in any way with respect
19    to the distribution or dissemination of press releases
20    regarding NHE Technology?
21         A.  I assert the Fifth Amendment.
22         Q.  And how often did you talk to Mr. Farmer, let's
23    say, during the period July 27, 2012, and October 11,
24    2012?  Did you speak with him with some frequency during
25    that period?
```

Charles Earl Grob, Jr.                                                    25

1           A.   I assert the Fifth Amendment.

2           Q.   Okay.   The production that the SEC made last

3    week of the documents that it obtained from the U.S.

4    Attorney's Office, did you have an opportunity to review

5    those documents?

6           A.   I assert the Fifth Amendment.

7           Q.   And to your knowledge is that a complete

8    production of all of your e-mails while you were with

9    Chimera?

10          A.   I assert the Fifth Amendment.

11          Q.   I want to ask you a few questions about the

12   PEMEX relationship.   Did Chimera, in fact, enter a

13   memorandum of understanding with PEMEX --

14          A.   I -- I assert the Fifth Amendment.

15               I'm sorry I cut you off.

16          Q.   And, in fact, did you take a couple of trips to

17   Mexico to meet with representatives of PEMEX?

18          A.   I assert the Fifth Amendment.

19          Q.   Okay.   And Mr. Farmer didn't attend those

20   meetings in Mexico; isn't that right?

21          A.   I assert the Fifth Amendment.

22          Q.   And did you have a reasonable basis in fact to

23   believe that you had a business relationship with PEMEX?

24          A.   I assert the Fifth Amendment.

25          Q.   And do you believe that the NHE Technology is

Charles Earl Grob, Jr.                                                          26

```
1    fictitious?

2         A.  I assert the Fifth Amendment.

3         Q.  You mentioned a brown bag of cash at your

4    testimony at the hearing.  Do you know for a fact that

5    the cash that was allegedly in the brown bag came from

6    Andrew Farmer?

7         A.  I assert the Fifth Amendment.

8         Q.  Did anybody represent to you that the cash came

9    from Andrew Farmer?

10        A.  I assert the Fifth Amendment.

11        Q.  Did you -- did Andrew Farmer admit to you that

12   he was the source of that cash?

13        A.  I assert the Fifth Amendment.

14        Q.  And what was the purpose -- the ostensible

15   purpose of your receipt of the brown bag of cash?

16        A.  I assert the Fifth Amendment.

17        Q.  And do you have a recollection of how much cash

18   was in the brown bag at that time?

19        A.  I assert the Fifth Amendment.

20        Q.  I want to show you what has been previously

21   marked as Exhibit No. 2.

22        A.  Uh-huh.

23             MR. VYDASHENKO:  You've marked it in this

24   deposition, right?

25             MR. EDMUNDSON:  Uh-huh.
```

1      A.   Okay.

2      Q.   (BY MR. EDMUNDSON)  All right.  And I'll

3  represent to you this is a series of e-mails that we

4  attached to our motion to vacate and these are e-mails

5  that we -- that were disseminated and distributed during

6  the IPO stage of Chimera.

7      A.   Uh-huh.

8      Q.   All right?

9           Now, you stated in your declaration that --

10  that you believe that you were not aware that there were

11  many times that there were communications between

12  individuals that did not include you.

13           And if you review the exhibits at

14  attachment -- at Exhibit No. 2, does it appear to you

15  that you were, in fact, included on e-mail

16  communications during the IPO phase that kept you

17  apprised of the activities that Mr. Loev was engaged in?

18      A.   I assert the Fifth Amendment.

19      Q.   Okay.  And, more specifically, isn't it true

20  that there is an e-mail that -- that Mr. Farmer sent to

21  you dated September 28th, 2011, that kept you apprised

22  that he had, in fact, sent a draft registration

23  statement to Mr. Loev?

24      A.   I assert the Fifth Amendment.

25      Q.   Okay.  And on -- with respect to the

1   October 18, 2011, e-mail in which the SEC has taken the

2   position that you were not copied on, isn't it true that

3   Farmer later sent you a copy of the edgarized version of

4   the registration statement the very same day,

5   October 18, 2011?

6        A.   I assert the Fifth Amendment.

7        Q.   And on November 17, 2011, the commission takes

8   the position that Loev had -- Farmer had sent Loev a

9   draft letter responding to comments the SEC had with

10   respect to the registration statement but that you were

11   not copied on; but based upon Exhibit No. 2, isn't it

12   true that Loev sent to Farmer and you his suggested

13   revisions and comments to the response letter on

14   November 21st, 2011?

15       A.   I assert the Fifth Amendment.

16       Q.   And, again, with respect to an e-mail that is

17   dated December 12, 2012, isn't it true based upon your

18   review of Exhibit 2 that you, in fact, were -- did

19   receive communications from either Farmer and Loev

20   regarding follow-up communications with the SEC

21   regarding Chimera's request for effectiveness?

22       A.   I assert the Fifth Amendment.

23       Q.   Okay.  Now that you have those e-mails in front

24   of you, does that change your belief as reflected in

25   your declaration at Paragraphs 10 and 11 that maybe you

Charles Earl Grob, Jr.                                                                29

```
 1    were not included in certain e-mail communications

 2    between Farmer and Loev with respect to the IPO

 3    transaction?

 4         A.  I assert the Fifth Amendment.

 5         Q.  Okay.  On January 13, 2012, there was a letter

 6    that we looked at at the hearing, that you had

 7    apparently signed, to Pennaluna.  Do you recall when you

 8    sent that letter to Pennaluna?

 9         A.  I assert the Fifth Amendment.

10         Q.  And did you have communications with Pennaluna

11    regarding Chimera's request for Pennaluna to make a

12    market in its stock separate and apart from Andrew

13    Farmer?

14         A.  I assert the Fifth Amendment.

15         Q.  And isn't it a fact that Andrew Farmer was

16    well-known to Pennaluna in his relationship with Chimera

17    before it began to make a market --

18         A.  I assert --

19         Q.  -- in Chimera stock?

20         A.  I assert the Fifth Amendment.

21         Q.  Did you and Mr. Farmer ever engage in an

22    express scheme to engage in securities fraud?

23         A.  I assert the Fifth Amendment.

24         Q.  And did you conspire with Mr. Farmer in any way

25    to commit a violation of the federal securities laws?
```

Charles Earl Grob, Jr.                                                          30

```
1        A.   I assert the Fifth Amendment.

2        Q.   Okay.  And did -- with respect to the press

3   releases that you issued on behalf of the company as

4   well as the public reports that were filed with the

5   commission, is it your testimony that you had a good

6   faith basis to believe the accuracy of the statements in

7   those documents?

8        A.   I assert the Fifth Amendment.

9        Q.   Do you believe that you ever issued a false and

10  misleading public statement as it relates to Chimera?

11       A.   I assert the Fifth Amendment.

12            MR. EDMUNDSON:  Let's go off the record for

13  two minutes.

14            (Discussion off the record)

15            MR. EDMUNDSON:  Back on the record.

16            Pass.

17                        EXAMINATION

18  BY MR. VYDASHENKO:

19       Q.   Mr. Grob, isn't it true that Mr. Farmer

20  introduced you to Mr. Massey?

21       A.   I assert the Fifth Amendment.

22       Q.   And you understood Mr. Farmer and Mr. Massey to

23  be working together; is that true?

24       A.   I assert the Fifth Amendment.

25       Q.   You were introduced to Mr. Brotherton through
```

Charles Earl Grob, Jr.                                                                      31

```
 1    either Mr. Farmer or Mr. Massey; is that right?

 2         A.   I assert the Fifth Amendment.

 3         Q.   You understood that Mr. Farmer and

 4    Mr. Brotherton are working together; is that true?

 5         A.   I assert the Fifth Amendment.

 6         Q.   You understood that Mr. Brotherton, Mr. Massey,

 7    and Mr. Farmer all were working together with respect to

 8    Chimera Energy Corp; is that right?

 9         A.   I assert the Fifth Amendment.

10         Q.   How -- how was it decided -- or who decided

11    that you would buy -- let me ask it this way:  To

12    initially capitalize Chimera, there was a 10,000-dollar

13    purchase of 10 million shares of stock; is that right?

14         A.   I assert the Fifth Amendment.

15         Q.   Who made the decision to price the stock -- the

16    10 million shares for $10,000?

17         A.   I assert the Fifth Amendment.

18         Q.   Did you ever solicit any loans from Kylemoore

19    or any other parties?

20         A.   I assert the Fifth Amendment.

21         Q.   Isn't it true that Mr. Farmer offered you a

22    Kylemoore loan?

23         A.   I assert the Fifth Amendment.

24         Q.   And Mr. Farmer -- isn't it true that Mr. Farmer

25    determined the amount that Kylemoore would loan, the
```

Charles Earl Grob, Jr.                                                          32

```
 1    term of that loan, and the interest rate of that loan?

 2         A.   I assert the Fifth Amendment.

 3         Q.   And that you did not have a -- that in the --

 4    strike that.

 5                   And that you did not negotiate any of those

 6    terms with respect to the Kylemoore loan?

 7         A.   I assert the Fifth Amendment.

 8         Q.   Did you have access to Chimera's -- to modify

 9    Chimera's website?

10         A.   I assert the Fifth Amendment.

11         Q.   Were there any other persons who had access to

12    modify Chimera's website?

13         A.   I assert the Fifth Amendment.

14         Q.   And when I say "modify," what I mean is to

15    place content or take content off the Chimera website.

16    With that understanding of that term, does your answer

17    change?

18         A.   No.  My answer -- my answer is I assert the

19    Fifth Amendment.

20         Q.   With respect to Chimera's S-1 registration

21    statement, is it true that you did not determine the

22    amount of money that Chimera would seek to raise in the

23    offering?

24         A.   I assert -- I assert the Fifth Amendment.

25         Q.   Is it true that you did not determine the
```

number of securities that the S-1 would register?

A. I assert the Fifth Amendment.

Q. Is it true that you did not determine the price of the securities that would be offered in the S-1?

A. I assert the Fifth Amendment.

Q. Who made those determinations that I just mentioned with respect to the S-1?

A. I assert the Fifth Amendment.

Q. Is it true that it was not your idea to go out and solicit investments for Chimera's IPO?

A. I assert the Fifth Amendment.

Q. Is it true that you have never met, communicated with, or solicited multiple people who invested in Chimera's IPO?

A. I assert the Fifth Amendment.

Q. Was it Mr. Farmer's idea to list Chimera's stock on the OT -- over-the-counter marketplace?

A. I assert the Fifth Amendment.

Q. Is it true that Mr. Farmer took the lead in getting Chimera's Form 211 application completed, approved by Pennaluna, and then approved by FINRA?

A. I assert the Fifth Amendment.

Q. Is it true that Mr. Farmer was the one who took the lead in responding to inquiries from Pennaluna and from FINRA relating to the 211 application?

DepoTexas, Inc.

Charles Earl Grob, Jr.                                                          34

```
 1          A.   I assert the Fifth Amendment.

 2          Q.   Whose idea was it to do a stock split of

 3   Chimera stock?

 4          A.   I assert the Fifth Amendment.

 5          Q.   Who told you where to wire money that Chimera

 6   paid for the purported NHE licensing agreement?

 7          A.   I assert the Fifth Amendment.

 8          Q.   And you never met or corresponded with anyone

 9   from China Inland; is that true?

10          A.   I assert the Fifth Amendment.

11                    (Mr. Edmundson and Mr. Ansley leave

12                     proceedings)

13          Q.   (BY MR. VYDASHENKO)   Whose idea was it for

14   Chimera to start issuing press releases?

15          A.   I assert the Fifth Amendment.

16          Q.   Isn't it true that that was not your idea?

17          A.   I assert the Fifth Amendment.

18          Q.   Whose idea was it for Chimera to start using a

19   service to distribute the press releases that were

20   issued?

21          A.   I assert the Fifth Amendment.

22          Q.   Is it true that it was not your idea?

23          A.   I assert the Fifth Amendment.

24                    (Mr. Ansley returns to proceedings)

25          Q.   (BY MR. VYDASHENKO)   Did you need Mr. Farmer's
```

Charles Earl Grob, Jr.                                                      35

```
 1    approval to settle the Air Liquide lawsuit?

 2         A.   I assert the Fifth Amendment.

 3                   (Mr. Edmundson returns to proceedings)

 4         Q.   (BY MR. VYDASHENKO)   Is it true that an entity

 5    called Fairwinds Consulting paid you $50,000 in August,

 6    2012?

 7         A.   I assert the Fifth Amendment.

 8         Q.   What was the purpose of that payment?

 9         A.   I assert the Fifth Amendment.

10         Q.   Is it true that you had a consulting agreement

11    that was entered into sometime in September or October

12    of 2012 with Fairwinds?

13         A.   I assert --

14                   MR. EDMUNDSON:   I'm going to object to the

15    question.   Is that in the complaint?

16                   MR. VYDASHENKO:   I don't know.

17                   MR. EDMUNDSON:   I don't believe it is.   Is

18    it relevant to this proceeding?

19                   MR. VYDASHENKO:   I believe it's relevant,

20    yes.

21                   MR. EDMUNDSON:   And how so?

22                   MR. VYDASHENKO:   Fairwinds Consulting is --

23    this is all in the documents that we had produced long

24    ago, but Fairwinds Consulting is an entity that is

25    controlled by Mr. Massey.
```

Charles Earl Grob, Jr.                                                          36

```
 1                    MR. EDMUNDSON:   Is Mr. Massey in the
 2   complaint?
 3                    MR. VYDASHENKO:   Yes.
 4                    MR. EDMUNDSON:   Is he a defendant?
 5                    MR. VYDASHENKO:   No.
 6                    MR. EDMUNDSON:   Is he named in the
 7   complaint?
 8                    MR. VYDASHENKO:   He's been identified
 9   either in the complaint or in the summary judgment
10   papers, where his role has been articulated.
11        Q.   (BY MR. VYDASHENKO)   You had a consulting
12   agreement with Fairwinds?
13        A.   I assert the Fifth Amendment.
14        Q.   What was the work that you were doing, if
15   anything, pursuant to that consulting agreement?
16        A.   I assert the Fifth Amendment.
17        Q.   When FINRA began its investigation of Chimera
18   of which you would have learned sometime in October,
19   2012, who directed Chimera's response to that
20   investigation?
21        A.   I assert the Fifth Amendment.
22        Q.   Did Mr. Farmer ever tell you how to respond to
23   the FINRA investigation?
24        A.   I assert the Fifth Amendment.
25        Q.   Did Mr. Farmer draft the response to the
```

```
 1    FINRA -- to questions sent by FINRA as part of that

 2    investigation?

 3         A.   I assert the Fifth Amendment.

 4         Q.   Did Mr. Farmer ever tell you how to respond to

 5    the SEC's investigation?

 6         A.   I assert the Fifth Amendment.

 7         Q.   Did Mr. Farmer ever advise you whether to

 8    testify or not in the SEC's investigation?

 9         A.   I assert the Fifth Amendment.

10         Q.   Did Mr. Farmer advise you on which counsel to

11    select in the SEC investigation?

12         A.   I assert the Fifth Amendment.

13         Q.   Did Mr. Farmer advise you on whether to produce

14    documents or not in the SEC investigation?

15         A.   I assert the Fifth Amendment.

16         Q.   Did Mr. Farmer advise you on which documents to

17    produce in the SEC investigation?

18         A.   I assert the Fifth Amendment.

19         Q.   Now, you had an e-mail address on the Chimera

20    Energy server; is that -- you had a Chimera Energy

21    e-mail address; is that right?

22         A.   I assert the Fifth Amendment.

23         Q.   How did you access that e-mail?

24         A.   I assert the Fifth Amendment.

25         Q.   Did -- did your ability to access your Chimera
```

```
 1    Energy e-mails change after you resigned as CEO?

 2         A.  I assert the Fifth Amendment.

 3         Q.  Did you give anyone the access information,

 4    meaning a login or password or other information

 5    necessary to exit -- excuse me -- to access your Chimera

 6    Energy e-mail address?

 7         A.  I assert the Fifth Amendment.

 8         Q.  E-mail account.

 9              Did you have access to your Chimera Energy

10    e-mail account after the SEC began its investigation?

11         A.  I assert the Fifth Amendment.

12         Q.  Did anyone else have access to your Chimera

13    Energy e-mail account after the SEC began its

14    investigation?

15         A.  I assert my Fifth Amendment.

16         Q.  Who other than your counsel did you speak to in

17    preparation for your testimony today?

18         A.  I assert my Fifth Amendment.

19         Q.  Did you provide funds to the IPO investors that

20    you solicited to purchase investment -- to purchase

21    Chimera shares in the IPO?

22         A.  I assert the Fifth Amendment.

23         Q.  And were the funds that you provided to these

24    investors -- did those funds come from the envelope of

25    cash that you had testified you received from
```

1    Mr. Farmer?

2              MR. EDMUNDSON:  Objection.  I'm not sure

3    that's what his testimony was.  It -- I don't have it in

4    front of me.  I'm not sure that's exactly what his

5    testimony was.

6         A.  I assert the Fifth Amendment.

7         Q.  (BY MR. VYDASHENKO)  Did the funds you used to

8    assist IPO investors in purchasing their shares in the

9    IPO come from an envelope of cash that you had

10   understood came from Mr. Farmer?

11        A.  I assert my Fifth Amendment.

12             MR. VYDASHENKO:  Let's -- can we go off the

13   record briefly so I can review and make sure I don't

14   have anything further?

15             (Break taken from 10:15 a.m. to 10:16 a.m.)

16        Q.  (BY MR. VYDASHENKO)  You were paid by

17   Mr. Farmer a salary of $2500 per month initially; is

18   that right?

19        A.  I assert the Fifth Amendment.

20        Q.  Is it true that Mr. Farmer set that amount as

21   your salary?

22        A.  I assert the Fifth Amendment.

23        Q.  Is it true that the salary was connected to

24   your work for Chimera?

25        A.  I assert the Fifth Amendment.

Charles Earl Grob, Jr.                                                    40

1     Q.  Is it your intent to assert the Fifth Amendment

2     with respect to all questions regarding Mr. Farmer's

3     involvement in Chimera's initial public offering?

4     A.  It is.

5     Q.  And is it your intent to assert the Fifth

6     Amendment with respect to Mr. Farmer's involvement in

7     the aspect of that public offering that involved

8     soliciting investors?

9     A.  It is.

10    Q.  Is it your intent to assert the Fifth Amendment

11    with respect to all questions regarding Mr. Farmer's

12    involvement in Chimera's application for a Form 211?

13    A.  I assert the Fifth Amendment.

14    Q.  Are you -- are you able to -- are you able to

15    categorically -- are you able to tell me that you intend

16    to categorically assert it with respect to that entire

17    topic?

18    A.  Yes.

19        MR. ANSLEY:  What topic?

20    Q.  (BY MR. VYDASHENKO)  The entire topic of

21    Mr. Farmer's involvement in Chimera's 211 application?

22    A.  Yes.

23        MR. VYDASHENKO:  I pass the witness.

24        MR. EDMUNDSON:  Mr. Grob, I appreciate your

25    time today and, you know, the decisions that you have to

```
 1    make.

 2                    THE WITNESS:  Likewise.

 3                    MR. EDMUNDSON:  And we may -- we may have

 4    to address this issue with the Court, but we will be in

 5    contact with your counsel.  Thank you very much.

 6                    THE WITNESS:  Thank you.

 7                    THE REPORTER:  Any other stipulations?

 8                    MR. SOVANY:  No.

 9                    We'll reserve.

10                    (Deposition concluded at 10:19 a.m.)

11

12

13      .

14

15

16

17

18

19

20

21        .

22

23

24

25
```

```
 1                  UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3      SECURITIES AND EXCHANGE       §
        COMMISSION,                   §
 4                                    §
            Plaintiff,                §
 5                                    § CIVIL ACTION NO.
        V.                            § 4:14-CV-2345
 6                                    §
        ANDREW I. FARMER, et al.,     §
 7                                    §
            Defendants.               §
 8

 9                     REPORTER'S CERTIFICATION

10              DEPOSITION OF CHARLES EARL GROB, JR.

11                       AUGUST 15, 2016

12

13          I, Julie Brown, Certified Shorthand Reporter in and

14      for the State of Texas, hereby certify to the following:

15          That the witness, CHARLES EARL GROB, JR., was duly

16      sworn by the officer and that the transcript of the oral

17      deposition is a true record of the testimony given by

18      the witness;

19          I further certify that pursuant to FRCP Rule

20      30(f)(1) that the signature of the deponent:

21          ____ was requested by the deponent or a party before

22      the completion of the deposition and returned within 30

23      days from date of receipt of the transcript.  If

24      returned, the attached Changes and Signature Page

25      contains any changes and the reasons therefor;
```

Charles Earl Grob, Jr.                                                                 43

```
 1        _X_ was not requested by the deponent or a party

 2   before the completion of the deposition.

 3        I further certify that I am neither attorney nor

 4   counsel for, related to, nor employed by any of the

 5   parties to the action in which this testimony was taken.

 6        Further, I am not a relative or employee of any

 7   attorney of record in this cause, nor do I have a

 8   financial interest in the action.

 9        Subscribed and sworn to on this the 16th day of

10   August, 2016.

11

12

13

14

15        _____
          Julie Brown, RPR, CSR
16        Texas CSR 6291
          Expiration Date:  12/31/2016
17        DepoTexas - Firm Registration No. 95
          13101 N.W. Freeway, Suite 210
18        Houston, Texas 77040
          (281) 469-5580
19

20

21

22

23

24

25
```