1             **UNITED STATES DISTRICT COURT**
            **SOUTHERN DISTRICT OF TEXAS**
2                **HOUSTON DIVISION**

3

   SECURITIES AND EXCHANGE      *   4:14-CV-02345
4    COMMISSION                *
                             *
5    VS.                     *   2:59 P.M.
                             *
6    ANDREW I. FARMER, ET AL     *   APRIL 12, 2017

7                **HEARING ON MOTIONS**
        **BEFORE THE HONORABLE KEITH P. ELLISON**
8              **VOLUME 1 OF 1 VOLUME**

9   **APPEARANCES:**

10   **FOR THE PLAINTIFF:**
   Mr. Matthew J. Gulde
11   US Securities & Exchange Commission
   801 Cherry Street, Unit 18
12   Dallas, Texas 76102
   817-978-1410
13

   **FOR THE DEFENDANT, ANDREW I. FARMER:**
14   Mr. J. Kevin Edmundson
   Attorney at Law
15   21209 Highway 71 West, Suite 3
   Spicewood, Texas 78669
16   512-720-0782
      and
17   Mr. Jeffrey J. Ansley (via telephone)
   Bell Nunnally & Martin, LLP
18   3232 McKinney Avenue, Suite 1400
   Dallas, Texas 75204
19   214-740-1408

20   **ALSO IN ATTENDANCE:**
   Mr. Andrew I. Farmer
21

   Court Reporter:
22   Laura Wells, RPR, RMR, CRR
   515 Rusk, Suite 8004
23   Houston, Texas 77002

24   Proceedings recorded by mechanical stenography.
   Transcript produced by computer-assisted transcription.
25

1                      **PROCEEDINGS**

2              THE COURT:  Good afternoon and welcome.  We are

3    here in Securities and Exchange Commission v. Farmer.  We

4    will take appearances of counsel, beginning with the

03:02:07   5    commission.

6              MR. GULDE:  Good afternoon, Your Honor.  Matt

7    Gulde for the SEC.

8              THE COURT:  Mr. Gulde.

9              MR. EDMUNDSON:  Good afternoon, Your Honor.

03:02:14  10    Kevin Edmundson for Mr. Farmer.  And also on the phone

11    we've not Jeff Ansley, who is cocounsel.

12              MR. ANSLEY:  Your Honor, this is Jeff Ansley for

13    Andrew Farmer.

14              THE COURT:  Thank you.  I'm going to ask the

03:02:25  15    lawyers in the courtroom to speak at this microphone

16    upfront because it's the only one that carries to those

17    that are participating by phone.

18         Okay.  I'm, of course, very familiar with this case;

19    and I have read all the writings that have been submitted,

03:02:41  20    the renewed motion to vacate order on summary judgment or

21    alternatively to stay the proceedings.  It is defendant's

22    motion.  Please don't repeat what is in the writings; but

23    if you have new argument, this is the time for it.

24              MR. EDMUNDSON:  Okay.

03:02:58  25              THE COURT:  Again, please speak from the rostrum.

*Laura Wells, CRR, RDR*

1      MR. EDMUNDSON:  Thank you, Your Honor.  As you

2  know, this is -- this motion to vacate was filed, I think,

3  last June; and it has gone through a few twists and turns.

4  We have had status conferences.

03:03:16   5      THE COURT:  Yes.

6      MR. EDMUNDSON:  The original motion was focused

7  on the new witness Charles Grob.

8      What I thought I would do today is focus on the second

9  new witness that we allege or that we contend has provided

03:03:33  10  material information that we didn't have.

11      THE COURT:  Mr. Massey, yeah.

12      MR. EDMUNDSON:  Mr. Massey.

13      THE COURT:  For the court reporter, M-a-s-s-e-y.

14      MR. EDMUNDSON:  Your Honor, for convenience I

03:03:44  15  thought I would direct the Court to our reply brief, which

16  is Document Number 127.

17      THE COURT:  I do have that, yeah.

18      MR. EDMUNDSON:  And that document, I believe,

19  really encapsulates the heart of the issue as it relates

03:03:55  20  to Mr. Massey.  The situation simply is Mr. Massey is a

21  material witness.  He is a codefendant with Mr. Farmer in

22  the criminal case.

23      During the pendency of the summary judgment process he

24  apparently reached out to the SEC and to the FBI and

03:04:13  25  provided statements.  Prior to that, he had been asserting

1    his Fifth Amendment privilege.

2        While the summary judgment motions were pending, he

3    provided statements, which are attached at Exhibit

4    Number 1 to the reply brief at Document Number 127.

03:04:32   5        We believe that, like Mr. Grob, these statements

6    create materially -- material disputed facts in this case

7    and should be considered by the Court and would prompt the

8    Court to vacate the order because facts are in dispute;

9    and as a matter of law, summary judgment is not

03:04:53   10   appropriate.

11       THE COURT:  Didn't -- wasn't the nub of

12   Mr. Massey's story one that was designed to incriminate

13   Mr. Farmer, who purportedly owed Mr. Massey's father a

14   large sum of money, without also implicating Massey?  I

03:05:10   15   mean, I think that's self-serving testimony, of course, to

16   exonerate yourself and inculpate somebody else.  But

17   wasn't that what was going on with Mr. Massey's story?

18       MR. EDMUNDSON:  Well, I mean, based upon the

19   notes, I think that's part of it.  What we also know from

03:05:25   20   the notes is that Mr. Massey told the SEC, assuming these

21   notes are accurate, that China Inland was a real entity.

22       THE COURT:  Say that again, please.

23       MR. EDMUNDSON:  China Inland was a real entity.

24       THE COURT:  China Inland, yeah.

03:05:41   25       MR. EDMUNDSON:  Massey and Chimera had a capsule

*Laura Wells, CRR, RDR*

1    prototype relating to NHE technology.  Mr. Massey also

2    stated, referring to NHE, the technology was real and

3    Haliburton is using something similar.

4         Those are new facts.  Facts and -- and material to

03:05:59    5    this dispute.  This dispute in large part is about a

6    fraudulent pump of a stock --

7              THE COURT:  Yeah.

8              MR. EDMUNDSON:  -- that started with what the

9    government contends is a fictitious licensing agreement

03:06:13    10    with China Inland and fictitious NHE technology, and the

11    Court's order credited that -- that factual finding.  In

12    fact, the order at Pages 6 and 7 found that the NHE

13    technology and China Inland itself were fictitious.

14         Part of the SEC's argument was that there wasn't a

03:06:36    15    defendant or even a non-party who provided any evidence to

16    validate the existence of China Inland or the NHE

17    technology.  Now we have a witness who told the SEC that

18    China Inland was a real entity and that there was a

19    capsule prototype of the technology.

03:06:58    20              THE COURT:  But I mean, if we give full credit to

21    what Massey said -- and some of it is pretty inconsistent,

22    it seems to me -- don't we still have the fact that in

23    violation of Section 17(a)(2) of the Securities Act

24    Mr. Farmer used the registration statement which omitted

03:07:19    25    the fact that Farmer was entirely financing the IPO to

*Laura Wells, CRR, RDR*

1  obtain money; and in violation of Section 17(a)(2), Farmer

2  used the statement to FINRA, all caps, F-I-N-R-A, which

3  concealed Farmer's role in Chimera, C-h-i-m-e-r-a, in

4  relationship with Grob, G-r-o-b, and numerous false

03:07:43  5  statements to the broker dealer Pennaluna,

6  P-e-n-n-a-l-u-n-a.

7       I mean, all these remain untouched by anything Massey

8  said, right?

9            MR. EDMUNDSON:  Based upon these notes, I don't

03:07:56  10  believe he addressed those issues; but I don't know what

11  else he knows.  I mean, these are the statements that he

12  made to the SEC.  They are bullet-point notes.  I don't

13  know what else was said.  I don't know if these are

14  complete.  I don't know what else he knows.

03:08:10  15       But apparently, between Grob and Massey, Grob being

16  the former CEO and Massey being the material witness,

17  particularly as to activities relating to Pemex in Mexico,

18  I mean, it could be a treasure trove of information about

19  other issues in this case.

03:08:30  20            THE COURT:  Couldn't -- I mean, I would have

21  thought that Mr. Farmer would have better luck getting

22  information about -- out of Mr. Massey than others.  I

23  mean, he could have gone and gotten this information from

24  Massey, couldn't he?

03:08:42  25            MR. EDMUNDSON:  He could have, except Mr. Massey

*Laura Wells, CRR, RDR*

1    had taken five in the investigation and continued to

2    represent to us that he would continue to take five in

3    this case.

4              THE COURT:  Well, we could attest to that though

03:08:57   5    with a subpoena, couldn't we?  Well, anyway.  Okay.

6    That's what he did.  You are right.  That's what he did.

7              MR. EDMUNDSON:  Your Honor, look.  One point

8    that -- that I do want to emphasize.  The SEC had made a

9    representation to the Court in its statement of undisputed

03:09:20  10    facts about China Inland that it was fictitious and the

11    technology was fictitious.

12        Yet at the same time, they have got a witness that's

13    coming in and telling them, well, wait a second.  That

14    technology is real, and I'm aware of the capsule

03:09:34  15    prototype.  And I believe that Haliburton is actually

16    testing the same technology.

17        Well, that might very well provide, if we could test

18    that with Mr. Massey, what do you know about that?  That

19    may flatly contradict the allegations made by the SEC at

03:09:54  20    that time and the conclusions in the order.  And we -- you

21    know, it's material.

22        The other -- and I would point out, Your Honor, in the

23    reply brief again, Document 127, Massey did provide

24    information about Jose Quiroga and Pemex in Mexico.

03:10:12  25    Apparently, Massey was in Mexico.  He was participating in

1    these negotiations.  He stated that some of the

2    allegations in the SEC complaint against Farmer related to

3    Pemex are not accurate.

4              THE COURT:  Slowly.  Slowly now.

03:10:28    5              MR. EDMUNDSON:  Excuse me.  He says -- Massey

6    says he met Jose Quiroga.  Massey also said Quiroga was a

7    Pemex employee, but Quiroga was not his real last name.

8         These are facts.  I mean, the central issue of the

9    case in large part, this fraud case, relates to these

03:10:47   10    false press releases, which Mr. Farmer didn't -- I mean,

11    there was no allegation that Mr. Farmer had anything to do

12    with the writing of those press releases or the editing or

13    approving the release of these press releases.  Yet they

14    have been found to be false.

03:11:03   15         And now we have a witness who apparently could provide

16    meaningful information about that aspect of the case, and

17    I don't know what else he could talk about.  He may be

18    able to talk about the registration or the negotiations

19    with Pennaluna.  I don't know, Your Honor.

03:11:20   20         But we have two new witnesses in this case that, based

21    upon what they have stated so far -- Mr. Grob in court,

22    Mr. Massey in his statements to the SEC as reflected in

23    these notes -- there are inconsistencies in the record.

24    Your Honor recognized that when Mr. Grob testified.

03:11:43   25         But there are also inconsistencies with Massey's facts

*Laura Wells, CRR, RDR*

1   and the facts that are in the order.  What I think -- and,

2   Your Honor, I would urge you to consider allowing us to

3   depose Mr. Massey, as we did with Mr. Grob.  Mr. Massey

4   has spoken to the government on five separate occasions,

03:12:06  5   beginning in August of 2015.  We would like --

6            THE COURT:  I just asked a little while ago why

7   you didn't go talk to Massey.  Are you saying now you are

8   sure he won't take the Fifth Amendment?

9            MR. EDMUNDSON:  Well, he has talked to the

03:12:21  10  government five times.

11           THE COURT:  Well, Grob has taken it and not taken

12  it.  I mean, I don't know what the pattern is here.

13           MR. EDMUNDSON:  Right.  I think we would like to

14  explore that.  I mean, I think in this context, because

03:12:30  15  Massey has spoken so freely with the government, that he

16  has probably waived his Fifth Amendment; and we would

17  press that, Your Honor.

18       You know, I mean, obviously, we raise the issue of the

19  FBI 302s.  We're not authorized to use them.  We tried to

03:12:53  20  get clearance from the U.S. attorney to authorize its use.

21  We cannot get agreement on that issue.  But the 302s

22  provide additional supplementary information that I think

23  is very relevant to this case.

24       We're extremely frustrated that the SEC and the U.S.

03:13:08  25  attorney's office are clearly sharing information, the

*Laura Wells, CRR, RDR*

1    tens of thousands of e-mails, for example, that became an

2    issue after we filed our original motion to vacate; but we

3    can't even use the 302 statements that Mr. Massey -- that

4    the FBI wrote about Mr. Massey's statements in the course

03:13:28    5    of those interviews.  And we think it is just very

6    frustrating.

7         I think one remedy here is to allow us to take his

8    deposition and see where we stand.

9         The other thing, Your Honor, is the criminal trial is

03:13:41   10   right around the corner.  It's now been -- I think in our

11   papers we had given you April of 2017 as a trial date.

12   That's been kicked to June.  But it's right around the

13   corner.  And all of these issues are going to be tried.

14        And so we would -- we think that there is ample basis

03:13:59   15   to vacate the order; and it may not cover every single

16   issue in the order, based upon what we know from Mr. Grob

17   and Mr. Massey at this point.  But there is grounds to

18   vacate the order.  Alternatively --

19             THE COURT:  The grounds are these two new

03:14:16   20   witnesses?

21             MR. EDMUNDSON:  Absolutely.

22             THE COURT:  Okay.  All right.

23             MR. EDMUNDSON:  And alternatively allow us to

24   depose Mr. Massey and report back, as we did with

03:14:25   25   Mr. Grob, or alternatively stay the case.  This case is

1    going to get tried.  Thank you.

2               THE COURT:  Okay.  Thank you.  Mr. Gulde.

3               MR. GULDE:  Your Honor, I heard a couple of

4    things that really left me scratching my head.  Most

03:14:49   5    recently, Mr. Edmundson's contention that Massey has

6    probably waived his Fifth Amendment privilege.  I would

7    agree with that.  He called Mr. Vydashenko and I

8    unsolicited --

9               THE COURT:  Spell Vydashenko for the court

03:15:03   10   reporter, please.

11              MR. GULDE:  I will do my best.

12              THE COURT:  She has got it.  She has already got

13   it.  You are saved.

14              MR. GULDE:  Thank goodness.

03:15:12   15      So we probably agree with that that he has waived it,

16   but that brings some cognitive dissidence here in this

17   case.  Because just as Mr. Massey has probably waived it,

18   Mr. Grob certainly waived it.  He sat right there and

19   testified in this case.

03:15:24   20      And Mr. Edmundson came up here and said, on behalf of

21   Mr. Farmer, we need to depose Mr. Grob because of what he

22   said there.  And Your Honor said on the phone conversation

23   that we had with counsel that you didn't find, you know,

24   what he said in court to really turn you around; but they

03:15:41   25   wanted to go further and depose him.  So you let him do

*Laura Wells, CRR, RDR*

1    it.

2         When they had the opportunity to do it, Mr. Grob took

3    five.  And not only did he assert his rights under the

4    Fifth Amendment, but Mr. Edmundson seemed to be asking

03:15:58    5    leading questions to paper his assertion to the Fifth.

6         They didn't come back to the Court to say, wait a

7    minute, didn't you say, Your Honor, or doesn't it look

8    like he has waived his Fifth Amendment privilege here?

9    They didn't do that.

03:16:11   10         The only thing I can come up with, Your Honor, is they

11    really don't want to hear what he has to say.  They want

12    the appearance of having been wronged here without, you

13    know, mitigating that by the -- by use of the deposition

14    that you allowed them to take.

03:16:27   15         And it's understandable that they don't want to hear

16    what he has to say because you also heard him bury

17    Mr. Farmer as to the sham IPO that Mr. Farmer gave him the

18    playbook to run.

19         So just stepping back for a second and looking at the

03:16:43   20    overall standard here, Rule 60(b) offers extraordinary

21    relief.  He has got to show -- Mr. Farmer has to

22    show newly discovered --

23         THE COURT:  Newly discovered and it would change

24    the results.

03:16:57   25         MR. GULDE:  And diligence.  He has got to show

*Laura Wells, CRR, RDR*

1    reasonable diligence in having sought that evidence

2    beforehand.

3        Your Honor pointed out that, you know, as the

4    additional background to that are all of these things --

03:17:12    5    the 17(a)(2) violations, the 10(b)(5) allegations, the

6    Rule 5 registration violations.  None of this so-called

7    new evidence would touch any of that.  So that's part of

8    the background, too.

9        And Mr. Edmundson said -- and I had to write this

03:17:30    10   down -- you know, I don't know what else he knows.  There

11   could be a treasure trove in there.  That sounds to me,

12   Your Honor, like the very definition of a fishing

13   expedition.  And that speaks directly to the issue of

14   whether or not Mr. Farmer and his counsel exercised

03:17:48    15   reasonable diligence to get ahold of any of this

16   information beforehand or at the relevant time during

17   civil litigation.  They did not.

18       First of all, as to Mr. Grob, we talked about that,

19   that they didn't really -- that they didn't come back and

03:18:08    20   move to compel.  And just one point on that that they

21   brought up in the briefing.  The idea -- they allege that

22   the SEC somehow sprung the idea of a federal criminal

23   investigation on Mr. Grob and Mr. Farmer, somehow

24   strategically timed right before Mr. Grob's deposition in

03:18:32    25   order to somehow bully him into not testifying or

1    asserting the Fifth.

2         First of all, that's completely absurd because it's

3    always been our position since he sat up there and

4    testified -- actually, since he made that self-serving

03:18:44    5    declaration in response to our penalty briefing that

6    Mr. Grob had waived his right to assert the Fifth

7    Amendment privilege.

8         But additionally, Mr. Farmer and Mr. Grob were aware

9    of the possibility and Mr. Farmer, as we pointed out in

03:18:59    10   our briefing, had briefed to the criminal court when

11   trying to amend his terms of supervised release that he

12   had known about it for over a year and this was -- this

13   would have been --

14             THE COURT:  Known about which now?

03:19:15    15             MR. GULDE:  He had known about the federal

16   criminal investigation and did not flee.  He was saying,

17   look, I'm not a flight risk.  I have known about this for

18   more than a year.

19        That flies directly in the face of kind of the

03:19:27    20   mud-slinging allegation that they threw kind of

21   desperately to somehow make it look like they are wrongly

22   being withheld Mr. Grob's testimony.

23        Now, as to Thomas Massey -- and it's my belief that

24   Mr. Massey has scheduled a change of plea hearing --

03:19:45    25   that's what the criminal docket is telling me -- for

*Laura Wells, CRR, RDR*

1   Tuesday.  So that shines --

2             THE COURT:  To plead guilty?

3             MR. GULDE:  I don't know, Your Honor.  I haven't

4   spoken with the prosecutors about that.  That's my

03:19:58   5   assumption.

6        But it sheds some light, possible light on their

7   motivation here now to really want to hear what he has to

8   say.  If Thomas Massey is going to plead guilty, maybe he

9   is going to testify against Mr. Farmer.  And certainly

03:20:10   10   Mr. Farmer would like to know what he has to say for the

11   criminal matter.  So using the civil discovery to help him

12   in the criminal matter is inappropriate.

13        But that's kind of beside the point.  Rule 60(b),

14   reasonable diligence, simply is not there.  And another

03:20:28   15   thing that Mr. Edmundson said that I'm just dumbfounded

16   here.  He said prior to that, meaning prior to Mr. Massey

17   calling us unsolicited while we were doing summary

18   judgment briefing, Mr. Massey had been asserting his Fifth

19   Amendment privilege.

03:20:51   20        Mr. Massey asserted his Fifth Amendment privilege in

21   response to an investigative subpoena prior to the filing

22   of this complaint.  We didn't notice his deposition.  So

23   we don't know.  The SEC doesn't know if he was asserting

24   his -- if he would have asserted his rights during the

03:21:09   25   litigation.

*Laura Wells, CRR, RDR*

1       And this right here, a few minutes ago, is the first

2   time in all of the briefing and in all of our

3   conversations that Mr. Edmundson has ever claimed that

4   Mr. Massey had been informing them that he would assert it

03:21:26   5   if called to testify.

6       You pointed out they didn't test that with the

7   subpoena.  So it's one thing to say you are going to do

8   it.  It's another thing to actually do it when subpoenaed.

9       But I'm not even sure that's credible.  There is

03:21:39   10  nothing in the record.  There is no declaration from

11  Mr. Farmer.  There is no declaration from an attorney

12  saying they contacted Mr. Massey who said that if called

13  to testify in the litigation he would assert his Fifth

14  Amendment.

03:21:52   15      As a little more background on him contacting us, he

16  spoke with us.  Those notes -- I relayed those notes or

17  relayed my recollections of what Mr. Massey had told me to

18  the AUSA, Mr. Martin.  And Mr. Martin apparently

19  memorialized that.  And that's what ended up getting

03:22:18   20  Mr. Farmer, and that's what is in the briefing that you

21  have seen.

22      Those conversations were in the hopes of setting up --

23  we still thought there was going to be a trial.  We hoped

24  to have Thomas Massey as a witness.  He was certainly

03:22:33   25  disclosed, I would assume by both parties and certainly by

*Laura Wells, CRR, RDR*

1   us, in our Rule 26 disclosure as a potential witness.

2        He, shortly after contacting us, went into the wind;

3   and we weren't able to talk to him anymore.  So he decided

4   to stop talking to us.

03:22:50   5        THE COURT:  Did he tell you anything that you

6   think was meant to exonerate Mr. Farmer?

7        MR. GULDE:  No, Your Honor.  Well, I mean, I

8   can't speak to Mr. Massey's intentions.  I mean, his --

9        THE COURT:  Do you think that that was his

03:23:08   10  purpose?

11       MR. GULDE:  It seemed to be self-serving

12  testimony that --

13       THE COURT:  Putting it on Mr. Farmer, not

14  exonerating Mr. Farmer.

03:23:15   15      MR. GULDE:  It blamed Mr. Farmer on the parts

16  that Mr. Massey was clean of.  So the parts that -- the

17  parts where he could safely inculpate Mr. Farmer, he did

18  so.  And certainly, he made the statements that

19  Mr. Edmundson has been hammering about Pemex and about the

03:23:33   20  viability of nonhydraulic fracking, as well.  But because

21  those are kind of in his realm, he was a little softer on

22  those.

23       But -- and first of all, Your Honor is exactly right.

24  None of those statements had anything to do with the sham

03:23:50   25  that Mr. Farmer was pulling on the investment side of the

1  stuff.  And all of that is completely sufficient to uphold

2  all of the claims against him.  Every single claim is

3  satisfied despite even if they hit a home run on Massey

4  and they get everything they want here, you know, barring

03:24:10  5  some, you know, the treasure trove that he is predicting

6  somehow.

7           THE COURT:  What would be the next step if I

8  don't vacate?  What would be the next step in this case?

9           MR. GULDE:  Enter judgment consistent with your

03:24:23  10  oral ruling, disgorgement, penalties and injunctions to

11  Mr. Farmer.  That would be what we would request, Your

12  Honor.

13           THE COURT:  What is the SEC's experience in these

14  matters when there are parallel civil and criminal

03:24:41  15  proceedings?

16           MR. GULDE:  Your Honor, I'm just not sure I can

17  speak to overall experience.  I have had very little

18  experience personally with parallel civil and criminal

19  proceedings.  My position is that there is no reason to

03:24:58  20  hold this up for any criminal proceeding.

21           THE COURT:  Well, it's one of my oldest cases.

22  So I'm reluctant to hold it up on any basis, but I don't

23  know.  In your view, there is not a significant

24  possibility that what we learn in the criminal proceeding

03:25:19  25  will impinge on this case?

*Laura Wells, CRR, RDR*

1          MR. GULDE:  That is my view, Your Honor,

2     absolutely and as to the -- I mean, specifically, as to

3     the claims that Mr. Edmundson is making about the

4     viability of the technology, nonhydraulic fracking.

03:25:35   5          And he has talked a lot -- he has said the word

6     "capsule" three or four times as though the existence of

7     some working or some model of what they intended to stick

8     down wells and blow up meant that they had a valid

9     technology.

03:25:51  10          Your Honor, we all knew about this capsule.  Mr. Grob

11     sat up there and talked about it.  That's not a surprise

12     here.  We didn't learn that from Mr. Massey.

13          As to the viability of that, there are two engineers

14     involved in this whole thing, as far as I can tell.  One

03:26:07  15     of them is Baldemar Rios; and in his deposition -- which I

16     don't believe Mr. Farmer's lawyers attended.  I don't know

17     why -- he said that -- I'm sure they have reviewed the

18     testimony.  Mr. Rios said that he attempted to try to get

19     the specifications and the background engineering

03:26:35  20     documents on how this technology would actually work but

21     that he always got stonewalled from Chimera and they would

22     never share with him.

23          So think about what that is.  The CEO, the eventual

24     CEO, and we would contend, obviously, the straw man CEO of

03:26:54  25     Chimera, was never allowed to see the technical documents

1    that somehow supported the idea that this technology was

2    viable.  That tells us something.

3         The other engineer involved is this man from Pemex who

4    also gave a deposition in this case, Dr. Avila.  And

03:27:11    5    Dr. Avila called this science fiction, that it's not real.

6         Now -- so Thomas Massey is going to go work on a

7    ranch.  That's what he told us.  And he has no technical

8    background.  He is not an engineer.  It is simply

9    incredible that his opinion -- his lay opinion about

03:27:32    10    whether this is a good thing or whether that capsule meant

11    anything means more than mine, for example, just seeing

12    this on the table right here or hearing about it after

13    Mr. Grob talked about it.

14         Even if we were to believe that Mr. Massey's testimony

03:27:48    15    and that everybody believed they had viable technology,

16    let's say we just believe that and swallow that bait and

17    we're the ideal investor in Mr. Farmer's mind, in the best

18    case, in that best-case scenario from Mr. Farmer, all that

19    Dr. Avila and the Pemex people did was show some

03:28:13    20    willingness to test the capsule in any of their wells.

21         And is that then what Chimera went out and touted to

22    the world of unsuspecting investors?  No.  They went much

23    further, and they said that it was going to be in use.

24    Their technology would be in use throughout Latin America.

03:28:34    25    They said that Pemex would use it on multiple wells.  A

1    far cry from even Thomas Massey and Mr. Farmer's best-case

2    scenario here.  It's still misleading, Your Honor.

3         I mean, the big news, I guess, in all this stuff with

4    Massey is that Farmer did not draft most of the press

03:28:57  5    releases.  That's not news.  We didn't allege that he did.

6    We alleged that he was deeply involved in Chimera and

7    mislead the investing public about that.  The Court didn't

8    rely on him drafting all the press releases in its

9    opinion.

03:29:14  10        The fact, apparently, is that John Brotherton appears

11    to have written the press releases.  That's John

12    Brotherton who made hundreds of thousands of dollars

13    directly from Mr. Farmer.  So somebody on Mr. Farmer's

14    payroll did.

03:29:30  15        So in the end, what do we have here?  We have got a

16    sham company that defaulted and just disappeared as soon

17    as it was challenged.  They never made a dime on, yes,

18    this fictitious technology.  We have --

19             THE COURT:  No suggestion it was ever

03:29:48  20    operational, right?

21             MR. GULDE:  Never operational, Your Honor.

22        We have investors who bought worthless stock after

23    Farmer spent hundreds of thousands of dollars admittedly

24    in this what he calls a market awareness campaign.  And we

03:30:05  25    have Farmer who walked away with all the money.  It's

*Laura Wells, CRR, RDR*

1    undisputed that he told lies to get there and get all that

2    money, Your Honor.  Thank you.

3              THE COURT:  Okay.  Mr. Edmundson.

4              MR. EDMUNDSON:  Let me just address the issue

03:30:26   5    with the press releases that Mr. Gulde just referenced.

6              THE COURT:  The issue of what?

7              MR. EDMUNDSON:  The press releases.

8              THE COURT:  The press releases.

9              MR. EDMUNDSON:  And Mr. Gulde points out, which

03:30:37   10    we had pointed out before, that Mr. Farmer did not draft

11    or edit the press release.

12              THE COURT:  Yeah.  I'm willing to accept that.

13              MR. EDMUNDSON:  Okay.  Unfortunately, it's in the

14    order.  Mr. Gulde said it's not in the order.  It's at

03:30:47   15    Page 20 of the order.  Okay.

16         And the order says, "The metadata on the registration

17    statement, many of the press releases and forms 8-K and

18    the letter to FINRA reveal that these documents were all

19    drafted or edited by defendant."

03:30:57   20         And that is one of the issues that we had been

21    briefing in the motion to vacate that is simply not true,

22    and it was borne out --

23              THE COURT:  What page are we on?

24              MR. EDMUNDSON:  Page 20 of the order.

03:31:08   25              THE COURT:  Okay.  Go ahead.

*Laura Wells, CRR, RDR*

```
 1              MR. EDMUNDSON:  You had asked Mr. Gulde about,
 2    you know, experience with criminal and civil cases.  I
 3    worked at the SEC for 18 years.  Okay.  And I was involved
 4    in a lot of parallel proceedings.  Typically what happens
 5    is the civil case gets stayed, and the criminal case goes
 6    forward.  In every case, no; but in most cases that's what
 7    happens.
 8         The capsule prototype, look, there is either a capsule
 9    prototype or there isn't.  I have never seen it.  I don't
10    know that the SEC has ever seen it.  But we now have a
11    witness who says that there is one that is in existence.
12    Mr. Gulde said that that wasn't new news because we
13    learned about that from Mr. Grob when he testified.  It
14    was new news to me.  Besides, Mr. Massey gave that
15    statement to the government months before Mr. Grob
16    testified about it.  But I think that's a very relevant
17    fact.
18         The treasure trove of information, I didn't predict
19    that there is going to be a treasure trove of information
20    from Mr. Massey.  I said it may be.  I mean, based upon
21    these 86 bullet points in the notes, it would appear to me
22    that he is a very significant witness that, I think, has
23    got material information about this case; and it may
24    impact very well the conclusions that the Court reached
25    and described in its order.
```

1    Mr. Gulde made reference to the re-arraignment next

2    week of Mr. Massey.  Yeah, I'm predicting that he has cut

3    a deal with the government; and I believe he is going to

4    be available to testify against Mr. Farmer.

03:32:52    5    We did not create this situation with Mr. Grob or with

6    Mr. Massey.  And we are not using this process to get

7    criminal information.  And if anybody thinks so, then

8    state the case.

9    We're trying to -- I'm trying to defend Mr. Farmer,

03:33:11   10   who is subject to an $8 million disgorgement order and an

11   injunction.

12          THE COURT:  I understand that.

13          MR. EDMUNDSON:  I'd like to depose a guy who has

14   been speaking to the government for the past 18 months.

03:33:23   15          THE COURT:  When did you first know that he was

16   speaking to the government?

17          MR. EDMUNDSON:  After the indictment in September

18   of 2016, some months later the U.S. attorney's office

19   started giving us criminal discovery.  The first pieces of

03:33:39   20   information we got were the 302s.

21          THE COURT:  Well, why couldn't you have come to

22   me then and asked for him to be deposed?

23          MR. EDMUNDSON:  Well, we did, Your Honor.  We

24   did.  Well, ask for a deposition at that point?

03:33:55   25          THE COURT:  Of Massey.

*Laura Wells, CRR, RDR*

1          MR. EDMUNDSON:  Your Honor, I didn't do it.  Like

2   I did with Mr. Grob, I did not ask for that; but I asked

3   for the same relief, the motion --

4          THE COURT:  On Grob you never pushed that.  I

03:34:05   5   wouldn't have allowed him to assert the Fifth.  I mean, he

6   came in and testified.  I remember the day he was here.

7          MR. EDMUNDSON:  Your Honor, we thought that based

8   upon his testimony that he gave here, the Court's

9   observations and what Mr. Vydashenko said, that Mr. Grob's

03:34:23   10   statements were at odds with the complaint.  We thought

11   that that was more than sufficient to move to vacate the

12   order.  It was -- it was that simple.

13      And frankly, I thought that there was some validity to

14   the argument that they were making, which was simply this:

03:34:41   15   They weren't aware of the criminal investigation.

16   Mr. Grob's counsel asked the Court while we were here

17   during the remedies hearing right before he testified

18   whether or not there was the existence of a criminal

19   investigation.  And as soon as he found out about that

03:34:56   20   proceeding, that's when he asserted five.

21      But more to the point, Your Honor, if we're looking

22   down the road and making some predictions, Mr. Grob is not

23   a defendant in the criminal case; and I expect he is going

24   to testify against Mr. Farmer.

03:35:12   25          THE COURT:  Well, he was bad for Mr. Farmer the

1    day he was here, I thought, very bad for him.  So I'm not

2    sure any further testimony from Grob is going to help your

3    client.

4        Have you got some reason to think Grob's testimony is

03:35:27  5    going to help your client?

6            MR. EDMUNDSON:  I thought his testimony did help

7    us.

8            THE COURT:  Oh, you did?

9            MR. EDMUNDSON:  In our original motion to vacate

03:35:35  10   we explained why we thought that Grob's testimony was

11   helpful.  For example, Mr. Grob testified about his

12   involvement in the registration process.  And, Your Honor,

13   I'm going to be -- I haven't gone back and reread his --

14   reread his testimony in quite a while, but I have notes

03:36:00  15   here that he was involved in the registration process.

16       And the order says Grob was not included as a

17   recipient on any of the defendant's e-mails to Loev.  The

18   point was -- the point there is that the SEC had made --

19   had made a statement in the undisputed facts that Mr. Grob

03:36:27  20   was not included in e-mail communications between

21   Mr. Farmer and counsel during the registration process,

22   and we provided evidence in the summary -- in the motion

23   to vacate that that just simply wasn't true.  It's just

24   not true.  It's not accurate.  He was included.  And we

03:36:48  25   provided the -- we attached in the appendix the e-mails

1  demonstrating that he was involved at every step of the

2  way.  Moreover, and with respect to the press releases, he

3  was always involved in it and approved them.

4       The Pennaluna letter, the commission confronted

03:37:07  5  Mr. Grob at that -- during that remedies hearing with a

6  January 13th document to Pennaluna; and I think the

7  contention in the undisputed facts and in the order were

8  that Mr. Grob never had an opportunity to review the

9  letter or comment on it.

03:37:26  10       Well, we now know because we now have located

11  additional documents in which he signed the letter.  And

12  it is not consistent with the idea that he never saw it or

13  didn't approve it or didn't have an opportunity to comment

14  on it.  He signed the letter.

03:37:45  15       So I think -- and finally, of course, Mr. Grob said

16  that he thought that the press releases were true.  That

17  was the real issue that we wanted to depose him on.  That

18  would have been powerful, I think, for Mr. Farmer because

19  there are no allegations that Mr. Farmer issued false

03:38:01  20  press releases.  He has to rely on other witnesses who

21  were involved in that process.  And that's Mr. Grob, and

22  that's Mr. Massey.

23       Again, Your Honor, look, we didn't create the

24  situation; and we're not using the criminal process or the

03:38:20  25  civil process to obtain some advantage in the criminal

1   case.  We're simply going where this takes us.  We became

2   aware of the Massey situation late last fall, and we put

3   it before the Court in the renewed motion.  In fact, the

4   notes that we attached we didn't even have until we filed

03:38:43   5   our rely brief.

6            THE COURT:  Okay.  On the press release, Page 20

7   says, "In each of the statements that violate

8   Section 17(a)(2), registration statement, press releases,

9   Forms 8-K and Chimera's statement to FINRA, Chimera made a

03:39:03   10  representation that was either blatantly false or grossly

11  misleading.  Moreover, because the registration statement

12  and Chimera's letter to FINRA contained misrepresentations

13  regarding defendant's own actions --" in italics own

14  actions -- "there is no question that the defendant was

03:39:22   15  aware of the false or misleading nature of these

16  representations."

17       So there the opinion deals with the registration

18  statement and Chimera's letter to FINRA.  Okay.

19       Then we go down, "Defendant knew that these documents

03:39:37   20  contained misrepresentations and material omissions

21  because the unrefuted evidence shows that he personally

22  prepared them."

23       I think they are still talking about the registration

24  and statement letter to FINRA.

03:39:51   25       "Although Grob or other Chimera agents ultimately

*Laura Wells, CRR, RDR*

1    authorized, filed or published these statements, thereby

2    insulating defendant from *Janus* liability --"  *Janus* is a

3    case name, J-a-n-u-s "-- the metadata on the registration

4    statement, many of the press releases and Forms 8-K and

03:40:12    5    the letter to FINRA reveal that these documents were all

6    drafted or edited by defendant."

7        There is a citation to the record, paren, "evidence

8    showing the defendant drafted and edited registration

9    statement."  More citations to the record.  Paren,

03:40:31    10   "evidence showing that the defendant drafted and edited

11   Form 8-K."  More record citations.  Paren, "evidence

12   showing the defendant drafted and edited letter to FINRA.

13   Because the defendant participated in the preparation of a

14   plainly false or misleading statement, the SEC has showed

03:40:48    15   that defendant must have been aware of the danger of

16   misleading the investing public, showing which is

17   sufficient to establish severe recklessness."

18       So I don't think it ever quite says Mr. Farmer drafted

19   the press releases.  At one point it's a little ambiguous.

03:41:11    20   But drafted or edited.  I mean, the press releases are

21   such a small part of the total data showing severe

22   recklessness, I'm not sure that by itself is enough to

23   upset the order; but I appreciate your pointing that out.

24       Anything further?  I'll give Mr. Gulde another chance.

03:41:33    25       MR. EDMUNDSON:  Your Honor, I don't.  But, you

*Laura Wells, CRR, RDR*

know, I think it's very difficult to isolate a handful of

facts and make a determination as to whether or not that's

going to absolutely upset the applecart or change the --

THE COURT:  Tell me what you think.  You are an

03:41:50    experienced lawyer, and you are obviously a very smart

guy.  Tell me what was going on.  What was this -- what

was the strategy for building this company?

MR. EDMUNDSON:  Well, I think the strategy was

Mr. Grob's strategy.  He wanted to form a company, which

03:42:07    he did.  He incorporated it, he founded it and he took the

majority shares.

He asked Mr. Farmer to consult with him to get him

some help because he had never done this before.  That's

what Mr. Farmer did.  Mr. Farmer made arrangements.

03:42:20    THE COURT:  Well, where was the underlying value

for this company?

MR. EDMUNDSON:  If you read the registration

statement, there wasn't much.  The registration statement

is quite clear this was a start-up.  I think it had

03:42:32    $70,000 in the bank.  It had a part-time officer who

committed himself to work ten hours a week.  It had no

existing contracts.

THE COURT:  Well, why was a company like -- why

was anybody out trying to find investors for a company

03:42:49    like that?  Assuming everything you have said is

*Laura Wells, CRR, RDR*

1   absolutely true, why would anybody lend his name to that

2   effort?

3          MR. EDMUNDSON:  Because Mr. Grob believed at that

4   time in these drill bits; and he believed that he could

03:43:04   5   build a company based upon, I think, the drill bits of

6   some sort.  That was his vision.

7       Now the vision later changed, as he testified here in

8   court, to transition into this NHE technology; but it was

9   his vision.

03:43:21   10         THE COURT:  There was no reputable scientist or

11   engineer who said this was a working technology, right?

12   There was nothing, absolutely nothing.

13         MR. EDMUNDSON:  Well, Your Honor, other than

14   China Inland, presumably, who gave them the licensed

03:43:34   15   technology, apparently a capsule; and Massey believes that

16   Haliburton had tested the same technology.

17         THE COURT:  That's is such a vague reference

18   though.  How does Massey know what Haliburton has tested?

19         MR. EDMUNDSON:  I don't know, but I would like to

03:43:48   20   explore it with Massey.  But that's the first time I am

21   hearing about it.  It may prompt me to go to Haliburton

22   and say, Hey, have you ever looked at this technology?  I

23   mean, it's his statement plus statements that might lead

24   to the discovery of additional evidence.

03:44:01   25         THE COURT:  Okay.  Thank you very much.  Thank

*Laura Wells, CRR, RDR*

1    you.

2          Yes, sir, Mr. Gulde.

3          MR. GULDE:  May I address the new stuff here,

4    Your Honor?  The Court asked a really good question of

03:44:22    5    Mr. Edmundson.  You know, what is the alternate

6    explanation here?  What is the legitimate explanation

7    here?  And they trod out the same old thing.  Mr. Farmer

8    is just a consultant here.

9          All you have to do is barely scratch the surface to

03:44:40    10   see that that is so far from the truth.  It glosses over

11   so many things.  Just off the top of my head in the few

12   seconds we have had here, Farmer financed it.  He financed

13   the IPO.  He didn't just raise money for it.  He gave

14   loans to people.

03:44:55    15         THE COURT:  Financed it and wasn't candid about

16   where the money was coming from.

17         MR. GULDE:  Exactly, Your Honor.  He didn't just

18   find investors.  He also used Kylemore, this international

19   entity that he is admittedly the U.S. representative of,

03:45:14    20   to give Chimera its seed capital.

21         He also paid out of his own pocket Grob's salary.  The

22   only money that Grob had coming in -- now that's another

23   interesting rabbit hole to dive down.  Mr. Farmer in a

24   deposition said, oh, no, that was for Mr. Grob to go

03:45:33    25   search the UT archives for patents that we could make use

1   of.  What capability Mr. Grob had shown to be able to

2   identify valuable patents to Mr. Farmer is a mystery to

3   me.

4           THE COURT:  It's not in the record.  It's not in

5   the record anyway.

6           MR. GULDE:  And frankly, I mean, Mr. Farmer is a

7   lot of things; but he is not stupid.  And the idea that he

8   would -- that he just believed in this and decided to

9   invest, you know, hundreds of thousands of dollars and

10  undertake this enormous undertaking to get people's money,

11  to use his own money to eventually get shares out of the

12  market just because he believed in Mr. Grob, that's

13  absurd, Your Honor.

14          A few of the points that Mr. Edmundson just brought up

15  about Mr. Grob that -- just the idea that some of the

16  things Mr. Grob said casts doubt somehow on the Court's

17  opinion that Mr. Grob had been -- had been on some e-mails

18  during the registration process with the lawyer.  The

19  point is not that Mr. Grob is totally uninvolved.  It's

20  that Mr. Farmer was himself deeply involved and hidden.

21  Nobody on the outside knew that he was deeply involved.

22          As to the Pennaluna letter, that January 13th thing

23  that Mr. Edmundson was talking about, the evidence shows

24  that Mr. Farmer didn't give Grob time to review a letter

25  that they eventually sent to Pennaluna.  It was sent on

1    January 13th.  It's beyond dispute that Mr. Grob didn't

2    have time to review it on January 13th.  Eventually, a

3    signed copy of this document shows up in February; but

4    between January 13th and February, the only reasonable

03:47:47    5    conclusion is that -- and Mr. Farmer was pulling those

6    strings and, you know, not really letting Mr. Grob drive

7    the car.

8          Mister -- he points to -- well, I guess Page 20 of the

9    order is the only other thing I have written down.  Your

03:48:13   10    Honor parsed that.  I agree that the use of the word

11    "press releases" there may be a little ambiguous.  I have

12    no objection to you striking the word "press releases"

13    there because all of the string cites of record cites

14    following that don't point to the press releases.  So that

03:48:30   15    doesn't look like a problem to just -- if you are to amend

16    your order, Your Honor, to pull the press releases out of

17    it.

18          THE COURT:  We have the re-arraignment on

19    Tuesday; is that right?

03:48:40   20          MR. GULDE:  That's my understanding, Your Honor.

21          THE COURT:  Is it here in the southern district?

22          MR. GULDE:  Yes.  It's in front of Judge Gilmore.

23          MR. EDMUNDSON:  Judge Gilmore.

24          THE COURT:  The allegations here are very

03:48:56   25    serious.  I have not heard anything today or in the

*Laura Wells, CRR, RDR*

1    writings that make me think the memorandum and order of

2    October 7th, 2015, are incorrect.  Whether we can get any

3    more of the story as this case proceeds, I don't know

4    that.

03:49:18   5    Again, I haven't seen anything to make me think we are

6    going to get anything that is going to exonerate

7    Mr. Farmer except maybe at the edges.  Maybe he did not do

8    this or did do that and we were wrong about some of the

9    details.

03:49:35   10    But the overall picture, I just don't see another way

11    to look at it.  The evidence is overwhelming.  It was a

12    classic pump-and-dump.  If it were not, I don't know why

13    Mr. Farmer was so careful about concealing his role.

14    Before entering a written order, I will ask the

03:49:57   15    parties to submit to me the transcript of Mr. Massey's

16    re-arraignment on Tuesday; and I'll make a ruling then.

17    MR. GULDE:  Thank you, Your Honor.  Nothing

18    further.

19    THE COURT:  Thank you.

03:50:34   20    (Proceedings concluded at 3:50 p.m.)

21    Date: April 30, 2017

*COURT REPORTER'S CERTIFICATE*

22    I, Laura Wells, certify that the foregoing is a
correct transcript from the record of proceedings in the

23    above-entitled matter.

24    _____/s/ Laura Wells_____
Laura Wells, CRR, RMR

25

Laura Wells, CRR, RDR