IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § | Civil Action No. 4:14-CV-02345 |
| v. | § § | |
| ANDREW I. FARMER, CHARLES E. GROB, JR., CAROLYN AUSTIN, BALDEMAR P. RIOS, and CHIMERA ENERGY CORP. | § § § § § § | |
| *Defendants* | | |

## DECLARATION OF CHARLES E. GROB, JR.

I, CHARLES E. GROB, JR., do hereby state the following under penalty of perjury the following is true and correct to the best of my knowledge:

1. I graduated from The University of Texas with a B.A. in Psychology in 2003. Between 2004-2007, I was figuring out what I wanted to do with my life professionally and my options were somewhat limited with a Psychology degree. After graduating from college, I tried several things out, including work as a financial advisor, insurance agent, and several other non-professional track jobs until 2008.

2. In 2008, I moved to Houston, Texas to pursue my M.B.A. at the University of Houston. Upon graduating in summer of 2010, I found the job market to be very difficult. During that time period, I primarily relied on my parents as a source of income, as well as minimal activities as an insurance agent, until the summer of 2011.

3. In August of 2011, I was given what I believed to be a good opportunity at the time – to become involved in a start-up company selling polycrystalline diamond compact ("PDC") cutters, and was named the CEO, sole director, and sole employee of CHIMERA ENERGY CORP. I remained in that position until my resignation on October 9, 2012.

4. I believed that CHIMERA was actually involved in the PDC business. Though the initial revenue from the PDC business was not good, I attributed that to any start-up business. I did not have any reason to not believe that the PDC business was not real.

Gz0C

5.      I do not have any educational background in engineering, petroleum engineering, physics, geophysics, geology, seismology, or chemistry.

6.      While I received my M.B.A., I did not at the time during my tenure with CHIMERA have any detailed or working knowledge of SEC rules or regulations with regard to disclosures, reporting requirements, or offerings.

7.      During my tenure with CHIMERA, I relied on others whom I thought possessed superior knowledge than I regarding any scientific or engineering information, and requirements – both business and legal – governing offerings of stock or the registration process under the SEC.

8.      During my tenure with CHIMERA, I did not know how to prepare any public filings required under the SEC rules and regulations, and I relied upon those with superior knowledge, both practical and legal, to draft those documents.

9.      Despite my lack of knowledge and sophistication in many respects, the SEC filings during my tenure with CHIMERA bear my signature.

10.     I was not aware that many times there were communications between individuals that did not include me that would have provided me a better understanding of the business dealings.  I now believe I was kept out of certain communications and discussions for a reason.

11.     At the time of the filing of the Registration Statement, I trusted Andrew Farmer and that he had the best interest of CHIMERA in mind.  I did not realize that his failure to communicate or copy me on emails to David Loev were part of a larger plan that I was not aware of.

12.     At the time of the IPO, I did not know and no one had told me the significance that the Registration Statement disclosed regarding the sale of shares and how that affected me, the selling of shares, or the ability or mode to raise capital.

13.     During the IPO phase, it was explained to me that there were certain methods of obtaining the requisite number of investors.  Though I did initially question certain methods, I was assured that some were common practice.  I trusted those around me who had more experience in participating in obtaining investments from people I knew.

14.     Prior to my involvement with CHIMERA, I did not know of the FINRA Form 211 requirement or process.  This was initiated by Andrew Farmer who introduced me to Pennaluna.  I deferred to those who had knowledge in how to have CHIMERA's stock quotation cleared by FINRA.

15.     Although I did not draft the response to FINRA's notice of deficiency, I read the

response and signed it. In retrospect, the language seemed vague and elusive, however, it did not appear facially incorrect. At the time, I did not know or appreciate the significance of such a response or Farmer's involvement being unorthodox. I was using this process as a learning opportunity and did not question some of what I in retrospect probably should have.

15. I have never had any interest or ownership in any of the following entities: Chartered, TransAmerica, Oak Resources, Inc., Clarent Services Corp., Hillsmere S.A., Levantera S.A., or Kylemore. At the relevant time, I did not know Farmer's ownership, interest, or affiliation with any of these companies.

16. I did not know the significance of a 4:1 forward split or why it should happen. I again took this as a learning opportunity.

17. During the summer of 2012, John Brotherton met with me and showed me schematics and drawing of what was supposed to be the NHE technology. He explained the technology to me, and without any technical or engineering background, I believed the technology was real. John did not provide me copies of the schematics or technical drawings and it never occurred to me at the time to do so. I believed the NHE technology would have been a good expansion of what CHIMERA had to offer.

18. CHIMERA associated with Baldemar Rios to negotiate with PEMEX. My understanding was that Rios was a former PEMEX employee and had connections that could help CHIMERA present the NHE technology to PEMEX to reach a deal over the NHE technology. I was not personally involved in the initial negotiations which were supposedly with PEMEX. As I have learned since the beginning of these proceedings, Rios had many email communications with Massey, many without my knowledge at the time as I was not copied on the email exchanges.

19. At no time during the summer of 2012 did I know that any document was forged. Specifically, I did not know that the Memorandum of Understanding was forged. Nonetheless, I did read and approve the press release.

20. I never drafted a press release. I believed many press releases to be true based on what I knew at the time. That said, I did approve some knowing that wording may have been artfully worded to keep or attract investor interest in CHIMERA and pushed the envelope as to what was within the realm of acceptable. But I believed that the technology was viable and we were ahead of curve in this new field of fracking and convinced myself that any aggressive press release was ok since CHIMERA was going to make significant changes in the industry and soar.

21. Until late September/early October 2012, I believed that NHE was viable and cutting-edge technology and that it just needed to be tested. In retrospect, there were certain red flags that I may have ignored both on the basis of taking the opportunity with CHIMERA as a learning opportunity, and that to believe that some people involved in CHIMERA and its momentum would be acting illegally or without basis would have defied logic or reason.

22.     I never knew that the purpose of any press release was part of a pump-and-dump scheme.  Through my time at CHIMERA, I received 36,000,000 shares.  I never sold any CHIMERA shares.  I still have the 36,000,000 shares.

22.     CHIMERA is the only publically traded company for which I have ever served as an officer or director, whether in name or in practice.

23.     Since the initiation of these and related proceedings, I am not aware of any opportunity now, or in the foreseeable future, to work at a publically traded company.

24.     Based on my experience with my position with CHIMERA, I have no intention now, or in the foreseeable future, to consider let alone accept a position of officer or director of a publically traded company.

25.     At no time other than these proceedings, have I been accused of actual or potential violations of any securities laws.

26.     Since the initial public filing against me in this matter, I have endured significant hardship, personally, professionally, and financially.

   a. Facing my family and wife under such circumstances was and is the most humbling experience which I do not wish on others.
   b. These proceedings have caused much strain in my relationship with my family and friends.
   c. These proceedings have foreclosed many, if not all, of the professional opportunities that would have been available to me otherwise, based on my educational achievement.

27.     I have been married to Shara since April 24, 2013.  Shara previously worked at The University of Texas Child Development Center in Austin, Texas until 2011 when she moved to Houston to work for Complete Care Medical.  She was making approximately $49,000/year until she resigned in November 2014.  She is currently a full-time student at Texas Women's Nursing School and has an expected graduation date of December 2016.  She recently took a part-time job at MD Anderson Cancer Center making $16.00/hour, working approximately 8-12 hours/week.

28.     I have endured significant financial hardship which continues.  I have attached a financial analysis as Exhibit 1 to this Declaration and incorporate it herein for all purposes.  In addition, we have a negative monthly cash flow of approximately $500.00.  Our rough-estimated monthly costs are approximately $4,000.00 with only approximately $3,500.00 in income.

29. With regard to Exhibit 1, I have explained certain portion as follows:

   a. The equity in our home consists of our life savings and money from our wedding and parents. My parents gifted $28,000 and my in-laws gifted $16,582. We purchased the home in July, 2013.

   b. Oakdale Resources LLC does not currently have any income. This was formed in August 2013 and has no affiliation or connection to Oak Resources, which was one of the companies listed in the Complaint. I named my LLC after my street, Oakdale St.

   c. Both USAA and Chase banks kicked us out shortly after the Complaint was filed. This is why they have a balance of zero.

   d. The promissory note for 1.25% of Class C shares for RF Identity Corp. represents the work that I performed for a start-up earlier this year. RF Identity Corp. is a start-up company that has very little revenue, if any. Based on my experience in this matter, I am cautious to say that this note is worth anything or not at this time.

   e. The 210 Sta-Bit Inc. shares represent the work that I performed for another start-up, which currently has zero revenue and is looking to test a new drilling tool. Based on a multiple of earnings, the valuation is currently zero.

   f. In addition to the work mentioned above, I had several deals with local oil and gas equipment companies that fell through due to the decline in oil prices.

   g. I was employed full-time at Revention Inc. from September 2015 to today, January 8, 2016. I had an "expected" annualized income of $45,000.00. It is in reality an hourly job plus commission, paying $18.21 per hour and requires a 45-hour workweek. I did not get paid holidays during the first 90 days. I was laid off from this employment today, January 8, 2016. I am currently unemployed.

30. I am not in a financial position to pay heavy penalties that the Commission seeks, and do not have any liquid assets that would satisfy any order by this Court to pay much of anything, let alone within the 14-day time period. For instance, any judgment or order against me would require the liquidation of the trading account and IRA. Any judgment or order beyond that amount, would require that I sell our house and use what equity we have in the house to satisfy any judgment or penalty.

31. Although I may not have realized the full-effect of my actions during my tenure at CHIMERA, I have since come to realize and appreciate the impact that my actions had or may have had on others, including those who relied on my actions or made inferences from my actions, my wife, family, and friends.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 8, 2016, in Houston, Texas.

_____
CHARLES E. GROB, JR.

| Charles Grob Net Worth/Financial Statement | | | | |
|---|---|---|---|---|
| **Assets and Liabilities** | **Valuation Metric** | **As of** | **Value** | **Date Closed*** |
| Homestead | HCAD Final Value 2015 | 12/7/15 | $365,000.00 | |
| Mortgage with SWBC | SWBC | 12/9/15 | $172,801.14 | |
| Loan owed to In-laws (Sami Samiuddin) | Father-in-law | 12/12/15 | $12,000.00 | |
| Shara Samiuddin Grob's Checking Account | Wells Fargo | 12/12/15 | $92.04 | |
| Shara Samiuddin Grob's Savings Account | Wells Fargo | 12/12/15 | $110.62 | |
| Charles and Shara Grob Joint Checking | Untiy National Bank | 12/9/15 | $4,915.12 | |
| Oakdale Resources LLC Business Checking | Unity National Bank | 12/12/15 | $487.28 | |
| Oakdale Resources LLC Business Checking* | Chase | | $0.00 | 12/5/14 |
| Charles and Shara Grob Joint Checking* | Chase | | $0.00 | 11/20/14 |
| Charles and Shara Grob Joint Checking* | USAA | | $0.00 | 9/24/14 |
| Charles Grob Checking* | USAA | | $0.00 | 9/24/14 |
| Charles Grob Savings* | USAA | | $0.00 | 9/24/14 |
| Charles Grob Credit Card* | USAA | | $0.00 | 9/24/14 |
| Roth IRA for Charles Grob | Waddell & Reed | 12/12/15 | $23,206.06 | |
| Brokerage Account for Charles Grob | Waddell & Reed | 12/12/15 | $0.00 | |
| Brokerage Account for Charles Grob | Scottrade | 12/12/15 | $5,664.89 | |
| PayPal Account for Charles Grob | PayPal | 12/12/15 | $695.27 | |
| Promissory note for 1.25% of Class C shares RF Identity | Multiple of Earnings | 12/12/15 | $0.00 | |
| 210 StaBit Inc. Shares | Multiple of Earnings | 12/12/15 | $0.00 | |
| 36,000,000 Chimera Energy Shares | CHMR | 12/12/15 | ? | |
| Inherited Family Jewlery | Self | 12/12/15 | $12,000.00 | |
| Furniture and Clothing | Self | 12/12/15 | $5,000.00 | |
| Firearms | Self | 12/12/15 | $1,200.00 | |
| Charles Grob's 2008 BMW 335i | Kelly Blue Book | 12/12/15 | $9,600.00 | |
| Shara Grob's 2002 Subaru Impreza | Kelly Blue Book | 12/12/15 | $2,779.00 | |
| | | | $245,949.14 | |
| * Closed by institution upon the filing of SEC Complaint | | | | |

Ex. 1